IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COUNTY OF SAN MIGUEL, COLORADO, et al.,

        Plaintiffs,

v.

MACDONALD, et al.,

        Defendants,

and

COLORADO CATTLEMEN'S ASSOCIATION,    Civ. No. 06-1946 (RBW)
8833 Ralston Rd.
Arvada, CO  80002-2239

PARTNERSHIP FOR THE WEST, and
350 Indiana Street, Suite 640
Golden, CO  80401

WESTERN CONSERVATION COALITION
1074 24 Road
Grand Junction, CO  81505

Intervenor-Applicants

**INTERVENOR-APPLICANTS COLORADO CATTLEMEN'S ASSOCIATION, PARTNERSHIP FOR THE WEST, AND WESTERN CONSERVATION COALITION'S MOTION FOR LEAVE TO INTERVENE AS DEFENDANTS**

Pursuant to Fed. R. Civ. P. 24(a) and Local Civil Rule 7(j), the Colorado Cattlemen's Association ("Cattlemen's"), the Partnership for the West ("Partnership") and the Western Conservation Coalition ("Western") collectively referred to herein as ("Intervenor- Applicants") hereby respectfully move this Court for leave to intervene as of right as Defendants in this case concerning Plaintiff's challenge to the Federal Defendant's finding that the Gunnison sage grouse does not warrant listing, nor candidate

status, under the Endangered Species Act.  In the alternative, Intervenor-Applicants move

for permissive intervention pursuant to Fed. R. Civ. P. 24(b).

Intervenor-Applicants have conferred with counsel for the Federal Defendants

and the Federal Defendants do not oppose this motion to intervene.  Plaintiffs' counsel

opposes this motion to intervene.

Grounds for this motion are as stated in the attached Memorandum of Points and

Authorities in support thereof and its exhibits.  This motion is filed concurrently with the

following documents:

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
INTERVENOR-APPLICANTS MOTION FOR LEAVE TO INTERVENE AS
DEFENDANTS;

[PROPOSED] ANSWER TO COMPLAINT;

[PROPOSED] ORDER GRANTING INTERVENTION;

EXHIBIT A: DECLARATION OF TERRY FANKHAUSER IN SUPPORT OF
INTERVENOR-APPLICANT COLORADO CATTLEMEN'S ASSOCIATION'S
MOTION TO INTERVENE AS A DEFENDANT;

EXHIBIT B: DECLARATION OF PAUL POISTER IN SUPPORT OF
INTERVENOR-APPLICANT PARTNERSHIP FOR THE WEST'S MOTION TO
INTERVENE AS A DEFENDANT;

EXHIBIT C: DECLARATION OF PAM PARIS IN SUPPORT OF
INTERVENOR-APPLICANT WESTERN CONSERVATION COALITION'S
MOTION TO INTERVENE AS A DEFENDANT;

CERTIFICATE REQUIRED BY LCvR 7.1 OF THE LOCAL RULES OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA;

 [PROPOSED] MOTION FOR KENT H. HOLSINGER TO APPEAR *PRO HAC
VICE*; DECLARATION OF KENT H. HOLSINGER IN SUPPORT OF [PROPOSED]
MOTION TO APPEAR *PRO HAC VICE*; AND [PROPOSED] ORDER ADMITTING
ATTORNEY *PRO HAC VICE*;

Submitted this 1st day of March, 2007.

/s/ Anurag Varma

_____

Anurag Varma
(D.C. Bar No. 471615)
CONLON FRANTZ PHELAN & VARMA LLP
1818 P Street, N.W. #400
Washington, D.C. 20036
Telephone: (202) 331-7050
Facsimile: (202) 331-9306
avarma@conlonfrantz.com

Kent H. Holsinger (*Pro Hac Vice* Applicant)
CO Bar No. 33907
HOLSINGER LAW, LLC
350 Indiana Street, Suite 640
Golden, CO  80401
Telephone:  (303) 577-4621
Facsimile:  (303) 496-1025
kent@holsingerlaw.com

*Attorneys for Intervenor-Applicants*
*Colorado Cattlemen's Association, Partnership for*
*the West and Western Conservation Coalition*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 1, 2007, I electronically filed the foregoing with the Clerk of the Court via the CM/ESF system, which will send notification of such to the attorneys of record.

Courtney Taylor                                                  Amy Atwood
courtney.taylor@usdoj.gov                          atwood@westernlaw.org




s/ Anurag Varma
_____
ANURAG VARMA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COUNTY OF SAN MIGUEL, COLORADO, et al., <br><br> Plaintiffs, <br> v. <br><br> MACDONALD, et al., <br><br> Defendants, <br><br> and <br><br> COLORADO CATTLEMEN'S ASSOCIATION, <br> 8833 Ralston Rd. <br> Arvada, CO 80002-2239 <br><br> PARTNERSHIP FOR THE WEST, and <br> 350 Indiana Street, Suite 640 <br> Golden, CO 80401 <br><br> WESTERN CONSERVATION COALITION <br> 1074 24 Road <br> Grand Junction, CO 81505 <br><br> Intervenor-Applicants | Civ. No. 06-1946 (RBW) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
INTERVENOR-APPLICANTS COLORADO CATTLEMEN'S ASSOCIATION,
PARTNERSHIP FOR THE WEST, AND WESTERN CONSERVATION
COALITION'S MOTION FOR LEAVE TO INTERVENE AS DEFENDANTS**

In this case, Plaintiffs challenge the U.S. Fish and Wildlife Service's ("FWS")
determination that listing of the Gunnison sage grouse under the Endangered Species Act
("ESA") 16 U.S.C. §§ 1531, *et seq.*. is not warranted.  71 Fed. Reg. 19954 (April 18,
2006).  Plaintiffs seek "new proposed and final listing and critical habitat determinations
for Gunnison sage grouse," and request that the Court order FWS to issue an emergency
rule immediately listing Gunnison sage grouse as endangered pursuant to Section 4(b)(7)
of the ESA.  Compl. at 24, ¶¶ D, E.

Civ. No. 06-1946

**PROPOSED INTERVENORS AND THEIR INTEREST IN THIS ACTION**

**Colorado Cattlemen's Association**

Colorado Cattlemen's Association ("Cattlemen's")[1] is a nonprofit trade organization representing the social, economic and educational interests of more than 12,000 beef producers throughout the State of Colorado. Declaration of Terry Fankhauser ("Fankhauser Decl.") ¶ 3. Founded in 1867, Cattlemen's mission is promoting and protecting Colorado's cattle industry. *Id.* Cattlemen's members are farmers and ranchers who are directly dependent upon farming and ranching for their income and as a way of life. *Id.* Many of the Cattlemen's members are families that have ranched the same private and public land for generations. *Id.*

Cattlemen's members pride themselves on good stewardship and care of their own private lands, as well as the federal lands upon which they rely to graze cattle. Fankhauser Decl. at ¶ 3. For generations, Cattlemen's members have raised hay and grazed cattle within the purported range of the Gunnison sage grouse. *Id.* The continued health and vibrancy of these public and private lands is critical to the livelihoods of Cattlemen's members. *Id.* Cattlemen's member families are on the ground throughout the purported range of the Gunnison sage grouse on a regular basis in connection with their livestock operations. As a result, they are knowledgeable about and care about the health of the range. *Id.* The stewardship of Cattlemen's members has also helped provide valuable wildlife habitat for the Gunnison sage grouse and other wildlife. *Id.*

---

[1] The Gunnison County Stockgrower's Association, Mesa County Cattlemen's Association, Delta County Livestock Association, Ouray County Cattlemen's Association, Uncompahgre Cattlemen's Association and San Luis Valley Cattlemen's Association, are member organizations of Cattlemen's. In the interest of efficiency, such organizations do not seek intervention in their own right, but do support Cattlemen's intervention and involvement in this case.

Many of Cattlemen's members appreciate Gunnison sage grouse and have observed them first-hand over the course of many years. *Id.*

Cattlemen's members are in the business of producing cattle and hay from private lands and grazing cattle on public lands. The region's agricultural industry under normal conditions is an industry with low margins of profit. *Id.* A listing of the Gunnison sage grouse under the ESA would negatively impact Cattlemen's members by imposing restrictions on the use of their own land, their water supplies for irrigation, as well as the public lands upon which they depend for seasonal pasture. Fankhauser Decl. ¶ 4.

Compliance with the requirements of the ESA would very likely cause the federal land management agencies to reduce the number of cattle that they will permit to graze upon the national forests or federal lands or the amount of time that the cattle may graze. Fankhauser Decl. ¶ 4. Moreover, ESA compliance may restrict the ability to use water rights held by Cattlemen's members that originate on federal lands. *Id.* Thus, listing will reduce profitability and further lower profit margins and, ultimately, the financial viability of Cattlemen's members. *Id.* at ¶ 5.

Cattlemen's focuses in part on the environmental and economic issues surrounding the ESA. *Id.* at ¶ 7. Cattlemen's believe reasonable alternatives exist that satisfy the needs of the species without impacting land use and the rights of Cattlemen's members. *Id.* at ¶ 8. In fact, Cattlemen's is working to promote wildlife conservation and support legislation to amend the ESA in a way that emphasizes species protection and recovery compatible with private property rights and the use of incentives for landowners to voluntarily conserve species and habitat. *Id.* at ¶ 7.

Cattlemen's members voluntarily participate in local Gunnison sage grouse working groups, the Gunnison County Sage Grouse Conservation Committee, and other efforts which would likely be jeopardized if a listing occurs. *Id.* at ¶ 8. In addition, many of Cattlemen's members have entered into Candidate Conservation Agreements with Assurances ("CCAAs") with the Colorado Division of Wildlife to preserve Gunnison sage grouse and their habitat on private lands. Many of Cattlemen's members have also encumbered thousands of acres of their private lands with conservation easements to benefit Gunnison sage grouse in perpetuity. *Id.*

As demonstrated above, listing the Gunnison sage grouse would have a very significant impact on Cattlemen's members ability to continue to raise cattle and hay on their own lands as well as the public lands they graze, as they have done for generations.

**Partnership for the West**

The Partnership for the West ("Partnership") is a nonprofit organization comprised of an alliance of people and organizations who support public policies that seek to restore a common sense balance between economic growth and environmental conservation. Declaration of Paul Poister ("Poister Decl.") ¶ 3. With offices in Golden, Colorado and Washington, D.C., the Partnership has a broad membership with more than 600 companies, associations, coalitions and individuals who collectively employ or represent more than one million citizens across the West in the following sectors: farming and ranching, coal, timber and wood products, small businesses, utilities, hard rock mining, oil and gas, construction, manufacturing, property rights advocates, education proponents, recreational access advocates, sportsmen and hunters, multiple use advocates, county government advocates, grassroots advocates and others. *Id.* The

Partnership is governed by a Board of Trustees comprised of representatives from these various sectors.  *Id.*  The Partnership's members provide valuable domestic resources and energy to the nation and the West.  *Id.*

For example, the Partnership's members operate mining, oil and gas, utility, agricultural and timber harvesting operations on public lands throughout the purported range of the Gunnison sage grouse and rely upon existing, and new, federal permits, SUPs and other authorizations to do so.  *Id.*  Because the federal government manages 36 percent of Colorado's surface lands and over 41 percent of the mineral estate, the impacts of a listing will have far-reaching consequences to the Partnership's members.[2]  Section 7 consultation requirements will likely lead to jeopardy determinations, in turn, leading to lengthy delays in processing permits, SUPs and authorizations, as well as costly mitigation measures that impede the ability of the Partnership's members to conduct their businesses.  *See* 16 U.S.C. § 1536(a)(2); Poister Decl. ¶ 6.  For example, the Partnership's members could be forced to retain outside experts such as biologists and attorneys, divert existing staff from other tasks, or leave work crews idle while consultations occur.  *Id.*

As evidenced in part by the Partnership's efforts to promote voluntary conservation efforts for the greater sage grouse, rather than a listing under the ESA, the Partnership's priorities include promoting wildlife conservation and legislation to amend the ESA in ways that protect private property and recover species.  *Id.* at ¶ 5.  A listing of the Gunnison sage grouse as threatened or endangered under the ESA would harm the Partnership by impairing existing conservation efforts, in which some of the Partnership's members are participants.  Poister Decl. ¶ 5.  The ESA creates disincentives to

---

2 Available at http://www.co.blm.gov/mines/minerals.htm.

landowners and industry and often restricts the ability to manage for species. *See* Amara Brook, Michaela Zint, Raymond De Young, *Landowners' Responses to Endangered Species Act Listing and Implications for Encouraging Conservation*. Listings create ". . . a complex maze of processes and procedures, which field biologists and managers must attempt to negotiate on a daily basis in order to implement on-the-ground projects." Forest Service and BLM, *Improving the Efficiency and Effectiveness of the Endangered Species Act*, (Dec.15, 2003). The ESA has been said to inhibit recovery of the peregrine falcon. (Burnham and Cade 2003b). Such would be the case for the Gunnison sage grouse as well. For example, local working groups for the Gunnison sage grouse would likely lose crucial landowner support if Plaintiffs prevail in this case. Poister Decl. ¶ 5. And landowners may start managing their own lands to avoid the presence of Gunnison sage grouse. *Id.*

An emergency listing, or even reversal of the FWS's not-warranted determination, as Plaintiffs' seek, would increase regulatory restrictions on agriculture, oil and gas production, utilities, mining, timber harvests, recreation and access to federal lands, which would have dramatic and negative impacts on the Partnership's members. Poister Decl. ¶ 6. Consultations with the FWS over needed permits will result in significant delays in processing permits to conduct business on private or public land, which, in turn, results in financial hardship on the Partnership's members. *Id.* For example, the operations of the Partnership's members may not be able to proceed until consultation with the FWS occurs, thereby resulting in a loss of economic revenue and productivity. Listing would also require amending federal management plans in ways that would

restrict access to federal lands and further impair the ability of the Partnership's members to conduct their businesses. *Id.*

**Western Conservation Coalition**

The Western Conservation Coalition ("Western") is a nonprofit organization dedicated to local and state wildlife conservation efforts while maintaining the highest scientific standards, private property rights, agriculture and a strong economy. Declaration of Pam Paris ("Paris Decl.") ¶ 3. Western supports local and state conservation efforts, rather than a federal listing under the ESA, for the Gunnison sage grouse.

Western's members are landowners, realtors, agricultural producers, trade organizations, contractors and other businesses in the southwestern Colorado range of the Gunnison sage grouse, some of which actively participate in local efforts to conserve the Gunnison sage grouse such as the Gunnison County Sage Grouse Conservation Committee. *Id.* at ¶ 4. Western's members rely upon use of their own private lands free of the restrictions of the ESA. *Id.* An emergency listing, or even reversal of the FWS's not-warranted determination, as Plaintiffs' seek, would subject Western's members to regulatory requirements under the ESA.

Plaintiffs' cite impacts to riparian areas and road construction as potential threats to the Gunnison sage grouse. Compl. at 12, ¶ 32. Members of Western engaged in the construction business, as well as other members that must construct, or reconstruct roads, bridges or other improvements, must obtain permits from the U.S. Army Corps of Engineers pursuant to 33 U.S.C. § 1344 where the discharge of dredged and fill material is involved. *Id.* at ¶ 5. Should the Gunnison sage grouse be listed under the ESA,

required section 7 consultations with the FWS will result in additional regulatory burdens, significant delays and financial hardship to Western's members. *Id.* For example, such consultations could delay construction projects initiated in the brief summer to the winter months, resulting in additional costs for snow removal, excavation and weather delays. Paris Decl. ¶ 4. Furthermore, the FWS could compel the federal regulatory agency to impose additional requirements, and thereby additional expenses on Western's members. *Id.*

Western has previously communicated its views against listing the Gunnison sage grouse to local, state and federal officials. *Id.* at ¶ 7. For example, Western compiled and submitted extensive comments to the FWS on the Gunnison sage grouse and commissioned an independent scientific review of whether Gunnison sage grouse should be classified separately from other sage grouse. *Id.*

### Intervenor-Applicants Have a Strong Interest in the Gunnison Sage Grouse and its Status under the ESA

Intervenor-Applicants have an interest in participating in government decision making concerning the protection of listed species, including involvement in consequential actions of federal and state agencies responsible for enforcing mitigation measures associated with land use. *See* Fankhauser Decl. ¶ 6; Poister Decl. ¶ 7; Paris Decl. ¶ 5.

Intervenor-Applicants are working to promote wildlife conservation and support legislation to amend the ESA in a way that emphasizes species protection and recovery compatible with private property rights and the use of incentives for landowners to voluntarily conserve species and habitat. *See* Fankhauser Decl. ¶ 7; Poister Decl. ¶ 5; and Paris Decl. ¶ 3.

Plaintiffs' seek an emergency listing of the Gunnison sage grouse. Compl. at 24, ¶¶ D, E. Such action would clearly impact the Intervenor-Applicants. The Forest Service and BLM, the federal agencies responsible for managing the public lands upon which Intervenor-Applicants hold permits, licenses and other authorizations,3 will be required to 1) carry out programs for the conservation of the species and 2) consult with the FWS to ensure that actions "authorized funded or carried out" by those agencies do not jeopardize the continued existence of any endangered or threatened species or result in destruction or adverse modification of any habitat the Secretary may determine to be critical. 16 U.S.C. § 1536. Listing of the Gunnison Sage Grouse as endangered or threatened will also require that the activities of Intervenor-Applicants do not impact the Gunnison sage grouse or its habitat on private or public lands pursuant to section 9 of the ESA. *See* 16 U.S.C. § 1538(a).

Even if the Court remanded the not-warranted decision to the FWS, Intervenor-Applicants would be forced to divert their time, efforts and resources away from their businesses (as well as substantial conservation efforts for the Gunnison sage grouse) to yet another lengthy administrative process that has already been undertaken once before. *See* Fankhauser Decl. ¶ 9; Poister Decl. ¶ 8; and Paris Decl. ¶ 8. Moreover, a listing, or even reversal of the FWS's not-warranted determination, may reinitiate consultation with the FWS on existing permits, SUPs or authorizations held by Intervenor-Applicants causing great regulatory uncertainty and financial impacts to Intervenor-Applicants. *See* 50 C.F.R. § 402.16; Fankhauser Decl. ¶ 4; Poister Decl. ¶ 6; Paris Decl. ¶ 4. Finally, Intervenor-Applicants may be subject to civil penalties of up to $25,000 per occurrence,

3 Fankhauser Decl. ¶ 4; Poister Decl. ¶ 4; Paris Decl. ¶ 4.

criminal fines up to $100,000 and up to one year in jail for any violations of the ESA. 16 U.S.C. §§ 1540(a) and (b).

## ARGUMENT

## I

### THE INTERVENOR-APPLICANTS SATISFY RULE 24(a) AND SHOULD BE GRANTED INTERVENTION AS OF RIGHT

Intervenor-Applicants seek to intervene as of right as a Defendants. Fed. R. Civ. P. Rule 24(a)(2) provides as follows:

> Upon timely application anyone shall be permitted to intervene in an action . . . when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

The U.S. Court of Appeals for the District of Columbia ("D.C. Circuit") uses the following four-part test to evaluate motions to intervene as of right: "(1) the application to intervene must be timely; (2) the applicant must demonstrate a legally protected interest in the action; (3) the action must threaten to impair that interest; and (4) no party to the action can be an adequate representative of the applicant's interests." *SEC v. Prudential Sec., Inc.*, 136 F.3d 153, 156 (D.C. Cir. 1998). *See also Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1074 (D.C. Cir. 1998). In assessing these factors, it is relevant that the D.C. Circuit takes "a liberal application in favor of permitting intervention" under Rule 24(a). *Nuesse v. Camp*, 385 F.2d 694, 702 (D.C. Cir. 1967); *Wilderness Soc'y v. Babbitt*, 104 F. Supp.2d 10, 18 (D.D.C. 2000).

**A.  Intervenor-Applicants- Possess Legally Protected Interests in this Action**

Plaintiffs describe the historic range of Gunnison sage grouse as southwestern Colorado, eastern Utah and portions of several other states.  Compl. at 11, ¶ 27. Gunnison sage grouse rely on, and reside in, sagebrush habitat.  *See* Compl. at 12 ¶ 29. Plaintiffs cite, among other things, activities such as urban development, road and utility corridors, fences, energy development, livestock grazing, fire suppression, off-road vehicles, as well as alterations and impacts to riparian areas as threats to Gunnison sage grouse.  Compl. at 12, ¶ 32.  Such activities are commonplace throughout the purported range of the Gunnison sage grouse.  And, as previously stated, Intervenor-Applicants are engaged in many of these activities in the range of the Gunnison sage grouse. Fankhauser Decl. ¶ 4; Poister Decl. ¶ 4; Paris Decl. ¶ 4.  Indeed, Intervenor-Applicants hold permits, SUPs and other authorizations for many of these activities in the range of the Gunnison sage grouse.  *Id.*

When assessing the interest requirement of Rule 24(a), the D.C. Circuit has adopted a liberal approach, looking to the "policies behind the 'interest' requirement" in the rule, and viewing the rule as a "practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Nuesse v. Camp*, 385 F.2d at 700; *see also Foster v. Gueory*, 655 F.2d 1319, 1324 (D.C. Cir. 1981) (quoting *Nuesse*).  Moreover, ". . . the interest of justice is best served when all parties with a real stake in a controversy are afforded an opportunity to be heard." *Hodgson v. United Mine Workers of Am.*, 473 F.2d 118, 130 (D.C. Cir. 1972).

As previously discussed, Intervenor-Applicants have an interest in the subject matter of this case because listing or reversal of the FWS's determination, would subject

them to the requirements of the ESA including section 7 consultations with the FWS, reinitiation of consultation, potential denial of permit renewals, significant delays in the conduct of their businesses and financial hardship. Even candidate status would cast doubt on Intervenor-Applicants continued ability to work within the range of the Gunnison sage grouse. Intervenor-Applicants have a strong interest in how the issue of impacts to the Gunnison sage grouse is resolved, as well as the adequacy of substantial current local, state and conservation measures being taken related to the Gunnison sage grouse. Fankhauser Decl. ¶ 6; Poister Decl. ¶ 7; Paris Decl. ¶ 6. Intervenor-Applicants ability to protect their interests will be impaired if the determination is withdrawn and/or if listing is ordered, and if they are not able to put forth their arguments in regards to alleged threats to the Gunnison sage grouse and current conservation efforts in which Intervenor-Applicants are active participants. *Id.*

Intervenor-Applicants represent thousands of individuals, landowners, businesses and stakeholders that live and work within areas that are located in the range of the Gunnison sage grouse. *See* Fankhauser Decl. ¶ 3; Poister Decl. ¶3; Paris Decl. ¶ 4. Plaintiffs' seek an emergency listing as well as reversal of the FWS's not-warranted determination. Compl. at 24, ¶¶ D, E. This threatens Intervenor-Applicants' interest in the proper application of the ESA, as well as their ability to conduct business on private and public lands within the range of the Gunnison sage grouse.

