UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| COUNTY OF SAN MIGUEL, COLORADO, *et al.*, | ) ) ) | Case No. 1:06-CV-1946 (RBW) |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| MACDONALD, *et al.*, | ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION OF COLORADO CATTLEMEN, *ET AL.*, TO INTERVENE**

**INTRODUCTION**

Plaintiffs oppose the proposed intervention in this case by the Colorado Cattlemen's Association, Partnership for the West, and Western Conservation Coalition (collectively "applicants") both as of right and permissively. In the alternative, plaintiffs urge the Court to limit the applicants' intervention to the particular issues of this case that arguably affect their interests, and generally to the remedy phase of this litigation where those interests might arguably be impaired. Plaintiffs further request that in the event the Court grants the applicants' intervention, their participation be appropriately limited so as to avoid duplicative argument and the introduction of extraneous issues.

**BACKGROUND**

**A.    The Endangered Species Act**

The Endangered Species Act, 16 U.S.C. § 1531 *et seq*. ("ESA" or "Act"), is the "'most comprehensive legislation for the preservation of endangered species ever enacted by any

1

nation.'" *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 698 (1995) (quoting *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 180 (1978)).  The purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b).

The ESA requires the Secretary of the Interior to determine whether any species is "endangered" or "threatened," 16 U.S.C. § 1533(a)(1), a responsibility he has delegated to the Department of the Interior's Fish and Wildlife Service ("FWS").  50 C.F.R. § 402.01(b).  A species is endangered if it is "in danger of extinction throughout all or a significant portion of its range," 16 U.S.C. § 1532(6), and is threatened if it "is likely to become an endangered species within the foreseeable future."  16 U.S.C. § 1532(20).

The ESA's substantive protections of a species and its critical habitat are triggered only when FWS "lists" a species in danger of becoming extinct as either endangered or threatened.  For example, when FWS lists a species, it is also required to "concurrently" designate "critical habitat" for that species, unless it determines that such habitat "is not then determinable."  16 U.S.C. § 1533(a)(6)(C).  Section 7(a)(1) requires federal agencies to carry out their programs in furtherance of the conservation of listed species.  16 U.S.C. § 1536(a)(1).  Section 7(a)(2) requires all other federal agencies to consult with FWS and "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence" of any listed species "or result in the destruction or adverse modification of habitat of such species[.]"  16 U.S.C. § 1536(a)(2).

Endangered species are entitled to greater legal protection under the ESA than threatened

species.  For any species listed as endangered, the ESA makes it unlawful for any person to

"import any such species into, or export any such species from, the United States," or to "take

any such species within the United States."  16 U.S.C. § 1538(a)(1)(A), (B).  Under the statute,

the term "take" includes "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or

collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  For species that are

listed as threatened, rather than endangered, the Secretary of the Interior "may," but is not

required to, extend these prohibitions on taking and export.  16 U.S.C. § 1533(d).

**B.**    **Procedural History**

Plaintiffs – the County of San Miguel, Colorado and nine public interest conservation and

accountability organizations – challenge the April 18, 2006 determination by the Secretary that

listing the Gunnison sage-grouse as an "endangered" or "threatened" species under the ESA is

"not warranted."  71 Fed. Reg. 19954 (Apr. 18, 2006) ("Listing Determination").  Plaintiffs filed

their Complaint on November 13, 2006 (Docket No. ("Doc.") 1), which pleads one claim for

relief, and alleges that in the negative Listing Determination, defendants unlawfully failed to rely

on the best scientific and commercial data available as required by Section 4(b)(1)(A) of the

ESA, 16 U.S.C. § 1533(b)(1)(A), by: (1) discounting information and FWS's own prior

conclusions that ongoing threats to Gunnison sage-grouse endanger the species throughout all or

a significant portion of its range; (2) relying on a flawed population trend analysis; (3)

misrepresenting the historic and current range of the species; (4) concluding that three Gunnison

sage-grouse groups and/or populations do not comprise a significant portion of the species'

range; and (5) concluding that the species is not endangered or threatened throughout a

significant portion of its range.  Complaint (Doc. 1) at ¶¶ 73-75.  Thus, plaintiffs allege that as a

3

result of these flaws, defendants' "not warranted" ESA listing determination for Gunnison sage-grouse is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the ESA within the meaning of the Administrative Procedure Act ("APA").  5 U.S.C. § 706(2); 16 U.S.C. § 1533(b)(1)(A).

Defendants filed an Answer on January 30, 2007.  Doc. 10.  On February 5, 2007, the Court scheduled an Initial Scheduling Conference for March 22, 2007.  Doc. 12.  The parties jointly filed a Meet and Confer Statement on February 26, 2007.  Doc. 13.  Applicants filed their Motion to Intervene on March 2, 2007.  Doc. 14.

## ARGUMENT

## I.    THE APPLICANTS ARE NOT ENTITLED TO INTERVENE AS OF RIGHT.

There is no dispute over the appropriate standard for intervention as of right.  As set out by the applicants in their memorandum, a motion to intervene as of right is based on whether: (1) the motion is timely; (2) the motion shows an adequate interest; (3) the motion shows the possible impairment of that interest; (4) the motion shows a lack of adequate representation by existing parties; and (5) the applicant has standing to sue.  *Fund for Animals v. Norton*, 322 F.3d 728, 731-32 (D.C. Cir. 2003); Memo. (Doc. 14-2) at 10.

At the outset, plaintiffs concede that the motion to intervene is timely.  However, plaintiffs dispute that the applicants have a legally protected interest in this action that is directly at stake and at risk of impairment.  Plaintiffs also assert that the interests of the applicants are adequately represented by the defendants.  Plaintiffs address these issues in turn.

4

A.    <u>**The Applicants' Interests Are Not Directly at Stake And It Is Unlikely That They Will Be Impaired By A Ruling From The Court**</u>.

Qualification for intervention as of right depends on "whether the applicant 'claims an interest relating to the property or transaction which is the subject of the action'" and "whether 'the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest.'" *Fund for Animals*, 322 F.3d at 731.

Here, the subject matter of the suit is defined by the claim for relief that plaintiffs assert in the Complaint, which requests the Court to (1) declare that FWS's "not warranted" finding on the Petition to list Gunnison sage-grouse as threatened or endangered violates Section 4(b)(3)(A) of the ESA; (2) declare that FWS's "not warranted" finding on the Petition to list Gunnison sage-grouse as threatened or endangered under the ESA is arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and/or constitutes agency action unlawfully withheld under section 706 of the APA; (3) issue an Order setting aside FWS' "not warranted" finding for Gunnison sage-grouse; and (4) remand to FWS to issue new proposed and final listing and critical habitat determinations for Gunnison sage-grouse consistent with the requirements of the ESA and the Court's Order. *See* Complaint (Doc. 1), Prayer for Relief at ¶¶ A-D.  Moreover, to ensure that appropriate and necessary relief will remain available should the species' status take a turn for the worse while this litigation is pending, plaintiffs also requested the Court to order FWS to issue an emergency rule immediately listing Gunnison sage-grouse as "endangered" under the ESA pending the agency's completion of normal listing procedures and rulemaking, pursuant to Section 4(b)(7) of the ESA.

16 U.S.C. § 1533(b)(7).[1]

As an initial matter, plaintiffs must accept at face value the applicants' basic characterization of their interest in this case – *i.e.*, that they have an interest in carrying out grazing, oil and energy exploitation, and other economic activities, and that these activities, which destroy, degrade, and/or convert suitable Gunnison sage-grouse habitat, are incompatible with the long-term biological needs of the species, and would therefore be restricted as a result of the species being listed under the ESA.[2] However, these interests do not relate to *defendants'* liability under the ESA, and therefore do not support the applicants' intervention. *See Western Watersheds Project v. U.S. Fish and Wildlife Serv.*, Civ. No. 06-277, Memo. Decision and Order (D. Idaho Mar. 8, 2007) (Exhibit ("Ex.") A) at 1 ("Because the intervenors cannot claim any

---

[1]  Plaintiffs also request the Court, in the event that plaintiffs are prevailing parties in this litigation, to award plaintiffs their reasonable fees, costs, and expenses, including attorneys fees, associated with this litigation pursuant to the ESA and other law, *see id*. at ¶ E (citing 16 U.S.C. § 1540(g)(4); 28 U.S.C. § 2412(d)(1)(A)), and to grant such additional and further relief as plaintiffs may request or this Court may deem just and appropriate. *Id*. at ¶ F.

[2]  The applicants' declarations and other materials do not set forth specific assertions or specific examples of the applicants' asserted interests – just sweeping, conclusory assertions to that effect. *See*, *e.g.*, Fankhauser Decl. (Doc. 14-2) at ¶ 8 (asserting, without factual or other support, that listing "will increase regulatory requirements which, in turn, will increase production costs and affect the viability of Cattlemen's members"). For example, although she claims that members of the Western Conservation Coalition must obtain permits from the Army Corps of Engineers in order to carry out construction activities, and that obtaining such permits will be more difficult if the Corps must comply with Section 7 of the ESA for activities that impact the Gunnison sage-grouse, Western Conservation Coalition's Executive Director points to no specific examples of any such permits. Rather, she simply asserts, in conclusory terms, that if the grouse is listed, Section 7 "consultations with the FWS will result in additional regulatory burdens, significant delays and financial hardships to Western's members." *See* Paris Decl. (Doc. 14-4) at ¶ 5; *see also* Poister Decl. (Doc. 14-3) at ¶ 6 ("listing . . . would increase regulatory restrictions on agriculture, oil and gas, utilities, mining, timber harvests, recreation and other activities on federal lands, which would have dramatic and negative impacts on the Partnership[] [for the West's] members").

interest that relates to the Service's liability, the Court denies the motion to intervene on the merits of the case.").