The predecessors of Cattlemen's current members have grazed on public lands within the purported range of the Gunnison sage grouse before Colorado was admitted to the Union. Fankhauser Decl. ¶ 3. Their interest in raising cattle and hay free from the

restrictions of the ESA on their private lands, as well as retaining their grazing permits, SUPs and other authorizations, in their current form are clearly protected interests.

Similarly, the Partnership's members hold permits, SUPs and other authorizations for conducting oil and gas, mining, utilities, timber harvesting and other activities on the public lands.   Poister Decl. ¶ 4. The Partnership's members also have significant economic interests in public and private lands in the form of infrastructure, time and resources, which would all be affected by overturning the FWS's listing decision.  *Id.*

Western's members have an interest in managing their private lands free of the restrictions of the ESA.  Paris Decl. ¶ 4.  Western also has an interest in supporting the facts it submitted as part of the process which resulted in the not-warranted decision on the Gunnison sage grouse.

Intervenor-Applicants, then, are under the zone of interests in *Bennett v. Spear*, 520 U.S. 154 (1997).

**B.  Disposition of this Case may Impair the Intervenors-Defendants' Interests**

Rule 24(a)'s "impairment" requirement directly relates to whether denial of intervention will impede Intervenor-Applicants' ability to protect their interests in the subject of the action. The Advisory Committee Notes for the 1966 amendments to Rule 24(a) explain, "[i]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene."

Here, there can be no question that the disposition of Plaintiffs' claims has the potential to impair the Intervenor-Applicants' interests.  Such interests will be directly and adversely affected by the relief Plaintiffs seek: an emergency listing the Gunnison sage grouse as "endangered" under the ESA and/or reversal and remand of the FWS's

not-warranted determination for further proceedings. As discussed herein, Intervenor-Applicants operate their businesses with the range of the Gunnison sage grouse, and require permits, SUPs and other authorizations from federal agencies such as the BLM and Forest Service for their livelihood. A listing would impose section 7 consultation and section 9 take prohibitions on Intervenor-Applicants. 16 U.S.C. §§ 1536(a)(2), 1538(a). A listing, or even reversal of the FWS's determination, could also reinitiate consultation on existing permits, SUPs and other authorizations held by Intervenor-Applicants. 50 C.F.R. § 402.16. Their operations on federal land also require compliance with federal management plans and the use of their own private lands unimpeded by the restrictions of an ESA listing. Western has previously communicated its views on Gunnison sage grouse to local, state and federal officials. Paris Decl. ¶ 7. In addition, Western compiled and submitted extensive comments to the FWS and commissioned an independent scientific review of whether Gunnison sage grouse should be classified separately from other sage grouse. *Id.* Finally, Intervenor-Applicants could be subject to civil and criminal penalties under the ESA for violations of the provisions listed herein. 16 U.S.C. §§ 1540(a) and (b).

Intervenor-Applicants have standing as associations to bring this action because: 1) its members have standing to sue in their own right; 2) the interests at stake are germane to the organizations' purpose; and 3) neither the claim asserted nor the relief requested requires its members to participate directly in the lawsuit. *See Hunt v. Wash. State Apple Adv. Comm'n*, 432 U.S. 333, 343 (1997); *Smuck v. Hobson*, 408 F.2d 175, 179 (D.C. Cir. 1969) (en banc) ("[I]n the context of intervention the question is not whether a lawsuit should be begun, but whether already initiated litigation should be

extended to include additional parties.").  As the Rule's plain text indicates, intervenors of right need only an ''interest'' in the litigation—not a ''cause of action'' or ''permission to sue.''  *See* Fed. R. Civ. P. 24(a)(2).

The potential listing of the Gunnison sage grouse is clearly germane to the purposes of organizations like the Cattlemen's, the Partnership and Western, which are dedicated to:  promoting and protecting the interests of the livestock industry in Colorado; promoting a common sense balance between economic growth and environmental conservation; and promoting local and state conservation efforts, consistent with property rights and strong economy.  *See* Fankhauser Decl. ¶ 3; Poister Decl. ¶ 3 and Paris Decl. ¶¶ 3, 4.

As discussed herein, Intervenor-Applicants will suffer concrete, particularized, actual, and imminent harm if Plaintiffs' lawsuit were to succeed.  Intervenor-Applicants' are capable of litigating this case without member participation.  Accordingly, Intervenor-Applicants satisfy the elements for standing as associations.

## C.  Existing Parties Do Not Adequately Represent Intervenors-Defendants' Interests

Intervenor-Applicants interests will not be adequately represented in the absence of intervention.  The Supreme Court has stated, the "inadequate representation" requirement of Rule 24(a) "is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n. 10 and acc. text (1972) (citation omitted). Representation, then, may be inadequate where the interests of the Intervenors-Defendants and those of the existing party are "different," even if they are not "wholly 'adverse,'" *Nuesse*, 385 F.2d at 703, or where they are "similar but not

identical." *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1293 (D.C. Cir. 1980). And the burden is on those opposing intervention to demonstrate representation is adequate. *Alexander v. FBI*, 186 F.R.D. 21, 31 (D.D.C. 1998) (quoting *Am. Tel. & Tel.*, 642 F.2d at 1293). The standard is met here.

The Plaintiffs interests diverge from those of Intervenor-Applicants. Plaintiffs seek an emergency listing of the Gunnison sage grouse under the ESA. Compl. at 24 ¶ E. Plaintiffs' also seek reversal of the FWS's not-warranted determination. Compl. at 24 ¶ D. As previously discussed, such is clearly divergent from the interests of Intervenor-Applicants.

The Federal Defendants are responsible for enforcing and administering the ESA. They have no statutory authority for fostering livestock grazing, privately-held water rights, timber harvesting, utilities, energy development, road construction or housing development, and cannot be expected to effectively represent these interests. The primary interest of FWS is protection and conservation of the species. Intervenor-Applicants interests are in pursuing their economic livelihoods on private and public lands. In addition, Intervenor-Applicants take different views than the FWS on what activities may impact the Gunnison sage grouse or its habitat, and how. *See* Fankhauser Decl. ¶ 6; Poister Decl. ¶ 7; Paris Decl. ¶ 6. Therefore, Applicants' interests are not adequately represented by the Federal Defendants. *Georgia v. U.S. Army Corps of Engineers*, 302 F.2d 1242, 1259 (11th Cir.2002) (while power association and federal defendant's both took the position that water withdrawals from reservoir should not be increased, the federal defendant's primary interest was management of a resource whereas the association's interest was economic); Wright, Miller & Kane, 7C Fed. Prac.

& Proc. Civ.2d § 1909.   Accordingly, none of the parties to the litigation adequately represent the interests of Intervenor-Applicants.

Finally, Intervenor-Applicants have special knowledge and information related to the agriculture, energy development, mining, timber harvesting, water rights and irrigation, utilities, construction and recreation, as well as the Gunnison sage grouse, which may assist the Court in this case.  *See* Fankhauser Decl. ¶¶ 6, 8; Poister Decl. ¶¶ 4, 5; Paris Decl. ¶ 7.

### D.  The Defendants–Intervenors' Motion to Intervene is Timely

Intervenor-Applicants' application for intervention is timely.   Timeliness is determined by examining all the circumstances of a case. *S. Christian Leadership Conf. v. Kelley*, 747 F.2d 777, 779 (D.C. Cir. 1984).   The Federal Defendants answered on January 30, 2007, less than four weeks ago.   Moreover, the administrative record has not yet been designated and no briefing schedule has yet been set.   Intervenor-Applicants' motion, then, is timely. *See, e.g.*, Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 1916 (1986); *Admiral Ins. Co. v. Nat'l Cas. Co.*, 137 F.R.D. 176, 177 (D.D.C. 1991) (holding a motion to intervene timely where "[t]he major substantive issues . . . have not yet been argued or resolved, and the movants filed their motions promptly."). Granting Intervenor-Applicants leave to intervene in this matter will not cause prejudice to any party, nor will it delay the proceedings.   In addition, Intervenor-Applicants will comply with all scheduling orders established by the Court for intervenor participation in this action.

Intervenor-Applicants, then, are entitled to intervention as a matter of right under Fed. R. Civ. P. 24(a) because (a) its motion is timely, and Intervenors-Defendants have a (b)  significantly protectable interest in the subject matter of the case, (c) which will be

impaired absent intervention and (d) is not adequately represented by the existing parties in this case.

## II

### INTERVENOR-APPLICANTS SATISFY THE STANDARD FOR PERMISSIVE INTERVENTION

In the alternative, Intervenor-Applicants should be granted intervention on a permissive basis under Fed. R. Civ. P. 24(b) because the Intervenor-Applicants raise common issues of law and fact, and intervention will not unduly delay the proceedings or prejudice the original parties.  Rule 24(b)(2) provides:

> Upon timely application anyone may be permitted to intervene in an action . . . when an applicant's claim or defense and the main action have a question of law or fact in common. . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

The D.C. Circuit has stated that permissive intervention may be granted in the court's discretion if the proposed Intervenor presents "(1) an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action." *EEOC v. Nat'l Children's Intervenors-Defendants, Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998). Like intervention of right, permissive intervention is to be granted liberally.  *Id.* at 1045 ("flexible interpretations" of rule appropriate in favor of intervention); *Nuesse*, 385 F.2d at 704-06 (D.C. Circuit favors liberal allowance of permissive intervention).

The Intervenor-Applicants readily meet all of these requirements. As discussed above in the context of intervention as of right, the Intervenor-Applicants' application is timely and existing parties will not be prejudiced.

Counsel for Intervenor-Applicants has contacted counsel for the parties to this case.  Intervention is unopposed by the Federal Defendants, but Plaintiffs have expressed

their intention to oppose intervention.  Declaration of Kent H. Holsinger in Support of

Intervenor-Applicants Motion to Intervene as Defendants ¶¶ 2,3.

## CONCLUSION

For the reasons set forth above, the Intervenor-Applicants respectfully requests

that this Court grant its motion to intervene as of right or, in the alternative, permissive

intervention.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COUNTY OF SAN MIGUEL, COLORADO, et al.,

      Plaintiffs,

v.

MACDONALD, et al.,

      Defendants,

and

COLORADO CATTLEMEN'S ASSOCIATION,      Civ. No. 06-1946 (RBW)
8833 Ralston Rd.
Arvada, CO  80002-2239

PARTNERSHIP FOR THE WEST, and
350 Indiana Street, Suite 640
Golden, CO  80401

WESTERN CONSERVATION COALITION
1074 24 Road
Grand Junction, CO  81505

Defendants-Intervenors-Applicants

**DECLARATION OF TERRY FANKHAUSER IN SUPPORT OF MOTION TO INTERVENE OF COLORADO CATTLEMEN'S ASSOCIATION**

      I, Terry Fankhauser, declare under penalty of perjury that the following is true and correct:

      1.  I am a citizen of the United States, over the age of eighteen (18) years of age, and make this Declaration based upon personal knowledge.

      2.  I am the Executive Vice President of the Colorado Cattlemen's Association ("Cattlemen's").

3.  Cattlemen's is a nonprofit trade organization representing the social, economic and educational interests of more than 12,000 beef producers throughout the State of Colorado.  Founded in 1867 (prior to Colorado's admittance to the Union) Cattlemen's mission is to promote the interests of Colorado's beef industry and protect Colorado's land, water and forage resources.  Cattlemen's members are farmers and ranchers who are directly dependent upon farming and ranching as a way of life.  Many of Cattlemen's member families that have ranched the same private and public land for generation.  Cattlemen's members pride themselves on good stewardship and care of their own private lands, as well as the federal public lands upon which they rely to graze cattle.  Cattlemen's members rely upon the use of their own private lands, as well as the public lands, free of the restrictions of the ESA.  For generations, Cattlemen's members have raised hay and cattle within the purported range of the Gunnison sage grouse.  The continued health and vibrancy of these public and private lands is critical to the livelihoods of Cattlemen's members.  The stewardship of Cattlemen's members has also helped provide valuable wildlife habitat for the Gunnison sage grouse and other wildlife.  Many of Cattlemen's members appreciate Gunnison sage grouse and have observed them first-hand over the course of many years.

4.  Cattlemen's member families depend on the ability to use Colorado's natural resources, including water resources and federally-managed lands.  Member families also depend on the ability to access and use federally-managed lands and water resources which come from those areas.  For example, many of Cattlemen's members rely upon water rights that originate on federal lands to irrigate their private hay meadows and pastures.  The ditches, reservoirs and other facilities required to transport their water

require Special Use Permits ("SUPs") or other authorizations from the federal agencies that manage the surrounding public land. Members of Cattlemen's ranch throughout the southwestern Colorado range of the Gunnison sage grouse and require federal grazing permits, SUPs or other authoriztions from federal agencies, such as the Bureau of Land Management ("BLM") and U.S. Forest Service. Their operations also require compliance with federal management plans. A federal listing of the Gunnison sage grouse, or reversal of the not-warranted determination, could alter permits, SUPs and management plans to the severe detriment to Cattlemen's members. For example, the U.S. Fish and Wildlife Service ("FWS") would likely restrict in time and numbers the ability to graze livestock on federal land, resulting in financial hardship to Cattlemen's members. In addition, the ability of Cattlemen's members to continue to irrigate their private hay meadows and pastures could be limited as a result of a listing, or reversal of the FWS's decision.

5. The region's agricultural industry under normal conditions is an industry with low margins of profit. The Gunnison sage grouse listing that Plaintiffs seek will increase regulatory requirements which, in turn, will increase production costs and affect the viability of Cattlemen's members. Even candidate status under the Endangered Species Act ("ESA") would cast doubt on Cattlemen's continued ability to work and recreate within the purported range of the Gunnison sage grouse in southwestern Colorado.

6. Cattlemen's have an interest in participating in government decision making concerning the protection of listed species, including involvement in consequential actions of federal and state agencies responsible for enforcing mitigation measures associated with land and water use. Cattlemen's have an interest in how the issue of

Civ. No. 06-1946 (RBW)                                                    3
Fankhauser Declaration

impacts to the Gunnison sage grouse is resolved, as well as the adequacy of current local, state and federal conservation measures for Gunnison sage grouse. Cattlemen's ability to protect their interests will be impaired if the determination is withdrawn and listing is ordered, and if it is not able to put forth its arguments regarding it's activities and existing conservation efforts in which Cattlemen's are active participants.

7.    Cattlemen's focuses in part on the environmental and economic issues surrounding the ESA. Cattlemen's are working to promote wildlife conservation and modernize the ESA in a way that emphasizes species protection and recovery compatible with private property rights and the use of incentives for landowners to voluntarily conserve species and habitat.

8.    Cattlemen's believe reasonable alternatives exist that satisfy the needs of species without impacting land use and the rights of Cattlemen's members. In fact, Cattlemen's members participate in local Gunnison sage grouse working groups, the Gunnison County Sage Grouse Conservation Committee, and other efforts which would likely be jeopardized if a listing occurs. Many of Cattlemen's members have also entered into Candidate Conservation Agreements with Assurances ("CCAAs") for the benefit of the Gunnison sage grouse and encumbered their lands with conservation easements.

9.    Should Plaintiffs' succeed in requiring the U.S. Fish and Wildlife Service ("FWS") to propose listing, Cattlemen's members would be forced to divert their time, efforts and resources away from ranching (as well as meaningful conservation efforts for the Gunnison sage grouse) to yet another lengthy administrative process that has already been undertaken once before.

10. The Gunnison County Stockgrower's Association, Mesa County Cattlemen's Association, Delta County Livestock Association, Ouray County Cattlemen's Association, Uncompahgre Cattlemen's Association and San Luis Valley Cattlemen's Association, are member organizations of Cattlemen's. In the interest of efficiency, such organizations do not seek intervention in their own right, but do support Cattlemen's intervention and involvement in this case.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 27th day of February, 2007.

/s Terry Fankhauser

_____

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COUNTY OF SAN MIGUEL, COLORADO, et al.,

       Plaintiffs,

v.

MACDONALD, et al.,

       Defendants,

and

COLORADO CATTLEMEN'S ASSOCIATION,    Civ. No. 06-1946 (RBW)
8833 Ralston Rd.
Arvada, CO  80002-2239

PARTNERSHIP FOR THE WEST, and
350 Indiana Street, Suite 640
Golden, CO  80401

WESTERN CONSERVATION COALITION
1074 24 Road
Grand Junction, CO  81505

Defendants-Intervenors-Applicants.

**DECLARATION OF PAUL POISTER IN SUPPORT OF MOTION TO
INTERVENE OF THE PARTNERSHIP FOR THE WEST**

     I, Paul Poister, declare under penalty of perjury that the following is true and correct:

     1.  I am a citizen of the United States, over the age of eighteen (18) years of age, and make this Declaration based upon personal knowledge.

     2.  I am the Executive Director of the Partnership for the West ("Partnership").  I have held that position since December, 2006.

3.  The Partnership for the West ("Partnership") is a nonprofit organization comprised of an alliance of people who support public policies that seek to restore a common sense balance between economic growth and environmental conservation.  With offices in Golden, Colorado and Washington, D.C., the Partnership has a broad membership with more than 600 companies, associations, coalitions and individuals who collectively employ or represent more than one million citizens across America in the following sectors:  farming and ranching, coal, timber and wood products, small businesses, utilities, hard rock mining, oil and gas, construction, manufacturing, property rights advocates, education proponents, recreational access advocates, sportsmen and hunters, multiple use advocates, county government advocates, grassroots advocates and others.  The Partnership is governed by a Board of Trustees comprised of representatives from various sectors listed above.  The Partnership's members provide valuable domestic resources and energy to the nation.

4.  Many of the Partnership's members hold existing, and require new, federal permits, SUPs and authorizations from federal agencies that manage land and mineral resources throughout the range of the Gunnison sage grouse.  Many of the Partnership's members have substantial investments in the form of infrastructure, time and resources necessary to conduct their businesses on public lands throughout the range of the Gunnison sage grouse.  Similarly, many of it's members must comply with federal management plans.

5.  As evidenced in part by the Partnership's efforts to prevent the listing of the greater sage grouse under the Endangered Species Act ("ESA"), the Partnership's priorities include promoting wildlife conservation and modernizing the ESA in ways that

protect private property and recover species.  A listing of the Gunnison sage grouse under the ESA would negatively impact the Partnership by impairing existing conservation efforts, of which the Partnership's members are a part.  The ESA creates disincentives to landowners and often restricts the ability to manage for species.  *See* Amara Brook, Michaela Zint, Raymond De Young, *Landowners' Responses to Endangered Species Act Listing and Implications for Encouraging Conservation*, attached as **Exhibit A.**  Listings under the ESA create ". . . a complex maze of processes and procedures, which field biologists and managers must attempt to negotiate on a daily basis in order to implement on-the-ground projects."  USFS and BLM, *Improving the Efficiency and Effectiveness of the Endangered Species Act*, (Dec.15, 2003).  The ESA has been said to inhibit recovery of the peregrine falcon.  (Burnham and Cade 2003b).  Such would be the case here too.  Local working groups for the Gunnison sage grouse would likely lose crucial landowner support, and landowners may start managing their own lands to avoid the presence of Gunnison sage grouse.

     6.    A listing, as Plaintiffs' seek, would increase regulatory restrictions on agriculture, oil and gas, utilities, mining, timber harvests, recreation and other activities on federal lands, which would have dramatic and negative impacts on the Partnership's members.  Section 7 consultations with the U.S. Fish and Wildlife Service ("FWS") on federal permits, SUPs and other authorizations needed to conduct these activities will result in delays, additional terms and conditions, and financial hardship to the Partnership's members.  For example, the Partnership's members could be forced to retain outside experts such as biologists and attorneys, divert existing staff from other tasks, or leave work crews idle while consultations occur.  Listing would also require

amending federal management plans in ways that would restrict access to federal lands and thereby impair the ability of the Partnership's members to recreate and conduct their businesses. Finally, listing the Gunnison sage grouse, or even reversal of the FWS's not-warranted determination, may reinitiate consultation on existing permits, SUPs or other authorizations held by the Parternship's members, causing great regulatory uncertainty and hardship.

7. The Partnership has an interest in participating in government decision making concerning the protection of listed species, including involvement in consequential actions of federal and state agencies responsible for enforcing mitigation measures associated with land use. The Partnership also has an interest in how the issue of impacts to the Gunnison sage grouse is resolved, as well as the adequacy of current local, state and conservation measures for the Gunnison sage grouse. The Partnership's ability to protect it's interests will be impaired if the determination is withdrawn and listing is ordered, and if it is not able to put forth its arguments regarding the potential effects of activities on Gunnison sage grouse as well as current conservation efforts.

8. Should Plaintiffs' succeed in reversal of the FWS's not-warranted determination, the Partnership's members would be forced to divert their time, efforts and resources away from their businesses to yet another lengthy administrative process that has already been undertaken once before.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 27th day of February, 2007.

/s Paul Poister

_____

Civ. No. 06-1946 (RBW)                                                          4
Poister Declaration

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COUNTY OF SAN MIGUEL, COLORADO, et al.,

      Plaintiffs,

v.

MACDONALD, et al.,

      Defendants,

and

COLORADO CATTLEMEN'S ASSOCIATION,      Civ. No. 06-1946 (RBW)
8833 Ralston Rd.
Arvada, CO  80002-2239

PARTNERSHIP FOR THE WEST, and
350 Indiana Street, Suite 640
Golden, CO  80401

WESTERN CONSERVATION COALITION
1074 24 Road
Grand Junction, CO  81505

Defendant-Intervenors-Applicants

## DECLARATION OF PAM PARIS IN SUPPORT OF MOTION TO INTERVENE OF THE WESTERN CONSERVATION COALITION

I, Pam Paris, declare under penalty of perjury that the following is true and correct:

1.  I am a citizen of the United States, over the age of eighteen (18) years of age, and make this Declaration based upon personal knowledge.

2.  I am the Executive Director of the Western Conservation Coalition ("Western").  I have held that position since June, 2005.