Even accepting such broad characterizations as fact, however, the applicants' claims regarding impairment do not survive the practical reality that, where successful on the merits, lawsuits such as this one usually result in declaratory judgement, reversal of the unlawful decision, and/or remand for a new, lawful determination consistent with the court's order – *i.e.*, not an Order compelling defendants to actually list the species in question.  *See*, *e.g.*, *Defenders of Wildlife, et al. v. Kempthorne, et al.*, 2006 WL 2844232 *13 (D.D.C. Sept. 29, 2006) (GK) (remanding, for the second time, unlawful listing determination for Canada lynx); *Spirit of the Sage Council v. Norton*, 294 F. Supp. 2d 67, 90 (D.D.C. 2003) (appropriate remedy for agencies' failure to comply with APA's notice and comment procedures was vacatur and remand of rule with instructions to begin anew); *Building Industry Legal Defense Found. v. Norton*, 231 F. Supp. 2d 100, 104-09 (D.D.C. 2002) (vacating and remanding final rules designating critical habitats for toad and shrimp species); *American Wildlands v. Norton*, 193 F. Supp. 2d 244, 248 (D.D.C. 2002) (remanding negative Westslope cutthroat trout listing decision to FWS); *Carlton v. Babbitt*, 26 F. Supp. 2d 102, 104-05 (D.D.C. 1998) (remanding FWS's 12-month finding that the grizzly bear should not be reclassified from "threatened" to "endangered" status); *Carlton v. Babbitt*, 900 F. Supp. 526, 534 (D.D.C.1995) (same); *Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670 (D.D.C. 1997) (vacating and remanding unlawful not warranted listing determination for Canada lynx).  Plaintiffs are not aware of a successful challenge to a "not warranted" 12-month listing determination that resulted in a court ordering FWS to list the species at issue. Indeed, as Judge Kessler observed in the latest of numerous decisions pertaining to the FWS's

failure to list Canada lynx under the ESA, even where "an agency has utterly failed to abide by the terms of a remand order, a second remand is the only appropriate remedy" – not an Order compelling FWS to list the species in question. *Defenders of Wildlife*, 2006 WL 2844232 at *13.[3]

Here, were the Court to reverse and remand the "not warranted" listing determination for Gunnison sage-grouse, and, as a result, defendants took the next step in the ESA listing process, such step would be a "proposed rule" to list the species. *See* 16 U.S.C. § 1533(a)(1); *see also*, *e.g.*, Dep't of the Interior, Fish and Wildlife Service, Endangered and Threatened Wildlife and Plants; Listing the Gunnison Sage-Grouse (*Centrocercus minimus*) as Endangered (excerpt attached as Ex. B).[4] This is because "[t]he process of determining whether or not a species is either endangered or threatened is composed of six distinct steps," *see Southwest Ctr. for Biological Diversity v. Babbitt*, 131 F. Supp. 2d 1, 2 (D.D.C. 2001), and only the last of these six steps would result in the Gunnison sage-grouse being listed under the ESA, which would result in the extension of the Act's procedural and substantive protections to the species.[5]

---

[3] Of course, under the ESA the Court has broad discretion to fashion appropriate relief – and, indeed, is arguably bound to issue equitable relief as necessary to further the Act's purposes. *See*, *e.g.*, *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1178 (9th Cir. 2002) (holding that ESA Section 4 listing violation "compelled the court to grant injunctive relief"). However, the fact that the Court has the discretion to order FWS to list the Gunnison sage-grouse as a result of this lawsuit argues, at most, for allowing the applicants to intervene in the remedy phrase of this suit. *See infra* at 20-22.

[4] Indeed, plaintiffs will demonstrate in this lawsuit that in July 2005, FWS *did* draft a proposed rule listing the Gunnison sage-grouse as endangered under the ESA, and concurrently designating critical habitat for the species – but, by April 2006, that "warranted" ESA listing determination was reversed by political appointees at the highest levels of the U.S. Department of the Interior. *See id.*; *see also* Complaint (Doc. 1) at ¶ 64.

[5] These "six distinct steps" are:

Thus, a proposed rule would be followed by a 60-day public comment period, during which interested members of the public (such as the applicants) would have the opportunity to submit comments supporting or objecting to a proposed rule.  *See* 16 U.S.C. § 1533(b)(5)-(6); 50 C.F.R. § 424.16(c)(vi)(2).  During such comment period, arguments could properly be raised

---

1)    Petition To List a Species With the Secretary — Pursuant to 16 U.S.C. § 1533(b)(3)(A), any person may file a petition to list a species with the Secretary.

2)    Determination As To Whether Or Not Petitioned Action Is Warranted ("90-Day Finding") — Pursuant to 16 U.S.C. § 1533(b)(3)(A), the Secretary must determine within 90 days after receiving a petition whether or not it presents substantial scientific or commercial information to warrant further action.

3)    Review Of Species' Status — Pursuant to 16 U.S.C. § 1533(b)(3)(A), if the Secretary determines that substantial scientific or commercial information was presented, a review of the species' status commences.

4)    Determination Regarding Review of Species' Status ("12-Month Finding") — Pursuant to 16 U.S.C. § 1533(b)(3)(B), upon completion of the review of the species' status, the Secretary determines whether:
    a)    the petitioned action is "not warranted";
    b)    the petitioned action is "warranted"; or
    c)    the petitioned action is "warranted but precluded" by other factors.

5)    Publication Of a Proposed Rule Listing a Species As Threatened Or Endangered — Pursuant to 16 U.S.C. § 1533(a)(1), if the Secretary determines, based on the best scientific and commercial data available, that any one of the following factors is present, the Secretary must publish a proposed rule in the Federal Register listing such species as threatened or endangered:
    a)    "the present or threatened destruction, modification, or curtailment of its habitat or range"
    b)    "overutilization for commercial, recreational, scientific, or educational purposes"
    c)    "disease or predation"
    d)    "the inadequacy of existing regulatory mechanisms"
    e)    "other natural or manmade factors affecting its continued existence"

6)    Final Determination — Pursuant to 16 U.S.C. § 1533(b)(6)(A), the Secretary must publish, within one year of the publication of the proposed rule, a final rule in the Federal Register either:
    a)    implementing the determination;
    b)    delaying the final determination for a period no greater than six months; or
    c)    withdrawing the proposed rule.

*Southwest Ctr.*, 131 F. Supp. 2d at 2.

9

regarding whether listing the species under the ESA is warranted, the impacts of listing, whether the grouse should be listed as "endangered" or "threatened," and whether and/or to what extent critical habitat should be designated, as well as the numerous policy arguments regarding the efficacy of the ESA that the applicants would seek to make as intervenors in this case. *See*, *e.g.*, Memo. (Doc. 14) at 5-6; *cf. Seminole Nation of Oklahoma v. Norton*, 206 F.R.D. 1, 6 (D.D.C. 2001) (rejecting intervention where applicants sought to expand the scope of the litigation).[6]

In analyzing whether an action will impair a proposed intervenor's interests, it is appropriate for a court to assess whether subsequent or separate administrative or judicial proceedings can afford the proposed intervenor adequate protection of its alleged interests such that intervention in the current matter is not warranted. *Sierra Club v. EPA*, 995 F.2d 1478, 1486 (9th Cir. 1993). Here, by arguing that their interests would be impaired by this litigation, the applicants presume an interest based on actions yet to come, which is not allowed. *See*, *e.g.*, *United Parcel Service of America, Inc. v. Net, Inc.*, 225 F.R.D. 416, 421 (E.D.N.Y. 2005) ("An interest that is remote from the subject matter of the proceeding, or that is contingent upon the occurrence of a sequence of events before in becomes colorable, will not satisfy the rule.")

---

[6] It is telling that had FWS issued a proposed rule to list the Gunnison sage-grouse, rather than the "not warranted" determination that plaintiffs challenge here, a legal challenge to a proposed listing rule would not have been ripe for judicial review. *See*, *e.g.*, *Carlton v. Babbitt*, 147 F. Supp. 2d 4, 8-9 (D.D.C. 2001) (FWS's proposed rule to reclassify small grizzly bear sub-population from "threatened" to "endangered"was not final agency action); *cf. Building Industry Assn. of Superior California v. Babbitt*, 979 F. Supp. 893, 904 (D.D.C. 1997) (rejecting challenge to "warranted" 90-Day Finding for species of fairy shrimp). This is because the "plain language of the ESA indicates . . . that the Secretary's finding that a petition is warranted is not subject to judicial review." *Building Industry*, 979 F. Supp. at 904 (citing 16 U.S.C. § 1533(b)(3)(C)(ii)). It follows from this that the applicants cannot claim that their interests are at serious risk of being impaired by this lawsuit, which might result in a proposed rule, but not a final rule, listing the Gunnison sage-grouse.

(*quoting Washington Elec. Coop., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 922 F.2d 92, 97 (2d Cir. 1990)).

Furthermore, even if, during this litigation, the grouse's status continued to deteriorate to the point that an "emergency" or other Order listing the species became necessary and legally appropriate, applicants' assertions of harm to their asserted interests are speculative at best. For example, the "significant delays" and "financial hardship" that are feared by the applicants, *see* (Doc. 14) Memo. at 11-12, would only arise if its members are forced to apply for federal permits to conduct activities that "adversely affect" Gunnison sage-grouse or "adversely modify" its critical habitat on federal lands, since Section 7 applies to federal agencies and not private parties. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.01.