3.  The Western Conservation Coalition ("Western") is a nonprofit organization dedicated to wildlife conservation through local and state conservation efforts while maintaining the highest scientific standards, private property rights, agriculture and a strong economy.  Western supports local and state conservation efforts, rather than a federal listing under the Endangered Species Act ("ESA") for the Gunnison sage grouse.

4.  Western's members are landowners, realtors, agricultural producers, trade organizations, contractors and other businesses in the southwestern Colorado range of the Gunnison sage grouse.  Western's members rely upon use of their own private lands free of the restrictions of the ESA.  *Id.*  An emergency listing, or even reversal of the U.S. Fish and Wildlife Service's ("FWS") not-warranted determination, as Plaintiffs' seek, would subject Western's members to regulatory requirements under the ESA.  For example, Western's members engaged in the construction business, as well as other members that must construct, or reconstruct roads, bridges or other improvements, must obtain permits from the U.S. Army Corps of Engineers pursuant to 33 U.S.C. § 1344 where the discharge of dredged and fill material is involved.  Should the Gunnison sage grouse be listed under the ESA, required section 7 consultations with the FWS will result in additional regulatory burdens, significant delays and financial hardship to Western's members. For example, such consultations could delay construction projects initiated in the brief summer to the winter months, resulting in additional costs for snow removal, excavation and weather delays.  Furthermore, the FWS could compel the federal regulatory agency to impose additional requirements, and thereby additional expenses on Western's members.  Some of Western's members actively participate in local efforts to conserve the Gunnison sage grouse such as the Gunnison County Sage Grouse

Conservation Committee.  Western believes a federal listing will hinder such local efforts as well as adversely impact the interests of Western's members.

5.    Western has an interest in participating in government decision making concerning the protection of listed species, including involvement in consequential actions of federal and state agencies responsible for enforcing mitigation measures associated with land use.  Western has an interest in the subject matter of this case as a listing, or reversal of the FWS's determination, would subject Western's members to onerous requirements under the ESA.  Should the Gunnison sage grouse be listed under the ESA, required consultations with the FWS will result in additional regulatory burdens, significant delays and financial hardship to Western's members.  In addition, a listing could reinitiate consultation on existing permits and authorizations causing great uncertainty and financial impacts on Western's members.

6.    Western has an interest in how the issue of impacts to the Gunnison sage grouse is resolved, as well as the adequacy of current local, state and conservation measures being taken related to the Gunnison sage grouse.  Western's ability to protect their interests will be impaired if the determination is withdrawn and listing is ordered, and if it is not able to put forth its arguments regarding the potential effects of these activities on Gunnison sage grouse and current conservation efforts, of which Western's members are active participants.

7.    Western has previously communicated its views on Gunnison sage grouse to local, state and federal officials.  *See* attached.  Western has also compiled and submitted extensive comments to the FWS on the Gunnison sage grouse and commissioned an

independent scientific review of whether Gunnison sage grouse should be classified separately from greater sage grouse. *See* attached.

    8.   Should Plaintiffs' succeed in requiring the U.S. Fish and Wildlife Service ("FWS") to propose listing, Western's members would be forced to divert their time, efforts and resources away from ranching (as well as meaningful conservation efforts for the Gunnison sage grouse) to yet another lengthy administrative process that has already been undertaken once before.

    I declare under penalty of perjury that the foregoing is true and correct. Executed on this 27th day of February, 2007.

/s Pam Paris
_____



*Western Conservation Coalition*

P.O. Box 1 Grand Junction, Colorado 81502
Phone: 970-209-7443 (Gunnison) or 970-245-0253 (Grand Junction)

July 8, 2005

The Honorable John Salazar
United States House of Representatives
1531 Longworth
Washington, D.C. 20515

Dear Congressman Salazar:

The Western Conservation Coalition is a grassroots entity organized for the protection and conservation of species in Western Colorado through local and state conservation efforts while maintaining the highest scientific standards, private property rights, agriculture and a strong economy. We are writing to express our concerns about the potential listing of the Gunnison sage grouse under the Endangered Species Act (the "ESA").

Without your help, we fear the Gunnison sage grouse could become the spotted owl of Western Colorado. The U.S. Fish and Wildlife Service could issue a proposed listing under the ESA as soon as this September. A listing could seriously impact ranchers and other landowners, businesses and local governments throughout the Southwest quarter of the State of Colorado, as well as parts of Utah and potentially Arizona and New Mexico. Grazing, irrigation, construction, oil and gas, mining, power (and more) could all be affected. Added to years of drought and sky-rocketing fuel prices, a federal listing could decimate the very landowners who have been productive stewards of wildlife habitat for generations. Many may have little choice but to sell their land or water to survive. The result would be catastrophic for the Western Slope of Colorado.

Unfortunately, there have been virtually no successes under the ESA: less than one percent of all listed species have ever recovered. Because the regulatory straightjacket of the ESA creates a disincentive to landowners, a federal listing, would do little to help (and could even harm) the Gunnison sage grouse.[1] According to Bureau of Land Management ("BLM") and U.S. Forest Service officials, the ESA creates " . . . a complex maze of processes and procedures, which field biologists and managers must attempt to negotiate on a daily basis in order to implement on-the-ground projects."[2]

---

[1] See Amara Brook, Michaela Zint, Raymond De Young, Landowners' Responses to an Endangered Species Act Listing and Implications for Encouraging Conservation, 17 Conservation Biology 1473, 1638 (Dec. 2003) (Where an extensive survey of landowners showed that many managed their land so as to avoid the presence of a listed species).

[2] USFS and BLM, Improving the Efficiency and Effectiveness of the Endangered Species Act, (Dec. 15, 2003).

For the above reasons, the Western Conservation Coalition, a grassroots coalition of ranchers, landowners and business interests, formed to promote responsible state and local conservation efforts, urges Congress to support existing localized efforts to recover Gunnison sage grouse populations rather than pursuing an unnecessarily restrictive federal listing. Further, we encourage USFWS to continue to work proactively with landowners to enter into Candidate Conservation Agreement with Assurances ("CCAAs") to provide for cooperative recovery efforts which help protect landowners' property rights.

The Gunnison Sage-Grouse Rangewide Conservation Plan identified "a low risk of extinction for the species range-wide," and the latest data indicates Gunnison sage grouse numbers are increasing. Five local working groups are dedicated to Gunnison sage grouse efforts and the Colorado Division of Wildlife has proposed a programmatic CCAA to help protect the species on private lands. The Gunnison County Stockgrower's have already committed to that effort and many other landowners in Southwestern Colorado are also carefully considering it. In addition, State and federal agencies have already undertaken aggressive conservation efforts to benefit sagebrush species like the greater sage grouse and the Gunnison sage grouse.

Accordingly, we respectfully request that you ask Secretary Gale Norton not to hamstring these significant local and state conservation efforts with a listing. Please give state and local conservation efforts an opportunity to benefit the Gunnison sage grouse.

Thank you for your consideration of this important matter. If you would like more information, please do not hesitate to contact Dick Bratton at (970) 641-1903, Cory Watt at (970) 349-1014, or Kent Holsinger, counsel to the Western Conservation Coalition at (720) 904-6000. Thank you.

Sincerely,

Reeves Brown
Club 20

John Stock
Gunnison County Contractors

Alan Foutz
Colorado Farm Bureau

Jeffrey W. Worthen
Gunnison County Realtors

Bob Leach
Colorado Association of Home Builders

John R. Villyard
San Luis Valley Rural Electric

2

*Kathy Hall*

Kathy Hall
West Slope COGA

*Keith Catlin*

Keith Catlin
Uncompaghre Valley Water Users

cc:  Colorado Congressional Delegation
     The Hon. Bill Owens
     The Hon. Jim Isgar
     The Hon. Lewis Entz
     The Hon. Kathleen Curry
     The Hon. Ray Rose
     The Hon. Mark Larson
     Gunnison County Commissioners
     Mesa County Commissioners
     Montrose County Commissioners
     Delta County Commissioners
     Dolores County Commissioners
     Montezuma County Commissioners
     La Plata County Commissioners
     Hinsdale County Commissioners
     Mineral County Commissioners
     Archuleta County Commissioners
     Ouray County Commissioners
     Chaffee County Commissioners
     Saguache County Commissioners
     Kathleen Clark, Director, U.S. Bureau of Land Management
     Ron Wenker, State Director, U.S. Bureau of Land Management
     Russell George, Executive Director, Colorado Department of Natural Resources
     Tom Blickensderfer, ESA Coordinator, Colorado Department of Natural Resources
     Bruce McCloskey, Director, Colorado Division of Wildlife

3

1430 Wynkoop Street
Suite 300
Denver, Colorado 80202

March 17, 2006

phone: 720.904.6000
fax: 720.904.6006

The Honorable Dale Hall
Director
U.S. Fish and Wildlife Service
U.S. Department of the Interior
1849 C Street, NW
Washington, D.C. 20240

Re:    Comments in Favor of State and Local Efforts to Conserve the Gunnison Sage
       Grouse Rather Than a Federal Listing

Dear Director Hall:

On behalf of the Western Conservation Coalition ("WCC"), I am writing to urge the U.S.
Fish and Wildlife Service ("FWS") not to list the Gunnison sage grouse under the
Endangered Species Act ("ESA"). The WCC is a grassroots coalition of landowners and
business interests formed to promote responsible state and local conservation efforts to
protect the sage grouse, and the Western Slope, from a federal listing. Working together
with the state, local governments, and landowners on sage grouse conservation would be
consistent with the White House "cooperative conservation" ethic as well as the
Department of the Interior's Four "C's."

The FWS has already determined that several other sagebrush obligates do not merit
listing. The FWS determined not to list: the Western sage grouse on February 7, 2003,
the Eastern sage grouse on January 7, 2004, the slickspot peppergrass on January 22,
2004, the white-tailed prairie dog on November 9, 2004, the greater sage grouse on
January 12, 2005 and the pygmy rabbit on May 20, 2005. The FWS declined to list the
greater sage grouse based upon: extensive regulatory mechanisms, the range of the
species on vast expanses of federal land, and unprecedented state, local and federal
sagebrush conservation measures. For many of the same the reasons, i.e. extensive
regulatory mechanisms, the range of the Gunnison sage grouse on vast expanses of
federal land, and the unprecedented State, local and federal sagebrush conservation
measures, the FWS should decline to list the sage grouse and withdraw its designation as
a candidate for listing.

Further, there are significant uncertainties as to whether the Gunnison sage grouse should
properly be classified as a species separate from the greater sage grouse. For example,
genetic differences between the Gunnison sage grouse and other sage grouse are small,
not well resolved and based on inadequate sampling. There is much more genetic,
morphologic and mating display divergence in dusky blue grouse compared to sooty blue
grouse but the blue grouse not considered separate species. In comparison, the Gunnison

Western Conservation Coalition Comments on the Gunnison sage grouse

⊡          ⊡          ⊡

sage grouse does not display an evolutionarily distinct set of haplotypes and there is more gene flow between greater sage grouse populations than between the Gunnison sage grouse and greater sage grouse.

The Gunnison sage grouse thrives in sagebrush habitat, and sagebrush is the most widespread vegetation in the intermountain lowlands in the western United States. Sagebrush habitat is predominately federal land protected by far-reaching federal laws. The BLM, for example, has designated the Gunnison sage grouse a Sensitive Species and Colorado is number three in the nation in terms of acres of private lands protected by conservation easements. A Gunnison Sage-Grouse Rangewide Conservation Plan has been prepared by federal and state biologists and it identified "a low risk of extinction for the species range-wide." Finally, the latest data indicates Gunnison sage grouse numbers are on the increase.

For all of these reasons, and more described herein, the FWS should decline to list the Gunnison sage grouse and withdraw it from the candidate list.

## I.    Procedural History
The American Lands Alliance has been attempting to list the Gunnison sage grouse under the ESA since January of 2000. They petitioned to list the Gunnison sage grouse before it was even classified as a species separate from other sage grouse. In 2000, it was designated as a candidate species for listing. In March of 2004, the FWS was petitioned for an emergency listing. As an apparent compromise, the FWS declined to list, but increased the listing priority from 5 to 2. The Western Environmental Law Center, based in Eugene Oregon, argued the sage grouse should be listed as endangered as soon as possible in their litigation against the FWS Petition Management Guidance Policy.[1] And the Law Center is using this ruling to force the FWS to act on this issue.[2]

## II.    ESA and Data Quality Act
The FWS Interagency Cooperative Policy on Information Standards under the Endangered Species Act ("Policy on Information Standards")[3], the best available science standard under the ESA[4], and the Data Quality Act[5] require a negative listing decision and removal from the list of candidate species.

Under the ESA, the FWS must utilize the best available scientific and commercial data. 16 U.S.C. Section 1533(b)(1)(a). Moreover, the Data Quality Act imposes certain standards of quality, objectivity and utility upon the information the FWS relies upon to make its findings. 44 U.S.C. Section 3516; 67 Fed. Reg. 8452 (Feb. 22, 2002). The Data Quality Act applies to information prepared by third parties, like the listing proponents, that federal agencies rely upon to make decisions. Id.

---

[1] Brent Israel, Wildlife advocates win ruling on petitions, The Salt Lake Tribune (June 4, 2004).
[2] Id.
[3] 59 Fed. Reg. 34271 (July 1, 1994).
[4] 16 U.S.C. Section 1533(b)(1)(a).
[5] 44 U.S.C. Section 3516; 67 Fed. Reg. 8452 (Feb. 22, 2002).

These deficiencies should be clear to the FWS in its critical review of the information presented pursuant to the Policy on Information Standards and the Data Quality Act. The FWS has a duty to gather, review and evaluate information presented in the petition to ensure that it is "reliable, credible, and represents the best scientific and commercial data available." 59 Fed. Reg. 34271 (July 1, 1994). Has management-level review pursuant to the policy taken place to verify and assure the quality of the science on the Gunnison sage grouse?

The FWS must consider the most recent or thorough information from stakeholders, the public and the scientific community. Accordingly, the FWS must consider information available to it—including these comments. See 50 CFR 424,14(b). Further, the FWS must ensure that the data used to make its determination is consistent with the standards within the ESA and the Data Quality Act.

## III. Historical versus Existing Populations

There is insufficient information regarding the past and present numbers and distribution of the Gunnison sage grouse over all or a significant portion of the sage grouse's range to support a listing. Estimates of historic populations of the Gunnison sage grouse are inaccurate and misleading such that a listing would violate the "objectivity" standard and the "utility" standards under the Data Quality Act.

Citations to Braun (1998) relied upon by the FWS are suspect. Braun cites no primary authority and merely creates numbers, distributions and purported threats out of whole cloth. Opinions, including those of the listing proponents, should not be represented as fact or dictate decisions that need to be made on scientific data. For example, historical estimates made by the listing proponents violate the Data Quality Act standards in that they are not supported by the data or by contemporary accounts and constitute pure speculation.

A lack of data makes it difficult to know whether there is an absence of Gunnison sage grouse in historically occupied habitat or whether there is inadequate documentation of existing grouse. The FWS cited a similar lack of information in its negative 90-day Finding on the petitions to list Arizona brome and nodding needlegrass. See 70 Fed. Reg. 3504, 3505-6 (Jan. 25, 2005). In addition, historic population change and habitat change are not relevant to survival of the species today. Instead, the FWS should focus on current populations and habitat conditions. And, as stated, current populations are on the increase.

## IV. Gunnison Sage Grouse Numbers on the Rise

New data from the Colorado Division of Wildlife ("DOW") shows Gunnison sage grouse populations in southwestern Colorado has mushroomed from 2,320 birds in 2005 to over 4,000 birds this year. Sally Spaulding, No reason to grouse: Rare bird rebounding across Western Slope, Grand Junction Daily Sentinel (July 28, 2005). This amounts to a 72% increase in the Gunnison Basin in one year. The rise in numbers was attributed to conservation programs aimed at protecting the birds and a wet winter. Id. In regards to

these conservation efforts, the DOW stated, "We will be successful in the long run." Bianca Prieto, Rocky Mountain News, (July 28, 2005).

There are many other birds in Colorado with lower populations that have not been federally listed. Colorado's lesser prairie chicken population (which has not been listed under the ESA) amounts to only 1,200-1,600 breeding birds. Available at: http://wildlife.state.co.us/species_cons/WildlifeInDanger/ Colorado's population of plains sharp-tailed grouse, which numbers in the hundreds, has likewise never been listed. Id. Finally, Colorado's greater prairie-chicken populations (which were never listed under the ESA) are now considered sufficient to classify the bird as a game species (6,000 to 10,000 birds). Id.

The FWS must, in conjunction with local and state governments, consider additional survey work (as well as additional morphologic and genetic work) on the Gunnison sage grouse prior to a listing decision. Additional survey work on the Gunnison sage grouse will result in the discovery of additional populations.[6] For many species, additional survey work identified additional populations:

For example, the FWS delisted the pine barrens tree frog where a considerable amount of potential habitat within the range had not been investigated, and results from surveys indicated much of that habitat was likely to harbor the species. 48 Fed. Reg. 52740 (Nov. 22, 1983). The FWS also recognized that estimates of black-tailed prairie dog ("BTPD") density varied depending upon the season, region, and climatic conditions and removed the species from the candidate list after additional surveys provided more accurate estimates of occupied habitat. 69 Fed. Reg. 51217 (Aug. 18, 2004); see also Press Release, U.S. Fish and Wildlife Service, Black-tailed Prairie Dog Removed from Candidate Species List (Aug. 12, 2004).

The discovery of additional populations and higher population estimates of the Rydberg milk-vetch were sufficient to subsequently delist that species. 54 Fed. Reg. 37941 (Sept. 14, 1989). Only three previously unknown populations sufficed to delist the least chub. 64 Fed. Reg. 41061 (July 29, 1999). Finding the Chiricahua dock, a 3- to 6-foot-tall perennial, to be more abundant and widespread than originally documented, the U.S. Fish and Wildlife Service withdrew its proposal to list the plant as threatened under the Endangered Species Act on August 9, 1999. Press Release, U.S. Fish and Wildlife Service, U.S. Fish and Wildlife Service Concludes that a Southwestern Plant is not Threatened (Aug. 9, 1999).

When studies were completed, researchers concluded that the Dismal Swamp southeastern shrew is more widespread than originally thought and is found in a wide variety of habitats throughout southeastern Virginia and the coastal plain of North Carolina. Press Release, U.S. Fish and Wildlife Service, Dismal Swamp Southeastern

---

[6] Even if sage grouse numbers were in a cyclic decline (they are actually increasing), annual fluctuations in population (up to 50%) do not necessarily equate to the need to list a species. See 69 Fed. Reg. 64889, 64892 (Nov. 9, 2004) (Where the FWS issued a negative 90-day Finding on the petition to list the white-tailed prairie dog).

Shrew No Longer Needs Endangered Species Act Protection, (Mar. 3, 2000). FWS
biologists also found listing of the sicklefin and sturgeon chub unwarranted due to new
information that indicated populations are more abundant and better distributed
throughout their range than previously believed. Press Release, U.S. Fish and Wildlife
Service, U.S. Fish and Wildlife Service Determines Sicklefin and Sturgeon Chub Do Not
Warrant Listing as Threatened or Endangered (Apr. 19, 2001).

The spineless hedgehog cactus was found to be more abundant than previously believed.
58 Fed. Reg. 49242 (Sept. 22, 1993). The Tumamoc globeberry was found to be more
abundant than previously believed. 58 Fed. Reg. 33562 (June 18, 1993). Eggert's
Sunflower was proposed for delisting when populations increased from 34 known sites to
279 known sites. 69 Fed. Reg. 17627 (April 5, 2004). Finally, the Preble's meadow
jumping mouse was proposed for delisting after populations increased from 29 known
sites to 126 known sites and the classification as a separate subspecies was found to be
erroneous. 70 Fed. Reg. 5404 (Feb. 2, 2005).

Additional survey work in the Gunnison sage grouse is likely to lead to the discovery of
additional populations. Regardless, population numbers are on the rise, and many other
avian species in Colorado persist (absent a federal listing) with lower population numbers
than those of the Gunnison sage grouse.

**V.    Expansive Habitat and Range of the Gunnison Sage Grouse**
Given the wide distribution of the Gunnison sage grouse and large blocks of sagebrush
habitat, the present or threatened destruction, modification, or curtailment of the species'
habitat or range is not a factor that threatens or endangers the sage grouse over all or a
significant portion of its range. In fact, the FWS recognizes that sagebrush is a hardy,
long-lived species that is the most widespread vegetation in the intermountain lowlands
in the western United States. See 70 Fed. Reg. 2244, 2254 (Jan. 12, 2005) (emphasis
added).

There are millions of acres of Gunnison sage grouse habitat owned and/or managed by
the federal government and protected by a vast array of federal environmental and land
management statutes and directives. Based upon these regulatory mechanisms, and state
and local conservation efforts, the FWS has already determined that several sagebrush
obligates do not merit listing. Similarly, the FWS should decline to list the Gunnison
sage grouse and withdraw it from the list of candidate species.

**VI.    The Gunnison Sage Grouse Fails to Meet Thresholds for Uniqueness**
We urge the FWS not to "list before you look." Current work on the Gunnison sage
grouse in southwestern Colorado did not use the latest scientific thresholds for
uniqueness. Further inquiry into the biology and status of the classification of the sage
grouse is necessary prior to any positive listing decision.

Designations as species and subspecies have been subject to broad interpretation. Many
species listed under the ESA were found to be classified incorrectly to begin with. For

example: cuneate bidens,[7] the Mexican duck,[8] the purple-spined hedgehog cactus,[9] the Truckee barberry,[10] the coastal cutthroat trout,[11] the Bahama swallowtail,[12] and the Preble's meadow jumping mouse[13] were all determined not to be unique species. The FWS should take care to avoid such an error here.

In 1946, the sage grouse was split into two subspecies (the eastern sage grouse and the western sage grouse) based on a review of only 11 museum specimens. This classification has been rejected in part due to genetic analysis of 332 samples from 16 populations that found no genetic evidence supporting the split. Similar issues arise here.

Specifically, the existing genetic and morphologic work relied upon to split the Gunnison sage grouse into a separate species fails to meet the threshold for uniqueness. There has been no combined comparison of populations across the range of the sage grouse in southwestern Colorado and the greater sage grouse. Regarding the work that has been done, a critical review found more genetic difference amongst greater grouse populations than between Gunnison sage grouse and greater sage grouse.