Indeed, it is true that once the Gunnison sage-grouse is listed under the ESA, federal "action" agencies (such as the Bureau of Land Management and U.S. Forest Service) would have to go through ESA Section 7 consultation with FWS to assess whether their ongoing or new activities may jeopardize the Gunnison sage-grouse. *See* 16 U.S.C. § 1536(a)(2). However, the results of that consultation process cannot be predicted now – particularly as they may affect specific federal decisions in which applicants may have an interest – and in any event, those consultations will again result in final agency decisions that the applicants or others may challenge in court. *Bennett v. Spear*, 520 U.S. 154 (1997) (Section 7 biological opinion is final agency action subject to judicial review). Thus, the chain of events that applicants rely on here for purposes of intervention is attenuated and speculative, and cannot support intervention.[7]

––––––––––––––––––––

[7] Indeed, Section 7 consultations are already occurring for activities that affect listed species, and those activities are proceeding with ESA protections in place. *See*, *e.g.*, *Arizona Cattle Growers v. U.S. Fish and Wildlife Serv.*, 273 F.3d 1229, 1233 (9th Cir. 2001) (setting

The applicants allude to numerous other "interests" that also do not hold up. For example, for "endangered" species, Section 9 of the ESA makes it unlawful for any person to "import any such species into, or export any such species from, the United States," or to "take any such species within the United States." *Id.* § 1538(a)(1)(A), (B). The term "take" includes "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). For species that are listed as threatened rather than endangered, the Secretary of the Interior "may," but is not required to, extend these prohibitions on taking and export. *Id.* § 1533(d). Thus, until there is a final rule listing the Gunnison sage-grouse as "endangered" (as opposed to "threatened") under the Act, it is not clear that Section 9's protections would even apply to the grouse. Moreover, the lawful take of protected species may be permitted for activities through issuance of "incidental take permits," which "function[] as a safe harbor provision immunizing persons from Section 9 liability and penalties for takings committed during activities that are otherwise lawful and in compliance with its terms and conditions" and any such incidental taking "'shall not be considered to be a prohibited taking of the species concerned.'" *See Arizona Cattle Growers*, 273 F.3d at 1239 (citing 16 U.S.C. § 1536(o)). The applicants do not explain why their members could not obtain such permits – and, indeed, their arguments would seem to indicate that they believe they could obtain such permits. *See*, *e.g.*, Memo. (Doc. 14) at 2 (asserting that applicant "Cattlemen's

---

forth standards for specifying levels of allowable "incidental take" in connection with grazing on federal lands). In addition, according to FWS, the "vast majority" of consultations conclude that the proposed activities are not likely to adversely affect listed species, usually because the consultation process allows for "changes to the project design" to be made "so that adverse impacts to listed species are avoided." FWS, *Consultations with Federal Agencies: Section 7 of the Endangered Species Act* (Feb. 2007) (Ex. C) at 2.

members pride themselves on good stewardship and care of their own private lands, as well as

the federal lands upon which they rely to graze cattle") (citing Fankhauser Decl. (Doc. 14-2) at ¶

3); *id*. at 5 (identifying "existing conservation efforts, in which some of the [applicant]

Partnership's members are participants") (citing Poister Decl. (Doc. 14-3) at ¶ 5); *id*. at 7

(asserting that members of applicant Western Conservation Coalition "actively participate in

local efforts to conserve the Gunnison sage grouse") (citing Paris Decl. (Doc. 14-4) at ¶ 4.

 At bottom, what the applicants actually complain of is that they do not want to be

burdened with the ESA's protections.  However, mere inconvenience caused by added expense

and delay from having to participate in separate or subsequent proceedings does not equate to an

interest "relating to the property or transaction which is the subject of the action."  *Fund for

Animals*, 322 F.3d at 731; *see*, *e.g.*, *Seminole Nation*, 206 F.R.D. at 9 (intervention motion

rejected where "there [wa]s no threat that th[e] suit will impair the [applicants'] rights" to money

property).  Nor does it constitute impairment of an interest sufficient to justify intervention as of

right.  *See*, *e.g.*, *Blake v. Pallan*, 554 F.2d 947, 954 (9th Cir. 1977) ("this is not a situation where

specific property rights are being determined in such a way that for all practical purposes the

initial judicial decision will foreclose the absent party's claims to an interest in the property").[8]

---

[8]  To the extent that the applicants identify a disagreement over the efficacy of the ESA in
conserving imperiled species, such policy disagreements do not provide a basis for intervention
as of right, as they also do not equate to an interest "relating to the property or transaction which
is the subject of the action."  *Fund for Animals*, 322 F.3d at 731.

 Moreover, applicants' objections are not supported by the track record of the ESA.
According to FWS data, only nine of the approximately 1,800 species ever listed under the Act –
including some severely depleted ones – have been declared extinct.  FWS, Threatened and
Endangered Species System, available at
(http://ecos.fws.gov/tess_public/TESSWebpageDelisted?listings=0) (last visited Mar. 13, 2007).
Ninety-nine percent of all listed species survive today, including the eagle, the buffalo, the
California condor, and the manatee.  *Id*.  Meanwhile, according to the FWS, from 1998-2002,

**B.**    **The Applicants Have Failed To Show That Their Interests Are Not Adequately Represented By The Defendants.**

The applicants have also failed to demonstrate that existing parties will not adequately represent their alleged interests in this case, as required by Rule 24(a).  Although the burden of showing inadequate representation is typically not great, *see Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538 n.10 (1972), the burden to show inadequate representation does appear to rest with the applicants, *see Fund for Animals*, 322 F.3d at 736 & n.7 (citing *id.*), and "the mere fact that there is a slight difference in interests between the applicant and the supposed representative does not necessarily show inadequacy, if they both seek the same outcome." *Nuesse v. Camp*, 385 F.2d 694, 703 (D.C. Cir. 1967); *see also id.* ("'Interests may be different without being adverse.'") (internal quotation omitted).

Here, applicants seek to show inadequate representation by asserting that they take "different views than the FWS on what activities may impact the Gunnison sage grouse, or its habitat, and how."  Memo. (Doc. 14) at 16.  However, the applicants fail to show that they and

---

FWS conducted over 300,000 informal and formal Section consultations, and the "vast majority" of projects were determined not to adversely affect listed species or their critical habitat – *i.e.*, the projects were allowed to go forward.  *See* FWS, *Consultations with Federal Agencies* (Ex. C).

Thus, according to one legal scholar, the ESA's process does not shut down industry, but simply "promotes intelligent planning, rarely stops projects, and prevents unnecessary habitat loss."  Patrick Parenteau, *Rearranging the Deck Chairs: Endangered Species Act Reforms in an Era of Mass Extinction*, 22 WM. & MARY ENVTL. L. & POL'Y REV. 227, 268-69 (1998).  Indeed, as another legal scholar has pointed out, the FWS "virtually always comes up with a reasonable and prudent alternative that allows the action in question to proceed."  Daniel J. Rohlf, *Jeopardy Under the Endangered Species Act: Playing a Game Protected Species Can't Win*, 41 WASHBURN L.J. 114, 151 (2001).  Thus, while "[o]n paper, the ESA looks like what some have called it – the strongest wildlife protection law in the world" – "[i]n reality . . . the ESA turns out to be. . . a statute that operates on a philosophy of compromise and accommodation, relying more on mitigation than prohibition."  Parenteau, *Rearranging Deck Chairs*, at 266.

14

the defendants have more than a "slight difference" in interests, when this case simply

challenges FWS's "not warranted" determination.  It is clear that the Secretary and the applicants

have exactly the *same* interest – *i.e.*, upholding the challenged "not warranted" determination.

There is no evidence that the Secretary will not make all possible arguments to defend the

negative determination, or any evidence that the applicants bring something to this litigation that

the Secretary does not.  Intervention should be denied when, as here, the proposed intervenors

bring nothing additional to the case.  *See*, *e.g.*, *Pate v. Dade County School Bd.*, 588 F.2d 501,

503 (5th Cir. 1979).  Accordingly, the applicants are adequately represented by the Secretary,

and on this basis alone intervention as of right should be denied.[9]


### C.    The Applicants Lack Constitutional Standing.

---

[9]  Indeed, it appears that the applicants and the Secretary are in lock-step on the question
of whether the Gunnison sage-grouse should be listed under the ESA.  After FWS field staff and
biologists determined, in July 2005, that the grouse should be listed as "endangered" under the
ESA, *see* Proposed Rule (Ex. B), high-ranking political appointees within the Department of the
Interior reversed that determination.  *See* Complaint (Doc. 1) at ¶ 64.  In so doing, the Listing
Determination articulated rationale that echoed arguments submitted to the agency by applicants.
*Compare*, *e.g.*, Western Conservation Coalition ("WCC") Comments on Gunnison sage grouse
(Mar. 17, 2006) (Doc. 14-4, Attachment 2) 8-11 (claiming that Gunnison sage-grouse is not
discrete from other sage-grouse species) *with* Listing Determination, 71 Fed. Reg. at 19955
(acknowledging "questions regarding the validity of this taxon").  FWS acknowledged
"questions" regarding the validity of the taxonomic distinction of Gunnison sage-grouse as a
species in the Listing Determination, despite being repeatedly informed by its own staff – as well
as by Dr. Clait Braun, a wildlife researcher and preeminent expert on the Gunnison sage-grouse
– that this is not a matter that is in serious dispute.  *See*, *e.g.*, Comments (Author Unidentified)
(Mar. 30, 2006) (Ex. D) (this is a taxonomic distinction that "should NOT be questioned");
Email from Fahey to Mehlhop, *et al*. (Apr. 12, 2006) (Ex. E) (calling questioning of Gunnison
sage-grouse's taxonomic status "disturbing"); *see also* Declaration of Clait Braun, Ph.D. (Mar.
26, 2006) (Ex. F) at ¶¶ 13-18 (rebutting arguments of WCC regarding taxonomic status of
Gunnison sage-grouse); *id*. at ¶ 28 (stating that WCC's letter "mixes fiction with very few facts"
and urging FWS to "disregard all of the material in the letter").
.