In March of 2006, Dr. Robert Zink, Professor of Ecology, Evolution and Behavior at the Bell Museum of Natural History, University of Minnesota, reviewed genetic studies (Oyler-McCance et al. 2005a) of the recently recognized Gunnison Sage Grouse (*Centrocercus minimus*; Young et al. 2000), and compared it to similar genetic information collected for the Greater Sage-Grouse (*Centrocercus urophasianus*; Oyler-McCance et al. 2005b). (Zink 2006). Dr. Zink examined the evolutionary history, the level of distinctiveness, and patterns of genetic variation within each species and based his inferences on previous published studies as well as new analyses based on mitochondrial DNA data he retrieved from Genbank. A copy of Dr. Zink's paper is attached hereto as **Exhibit A**. Among other things, Dr. Zink found there was inadequate sampling. He was critical that existing studies on Gunnison sage-grouse are based on only 141 base pairs of mtDNA sequence which is "extremely low by modern standards" and noted that other studies have been rejected from publication based on less. (Zink 2006).

Dr. Zink found, "there is much higher gene flow between greater sage-grouse populations than between Gunnison sage-grouse and greater sage-grouse." (Zink 2006) (Emphasis added). He explained, "unlike the vast majority of avian species, the Gunnison sage-grouse does not display an evolutionarily distinct set of haplotypes (e.g. Fig. 1B). Instead, the genetic support for species recognition comes from differences in the relative frequencies of haplotypes." *Id.* Because the haplotypes for Gunnison sage grouse do not sort into reciprocally monophyletic groups as they do for most species,[14] morphologic

---

[7] 61 Fed. Reg. 4372 (Feb. 6, 1996).
[8] 43 Fed. Reg. 32258 (July 25, 1978).
[9] 54 Fed. Reg. 4879 (Nov. 27, 1989).
[10] 68 Fed. Reg. 56564 (Oct. 1, 2003).
[11] 65 Fed. Reg. 24420 (April 26, 2000).
[12] 49 Fed. Reg. 34501.
[13] 70 Fed. Reg. 5404 (Feb. 2, 2005).
[14] This is concrete evidence of interbreeding between greater sage grouse and Gunnison sage grouse.

and behavioral differences become much more important to the question of proper classification.

Gunnison sage-grouse and greater sage-grouse are less differentiated than populations of the blue grouse (*Dendragapus obscurus*; Barrowclough et al. 2004) that do not have species status. As Dr. Zink explained:

> Thus, the AOU considers the Gunnison sage grouse as a separate species but not the blue grouse that are clearly more genetically distinct. Presumably this reflects an opinion that the morphological and behavioral differences are more important in sage grouse than in blue grouse. However, Barrowclough et al. (2004:1919) commented that the blue grouse groups "are more divergent than are greater sage-grouse and Gunnison sage-grouse (Young et al. 2000) in terms of genetic differentiation (hence period of isolation), mating system and morphology".

(Zink 2006).

Recent scientific advances (Avise and Ball 1990), (Ball and Avise 1992), (Cronin 1997), (Wehausen and Ramey 2000), (Zink 2004), (Ramey et al. 2005) apply more scientific rigor to species, subspecies and DPS classifications. And the investment in further threshold testing is small relative to the potential costs of listing an invalid taxon under the ESA. For example, the estimated costs to landowners and local governments from the erroneous listing of the Preble's mouse could approach $200 million per decade.

The FWS has made several determinations not to list based upon greater distinctions than found here. For example, on May 19, 2005, the FWS cited the Mexican bobcat's widespread and stable status in Mexico, the questionable taxonomy of the subspecies, and the lack of discreteness from other populations in its proposed delisting rule. 70 Fed. Reg. 28895, 28896 (May 19, 2005). For example, the FWS relied in part on recent genetic evidence, (Mitton et al. 2006 in review) and (Novak et al. 2005), that suggested the Yellowstone Cutthroat ("YCT"), was not distinct from the fine-spotted cutthroat trout in its decision not to list the YCT. 12-Month Finding for a Petition to List the Yellowstone Cutthroat Trout as Threatened, 71 Fed. Reg. 8818 (Feb. 21, 2006). The YCT is said to be morphologically differentiated from roughly 13 other named subspecies of cutthroat trout based upon its geographic location and the pattern of spots on its side. Id.

The FWS also found evidence insufficient to indicate the Uinta Mountainsnail was a valid subspecies such that it qualified for listing under the ESA. 90-Day Finding on a Petition to List the Uinta Mountainsnail as Endangered, 70 Fed. Reg. 69303 (Nov. 15, 2005). The genus of land snails inhabits the greater part of Western North America and is comprised of 32 species and 54 subspecies.[15] Id. at 69303-04. In that case, it was unkown if populations were increasing or decreasing. Accordingly, the FWS declined to undertake a full status review or to list. Id. at 69304. Even with evidence of genetic

---

[15] The snail is split into Eastern and Western "divisions" and each division is broken into land snail "provinces." Id. at 69303.

distinctions, the FWS declined the list the American dipper as a DPS in the Black Hills. 90-Day Finding on a Petition to List the American Dipper in the Black Hills of South Dakota as Threatened or Endangered, 71 Fed. Reg. 4341 (Jan. 26, 2006). There, the FWS found limited populations in a limited area were not significant to a species that inhabits such a vast range. Id. at 4343.

In short, the Gunnison sage grouse fails established thresholds for uniqueness. Genetic and morphologic differences between the Gunnison sage grouse and other sage grouse are small, not well resolved and based on inadequate sampling. For example, the Gunnison sage grouse does not display an evolutionarily distinct set of haplotypes and there is more gene flow between greater sage grouse populations than between the Gunnison sage grouse and greater sage grouse. Accordingly, the FWS should decline to list and withdraw its candidate status.

## VII.    Even if the Gunnison Sage Grouse is a Species or Subspecies, it is Not Discrete from Other Sage Grouse Nor Significant to the Taxon

### A.    Gunnison Sage Grouse Not Discrete

No significant barriers separate the Gunnison sage grouse, an avian species, and other sage grouse. There may well be overlap in the range of the Gunnison sage grouse and other sage grouse. In fact, dispersal across surprising differences has been confirmed by genetic analysis. Gunnison Sage Grouse Rangewide Plan at 48. Finally, interbreeding with other sage grouse has occurred, and is likely to occur.

Key to FWS findings of discreteness is significant evidence of isolation and unique ecological habitats. For example, the FWS considered the Southern Rocky Mountain Population ("SRMP") of boreal toads as discrete because they are ground-dwelling creatures that rarely move more than three miles. 70 Fed. Reg. 56880, 56884 (Sept. 29, 2005). The gap between SMRP boreal toads and other toads was 100 miles to the North and 155 miles to the West of desert environment impassible to the amphibians. Id.

The FWS has also found discreteness where: American dippers in the Black Hills were separated from other suitable habitats by the expanse of the Great plains; the American crocodile was separated by thousands of miles of open ocean from other crocodile populations in central and south America; and more than 1,000 miles separated gray wolves in Canada from wolves in Mexico.

And morphological differences between the Gunnison sage grouse and other sage grouse may be overstated. And Dr. Zink pointed out, "[I]f the morphological and behavioral features noted by other authors are discrete and diagnostic, it would mean that they have evolved in less time than it takes for mtDNA gene trees to become reciprocally monophyletic. This is not unheard of in avian species, but it is not a common occurrence." (Zink 2006) (Emphasis added).

Purported differences in size between the Gunnison sage grouse and other sage grouse could be attributed to sampling bias. Dr. Clait Braun, a paid consultant for the

environmental groups seeking to list the greater sage grouse under the ESA, is said to have noticed the wings collected for the sage grouse were smaller than those collected for sage grouse in northwestern Colorado. This could reflect that more juvenile birds were harvested in the Gunnison area in a given year versus northwestern Colorado. Moreover, the results may have been skewed because more hunters abided by voluntary wing drops in one area versus the other.

The sage grouse's mating display has been reported by (Young et al. 2000) to differ from other sage grouse. But song and display can vary among even individuals. For example, Margaret Morse Nice, a noted ornithologist, recorded that individual song sparrows have their own individual musical styles and that some have a more varied repertoire than others. Joseph Kastner, A World of Watchers, Alfred A. Knopf, New York at 151 (1986). Moreover, she noted individual differences in the timing of their displays. It follows that individual sage grouse may exhibit different displays at different times. Differences among individuals, then, could invalidate the alleged distinctions between Gunnison sage grouse and the greater sage grouse.

B.     Gunnison Sage Grouse Not Significant to the Taxon
Taxonomic, morphologic and genetic uncertainties have contributed to FWS findings that populations were not significant to the taxon as a whole. Great isolation as well as biologic or ecological significance are key to findings of significance. No such isolation exists in the case of the Gunnison sage grouse and the greater sage grouse.

In fact, the Gunnison sage grouse shares many of the same haplotypes as greater sage grouse populations throughout the species' range such that there is higher gene flow between greater sage grouse populations than between the Gunnison sage grouse and greater sage grouse. Moreover, the Gunnison sage grouse exists at the periphery of the vast range of the greater sage grouse. Greater sage grouse inhabit over 110 million acres in the West.

A review of recent decisions by the FWS is instructive as to how the agency views significance to the taxon. For example, the FWS cited genetic and morphologic uncertainty in its decision to withdraw the SRMP of boreal toad from the candidate list. 70 Fed. Reg. 56880, 56884 (Sept. 29, 2005). The SMRP of the boreal toad was not found to be significant to the taxon because the gap resulting from its loss would be a relatively small portion of the subspecies range. Id. at 56883. In addition, genetic differences were small, not well resolved, and based on inadequate sampling. Id. Finally, the toads appeared so closely related that interbreeding would likely produce viable offspring. Id. at 56884.

Subspecies' status was proposed for the Uinta Mountainsnail, "based primarily on its relatively wider umbilicus, an exceedingly variable feature in Oreohelix taxa . . . ." 90-Day Finding on a Petition to List the Uinta Mountainsnail as Endangered, 70 Fed. Reg. 69303 (Nov. 15, 2005). But (Roscoe and Grosscupt 1964) suggested that Uinta mountainsnail could not be distinguished from another mountainsnail and that apparent

differences could be attributed to examinations of juvenile specimens versus adults. Id. at 69304. Such could be the case with Gunnison sage grouse specimens.

In downlisting the American crocodile, the FWS noted its separation across thousands of miles of open ocean from other crocodile populations and that loss would result in a significant reduction in the extent of the species' range. Reclassifying the American Crocodile Distinct Population Segment in Florida from Endangered to Threatened and Initiation of a 5-Year Review, 70 Fed. Reg. 15052, 15055 (Mar. 24, 2005).

Even with preliminary evidence of genetic distinctions, the FWS declined the list the American dipper as a DPS in the Black Hills. 90-Day Finding on a Petition to List the American Dipper in the Black Hills of South Dakota as Threatened or Endangered, 71 Fed. Reg. 4341 (Jan. 26, 2006). The dipper is at the eastern edge of its range in the Black Hills. While considered discrete from other populations, the FWS rejected petitioners arguments that the Black Hills were a unique ecosystem. While the Black Hills have unique features, the FWS recognized habitat for the dipper (cold streams with swift flow, suitable substrate and good water quality) is similar to habitat found in many other western mountain ecosystems. Id.

Another useful measure of significance is explained in the proposed rule, Designating the Northern Rocky Mountain Population of Gray Wolf as a Distinct Population Segment; Removing the Northern Rocky Mountain Distinct Population Segment of Gray Wolf from the Federal List of Endangered and Threatened Wildlife, 71 Fed. Reg. 6634, 6641 (Feb. 8, 2006). There, the FWS concluded that the northern rockies were the "only area where such a high diversity of large predators occupy the same areas as a large variety of native ungulate prey species, resulting in complex ecological interaction between the ungulate prey, predator and scavenger groups." Id. citing (Smith et al. 2003). Further, loss of the DPS would create a gap in the species' range of over 1,000 miles between Mexico and Canada. Id.

In short, the Gunnison sage grouse is not significant to the taxon of sage grouse. Like the American dipper in the Black Hills, (which is at the eastern edge of the American dipper's range), the Gunnison sage grouse dwells on the periphery of the range of sage grouse. The FWS has determined before that limited populations of American dipper in a limited area were not significant to a species that inhabits a much smaller range than the sage grouse (5,000 km from north to south and 1,800 km from west to east). 71 Fed. Reg. at 4343. The Gunnison sage grouse inhabits only a tiny fraction of the range of sage grouse. Sage grouse number in the hundreds of thousands and inhabit over 110 million acres across eleven western states and two Canadian provinces.

Unlike the SMRP of boreal toad, the American dipper, and the American crocodile, there are no impassible ecological barriers separating the Gunnison sage grouse from other sage grouse. There is evidence of interbreeding with other sage grouse and relatively small distances separate this avian species from other populations. Neither does the Gunnison sage grouse inhabit a unique ecological environment. Like the American dipper, it is the habitat used by sage grouse that the FWS should consider. In this case,

sagebrush is the most abundant lowland vegetation in the American west and there are no "complex ecological interactions" (as in the case of the gray wolf in the northern rockies) that are applicable to the Gunnison sage grouse compared to other sage grouse. For the above reasons, the FWS should decline to consider the Gunnison sage grouse as significant to the taxon.

## VIII.   Threats to the Gunnison Sage Grouse are Overstated

Concerns of declining populations are not corroborated by concrete evidence of such declines. To the contrary, Gunnison sage grouse numbers are <u>increasing</u>. Even if there were population declines, the FWS seems to ignore cyclic predator prey relationship and population variability due to drought conditions in recent years. Finally, the FWS discounts the adaptability of the Gunnison sage grouse.

There is no credible scientific information supporting the assertion that large amounts of habitat will be lost, or that development, grazing, oil and gas, road construction or traffic will result in increased mortality of Gunnison sage grouse. As previously stated, sagebrush is the most widespread lowland vegetation in the intermountain West.

The effect in terms of the actual habitat affected is speculative and uncorroborated. There is also a lack of data to assess how this alleged fragmentation influences specific sage grouse life history parameters such as productivity, density, and home range. No information is provided as to the range-wide extent of these activities in terms of scale.

A.    <u>Grazing Not a Threat to the Gunnison Sage Grouse</u>
While grazing has often been cited as a threat to the sage grouse, recent scientific evidence, as well as applied conservation, demonstrates it could actually be beneficial. A recent article in Conservation Biology recognized that cattle grazing plays an important role in maintaining wetland habitat and that removing cattle could inadvertently degrade habitat necessary for endangered species. Pyke, Christopher R. & Marty, Jaymee (2005), <u>Cattle Grazing Mediates Climate Change Impacts on Ephemeral Wetlands</u>, *Conservation Biology* 19(5), 1619-1625. Experiments showed removing grazing reduced the duration of wetland flooding by 50 days per year and that grazing presented real opportunities to adapt to climate variability and climate change. Livestock watering has also been found to be a benefit to other sensitive species. <u>See Determination of Threatened Status for the California Tiger Salamander; and Special Rule Exemption for Existing Routine Ranching Activities</u>, Final Rule, 60 Fed. Reg. 47212, 47216 (Aug. 4, 2004).

B.    <u>Predators and the Gunnison Sage Grouse</u>
Rather than focus on the real causes for sage grouse populations, the FWS seems to knee-jerk to hypothetical human-caused threats. Gunnison sage grouse numbers are strong and growing stronger. Yet controlling predation may truly benefit the Gunnison sage grouse within sage grouse habitat. Predators have long been known to adversely effect game bird populations. <u>See More game birds by controlling their natural enemies</u>, New York city, More game birds in America (1931). And large sage grouse population fluctuations, as a result of predators and predator control efforts, have also long been recognized.

For example, early in 1924, newspapers reported on predator control in the Colorado by the federal Biological Survey the previous year. In 1923, the Biological Survey harvested 3,233 predators including, among others, 2,812 coyotes. U.S. Hunters Kill 3,233 Predatory Animals in 1923, Jackson County Star (Jan. 24, 1924). The effect on sage grouse was dramatic. As one Colorado newspaper reported:

> As a result of continued activities in coyote control in the North Park country, Colo., the number of sage hens was greatly increased during the summer of 1923 according to a report received by the Biological Survey, United States Department of Agriculture. On one inspection trip flocks ranging from 12 to 60 were seen, whereas three years ago these birds were exceedingly scarce. Quail are also on the increase in western Colorado. Hundreds of them are seen on the sheep ranges which have been cleared of coyotes.

Increase in Game Birds, Jackson County Star (April 24, 1924).

Crows and ravens are also significant predators of avian species. For example, 7 of 10 California condor nests within a one-half mile of raven nests lost eggs and chicks to Raven predation. Ramey (1989). The correlation between predators and game birds has not changed through the years. The USDA still reports that predator damage control efforts focused on increasing nest production "have proven very successful." USDA Animal and Plant Health Inspection Service, Wildlife Services, Environmental Assessment on Predator Damage Management in Colorado at 22 (May, 2005). They also report:

> Populations of some of the most important prairie grouse predators have increased dramatically over the last 100 years . . . and **even in areas of good habitat,** predator populations can be so abundant that habitat alone may not suffice to allow grouse populations to increase (Bergerud 1988). . . In a survey of U.S. public attitudes regarding predators and their management to enhance avian recruitment, Messmer et al. (1999) found that given information suggesting predators are among the threats to a declining bird population, the public generally supported using PDM for the protection of bird populations.

Id. (Emphasis added). Predation of sage grouse, primarily by coyotes and ravens, has long been the major factor in grouse population levels. Coyote removal resulted in drastic increases in nest success. One study, Presnall and Wood (1953), found:

> Examination of the stomach contents from an adult female coyote removed the next day revealed parts of an adult sage hen plus six whole newly-hatched sage grouse chicks. The area around the den was littered with sage-grouse bones and feathers. No other prey remains were found around the den, and it appeared that the pups had been raised largely upon sage-grouse.

Id. Red fox have also been found to be significant predators that should be discouraged where there are sage grouse populations. More recently, survival estimates for chicks were only 15% and 18% in 1999 and 2000. Id. citing Burkepile et at. (2001) Predators were responsible for 90% of the mortality in 1999 and 100% of the mortality in 2000. Id.

In comments to the USDA, some stakeholders urged the agency to consider predator control efforts in areas inhabited by the sage grouse. Such action would have an immediate and positive effect on sage grouse populations.

C.    Agricultural Conversion Not a Threat to the Gunnison Sage Grouse

The threat of agricultural conversion to the Gunnison sage grouse is also overstated. Given today's demographics and the increasing urbanization of society, the FWS has recognized that conversion to agricultural lands is not a threat. See 70 Fed. Reg. 2255.

The FWS must take into account only the current status of the species. Besides, agricultural conversion no longer occurs as it did in the nineteenth and early twentieth centuries. While agricultural development, towns and infrastructure have reduced the upper limit of potential habitat, that does not necessarily pose a threat to the species. More current data must be considered relative to the security of populations remaining on many millions of acres of the sagebrush-steppe. Moreover, the BLM no longer actively converts sagebrush to other habitat types. Instead, BLM has changed its focus to improving the diversity of the native plant community and reducing the risk of wildfire. (BLM 2004).

The FWS has not held agricultural conversion to be a threat to species in: delisting the Aleutian Canada goose (66 Fed. Reg. 15643 (Mar. 20, 2001); removing the black-tailed prairie dog from the candidate list (69 Fed. Reg. 51217 (Aug. 18, 2004); and issuing a not warranted finding on the petition to list the greater sage grouse (70 Fed. Reg. 2244).

D.    Fire Not a Threat to the Gunnison Sage Grouse

The risk of fire to the habitat and species is also overstated. Bennett (1992) notes that chemically treated sagebrush returns to pre-treatment conditions within 15-20 years. Bennett, L. E. 1992. Soil Conservation Service (SCS) Brush Project: Final Report. University of Wyoming Fish and Wildlife Cooperative Research Unit, Laramie, Wyoming. Even burned areas of mountain big sagebrush generally recover a substantial sagebrush component within 10-12 years. At the upper precipitation zone for Wyoming big sagebrush recovery following fire can occur in 15 to 20 years and even at the lower precipitation zone recovery will be substantial in 40 years, Winward (1991).

E.    Invasive Species Not a Threat to the Gunnison Sage Grouse

There is no documented relationship between cheatgrass, or other nonnative weeds, and sage grouse populations. See 12-Month Finding for Petitions to List the Greater Sage Grouse as Threatened or Endangered, 70 Fed. Reg. 2243 (Jan. 12, 2005).

F.    Climate Change Not a Threat to the Gunnison Sage Grouse

There is no credible evidence that climate change, environmental stochastic events, and other human disturbances threaten the sage grouse. Id.

G.    Disease Not a Threat to the Gunnison Sage Grouse

Disease or predation do not threaten the continued existence of the species. There has been relatively little concern related to West Nile Virus in Colorado in recent years. Jim Erickson, W. Nile isn't plaguing Colorado this season, Rocky Mountain News (August 20, 2005).

There is no evidence supporting a link between West Nile virus and coal-bed methane development. 70 Fed. Reg. 2244. The FWS found that even "dramatic fluctuations" in the amount of black-tailed prairie dog occupied habitat at specific large complexes, due to plague, did not appear to influence range-wide species persistence. 69 Fed. Reg. 51217 (Aug. 18, 2004). Also in the case of the prairie dog, Lomolino et al. (2003) postulated that habitat fragmentation may actually benefit some populations by protecting them through isolation. Such issues should be considered for the Gunnison sage grouse as well.

H.    Oil and Gas Activity Not a Threat to the Gunnison sage Grouse

The threat to Gunnison sage grouse from oil and gas development is also overstated. In May of 2005, the BLM pulled two parcels of land in San Miguel County from its May 12 oil and gas lease sale because of the presence of sage grouse. D. Dion, Telluride Daily Planet (May 5, 2005). In addition, the BLM has deferred leasing 14 split-estate parcels to review potential impacts to the sage grouse. Eryn Gable, BLM withdraws Gunnison sage grouse habitat from leasing, Land Letter (May 19, 2005).

Even if domestic energy production is on the increase, there is no evidence that it threatens the sage grouse with extinction throughout all or a significant portion of its range. Simple references to permits for oil and gas development do not correlate with whether this development has occurred, and if so, whether it is occurring in sage grouse habitat. In addition, there is not substantial scientific information indicating that these developments affect sage grouse use of habitat, reproduction or survival.