The D.C. Circuit has made clear that a party seeking to intervene as of right must demonstrate that it has standing under Article III of the Constitution. *See Fund for Animals,* 322 F.3d at 732 (citing *Military Toxics Project v. EPA,* 146 F.3d 948, 953 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1074 (D.C. Cir. 1998); *Building & Constr. Trades Dep't v. Reich,* 40 F.3d 1275, 1282 (D.C. Cir. 1994)). The Supreme Court has held that, to establish the "irreducible constitutional minimum" for Article III standing, a party must show that it has suffered an injury in fact – *i.e.*, "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotations, footnote, and citations omitted). The Supreme Court has further held that "there must be a causal connection between the injury and the conduct complained of and "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id*. at 560-61 (internal quotations and citations omitted).[10] Here, the applicants fail to satisfy the requirements for Article III standing for the same reasons that they fail to satisfy the requirements of Rule 24(a).

The applicants fail on the first prong of this three part test – "injury in fact" – because they fail to identify, any particularized, "legally protected interest" for which an injury is "actual or imminent." *Lujan*, 504 U.S. at 560. As explained earlier, the applicants have filed declarations in support of their motion to intervene which fail to identify any such interest or

---

[10] The applicants suggest that they have a lesser burden to demonstrate standing than that which is required of plaintiffs. *See* Memo. (Doc. 14) at 14-15. However, the D.C. Circuit has made clear that "'because a Rule 24 intervenor seeks to participate on an equal footing with the original parties to the suit, he must satisfy the standing requirements imposed on those parties.'" *Fund for Animals*, 322 F.3d at 732 (quoting *City of Cleveland v. NRC,* 17 F.3d 1515, 1517 (D.C. Cir. 1994)).

imminent injury. *See supra* at 6-7. Thus, the applicants must wait until they can demonstrate that any injury is actual or imminent to have standing.

In addition, to have constitutional standing a party must establish that it has "personally . . . suffered some actual or threatened injury," which may be "fairly . . . traced to the challenged action" and is "likely to be redressed by a favorable decision" of the court. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472 (1982) (internal quotations and citations omitted). However, the applicants' asserted injuries – *i.e.*, of "significant delay" and "financial hardship," Memo. (Doc. 14) at 5-6 – are not "fairly traceable" to the "not warranted" listing decision but rather to speculative events will be caused in the future, if at all, by yet-to-be-published regulations. The applicants similarly depend upon future compliance by third parties with Sections 7 and 9 in order to proceed with their activities. *See supra* at 11-13.

Thus, Section 7(a)(2) of the ESA requires all federal agencies "to insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [any critical] habitat of such species[.]" 16 U.S.C. § 1536(a)(2). When an agency determines that its proposed action "may affect listed species or critical habitat[,]" it must engage in formal consultation with the federal resource agency responsible for the species at issue, which in the case of the Gunnison sage-grouse is FWS. *See* 50 C.F.R. § 402.14(a). Consultation concludes with the issuance of a "Biological Opinion" "detailing how the agency action affects the species or its critical habitat" and indicating whether the proposed action is likely to jeopardize the species' continued existence. 16 U.S.C. § 1536(b)(3)(A). When a

17

jeopardy determination is reached, the Biological Opinion may indicate any "reasonable and prudent" alternatives to the action under review. *Id.*; 50 C.F.R. § 402.14(h)(3). When it is determined that the action and "any resultant incidental take" of the species will not jeopardize the species, FWS must provide an "incidental take statement" specifying "reasonable and prudent measures ... necessary or appropriate to minimize such impact." 16 U.S.C. § 1536(b)(4); *see also id.* at § 1532(19) ("The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."). After the initiation of a required consultation, Section 7(d) of the Act prohibits "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate [Section 7(a)(2) ]." *Id.* § 1536(d); *see also* Memo. (Doc. 14) at 5 (describing chain of causation required for intervenor's asserted interests to be affected by protections found in Section 7 of the ESA. The harm that the applicants identify as being caused by Section 7 of the ESA could only result, if at all, following completion of these many steps.

Thus, even where a species is listed and entitled to the protections of Sections 7 and 9 of the ESA, compliance with these provisions involves a chain of events and, in the case of the requirements of Sections 7 and 9, the actions of third parties that are not before the Court in this case. *Fund for Animals*, 295 F. Supp. 2d 1, 7 (D.D.C. 2003) ("When redress depends on the cooperation of a third party, it becomes the burden of the [applicant] to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury") (quoting *U.S. Ecology, Inc. v. U.S. Dep't of the Interior,* 231 F.3d 20, 24 (D.C. Cir. 2000)).

18

Accordingly, the applicants have failed to establish that they have "'personally ... suffered some actual or threatened injury,' which may be 'fairly ... traced to the challenged action' and is 'likely to be redressed by a favorable decision' of the court." *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 661 (D.C. Cir. 1996) (quoting *Valley Forge*, 454 U.S. at 472 (internal quotations and citations omitted)). And, as the D.C. Circuit has made clear, "[a] party that fails to demonstrate any of these prerequisites cannot seek relief from the federal judiciary." *Id*. at 662.

## II.    THE APPLICANTS SHOULD NOT BE GRANTED PERMISSIVE INTERVENTION.

There is no quarrel over the appropriate standard for permissive intervention. *See* Memo. (Doc. 14) at 24 (quoting Rule 24(b)). Rather, plaintiffs contend that the applicants' participation in this suit will "prejudice the adjudication of the rights of the original parties." Fed. R. Civ. P. 24(b). To the extent that the applicants have interests in common questions of law or fact with the main action, those interests are adequately represented by the Secretary and the applicants' participation is unnecessary.

As argued above, the applicants bring nothing additional to this case. They assert no legal position that differs from the position of the Secretary – as demonstrated by the similarity of the Secretary and the applicants' Answers and affirmative defenses. *Compare* Answer (Doc. 10) *with* Proposed Answer (Doc. 14-5). The applicants merely seek to defend the challenged "not warranted" determination in concert with the Secretary. This would subject both plaintiffs and the Court to repetitive and duplicative briefing, prejudicing the plaintiffs and thwarting judicial economy, and causing undue delay. Permissive intervention in such a situation is not appropriate. *Nuesse*, 385 F.2d at 704 ("permissive intervention may be denied in order to avoid

the likelihood of undue delay").

Because the applicants' participation will be redundant, it is unlikely to aid the Court or foster judicial economy. The Court should deny the applicants' alternative motion for permissive intervention.[11]

## III.    IF ALLOWED TO INTERVENE IN THIS CASE, THE APPLICANTS SHOULD BE GRANTED LIMITED STATUS.

It is well established that a court may limit the scope of intervention by an applicant. *See* Advisory Committee Notes on Fed. Rule Civ. P. 24 ("An intervention of right under the amended rule [24(a)] may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings."); *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 378 (1987). Thus, the extent of an intervenor's allowed participation is largely determined by its overall interest in the case. *United States v. American Tel. & Tel. Co.*, 642 F.2d 1285, 1291 (D.C. Cir. 1980) (noting that the District of Columbia Circuit allows "intervention for individual issues when appropriate to protect particular interests, with the limited nature of the intervenor's interest determining the scope of intervention that should be allowed") (*citing Smuck v. Hobson*, 408 F.2d 175, 179-80 (D.C. Cir.

---

[11] Plaintiffs note that "[w]here proposed intervenors present no new questions" or otherwise fail to satisfy the basic requirements for intervention, "courts have preferred to confer amicus status rather than granting permissive intervention." *See*, *e.g.*, *Silver v. Babbitt*, 166 F.R.D. 418, 434 (D. Ariz. 1994); *see also Tennessee Gas Pipeline Co., A Div. of Tenneco, Inc. v. F.E.R.C.*, 736 F.2d 747 (D.C. Cir. 1984) (where application of Federal Energy Regulatory Commission's ("FERC") Natural Gas Act interpretative rule, allowing FERC to suspend initial rates to a particular company, was hypothetical and thus not ripe, company's submission accepted as the submission of an amicus); *Rio Grande Pipeline Co. v. F.E.R.C.*, 178 F.3d 533 (D.C. Cir. 1999) (purchaser of pipeline segment granted amicus status where it lacked standing with respect to petition for review of FERC orders brought by purchaser of separate pipeline, and thus was not proper intervenor).

1969)).  Accordingly, some limits on the applicants' intervention, if granted either as of right or permissively, are appropriate to ensure the "efficient conduct of proceedings" and to correspond with the "particular interests" the applicants seek to protect.

To ensure the "efficient conduct of the proceedings," the applicants should be ordered not to assert any claims outside the scope of Complaint.  *See*, *e.g.*, *Fund for Animals*, 322 F.3d at 738 (district court has the option to limit intervenors to the claims raised by the original parties and may bar them from raising collateral issues); *Washington Electric Coop.*, 922 F.2d at 97 (intervention may not be used to "interject collateral issues into an existing action") (other citations omitted); *see also Trbovich*, 404 U.S. at 536-37 (intervention limited to the claims of illegality presented in the plaintiff's complaint); *Alabama Mun. Distribs. Group v. FERC*, 300 F.3d 877, 879-80 (D.C. Cir. 2002) (acknowledging the "well-established principle that, absent extraordinary circumstances, intervenors 'may join issue only on a matter that has been brought before the court by another party'") (*quoting Illinois Bell Telephone Co. v. FCC*, 911 F.2d 776, 786 (D.C. Cir. 1990)).  In addition, the applicants should be precluded from filing any motions independently, or in which the Secretary does not join.  Moreover, the applicants should be prohibited from seeking any discovery not sought by the Secretary.