Surface disturbance from oil and gas production is also greatly exaggerated. The actual footprint of such activities is too minute to quantify given the vast amount of sagebrush habitat. For example, the 90-day Finding on the greater sage grouse notes that at least 98% of sagebrush habitat within the [Powder River] Basin will be undisturbed by what has often been considered the most widespread oil or gas development project in American history. The FWS also estimates disturbance as a result of oil and gas activity at less than one percent of habitat. See 70 Fed. Reg.2262. In the determination not to list the greater sage grouse, energy production was ranked relatively low (sixth) as a range-wide risk factor to the species. Id. at 2264.

Moreover, extensive habitat mitigation is required on private surface, even where the mineral ownership is also in private hands. Surface Use Agreements ("SUA") are negotiated with private surface owners and these specify reclamation requirements, damage payments, etc.. Where federal minerals underlay the private surface, the BLM requires execution of a SUA and a Surface Use Plan, including mitigation and reclamation specifications, prior to approval. Surface Use Plans are required by BLM nationwide pursuant to Onshore Order 1 (BLM, 2001a).

I.    Localized Impacts from Development not a Threat to the Gunnison Sage Grouse
The FWS has previously determined that localized impacts are insufficient to warrant listed status. For example, based upon the discovery of only eleven additional sites, the FWS considered localized impacts from mining and road construction insignificant to the Rydberg milk-vetch such that delisting occurred.[16]

Similarly, in the 12-month finding for the black-tailed prairie dog, the FWS noted that urbanization represents a locally substantial loss of occupied habitat, but in a range-wide context it is not significant. The FWS further stated, given population estimates in Colorado and elsewhere, urbanization cannot be considered a threat at present or in the foreseeable future, either in Colorado or rangewide.[17] If urbanization along Colorado's Front Range s not a threat to the black-tailed prairie dog, then it must not be a threat to a sage grouse that inhabits tens of millions of acres of public land throughout southwestern Colorado.

Habitat degradation and fragmentation are greatly overstated as potential threats despite significant uncertainties, and indeed, evidence to the contrary. All U.S. cities and towns occupy only 3 percent of the nation's land.[18] Localized threats to such a far-ranging species are insufficient to merit listing. Finally, the significant regulatory mechanisms and conservation measures discussed herein protect the Gunnison sage grouse throughout its range. Localized threats to such a far-ranging species as the Gunnison sage grouse are insufficient to merit a proposed listing. The FWS previously determined that localized impacts from mining and road construction were insignificant to the Rydberg milk-vetch due to population numbers and the range of the species. 54 Fed. Reg. 37941, 37942 (Sept. 14, 1989. Such is the case here as well. Finally, potential impacts of future development are not quantifiable and the FWS cannot conclude that listing is warranted without violating the best available science standard under the ESA and the standards of the Data Quality Act.

IX.    **Adequate Existing Regulatory Mechanisms are in Place to Protect the Gunnison Sage Grouse**

Section 4(b) of the ESA requires the FWS to take into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and

---

[16] 54 Fed. Reg. 37941, 37942 (Sept. 14, 1989.
[17] 69 Fed. Reg. 51217 (Aug. 18, 2004).
[18] U.S.D.A. 1997 Natural Resources Inventory.

food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas." 16 U.S.C. § 1533(b)(1)(A). Accordingly, the FWS must consider the vast array of local, state and federal laws, rules, regulations and ordinances that protect sagebrush habitat and sage grouse throughout its range.

The Western Governor's Association compiled summaries of the "unprecedented" locally-driving efforts to conserve sage grouse and sagebrush habitat. WGA, Conserving the Greater Sage Grouse; Telling the Private Lands Story…Conservation of the Greater Sage Grouse – A Partnership Effort. These documents provide an exhaustive list of impressive on-the-ground work that must be considered in the listing decision on the Gunnison sage grouse. It should also be noted that these efforts could be compromised should sagebrush obligates, such as the sage grouse in southwestern Colorado, be listed.

Local and State involvement has been crucial to delisting species and preventing listings (the black-tailed prairie dog, the mountain plover and the peregrine falcon (where State wildlife agencies played a fundamental role in the recovery process and delisting by protecting nesting habitat, carrying out releases, and monitoring populations). The FWS fails to consider the extensive federal, state and local conservation activities currently occurring for the benefit of the greater sage grouse and sagebrush habitat. These efforts far overshadow conservation efforts relied upon to delist species in the past, and must be considered in the FWS decision on the Gunnison sage grouse.

Sections 4(a)(1) and 4(b)(1)(A) as well as 50 CFR 424.111(f) require the FWS to consider any State or local laws, regulations, ordinances, programs, or other specific conservation measures in listing decisions. And local and state conservation efforts have been successful in conserving species in the past. See e.g. Frances Haverstrom, Strictly for the Chickens, Iowa State Univ. Press (1980). Many rare species, including the Virgin River Spinedace in utah, Pecos pupfish in New Mexico and the Copperbelly water snake in Kentucky, Illinois and Indiana have benefited from state and local conservation efforts such that listing was unnecessary.

The FWS must also abide by the August 26, 2004 Executive Order requiring the Department of the Interior, as well as other Departments, to "implement laws relating to the environment and natural resources in a manner that **promotes cooperative conservation**, with an emphasis on appropriate local participation in Federal decision-making, in accordance with their respective agency missions, policies, and regulations." Exec. Order No. 13352. (Emphasis added).

The Interagency Cooperative Policy Regarding the Role of State Agencies in Endangered Species Act Activities, (the Interagency Policy) emphasizes the importance of the states in conserving species prior to listing decisions. Prior to making listing decisions, the Interagency Policy directs the FWS to: utilize the expertise and solicit the information of State agencies in determining whether listing is warranted. 59 Fed. Reg. 34275 (1994). Further, the FWS is to work with the States in developing proactive measures for species and their habitat to remove or alleviate threats such that listing is not warranted." Id.

<u>Conservation efforts for the sage grouse are synonymous with conservation efforts for sagebrush habitat.</u>  And the States within the range of the sage grouse have, or are developing, conservation plans for the species' habitat.  The conservation plans are focused on addressing local sage-grouse or sagebrush habitat concerns through a variety of mechanisms (*i.e.*, changes in regulations, habitat improvement projects, etc.). 70 Fed. Reg. 2272.  Since the FWS decision not to list the greater sage grouse, such efforts have progressed to the point that the agency must consider these efforts when making listing decisions for other sagebrush obligates, such as the Gunnison sage grouse.

A.    <u>Western States Actively Involved in Sage Brush and Sage Grouse Conservation</u>
The States that participate in the Western Association of Fish and Wildlife Agencies ("WAFWA"), are now considering the development of a single memorandum of understanding for all sagebrush species.

On January 7, 2005, WGA pledged to continue conservation efforts on sagebrush habitat in response to the decision not to list the greater sage grouse.  On February 11 and 12, 2005, WGA sponsored the National Conference for Sage Grouse Local Working Groups in Sparks, Nevada.  There, experts from around the country, representatives of local working groups, state and federal agencies, universities, environmental groups and Tribes, convened to discuss how best to move forward with sagebrush conservation efforts.

Specifically, the conference objective was, "[T]o provide a forum for the local working groups to meet, communicate and network to advance the protection and enhancement of sage-grouse and sagebrush by *Empowering Local Working Groups* with current information, validated science, and conservation tools." <u>Conference Proceedings Report</u> at 1 (emphasis in original).  Conference recommendations included:  annual (or biennial) state or regional conferences for local working groups, interagency and interstate cooperation and information exchange, the development of a clearinghouse for research, data, funding, best management practices, and project implementation stories, establishment of a direct link to the governors for the local working group members and other agencies, recommendations for funding to implement strategies, and that all the agencies, non-governmental groups, establish and maintain the conservation efforts as a priority. <u>Conference Proceedings Report</u> at 7.

On June 13, 2005, the Western Governors' Association established a Sagebrush Conservation Council to:  (1)  Ensure continued progress of the efforts at the federal, state, and local level to conserve sagebrush habitats and the sage grouse across its range; and (2)  Provide support for other conservation initiatives within the sagebrush ecosystem.  Western Governors' Association Sagebrush Conservation Charter.  The council will assist local groups in implementing their plans to conserve sage grouse habitat. Gargi Chakrabarty, <u>West's agenda:  habitat</u>, Rocky Mountain News 3C (June 27, 2005).  It will also coordinate local, state and regional plans. <u>Id.</u>

B.      State Efforts to Conserve the Gunnison Sage Grouse

The Gunnison sage grouse is a species of special concern in Colorado.  Colorado's nongame state income tax checkoff program allows residents to donate any amount they choose as a contribution from their state tax refund or as a donation.  Through the Colorado Species Conservation Partnership, Great Outdoors Colorado state lottery proceeds amounting to $12 million have been granted to the Colorado Division of Wildlife ("DOW").  DOW has shifted significant resources to the sage grouse, including the purchase of at least two wildlife areas.

Conservation efforts in Colorado far exceed the national norm.  Colorado is the number three state in the nation by acres protected by land trusts.  Colorado Conservation Trust, Conservation at a Crossroads at 8 (2005).  Since 1996, 75 conservation measures have passed generating over $2 billion dollars in funds for conservation efforts in Colorado. Id.  Significant conservation measures are already in place, and underway, in the range of the Gunnison sage grouse.

Roughly 182,000 acres of private land have been protected in current and potential habitat for the Gunnison sage grouse in Colorado.  See Colorado Conservation Trust, Conservation at a Crossroads at 6 (2005).  The Trust for Public Land, Mesa Land Trust, and other groups, have protected 60,000 acres of private lands in Mesa County.  Id. at 9.  At least 50,000 acres of crucial habitat has already been protected in Gunnison County. Id.  There, a real estate tax in Crested Butte and a county sales tax generate over $1 million per year for land protection.  Id.

1.      Rangewide Conservation Plan

The DOW has led efforts to adopt a Rangewide Conservation Plan for the Gunnison sage grouse.  The purpose of the plan is to protect, enhance, and conserve Gunnison sage grouse populations and their habitats by providing a rangewide perspective, guidance and recommendations to local working groups and other interested or affected parties and stakeholders.  Available at: http://wildlife.state.co.us/species_cons/Gunnison_sage_grouse/index.asp.  The plan has been reviewed and is considered strict enough that it "would effectively block any future development in the Gunnison Area."  Laura S. Freeman, County responds to new sage grouse defense guidelines, Gunnison Country Times (Dec., 2004) (quoting Glen Noble, engineering manager for the Gunnison County Electric Association).  More importantly, the Gunnison Sage-Grouse Rangewide Conservation Plan identified "a low risk of extinction for the species range-wide."  Available at: http://wildlife.state.co.us/species_cons/Gunnison_sage_grouse/index.asp.

2.      Candidate Conservation Agreements with Assurances

The DOW is also seeking participants in Candidate Conservation Agreements with Assurances (CCAAs) for the sage grouse.  Gary Gerhardt, Plan may keep bird off endangered list, Rocky Mountain News 8A (May 14, 2005).  DOW received key support for the CCAAs from the Gunnison County Stockgrowers Association.  Editorial, Stockgrowers step up, Gunnison Country Times (June 9, 2005).

The CCAAs will protect occupied habitat through Certificates of Inclusion. Next, landscapes will be kept intact by protecting currently occupied, vacant/unknown and potential habitats and precluding future fragmentation. Restoration and enhancement of habitat may also be pursued. Taken together, the DOW expects to "provide habitats necessary to achieve the optimum population goals cited in the rangewide plan." CCAA for Gunnison Sage Grouse at 10. By July 1, 2006, the DOW will have appropriated $280,000 for CCAA surveys and baselines. Gary Skiba (pers. comm. 2005). Less than 45% of the habitat for the sage grouse is on private land. Id.

NRCS has also helped fund private land work through habitat management agreements and by designating some lands as priority areas for the Conservation Reserve Program. Terry Ireland, A Success Story in the Making, Endangered Species Bulletin (Sept. 1999). BLM has worked with private landowners to change grazing patters or rest BLM grazing allotments. Id. Allotment management plans have been revised to include sage grouse conservation measures. Grazing exclosures have also been created. In addition, FWS provided $60,000 to DOW for habitat management for one of the most imperiled populations in 1998. Id.

As previously stated, the FWS has declined to list other species with lower populations numbers, fewer conservation efforts and lower percentages of habitat protected by federal lands and federal laws. Accordingly, the FWS should decline to list, and withdraw from candidate status, the Gunnison sage grouse.

C.    Significant Local Regulatory Mechanisms Protect the Gunnison Sage Grouse
Local ordinances and regulations, in conjunction with federal management actions, have been determined sufficient to preclude the need to list before. See FWS News Release, Sacramento Mountains Checkerspot Butterfly will not be Declared Endangered, (Dec. 21, 2004). There, a greenbelt ordinance, a County resolution to conserve the butterfly and implement regulatory measures, as well as USFS efforts to manage and maintain butterfly habitat precluded the need to list. Id.

While the FWS has recognized "numerous conservation actions have occurred and funding and plans for additional conservation actions are in place," the agency said threats have not been eliminated or reduced enough to remove the need for potential listing. Specifically, the FWS cited the relaxation of restrictions on land use in Gunnison County as an ongoing threat to justify a potential listing.

But, in a July, 2005 newspaper article, Gunnison County Manager John DeVore said the FWS had two fundamental misconceptions in regards to proposing to list the GUSG. Laura S. Freeman, Federal officials say sage grouse could dodge listing, Crested Butte News 12 (July 22, 2005). First, agencies incorrectly assumed development on private land would continue as in the past. It will not. Second, agencies incorrectly assumed the county did not have sage grouse protection regulations. Id.

Counties have significant regulatory authority, commonly-known as 1041 regulations, as enumerated by C.R.S. §§ 24-65.1-201, 203. These powers apply to areas of state interest,

and activities of state interest, as defined by local governments. 1041 powers have been applied to prevent projects that are perceived to have significant environmental impacts. Gunnison County, for one, is now considering including the needs of the Gunnison sage grouse in its Special Development Regulations and Land Use Resolution.

The County Commissioners are speaking with DOW and FWS officials about how best to amend their LUR to help the grouse. Toni M. Todd, <u>Commissioners look to facilitate grouse recovery</u>, Gunnison Country Times (June 9, 2005). Gunnison County also has over $240,000 in a Sage Grouse Mitigation Fund that will be used to help conserve the sage grouse. <u>See</u> Toni M. Todd, <u>Commissioners look to facilitate grouse recovery</u>, Gunnison Country Times (June 9, 2005). It will also be used to hire a full-time sage grouse coordinator at the local level. <u>Id.</u> In addition, the County has formed the Gunnison Valley Sage Grouse Strategic Committee to work with the coordinator on sage brush conservation. Finally, the County plans to amend the bylaws of the Land Preservation Board to help with conservation efforts. <u>Id.</u> In addition, the Commissioners are reconsidering past changes to the LUR. Laura S. freeman, <u>Commissioners to reconsider LUR changes</u>, Gunnison Country Times (April 28, 2005).

San Miguel County has also used its regulatory power and the Gunnison sage grouse to stop a small-scale renewable energy project (a windmill). D. Dion, <u>Sage grouse gets reprieve from county</u>, Telluride Daily Planet (May 5, 2005).

1.    <u>Local Working Groups</u>

Five local working groups are dedicated to sage grouse efforts in southwestern Colorado and state and federal agencies have already undertaken aggressive conservation efforts to benefit sagebrush species. The Gunnison Working Group, for example, has been working to protect the GUSG for 11 years. A long-time National Park Service employee was named coordinator for the Working Group in March, 2005. Partners in the Working Group effort include: Black Canyon Audubon Society, BLM, DOW, Gunnison County Stockgrower's Association, Gunnison County, High Country Citizen's Alliance, NPS, NRCS, the Sisk-a-dee environmental group, USFS, FWS and Western State College.

In a letter to the Gunnison Working Group, the FWS recognized its remarkable efforts to manage and conserve habitat, implement regulatory restrictions, conduct research, and educate the public. As the FWS stated:

> Habitat is being managed throughout the current range of the sage-grouse, including some brush beating or thinning; preservation, restoration, and enhancement of riparian, wetland, and wet meadow areas; changes in grazing management; removal of encroaching pinyon, juniper, oakbrush, and nonnatives; seeding of native forbs and grasses; and the planting of sagebrush. Habitat is being conserved through purchase and conservation easements and changes in Gunnison County Land Use Resolutions. Information materials have informed the public about the sage-grouse and some habitat maps have been created. Research on habitat use, habitat corridors between populations, and genetics should provide further guidance on range-wide management actions in a range-

wide Conservation Plan. All of these actions have been and will be considered during our annual status reviews.

Letter from John A. Blankenship, Acting Regional Director, to Gunnison Sage-grouse Working Group Members (July 2, 2002).

Funding for the Working Group has come from DOI's Cooperative Conservation Initiative (CCI) and through the DOW and the Challenge Cost-Share program. Early implementation efforts were funded by the National Fish and Wildlife Foundation (NFWF), and The Nature Conservancy has provided various in-kind support for other efforts. A local environmental group also markets sage grouse t-shirts and uses the proceeds to fund educational materials. Available at:
http://www.blm.gov/nhp/spotlight/sage_grouse/success/gunnison.htm

Further, BLM and the county agreed to institute a surcharge on dumping at the landfill to support environmental mitigation and habitat conservation, since the site chosen was in sage grouse habitat. Surcharges are placed in a special fund that is used for cost-share projects. Id. In addition, the Gunnison Sage Grouse Conservation Plan developed by the Working Group provides more than 200 conservation actions to conserve the sage grouse. Id.

D.    Federal Laws and Federal Land and Management
The FWS should consider the tens of millions of acres of sage grouse habitat owned and/or managed by the federal government. Sage grouse habitat constitutes tens of millions of acres of federal lands and are currently protected by a vast array of federal environmental and land management statutes and directives, including, but not limited to: the Federal Land Policy and Management Act ("FLPMA"), the National Forest Management Act ("NFMA"), the National Environmental Policy Act ("NEPA"), the Clean Water Act, the Sikes Act, the National Park Service and U.S. Forest Service Organic Acts, and the BLM Manual. Many federal agencies, particularly the BLM, already have a long list of management activities and stipulations to protect sagebrush obligate species like the sage grouse.

The BLM is responsible for managing the oil and gas resources in the United States on lands administered by the Forest Service, Fish and Wildlife Service, Department of Defense, and BLM. BLM also oversees minerals operations on Tribal. The BLM has been active in sage grouse and sagebrush conservation. BLM considers the Gunnison sage grouse a sensitive species. In addition to Section 6 of the federal oil and gas lease form, the NEPA process for permitting projects and the Interagency Gold Book, the Western Governor's Association outlined many important federal and state laws, policies and regulations that apply to sagebrush habitat:

    • Mineral Leasing Act (1920) (30 USC 181-263, as amended) – Authorizing the Secretary of the Interior to issue leases for the disposal of certain minerals (currently coal, phosphate, sodium, potassium, oil, oil shale, gilsonite, and gas), including leases beneath National Forest surface.

• Mineral Leasing Act for Acquired Lands (1947) (30 USC 351-359 as amended) - Stating that all deposits of coal, phosphate, oil, oil shale, gas, sodium, potassium, and sulfur that are owned or may be acquired by the United States shall be leased by the Secretary of the Interior under the same provisions as contained in the mineral·leasing laws.
• Forest and Rangeland Renewable Resources Planning Act (1974) (16 USC 1600-1614) - Which regulated the planning and management of renewable resources on national forest lands.
• Sikes Act (1974) (16 USC 670g, *et seq*., as amended) - Directs the Secretaries of the Interior and of Agriculture to develop, maintain, and coordinate wildlife conservation programs in cooperation with state agencies.
• Federal Land Policy and Management Act (FLPMA) (1976) (43 USC. 1701 *et seq*.) - Authorizing the Secretary of the Interior to manage the public lands for multiple uses so as to protect environmental qualities and to regulate the disposal of the public lands.[19]
• National Forest Management Act (NFMA) (1976), (16 USC 1600 *et seq*., as amended, 36 CFR 219.6) - Authorizing the Secretary of Agriculture to develop management programs based on multiple-use, sustained yield principles and implement a resource management plan for each unit of the National Forest System.
• Federal Onshore Oil and Gas Leasing Reform Act (FOOLGRA) (1987) (30 USC 195, 226-3) - Granting the Secretary of Agriculture expanded authority over oil and leases and approval of surface disturbance.

BLM also regulates approval of operations and manages oil and gas drilling activities on the federal public lands through its Onshore Oil and Gas Orders. Orders of particular importance to sage-grouse conservations efforts include:

• Onshore Order No.1 - Approval of Operations
• Onshore Order No. 2 - Drilling Operations
• Onshore Order No. 7 - Disposal of Produced Water

Collectively, these regulations provide authorization to the BLM and USFS to apply restrictions to oil and gas development on federal lands and on federal split-estate mineral situations. The regulations provide full authorization to institute conservation measures designed to protect sage-grouse and other species of concern.

At the state level, each of the oil-producing states has authorized oil and gas regulatory bodies to govern oil and gas development within their borders. Other

---

[19] The Federal Land Policy and Management Act of 1976 (FLPMA) (43 U.S.C. 1701 et seq. governs most land uses on BLM-administered lands. Section 102(a)(8) of FLPMA specifically recognizes wildlife and fish resources as being among the uses for which these lands are to be managed. Regulations pursuant to FLPMA and the Mineral Leasing Act (30 U.S.C. 181 et seq.) that address wildlife habitat protection on BLM-administered land also include 43 CFR 3162.3-1 and 43 CFR 3162.5-1; 43 CFR 4120 et seq.; 43 CFR 4180 et seq..

state agencies, such as the departments of environmental quality, may apply additional restrictions to ensure that oil and gas industry operations are conducted in an environmentally safe manner.

Cooperation between the state wildlife agencies of the sage-grouse states and the BLM, USFS, and USFWS is authorized by the Memorandum of Understanding (MOU) of August 2000. Provisions of that agreement include (BLM, 2001):

• The States will convene working groups to develop State or local sage grouse and sagebrush conservation plans;
• An interagency Conservation Planning Framework Team will be established to develop a range-wide Conservation Framework;
• The MOU Parties will begin collecting, analyzing and distributing sage-grouse population and habitat data to the working groups for conservation planning purposes.