Furthermore, to serve judicial economy, ensure the efficient conduct of the proceedings, and avoid unfairly prejudicing plaintiffs with duplicative and lengthy briefing, the applicants and the Secretary, should be ordered to comply, respectively, with one-half of the applicable, standard page limitations for briefs provided in the Local Rules.

Finally, it would be appropriate to limit the applicants' intervention to the remedial phase of this case.  The applicants' interest is limited to avoiding ESA restrictions that might result

from plaintiffs' requested relief. Memo. (Doc 14) at 5-6. The applicants are not harmed by the

liability phase of this case, which entails deciding whether or not the Secretary has complied

with his obligations under the ESA, but only by a potential injunction ordering the Secretary to

list the Gunnison sage-grouse. Accordingly, the applicants should be heard only on the

injunction and remedy issue, not liability.[12]

## CONCLUSION

For all of the reasons set forth above, plaintiffs respectfully request the Court to deny the

applicants' motion to intervene as of right in this action and alternative motion for permissive

intervention. However, if the Court does decide to grant the applicants' motion, plaintiffs

alternatively request the Court to place appropriate limits on the applicants' intervention,

restricting their participation to the issues properly of interest to the applicants, to serve judicial

economy by prohibiting them from raising collateral issues, and restrict the volume of briefing.

In particular, plaintiffs believe it would be appropriate to limit the applicants' intervention to the

remedial phase of this case.


DATED:        March 13, 2007            Respectfully submitted,

                                        /s/   *Amy R. Atwood*
                                        Amy R. Atwood

---

[12]  Courts regularly limit intervention to only the remedial phase of a case. *See*, *e.g.*, *Western Watersheds Project* (Ex. A); *Donnelly v. Glickman*, 159 F.3d 405, 410 (9th Cir. 1998) (noting that "[a]lthough the proposed intervenors lack an interest in the liability phase of plaintiffs' action, in theory they could still intervene in the remedial phase"); *Howard v. McLucas*, 782 F.2d 956, 960-61 (11th Cir. 1986); *Kirkland v. New York State Dep't. of Correctional Servs.*, 711 F.2d 1117, 1128 (2d Cir. 1983), *cert. denied*, 465 U.S. 1005 (1984); *Brody By and Through Sugzdinis v. Spang*, 957 F.2d 1108, 1116 (3d Cir. 1992) (analyzing the relationship of the applicant intervenor's interest in the merits and the remedy portions of the case independently).

D.C. Bar No. 470258
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97405
541-485-2471
541-485-2457 (fax)
atwood@westernlaw.org

Geoff Hickcox
admitted *pro hac vice*
Western Environmental Law Center
679 East Second Ave, Suite 11B
Durango, CO 81301
970-382-5902
970-385-6804 (fax)
ghickcox@gmail.com

Rebekah S. King
admitted *pro hac vice*
Assistant San Miguel County Attorney
P.O. Box 791
333 W. Colorado Ave., Third Floor
Telluride, CO 81435
970-728-3879
970-728-3718 (fax)

Attorneys for Plaintiffs

23

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| WESTERN WATERSHED PROJECT, | ) ) | |
| | ) | Case No. CV-06-277-E-BLW |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM DECISION** |
| v. | ) | **AND ORDER** |
| | ) | |
| U.S. FISH AND WILDLIFE SERVICE, | ) ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Western Watershed Project (WWP) brought this suit against the U.S. Fish & Wildlife Service (the Service) for its failure to list the Greater Sage Grouse under the federal Endangered Species Act (ESA).  Specifically, WWP claims the Service did not follow the ESA requirements.

Fourteen parties seek to intervene in this case.  Because the intervenors cannot claim any interest that relates to the Service's liability, the Court denies the motion to intervene on the merits of the case.  This raises the issue of whether the intervenors should be allowed to intervene for remedy purposes.  If WWP seeks only a remand to the Service for the purpose of conducting a proper process under the ESA, then the intervenors are not allowed to intervene.

**Memorandum Decision and Order - 1**

However, it is unclear to the Court whether WWP is seeking more than just a remand of the Service's determination. WWP may be seeking additional remedies to protect the Sage Grouse. If such remedies are sought, then the intervenors must be allowed input at that point.

Thus, the Court will grant the motion to intervene in part. The Court will allow the intervention only for the purpose of challenging any proposed remedy beyond a remand to the Service.

## ORDER

IT IS HEREBY ORDERED, that the motions to intervene (Docket Nos. 16, 17, 24, 36, 45, 47) be GRANTED IN PART AND DENIED IN PART. They are granted to the extent they seek to intervene only for the purpose of challenging any proposed remedy beyond a remand to the Service for the purpose of conducting a proper process under the ESA. They are denied in all other respects.

DATED: **March 8, 2007**



Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision and Order - 2**

Billing Code 4310-55-P

DEPARTMENT OF THE INTERIOR

Fish and Wildlife Service

50CFR Part 17

RIN XXXX-XXX

Endangered and Threatened Wildlife and Plants; Listing the Gunnison Sage-grouse

(Centrocercus minimus) as Endangered

AGENCY:  Fish and Wildlife Service, Interior.

ACTION:  Proposed rule.

SUMMARY:  We, the Fish and Wildlife Service (Service), propose to list the Gunnison

sage-grouse (Centrocercus minimus) as endangered under the authority of the

Endangered Species Act of 1973, as amended (ESA).  The Gunnison sage-grouse

historically occurred in four States including Colorado, Utah, Arizona, and New Mexico.

Today, it is found in only seven localized populations in Colorado and Utah representing

10 percent of its historical range.  Only one of these seven populations contains more

1

than 350 individuals.  The total range-wide population estimate in 2005 was less than

6,000 individuals.  The primary threats include direct habitat loss, degradation and

fragmentation from building development, road and utility corridors, fences, energy

development, conversion of native habitat to hay or other crops, alteration or destruction

of wetland and riparian areas, drought, inappropriate livestock management, creation of

reservoirs, and fire suppression that allows encroachment of woody vegetation.  Limited

genetic diversity in the smallest populations and small size of most populations also may

exacerbate impacts of relatively small threats.


DATES:  We will consider comments on this proposed rule received until the close of

business on **[INSERT DATE 60 DAYS FROM FEDERAL REGISTER**

**PUBLICATION DATE]**.  Two public hearings are scheduled--one on September 21,

2005, at the Norwood Community Center in Norwood, Colorado, at 5:00 pm, and one on

September 22, 2005, at the Gunnison County Fairgrounds Community Center  in

Gunnison, Colorado, at 5:00 pm.  Requests for additional public hearings must be

received by **[INSERT DATE 30 DAYS FROM FEDERAL REGISTER**

**PUBLICATION DATE]**.


ADDRESSES:  If you wish to comment, you may submit your comments and materials

concerning this proposal by any one of several methods--

2

1.  You may submit written comments to U.S. Fish and Wildlife Service, Western Colorado Ecological Services Office, 764 Horizon Drive, Building B, Grand Junction, Colorado 81506-3946.

2.  You may hand-deliver written comments to our office at the address given above.

3.  You may send comments by electronic mail (e-mail) to fw6_gusg@fws.gov. See the Public Comments Solicited section below for file format and other information about electronic filing.

Comments and materials received, as well as supporting documentation used in preparation of this proposed action, will be available for inspection, by appointment, during normal business hours, at the above address.

FOR FURTHER INFORMATION CONTACT:  Allan Pfister, Western Colorado Supervisor at the address listed above (telephone 970-243-2778; facsimile 970-245-6933).

SUPPLEMENTARY INFORMATION:

Background

# Consultations with Federal Agencies

*Section 7 of the Endangered Species Act*

The Endangered Species Act (ESA) directs all Federal agencies to participate in endangered species conservation. Specifically, section 7 of the ESA charges Federal agencies to aid in the conservation of listed species (section 7 (a)(1)), and requires Federal agencies to ensure that their activities are not likely to jeopardize the continued existence of listed species or adversely modify designated critical habitats (section 7 (a)(2)).

## What types of conservation activities are we doing under section 7(a)(1)?

One way that we actively carry out conservation activities for listed species under section 7(a)(1) is through our Partners for Fish and Wildlife Program. This program is geared toward habitat restoration on private lands. Listed species are considered a priority in this program. As a result, habitat restoration efforts funded by the Partners program have directly benefitted a number of listed species, such as the Louisiana black bear (Ursus americanus luteolus), the red-cockaded woodpecker (Picoides borealis), and the Karner blue butterfly (Lycaeides melissa samuelis).

Other Federal agencies also have used their existing authorities to conserve listed species. For example, the U. S. Department of Agriculture's Natural Resources Conservation Service has incorporated listed species and their conservation needs into the Wetland Reserve Program, the Wildlife Habitat Incentive Program, and the Environmental Quality Incentive Program.