All of these provisions are currently being acted upon. The MOU also requires the BLM, USFS and FWS to:

• Provide for habitat protection, conservation and restoration consistent with the National Environmental Policy Act and other applicable laws, regulations, directives, and policies;
• Consider the WAFWA Guidelines for Management of Sage-grouse Populations and Habitats, State and Local Conservation Plans, and other appropriate information in their respective planning processes; and,
• Work together to identify research needs and strategies and conduct joint assessments, monitoring and research.

The majority (70%) of existing sagebrush habitat is publicly owned and managed by a state or federal agency. The U.S. Bureau of Land Management (BLM) manages approximately 50% of existing U.S. sagebrush habitat (Connelly *et al*, 2004, pg. ES-1). This figure somewhat understates the importance of BLM oversight with respect to the oil and gas industry. The BLM is authorized by the federal government to be the agency solely responsible for issuing federal oil and gas leases and permitting drilling applications.

Western Governor's Association, "Greater Sage-grouse Conservation Efforts and the Oil and Gas Industry: An Analysis showing the extensive Greater Sage-grouse conservation efforts conducted by the oil & gas industry across the West, ("WGA's Analysis") at 39-41 (Aug. 17, 2004) (emphasis in original).

Moreover, 43 CFR 1600, Planning, Programming, Budgeting, contains the regulatory authority for resource management planning, which guides the development of and revisions to BLM's land use plans which in turn designate areas of critical environmental concern and impose other measures that are utilized to manage sage grouse and other species of concern, including their habitats.

In addition to land use plans, all federal agencies are required to perform an environmental analysis of proposed projects on public lands. The environmental analysis is driven by the type of project that is proposed, issues identified by the public, conformance with land use plan requirements, and interagency acquisition of and exchange of information pertinent to protection of important wildlife species and habitats. WGA's Analysis at 12.

The BLM also requires producers to post reclamation bonds prior to surface disturbing operations and enforces very rigid and specific interim and final reclamation requirements on areas disturbed by oil and gas drilling, roads or pipelines. The seed mix on areas disturbed by oil and gas activities must include species beneficial to wildlife, including sagebrush obligates. Reclamation bonds are released only after BLM or USFS certifies the success of reclamation efforts.

The BLM's comprehensive conservation efforts also include (among other things): issuance of guidance to the states, rulemakings, restating policy through Instruction Memorandum applying Health Standards to BLM lands, issuing interim management guidelines, issuing supplemental planning guidance for the Land Use Planning Handbook and issuing program guidance including BMPs for sage-grouse and sagebrush conservation in fire, travel, and grazing plans and vegetation management plans as well as operations. Id. at 13-20.

Federal and State agencies have vigorously implemented conservation measures for sagebrush conservation. As WGA concludes:

> **Adequacy of existing regulatory safeguards** - This study has examined sage-grouse and sagebrush management practices of the BLM and USFS, the principal public lands management agencies within the sagebrush biome. It has demonstrated that actions by these agencies, and by state land management agencies, affect the vast majority of sagegrouse habitat (70%) and will thus be the principal determinants in species recovery efforts. It has further demonstrated that these agencies, the BLM in particular, have responded to the increased perception of threats to the species with increased environmental protective measures in management plans. [along with increased monitoring by the states, the discovery of unknown breeding grounds and some mitigation activities on private lands] . . . **Such measures, taken together, eliminate or adequately reduce the threats to the species.**

WGA's Analysis at 94. (emphasis in original). WGA examined 136 management plans, major NEPA documents, and BLM state office guidelines over more than two decades to inventory sage-grouse and sagebrush conservation measures imposed by BLM and USFS. But even this compilation fails to capture the myriad of protective measures already in place.

BLM policy and guidance for species of concern occurring on BLM managed land is addressed under BLM Manual 6840--Special Status Species Management (BLM 2001). The BLM has designated the sage grouse a sensitive species. BLM's policy regarding sensitive species is that "[T]he protection provided by the policy for candidate species shall be used as the minimum level of protection for BLM sensitive species." (BLM 2001). This designation carried with it, through regulation, habitat and species protections similar to those afforded candidate species under the ESA. The BLM policy regarding candidate species includes: implementation of management plans for conserving the species and its habitats; ensuring actions authorized, funded, or carried out by the BLM do not contribute to the need for the species to become listed; ensuring the species are considered in land use plans; developing and/or participating in management plans and species and habitat assessments; and monitoring the species for evaluating management objectives. (BLM 2001).

Land use plans are the basis for all actions and authorizations involving BLM-administered lands and resources: they establish allowable resource uses, resource condition goals and objectives to be attained; program constraints and general management practices needed to attain the goals and objectives; general implementation sequences; and intervals and standards for monitoring and evaluating the plan to determine its effectiveness and the need for amendment or revision (43 CFR 1601.0-5(k)). An estimated 85 plans contain standards and/or prescriptions that "contribute positively to on-the-ground sage-grouse habitat conservation" and/or "contribute positively to on-the-ground sagebrush conservation." 70 Fed. Reg. 2272. In fact, the BLM Manual 6840.22A is geared specifically towards protecting species and their habitats such that listing under the ESA is not necessary. Id. at 2273.

On November 16, 2004, BLM Instruction Memorandum (IM) No. 2005-024 informed all BLM offices of the development of a National BLM Sage-grouse Habitat Conservation Strategy designed to promote conservation of sage-grouse and sagebrush habitats on BLM lands. The IM instructed BLM State Directors to develop a process and schedule to update deficient land use plans to adequately address sage-grouse and sagebrush conservation needs no later than April 1, 2005. Implementation plans are also covered by this IM.

BLM has regulatory authority regarding oil and gas leasing pursuant to 43 CFR 3100 et seq., and regularly requires stipulations as a condition of issuing a lease. BLM land use plans and implementation plans may also include Best Management Practices (BMPs). IM 2004-194 (June 22, 2004) addresses the integration of BMPs into Application for Permit to Drill (APD) approvals and associated rights-of-way with appropriate NEPA evaluation. BLM expects that wells drilled using BMPs will have fewer impacted acres of sagebrush habitat than has been estimated in EISs (e.g., for the Powder River EIS) and consequently there will be less habitat loss and fragmentation (BLM 2004a).

BLM also has regulatory authority for grazing management as provided in 43 CFR part 4100. The State or regional standards for grazing administration must address habitat for endangered, threatened, proposed, candidate, or special status species, and habitat quality

for native plant and animal populations and communities (43 CFR 4180.2(d)(4) and (5). The BLM states that 89 percent of lands are meeting standards, or are not meeting standards but appropriate actions have been implemented to ensure significant progress towards the standards (BLM 2004a).

The BLM spent over $14 million on sage grouse conservation in FY 2004 and sought an increase of $3.2 million for FY 2005 for restoration and conservation of sagebrush habitats. Statement of Chad D. Calvert on Sage Grouse Conservation, U.S. Department of the Interior, Before the Senate Environment and Public Works Committee, Subcommittee on Fisheries, Wildlife and Water on Sage Grouse Conservation, (Sept. 24, 2004). Special Status Species Program is the BLM's regulatory scheme to address conservation efforts to avoid the need to list species. The Department's Manual at 632.16 directs BLM to "utilize authorities to not only protect listed species, but also to avoid precipitating the decline of other species to the point where listing would be appropriate." Id.

BLM also assists with the Candidate Conservation program where FWS works with states, landowners and others to voluntarily conserve candidate and other species. Candidate Conservation Agreements can involve both federal and non-federal land and they do not include assurances as CCAAs do. Under the Landowner Incentive Program, the FWS also provides financial assistance to partners interested in implementing the conservation actions that benefit listed and other species.

Existing regulatory mechanisms are adequate to address potential impacts to sage grouse habitat. For example, all BLM field offices whose jurisdictions include sagebrush habitat have stipulations related to habitat protection.

E.    Other Laws, Regulations and Efforts Protect the Gunnison Sage Grouse
The Forest Service (USFS) has management authority for 8 percent of the sagebrush habitat in the United States. Management of Federal activities on National Forest System lands is guided principally by the National Forest Management Act (NFMA) (16 U.S.C. 1600-1614). NFMA specifies that all National Forests must have a land and resource management plan (LRMP) (16 U.S.C. 1600) to guide and set standards for all natural resource management activities on each National Forest or National Grassland. NFMA requires the USFS to incorporate standards and guidelines into LRMPs (16 U.S.C. 1600). This has historically been done through a NEPA process, including provisions to manage plant and animal communities for diversity, based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives. The Forest Service can also place additional seasonal or temporal stipulations to protect sage-grouse on oil and gas developments on lands they manage (Forest Service in litt. 2004).

The National Park Service Organic Act states that the NPS will administer areas under their jurisdiction "by such means and measures as conform to the fundamental purpose of said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historical objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the

enjoyment of future generations." 16 U.S.C. § 1 et seq..

The National Wildlife Refuge System Administration Act (16 U.S.C. 668dd-668ee)
provides guidelines and directives for administration and management of all areas in the
National Wildlife Refuge system. Refuges are managed for species
conservation, consistent with direction in the National Wildlife Refuge
System Administration Act, as amended, and related Service polices and guidance.

The Natural Resources Conservation Service (NRCS) of the U.S. Department of
Agriculture assists farmers, ranchers, and other private landowners in reducing threats to
sagebrush habitat.  Large areas of privately-owned lands are currently withdrawn from
crop production and planted to native and non-native cover under the
NRCS' Conservation Reserve Program (CRP) (69 FR 24875).  The Natural Resource
Conservation Service has also prepared a strategy for focusing conservation programs
that use incentives for private landowners to conserve or enhance sagebrush habitat.
Letter from Dr. James A. Mosher, North American Grouse Partnership, to Pat Diebert,
U.S. Fish and Wildlife Service (July 28, 2004) (on file with U.S. Fish and Wildlife
Service).

Executive Order 13112 required the National Invasive Species Council to produce a
National Management Plan (NMP) for Invasive Species every two years.  In January
2001, the Council released the first NMP, which serves as a blueprint for all federal
action on invasive species. It provides goals and objectives for invasive species
management, research needs, and measures to minimize the risk of species introductions.

Part of the Cooperative Conservation Initiative, funded through the Land and Water
Conservation Fund (LWCF), the Partners for Fish and Wildlife program, a voluntary
habitat restoration program, provides financial assistance and restoration expertise to
private landowners and other partners who choose to improve habitat on their land.  Since
its creation in 1987, the Partners for Fish and Wildlife has resulted in over 28,000
agreements with landowners resulting in the restoration of over 1 million acres of
uplands, nearly 650,000 acres of wetlands and nearly 5,000 miles of riparian and stream
habitat. Statement of Chad D. Calvert on Sage Grouse Conservation, U.S. Department of
the Interior, Before the Senate Environment and Public Works Committee, Subcommittee
on Fisheries, Wildlife and Water, (Sept. 24, 2004).  These, and other programs, "reflect a
strong commitment to conservation through cooperation, communication and
consultation with private, state and other non-federal partners." Id.

Private conservation efforts are also laudible.  For example, all 22 electric cooperatives in
Colorado are implementing avian protection measures including raptor perch avoidance
near sage grouse leks. Remarks of Donnah Moody, CREA, Cooperative Conservation in
Action (July 7, 2005).  Private industry is also participating in habitat and wildlife
improvements aimed at sagebrush and sage grouse conservation, helping to conduct
wildlife surveys and implementing production restrictions on federal and private land.
Other groups are coordinating with BLM on operational guidelines and Best

Management Practices on developed lands regardless of ownership and implementing voluntary mitigation measures.

Other private conservation actions include: efforts to minimize damage to soils and sagebrush understory, underground placement of electrical lines, invasive plant control by routine washing of company and contractor vehicles, education of employees and contractors regarding best management practices, commitments to work with the scientific community and local stakeholders to obtain new data and improve management practices as well as support for local sage-grouse working groups, assistance with long-term planning and funding, coordination with BLM on habitat enhancement and wildfire reduction, and assistance with species inventories.

## X.    PECE POLICY

The Honorable Craig Manson, former Assistant Secretary for Fish, Wildlife and Parks at the U.S. Department of the Interior lauded the decision to rely on state and local conservation efforts (rather than a federal listing) for the greater sage grouse. "This is the beginning of a great story in American conservation," said Manson. And FWS officials have conceded state and local conservation efforts may be more productive for the sage grouse:

> By using Conservation Plans and the new CCAA policy, we believe it is possible to ensure the survival of the Gunnison sage grouse without Federal listing. With some people less willing to actively conserve federally listed species on their land, conservation efforts for non-listed species appears to be a beneficial approach. If the States and stakeholders take an early lead for the management of non-listed species, as they have done with the Gunnison sage grouse, species conservation may be more successful in the long term. . . ."

Terry Ireland, A Success Story in the Making, Endangered Species Bulletin (Sept. 1999).

The FWS' Policy for Evaluation of Conservation Efforts When Making Listing Decisions ("PECE") establishes a consistent set of criteria to evaluate whether formalized conservation efforts, that have yet to be implemented or to show effectiveness, will improve the status of the species such that listing is unnecessary.

Pursuant to the PECE policy, the FWS received and reviewed 27 plans, or conservation strategies, outlining more than 300 individual conservation efforts for the greater sage grouse. 70 Fed. Reg. 2251. Many of these will also benefit the sage grouse in southwestern Colorado. Consistent with the FWS ecosystem approach, conservation efforts for the sage grouse and sagebrush habitat, should be considered to benefit other species that utilize similar habitats. Conservation efforts for sagebrush habitat will preclude the need to list sagebrush species when, as here, they are sufficiently certain to be implemented and effective so as to have contributed to the elimination or adequate reduction of one or more threats to the species. 68 Fed. Reg. 1500, 15115 (2003) (emphasis added).

As specified by WGA:

> BLM's sage-grouse habitat conservation strategy will require a significant
> commitment of staff and resources. The draft Plan called for requests for
> increased budgets and prioritization of sage-grouse conservation across all BLM
> programs. Responses include:
>
> • FY 2005 BLM budget proposal set at $1.8 billion, an increase in funding of $53
> million over FY 2004.
> • FY 2005 budget allocates $3.2 million for sage grouse conservation and
> restoration efforts, in accordance with the draft BLM habitat conservation
> strategy.
> • FY 2005 budget allocates $4.0 million for resource monitoring, an increase of
> 110% over FY 2004.
> • Reallocation of staff and budgets are planned per the Draft Sage-grouse Habitat
> Conservation Strategy (BLM, 2003, pg.21). . . .

WGA Analysis at 29.

As to the certainty that conservation efforts for the sage grouse, and sagebrush habitat,
will be implemented: (1) there is a high level of certainty that the resources necessary to
carry out the conservation efforts are available; (2) the numerous federal, state and local
parties have the authority to carry them out; (3) ample and extensive regulatory and
procedural mechanisms are in place to carry out the efforts; (3) there is a schedule for
completing and evaluating the efforts; and (4) incentives included in the efforts will
ensure the level of voluntary participation needed.

As to the certainty conservation efforts for the greater sage grouse, and sagebrush habitat,
will be effective under PECE, the efforts: (1) describe the nature and extent of threats to
be addressed and how the threats will be reduced; (2) establish specific conservation
objectives; (3) identify the appropriate steps to reduce threats to the species; and (4)
include quantifiable performance measures to monitor compliance and effectiveness.

There is a high level of certainty: that the legal procedural requirements will be met; that
adequate regulatory mechanisms are in place to eliminate or adequately reduce the threats
to the sage grouse; that conservation efforts will be implemented (and effective); and that
the parties to the conservation efforts have demonstrated commitments to the efforts and
a history of receiving funding for species conservation.

## XI.    Gunnison Sage Grouse Afforded More Protections Than Other Species
##        Previously Considered for Listing or Delisting

Similar, yet less rigorous efforts, have been relied upon to delist several species and
withdraw proposed listings. For example, some 59 percent of the habitat of the
Yellowstone Cutthroat Trout ("YCT") is on lands managed by federal agencies and
protected by various federal laws, including the Clean Water Act, FLPMA, NFMA, Wild

and Scenic Rivers legislation, the Wilderness Act and NEPA. 12-Month Finding for a Petition to List the Yellowstone Cutthroat Trout as Threatened, 71 Fed. Reg. 8818, 8825 (Feb. 21, 2006). The USFS also classifies the YCT as a "Sensitive Species." Id.

There, a full status review did not indicate the status and trend of the YCT was declining "in a broad pattern, or to such an extent that would indicate a failure of existing laws and regulatory mechanisms to provide for sufficient protection of the species habitat on National Forest Lands." Id. Even though the YCT is considered a coveted game species, the FWS recognized state regulatory mechanisms and ongoing coordination between state and federal officials as further conservation efforts for the YCT. Id. at 8825-26. The FWS also found no evidence of local extinctions in geographically isolated areas such that it concluded such extirpations were unlikely to occur. Id. at 8827. In fact, having many local populations was found to spread the risk of extinction. Id. Finally, recent upward population trends and adequate regulatory mechanisms and conservation efforts led the FWS to conclude the YCT did not merit listing. Id. at 8831.

Based upon the acquisition of a conservation easement on the only entrance upon the cave by a local land trust, and a CCAA, the FWS determined not to list two species of Kentucky cave beetles and removed them from candidate status. Revised 12-Month Finding for the Greater Adams Cave Beetle and the Lesser Adams Cave Beetle, 70 Fed. Reg. 72973 (Dec. 8, 2005). While the FWS will take no further action, it did solicit further information regarding the species taxonomy, genetics and status. Id. at 72974. The two beetles are said to be "eyeless, reddish-brown insects that range in length from 3 to 5 millimeters. Id.

With conservation efforts in place, and no evidence that surrounding land use has negatively impacted the Holsinger's cave beetle, the FWS found that threats to the species had been eliminated such that it no longer met the definition of a candidate species. Review of Native Species That Are Candidates or Proposed for Listing as Endangered or Threatened; Annual Notice of Findings on Resubmitted Petitions; Annual Description of Progress on Listing Actions; Proposed Rule, 70 Fed. Reg. 24870, 24885 (May 11, 2005). Similarly, the FWS removed the Camp Shelby burrowing crayfish from candidate status due to a CCA along with aggressive habitat management and monitoring. Id.

Even though all four states within the range of the Gunnison's prairie dog recognized it for special management consideration, the FWS declined to list due to existing conservation efforts. 90-Day Finding on a Petition to List the Gunnison's Prairie Dog as Threatened or Endangered, 71 Fed. Reg. 6241, 6247 (Feb. 7, 2006). The FWS cited a WAFWA assessment as well as its Prairie Dog Conservation Team and White-tailed and Gunnison's Prairie Dog Working Group which concluded active management and development of a comprehensive conservation strategy for the species and its habitat are necessary. Such efforts are ongoing and the FWS expects a conservation strategy to be completed by 2006. Id. at 6248.

Special management areas and state listed status helped convince the FWS to delist the McKittrick Pennyroyal. Moreover, the Forest Service agreed to monitor populations, the National Park Service agreed to protect the species on its lands and the BLM placed the plant on its list of sensitive species with a commitment for monitoring for five years. 58 Fed. Reg. 49244 (Sept. 22, 1993). Protection on only 286,000 acres of Federal, State, and private land was deemed sufficient to delist the Hoover's woolly-star. Press Release, U.S. Fish and Wildlife Service, California Native Plant Removed From Federal Threatened Species List, (Oct. 7, 2003).

While management areas encompassed only approximately 35 percent of the remaining flat-tailed horned lizard habitat in the United States, the FWS found the habitat sufficient to withdraw the proposal to list the species. Press Release, U.S. Fish and Wildlife Service, Fish and Wildlife Service Concludes Flat-Tailed Horned Lizard Not Threatened With Extinction, (Jan. 3, 2003). The majority of the habitat for the Rydberg milk-vetch occurred on federal lands administered by the Forest service. 54 Fed. Reg. 37941, 37942 (Sept. 14, 1989). While no regulatory mechanism would protect the species following delisting of the Rydberg milk-vetch, the FWS relied upon the Forest Service Manual and its administrative requirement to protect and maintain viable populations of rare species. 54 Fed. Reg. 37941, 37942 (Sept. 14, 1989). Many of the known breeding sites of the pine barrens tree frog were located on large tracts of public land.

Did the FWS err in its previous decisions to withdraw the black-tailed prairie dog, the Holsinger's cave beetle and the burrowing crayfish from candidate status? Did the FWS err in its decisions to delist the northern rockies population of gray wolf, the mountain plover, the pine barrens tree frog, the peregrine falcon, Aleutian Canada goose, the sicklefin chub, sturgeon chub, the Chiricahua dock, the flat-tailed horned lizard, the Hoover's woolly-star, the McKittrick Pennyroyal, the Robbins cinquefoil and the Rydberg milk-vetch (species with far fewer protections than the sage grouse)? Did the FWS err in its decisions not to list the Black Hills mountainsnail, the Yellowstone cutthroat trout, the Gunnison prairie dog and two Kentucky cave beetles? If not, the FWS should issue a negative listing decision and remove the Gunnison sage grouse from the list of candidate species.

Conservation efforts for the Gunnison sage grouse overshadow those relied upon to delist in the myriad of examples above. The FWS should decline to list the Gunnison sage grouse and should withdraw candidate status.

## XII.    Listing Would Jeopardize Conservation Efforts
Unfortunately, there have been few successes under the ESA: less than one percent of all listed species have ever recovered. Because the regulatory ESA creates a disincentive to landowners, a federal listing, would do little to help (and could even harm) conservation efforts for sage grouse and sagebrush habitat.

Listings often restrict the ability to manage for species and could even result in harm to the species. See Amara Brook, Michaela Zint, Raymond De Young, Landowners' Responses to an Endangered Species Act Listing and Implications for Encouraging

Conservation, 17 Conservation Biology 1473, 1638 (Dec. 2003) (Where an extensive survey of landowners showed that many managed their land so as to avoid the presence of a listed species). Many landowners managed their forest lands to avoid the nesting of federally-listed red-cockaded woodpeckers. For example:

> Ben Cone of North Carolina managed 7,200 acres of timberland with 70-80 year harvest rotations, small cuts, and controlled burns, which . . . created habitat for the red-cockaded woodpecker. When the endangered woodpecker took up residence on Cone's land, more than 1,500 acres were placed under the control of the U.S. Fish and Wildlife Service (see Stroup 1997). In response, Cone began a harvest rotation of 40 years on the rest of his land in order to eliminate the mature pines favored by the woodpecker and also remove any possibility that the federal government would take control of his remaining land.