## What is the consultation process that occurs under section 7(a)(2)?

The provision under section 7 that is most often associated with the Service and other Federal agencies is section 7(a)(2). It requires Federal agencies to consult with the Service to ensure that actions they fund, authorize, permit, or otherwise carry out will not jeopardize the continued existence of any listed species or adversely modify designated critical habitats. The Service issued regulations in 1986 detailing the consultation process, and we have since completed a handbook describing the process in detail. The handbook is available on our web site at **http://www.fws.gov/endangered/consultations**.

## How is the consultation process started?

Before initiating an action, the Federal action agency (the agency planning a specific action), or its non-Federal permit applicant, must ask the Service to provide a list of endangered, threatened, and proposed species and designated and proposed critical habitats that may be present in the project area. If we answer that no species or critical habitat are present, then the Federal action agency has no further ESA obligation under section 7(a)(2) and consultation is concluded. If a species is present, then the Federal action agency must determine whether the project may affect listed species. If so, consultation is required. If the action agency determines (and the Service agrees) that the project is not likely to adversely affect any listed species or designated critical habitat, then the consultation (informal to this point) is concluded and the Service's concurrence is put in writing.

## What happens if a Federal project may adversely affect a listed species?

If the Federal action agency determines that a project may adversely affect a listed species or designated critical habitat, formal consultation is required. There is a designated period of time in which to consult (90 days), and beyond that, another set period of time for the Service to prepare a biological opinion (45 days). The analysis of whether or not the proposed action would be likely to jeopardize the continued existence of the species or adversely modify designated critical habitat is contained in the biological opinion. If a jeopardy or adverse modification determination



*Red-cockaded woodpecker*

USFWS   photo by John & Karen Hollingsworth

is made, the biological opinion must identify any reasonable and prudent alternatives that could allow the project to move forward.

## How does the Service manage projects that require the 'take' of some listed species?

If the Service issues either a nonjeopardy opinion or a jeopardy opinion that contains reasonable and prudent alternatives, it may include an incidental take statement. "Take" is defined as harassing, harming, pursuing, hunting, shooting, wounding, killing, trapping, capturing, or collecting listed species or attempting to engage in any such conduct. ("Harm" is further defined to include significant habitat modification or degradation that results in death or injury to a listed species by significantly impairing behavioral patterns such as breeding, feeding, or sheltering.) "Incidental take" is defined as take that is incidental to, and not the purpose of, an otherwise lawful activity. The Service must anticipate the take that may result from the proposed project and, providing such take will not jeopardize the continued existence of

listed species, describe that take in the incidental take statement. The latter contains clear terms and conditions designed to reduce the impact of the anticipated take to the species. These terms are binding on the action agency.

## What is the consultation workload?
From 1998-2002 the Service conducted over 300,000 informal and formal Section 7 consultations. The vast majority of these actions were not likely to adversely affect listed species or their designated critical habitat. A large percentage of projects that would have, at least as initially planned, adverse impacts to listed species are dealt with through informal consultation, in which the Federal action agency makes changes to the project design so that adverse impacts to listed species are avoided.

As more Federal agencies begin to work with the Service under section 7(a)(1), the conservation benefits should be reflected in an even lower number of jeopardy and adverse modification opinions.

## What type of guidance is available for other Federal agencies?
Guidance is available on our section 7 web site at **http://www.fws.gov/endangered/consultations**. Please call us at 703/358-2106 if you have any questions, or see our Endangered Species Contacts web site at **http://www.fws.gov/endangered/contacts.html** to locate a Service office in your area.

## What is the Service doing to facilitate the consultation process?
Designing projects in ways that are compatible with the conservation needs of listed species is among the most effective methods of ensuring a more rapid and efficient section 7 consultation process. The Service is currently developing an internet-based consultation and information system that can be used to screen out projects that will not affect listed species, complete the requirements of informal consultation, expedite formal consultation, and better integrate section 7 consultation with other environmental review processes. This system is being designed to provide project proponents with information that will allow them to better understand how their actions may affect listed species along with suggestions for how to avoid, minimize, or mitigate these effects. Project proponents will be able to go on-line



Photo by Dan Anderson/USFWS

*This Louisiana black bear was one of the largest ever captured on Tensas River National Wildlife Refuge, weighing in at over 400 pounds. The bear was trapped using a leg-hold cable snare that does not injure the animal. The biological information obtained, including weight, sex, a tooth for aging, and other measurements, are part of the Service's ongoing research efforts to aid in the recovery of this threatened subspecies. Afterwards, the bear was released on site.*

and receive information regarding listed species and designated critical habitat that may be affected by proposed activities, obtain "best management practices" (BMPs) that can be used during the project design phase to address anticipated impacts, identify appropriate Service contacts, and submit information that will be needed to complete section 7 consultation. We anticipate this system will be functional within limited areas of the country in late 2007.

**U. S. Fish and Wildlife Service
Endangered Species Program
4401 N. Fairfax Drive, Room 420
Arlington, VA 22203
703-358-2390
http://www.fws.gov/endangered/**

**February 2007**

The following comments are based on a limited review of the GUSG finding which included comments from Tom Graf and Julie McDonald (ie I only had time to read those sections where they had commented), and with the realization that the version being reviewed is not a current version.

The main areas where it is difficult to support the current wording/or comments in the document are species designation, the PVA discussion, urban development section, and the finding conclusion.

    1.  The species designation issue is one that should NOT be questioned.  We have not been provided any science that disputes GUSG species designation.

    2.  The PVA section states that the "PVA purpose was to assist the CDOW in evaluating the relative conservation value of each Gunnison sage-grouse population and to identify critical gaps in the knowledge of Gunnison sage-grouse in prioritizing management options for this species, particularly in relation to maintenance of genetic diversity and the need for population augmentation".  The RCP states that the PVA was "used to evaluate the relative risk of extinction for each population under the current conditions (ie the risk of extinction if nothing changes" and "to estimate relative extinction probabilities and loss of genetic diversity over time for various population sizes, and to determine the sensitivity of GUSG population growth rates to various demographic parameters". The fact that the PVA does not deal with habitat fragmentation or loss has also been deleted from the finding, which would show that we are making this finding even though we are aware of this limitation.

Graf's comments (TG#26) on what the PVA does/says are not appropriate.

    3.  Urban development  Statements made and population projections added to this document do not address the potential or actual impact of urban development on GUSG. It is not just an issue of number of people but the distribution of urban development relative to key GUSG habitat that will affect the future of the species.  This information was in previous versions.  This concern is similar to the note inserted in the end of this section, so I don't know how this issue has been addressed in the current version.

    4.Other concerns exist for statements inserted relative to the impact of roads and "us having no reason to believe that they will have a significant effect".  We have a reason to believe they may have a significant effect, we just don't have any science that documents that they are.  Conclusion statements relative to invasive species and powerlines are also not supportable, they are conjecture are part of the author of the insertions.

    5. Graf comment #91 that the populations discussed are stable is not an accurate statement and should not be addressed.  The correction that needs to be made is that the PVA did not analyze the relative extinction probability of just the Dove Creek group, so the statement as written is not accurate.

**Pat Mehlhop/R6/FWS/DOI**

04/12/2006 07:21 AM

To   Al Pfister/R6/FWS/DOI@FWS, Susan Linner/R6/FWS/DOI@FWS, Terry Ireland/R6/FWS/DOI@FWS

cc

bcc

Subject   Fw: final GUSG pkg

Patricia Mehlhop, Candidate Conservation Coordinator
303-236-4215

----- Forwarded by Pat Mehlhop/R6/FWS/DOI on 04/12/2006 07:21 AM -----



**Bridget Fahey/R6/FWS/DOI**

04/12/2006 06:48 AM

To   Pat Mehlhop/R6/FWS/DOI@FWS, Robert Dach/R6/FWS/DOI@FWS

cc   Julie Lyke/R6/FWS/DOI@FWS, Chuck Davis/R6/FWS/DOI@FWS

Subject   final GUSG pkg

Here is the GUSG rule that went to the FR. Changes to the last version you saw were worked out between Dale and Julie MacD over the last 2 days. There is a disturbing sentence on P7 regarding the validity of the taxon. When I find out publication date, I will let you know.

----- Forwarded by Bridget Fahey/R6/FWS/DOI on 04/12/06 08:47 AM -----

**Renne Lohoefener/ARL/R9/FWS/DOI**

04/11/06 06:01 PM

To   Chris Nolin/ARL/R9/FWS/DOI@FWS, Bridget Fahey/R6/FWS/DOI@FWS

cc   Jim Serfis/ARL/R9/FWS/DOI@FWS

Subject   Message from Bryan

Chris/Bridget:

I have attached the version of teh gunnison's sage grouse that was signed/cleared through exec sec/and delivered to FR tonight.

Thanks,

Bryan



GUSG Final Listing Determination_final.doc

**DECLARATION OF DR. CLAIT E. BRAUN**

I, Clait E. Braun, declare:

    **I.**    <u>**Background and Qualifications**</u>

    1.    My name is Clait E. Braun, and I reside in Tucson, Arizona. This declaration is submitted in support of protecting Gunnison sage-grouse under the Endangered Species Act.

    2.    I have a B.S. in Technical Agronomy from Kansas State University, a M.S. in Wildlife Management from the University of Montana, and a Ph.D. in Wildlife Biology from Colorado State University. I am a Certified Wildlife Biologist and have attended numerous short courses, workshops, and technical sessions to remain current in my professional work.

    3.    I was a Research Wildlife Scientist, Wildlife Research Leader, and Avian Program Manager for the Colorado Division of Wildlife from 1969 to 1999. In addition, I taught as an Instructor at the University of Montana (1963-65) and Colorado State University (1966-69), and have been an invited lecturer at more than 20 U.S. and Canadian universities. I also worked as a Soil Scientist in Kansas (1961) and Montana (1964) for the U.S.D.A. Soil Conservation Service and as a Research Technician with the Montana Department of Fish and Game (1965).