> Ben Cone's experience is not an isolated incident, as a study by economists Dean Lueck and Jeffrey Michael (1999) confirms. Using data from hundreds of forest plots in North Carolina, they found that the more red-cockaded woodpeckers in the vicinity, the more likely the landowners were to harvest younger trees. . . . (Lueck and Michael 1999, 36). The landowners' incentive for using this shorter rotation was to ensure the birds did not move onto their property, possibly leading to land-use restrictions. Clearly, the ESA is creating perverse incentives.[20]

According to Bureau of Land Management ("BLM") and U.S. Forest Service officials, the ESA creates " . . . a complex maze of processes and procedures, which field biologists and managers must attempt to negotiate on a daily basis in order to implement on-the-ground projects."[21] In regards to the peregrine falcon, leading experts concluded, "despite having the authority for implementing the ESA, and a number of their biologists contributing importantly to the recovery program, as an agency the FWS had a limited role, and its law enforcement division, which was in charge of issuing permits as well as enforcing regulation, was regularly an obstacle to recovery actions."[22]

For many of the same reasons, the FWS regularly states, "[I]n 30 years of implemtneint the ESA, the Service has found that the designation of critical habitat provides little additional protection to most listed species, while preventing the Service from using scarce conservation resources for activities with greater conservation benefits." See e.g. Press Release, Central Population of California Tiger Salamander Listed as Threatened, U.S. Fish and Wildlife Service (July 26, 2004).

The State of Colorado, in public meetings across the southwestern quarter of Colorado, stated its preference to preclude the need to list the sage grouse. The Wyoming Department of Agriculture opposed listing the greater sage grouse in part because of the

---

[20] Holly Lippke Fretwell, Forests: Do we get what we pay for? Available at http://www.perc.org/publications/landreports/report2.php#tale (Emphasis added).
[21] USFS and BLM, Improving the Efficiency and Effectiveness of the Endangered Species Act, (Dec. 15, 2003).
[22] (Burnham and Cade 2003b) (emphasis added).

"unprecedented array of state and locally led sage grouse conservation efforts that are now underway or are planned across the West."[23] The Utah Division of Wildlife Resources aptly stated, "we are concerned that an eventual listing of these species [the greater sage grouse] under the federal Endangered Species Act will only serve to encumber and deflate possible efforts underway to conserve this species through local working groups and Utah's Habitat Initiative."[24] Finally, the North American Grouse Partnership expressed real concern for a multitude of cooperative conservation efforts (and indeed predicted failure for some) should a listing occur.[25]

Local groups oppose the listing of the sage grouse for many of the same reasons. The Colorado Farm Bureau, Montrose County Commissioners, Club 20, State Senator Lew Entz, State Representative Josh Penry, Uncompahgre Valley Water Users Association, San Luis Valley Rural Electric, the Grand Junction Chamber of Commerce, Gunnison County Realtors, Gunnison County Contractors, the Colorado Association of Home Builders, and West Slope COGA have all publicly expressed their support for state and local conservation efforts rather than a federal listing. Colorado Counties Inc. (CCI), also expressed its strong support for state and local conservation efforts. Jake Klein, Public Lands Steering Committee Chair, CCI, letter to the Honorable Gale Norton, (August 16, 2005). The FWS also expressed that it "supports voluntary conservation as the most effective method to protect species and their habitats." 70 Fed. Reg. 2245. The FWS does "recognize that listing may affect local planning efforts, due to its effect on voluntary conservation efforts." Id. at 2246.

We urge the FWS to decline to list, withdraw from candidate status, and support state and local conservation of the Gunnison sage grouse, in conjunction with measures already in place on federal lands, as the most effective methods to protect the Gunnison sage grouse and its habitat in southwestern Colorado.

## XIII.  Candidate Status Unwarranted for Gunnison Sage Grouse

The FWS established criteria to prioritize listing actions by: (1) the magnitude of the threat faced by a species; (2) the immediacy of the threat faced by a species; and (3) the taxonomic distinctness of the species.[26] In addition, prior to determining whether listing of candidate species is warranted, the FWS must first process emergency listing rules, and final determinations on proposed listings.[27]

Candidates are "any species being considered by the Secretary for listing as an endangered or a threatened species, but not yet the subject of a proposed rule." 50 C.F.R. section 424.04(b). From time to time, the Secretary may publish updates of the review status of species that are candidates for listing. 50 C.F.R. section 424.15(b). The

---

[23] Letter from Jim Schwarz, Wyoming Department of Agriculture, to Dr. Pat Deibert, U. S. Fish and Wildlife Service (July 30, 2004) (on file with the U.S. Fish and Wildlife Service).
[24] Letter from Kevin K. Conway, Utah Division of Wildlife Resources, to Bob Morgan, Utah Department of Natural Resources (July 19, 2004) (on file with Utah Division of Wildlife Resources).
[25] Letter from Dr. James A. Mosher, North American Grouse Partnership, to Pat Diebert, U. S. Fish and Wildlife Service (July 28, 2004) (on file with U.S. Fish and Wildlife Service).
[26] 48 Fed. Reg. 43098, 43103 (Sept. 21, 1983).
[27] 64 Fed. Reg. 57114, 57118-19 (Oct. 22, 1999).

regulations explain that the purpose of candidate notices is to "invite comment from all interested parties regarding the status of the species named." 50 C.F.R. section 424.15(c). For the reasons described herein, we again urge the FWS to reconsider the inclusion of the Gunnison sage grouse on the candidate list.

## XIV.   Conclusion:  the FWS Should Not List the Gunnison Sage Grouse and Should Withdraw Candidate Status

The FWS must focus its efforts on listing actions that will provide the greatest conservation benefits to imperiled species in the most expeditious and biologically sound manner.  See Final Listing Priority Guidance for Fiscal Year 2000. 64 Fed. Reg. 57114 (Oct. 22, 1999).  The FWS should focus its limited resources on species that do not have the benefit of the expansive range of the Gunnison sage grouse and its habitat nor the extensive regulatory mechanisms and conservation efforts already underway.  The FWS may always restore candidate status if additional information supports it.

A listing would be inconsistent with the letter and spirit of the Interagency Cooperative Policy for the Ecosystem Approach to the Endangered Species Act.  59 Fed. Reg. 34274 (July 1, 1994).  That policy recognizes that, "[S]pecies will be conserved best not by a species-by-species approach but by an ecosystem conservation strategy that transcends individual species."  Id.  As stated, the FWS has already determined not to list several other sagebrush obligates for the same reasons that the Gunnison sage grouse should not be listed in southwestern Colorado.

Unlike the majority of avian species, the Gunnison sage grouse does not have an evolutionarily distinct set of haplotypes such that there is higher gene flow between greater sage grouse populations than between the Gunnison sage grouse and the greater sage grouse.  Moreover, there are no clear causal relationships between human actions and alleged declines in the Gunnison sage grouse.  There are no clear cause and effect relationships between management action and habitat and population response.  And there is little credible empirical evidence that sage grouse populations have declined or are declining as a result of any recent and ongoing human activity.  To the contrary, Gunnison sage grouse populations are increasing and sage grouse have been observed using habitats altered by man throughout its range.

The Gunnison sage grouse is a species of special concern in Colorado and BLM has designated it as a Sensitive Species.  In light of the expansive range of the species on large tracts of federal land, extensive regulatory mechanisms, unprecedented state and local sagebrush conservation efforts, and the inaccuracies and uncertainties pointed out herein, a listing would fail the ESA, the FWS Policy on Information Standards and Data Quality Act standards.  The best scientific and commercial information available regarding the past, present, and future threats faced by the Gunnison sage grouse do not support a listing nor continued candidate status.

We respectfully urge the FWS to promote State and Local conservation efforts and not to list the Gunnison sage grouse.  Thank you for your prompt attention to this important and

timely matter. Should you wish to discuss this matter, please do not hesitate to contact me at (720) 904-6000. Thank you.

Sincerely,

Kent Holsinger

Enclosure

cc:          The Hon. Wayne Allard
             The Hon. Ken Salazar
             The Hon. John Salazar
             The Hon. Russell George
             Julie McDonald
             Tom Blickensderfer

# Review of Genetic Studies of the Gunnison Sage-Grouse

Robert M. Zink, Ph.D.
7555 99th St. Ct. No.
Grant, MN 55110
651 653 1226
zinkx003@umn.edu

13 March 2006

*Overview*

The purpose of this paper is to review genetic studies (Oyler-McCance et al. 2005a) of the recently recognized Gunnison Sage Grouse (*Centrocercus minimus*; Young et al. 2000), and to compare it to similar genetic information collected for the Greater Sage-Grouse *(Centrocercus urophasianus*; Oyler-McCance et al. 2005b). Questions of interest include the evolutionary history of these species, level of distinctiveness of the two species, and patterns of genetic variation within each species. Inferences are based on previous published studies as well as new analyses presented here that were based on mitochondrial DNA data retrieved by the author from Genbank.

*Types of Molecular Data Used in Decisions about Species Limits*

The molecular analyses of the sage grouse have used two molecular sources of information, mitochondrial DNA (mtDNA) and microsatellites. MtDNA is a haploid, maternally inherited molecule and the data consist of sequences (strings of nucleotides that are the genetic code). Different sequences are termed haplotypes, meaning that for the same piece of mtDNA (gene or gene region), individuals have at least one base pair difference. Microsatellites are nuclear markers, and one only learns whether an individual is homozygous or heterozygous for a particular allele, not its DNA sequence. An advantage of microsatellites is that one can gather information from many loci, whereas mtDNA is in effect a single gene estimate of population history. However, of relevance to the analysis of recently diverged populations is the fact that microsatellites are inherited as diploid, biparental markers. Because of the difference in the modes of inheritance, nuclear markers require more time to reflect population isolation than mtDNA markers. That is, if two populations have recently separated, mtDNA will reveal evidence before nuclear markers such as microsatellites, on average. This difference is readily understood to be a factor of four. Therefore, it will take nuclear loci such as microsatellites on average four times longer than mtDNA to reveal a distinction between isolated populations. In the information given in the papers on sage grouse, it is clear that the nuclear markers add no new information. It is valuable that they do not conflict with mtDNA, but as expected, they provide the same answer (or show less differentiation as expected for a nuclear locus). It is my opinion that under most circumstances, mtDNA is the marker of choice for recently diverged populations such as sage grouse. Therefore,

1

for this reason and the fact that the microsatellite data are not readily available, I confine my remarks to the mtDNA data.

The expectation of populations that have been isolated is that they will be on mutually exclusive parts of a phylogenetic tree of the mtDNA haplotypes (Fig. 1). That is, all the haplotypes from one area will be more closely related to haplotypes in their own area than any of them are to haplotypes from another area. This is the pattern for mtDNA haplotypes for most (> 95%) of avian species. There are some examples of what are considered species that do not exhibit this type of a mtDNA tree, but not many.



Figure 1. Two hypothetical populations, one (A) that has experienced bouts of geographical isolation and its mtDNA gene tree shows evidence of this. In B, the populations have been exchanging genes and the gene tree does not reveal a history of isolation.

An interesting comparison for the sage-grouse is the blue grouse (*Dendragapus obscurus*). Using similar methods, albeit with a much greater amount of mtDNA sequence, Barrowclough et al. (2004) explored genetic variation throughout the range of blue grouse. Two traditional taxa, sooty and dusky grouse, once considered species but presently considered subspecies, were diagnostically distinct on the mtDNA tree (Fig. 2). That is, from the mtDNA, one could determine whether a given individual was from the sooty or dusky lineages. This is exactly what is found for the bulk of avian species. Ironically, the dusky and sooty are considered "subspecies groups" of the same species (blue grouse), whereas the Gunnison and greater sage-grouse, with a phylogenetic tree of mtDNA haplotypes that is not sorted to taxon, are considered species.

The amount of mtDNA sequence required to answer the question of whether two groups are significantly different depends more on the nature of the differences than the length of the sequence. However, it stands out that the studies on Gunnison sage-grouse are based on only 141 base pairs of mtDNA sequence. This sequence comes from a non-

2



From Barrowclough et al. (2004)

Figure 2. Haplotype tree for eastern and western populations of the blue grouse taken from Barrowclough et al. (2004). This tree shows that populations from the western part of the range ("sooty" grouse) and phylogenetically distinct from populations to the east (dusky grouse). This tree shows that each group has a distinct evolutionary history and qualifies for species status and separate management consideration. Sooty and dusky grouse were once considered distinct species but were lumped into a single species (blue grouse) by the American Ornithologists' Union.

coding region, which makes it hard to verify the mitochondrial authenticity. However, the large number of haplotypes (in at least greater sage-grouse) suggests that the sequences are mitochondrial. Nonetheless, 141 bp is extremely low by modern standards. As an associate editor I have seen papers rejected from peer-reviewed journals with more sequence than this. I think that the researchers working on sage grouse ought to bring their sequences in line with current standards. There is little reason to continue to sequence such a short piece. I personally would add a coding gene such as ND2 so that more sophisticated selection tests can be performed. It might not change the answer, but it is not justified in my opinion to continue to sequence such a short piece of mtDNA.

**Background on sage-grouse**

Sage-grouse were widely distributed in appropriate habitat in western North America (Young et al. 1999). Their abundance and distribution has decreased in modern times owing to habitat loss among other factors. Early studies found that there was geographic variation in the external morphology of museum specimens, and this variation was used to erect subspecies, suggesting some degree of evolutionary diversification. Several early papers hinted that populations in the Gunnison Basin were differentiated in morphology (small size, filoplume length, tail banding) and the behavior of males

3

strutting on leks (nature of display, vocalizations)(Kahn et al. 1999). In 1999, Young et al. reported discovering a pattern of mtDNA variation that hinted at relatively deep evolutionary divisions in Sage-Grouse, and that the population in the Gunnison Basin of Colorado had a different frequency of haplotypes. Based on these morphological, behavioral and genetic (mtDNA and microsatellites), Young et al. (1999) suggested that the populations in the Gunnison Basin merited species status, *Centrocercus minimus*. This was accepted by the Check-list committee of the American Ornithologists' Union, which produces the "official" checklist of North American birds. Subsequent publications on genetics greatly increased the sampling of individuals and populations (but not sequence) and clarified that together, greater sage-grouse and Gunnison sage-grouse are very closely related. In particular, there are two deep haplotype clades in sage grouse, termed Clade I and Clade II. Haplotypes in each clade differ by a considerable percentage. However, the two clades are not geographically partitioned (as in Fig. 1A, 2), and all but four populations of greater sage-grouse have haplotypes belonging to each clade. The Gunnison sage-grouse has only five haplotypes, all belonging to Clade I, although other haplotypes from Clade I occur in greater sage-grouse. The Gunnison sage-grouse differs in the frequency of haplotypes from greater sage-grouse, thereby showing a quantitative but not qualitative level of distinctiveness in mtDNA control region sequences.

### *Overall mtDNA pattern in greater sage-grouse and Gunnison sage-grouse*

Despite independent analyses of greater sage-grouse and Gunnison sage-grouse mtDNA data sets (Oyler-McCance et al. 2005a,b), there appears to be no recent analysis that combines sequences from the two species into a single analysis. I downloaded most of the haplotypes from Genbank that were deposited by these and previous studies. I subjected the sequences to a clustering analysis that produces a neighbor-joining tree Figure 3). This tree recovers the basic pattern found in earlier studies of both species (e.g. Kahn et al. 1999), which shows two deep haplotypes clades. It is likely that the two clades originally corresponded to small bodied (Clade I) and large-bodied (Clade II) sage-grouse. The Gunnison sage-grouse includes only haplotypes from Clade I (red arrows in Figure 3), whereas greater-sage grouse populations almost always (with four exceptions; Oyler-McCance 2005b) have representatives of both Clades I and II. Thus, unlike the vast majority of avian species, the Gunnison sage-grouse does not display an evolutionarily distinct set of haplotypes (e.g. Fig. 1B). Instead, the genetic support for species recognition comes from differences in the relative frequencies of haplotypes.

4



Figure 3. Neighbor-joining tree showing evolutionary relationships among most haplotypes for Greater Sage-Grouse and Gunnison Sage-Grouse (indicated with red arrows). The haplotypes for each species do not sort into reciprocally monophyletic groups as they do for most species. If the morphological and behavioral features noted by other authors are discrete and diagnostic, it would mean that they have evolved in less time than it takes for mtDNA gene trees to become reciprocally monophyletic. This is not unheard of in avian species, but it is not a common occurrence.

That is, if the Gunnison sage-grouse were like the majority of avian species, all of the red arrows would be grouped together to the exclusion of other haplotypes on the tree, as they are for the sooty and dusky (blue) grouse (Fig. 2).

### Interpretation of molecular sequence data

There are two hypotheses that can explain the existence of the two main haplotype clades in sage grouse. The first hypothesis is that one expects populations to exhibit a haplotype tree that has a main basal split. One expects populations to have haplotypes from each "side" of the haplotype tree. Differences in frequencies of each clade can result from genetic drift owing to restrictions in dispersal. The second alternative is that sage grouse were once isolated into two groups, which would explain the existence of two clades. If the two once-isolated groups were to come into contact, and there was no reproductive isolation, haplotypes would be exchanged between groups and if gene flow were sufficiently extensive, the haplotypes from each clade would be intermingled throughout the ranges of the two formerly isolated groups.

These two hypotheses lead one to expect different genetic signatures in the two clades. Under the first hypothesis, there was always just one "population," and if one were to analyze each haplotypes clade independently, there should be no differences. However, if there were once two isolated clades, and they experienced different population histories, one could expect different genetic signatures. The fact that Gunnison sage-grouse lack representatives of Clade II suggests there was not free dispersal between the two groups (it could be argued that chance plays a role, but a large number of Gunnison sage-grouse have been examined and examples of Clade II are lacking).

To explore further potential differences in the genetic signatures among clades, I analyzed the 141 bp control region sequences from Genbank that were used in the papers on sage-grouse population and taxonomic structure. Unlike the analysis of haplotypes relationships in Figure 3, in this analysis, all individuals are used. For Clade I, I analyzed 299 individuals. I performed a mismatch distribution test. This simple analysis involves computing the number of differences between the haplotypes of each pair of individual grouse (Rosas et al. 2003). If the resulting distribution is unimodal, one can infer that the population has expanded in the recent past. If it is multi-modal, then one infers that the population has been relatively stable.

The two mismatch distributions appear to be different. For Clade I, the distribution (Fig. 4) is unimodal, suggesting population growth. For Clade II, the distribution is bimodal (Fig. 5), which is inconsistent with population growth. Therefore, the two clades appear to have had differing recent evolutionary histories. This implies that there were indeed two isolated historically populations of sage grouse in the evolutionary past. However, it also suggests that they once regained contact the haplotypes were spread widely into each group, as suggested by Kahn et al. (1999). That is, there must not have been any barriers to intermating at that time. However, it appears that the nature of population expansion was not completely random, otherwise one would expect some clade II haplotypes in

6

Gunnison sage-grouse. The differences in haplotypes frequencies mostly likely arose because of genetic drift owing to limited gene exchange (see below).



Figure 4. Mismatch distribution for control region haplotypes for Clade I in sage grouse. This figure suggests that this clade has undergone a population expansion, because the observed and expected differences are not significantly different.



Figure 5. Mismatch distribution for 799 individuals of Clade II for mtDNA control region sequence of sage grouse. The plot shown is not consistent with population growth, as can be seen by the difference in the observed and expected lines. This suggests that this clade has been part of a population that has experienced a more stable recent evolutionary history than individuals in Clade I.

7

An important task is to explore gene exchange between Gunnison and greater sage-grouse. To evaluate this possibility, I used a computer program Mdiv (Nielsen and Wakeley 2001) that estimates the rate of gene exchange among populations. Because this is a time-intensive analysis, I made only four comparisons: San Miguel (Gunnison sage-grouse) and Eagle (greater sage-grouse), Gunnison (Gunnison sage-grouse) and Eagle (greater sage-grouse), Eagle vs. Blue Mtn. (both greater sage grouse), and Farson versus Eagle (both greater-sage grouse). My intent was to compare levels of gene flow between two samples of Gunnison sage-grouse and greater sage-grouse, and to compare these against a value comparing greater sage-grouse samples (Eagle, Farson, Blue Mtn.).

The results, albeit preliminary because so few populations were analyzed, show that there is much higher gene flow between greater sage-grouse populations than between Gunnison sage-grouse and greater sage-grouse (Fig. 6). That is, by looking at the peaks of the distributions, one can see that levels of gene flow (M, an estimate of the number of individuals exchanged between populations) differ in these two levels of comparison. The plots suggest that the level of gene flow between Gunnison sage-grouse and greater sage-grouse is an order of magnitude lower than between the samples of greater sage-grouse that were selected for analysis. In particular, the level of gene flow between Gunnison sage-grouse and greater sage-grouse is under 1 individual per generation, which is acknowledged to be low enough such that populations can evolve independently. This suggests that although there was once considerable gene flow, it is now more limited. Whether this is due simply to fragmentation of the range and an inability of the birds from each species to interact is unknown.



8







Figure 6. Posterior probability distributions derived from Mdiv analyses. The peak of the distribution is the estimate of the parameter. One can see that the peaks of comparisons of gene flow rates (M) for populations of greater sage-grouse (Blue Mtn., Eagle, Farson) exceed those between Gunnison sage-grouse (Gunnison, San Miguel) and greater sage-grouse.

### Comments on Greater sage-grouse.

The studies to date have found a haplotype tree that does not reflect long-term isolation for greater sage-grouse populations because all but 4 population samples have representatives of both Clades I and II. That is, there is no instance in which the haplotypes from a particular area occupy a distinctive part of the phylogenetic tree. However, at least three groups of populations show strong differences in the frequencies of each clade: Washington, Lyon/Mono, and the remainder of the range. The differences among the groups can occur with reduced dispersal among the regions, and it is possible that what is seen is a signature of past exchange of individuals and that at present the groups are behaving as if they were evolutionarily distinct. It is difficult if not impossible to distinguish between these two alternatives with the data at hand. However, it is significant that the level of frequency difference rivals that of the Gunnison sage-grouse versus greater sage-grouse. Thus, it is possible that overall there are really four taxa instead of one. Whether there are morphological and behavioral differences for these newly identified populations is unknown. If it were not for the behavioral and morphological differences in the Gunnison sage-grouse, the populations from Washington and Lyon/Mono would be recognized as showing greater evolutionary distinctiveness.