    4.    My field research was primarily on different species of birds, especially species of grouse (1965-2006). I specifically conducted and directed research on sage-grouse throughout Colorado from 1973 through mid 1999. My research on sage-grouse has caused me to study sagebrush steppe ecosystems (plants and animals)

throughout all western states and provinces including the Gunnison Basin and other areas within southwest Colorado and southeast Utah. This research has led to more than 290 scientific publications, mostly in peer-reviewed journals.

## II.   Comments

5.      In preparing this declaration, I reviewed the letter of 17 March 2006 from Kent Holsinger of Hale-Friesen Law Firm, Denver, Colorado to Dale Hall, Director, U.S. Fish and Wildlife Service, Washington, D.C. submitted on behalf of the Western Conservation Coalition (hereafter WCC). I also carefully read the 13 March 2006 'Review of Genetic Studies of the Gunnison Sage-Grouse' prepared by Dr. Robert M. Zink of Grant, Minnesota (hereafter Zink Report). Further, I have reviewed the appropriate scientific literature on sage-grouse and their habitats especially as relating to Gunnison sage-grouse (*Centrocercus minimus*) in southwestern Colorado and southeastern Utah.

6.      The sage-grouse is the most recognizable avian species of the sagebrush steppe. This grouse is solely dependent on sagebrush for all of its' life processes and is unique among all birds in its' use of the sagebrush steppe. For the species to persist without extirpation, large tracts of mostly undisturbed sagebrush habitats with minimal fragmentation must be provided. Thus, the presence of sage-grouse is a measure of the overall condition and health of the sagebrush habitat type

7.      The Gunnison sage-grouse population in southwestern Colorado historically and recently was contiguous with Gunnison sage-grouse in southeastern Utah as habitats were continuous. The species also historically occurred in northern New Mexico and likely northeastern Arizona. Gunnison sage-grouse have been extirpated

from both New Mexico and Arizona and numerous counties in southwestern Colorado (Braun, C. E. 1995. Distribution and status of sage grouse in Colorado. Prairie Naturalist 27: 1-9) and at least 2 counties in southeastern Utah.

8.     The WCC Letter repeatedly (page 1) reports that "Gunnison sage-grouse [occurred] on vast expanses of federal land" or (page 5) has a "wide distribution of Gunnison sage grouse and large blocks of habitat." On page 21, the WCC Letter indicates "tens of millions of acres of sage grouse habitat [are] owned and/or managed by the federal government." These statements are untrue for Gunnison sage-grouse and are not supported by the Rangewide Conservation Plan for Gunnison sage-grouse (CDOW 2005) and Schroeder et al. (2004) estimates of current range of 1,822 mi² (1,166,080 acres including both Federal and private lands). Further, this area is highly fragmented with only 6-7 small, scattered populations and subpopulations. There are not (WCC letter: page 5) "millions of acres of Gunnison sage grouse habitat owned and managed by the federal government."

9.     The WWC letter repeatedly (pages 1 and 6) states, "there are significant uncertainties as to whether the Gunnison sage grouse should properly be classified as a species separate from the greater sage grouse." The WCC Letter also alleges genetic differences between Gunnison and other sage-grouse are the result of inadequate sampling. Although Kahn et al. (1999) report data from 141 base pairs of control region 1, they sequenced 380 base pairs (essentially the entire variable portion of control region 1) and showed that 92% of the variability in control region 1 was found in the 141 base pairs that they used in their analysis [and those of Benedict et al. (2003) and Oyler-McCance et al. (2005a and 2005b)]. Furthermore, DNA sequence data from 1080

Greater sage-grouse and 248 Gunnison sage-grouse have been collected and published.
Therefore, the assertion that there has been inadequate genetic sampling is entirely
unwarranted.

10.     The WCC also suggests (WCC letter: page 1) there is more
divergence between dusky and sooty blue grouse than between Gunnison and other sage-
grouse and therefore challenges whether the Gunnison sage-grouse should be considered
a separate species given that the dusky and sooty blue grouse are classified as sub-
species. This point is moot, as the American Ornithologists' Union has classified both
former races of blue grouse as separate species (Auk 2006: in press). The WCC letter
consistently misinterprets the findings of the Zink Report.

11.     The WCC letter (page 2), citing the Gunnison Sage-grouse
Rangewide Conservation Plan (hereafter Rangewide Plan) suggests there is "a low risk of
extinction for the species range-wide." Unfortunately, the population viability analysis in
the Rangewide Plan presents a trial and error approach at best pertaining to extinction
risk and is very misleading. It uses inappropriate baseline parameters (from Greater sage-
grouse populations) and time intervals (50 years) as all but one population of Gunnison
sage-grouse have little chance of persisting for 10-25 years. In Appendix F of the
Rangewide Conservation Plan, the use of Gunnison rather than Greater sage-grouse data
suggests a high risk of extinction for the Gunnison sage-grouse when Gunnison sage-
grouse data are used in the analysis.  Further the Rangewide Plan admits its' analysis
does not account for increased habitat loss or fragmentation. The expected and
cumulative effects of habitat loss and fragmentation that will occur will negatively affect
all life processes of Gunnison sage-grouse and will be significant throughout the species'

range. Further, other factors, while rarely mentioned in the Rangewide Plan, will occur

with negative impacts not only on local subpopulations but also on Gunnison sage-grouse

populations at a landscape scale. Sage-grouse are truly specialist species (they depend

upon sagebrush for food and cover) that require vast landscapes (Connelly et al. 2000)

(Connelly, J. C., M. A. Schroeder, A. R. Sands, and C. E. Braun. 2000. Guidelines to

manage sage grouse populations and their habitats. Wildlife Society Bulletin 28: 967-

985).

       12.    The WCC letter alleges that knowledge of the historical

distribution of Gunnison sage-grouse is insufficient. However, in a peer-reviewed and

published paper, Schroeder et al. (2004) estimated the historical distribution was at least

21,376 mi² and the present distribution was about 1,822 mi². This is a decrease of at least

85-90%. Braun (1995) identified 8 counties in southwestern Colorado in which sage-

grouse (now Gunnison sage-grouse) had been extirpated. Populations in 4 of these

counties had been extirpated since 1980. There is no evidence in the WCC letter (page 4)

that "additional survey work will result in the discovery of additional populations" of

Gunnison sage-grouse.  Surveys for additional Gunnison sage-grouse breeding areas and

populations have been intensive during the past decade.

       13.    The WCC letter consistently (e.g., beginning on page 3) mixes

information from Greater sage-grouse with that of Gunnison sage-grouse misleading the

reader. For example, Braun (1998) did not mention Gunnison sage-grouse.

       14.    The WCC letter suggests that Gunnison sage-grouse numbers are

increasing (page 3). This speculation is unfounded as a one-year increase of 72% (from

2,320 to >4,000) would be incredible (and impossible) if true but also does not suggest

that total population size will increase in the short- or long-term. Further, a Colorado Division of Wildlife (hereafter CDOW) biologist admits in the same article (Grand Junction Sentinel, 28 July 2005) that it was possible that some males may have been counted twice. There is also evidence that the estimator used by the CDOW for the first time in 2005 inflates population estimates by at least 25%. Important to determining whether Gunnison sage-grouse populations are increasing would be taking data for several years using a 3-year moving average to detect if a trend in population increase is occurring.

15. The WCC letter (pages 5 and 8) states, "the Gunnison sage grouse fails to meet thresholds for uniqueness." The work describing Gunnison sage-grouse used the latest scientific thresholds for uniqueness as indicated in peer reviewed scientific publications (Hupp and Braun 1989, Young et al. 1994, Young et al. 2000). These modern techniques included but were not limited to use of videos, sonograms, DNA - analysis, radiotracking, etc. all of which contributed to identifying unique characters of behavior, morphology, plumage appearance, and genetics. The claim (WCC letter: page 6) that "the existing genetic and morphologic work relied upon to split the Gunnison sage grouse into a separate species fails to meet the threshold for uniqueness" is untrue and is without scientific merit as attested by published peer reviewed papers.

16. The WCC letter alleges (page 8) that the "Gunnison sage [is] not discrete" without any presentation of scientific data. The Zink Report does not suggest this interpretation of the published data. The WCC letter also suggests there may be overlap "in the range of the Gunnison sage grouse and other sage grouse" without providing any supporting information. In fact, extensive sampling throughout Colorado

and adjacent states has failed to identify any similar small-bodied sage-grouse outside of southwestern Colorado and adjacent southeastern Utah.

17.    The WCC letter (pages 8 and 9) claims that Dr. Clait Braun, who was employed by the Colorado Division of Wildlife from 1969 to 1999, misidentified wings of Gunnison sage-grouse as being smaller than those from sage-grouse from northwestern Colorado because the smaller wings were from " juvenile birds." This is blatantly untrue as the harvest reports for 1977 (and all subsequent years through 1998) for sage-grouse wings collected in the Gunnison Basin and all other areas of Colorado indicates the wings were stored and processed separately with juveniles being identified in all populations. Such an allegation questions the education, experience, expertise, and professionalism of a Certified Wildlife Biologist who has published extensively on methodology for identifying age and gender from examination of sage-grouse wings (Beck, T. D., R. B. Gill, and C. E. Braun. 1975. Sex and age determination of sage grouse from wing characteristics. Game Information Leaflet Number 49. Colorado Division of Game, Fish and Parks, Fort Collins, USA.), as well as for other species of grouse (several papers on blue grouse and white-tailed ptarmigan). Further, Dr. Braun is a recognized authority in this area of wildlife biology.