### Comparison to other species

The Gunnison sage grouse differs from most, but not all, avian species in not possessing a distinct set of mtDNA haplotypes. That is, most avian species have a haplotype tree in which species membership can be unambiguously inferred from the tree (Fig. 1A). Instead, Gunnison sage grouse differs in the frequency of Clade I and II haplotypes relative to the other populations. This is a low level of mtDNA distinctiveness relative to most other avian species. In particular, one can see that the Gunnison sage-grouse and greater sage-grouse are less differentiated than populations of the Blue Grouse (*Dendragapus obscurus*; Barrowclough et al. 2004) that have been considered species in the past but are considered the same species today by the same group that formally split off the Gunnison Sage grouse as a separate species (the AOU Committee on Classification and Nomenclature; see aou.org and select checklists). Thus, the AOU considers the Gunnison sage grouse as a separate species but not the blue grouse that are clearly more genetically distinct. Presumably this reflects an opinion that the morphological and behavioral differences are more important in sage grouse than in blue grouse. However, Barrowclough et al. (2004:1919) commented that the blue grouse groups "are more divergent than are greater sage-grouse and Gunnison sage-grouse (Young et al. 2000) in terms of genetic differentiation (hence period of isolation), mating system and morphology".

10

### Gunnison Sage-Grouse

Oyler-McCance et al. (2005) recently reported on microgeographic differences in the separate populations of the Gunnison sage-grouse. They found different frequencies of haplotypes among the populations, and concluded that these were statistically significant. I think that this analysis is sound, but it is subject to another interpretation. To say that there are significant genetic differences among these populations ought to based on diagnostic differences and not just frequency differences. There are only two haplotypes unique to Gunnison sage-grouse, which suggests local differentiation. However, I did a phylogenetic analysis on the 5 haplotypes that occur in this region and found that the two unique haplotypes are not each others closest relatives. This means that they evolved from other widespread haplotypes, and one should not overly emphasize the genetic differences among the local Gunnison populations. That is, they might be statistically significant but not biologically significant.

### Conclusions

It is my opinion that the following statements are consistent with the mtDNA data used to describe the population history of the greater sage-grouse and Gunnison sage-grouse:

1. The Gunnison sage-grouse is not as distinctive as the majority of avian species, because it differs from its sister species (greater sage-grouse) only in the frequency of mtDNA haplotypes. That is, it does not possess a diagnostic set of mtDNA haplotypes. Hence, it is probably of recent evolutionary origin, and is potentially not as "significant" as other more strongly differentiated species. Nonetheless, it appears to show morphological and behavioral differences that suggest it is a significant taxon. It is likely that the morphological and display differences between Gunnison sage-grouse and greater sage-grouse arose rapidly owing to sexual selection.

2. At least two other populations of greater sage-grouse (Lyon/Mono, Washington) are as, or more, distinctive in mtDNA than the Gunnison sage-grouse. Whether these populations are also distinctive in morphological and behavioral features should be established. It is possible that the number of distinct taxa exceeds the two currently recognized species.

3. If it were not for the morphological and behavioral distinctiveness of Gunnison sage-grouse, they would not be considered special because of their mtDNA. Hence, it is crucial that the morphological and behavioral evidence be carefully evaluated. The hypothesis that the distinctiveness of the Gunnison population arose because of fragmentation of a gradient in continuous morphological and behavioral variation should be evaluated.

11

4.  The Gunnison sage-grouse is less differentiated genetically than are two geographically separated populations of blue grouse (*Dendragapus obscurus*) that are considered distinct by the American Ornithologists' Union only at the subspecies level.

5.  The history of the greater sage-grouse and Gunnison sage-grouse appears to be one in which there was once geographical separation, followed by contact and asymmetric introgression. Whether the two are currently reproductively isolated is speculative, but the analyses reported here suggest that gene flow between the two putative species is currently limited.

*References consulted:*

Barrowclough, G. F., J. G. Groth, L. A. Mertz and R. J. Gutierrez. 2004. Phylogeographic structure, gene flow and species status in blue grouse (*Dendragapus obscurus*). Molecular Ecology 13:1911-1922.

Benedict, N. G., S. J. Oyler-McCance, S. E. Taylor, C. E. Braun, and T. W. Quinn. 2003. Evaluation of the eastern (*Centrocercus urophasianus urophasianus*) and western (*Centrocercus urophasianus phaios*) subspecies of sage-grouse using mitochondrial control-region sequence data. Conservation Genetics 4:301-310.

Kahn, N. W., C. E. Braun, J. R Young, S. Wood, D. R. Mata, and T. W. Quinn. 1999. Molecular analysis of genetic variation among large- and small-bodied sage grouse using mitochondrial control-region sequences. Auk 116:819-824.

Nielsen, R. & Wakeley, J. W 2001. Distinguishing migration from isolation: an MCMC approach. *Genetics* **158**, 885-896.

Oyler-McCance, S. J., J. St. John, S. E. Taylor, A. D. Apa, and T. W. Quinn. 2005a. Population genetics of Gunnison sage-grouse: implications for management. J. Wildlife Management 69:630-637.

Oyler-McCance, S. J., S. E. Taylor, and T. W. Quinn. 2005b. A multilocus population genetic survey of the greater sage-grouse across their range. Molecular Ecology 14:1293-1310.

Rosas, J., Sanchez-DelBarrio, J. C., Messeguer, X., & Rozas, R. 2003 DnaSP, DNA polymorphism analyses by the coalescent and other methods. *Bioinformatics* **19**, 2496-2497.

Young, J. R., C. E. Braun, S. J. Oyler-McCance, J. W. Hupp, and T. W. Quinn. 2000. A new species of sage-grouse (Phasianidae: *Centrocercus*) from southwestern Colorado. Wils. Bull. 112:445-453.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COUNTY OF SAN MIGUEL, COLORADO, et al., | |
| Plaintiffs, | |
| v. | |
| MACDONALD, et al., | |
| Defendants, | |
| and | |
| COLORADO CATTLEMEN'S ASSOCIATION, 8833 Ralston Rd. Arvada, CO  80002-2239 | Civ. No. 06-1946 (RBW) |
| PARTNERSHIP FOR THE WEST, and 350 Indiana Street, Suite 640 Golden, CO  80401 | |
| WESTERN CONSERVATION COALITION 1074 24 Road Grand Junction, CO  81505 | |
| Defendants-Intervenors. | |

**[PROPOSED] DEFENDANTS-INTERVENORS' ANSWER**

Colorado Cattlemen's Association ("Cattlemen's"), the Partnership for the West ("Partnership") and the Western Conservation Coalition ("Western") collectively referred to herein as ("Defendants-Intervenors") for their Answer in response to the Complaint (the "Complaint") filed by Plaintiffs, state as follows:

**STATEMENT OF THE CASE**

1.  The allegations set forth in Paragraph 1 are Plaintiffs' characterization of the case to which no response is required.  To the extent a response may be required, Defendants-Intervenors deny these allegations.

2.  The allegations set forth in Paragraph 2 are Plaintiffs' characterization of the case to which no response is required.  To the extent a response may be required, Defendants-Intervenors deny these allegations.

3.  The allegations set forth in Paragraph 3 are Plaintiffs' characterization of the case to which no response is required.  To the extent a response may be required, Defendants-Intervenors deny these allegations.

4.  The allegations set forth in Paragraph 4 consist of legal conclusions that require no response.  To the extent a response may be required, Defendants-Intervenors deny these allegations.

5.  The allegations set forth in Paragraph 1 are Plaintiffs' characterization of the case to which no response is required.  To the extent a response may be required, Defendants-Intervenors deny these allegations.

## JURISDICTION AND VENUE

6.  The allegations set forth in Paragraph 6 consist of legal conclusions that require no response.  To the extent a response may be required, Defendants-Intervenors deny these allegations.

7.  Defendants-Intervenors admit that Plaintiffs' Notices of Intent (NOI) to sue were received by Defendants over sixty days before Plaintiffs' filed the Complaint. Defendants-Intervenors aver that the NOI is a document that speaks for itself and is the best evidence of its contents.  Any allegation to the plain meaning of the NOI is denied. The remaining allegation in Paragraph 7 consists of legal conclusions that require no response.  To the extent that response may be required, Defendants-Intervenors deny the allegations.

8.   The allegations set forth in Paragraph 8 consist of legal conclusions that require no response.  To the extent a response may be required, Defendants-Intervenors deny these allegations.

9.   Defendants-Intervenors admit the allegations in the first sentence of Paragraph 9, but do not have sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 9 and therefore deny same.

10.   Defendants-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 10 and therefore deny same.

11.   Defendants-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 11 and therefore deny same.

12.   Defendants-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 12 and therefore deny same.

13.   Defendants-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 13 and therefore deny same.

14.   Defendants-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 14 and therefore deny same.

15.   Defendants-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 15 and therefore deny same.

16.   Defendants-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 16 and therefore deny same.

17.   Defendants-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 17 and therefore deny same.

18.  Defendants-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 18 and therefore deny same.

19.  Defendants-Intervenors do not have sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 19 and therefore deny same.

20.  Defendants-Intervenors deny the allegations in Paragraph 20.

21.  Defendants-Intervenors do not have sufficient information or knowledge to form a belief as to where Plaintiffs' members spend their time.  As to the remaining allegations in Paragraph 21, Defendants-Intervenors do not have sufficient information or knowledge to form a belief as to the remaining allegations in Paragraph 21, and therefore deny same.

22.  In response to the allegations in Paragraph 22, Defendants-Intervenors admit Julie MacDonald is Deputy Assistant Secretary for Fish Wildlife and Parks, but deny that she is an appropriate defendant in this case.  Defendants deny the remaining allegations in Paragraph 22.

23.  In response to the allegations in Paragraph 23, Defendants-Intervenors admit Dirk A. Kempthorne is the Secretary of the Interior and is sued in his official capacity. The remaining allegations in Paragraph 23 purport to characterize the ESA, a statute that speaks for itself and is the best evidence of its contents.  Any allegations contrary to the plain meaning of the ESA are denied.

24.  In response to the allegations in Paragraph 24, Defendants-Intervenors admit H. Dale Hall is the Director of FWS and is sued in his official capacity.  The remaining allegations in Paragraph 24 purport to characterize the ESA, a statute that speaks for itself

4

and is the best evidence of its contents.  Any allegations contrary to the plain meaning of the ESA are denied.

## FACTUAL ALLEGATIONS

25.  Defendants-Intervenors admit the allegations in Paragraph 25.

26.  The allegations in Paragraph 26 purport to characterize findings or statements by persons and organizations that are not parties to this litigation.  Therefore, no response is required.  Defendants-Intervenors deny any allegations contrary to the plain meaning of these findings or statements.

27.  In response to the allegations in Paragraph 27, Defendants-Intervenors admit that the historic range of the Gunnison sage grouse likely included southwestern Colorado, northern New Mexico, northeastern Arizona and southeastern Utah, but deny that the historic range included southwestern Kansas and northwestern Oklahoma.

28.  In response to the allegations in the first three sentences of Paragraph 28, Defendants-Intervenors admit those allegations and deny the remaining allegations of Paragraph 28.

29.  Defendants-Intervenors admit the allegations in Paragraph 29.

30.  The allegations in Paragraph 30 purport to characterize the April 18, 2006 listing determination, a document that speaks for itself and is the best evidence of its contents.  Defendants-Intervenors deny any allegation contrary to the plain meaning of the listing determination.

31.  Defendants-Intervenors deny the allegations in Paragraph 31.

32.  Defendants-Intervenors deny the allegati ons in Paragraph 32.

33.  The allegations in Paragraph 33 purport to characterize a finding or statement

by an organization not party to this litigation.  There, no response by the Defendants-Intervenors is required.  Defendants-Intervenors deny any allegation contrary to the plain meaning of that statement.

34.  Defendants-Intervenors deny the allegations in Paragraph 34.

## THE ENDANGERED SPECIES ACT

35.  The allegations in the first sentence of Paragraph 35 purport to characterize provisions of the ESA and regulations promulgated pursuant to the ESA.  The statute and its regulations speak for themselves and are the best evidence of their contents.  Defendants-Intervenors deny any allegation contrary to their plain meaning.  The allegations in the second sentence purport to characterize *Tennessee Valley Auth. v. Hill*, a case that speaks for itself and it is the best evidence of its contents.  Any allegations contrary to the plain meaning of the case are denied.

36.  The allegations in Paragraph 36 purport to characterize provisions of the ESA and regulations promulgated pursuant to the ESA.  The statute and its regulations speak for themselves and are the best evidence of their contents.  Defendants-Intervenors deny any allegation contrary to their plain meaning.

37.  The allegations Paragraph 37 purport to characterize provisions of the ESA.  The statute speaks for itself and is best evidence of its contents.  Defendants-Intervenors deny any allegation contrary to its plain meaning.

38.  The allegations Paragraph 38 purport to characterize provisions of the ESA.  The statute speaks for itself and is best evidence of its contents.  Defendants-Intervenors deny any allegation contrary to its plain meaning.

39.  The allegations in Paragraph 39 purport to characterize provisions of the ESA and regulations promulgated pursuant to the ESA.  The statute and its regulations speak for themselves and are the best evidence of their contents.  Defendants-Intervenors deny any allegation contrary to their plain meaning.

40.  The allegations in Paragraph 40 purport to characterize provisions of the ESA.  The statute speaks for itself and is best evidence of its contents.  Defendants-Intervenors deny any allegation contrary to its plain meaning.

41.  The allegations Paragraph 41 purport to characterize provisions of the ESA.  The statute speaks for itself and is best evidence of its contents.  Defendants-Intervenors deny any allegation contrary to its plain meaning.

42.  The allegations in Paragraph 42 purport to characterize provisions of the ESA.  The statute speaks for itself and is best evidence of its contents.  Defendants-Intervenors deny any allegation contrary to its plain meaning.

43.  The allegations in Paragraph 43 purport to characterize provisions of the ESA.  The statute speaks for itself and is best evidence of its contents.  Defendants-Intervenors deny any allegation contrary to its plain meaning.

44.  The allegations in Paragraph 44 purport to characterize provisions of the ESA.  The statute speaks for itself and is best evidence of its contents.  Defendants-Intervenors deny any allegation contrary to its plain meaning.

45.  The allegations in Paragraph 45 purport to characterize provisions of the ESA and regulations promulgated pursuant to the ESA.  The statute and its regulations speak for themselves and are the best evidence of their contents.  Defendants-Intervenors deny any allegation contrary to their plain meaning.

**LISTING HISTORY**

46.  Defendants-Intervenors admit the allegations in Paragraph 46.

47.  Defendants-Intervenors admit the allegations in Paragraph 47, but aver that the candidate form was actually signed on January 18, 2000.

48.  The allegations Paragraph 48 purport to characterize The Candidate and Listing Priority Assignment Form, a document that speaks for itself and is the best evidence of its contents.  Defendants-Intervenors deny any allegation contrary to its plain meaning.

49.  Defendants-Intervenors admit the allegations in Paragraph 49.

50.  The allegations Paragraph 50 purport to characterize the Candidate Designation, a document that speaks for itself and is the best evidence of its contents. Defendants-Intervenors deny any allegation contrary to its plain meaning.

51.  The allegations in Paragraph 48 purport to characterize the Candidate and Listing Priority Assignment Form, a document that speaks for itself and is the best evidence of its contents.  Defendants-Intervenors deny any allegation contrary to its plain meaning.

52.  The allegations in Paragraph 52 purport to characterize the Candidate and Listing Priority Assignment Form, a document that speaks for itself and is the best evidence of its contents.  Defendants-Intervenors deny any allegation contrary to its plain meaning.

53.  The allegations set forth in Paragraph 53 are Plaintiffs' characterization of the case to which no response is required.  To the extent a response may be required, Defendants-Intervenors deny these allegations in Paragraph 53.

54.   The allegations in Paragraph 54 purport to characterize the Candidate and Listing Priority Assignment Form, a document that speaks for itself and is the best evidence of its contents.  Defendants-Intervenors deny any allegation contrary to its plain meaning.

55.   The allegations in Paragraph 55 are Plaintiffs' characterization of a motion and order in *ALA v. Norton I*, which speak for themselves and require no response.  To the extent a response may be required, Defendants-Intervenors deny these allegations.

56.   The allegations set forth in Paragraph 56 are Plaintiffs' characterization of the case to which no response is required.  To the extent a response may be required, Defendants-Intervenors deny these allegations.

57.   The allegations in Paragraph 57 purport to characterize the Candidate Notice of Review, a document that speaks for itself and is the best evidence of its contents. Defendants-Intervenors deny any allegation contrary to its plain meaning.

58.   The allegations in Paragraph 58 purport to characterize the Candidate and Listing Priority Assignment Form, a document that speaks for itself and is the best evidence of its contents.  Defendants-Intervenors deny any allegation contrary to its plain meaning.

59.   The allegations in Paragraph 59 are Plaintiffs' characterization of a motion and order in *ALA v. Norton I*, which speak for themselves and require no response.  To the extent a response may be required, Defendants-Intervenors deny these allegations.

60.   The allegations in Paragraph 60 purport to characterize the Candidate Notice of Review, a document that speaks for itself and is the best evidence of its contents. Defendants-Intervenors deny any allegation contrary to its plain meaning.

61. The allegations in Paragraph 61 purport to characterize the Candidate Notice of Review, a document that speaks for itself and is the best evidence of its contents. Defendants-Intervenors deny any allegation contrary to its plain meaning.

62. Defendants-Intervenors are without sufficient knowledge to admit or deny the allegations in Paragraph 62.

63. The allegations in Paragraph 63 are Plaintiffs' characterization of a motion and order in *ALA v. Norton I*, which speak for themselves and require no response. To the extent a response may be required, Defendants-Intervenors deny these allegations.

64. Defendants-Intervenors are without sufficient knowledge to admit or deny the allegations in Paragraph 64.

65. Defendants-Intervenors admit that FWS published a listing determination on April 18, 2006, but are without sufficient knowledge to admit or deny the remaining allegations in Paragraph 65. Defendants-Intervenors deny the remaining allegations in Paragraph 65.

### THE "NOT-WARRANTED" LISTING DETERMINATION

66. The allegations in Paragraph 66 purport to characterize the Listing Determination, a document that speaks for itself and is the best evidence of its contents. Defendants-Intervenors deny any allegation contrary to its plain meaning.

67. The allegations in Paragraph 67 purport to characterize the Listing Determination, a document that speaks for itself and is the best evidence of its contents. Defendants-Intervenors deny any allegation contrary to its plain meaning.

68.    The allegations in Paragraph 68 purport to characterize the Listing Determination, a document that speaks for itself and is the best evidence of its contents. Defendants-Intervenors deny any allegation contrary to its plain meaning.

69.    The allegations in Paragraph 69 purport to characterize the Listing Determination, a document that speaks for itself and is the best evidence of its contents. Defendants-Intervenors deny any allegation contrary to its plain meaning.

70.    The allegations in Paragraph 70 purport to characterize peer reviews of the Garton report, the reviews speak for themselves and are the best evidence of their contents. Defendants-Intervenors deny any allegation contrary to their plain meaning.

## CLAIM FOR RELIEF

71.    Defendants-Intervenors hereby incorporate by reference the responses to each of the allegations set forth in Plaintiffs' Complaint.

72.    The allegations in Paragraph 72 purport to characterize the ESA, a statute that speaks for itself and is the best evidence of its contents.  Defendants-Intervenors deny any allegation contrary to its plain meaning.

73.    The allegations in Paragraph 73 consist of legal conclusions and Plaintiffs' characterization of the case and require no response.  To the extent a response is required, Defendants-Intervenors deny each allegation.

74.    In response to the allegations in Paragraph 74 consist of legal conclusions and Plaintiffs' characterization of the case and require no response.  To the extent a response is required, Defendants-Intervenors deny each allegation.

11

## PRAYER FOR RELIEF

The remainder of the Complaint consists of Plaintiffs' Prayer for Relief and requires no response.  To the extent a response is required, Defendants-Intervenors deny Plaintiffs are entitled to the relief requested or to any relief whatsoever.

## GENERAL DENIAL

Defendants-Intervenors hereby deny any allegations of Plaintiffs' Complaint, whether express or implied, that are not otherwise specifically admitted, denied, or qualified therein.

Dated this 1st day of March, 2007.


/s/ Anurag Varma
_____

Anurag Varma
(D.C. Bar No. 471615)
CONLON FRANTZ PHELAN & VARMA LLP
1818 P Street, N.W. #400
Washington, D.C. 20036
Telephone:  (202) 331-7050
Facsimile:  (202) 331-9306
avarma@conlonfrantz.com

Kent H. Holsinger (*Pro Hac Vice* Applicant)
CO Bar No. 33907
HOLSINGER LAW, LLC
350 Indiana Street, Suite 640
Golden, CO  80401
Telephone:  (303) 577-4621
Facsimile:  (303) 496-1025
kent@holsingerlaw.com

*Attorneys for Defendants-Intervenors*
*Colorado Cattlemen's Association, Partnership for*
*the West and Western Conservation Coalition*

12

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COUNTY OF SAN MIGUEL, COLORADO, et al.,<br><br>      Plaintiffs,<br>v.<br><br>MACDONALD, et al.,<br><br>      Defendants,<br><br>and<br><br>COLORADO CATTLEMEN'S ASSOCIATION,<br>8833 Ralston Rd.<br>Arvada, CO  80002-2239<br><br>PARTNERSHIP FOR THE WEST, and<br>350 Indiana Street, Suite 640<br>Golden, CO  80401<br><br>WESTERN CONSERVATION COALITION<br>1074 24 Road<br>Grand Junction, CO  81505<br><br>Defendants-Intervenors | Civ. No. 06-1946 (RBW) |

**[PROPOSED] ORDER GRANTING INTERVENTION**

      Having reviewed the Colorado Cattlemen's Association, Partnership for the West and Western Conservation Coalition ("Intervenor-Applicants") Motion for Intervention as Defendants, their Memorandum of Points and Authorities in support of their motion and supporting declarations, the responses and replies thereto, and the entire file in this case, the Court hereby finds that pursuant to Fed. R. Civ. P. 24(a), and for good cause

shown, the Intervenor-Applicants are entitled to intervene as of right as defendants in this

case. Accordingly, it is hereby:

ORDERED that the Intervenor-Applicants' Motion to Intervene as of Right as

Defendants in this case is GRANTED.

IT IS SO ORDERED this _____ day of _____, 2007.


_____
UNITED STATES DISTRICT JUDGE