18.    The WCC letter (page 9) questions the work of Dr. J. R. Young in studies of the mating behavior of sage-grouse. Dr. Young used the best available technology in her work, which remains the standard for the profession, in playback experiments to measure responses to sage-grouse calls, as well as highly specialized sound recordings and video monitoring of Gunnison sage-grouse. "Differences among individuals" would "not invalidate" the distinctions reported as multiple birds at multiple

sites over several years were included in the analysis. Her work was reviewed by a
scientific committee and was found to have merit and her (and her co-authors) 1994 peer-
reviewed publication included statistical tests that examined whether differences among
individuals were small compared to the significant differences in mating behavior
between Gunnison sage-grouse and Greater sage-grouse.

19.    The WCC letter alleges the Gunnison sage-grouse does not
"inhabit a unique ecological habitat." However, scientific studies of a variety of species
(Armstrong, D. M. 1972. Distribution of mammals in Colorado. Monograph Number 3.
Museum of Natural History, University of Kansas, Lawrence, USA) indicate the
Gunnison Basin and southwestern Colorado were isolated by the Colorado River at one
time, which created unique habitats and barriers to movement of animals. Gunnison sage-
grouse evolved to take advantage of smaller patches of habitat that were interspersed with
unsuitable habitats over a large landscape. The species tends to use more mountain
browse type and less sagebrush than Greater sage-grouse and evolved behaviors to more
fully use snow and dense sagebrush in winter. These are unique uses of habitats not
preferred by Greater sage-grouse.

20.    The WCC letter claims (pages 11-15) "threats to the Gunnison
sage-grouse are overstated." This is obviously not true or Gunnison sage-grouse would be
more abundant and more widely distributed. Livestock grazing is among the most
dominant uses of all areas where Gunnison sage-grouse once occurred. It is notable that
the species has been most greatly reduced in abundance and distribution in the drier
portions of its' former distribution indicating that it could not compete well with
livestock use of herbaceous vegetation, especially near limited water sources. Livestock

grazing continues to be a serious impediment to recovery of Gunnison sage-grouse populations in several areas (i.e., especially Dry Creek Basin, Cimarron), as well as in all other population areas.

21.    Controlling predators (WCC letter: page 11) is suggested to benefit Gunnison sage-grouse despite the abundance of data that sage-grouse survival is dependent upon habitat quality and quantity. All of the material cited on effects of predator control in the WCC letter is quite dated (1923, 1924, 1931, 1953) and is without any scientific merit. A clear relationship between nest predation by ravens or any other predator and recruitment of young to the next breeding season is poorly documented. Even the most recent data cited in the WCC letter (1999 and 2000) concern artificial situations where red fox have spread into agricultural areas adjacent to fragmented patches of sagebrush.

22.    Agricultural conversion (WCC letter: page 13) is ongoing at Dove Creek in Dolores County and is one of the leading causes of the marked population decline (<10 birds counted in 2005) and likely extirpation of that population. The WCC letter fails to mention the effect of these conversion projects on "the current status of the species."

23.    The WCC letter (page 13) claims that fire is "not a threat to the Gunnison sage grouse" without presenting any justification. Scientific studies (Connelly et al. 2000) of Greater sage-grouse have determined that fire can have a negative impact on sage-grouse populations and no studies in Gunnison sage-grouse habitats have yet been conducted to measure the extent of threat that fire may pose to the species.

24.     The WCC letter claims (pages 13-14) that "invasive species [are] not a threat to the Gunnison Sage Grouse" without any consideration of the expanses of cheatgrass dominating the understory of large areas of sagebrush overstory throughout Dry Creek Basin where the last active lek site became inactive in 2005. This claim is without any merit.

25.     The WCC letter (pages 14-15) claims that "oil and gas activity [is] not a threat to the Gunnison Sage Grouse" without providing any supportive data. My experience with oil field development in Colorado (Braun et al. 2002) (Braun, C.E., O. O. Oedekoven, and C.L. Aldridge. 2002. Oil and gas development in western North America: effects on sagebrush steppe avifauna with particular emphasis on sage grouse. Transactions of the North American Wildlife and Natural Resources Conference 67:337-349) suggests there is no end to the negative impacts to sage-grouse populations from oil and gas development as activities may change annually, noise disturbance varies from year to year, additional wells and compressors may be added, new trails, roads, pipelines, and power lines will appear while reclamation of abandoned areas is inadequate and uncertain at best. Under the best circumstances, habitat reclamation useful to sage-grouse may take 30 years. Thus, there is substantial uncertainty that habitats useful to Gunnison sage-grouse can be reclaimed and that sage-grouse populations will respond. However, it is certain that sage-grouse populations will decrease as a result of oil and gas development (Braun et al. 2002) and those in the most heavily developed areas (more than 1 well /40 acres) will likely be extirpated.

26.     The WCC letter (page 15) claims that "localized impacts from development [are] not a threat to the Gunnison Sage Grouse" despite knowledge of the

negative effects of new expansion of home sites to Gunnison sage-grouse into winter habitat in the Secret Canyon development at Dove Creek in Dolores County where fewer that 10 birds were counted in 2005. Similar negative effects are occurring in Gunnison County as well as at Poncha Pass in Saguache County. The expected effects of disturbances (noise, traffic, etc.) on Gunnison sage-grouse from development of roads, houses, pets, fences, and human activity are habitat fragmentation, loss of population continuity including loss of genetic diversity, reduction in population size through disrupted breeding, reduced nest success, and reduction in chick survival, all leading to eventual lek abandonment, bird kills by vehicle strikes, and decreased densities of sage-grouse. These impacts have been demonstrated to occur (Connelly et al. 2000) and there are cases of sage-grouse leks becoming extirpated in the Gunnison Basin following the establishment of new housing developments.

27.    The WCC letter claims (pages 15-28) that "adequate existing regulatory mechanisms are in place to protect the Gunnison Sage Grouse." Unfortunately, the existing regulatory mechanisms have failed miserably to protect Gunnison sage-grouse for the last 60+ years, which is one of the major reasons for the documented decreases in abundance and distribution of the species. Without the threat of listing or its' status as a Candidate species for listing under the Endangered Species Act, no changes would have occurred in management or planning for Gunnison sage-grouse in the last 10 years. There would be no Conservation Plans, no Local Working Groups, and the BLM would not have listed Gunnison sage-grouse as a sensitive species. Colorado has yet to give Gunnison sage-grouse full protection as it is still listed as a game species by the CDOW. The evidence that recent interest in protecting the species has made any

difference in population numbers or distribution is lacking. All conservation plans developed to date are voluntary, implementation of conservation actions has been limited, and funding has only recently been directed to benefit Gunnison sage-grouse. The only Gunnison sage-grouse working group to have conducted a review of the implementation of conservations actions designed to recover the grouse found that none of the 28 critical actions identified for the first two phases had been completed and that substantial progress on actions was declining with time.  One can only conclude that present regulatory mechanisms have miserably failed, are ineffective, and are inadequate despite claims in the WCC letter to the contrary.

III.     Conclusions

28.     My professional analysis, based on 30 years of research, data analysis, and scientific writing is that the material in the letter from Kent Holsinger to Dale Hall, Director of the U.S. Fish and Wildlife Service mixes fiction with very few facts. The U.S. Fish and Wildlife Service should disregard all of the material in the letter from Kent Holsinger. The report by Robert Zink is supportive of the published data on Gunnison sage-grouse but incorrectly contrasts sage-grouse with blue grouse, which Dr. Zink appears to not be aware of now being classified as 2 species. Further, the Zink Report fails to include mention of the total number of base pairs of Gunnison sage-grouse that were actually considered and relies on genetic data alone, not considering peer-reviewed published differences in behavior and morphology. The totality of all of the factors of distinct morphology, mating behaviors, and a lack of gene flow are why the AOU's Committee on Nomenclature recognized the Gunnison sage-grouse as a distinct, unique, and separate species easily identifiable from Greater sage-grouse in 2000 and

why the peer-reviewed scientific paper (Young et al. 2000) was recognized with an Edwards Award for the best paper published in the journal in that year.

29.    In their finding dated 12 January 2005 that Greater sage-grouse were "not warranted" for listing under the Endangered Species Act, the U.S. Fish and Wildlife Service [Federal Register 70(8): 2245] indicated, "most of the planned conservation efforts for the greater sage-grouse have not yet been implemented." Clearly, this is also true for Gunnison sage-grouse. The U.S. Fish and Wildlife Service has the responsibility to implement conservation efforts to benefit this species as provided under the Endangered Species Act.

30.    The National Audubon Society has concluded that Gunnison sage-grouse are among the 10 most endangered bird species in the United States and supports listing the species under the Endangered Species Act (Audubon 2006). All of these factors lead me to conclude the WCC letter is without merit.

Signed under penalty of perjury this 26th day of March 2006.

_____Signed_____
Dr. Clait E. Braun

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| COUNTY OF SAN MIGUEL, COLORADO, *et al.*, | ) ) ) | Case No. 1:06-CV-1946 (RBW) |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| JULIE MACDONALD, *et al.*, | ) ) | |
| Defendants. | ) ) | |

<u>**ORDER ON MOTION TO INTERVENE**</u>

Having reviewed Proposed-Intervenors' Motion to Intervene and supporting documents,

and Plaintiffs' Memorandum in Opposition and supporting documents, it is hereby

ORDERED that Proposed-Intervenors' Motion to Intervene is DENIED.

Dated this _____ day of _____, 2007.

_____
HONORABLE REGGIE B. WALTON