## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| COUNTY OF SAN MIGUEL, | ) | |
| COLORADO, *et al.*, | ) | |
| | ) | Case No. 1:06-CV-1946 (RBW) |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MACDONALD, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFFS' COMBINED MOTION FOR SUPPLEMENTATION OF THE ADMINISTRATIVE RECORD, ADEQUATE CERTIFICATION OF THE RECORD, CHALLENGING DEFENDANTS' CLAIMS OF ATTORNEY-CLIENT PRIVILEGE AND FOR *IN CAMERA* REVIEW OF DEFENDANTS' PRIVILEGE CLAIMS, AND FOR JUDICIAL NOTICE OF AN INSPECTOR GENERAL REPORT ON JULIE MACDONALD

By this motion, plaintiffs move for supplementation of the Administrative Record

("Record") with 32 specific records that reflect biological facts concerning the status of

Gunnison sage-grouse and the nature and scope of federal defendants' decisionmaking process in

connection with the negative "12-month" listing determination for Gunnison sage-grouse of

April 18, 2006. The April 18, 2006 determination – which plaintiffs are challenging in this case

– concluded that listing the bird under the Endangered Species Act, 16 U.S.C. § 1531, *et seq*.

("ESA") is "not warranted." 71 Fed. Reg. 19954 (Apr. 18, 2006).

Plaintiffs also challenge federal defendants' certification of the Record as inadequate, as

it fails to reflect the manner and guidelines by which the Record was compiled and specify what

the Record contains and what it does not contain. Plaintiffs also challenge defendants'

sweeping, unsubstantiated claims of attorney-client privilege for 23 records, and request the

1

Court to review defendants' privilege claims *in camera*.  Moreover, plaintiffs move the Court to take judicial notice of a March 29, 2007 Investigative Report of the Department of Interior Inspector General concerning allegations against Julie MacDonald, former Deputy Assistant Secretary for Fish, Wildlife and Parks, which confirmed that she "has been heavily involved with editing, commenting on, and reshaping the Endangered Species Program's scientific reports from the field."  *See* Department of the Interior, Office of Inspector General, *Investigative Report on Allegations Against Julie MacDonald, Deputy Assistant Secretary for Fish, Wildlife, and Parks* (Mar. 29, 2007) ("IG Report") at 2 (Ex. B).

This motion is supported by a memorandum of points and authorities, which demonstrates that the Court should order defendants to supplement and properly certify the Administrative Record, including the 32 contested records; order defendants to properly certify the Record; review defendants' privilege log and claims of attorney-client privilege *in camera* and evaluate whether the privilege applies; and take judicial notice of the IG Report.

A Proposed Order is being filed today with this motion.


DATED:        September 21, 2007          Respectfully submitted,

                                          ___/s/_____
                                          Amy R. Atwood
                                          D.C. Bar No. 470258
                                          Western Environmental Law Center
                                          1216 Lincoln Street
                                          Eugene, Oregon 97405
                                          541-914-8372
                                          541-485-2457 (fax)
                                          atwood@westernlaw.org

                                          Geoff Hickcox
                                          admitted *pro hac vice*
                                          Western Environmental Law Center

679 East Second Ave, Suite 11B
Durango, CO 81301
970-382-5902
970-385-6804 (fax)
ghickcox@gmail.com

Rebekah S. King
admitted *pro hac vice*
Assistant San Miguel County Attorney
P.O. Box 791
333 W. Colorado Ave., Third Floor
Telluride, CO 81435
970-728-3879
970-728-3718 (fax)
beckyk@sanmiguelcounty.org

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COUNTY OF SAN MIGUEL, COLORADO, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| MACDONALD, *et al.*, | ) ) |
| Defendants. | ) ) ) |

Case No. 1:06-CV-1946 (RBW)

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' COMBINED MOTION FOR SUPPLEMENTATION OF THE ADMINISTRATIVE RECORD, ADEQUATE CERTIFICATION OF THE RECORD, CHALLENGING DEFENDANTS' CLAIMS OF ATTORNEY-CLIENT PRIVILEGE AND FOR *IN CAMERA* REVIEW OF DEFENDANTS' PRIVILEGE CLAIMS, AND FOR JUDICIAL NOTICE OF AN INSPECTOR GENERAL REPORT ON JULIE MACDONALD**

**INTRODUCTION**

Plaintiffs move for supplementation of the Administrative Record in this case with 32 specific records that reflect biological facts concerning the status of Gunnison sage-grouse and the nature and scope of federal defendants' decisionmaking process in connection with the negative "12-month" listing determination for Gunnison sage-grouse of April 18, 2006. 71 Fed. Reg. 19954 (Apr. 18, 2006). The April 18, 2006 determination concluded that listing the bird under the Endangered Species Act, 16 U.S.C. § 1531, *et seq*. ("ESA") is "not warranted." *Id*.

As demonstrated below, defendants have attempted to skew the Administrative Record in this case by omitting from it 32 highly relevant records that are adverse to defendants' position that Gunnison sage-grouse is not an endangered or threatened species – and, indeed, show that ESA protection is both "warranted" as a legal matter and necessary as a biological matter to save

1

the species from otherwise almost certain extinction in the foreseeable future.  *See* Indices of

Records at Issue (Exhibit ("Ex.") A) at Category 1, 2.  As also demonstrated by this motion,

federal defendants' certification of the Record is inadequate, as it fails to reflect the manner and

guidelines by which the Record was compiled and specify what the Record contains and what it

does not contain.  Plaintiffs also challenge defendants' sweeping, unsubstantiated claims of

attorney-client privilege for 23 records, and request the Court to review defendants' privilege

claims *in camera*.  Moreover, plaintiffs move the Court to take judicial notice of a March 29,

2007 Investigative Report of the Department of Interior Inspector General concerning allegations

against Julie MacDonald, former Deputy Assistant Secretary for Fish, Wildlife and Parks, which

confirmed – as, plaintiffs will demonstrate, the Record already shows – that she "has been

heavily involved with editing, commenting on, and reshaping the Endangered Species Program's

scientific reports from the field."  *See* Department of the Interior, Office of Inspector General,

*Investigative Report on Allegations Against Julie MacDonald, Deputy Assistant Secretary for*

*Fish, Wildlife, and Parks* (Mar. 29, 2007) ("IG Report") at 2 (Ex. B).

## BACKGROUND

Plaintiffs – the County of San Miguel, Colorado and nine conservation organizations[1] –

filed this lawsuit on November 14, 2006 (Dock. No. 1) pursuant to the ESA and Administrative

Procedure Act, 5 U.S.C. § 706(2)(A) ("APA").  Plaintiffs challenge federal defendants' April 18,

2006 12-month ESA listing determination for Gunnison sage-grouse, which concluded that

---

[1] The nine conservation organizational plaintiffs are Sagebrush Sea Campaign, Center for Native
Ecosystems, Forest Guardians, The Larch Company, Sinapu, Center for Biological Diversity,
Public Employees for Environmental Responsibility, Black Canyon Audubon Society, and Sheep
Mountain Alliance.

listing Gunnison sage-grouse under the ESA as "endangered" or "threatened" is "not warranted." 74 Fed. Reg. 19954 (Apr. 18, 2006); 16 U.S.C. § 1533(b)(3)(C)(ii).[2]

On April 18, 2006, the same day the "not warranted" listing determination was published in the Federal Register, the Sagebrush Sea Campaign ("SSC"), one of the plaintiffs, made a request pursuant to the Freedom of Information Act, 5 U.S.C. § 551 *et seq.* ("FOIA"), for all "public documents" "that comprise the 'administrative record' for the final listing determination for Gunnison sage-grouse" under the ESA. *See* Letter from Salvo to Hunt, *et al.* (Apr. 18, 2006) (Ex. C). The SSC FOIA request was sent to the FOIA Officer for the Washington Office of FWS, the FOIA Coordinator for Region 6 of the FWS in Denver, Colorado, and the local FWS Field Office in Grand Junction, Colorado. *See id.* at 1. Over the following months, FWS personnel processed SSC's FOIA request and ultimately disclosed to SSC hundreds of records ("FOIA AR") that pertain to FWS's negative listing determination. *See* Index for "Administrative Record for Gunnison Sage-grouse Determination of April 18, 2006" (FOIA AR Index") (Ex. D).[3]

---

[2]  This is the third ESA lawsuit challenging defendants' failure to lawfully implement the ESA in responding to the January 25, 2000 petition to list Gunnison sage-grouse. *See* Administrative Record ("AR") 12942 (petition to list Gunnison sage-grouse under the ESA). The first case involved a challenge to FWS's reliance on the Petition Management Guidance ("PMG") policy to avoid making an initial, 90-day finding on the petition. *American Lands Alliance, et al. v. Norton, et al.*, 242 F. Supp. 2d 1 (D.D.C. 2003). The second case involved a challenge to defendants' designation of the species as "warranted but precluded." *American Lands Alliance, et al. v. Norton, et al.*, Civ. No. 04-0434 (D.D.C.) (RBW). The second lawsuit resulted in a settlement agreement between the parties that required defendants to make the 12-month listing determination that plaintiffs are now challenging in this case.

[3]  SSC also requested FWS to waive any fees associated with the request, which was granted, on the basis that release of the requested records "is in the public interest because [the records] will significantly contribute to public understanding of government operations, particularly as they relate to Gunnison sage-grouse conservation." *Id.* at 2-5.

On April 16, 2007, defendants filed the "Administrative Record" (Dock. No. 22) ("Litigation AR" or "Record"), which includes most of the records that FWS disclosed to SSC in response to its FOIA request. *Compare* FOIA AR Index (Ex. D) *with* "Administrative Record for Gunnison Sage-grouse Determination of April 18, 2006" ("Litigation AR Index") (Ex. E). Plaintiffs reviewed the Litigation AR, and discovered that defendants had omitted 45 documents that were disclosed SSC, or which were otherwise relevant to, and before the agencies at the time of, the listing determination.

Accordingly, plaintiffs sent a letter to defendants' counsel on August 13, 2007 explaining that the omitted records included documentation of: (1) "critical habitat" for Gunnison sage-grouse that was developed by FWS biologists and staff concurrently with a proposed rule to list the species as "endangered" or "threatened"; (2) FWS's "public outreach" plan for the proposed rule, which explained the rationale for it; (3) materials from the administrative records for the prior two Gunnison sage-grouse lawsuits, including correspondence from scientists and other parties discussing the imperiled status of Gunnison sage-grouse; and (4) other records. *See* Letter from Atwood to Maysonett (Aug. 13, 2007) (Ex. F, without attachments) at 1-5. In reviewing the Litigation AR, plaintiffs also discovered that defendants had neglected to include a declaration that certified the Record, *id*. at 6-7, and had made sweeping claims of attorney-client privilege for 40 other records, including 17 records that FWS had already disclosed to SSC in response to its FOIA request. *Id*. at 5-6.

In response, defendants agreed to add 11 of the documents identified by plaintiffs to the Litigation AR. *See* Letter from Williams to Atwood (Aug. 31, 2007) (Ex. G). These 11 records, which are attached as Exhibit H, include correspondence and other records from the prior

4

lawsuits, as well as electronic mail messages generated by agency personnel prior to the April 16, 2006 negative determination. *See* Supplemented Records (Ex. H). Defendants later agreed to add an additional record, bringing the total to 12. *Id*. However, defendants refused to supplement the Record with almost three dozen additional records, including all of the "critical habitat" and "public outreach" records that FWS disclosed pursuant to SSC's FOIA for the "administrative record." Williams to Atwood (Ex. G) at Category 1; Critical Habitat Records (Ex. J); Public Outreach Records (Ex. K). With regard to the critical habitat records specifically, defendants claimed that they were not "part of the agency's final listing decision" and "were not directly or indirectly considered by the decision maker" and, therefore, "are not part of the administrative record." *Id*. at 2. Defendants also claimed that the existing Record is "more than adequate" and that supplementation is not "necessary." *Id*.

Defendants also provided plaintiffs with a declaration purporting to certify the Record, which is dated April 13, 2007. *See* Declaration of Charles P. Davis (Ex. I). Defendants claimed that the certification had been prepared concurrently with the Record, but that it was "inadvertently omitted." Williams to Atwood (Ex. G) at 1. The April 13, 2007 declaration does not specify the manner and guidelines by which the Record was compiled, nor state what it does, and does not, contain. *See generally* Davis Decl. (Ex. I).

Defendants further agreed to "withdraw" their assertion of attorney-client privilege for 17 records which they had already disclosed to SSC in the earlier FOIA response. Williams to Atwood (Ex. G) at 3. However, defendants did not provide any additional information about the remaining 23 records that have been withheld through claims of attorney-client privilege that would allow plaintiffs or the Court to evaluate those privilege claims. Plaintiffs informed

defendants that they would file a motion to supplement the Record and challenge defendants' privilege claims.

Accordingly, by this combined motion, plaintiffs: (1) move the Court to Order defendants to supplement the Record with 32 additional documents [4] that were before the agency at the time of the decision and clearly relate to the Gunnison sage-grouse ESA 12-month listing determination; (2) move the Court to order defendants to file a declaration that properly certifies the Record; (3) challenge defendants' attorney-client privilege claims and move the Court to review defendants' claims of privilege *in camera*; and (4) move the Court to take judicial notice of the IG Report.

Each of these arguments are addressed below.

## ARGUMENT

I.    **THE ADMINISTRATIVE RECORD MUST BE SUPPLEMENTED TO INCLUDE EVERYTHING THAT WAS DIRECTLY OR INDIRECTLY CONSIDERED BY THE DECISIONMAKER.**

A.    **The Administrative Record Must Include All Documents And Materials That Federal Defendants Directly Or Indirectly Considered In Connection With The Gunnison Sage-Grouse ESA Listing Determination.**

The APA governs judicial review of agency actions, including ESA determinations by FWS.  5 U.S.C. § 706(2); *Public Citizen v. Heckler*, 653 F. Supp. 1229, 1236 (D.D.C. 1986). The APA authorizes a reviewing court to "hold unlawful and set aside agency action, findings

---

[4]  By this motion, plaintiffs are not pursuing supplementation of the Record with one document that was identified in plaintiffs' August 13, 2007 letter.  *See* Atwood to Maysonett (Ex. F) at 4-5 (02/20/06 Newspaper Article: *Daily Sentinel*, *Sage grouse abandon Glade Park Area*).  Thus, by this motion plaintiffs are seeking supplementation of the Record with 32 records.  *See* Indices (Ex. A) at Categories 1-2.  The contested records are grouped and attached by category.  *See* Critical Habitat Records (Ex. J); Public Outreach Records (Ex. K); Other Records (Ex. L)

and conclusions of law" that are, among other things, "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

Under this standard, a reviewing court must undertake a "thorough, probing, in-depth review" of the agency's decision and then decide whether it was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971). An agency's decision is arbitrary and capricious:

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfr. Ass'n. v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43 (1983).

Applying this standard to this case, in which plaintiffs challenge federal defendants' negative, 12-month listing determination, the Court will be asked to determine whether FWS considered all of the factors that are relevant to the question of whether Gunnison sage-grouse are endangered or threatened under the ESA. *See* 16 U.S.C. § 1531(6) (statutory definition of "endangered"); 16 U.S.C. § 1532(20) (definition of "threatened"); *see also Carlton v. Babbitt*, 26 F. Supp. 2d 102, 105 (D.D.C. 1998) (listing five statutory factors FWS is required to review when making listing determinations); 16 U.S.C. § 1533(b)(1)(A) (FWS required to make listing determinations "solely on the basis of the best scientific and commercial data available"). The Court will evaluate whether, in reaching the not warranted listing determination for Gunnison sage-grouse, the agencies relied on factors that Congress did not intend they consider, failed to consider important aspects about Gunnison sage-grouse's status, reached a conclusion that runs

counter to the evidence that was before FWS, or is so implausible that it cannot be ascribed to a difference in view or the product of FWS expertise. *Motor Vehicle,* 463 U.S. at 43 [5]

The Court must make this inquiry based solely on "the whole record or those parts of it cited by a party", 5 U.S.C. § 706, "that was before the [agency] at the time [it] made [its] decision." *Citizens to Preserve Overton Park*, 401 U.S. at 420; *accord*, *Fund for Animals v. Babbitt,* 903 F. Supp. 96, 105 (D.D.C.1995) (citing *Camp v. Pitts,* 411 U.S. 138, 142 (1973)). The "administrative record" must include "neither more nor less" information than the agency "directly or indirectly considered." *See Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 196-97 (D.D.C. 2005) (citing *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993)); *accord, Amfac Resorts, L.L.C. v. Dep't of Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001); *Novartis Pharms. v. Shalala*, 2000 WL 1769589 at *2 (D.D.C. Nov. 27, 2000); *see also Pers. Watercraft Indus. Ass'n v. Dep't of Commerce*, 48 F.3d 540, 546 n.4 (D.C. Cir. 1995) ("whole record" contains all materials "pertaining to the [challenged] regulation").

An agency is entitled to a "presumption of regularity" that it "properly designated the administrative record", *see*, *e.g.*, *Fund for Animals*, 391 F. Supp. 2d at 197, but this presumption is "just that – a presumption" – and it "may be overcome." *Fund for Animals*, 245 F. Supp. 2d

---

[5]  Plaintiffs will demonstrate in their briefs on the merits that, as even as the current Litigation AR shows, after years of maintaining that listing Gunnison sage-grouse under the ESA is, in fact, "warranted," AR 104-193, and after FWS field staff and biologists concluded that the species should be listed under the ESA as "endangered" – and even prepared several drafts of a rule proposing to list it, *see*, *e.g.*, AR 11248-12680 – once the Washington Office and Deputy Assistant Secretary MacDonald became involved, the draft rules were inexplicably overturned. Plaintiffs will also show that Ms. MacDonald, who played a direct part in the agencies' reversal of course, later resigned after she was investigated by the DOI's Inspector General, which issued a report that "confirmed that MacDonald has heavily involved in editing, commenting on, and reshaping the Endangered Species Program's scientific reports from the field." *See* IG Report (Ex. B) at 1.

49, 57 (D.D.C. 2003).  The D.C. Circuit has recognized specific circumstances in which a court "may deem supplementation necessary."  *See Nat'l Wilderness Inst. v. U.S. Army Corps of Eng'rs*, 2005 WL 691775 at *10 (D.D.C. Mar. 23, 2005).  Two such instances occur when "it appears the agency deliberately or negligently excluded documents adverse to its decision" or "the materials provide background information in order to determine whether the agency considered all the relevant factors."  *American Wildlands v. Norton*, 2006 WL 2780702 at *1 (D.D.C. Sep. 21, 2006); *see also James Madison, Ltd. v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996) (collecting cases).  Thus, "[t]o ensure that the administrative record contains 'neither more nor less' information than was before the agency," courts in the D.C. Circuit "have directed agencies to collect those materials 'that were compiled by the agency that were before the agency at the time the decision was made.'"  *Fund for Animals*, 245 F. Supp. 2d at 55 (citing *James Madison Ltd.*, 82 F.3d at 1095); *accord*, *Common Sense Salmon Recovery v. Evans*, 217 F. Supp. 2d 17, 20 (D.D.C. 2002)).

    If an agency refuses to supplement an administrative record on the basis that it did not "consider" the additional information in connection with the challenged agency action, supplementation with "extra-record" information may still be warranted.  *See, e.g., Pacific Shores Subdivision California Water Dist. v. U.S. Army Corps of Eng'rs.*, 448 F. Supp. 2d 1, 6 (D.D.C. 2006) (clarifying distinction between "what it means to 'supplement' the record" and "allowing the review of extra-record evidence").  Thus, consideration of such "extra-record" evidence is appropriate "when the agency failed to consider factors which are relevant to its final decision[.]"  *Delano v. Roche*, 391 F. Supp. 2d 79, 88 (D.D.C. 2005) (quoting *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir.1989)); *see also id*. at 89 (applying Fed. R. of Evid. 401's definition

9

of "relevance" – *i.e.*, "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" – to administrative record).  Here, extra-record consideration of evidence may be warranted in order to allow the Court to evaluate whether the Secretary failed or refused to "consider" factors that are "relevant" to its final, "not warranted" listing determination.

With these principles in mind, plaintiffs move to supplement the administrative record with 32 specific records.

> **B.**     **Plaintiffs Meet The *Prima Facie* Test Showing That FWS Excluded From The Record Information That Is Adverse To Its Position, And This Showing Warrants Supplementation Of The Record.**

The D.C. Circuit has held that a district court is to supplement an administrative record when "the agency deliberately or negligently exclude[s] documents that may have been adverse to its decision."  *James Madison Ltd.*, 82 F.3d at 1095 (citing *Kent County v. Entvl. Prot. Agency*, 963 F.2d 391, 395-96 (D.C. Cir. 1992)).  A plaintiff "can make a *prima facie* showing that an agency excluded information adverse to its position" by "proving that the documents at issue (1) were known to the agency at the time it made its decision, (2) 'are directly related to the decision,' and (3) 'are adverse to the agency's decision.'"  *Fund for Animals*, 391 F. Supp. 2d at 198 (quoting *Public Citizen v. Heckler*, 653 F. Supp. 1229 (D.D.C. 1986)).  As explained below, the 32 contested records were known to FWS at the time of the determination and are directly related to it, and are adverse to FWS's position that listing Gunnison sage-grouse as "endangered" or "threatened" under the ESA is "not warranted."

1.    **The Records Were Known To FWS At The Time Of The Negative Gunnison Sage-Grouse Listing Determination.**

All of the 32 records were known to FWS at the time of the "not warranted" decision. The contents of 31 of the disputed records were created in whole or in part by FWS personnel, *see* Ex. A; *see also* Ex. J (12 critical habitat records); Ex. K (16 public outreach records); Ex. L at 1-2 (other records, including emails dated Sep. 6, 2005 and Dec. 8, 2005), and two of the records were part of the administrative record for the second lawsuit. *See American Lands Alliance, et al. v. Norton, et al.*, Civ. No. 04-0434, Joint Stip. (Doc. No. 33) (D.D.C. Mar. 15, 2005) (R.B.W.) (Ex. M) (supplementing administrative record to include, among other records, Email from Young to Ireland (Aug. 7, 2003) and *Denver Post* article); Ex. L (other records); *see also Fund for Animals*, 391 F. Supp. 2d at 198 (finding that plaintiffs demonstrated FWS knew of contested records where records were either created by FWS or provided to the agency). In addition, almost all (28) of the disputed records were also identified by FWS as part of the "administrative record" and disclosed to SSC in response to its FOIA request. *See* Indices (Ex. A) at Categories 1-2; FOIA AR Index (Ex. D); Critical Habitat Records (Ex. J); Public Outreach Records (Ex. K). There can be no serious dispute that the records at issue were known to FWS at the time of its decision.

2.    **The Records Contain Information That Is Directly Relevant To The Listing Determination.**

It also cannot seriously be disputed that the 32 records directly relate to FWS's 12-month listing determination for Gunnison sage-grouse. Twenty-eight of the records were generated by FWS in direct relation to the agency's initial, proposed rule to list Gunnison sage-grouse under the ESA. Although that determination was later reversed by then Deputy Assistant Secretary

MacDonald and other FWS officials, these records nevertheless "contain information that is directly relevant" to the ultimate finding.  *Fund for Animals*, 391 F. Supp. 2d at 198.[6]

## i.    Critical Habitat Records

Twelve of the 32 contested records reflect FWS's development of proposed "critical habitat" in connection with a proposed rule to list Gunnison sage-grouse.  *See* Indices (Ex. A) at Category 1; Critical Habitat Records (Ex. J).  Under the ESA, critical habitat includes those specific areas, whether occupied by the species or not, that are considered "critical" to a listed species' long-term conservation.  *See* 16 U.S.C. § 1532(5) ("critical habitat" consists of areas that are deemed "essential for the conservation of the species").  The ESA defines "conservation" of a species as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary."  16 U.S.C. § 1532(3); *see also Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004) (ESA's "purpose of establishing 'critical habitat' is for the government to carve out territory that is not only necessary for the species' survival but also essential for the species' recovery").

The critical habitat records contain information that is directly relevant to the Gunnison sage-grouse listing determination.  The records document the status of Gunnison sage-grouse in

_____

[6]  As plaintiffs will explain in detail in their brief on the merits, FWS staff in Region 6 first developed a proposed rule to list Gunnison sage-grouse as "endangered species", *see, e.g.*, AR 12344 – *i.e.*, a species that is "in danger of extinction throughout all or a significant portion of its range", 16 U.S.C. § 1532(6), before these staff's positive listing recommendation was reversed by agency officials in the "Washington office" of FWS and Deputy Assistant Secretary MacDonald.  *See, e.g.*, AR 284, 286, 11247.  Assistant Secretary MacDonald resigned on May 1, 2007, following release of the IG Report (Ex. B) and a week before the House Resources Committee was scheduled to look into her handling of science and staffers at the agency.

the context of the legal question of which, and how much, habitat would be necessary to allow the bird to recover from the brink of extinction. *See*, *e.g.*, Critical Habitat Records (Ex. J) at p. 6 (listing 18 units for the "proposed CH rule"); *see also id*. at pp. 7-87.[7]

The critical habitat records also reflect the agencies' decisionmaking process, as they show that FWS staff and officials took seriously their statutory duty to designate critical habitat for a species "concurrently" with proposing and finalizing a rule to list it. 16 U.S.C. § 1533(a)(3) (FWS shall, "to the maximum extent prudent and determinable . . . , concurrently with making a determination under paragraph (1) that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat); *see also*, *e.g.*, Critical Habitat Records (Ex. J) at pp. 7, 8, 46, 47, 76 (emails among

---

[7]  For example, in light of the small size of seven scattered Gunnison sage-grouse populations, FWS staff and biologists recognized that it would be necessary to protect all remaining populations to ensure the species' recovery. *See*, *e.g.*, *id*. at 52 ("All seven extant populations are essential to the survival of the species" and "the smaller GUSG populations have a relatively high probability of extinction" but are "vital to the existence of the sage-grouse"); *see also id*. at 13 (same). The records further observe about the biological status of the species:

> The Gunnison Basin population is the largest population with a low risk of extinction (< 1%) in the next fifty years according to the PVA. Other populations have a predicted risk of extinction between 6 and 42%. Results from the PVA suggest that very small GUSG populations (< 25) are at a high risk of extinction during a 50-year period, even when the population is expected to increase in size over the long-term. In contrast, individual GUSG populations can be considered "secure" (< 5% extinction probability) if they contain 500 birds or more and have a stable population size. The only population that can be concluded to be secure, however, is the Gunnison Basin that had a 2004 population estimate of 2,443. The other populations had estimates of 39 to 245 adult grouse, indicating a moderate amount of risk of extinction over a 50-year period. Even though the smaller GUSG populations have a relatively high probability of extinction, they are vital to the existence of the sage-grouse.

*Id*.

agency staff discussing timeline for the proposed listing rule and critical habitat for Gunnison sage-grouse).

Thus, the records contain information that is directly relevant, both substantively and procedurally, to the listing determination, *Fund for Animals*, 391 F. Supp. 2d at 198, as even FWS implicitly acknowledged by disclosing the records to SSC in response to its FOIA request for the "administrative record."  *See* FOIA AR Index (Ex. D) at Tab 5.

### ii.    Public Outreach Records

Sixteen of the 32 contested records reflect FWS's "Outreach Plan" for its initial proposed rule to list Gunnison sage-grouse under the ESA.  *See* Indices (Ex. A); Public Outreach Records (Ex. K).  Like the critical habitat records, these public outreach records were disclosed to SSC. FOIA AR Index (Ex. D) at Tab 7.

As with the critical habitat records, the omitted public outreach materials contain information that is directly relevant to the listing determination, including scientific information about the species' status, *see* Public Outreach Records (Ex. K) at pp. 13-14, as well as "Outreach Plan[s]," *id*. at pp. 2-4,  "Draft News Releases," *id*. at pp. 6-8, "Questions and Answers," *id*. at pp. 10-12, and other records that explain the agency's rationale for a proposed rule.  The records set forth in plain terms the rationale underlying the proposed rule, are directly related to the Gunnison sage-grouse listing determination, and were before the decisionmaker at the time of the decision, as FWS itself recognized by disclosing them to SSC in response to SSC's FOIA request for the "administrative record."

### iii.    Other Records

There are four additional, contested records that were either generated by FWS staff or

14

included in the administrative records for the first and/or second Gunnison sage-grouse ESA citizen suits, that contain information that is directly relevant to the listing determination.

The August 7, 2003 electronic mail communication from Jessica Young, Ph.D., a scientist, professor at Western State College in Gunnison, Colorado and a leading Gunnison sage-grouse researcher and expert, relates her concerns to Terry Ireland, FWS Biologist, about the status of Gunnison sage-grouse and the impacts of drought to the species. *See* Other Records (Ex. L) at p. 2 ("[w]e have witnessed an approximately 30% population loss within the Gunnison Basin during the past two years"). Dr. Young – who has published numerous studies about Gunnison sage-grouse, *see* AR 8293 – predicted that "If the species continues to decline at the rate it has during these past two drought years, it will become extinct within 5-10 years." Other Records (Ex. L) at p. 2. The *Denver Post* article dated October 27, 2003 reports that West Nile virus had caused the deaths of almost two dozen greater sage-grouse (a separate species of sage-grouse), and raised the possibility that Gunnison sage-grouse might contract and succumb to the disease as well. Other Records (Ex. L) at pp. 3-4. These two records include information that is directly relevant to the Gunnison sage-grouse listing determination, because the ESA requires FWS to make listing determinations based on the impacts to species from, among other things, habitat modification or destruction, disease, and other factors affecting the species' continued existence. *See* 16 U.S.C. § 1533(a) (requiring FWS to determine whether any species is an endangered species or a threatened species due to habitat destruction, modification, or curtailment, disease, or other natural or manmade factors affecting its continued existence"). These records were also clearly "before" the Secretary, as they were included in the administrative record for the second case. *See* Joint Stip. (Ex. M).

Two electronic mail communications dated September 6, 2005 reflect FWS's development of a proposed rule to list the species. These emails reflect the chronology of the agency's decisionmaking process and rule development, and, thus, are directly relevant to the listing determination. Two collections of electronic mail communications reflect the involvement of FWS's Washington Office and Julie MacDonald in the listing determination and decisionmaking process. Other Records (Ex. L) at pp. 5-7. These records all contain information that directly relates to the Gunnison sage-grouse negative listing determination, and, as they were generated by FWS staff, were clearly "before" the Secretary. *Fund for Animals*, 391 F. Supp. 2d at 198.

### 3.   The Contested Records Are Adverse To FWS's "Not Warranted" Listing Determination.

All of the contested records are adverse to defendants' position that Gunnison sage-grouse is not an endangered or threatened species. *See* 71 Fed. Reg. 19954 (Apr. 18, 2006). Many of the records contain scientific and factual information about the biological status of the species, and strongly indicate that as a substantive matter the species is, in fact, in danger of extinction as a result of the cumulative effect of numerous threats and the low size of all but one of the populations. *See generally* Critical Habitat Records (Ex. J); Public Outreach Records (Ex. K); Other Records (Ex. L). The records suggest that had FWS adequately considered this information pursuant to the ESA's five statutory criteria – as it did initially – it would have reached the inescapable conclusion that listing of Gunnison sage-grouse is warranted, and issued a proposed rule to list the species under the ESA. *See*, *e.g.*, AR 12344. Hence, the records are adverse to defendants' position because they strongly indicate that the negative determination was arbitrary and capricious. 5 U.S.C. § 706(2)(A); *supra* at 6-10.

16

In addition, one of the contested records further confirms that Ms. MacDonald played a role in the agency's negative determination. *See*, *e.g.*, Other Records (Ex. L) at p. 7 (reflecting MacDonald's involvement); IG Report at 1 (confirming that "MacDonald was heavily involved in editing, commenting on, and reshaping the Endangered Species Program's scientific reports from the field"). Together with the information that is already contained in the Litigation AR as well as the supplemented records, the electronic mail communication that is dated Dec. 8, 2005, only further confirms that Ms. MacDonald played a significant role the agency's reversal of the initial, proposed rule developed by FWS biologists and staff. *See* Other Records (Ex. L) at p. 7 (noting that materials were provided at "Julie MacDonald's request").[8]

FWS may not "skew the record in its favor by excluding pertinent but unfavorable information." *Fund for Animals*, 245 F. Supp. 2d at 55 (citing *Envtl. Def. Fund v. Blum*, 458 F. Supp. 650, 661 (D.D.C. 1978)). The omitted records are "indicative of a lack of rationality on the part of [FWS] in the decisionmaking process." *Public Citizen*, 653 F. Supp. at 1237. Indeed, "[f]or an agency to say one thing" – *i.e.*, to conclude repeatedly that Gunnison sage-grouse

---

[8] Ms. MacDonald's involvement in the agency's reversal of course for Gunnison sage-grouse is relevant because it echoes the findings of the IG Report, which cast a dark cloud over any negative listing determinations in which she was significantly involved. *See* IG Report (Ex. B) at 4-10 (recounting MacDonald's altering and changing of scientific documents); *see also Ctr. for Biological Diversity v. U.S. Fish and Wildlife Service,* 2005 WL 2000928 (N.D. Cal. Aug. 19, 2005) (finding that Ms. MacDonald and other high-ranking political officials at DOI substituted ESA statutory analysis with "[b]rute force *ipse dixit* . . . without even a semblance of agency reasoning" for listing determinations for California tiger salamander populations); *see also infra* at 26-27 (requesting the Court to take judicial notice of IG Report). In light of the IG Report, as well as Ms. MacDonald's resignation following its release (and one week before she was to testify before a House committee), this record is adverse to defendants' position because it further shows that the agencies did not make the negative determination "solely on the basis of the best scientific and commercial data available," as the ESA requires. *See* 16 U.S.C. § 1533(b)(1)(A).

warrants listing and designation of critical habitat under the ESA – "and do another" – *i.e.*, refuse both to list the bird and proceed to propose habitat critical to its long-term recovery – "is the essence of arbitrary action." *Id*. (citing *New England Coalition on Nuclear Pollution v. NRC*, 727 F.2d 1127 (D.C. Cir.1984)). These records indicate that the rationale underlying the Secretary's ultimate, negative determination "'may very well be pretextual.'" *Id*. Accordingly, the Record should be supplemented with these materials.

***

The "whole record" consists "all documents and materials that the agency 'directly or indirectly considered' . . . [and nothing] more nor less." *Maritel, Inc. v. Collins*, 422 F. Supp. 2d 188, 196 (D.D.C. 2006) (quoting *Bar MK Ranches*, 994 F.2d at 739). That is all plaintiffs are seeking here. Plaintiffs have made a *prima facie* showing that the contested records should be added to the Record pursuant to *James Madison, Ltd.*, which holds that a district court is required to supplement the administrative record when the agency deliberately or negligently excludes documents that may have been adverse to its decision. *See James Madison, Ltd.*, 82 F.3d at 1096. Accordingly, the Court should Order defendants to supplement the Litigation AR with the "whole record."

**C.    Supplementation Is Also Appropriate Because FWS Considered The Contested Records But Failed To Include Them In The Record.**

The D.C. Circuit has made clear that consideration of "extra-record evidence" is appropriate when the agency has considered evidence which it failed to include in the record. *See Delano v. Roche*, 391 F. Supp. 2d at 88 (citing *Esch*, 876 F.2d at 991); *see also Pacific Shores*, 448 F. Supp. 2d at 5-6 (distinguishing between supplementation of an administrative record with consideration of extra-record evidence).

18

Defendants' protestations notwithstanding, *see* Williams to Atwood (Ex. G) at 2, it cannot be seriously disputed that FWS directly or indirectly "considered" the 32 records at issue here. The records were either generated by FWS and DOI staff and officials or provided to FWS by third parties. *See supra* at 11-16. The critical habitat and public outreach records – which were disclosed to SSC in response to its request for the "administrative record" – were all generated by FWS field and regional office staff and reflect the agency's justification and explanation for a proposed rule.

In claiming that the agencies did not "consider" these materials, defendants essentially argue that they did not "rely on" them in connection with the ultimate final, negative listing determination. While it very well may true that FWS did not *rely on* the factual information contained in these records when the agencies made the "not warranted" listing determination for Gunnison sage-grouse, FWS cannot exclude the information from the Record on this basis. *See Fund for Animals*, 245 F. Supp. 2d at 55 (citing *Ad Hoc Metals Coalition v. Whitman*, 227 F. Supp. 2d 134, 139 (D.D.C. 2002)) (agency may not "exclude information on the grounds that it did not 'rely' on the excluded information in its final decision"); *see also id.* ("an agency may not unilaterally determine what constitutes the administrative record). The Court should reject FWS's efforts to "justify the exclusion of these highly relevant, adverse documents from the administrative record simply by claiming that the document were not 'directly or indirectly considered' by the agency." *Fund for Animals*, 391 F. Supp. 2d at 199 (quotation omitted) (citing *Blum*, 458 F. Supp. at 661 (warning that an "agency may not . . . skew the 'record' for review in its favor by excluding from that 'record' information in its own files which has great pertinence to the proceeding in question")).

19

Because FWS indisputably directly or indirectly "considered" the information in these records, the Record should be supplemented to include them. *See Fund for Animals*, 391 F. Supp. 2d at 199 (granting plaintiffs' request to supplement record with materials that agency directly or indirectly considered).

**D.**    **Supplementation Is Also Warranted Because The Contested Records Will Allow The Court To Evaluate Whether Defendants Considered All Of The Relevant Factors.**

Even if it could be believed (despite all evidence to the contrary) that the records contain information that the Secretary did not "consider," *see* Williams to Atwood (Ex. G) at 2, the Record should still be supplemented to include these materials. A court may order supplementation with such "extra-record" evidence to evaluate whether the agency considered all of the relevant factors. *James Madison, Ltd.*, 82 F.3d at 1095; *see also Partlo v. Johanns*, 2006 WL 1663380 at *29 (D.D.C. June 11, 2006) (quoting *Esch*, 876 F.2d at 991) (*Esch* stands for the principle "that while a court is generally confined to the administrative record upon APA review, 'it may sometimes be appropriate to resort to extra-record information to enable judicial review to become effective'") .

As explained *supra* at 11-16, the contested records contain information that is directly relevant to the Secretary's determination of whether listing Gunnison sage-grouse under the ESA is warranted. The 12 critical habitat records contain factual, scientific information about the imperiled biological status of the species, as well as information about which, and how much, critical habitat would be necessary to stave off its extinction. The public outreach records set forth in plain terms the rationale underlying the draft, positive determinations. The other records consist of an electronic mail communication from Dr. Young that articulate her concerns about

the impact of drought on the survival of the species, and the *Denver Post* article reflects concerns about the potential impact to the species from West Nile virus.  Other Records (Ex. L) at 1-4. Both of these latter records were included in the administrative record for the second ESA lawsuit concerning the agencies' refusal to protect Gunnison sage-grouse under the ESA and should have been considered by the agency.  *See Carlton v. Babbitt*, 26 F. Supp. 2d at 107 (supplementing record to include "publicly available" documents including some records that were "official records from court proceedings" because they "should have been considered by the agency" and including in the record).  The electronic mail communication from Dec. 8, 2005 reflect the involvement of Julie MacDonald in the listing determination.  Other Records (Ex. L) at 7; *Esch*, at 993 ("Consideration of all relevant factors includes at least an effort to get both sides of the story.").  Under the proper, lawful ESA analysis, all of this information is relevant to the ultimate issue of whether Gunnison sage-grouse is "threatened" or "endangered" with extinction.  16 U.S.C. § 1533(a)(1).

Thus, if the Secretary did ignore this information in making the final, negative determination, then this would be very important for the Court to know, precisely because the ESA requires the Secretary to consider this very information when making listing determinations.  *See* 16 U.S.C. § 1533(a) (requiring Secretary to determine whether any species is an endangered species or a threatened species because of any one of five statutory factors). Accordingly, should the Court have any doubt that the agency "considered" all of these materials, the Record should be supplemented with these records in order to allow the Court to evaluate whether the agency considered all of the relevant factors.  *See Delano v. Roche*, 391 F. Supp. 2d at 89 (granting plaintiffs' motion to supplement record in light of its relevance to

21

underlying action); *James Madison, Ltd.*, 82 F.3d at 1095.

**II.    DEFENDANTS' CERTIFICATION OF THE ADMINISTRATIVE RECORD IS INADEQUATE, WHICH REMOVES ANY PRESUMPTION THAT DEFENDANTS HAVE PROPERLY DESIGNATED THE RECORD.**

Certification of the record is a prerequisite to the presumption that the agency has

properly designated an administrative record.  *See Pacific Shores*, 448 F. Supp. 2d at 5. When

they filed the Record with the Court and provided a copy to plaintiffs in April, defendants

neglected to include a declaration certifying the Record.  Although plaintiffs informed

defendants of this apparent oversight in their August 13, 2007 letter regarding record issues, *see*

Atwood to Maysonett (Ex. F) at 6-7, and defendants have since produced a declaration, *see*

Davis Decl. (Ex. I), defendants have yet to file a properly certified copy of the administrative

record with the Court.

Proper certification of an administrative record requires the agency, by declaration, to

certify that the Record is complete; explain the manner and guidelines that were used to compile

the Record; and identify what the Record contains, and importantly, what is does not contain.

*See, e.g., Ctr. for Biological Diversity, et al. v. Kempthorne, et al.*, Civ. No. 06-04186, Order

(N.D. Cal. Oct. 19, 2006) (WHA) (Ex. N) (requiring federal defendants, who had already filed

an administrative record for an ESA listing case, to "promptly a detailed declaration explaining

what is and is not in the 'administrative record' and the manner and guidelines by which it was

compiled").

It is necessary for plaintiffs and the Court to know this information because judicial

review will be limited to evidence in the Record.  For this reason, "documents that were *not*

relied upon by a decisionmaker, or evidence relating to such documents and their non-

consideration, have been held to be necessary elements of an administrative record . . .." *Trout Unlimited, et al. v. Lohn, et al.*, Civ. No. 05-1128C, Slip Op. (W.D. Wash. May 4, 2006); 2006 WL 1207901 *3 (quoting *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43).; *cf. Pikes Peak Family Housing, LLC v. United States*, 40 Fed. Cl. 673, 677 (1998) ("[e]ffective judicial review of an agency's exercise of discretion is irreconcilably at odds with the notion that the reviewing court's inquiry must be confined to an administrative record that is likewise the product of the agency's sole discretion"). Indeed, the Court can only properly evaluate whether defendants "considered" all of the "relevant" factors – a central APA inquiry, *see Motor Vehicle Mfr. Ass'n.,* 463 U.S. at 43 – if it knows which materials the agency did not rely on when making the Gunnison sage-grouse listing determination.

Defendants' re-discovered declaration does not provide this basic information. *See* Davis Decl. (Ex. I). This fact, coupled with the sheer number of documents that are put at issue by this motion, calls into doubt the integrity of the Record, and, thus, the Court cannot be certain that the Record in its current form will enable proper judicial review under the APA. Accordingly, the Court should order defendants to produce a declaration that adequately certifies the Record and shows that it is complete, *i.e.*, by explaining the manner and guidelines that were used to compile it, and identifying what it does, and does not, contain. *See Ctr. for Biological Diversity, et al. v. Kempthorne*, Order (Ex. N). The Court should also order defendants to describe, in their next certification, the circumstances by which a declaration that was signed on April 13, 2007 was somehow "inadvertently omitted" from the Record that was filed with the Court three days later.

Particularly where the contested records would not even be *known* to plaintiffs or the

23

Court were it not for SSC's FOIA request – and where, after the missing documents were brought to defendants' attention, the agencies continued to try to avoid judicial review by making specious claims that the records were not "considered" (*i.e.*, relied on) by the decisionmaker – it is quite possible if not highly likely that there are still more relevant and adverse records that are missing from the Record, but which should be included in it, their existence perhaps never revealed to SSC, plaintiffs, or the Court.  To help ensure that this does not happen, the Court should order defendants to file a proper and complete certification of the administrative record.

## III.    DEFENDANTS' CLAIMS OF ATTORNEY-CLIENT PRIVILEGE ARE UNSUBSTANTIATED, AND THE COURT SHOULD REVIEW THE CLAIMS *IN CAMERA***.**

Defendants originally attempted to withhold 40 records by invoking the attorney-client privilege.  *See* Litigation AR Index (Ex. E) at Tab 20.  However, since 17 of these records were disclosed to SSC as a result of its FOIA request, plaintiffs informed defendants that any privilege, to the extent one applies, had been waived as to those records.  Atwood to Maysonett (Ex. F) at 5 (citing *In re Grand Jury*, 475 F.3d 1299, 1305 (D.C. Cir. 2007) ("the privilege is lost even if the disclosure is inadvertent") (other internal quotations and citations omitted)).  Defendants then "withdrew" their privilege claims as to those 17 records.  *See* Williams to Atwood (Ex. G) at 3.  However, although plaintiffs also explained how the agencies had failed to carry their burden of demonstrating that the privilege applies to *any* of the records for which it was claimed, *see* Atwood to Maysonett (Ex. F) at 5-6, defendants have not responded to this deficiency at all, let alone refuted it.

The "general subject matters of clients' representations are not [attorney-client]

24

privileged", *U.S. v. Legal Services for New York City*, 249 F.3d 1077, 1081-82 (D.C. Cir. 2001) (citing *In re Grand Jury Subpoena*, 204 F.3d 516, 520 (4th Cir. 2000)), "[n]or does the general purpose of a client's representation necessarily divulge a confidential professional communication, and therefore that data is not generally privileged." *Id*.  To be protected by the attorney-client privilege, a document "must disclose a confidential communication from that client to an attorney for the purpose of securing legal advice." *United States v. M & T Mortgage Corp.*, 242 F.R.D. 16, 22 (D.D.C. 2007) (citing *United States ex rel. Fago v. M & T Mortgage Corp.*, 235 F.R.D. 11, 10-11 (D.D.C.2006)).  Ultimately, "the burden of demonstrating the applicability of the privilege lies with those asserting it." *Id.* (citing *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir.1998) (per curiam); *cf. In re Sealed Case*, 877 F.2d 976, 979-80 (D.C. Cir.1989)).  As such,  the burden requires the party claiming the privilege to show that it applies "to each communication for which it is asserted.  *Id*. (citing *Lindsey*, 158 F.3d at 1270-71).

Defendants simply have not carried their burden to show the privilege applies to any of the remaining 23 records for which the privilege is claimed.  To the contrary, defendants' vague, cryptic privilege log entries provide no material information whatsoever that would allow plaintiffs or the Court to determine whether the records are, in fact, privileged.  *See generally* Litigation AR Index (Ex. E) at Tab 20.  Thus, at a minimum, for the 23 records for which the privilege is still claimed by the agencies, *see* Indices (Ex. A) at Category 3, defendants should be ordered to produce an adequate privilege log, which "make[s] the claim expressly" and "describe[s] the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection."  Fed. R. Civ. P. 25(b)(5).

Additionally, given the nature of and circumstances surrounding their blanket application of the privilege to materials so far (as demonstrated the 17 records that were already publicly disclosed to SSC), the documents for which defendants maintain their claims of privilege should be reviewed by the Court *in camera*.  It is clear that defendants' application of the privilege to any material at this point should be scrutinized, and only by viewing the records *in camera* will the Court be assured that the communications were made for the purpose of obtaining and providing legal advice – a necessary prerequisite to justifying invocation of the attorney-client privilege.  *See Mead Data Cent., Inc. v. United States Dept. of the Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977).  Thus, plaintiffs also move the Court to conduct an *in camera* review of the remaining materials for which defendants maintain the privilege applies.  *See*, *e.g.*, *General Elec. Co. v. Johnson*, 2007 WL 433095 at *18-19 (D.D.C. 2007) (reviewing claims of attorney-client privilege *in camera*); *accord*, *United States v. M & T Mortgage Corp.*, 242 F.R.D. at 22-23.

## IV.    THE COURT SHOULD TAKE JUDICIAL NOTICE OF THE IG REPORT ON ALLEGATIONS AGAINST FORMER DEPUTY ASSISTANT SECRETARY MACDONALD.

Plaintiffs request the Court to take judicial notice of the Inspector General Report on Julie MacDonald.  *See generally* IG Report (Ex. B).  This Report provides the Court with information as to the nature of Ms. MacDonald's involvement with ESA determinations. Specifically, the IG Report "confirmed that MacDonald was heavily involved in editing, commenting on, and reshaping the Endangered Species Program's scientific reports from the field." *Id*. at 1.[9]

---

[9]  Plaintiffs are not asking the Court to take judicial notice of the factual accuracy of the statements contained in the IG Report.  Rather, plaintiffs ask the Court to take notice of the fact that the IG Report has been published and of its general nature, and of its conclusions – *i.e.*, that

26

To take judicial notice of the IG Report, it must be "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." F.R.E. 201(b). The IG Report meets this test, as the DOI itself produced the document, and the agency could not be expected to deny its publication, nor deny that the statements and conclusions contained in the Report were actually made by DOI. Further, the Court may "take judicial notice of matters of general public record." *Moxley v. Meredith*, 471 F. Supp. 777, 779 n. 4 (D.D.C. 1977) (citing *Phillips v. Bureau of Prisons*, 591 F.2d 966, 969 (D.C. Cir. 1979)); 5 C. Wright & A. Miller, Federal Practice, section 1357 at 593 (1969).

Accordingly, the Court should take judicial notice of the IG Report. *Mack v. South Bay Beer Distributors, Inc*., 798 F.2d 1279, 1282 (9th Cir. 1986), *abrogated on other grounds by Astoria Federal Sav. and Loan Ass'n v. Solimino*, 501 U.S. 104 (1991) ("[A] court may take judicial notice of 'records and reports of administrative bodies'").

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Court should Order defendants to supplement and properly certify the Administrative Record, including the 32 contested records; order defendants to properly certify the Record; review defendants' privilege log and claims of attorney-client privilege *in camera* and evaluate whether the privilege applies; and take judicial notice of the IG Report on former Deputy Assistant Secretary MacDonald. A Proposed Order is being filed today with this motion.

---

Ms. MacDonald "has been heavily involved with editing, commenting on, and reshaping the Endangered Species Program's scientific reports from the field" and that she violated the Code of Federal Regulations by disclosing nonpublic information to private sector sources. *Id*. at 2 (citing 5 C.F.R. § 2635.703 (Use of Nonpublic Information), 5 U.S.C. § 2635.101 (Basic Obligation of Public Service, Appearance of Preferential Treatment)).

DATED:          September 21, 2007          Respectfully submitted,

                                          ____/s/_____
                                          Amy R. Atwood
                                          D.C. Bar No. 470258
                                          Western Environmental Law Center
                                          1216 Lincoln Street
                                          Eugene, Oregon 97405
                                          541-914-8372
                                          541-485-2457 (fax)
                                          atwood@westernlaw.org

                                          Geoff Hickcox
                                          admitted *pro hac vice*
                                          Western Environmental Law Center
                                          679 East Second Ave, Suite 11B
                                          Durango, CO 81301
                                          970-382-5902
                                          970-385-6804 (fax)
                                          ghickcox@gmail.com

                                          Rebekah S. King
                                          admitted *pro hac vice*
                                          Assistant San Miguel County Attorney
                                          P.O. Box 791
                                          333 W. Colorado Ave., Third Floor
                                          Telluride, CO 81435
                                          970-728-3879
                                          970-728-3718 (fax)
                                          beckyk@sanmiguelcounty.org

                                          Attorneys for Plaintiffs

# Exhibit A:
# Indices of Records At Issue

## Category 1: Records Disclosed Pursuant to April 18, 2006 FOIA Request

### Critical Habitat Records

| Number | Date | Description (from FOIA AR Index) | Pages |
|--------|------|----------------------------------|-------|
| 1 | 00/00/05 | Draft Critical Habitat patches and acreages | 5 |
| 2 | 00/00/05 | List of 18 Draft CH units and total acreage | 1 |
| 3 | 03/25/05 | Gunnison sage-grouse timeline | 1 |
| 4 | 04/18/05 | Proposed CH concept paper e-mail | 1 |
| 5 | 04/18/05 | Proposed CH concept paper attachment 1 | 37 |
| 6 | 06/07/05 | Email from K.Johnson to T.Ireland re: GUSG Question | 1 |
| 7 | 07/03/05 | Proposed critical habitat concept paper e-mail | 1 |
| 8 | 07/03/05 | Proposed critical habitat concept paper | 15 |
| 9 | 10/13/05 | Draft CH concept paper | 10 |
| 10 | 10/26/05 | CH Designation Benefits Memo from Director | 3 |
| 11 | 11/04/05 | E-mail on draft CH concept paper | 1 |
| 12 | 11/04/05 | Concept paper attachment 1 | 11 |

### Public Outreach Records

| Number | Date | Description (from FOIA AR Index) | Pages |
|--------|------|----------------------------------|-------|
| 13 | 07/21/05 | Draft outreach plan e-mail | 1 |
| 14 | 07/21/05 | Draft outreach plan attachment 1 | 4 |
| 15 | 07/21/05 | Draft news release e-mail | 1 |
| 16 | 07/21/05 | Draft news release attachment 1 | 3 |
| 17 | 07/26/05 | Draft Q&A's e-mail | 1 |
| 18 | 07/26/05 | Draft Q&A's attachment 1 | 3 |
| 19 | 02/09/06 | Draft summary of 12-month finding (determination) | 2 |
| 20 | 02/16/06 | Outreach plan e-mail | 1 |
| 21 | 02/16/06 | Outreach plan attachment 1 | 4 |
| 22 | 03/28/06 | Gunnison sage-grouse outreach materials e-mail | 1 |
| 23 | 03/28/06 | Gunnison sage-grouse final outreach plan attachment 1 | 3 |
| 24 | 03/28/06 | Draft Gunnison sage-grouse Q&A's attachment 2 | 2 |
| 25 | 03/28/06 | Draft Gunnison sage-grouse news release attachment 3 | 2 |
| 26 | 03/28/06 | Gunnison sage-grouse final summary attachment 4 | 2 |
| 27 | 04/12/06 | Final Determination news release and Q&As | 4 |
| 28 | 04/13/06 | E-mail from S. Rose on outreach materials | 2 |

## Category 2: Other Records, Including Records from Prior Litigation

| Number | Date | Description | Pages |
|---|---|---|---|
| 29 | 08/07/03 | Email from J.Young, Ph.D. to T.Ireland re: drought tour | 2 |
| 30 | 10/27/03 | Denver Post, *Dwindling Grouse Face New Threat in W.Nile . . .* | 2 |
| 31 | 09/06/05 | Email from P.Mehlhop to A.Pfister, J.Lyke, P.Deibert, S.Linner re: GUSG PR with more changes | 2 |
| 32 | 12/08/05 | Email from E.Stevens to J.Underwood, J.Lyke, C.Nolin, N.Alt, R.Lohoefener re: Fw: Julie Request | 1 |

## Category 3: Records Withheld Under Attorney-Client Privilege

| Number | Date | Description (from Litigation AR Index) |
|---|---|---|
| 1 | 08/10/05 | Privileged Interparty Settlement Communication |
| 2 | 09/16/05 | Forwarded E-mail from C. Davis on settlement date offer by plaintiff's |
| 3 | 10/25/05 | E-mail by T. Thorn on new Gunnison Basin Map |
| 4 | 10/25/05 | Gunnison Basin Map (Sensitive-hazardous materials) |
| 5 | 11/00/05 | Nine maps of Gunnison Basin (Sensitive-hazardous materials) |
| 6 | 11/29/05 | E-mail on Gunnison Basin maps for Conference call |
| 7 | 11/29/05 | Map for conference call attachment 1 (Sensitive-hazardous materials) |
| 8 | 11/29/05 | Map for conference call attachment 2 (Sensitive-hazardous materials) |
| 9 | 11/29/05 | Map for conference call attachment 3 (Sensitive-hazardous materials) |
| 10 | 11/29/05 | Map for conference call attachment 4 (Sensitive-hazardous materials) |
| 11 | 03/20/06 | Forwarded e-mail from P. Mehlhop of T. Graf's comments on draft Determination |
| 12 | 03/20/06 | T. Graf comments on draft Determination |
| 13 | 03/20/06 | T. Graf Solicitor review sheet |
| 14 | 03/30/06 | E-mail from B. Dach with B. Jesup batch 1 comments on Determination |
| 15 | 03/30/06 | B. Jesup batch 1 comments on Determination, attachment 1 |
| 16 | 03/30/06 | E-mail from B. Dach with B. Jesup batch 2 comments on Determination |
| 17 | 03/30/06 | B. Jesup batch 2 comments on Determination, attachment 1 |
| 18 | 03/30/06 | E-mail from B. Dach with B Jesup batch 3 comments on Determination |
| 19 | 03/30/06 | B. Jesup batch 3 comments on Determination, attachment 1 |
| 20 | 03/30/06 | E-mail from B. Dach with B. Jesup batch 4 comments on Determination |
| 21 | 03/30/06 | B. Jesup batch 4 comments on Determination, attachment 1 |
| 22 | 03/31/06 | E-mail from B. Dach on response to Graf's comments |

23              03/31/06         Responses to T. Graf's comments on draft Determination

**Exhibit B:**

**Department of the Interior,**
**Office of Inspector General,**
*Investigative Report on Allegations Against*
*Julie MacDonald, Deputy Assistant Secretary*
*for Fish, Wildlife, and Parks* **(Mar. 29, 2007)**



# REPORT OF INVESTIGATION

## Julie MacDonald,
## Deputy Assistant Secretary,
## Fish, Wildlife and Parks

This report contained information that has been redacted pursuant to 5 U.S.C. §§ 552 (b)(2), (b)(5), (b)(6), and (b)(7)(C) of the Freedom of Information Act and 5 U.S.C. § 552a(k)(2) of the Privacy Act. Supporting documentation for this report may be requested by sending a written request to the OIG Freedom of Information Act Office.

# Results in Brief

The Office of Inspector General (OIG) initiated this investigation based on an anonymous complaint alleging that Julie MacDonald, Deputy Assistant Secretary (DAS), Fish, Wildlife and Parks, had been involved in unethical and illegal activities. Specifically, the complainant alleged that MacDonald had bullied, insulted, and harassed the professional staff of the U.S. Fish and Wildlife Service (FWS) to change documents and alter biological reporting regarding the Endangered Species Program. As our investigation progressed, we also developed information that MacDonald had disclosed nonpublic information to private sector sources.

Through interviewing various sources, including FWS employees and senior officials, and reviewing pertinent documents and e-mails, we confirmed that MacDonald has been heavily involved with editing, commenting on, and reshaping the Endangered Species Program's scientific reports from the field. MacDonald admitted that her degree is in civil engineering and that she has no formal educational background in natural sciences, such as biology.

While we discovered no illegal activity on her part, we did determine that MacDonald disclosed nonpublic information to private sector sources, including the California Farm Bureau Federation and the Pacific Legal Foundation. In fact, MacDonald admitted that she has released nonpublic information to public sources on several occasions during her tenure as Deputy Assistant Secretary for FWS.

The OIG Office of General Counsel's review of this investigation indicates that MacDonald's conduct violated the Code of Federal Regulations (C.F.R.) under 5 C.F.R. § 2635.703 Use of Nonpublic Information and 5 C.F.R. § 2635.101 Basic Obligation of Public Service, Appearance of Preferential Treatment.

This case is being referred to the Department of the Interior (DOI) for potential administrative action against MacDonald.

# Background

Julie MacDonald came to the Department of the Interior in July 2002. She served as senior advisor to the former Assistant Secretary until 2004, when she was promoted by then Secretary Gale Norton to Deputy Assistant Secretary for Fish, Wildlife and Parks. MacDonald is a civil engineer with a master's degree in management. She began her federal career as a hydraulic engineer with Interior's Bureau of Reclamation in 1979. In 1987, she commenced a career in public policy. She has been a staff consultant in the California Legislature and served as senior staff to a former California Senate minority leader. A former California Governor later appointed her as Associate Secretary of the State Health and Welfare Agency and then as Deputy Secretary for Legislative Affairs in the California Resources Agency. In the latter position, she was responsible for gaining bipartisan passage of new provisions in the California Endangered Species Act. DAS MacDonald has oversight of FWS operations including the examination of Endangered Species Act (ESA) reviews, and five-year Critical Habitat Designations (CHD) reviews.

2

Congress enacted the ESA in 1973. The purpose of the ESA is to conserve, or recover, the ecosystems upon which endangered and threatened species depend. Section 4 of the ESA directs the Secretary of the Interior to determine by regulation whether a given species should be listed as endangered or threatened, based upon the "best scientific and commercial data available…after conducting a review of the status of the species."

The Department is required by statute to conduct a review of every listed Endangered Species (ED) at least every five years. This is to determine whether, based on the best available science, each listed species should have its status either lowered from endangered to threatened, raised from threatened to endangered, delisted altogether, or remain unchanged.

The term critical habitat refers to a specific area within the geographical area occupied by the species, at the time it is listed. Critical habitat includes habitat areas that are both occupied and unoccupied by listed species that are essential to the conservation of the species. FWS must designate critical habitat "on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat."

The legal review and clearance procedure for rule-making documents prepared under Section 4 of the ESA, which was modified in 2004, describes the path ED and CHD packages take to be published at the Federal Register.

Usually operating under a court ordered deadline, ED and CHD review timelines for completion vary from 12 to 18 months. After a draft report is completed, the Regional Office, including the Regional Solicitor's Office, review the field's findings; the Regional Solicitor's Office conducts a draft legal analysis of the report, which is sent to FWS headquarters; at headquarters, the Assistant Director for Endangered Species and the Department Solicitor's Office review the report for legal issues and other concerns. Changes and comments can be made to the draft, but then it is sent back to the Regional Office for a formal legal review by the Regional Solicitor's Office. The regional attorney assigned to the review can surname the document if he/she agrees that the report has legal sufficiency (can withstand a potential lawsuit); they can also disagree and not surname the final. Whether the draft is surnamed or not, it goes back to the Department's Solicitor's Office, the FWS Director, and the Assistant Secretary for Fish, Wildlife and Parks, including Deputy Assistant Secretary MacDonald. According to the policy of the Chief of Staff for the Department, Brian Waidmann, the document must be surnamed before leaving DOI, usually by Barry Roth, Deputy Associate Solicitor for Parks and Wildlife. Waidmann also reviews the package before it goes to the Federal Register for publishing.

When FWS suspects that a species is sliding toward extinction, it places a notice in the Federal Register describing the situation and the studies that led to this conclusion. Independent scientists and others, including the public, may comment on the proposed listing. If FWS determines, usually within one year, that the species does deserve listing, it places another notice in the Federal Register. Thirty days later, the listing becomes effective. Unlike other parts of the Endangered Species Act, the listing of a threatened or endangered species is based solely on science, not on economics or other factors.

3

# Details of Investigation

## Altering/Changing Scientific Documents

On April 11, 2006, the OIG received an anonymous complaint from an employee of FWS alleging unethical and illegal activities by MacDonald. The complainant stated that MacDonald had persistently harassed, bullied, and insulted FWS employees to change documents and "ignore good science" related to the Endangered Species Program. After initiating a preliminary inquiry into these allegations, we opened an investigation.

On October 30, 2006, an article appeared in *The Washington Post* regarding DAS MacDonald and her consistent rejection of FWS staff scientist's recommendations to protect animals and plants under the ESA. Several issues were raised in the article which required further investigation.

When we interviewed the former Director of the FWS Endangered Species Program (ES), he stated that many of the scientific reports his office has issued have been edited extensively by MacDonald, who has no background in biology, and cited the Sage Grouse Risk Analysis as an example. He explained that many other officials in MacDonald's position have made changes to reports to reflect their political philosophy, but MacDonald took it a step further by involving herself at the field level. He explained that MacDonald regularly bypassed managers to speak directly with field staff, often intimidating and bullying them into producing documents that had the desired effect she and the former Assistant Secretary wanted.

The former ES Director discussed one instance in which MacDonald interfered in FWS critical habitat fieldwork. He said that in central California, FWS had been collecting data where *vernal pools* were located to designate them as a critical habitat. He said FWS was conducting the work under a court order with a required date of completion. He explained that several days before this date, FWS sent its report to MacDonald, who then determined that the economic cost of designating the area as a critical habitat was unacceptable. The former ES Director said MacDonald ordered him to revise the report to reflect her position.

*Agent's Note: Vernal pools are miniature ecosystems: natural depressions covered by shallow water for variable periods from winter to spring, they are typically dry for most of summer and fall. A diverse array of plants and animals adapted to a waterlogged spring followed by a parched summer has evolved that thrive under these conditions. Many of these are native species endemic to vernal pools or related wetland habitat. Because of the extreme environment, there are relatively few introduced species that can compete with the natives. In addition to providing habitat for the resident species, vernal pools provide resting sites for migrating birds and foraging grounds for bald and golden eagles.*

The former ES Director said MacDonald reached this conclusion after she had accessed a California Department of Development Web site and researched business development figures from the counties involved with the critical habitat. He stated that she had misread the figures and based her decision on a mistake, although she later acknowledged that she interpreted the figures incorrectly.

The former ES Director said that overall, MacDonald did not want to accept petitions to list species as endangered, and she did not want to designate critical habitats. He said the overall effect

4

was to minimize the Endangered Species Act as much as possible or ensnare it in court litigation, which happened often.

We interviewed the Assistant Director for External Affairs, FWS, who stated that MacDonald would not accept the field's scientific findings and would apply science from alternative outside sources. She said MacDonald would use information from these sources as "the best science" and insist field employees revise their findings to fit what she wanted.

The Assistant Director for External Affairs described MacDonald as "an angry woman" who had been abusive to her and had become a liability to FWS. She stated that MacDonald had demoralized the FWS program with her interference in endangered species studies – often reaching "way down the line" to have reports reflect what she wanted.

When we interviewed the Chief of the Division of Consultation, FWS, he said that while he has not personally experienced or witnessed any inappropriate behavior by MacDonald, many of the field biologists had expressed concerns similar to the OIG complainant. The Chief said he believed that MacDonald's policy regarding endangered species was not to regulate them unless there was scientific proof showing otherwise. He said that unfortunately, in most cases, there is rarely definitive scientific proof, leaving uncertainties. The Chief of the Division of Consultation said MacDonald, when evaluating scientific reports, has leaned more toward the question of: "Does the science fit the policy?"

When we interviewed the Assistant Manager, California/Nevada Operations (CNO), FWS, he explained he has managed or was the lead biologist for the past eight years on numerous studies under the ESA and CHD. FWS would typically not establish CHD for a species until sued by environmental groups to do so. The process involved in CHD would follow the actual listing of an endangered species. [Ex. 5]

The CNO Assistant Manager explained how ESA issues get to court. The DOI and FWS are sued in federal court to review the status of an ED species (list/delist) or CHD. A deadline date is established for the review to be completed. The CNO Assistant Manager's staff would begin compiling scientific and biological data on the issue. Initial draft of the issue would be given to the Regional Solicitor's Office for legal review and sent back for revision. The final draft is reviewed for legal sufficiency by the Regional Solicitor's Office and sent to FWS headquarters in Washington, D.C., for further comments and revisions. The CNO Assistant Manager said many reviews are not surnamed by the regional attorneys because they are legally vulnerable due to administrative procedures ([Ex. 5]).

With respect to the California Tiger Salamander CHD and listing of the Distinct Population Segment (DPS), there was a push by DAS MacDonald to combine a large central area of California with two other smaller DPS for the salamander. According to CNO Assistant Manager, that proposal was eventually rejected by the court, as well as science, when it was determined that there were genetic differences in each population of the salamander that would prevent their combining the DPS.

The Endangered Species Coordinator, CNO, FWS, reiterated the California Tiger Salamander experience during her interview. She was the team coordinator on the FWS determination of threatened status for the Central California DPS of the California Tiger Salamander. The CNO ES Coordinator said DAS MacDonald was not happy that there were two DPSs in the north and south regions of California and wanted to consolidate these into a central California salamander population;

5

FWS employees disagreed with the consolidation. MacDonald had a number of objections in the final salamander rule to the CNO's findings. This was a controversial issue because consolidating the population segments from the north and south regions into the central population would diminish their status as 'endangered' to the central region's lesser designation of 'threatened.' The ES Coordinator commented that MacDonald was able to get what she wanted on the final salamander ruling; however, the court overruled the Department and kept the north and south DPSs as endangered, while adding the central region as threatened.

The CNO Assistant Manager stated that FWS Ecological Services does not factor in economic issues when reviewing endangered species for a listing. Economics does become an issue though in CHD. The economic issues would be something that senior management at DOI may take into consideration in their decisions in the process. The Secretary of the Interior can overrule FWS' research based on economic considerations as long as it does not lead to the extinction of the species. The CNO Assistant Manager added that FWS research has to be repeated over and over based on the challenges, lawsuits, and pendulum of politics. He also stated that there has been a lot of pressure on his department in CNO over the last three years, "but we have toed the line." He explained, "Everything needs to be consistent with the law and the science."

The CNO Assistant Manager stated that the CNO is at the center for continual lawsuits by the private sector and environmentalists and that the environmental groups particularly like the Ninth Circuit Court of Appeals for ESA issues. He commented that the Regional Solicitor's Office rarely surnames their legal reviews on ED/ CHD issues. The normal path for his office's work (aside from legal review) would be from himself to the CNO Manager, to FWS Deputy Director Marshall Jones, to FWS Director Dale Hall, and then the to the Special Assistant to the Assistant Secretary for Fish, Wildlife and Parks, the Deputy Assistant Secretary and the Assistant Secretary, Fish, Wildlife and Parks would weigh in with the Secretary's Chief of Staff. Deputy Associate Solicitor Barry Roth would surname the FWS packages before sending them to the Federal Register. The CNO Assistant Manager said if DOI management (Assistant Secretary, Chief of Staff) wants something accomplished policy wise, it does not matter whether the Regional Solicitor's Office surnamed the rulemaking package or not; the DOI's Deputy Associate Solicitor can, and frequently does, use his surname authority to move the rule to the Federal Register.

The CNO Assistant Manager commented that working with Julie MacDonald "has been one of the most challenging times in my entire career." He stated that MacDonald intimidated some FWS employees and added that it was very unusual for a person of her position to directly contact field biologists and challenge them on their work. He said MacDonald would relate to the various FWS personnel she contacted that she was calling on behalf of the former Assistant Secretary. The CNO Assistant Manager stated that the CNO Manager would verify that information by calling the former Assistant Secretary himself to ensure that he was the source of the inquiry and not MacDonald. The CNO Assistant Manager related there was a fair amount of "explicit" conversations with MacDonald that the former Assistant Secretary "wanted this and that done" and it caused a lot of stress on his staff.

We interviewed the Chief of the Endangered Species Division, CNO, FWS; he works for the CNO Assistant Manager. The CNO ESD Chief stated that Julie MacDonald "was in your face all the time, but never inappropriate." The CNO ESD Chief described MacDonald as "a pain in the butt."

The CNO ESD Chief stated that he was responsible for much of the research on the Delta Smelt fish as an ESA issue. There was a recovery plan established in 1990 for the Delta Smelt, and

there was also a plan for delisting the Smelt if the population index was exceeded three of the next five years. In 2003, the California Farm Bureau Federation (Farm Bureau) produced a report that the Delta Smelt was no longer threatened. The Farm Bureau report was not referenced, cited, or published with any scientific research. As a result, FWS asked the U.S. Geological Survey (USGS) to conduct a peer review. USGS completed the review and criticized the Farm Bureau's report. There is still an ongoing lawsuit against FWS for not delisting the Smelt based on the recovery plan and whether the population index is accurate. The CNO ESD Chief stated that MacDonald challenged the basic population index that FWS biologists have always used and claimed that the USGS peer review was "no good." In the current lawsuit by the Farm Bureau, there was an e-mail provided to the Farm Bureau that has caused controversy. *Agent's Note: The e-mail was ultimately determined to have been provided by MacDonald.* The presiding judge on the case demanded that FWS explain its position since the e-mail makes the FWS appear confused over its own stance on the Smelt's listing under the ESA. The CNO ESD Chief added that just because an endangered species' recovery plan is met, that does not mandate delisting. He said MacDonald was highly opinionated about what she believed was the right way to evaluate the controversy and she did not support FWS research or the peer review by USGS.

The CNO ESD Chief related a series of phone conversations and meetings with MacDonald, during which she kept pressuring him to make subtle changes to his report or research. Although, according to CNO ESD Chief, in some cases it was just changing words, he had to involve other CNO management so that his report did not begin to just mirror what MacDonald wanted him to say. The CNO ESD Chief opined that the degree of involvement by MacDonald was unprecedented for a DAS.

The CNO Manager FWS, was interviewed and said that most issues on the ESA are court driven. With respect to DAS MacDonald, the CNO Manager related that he has been around a long time with FWS and never took anything MacDonald said or wanted at face value. He would contact the former Assistant Secretary directly or fly to Washington, D.C., to verify MacDonald's requests and present his view on the ED and CHD reviews coming from the CNO.

The CNO Manager stated that his office's confrontations with MacDonald had become much better since Dale Hall had become FWS Director. Thompson opined that political appointees should make changes in policy but not interfere with biologists doing their jobs. There were times MacDonald was helpful in her critical reviews, but the CNO Manager viewed her as ineffective in her overall approach. In the Delta Smelt issue, the CNO Manager stated that he received an enormous amount of pressure from MacDonald. The presiding judge requested a memo for inclusion into the Smelt Administrative Record (a record is kept on all reviews) explaining the circumstances surrounding an e-mail by MacDonald to the CNO Manager and other CNO officials regarding a press release on the Smelt. MacDonald allegedly sent the e-mail to a friend in the Farm Bureau, who brought it to the attention of the judge and prompted the request. In the memo, the CNO Manager identifies MacDonald as being the source of much of the conflicting DOI internal debate over the Smelt. The CNO Manager said he believed that the Farm Bureau dropped its lawsuit on the five-year status review of the Smelt because the science did not support the claims for delisting.

The CNO Manager stated that there are 30 to 50 lawsuits on his desk in any week and that it comes with the territory, the politics, the agency, and the geographical area he supervises. He stated that MacDonald would often put a slant on the rules that would compromise FWS' position and success in court.

7

The CNO Manager was aware of DOI/FWS headquarters personnel who wanted to file a hostile work environment complaint against MacDonald. He said his employees at CNO were definitely stressed, pushed, and yelled at by MacDonald. The CNO Manager stated he would interject at any point when he felt MacDonald had clearly stepped out of her authority and was demeaning to his staff, even to the point of halting conference calls and not calling MacDonald when she had stepped over the line.

The CNO Manager concluded by saying that MacDonald was a prolific writer and made him and his staff do an incredible amount of work, which was often unproductive. He added he felt confident that he and his staff remained professional throughout their contacts with MacDonald despite not feeling MacDonald always shared that basic approach.

The OIG interviewed the Assistant Manager, Region 1 Portland, FWS, who said that she heads up the Endangered Species Review Section for Region 1. The Portland Assistant Manager informed us that the recently retired Region 1 Director was very frustrated in his contacts with MacDonald.

The Portland Assistant Manager commented that Julie MacDonald intimidated FWS personnel within Region 1. She instructed her staff to tell MacDonald that they would need to go through their supervisors when they were badgered with questions by MacDonald. She related that MacDonald would curse and yell at her, but she never felt intimidated or threatened by MacDonald because the Portland Assistant Manager was confident that her 20 years of government service and quality of work could withstand the verbal attacks; however, she sympathized with the less senior FWS employees who might not have felt as secure on the receiving end from a senior manager. She described MacDonald as lacking the basics in managerial style.

The Portland Assistant Manager stressed to her staff to be impartial in their work, be complete, and, above all, remain professional and dedicated to the overall mission of FWS. She commented that MacDonald was very critical and would find mistakes on things that were incomplete, which was a good thing, but her confrontational style tainted any positives related to her review. The Portland Assistant Manager also added that MacDonald would go around managers to get to the lowest level FWS employees. This was considered to be unprofessional and caused additional problems within the region since many of the biologists were not used to that type of direct contact from a senior manager in the Assistant Secretary's corridor.

The Portland Assistant Manager said that MacDonald was very frustrated over CHDs. On the designation of critical habitat for the Bull Trout, for example, there were specific exclusions for federal agencies and not federal lands, as MacDonald had wanted. The exclusion of federal lands meant more miles of critical habitat eliminated.

*Agent's Note: In a number of e-mails and comments on the Bull Trout CHD, MacDonald forced a reduction in critical habitat miles in the Klamath River basin from 296 to 42 miles.*

The Portland Assistant Manager stated Region 1 has produced numerous completed ESA reviews over the past three years and MacDonald has never overturned any of her staff's reviews; however, she said many Region 1 decisions on ESA reviews were revised as a matter of policy by MacDonald or another Fish, Wildlife and Parks senior manager's discretion. The Portland Assistant Manager stated MacDonald has never told her that she could not list or delist an endangered species.

8

The Assistant Manager commented that she has been with the government long enough to know there are a lot of political issues that affect agency decisions.

The Portland Assistant Manager stated that although MacDonald lacked a professional managerial style, she was unaware of any known incidents in which a Region 1 FWS employee felt threatened enough to file a hostile work environment complaint against MacDonald. The Assistant Manager commented that MacDonald would invoke the former Assistant Secretary's name on many occasions to obtain what she wanted from the field. She said that the former regional director ran a lot of interference, while MacDonald put a lot of pressure (using the former Assistant Secretary's name) on the Region.

In closing, the Portland Assistant Manager stated that there was a lack of oversight by DOI senior management to keep MacDonald in check and advise her of her role in the process. The Assistant Manager stated that after FWS Director Dale Hall was appointed in October 2005, he quickly realized that it was unprofessional for MacDonald not to follow a chain of command and it hindered the rulemaking process to have MacDonald involved at the field level.

We interviewed the Chief, Classification and Conservation, FWS, who stated that MacDonald often interjected herself into the scientific process. She cited MacDonald's involvement in an FWS study of Preble's Meadow Jumping Mouse as an example. The mouse was listed in 1998 as a threatened species under the ESA.

On February 2, 2005, FWS issued a finding on a petition to delist the Preble's mouse and proposed to remove the mouse from the federal list of threatened and endangered species. The delisting proposal was primarily based on the genetic research conducted by a zoologist formerly of the Denver Museum of Nature and Science. The zoologist's study claimed that the Preble's mouse was not a species unto itself and was part of a more common species of mouse. The Classification and Conservation Chief said that based on this information, MacDonald wanted to delist the species from the endangered list.

According to the Classification and Conservation Chief, in seeking to use the best science possible in making a final decision, FWS later commissioned a USGS biologist to do an independent genetic analysis of several meadow jumping mouse subspecies. The USGS study results, provided to FWS on January 25, 2006, raised significant questions about the conclusions drawn by zoologist in his study.

Given the apparent inconsistencies between these reports, said the Classification and Conservation Chief, the FWS contracted with Sustainable Ecosystems Institute (SEI) to organize an independent scientific review panel to analyze, assess, and weigh the reasons why the data, findings, and conclusions of the USGS biologist differ from those of the zoologist. The Chief said MacDonald wanted to hire an outside consultant other than SEI. On July 21, 2006, SEI delivered to FWS their report, which stated that based on the "best available science" it appears the Preble's mouse is a distinct species on at least some basis. A final determination by FWS on the status of the Preble's mouse is pending.

The Classification and Conservation Chief opined that MacDonald is more interested in political views than getting it "right." She said that in many instances, FWS establishes a ruling on a critical habitat in the Western United States, has it published in the Federal Register, and then has it

immediately challenged in court by business interests such as water and power companies, cattlemen's associations, commercial and residential housing developers, and farm bureaus. According to the Chief, FWS has been losing many of these challenges, and FWS budget resources are being wasted when a court finds fault with a ruling two or three times on the same habitat review. Further, the Classification and Conservation Chief claimed that several of the Regional Solicitor Offices will not surname, or sign off on, the rule making documents (ED/CHD reviews) or policy decisions because they believe they are not legally sufficient.

During the investigation, we found an example of the legal wrangling involved with a critical habitat ruling described in an article in the *San Francisco Chronicle* on May 17, 2003, regarding the Alameda Whipsnake. According to the article, the Alameda Whipsnake dispute started in 1999 when the Center for Biological Diversity, an environmental group based in Tucson, AZ, sued FWS for failing to designate critical habitat for the whipsnake. The environmental group prevailed in its suit and in 2000; FWS designated more than 400,000 acres of land as critical whipsnake habitat. Following that designation, a coalition including the Home Builders Association, the California Chamber of Commerce, and the California Alliance for Jobs sued FWS alleging it violated the ESA by not adequately defining the habitat area or considering its economic impact. The Pacific Legal Foundation (PLF) represented the coalition in this case and was successful in overturning the original protected habitat of the whipsnake.

The article quoted a spokesperson for FWS in Sacramento, CA, who stated that FWS spent a lot of money on a process that was lawsuit-driven to designate a habitat, after which it was lawsuit-driven to get it dismantled. According to the spokesperson, this illustrates the drain on the FWS budget having to contend with constant lawsuits from either business interests or environmental groups.

***Agent's Note:*** *According to their Web site, the PLF is a conservative law firm representing various business interests. It is a self-proclaimed national leader in the effort to reform the ESA and raise awareness of the Act's impact on people. They have successfully mounted a number of legal challenges to ED/CHD reviews throughout the Western United States on behalf of their clients such as the California Farm Bureau, Washington Farm Bureau, California State Grange, Arizona Cattle Growers' Association, and the California Cattlemen's Association.*

When the OIG questioned her regarding her involvement in the Delta Smelt case, MacDonald related that she has not had to testify in court, but she did have to file a clarifying memorandum, co-signed by CNO Manager, as to the circumstances surrounding her e-mail to CNO officials regarding a controversial press release by CNO on the Smelt.

According to DAS MacDonald, when she attended meetings at Western Regional Offices, it was not beyond the realm of possibility that she swore at field personnel when challenging them on their scientific/biological findings. She said she generally will match the tone of whoever is speaking to her. She recalled that early in her tenure with DOI, the quality of the ED/CHD reviews emanating from the field was bad. She added that the reviews have since improved.

## Regional and Department Solicitors' Comments on the Legal Review Process

We interviewed an attorney from the Department Solicitor's Office in the Main Interior Building (MIB). The attorney has worked on FWS legal issues regarding ED and CHD reviews.

During the past four to five years, he said, federal listings involving ED and CHD reviews have been accomplished under court ordered deadlines.

The attorney from the Solicitor's Office described the process of how a CHD review gets published in the Federal Register. He said if there is a legal dispute between the Regional and Department Solicitor's Offices, the final decision concerning the ED and CHD review packages is made by Deputy Associate Solicitor Roth or Solicitor David Bernhardt, if necessary. According to the attorney, Roth and Bernhardt both have the ability to elevate the surnamed review to the DOI's Chief of Staff despite legal insufficiencies cited by the FWS Regional Solicitor's Office.

We interviewed the Assistant Regional Solicitor, Solicitor's Office, FWS Region 1, Portland, OR, who described his work as involving either litigation, legal review, or rule making as it applies to the ESA.

The Portland Assistant Regional Solicitor stated he has conducted approximately 15 ED/CHD legal reviews and that the administrative record for these reviews generally consists of factual support, scientific data, public comment, and peer review. When asked why he does not generally surname on ED/CHD reviews, the Assistant Regional Solicitor commented he has not surnamed a document in six years due to the legal insufficiency of the documents. He states that he looks at the rule, the rationale within the rule, past judicial decisions, whether it is factually supported, and whether there are any hopes of public support.

The Portland Assistant Regional Solicitor related that he and FWS personnel are always under court ordered deadlines to meet review dates. Normally when he gets a review, there is already a deadline looming and he attempts to turn them around in 24 hours; however, it often takes a week when questions need to be asked of the field biologists.

The Assistant Regional Solicitor commented that often what is being proposed or sent to him for review is a legal stretch. Due to the heavy workload of the field biologists and the ever-present court deadlines, the regional reviews are not particularly good. The initial review package from the field on a CHD or an ED listing/delisting package may be delivered to him lacking elements the field biologists should have included. The Portland Assistant Regional Solicitor often spends time correcting these mistakes and then does the initial review.

The Portland Assistant Regional Solicitor described the review process for a CHD and ED package. He said the completed package would go to the Federal Register, usually the day before it is due, even though from his perspective the package was legally insufficient. The Assistant Regional Solicitor said the former Deputy Associate Solicitor used to rationalize that even though he surnamed a legally insufficient document, it kept the Secretary of the Interior from being held in contempt of court. The Portland Assistant Regional Solicitor commented that the former Counsel to Secretary Norton, believed the former Deputy Associate Solicitor was actually signing ESA issues as being legally sufficient.

The Portland Assistant Regional Solicitor recalled two teleconference calls on CHD for Bull Trout and the Sage Grouse that he had with DAS MacDonald and other Regional and headquarters FWS officials. MacDonald wanted a 90 percent reduction in acreage for the Bull Trout's critical habitat. The Assistant Regional Solicitor remembered distinctly that MacDonald was "quite hostile, raised her voice repeatedly, and cut people short as they were explaining." The Portland Assistant

11

Regional Solicitor sent the attorney in the Solicitor's Office at MIB an e-mail with the subject, "and the Red Queen was talking backwards," after the conference call. The Portland Assistant Regional Solicitor wrote, "Re: today's call. I'm still reeling from my little taste of it, but its [sic] Alice in Wonderland every day for you, isn't it?" The Assistant Regional Solicitor opined that MacDonald was disrespectful, rude, and unprofessional, and said, "never in over 20 years of government service" had he seen a political appointee behave like she did.

The Portland Assistant Regional Solicitor was assigned the legal review for the designation of Columbia and Klamath populations for the Bull Trout habitat. He cited three reasons for not surnaming the document and a fourth regarding the preamble disclaimer as being inappropriate and in need of deletion from the final rule on the Bull Trout.

Regarding the other conference call on Sage Grouse with MacDonald, the Portland Assistant Regional Solicitor said the interaction with MacDonald was even worse than on Bull Trout. On Sage Grouse, there was a deadline approaching and a major issue involving state regulations for protecting the species. He described the Policy for Evaluating Conservation Efforts (PECE), in which state conservation efforts are screened under defined criteria to validate conservation plans. The Assistant Regional Solicitor said the policy is very well-written, if FWS just followed it. For Sage Grouse, three FWS regions (Regions 1, 2, and 6) reviewed state plans and determined that conservation efforts did not meet the PECE policy.  The Portland Assistant Regional Solicitor said once MacDonald was informed, she claimed that FWS came up with the wrong conclusions and instructed them to go back and do the review again. He termed this behavior by MacDonald as "the most brazen case of political meddling" he had seen. [Ex. 5]

In an e-mail to his supervisor, the Portland Assistant Regional Solicitor said that the former DOI Deputy Solicitor, who was in on the conference call, opined that, "…FWS has received inadequate supervision [relating to Sage Grouse and PECE policy] and that it's time for us to start 'meddling' in their work."

When asked about the preamble disclaimer language on their legal review memo (which the Portland Assistant Regional Solicitor believed was initiated by the former Assistant Secretary in 2001 or 2002), he opined that it is a waste of time and makes FWS look reluctant to carry out its duties, casting a negative light on the entire process.  The Portland Assistant Regional Solicitor stated he worked with attorney at the MIB a few months ago to change the verbiage in the preamble and that the Assistant Solicitor for Fish & Wildlife, MIB, supposedly has referred it to Assistant Secretary for Fish, Wildlife and Parks David Verhey for further review.

The Assistant Regional Solicitor, Solicitor's Office, CNO, FWS, Sacramento, CA, stated that he has been doing FWS reviews for the past seven years and has done approximately 20 reviews since 2002. These reviews typically consist of listings, 90-day findings, 12-month findings, preliminary CHDs, and final CHDs.

The Assistant Regional Solicitor in Sacramento recalled the Alameda Whipsnake ruling that he had surnamed as being legally sufficient and from which he learned a lesson because the ruling was overturned in court. He commented that he has not surnamed a CHD since 2002. In his legal analysis of the California Tiger Salamander listing, which included the consolidation of the three DPSs that MacDonald wanted and obtained in the final ruling, the Assistant Regional Solicitor in Sacramento

concluded that it was legally insufficient. The final ruling proceeded to the Federal Register, was immediately challenged, and was overturned by a federal district court.

The Assistant Regional Solicitor in Sacramento said that ED and CHD reviews always have looming deadlines and they have to be surnamed by the Department Solicitor's Office before going to the Federal Register. He related that if there are legal concerns, the Assistant Secretary for Fish, Wildlife and Parks would become involved. There are monthly calls back and forth, and legal objections are discussed. The preamble disclaimer language added to the final rules is always debated and "the higher pay grades make the final decision." As to the legal analysis, the Assistant Regional Solicitor in Sacramento said, "MacDonald is not in my chain of command. We work for the Interior Secretary through the Solicitor. MacDonald found that out early in her career." The Assistant Regional Solicitor in Sacramento commented that he had never had a one-on-one discussion with MacDonald. He has raised objections to the rubber stamping of ESA packages at senior levels in the Department despite them being identified as legally insufficient at the regional level; he said, however, "Policy trumps science within the Assistant Secretary's corridor on many occasions."

The Assistant Solicitor for Fish and Wildlife, Solicitor's Office, DOI, Washington, D.C., said the bulk of their work is with the ED, CHD, and litigation issues with the ESA.

He described the typical process for legal analyses of ED and CHD reviews conducted at the regional office level. Sometimes, however, he said that in between the packages going from the Assistant Secretary's Office to the Chief of Staff's Office, they are reviewed by Deputy Associate Solicitor Barry Roth. The Assistant Solicitor for Fish and Wildlife said he provides legal advice (weaknesses in case, potential for legal suit, etc.) to Roth and usually it involves two points of consideration: one, whether to surname the document to avoid being held in contempt of court for failing to provide the Federal Register a rule by the court ordered deadline; and two, whether to surname the document as being defensible in court if challenged or surname the document noting the legal concerns raised by the Regional Solicitor's Office. The main concern is to publish the best decision possible within court deadline requirements.

According to the Assistant Solicitor for Fish and Wildlife , since the Bush Administration came into office in 2001, DOI senior management has conducted a balancing of risk factors involved with sending ED and CHD rules to the Federal Register with the knowledge that there are legal problems with the packages. Obviously, the said, the Assistant Secretary's Office policy agenda involves a certain amount of litigation risks and they are prepared to absorb expected losses.

The Assistant Solicitor for Fish and Wildlife said that in the past four years that Julie MacDonald has been with the Assistant Secretary's Office for Fish, Wildlife and Parks, over 75 percent of the legal reviews his office has received from the FWS western regional offices have not been surnamed.

The Assistant Solicitor for Fish and Wildlife was asked if he had felt any pressure on the ED and CHD issues from DAS MacDonald regarding the number of non-surnamed documents coming from the regions. He said he felt no pressure from MacDonald because she is not in his chain of command; rather, the pressure comes from the court deadlines his office has to meet.

The Assistant Solicitor for Fish and Wildlife related that Brian Waidmann, DOI Chief of Staff, wanted the Solicitor's Office opinion and surname on ED and CHD packages before they go to the Federal Register.

He commented on the preamble disclaimer language for critical habitat that the former Assistant Secretary had inserted into final CH rules. The Assistant Solicitor for Fish and Wildlife said that recently in a California federal court decision on Vernal Pools CH designation, the court said FWS' failure to consider the recovery benefits of a critical habitat designation was a key point in remanding the case.

[Ex. 5]

We interviewed Barry Roth, Deputy Associate Solicitor, Solicitor's Office, DOI, Washington, D.C., he stated that when ED and CHD review packages get to him, he is usually under a court ordered deadline to move them on to the Federal Register; this rarely leaves time to remedy legal problems with the packages. He acknowledged surnaming the packages before they go to the Federal Register to avoid contempt of court charges for missing court deadlines. Roth said meeting the deadlines is his main focus. He does due diligence in reviewing the legal analysis from the Regional Solicitor's Office, notes their legal concerns, and signs them. He understands that he is under no statutory requirement to surname; however, it is DOI Chief of Staff Brian Waidmann's policy that the package be surnamed before the final rule goes to the Federal Register.

Roth said the process for review, commenting, and surnaming has not worked well over the past few years. There has not been a lot of time to work out the legal problems associated with the packages before the court deadline arrives. Within the last year, Roth said the process has improved somewhat as the documents are being delivered with more than one day's notice.

Prior to Roth taking on the surnaming duty, the former Deputy Associate Solicitor, was in the position to last review the ED and CHD packages. Roth said the former Deputy Associate Solicitor more or less rubber stamped the packages with his signature due to the large amount of packages that arrived from the field because of time limits imposed by a court deadline. Roth said he has attempted to give the documents a more critical review before sending them to the Federal Register.

Roth stated that FWS had been instructed to use a boilerplate preamble disclaimer language favored by the former Assistant Secretary regarding critical habitat designations. It was seen as a legal obstacle by several of the Regional Solicitor's attorneys who review CHD packages, and it was recently struck down by a federal district court in California.

Roth related that the FWS work agenda is controlled by the litigation process regarding ED rule listings/delistings and CHDs. Roth used the term, "unfunded mandate on FWS" to describe how their work is affected by lawsuits. They do not have the budget to constantly conduct ED and CHD reviews under court deadlines, in addition to carrying out their normal duties.

Roth advised that he does not always agree with everything DAS MacDonald does; however, he did say she works hard and he has approached their business relationship as her "legal adviser." He normally talks to her on ED and CHD matters when subordinates, an attorney and the Assistant Solicitor for Fish and Wildlife, feel the need to elevate an issue. Roth said MacDonald customarily goes through FWS management with her comments and reservations on particular ED and CHD

matters. In matters where Roth and MacDonald have opposing views, he brings the issue to the attention of Solicitor David Bernhardt. Roth related that Bernhardt was focusing more on ESA issues than his predecessors.

Roth was asked if he had knowledge of MacDonald ever releasing deliberative process material outside of DOI, FWS, and the federal government, he recalled the Delta Smelt e-mail she released to the California Farm Bureau in 2004.

The OIG interviewed DOI Solicitor David Bernhardt concerning his role in the ED/CHD legal review process. Bernhardt echoed his subordinate Barry Roth's assertion that ED and CHD packages arrive at the Department usually under a court ordered deadline leaving little time for review before going to the Federal Register. The overriding concern is to avoid contempt of court for the Secretary of the Interior. Bernhardt said he has an obligation to give legal advice to the Secretary as to whether these ED/CHD packages are a bad risk or an assumable risk, given their legal sufficiency, and to provide the Secretary with options.

Recently, Bernhardt sent a memorandum to his office attorneys that included a section on the surnaming of documents. He reminded them that the placing of your surname on a document is an attestation that they have inquired into and analyzed the factual and legal matters presented in the document and are satisfied that the matter is in compliance with applicable law. Bernhardt advised them that it is appropriate to include with their surname comments that describe the scope of the review or articulate reservations to which their surname is subject, consistent with the duty of due diligence.

Bernhardt acknowledged that he has the final decision in differences between Roth and DAS MacDonald regarding legal concerns with ED/CHD packages. He views MacDonald as a legal client to whom he provides advice.

When we interviewed FWS Deputy Director Marshall Jones, he stated several Senior Executive Service employees within the FWS regional offices have contemplated filing hostile work environment complaints. He said none of these individuals, however, have gone forward with their complaints. Jones commented that it seemed like MacDonald had "political heat" on her to change the science behind the endangered species reviews.

According to Jones, MacDonald was the former Assistant Secretary's "attack dog" regarding ED issues. Jones stated that after the new appointment of Hall as FWS Director, MacDonald had moderated her interference. He said Hall had "drawn a line in the sand" with MacDonald and had stated that she has the right to change policy but not the science coming from the field.

Jones also speculated that MacDonald may have been sharing internal FWS ED documents with outside sources. He said he based this suspicion on the sources MacDonald used to challenge FWS field biologist findings. Jones explained that FWS is also being consistently sued in federal court by private sector entities for missing endangered species review deadlines. He cited the PLF as a legal group who regularly sues FWS for missing review dates.

Jones stated that while MacDonald has been correct on several occasions in her challenges of field research, he emphasized that her position is one of political policy – not scientific finding.

15

We interviewed Dale Hall, FWS Director, about the allegations against MacDonald. He stated, "A lot of that is true". He said that since October 2005, when he was sworn in, he has been involved in a "running battle" with MacDonald over the chain of command in FWS and her repeated attempts to circumvent it.

As an example of her interference, Hall cited MacDonald's involvement of a FWS study of the Southwest Willow Flycatcher, a small bird placed on the ED list in 1995 and whose habitat stretches from Arizona through New Mexico and into Southern California. He said the FWS Southwest Region was studying the Flycatcher in order to be in compliance with a September 30, 2003 opinion issued by the Federal District Court of New Mexico (*Center for Biological Diversity v. Norton*). Hall was the Regional Director for that office at the time. He said the biologists were identifying primary constituent elements, which are elements that endangered species need to live. One of these elements was the nesting range of the Flycatcher. Hall explained that birds have flying radiuses around their nests, and the field biologists determined that the Flycatcher's radius or range was 2.1 miles. He said MacDonald decided that 1.8 miles was more accurate, and she then argued with the field personnel about that issue.

Hall said he told the field staff to inform her of the science behind their findings, and if she still said to make the change, to go ahead and do so – but to document everything. He said that in the end, MacDonald had them change the range to 1.8 miles because she was concerned that the 2.1 radius figure would extend into California. Hall stated that MacDonald had a particular interest in all of the ED work in California, where her husband maintained the family ranch, and she had previously served in various California State Legislature positions ranging from staff consultant to a former Republican Senate Minority Leader, to Associate Secretary of Health and Welfare and Deputy Secretary for Legislative Affairs under a former California Governor.

Hall said he had a "face down" with MacDonald over an issue involving the Kootenai River sturgeon, a white sturgeon fish that resides in Montana and Idaho. Hall explained that the sturgeon needed certain levels of river flow in order to spawn, and the goal is to have reasonable river flows for spawning without affecting the operations of the dams[1] more than necessary.

Hall, a wildlife biologist, noted that flow levels are measured in ranges and are not tied into one specific number. He said the field established the range for the Kootenai sturgeon between 2.3 and 5.9 cubic feet per second. He said MacDonald wanted to be specific and asked the field to change the final figure to 5.9. Hall said he challenged MacDonald on her assertion and asked her to put it in writing but that she ultimately relented and they kept the 2.3 to 5.9 range.

Hall stated that MacDonald later circumvented the chain of command and went directly to the field biologists at the river to request documents and to remind them to "be sure" about the science. He noted that the dam operators would have benefited from using the 5.9 figure.

We interviewed the former Assistant Secretary for Fish, Wildlife and Parks, who related that he did not recall anyone in FWS complaining to him regarding the managerial style of MacDonald. A quote from the former Assistant Secretary in a *Time* magazine article from December 13, 2004, regarding MacDonald's critique of the Sage Grouse review stated, "She is highly qualified, an engineer, extremely competent, and reads every single paper cited" by federal biologists in their

---

[1] There are at least five dams along the river's route.

reviews. The former Assistant Secretary said he had complete confidence in MacDonald's abilities, first as his Special Assistant and then as Deputy Secretary. She frequently spoke for him in matters regarding ED and CHD with FWS. The former Assistant Secretary said he spoke on a regular basis with FWS Regional Directors regarding ED and CHD final packages and their associated problems. He stated he was personally involved in these issues as they were matters of importance to him.

The OIG interviewed another former Assistant Secretary for Fish, Wildlife and Parks, who subsequently assumed the position and who supervised MacDonald for approximately seven months before accepting a position in the private sector. The other former Assistant Secretary stated that there were several disagreements between FWS Director Hall and MacDonald over chain of command issues and MacDonald's penchant for communicating directly with field employees over scientific reporting. The other former Assistant Secretary said Hall and MacDonald differed over the role the Deputy Assistant Secretary should have in reviewing and editing the scientific reports coming from the field. He described himself as a "referee" between Hall and MacDonald in several meetings.

The other former Assistant Secretary commented that he had heard that several FWS regional directors and office managers were contemplating filing hostile work environment complaints against MacDonald. He said he had heard that MacDonald "got into the face" of FWS personnel and that she had a fundamental suspicion of FWS employees because of her belief that they were close with the environmental groups. He said he has a philosophical difference with MacDonald on how to treat employees, and he did not agree with her approach.

When we interviewed Julie MacDonald, she said she is responsible for reviewing, commenting, and at some times editing critical habitat designation reports and five-year endangered species reviews. MacDonald said she views her involvement in the Endangered Species Program as part of her duties, and she challenges the science produced by FWS field personnel and makes them accountable for the citations and rules they refer to in field reports. She admitted that she is not always right, as in the case of the vernal pools, but added, "The figures were a mistake and very embarrassing, but they didn't make a difference in the outcome of the review."

DAS MacDonald considered the Western Regional Solicitor's Offices to be outside their legal realm in their opinions and analysis regarding ESA and CHD issues." She accused the FWS of being lax in submitting ESA/CHD packages to DOI senior management before court ordered deadlines were imminent.

During her interview, DAS MacDonald was asked why she ignored or discounted the Regional Solicitor's legal opinion concerning ED/CHD packages. MacDonald replied it was a matter of policy, it was what worked best, and it was the result of the risk balancing that takes place between policy and legal insufficiency. MacDonald commented that the former Assistant Secretary was "very" involved regarding ED/CHD issues [Ex. 5].

MacDonald echoed Roth's comment regarding Waidmann wanting everything surnamed before leaving DOI and going to the Federal Register, describing it as his "informal and unwritten" policy. MacDonald agreed with Roth stating that in policy disputes with the DOI Solicitor's Office, she consults with Bernhardt for resolution.

17

**Misuse of Position**

As our investigation of MacDonald progressed, in addition to the initial allegations, we developed information that MacDonald had misused her position and disclosed nonpublic information to private sector sources.

On April 4, 2006, OIG investigators reviewed MacDonald's government e-mails, using the keyword "Pacific Legal Foundation" as a search item because of the number of times this private sector legal entity appears in newspaper and other media articles related to court decisions involving ED.

The e-mail search revealed that MacDonald had sent an FWS document titled, "Interim Guidance for the Designation of Critical Habitat Under the Endangered Species Act," with an attachment that consisted of 147 pages, to a PLF attorney. MacDonald sent this e-mail on February 4, 2004, following an exchange of e-mails she had with the PLF attorney on the subject of draft CHD policy.

In those e-mails, the PLF attorney requested information from MacDonald, stating, "Any information that you can share regarding the draft policy, and general guidance as to the process/timetable, would be greatly appreciated." MacDonald wrote back, "I will send you a copy of the draft but please do not share it with anyone else. It's still undergoing revision, although the fundamental legal/policy approach will not change. Does that work for you?" The PLF attorney acknowledged, "…yes, that would definitely work. You have my word that it won't go beyond me. Thanks [the PLF attorney's first name]."

Marshall Jones identified the e-mail to the PLF attorney containing the Interim Critical Habitat Guide as being nonpublic information and classified as internal DOI/FWS documents. Jones stated that these documents were for "FWS eyes only" and should not have been disseminated outside of DOI.

*Agent's Note: According to Deputy Director Jones, the Interim Guidance for Critical Habitat Designation has never been publicly released or published for comment. Jones said it remains an FWS internal document and probably will remain so indefinitely. During his interview, Jones speculated that MacDonald may have been sharing internal FWS ED documents with outside sources; however, he had no evidence to substantiate his contention.*

The former Assistant Secretary stated that he did not give MacDonald permission to release the Interim Guidance for Critical Habitat Designation Policy to the attorney for the PLF. He added that he never knowingly gave MacDonald a blanket authorization to release nonpublic information. The former Assistant Secretary stated that he authorized MacDonald to share matters with whomever necessary in the course of consultations on issues.

The other former Assistant Secretary also said he never gave MacDonald permission to release nonpublic information. He admitted that the issue of MacDonald disclosing nonpublic information was a rumor within Fish, Wildlife and Parks; however, he said the subject was not officially brought to his attention in his official capacity as Assistant Secretary.

During our review, we found another e-mail, dated March 30, 2004, which MacDonald sent to a non-governmental address. This e-mail included an attachment titled, "Draft [Delta Smelt] 5-Year Review," which was an FWS review of a Northern California endangered species, the Delta Smelt.[2] During her interview, MacDonald identified the address as her private e-mail account. She said she often transmitted DOI/FWS documents to her home computer for use during off hours.

We found the Draft Delta Smelt five-year review was a highly controversial issue within FWS. In fact, the media heavily reported on MacDonald and her attempts to derail the status review on the Smelt because it did not support removing protections for the Smelt. FWS released its status review on the Delta Smelt on March 31, 2004. Originally, the review had recommended that the threatened listing be continued; however, on April 1, 2004, MacDonald sent an e-mail to FWS CNO Manager, the CNO Assistant Manager, and the Chief of ESD in the Sacramento office, stating that "...the facts represented by the Service [released status review] provide an oversimplified and misleading characterization of what is happening...I have asked the press release be stopped until we have an opportunity to more accurately characterize the finding and its basis".

***Agent's Note:*** *The FWS biologists from the Sacramento office who completed their review of the Delta Smelt five-year draft in March 2004, took the position that there was no justification for delisting the Smelt, while MacDonald opposed the field decision through her comments in the margins of the Smelt draft review dated March 30, 2004. As of this date, the Farm Bureau is no longer a part of the Smelt lawsuit against FWS.*

We discovered several other e-mails sent from MacDonald's government computer to internet subscriber addresses outside of the Department. The title of two such e-mails was the "Delta Smelt letter/report/press release". These e-mails contained MacDonald's critical comments regarding the FWS Sacramento office's release of a Delta Smelt review letter to the Congressional Affairs office in Washington, D.C..

We sent an Inspector General subpoena to AOL for subscriber information for the e-mail accounts to which MacDonald sent the documents. We identified the recipients as an attorney-advisor in the Solicitor's Office at MIB, the father of an individual MacDonald met online, and her child.

Two weeks after MacDonald sent the above-mentioned e-mails, the California Farm Bureau made a formal FOIA request for the e-mail and any responses to it (MacDonald had provided a copy of the e-mail to a Farm Bureau lobbyist and personal friend). An examination of the FOIA file revealed that the e-mail was designated exempt from public disclosure by DOI's FOIA office as "inter-agency or intra-agency memorandums or letters" on July 7, 2004.

A further review of MacDonald's government e-mails showed a large Environmental Protection Agency (EPA) file that was sent to a private AOL account. MacDonald had also sent the same document to another account ending in *chevrontexaco.com*.

Additional reviews of MacDonald's e-mails show that she regularly meets and communicates with officials and lobbyists working for the California Farm Bureau Federation and the Building Industry Association of Southern California. Both of these entities have launched lawsuits against

---

[2] An IG subpoena to MSN/Hotmail did not disclose relevant subscriber information other than the e-mail address was initiated in Los Angeles, CA, in 1999.

FWS to force it to review whether certain species should continue to be listed as endangered. Based on the analysis of several of these e-mails, MacDonald appears to have a close personal and business relationship with a Farm Bureau lobbyist.

Examples include an October 4, 2002 e-mail where the Farm Bureau lobbyist asked MacDonald for information on what FWS has done with the Office of Management and Budget guidelines attached to the e-mail. He also asked about the status of his request for a meeting between the former Assistant Secretary and two Farm Bureau representatives to discuss a court decision concerning FWS land-use restrictions.[3] The Farm Bureau lobbyist requested feedback from MacDonald on these subjects, and MacDonald provided answers in a subsequent e-mail on October 17, 2002.

We found another e-mail, dated September 30, 2003, from the Farm Bureau lobbyist to MacDonald, where he asked her, "with respect to the FY 04 appropriations/budget – any issue regarding the funding for the Fish and Wildlife Service to do the 5 year delta smelt review? where would the money come from?"

*Agent's Note: MacDonald requested through a series of e-mails to subordinate employees, including the FWS Associate Director for Budget, Planning and Human Resources, to gather the above information for her, MacDonald then passed it onto the Farm Bureau lobbyist.*

In another example of MacDonald's close relationship with the California Farm Bureau Federation, she voluntarily provided the previously mentioned Delta Smelt e-mail to an attorney for the California Farm Bureau Federation, who immediately filed the e-mail with the U.S. District Court in Washington, D.C. The court had been reviewing the Delta Smelt case and Farm Bureau's attorney asked the judge to reopen it, citing disarray among the federal defendants as demonstrated by the MacDonald e-mail.

Affidavits filed with the court in the Delta Smelt case indicate that the attorney and the lobbyist testified in District of Columbia Federal District Court that MacDonald provided the objectionable e-mail to the lobbyist at the Farm Bureau attorney's request.

As documented through her government e-mails, DAS MacDonald has met with, lunched with, spoken to, allowed access to high level DOI officials, and provided nonpublic information on FWS internal deliberations to lobbyists like the California Farm Bureau Federation lobbyist and private sector entities such as the California Farm Bureau Federation and PLF over the past four years.

During her interview, MacDonald admitted to sending the Interim Critical Habitat Guide via her government e-mail account to a PLF attorney. She acknowledged that the document would not have been released under a Freedom of Information Act (FOIA) request; however, she said that did not mean she could not release it to a personal friend, the PLF attorney, as long as the attorney would not post the document on the PLF's Web site. Shortly thereafter, MacDonald changed her statement and said she may have received authorization to release the document to the PLF attorney from her supervisor, the former Assistant Secretary.

---

[3] *Arizona Cattle Growers v. U.S. FWS*

According to MacDonald, an attorney in the Solicitor's Office works FWS legal issues for the Department, and in that capacity, she has sent numerous FWS documents to the attorney's home computer for review (when on leave/after hours).

MacDonald confirmed that she also sent the Delta Smelt document to an on-line game friend through his father's e-mail account. MacDonald said is acquainted with the on-line friend through internet role-playing games. She said she engages in these games to relieve the stress created by her job; however, she said she has not played while at work. When asked why she would e-mail an internal DOI document to a private citizen, MacDonald replied, "I was irritated [with what was happening regarding the subject of the document] and tried to explain my irritation over the phone; however, I sent it to him to read for a better understanding."

*Agent's Note: The on-line game friend is not professionally or personally affiliated with DOI or any of its entities. MacDonald continues to play games on the internet with the on-line friend; however, she has not sent any internal DOI information to him since her first interview last summer.*

MacDonald could offer no explanation as to why she sent her child an e-mail containing an internal DOI/FWS document other than she feels frustrated at times and likes to have third party reviews of these documents. MacDonald opined that she sent FWS documents to the on-line game friend and her child to have another set of eyes give an unfiltered opinion of them, negative comments included.

MacDonald admitted to sending "Watershed proposed draft rule by the EPA: proposal of a new framework for accomplishing the water quality planning and management provisions of the Clean Water Act" via government e-mail to a personal friend, whose e-mail address ended in *chevrontexaco.com.* She said she did not remember why she sent the document as an attachment to the friend but stated, "It probably wasn't releasable." When MacDonald was questioned about the second e-mail, containing a large EPA file, sent to another e-mail address ending in *chevrontexaco.com,* MacDonald could not recall whom this e-mail address belonged to.

MacDonald acknowledged having contact with the Farm Bureau and other lobbying entities, including a professional relationship with the California Farm Bureau Federation lobbyist. She stated that she also has a social relationship with the lobbyist. However, she denied giving preferential treatment to the Farm Bureau lobbyist or his clients. She stated, "I try to respond to everyone/public when asked for information. It's my duty as a public servant." MacDonald stated that the Farm Bureau lobbyist has no more access than any other person seeking information on FWS programs.

Title 5 of the Code of Federal Regulations (C.F.R.) § 2635.101 Basic Obligation of Public Service states:

Employees shall act impartially and not give preferential treatment to any private organization or individual.

Employees shall endeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards set forth in this part. Whether particular circumstances create an appearance that the law or these standards have been violated shall be determined from the perspective of a reasonable person with knowledge of the relevant facts.

Title 5 of the Code of Federal Regulations (C.F.R.), Chapter XVI, Subpart G, Standards of Ethical Conduct for Employees of the Executive Branch § 2635.703 Use of Nonpublic Information states:

(a) *Prohibition.*    An employee shall not…allow the improper use of nonpublic information to further his own private interest or that of another, whether through advice or recommendation, or by knowing unauthorized disclosure.

(b) *Definition of nonpublic information.* … Is information that the employee gains by reason of Federal employment and that he knows or reasonably should know has not been made available to the general public.    It includes information that he knows or reasonably should know:

(1) Is routinely exempt from disclosure under 5 U.S.C. 552 or otherwise protected from disclosure by statute, Executive order or regulation;

(2) Is designated as confidential by an agency; or

(3) Has not been actually disseminated to the general public and is not authorized to be made available to the public on request.

An Associate General Counsel of the OIG's Office of General Counsel reviewed the details of our investigation and advised that the C.F.R. had been violated under 5 C.F.R. § 2635.101 Basic Obligation of Public Service because of the appearance of preferential treatment and 5 C.F.R. § 2635.703 Standards of Conduct, Use of Nonpublic Information.

## Subject(s)

Julie MacDonald, Deputy Assistant Secretary, Fish, Wildlife and Parks, Department of the Interior, Washington, D.C.

## Disposition

The results of this investigation will be forwarded to the Assistant Secretary for Fish, Wildlife and Parks for appropriate administrative action as warranted.[Ex.5]

22

# Exhibit C:

# Freedom of Information Act Request from Mark Salvo to Johnny Hunt, *et al*. (Apr. 18, 2006)

# FREEDOM OF INFORMATION ACT REQUEST

## THE SAGEBRUSH SEA CAMPAIGN

2224 W. PALOMINO DRIVE
CHANDLER, ARIZONA 85224
503/757-4221
MARK@SAGEBRUSHSEA.ORG

April 18, 2006

Johnny Hunt
FOIA Officer
U.S. Fish and Wildlife Service
Division of Policy and Directives Management
4401 N. Fairfax Drive
Room 222, Arlington Square
Arlington, Virginia 22203

Cathey Willis
FOIA Coordinator
U.S. Fish and Wildlife Service
Region 6
P.O. Box 25486
Denver, Colorado  80225

Allan Pfister
Western Colorado Supervisor
U.S. Fish and Wildlife Service
Ecological Services Field Office
764 Horizon Drive, Building B
Grand Junction, Colorado 81506–3946

Dear FOIA Officers:

I am writing on behalf of the Sagebrush Sea Campaign to request public **documents possessed by the U.S. Fish and Wildlife Service that comprise the "administrative record" for the final listing determination for Gunnison sage-grouse (*Centrocercus minimus*) as threatened or endangered under the Endangered Species Act (71 Fed. Reg. 19954).** This request is submitted pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552 et seq., U.S. Department of Interior FOIA regulations, 43 C.F.R. 2 et seq., and other applicable authority.

Please exclude the following documents from your response to this request.

1.  Petition to list Gunnison sage-grouse under the Endangered Species Act.

2.  Candidate Notices of Review published by the Fish and Wildlife Service.

3.  Connelly, J. W., S. T. Knick, M. A. Schroeder, S. J. Stiver. Range-wide Conservation Assessment of Greater Sage-grouse and Sagebrush Habitats. Western Association of Fish and Wildlife Agencies. (June 2004) (unpublished report).

4.  Western Governors' Association. Conserving Greater Sage Grouse: A compilation of efforts underway on state, tribal, provincial, and private lands. (undated, unpublished report).

5.  Western Governors' Association. Conserving Greater Sage Grouse – Appendix: Examples of partnerships and strategies at work across the West. (undated, unpublished report).

6.  Peer-reviewed papers and research published in publicly available scientific journals.

By the term "documents," this request adopts the definition of the Federal Records Act, 44 U.S.C. § 3101 et seq., which includes "all papers, maps, photographs, machine readable materials or other documentary materials, regardless of physical form or characteristics, made or received by an agency of the United States Government under Federal law or in connection with the transaction of public business…." *Id.* at § 3301. This definition includes paper documents, electronic mail (e-mail), memoranda, notes, guidelines, and internal policy documents without exception. All of the above information should be easily available and a matter of public record.

Please tender responsive documents in electronic format whenever possible.

<u>Fee Waiver</u>

Pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 43 C.F.R. § 2.19(b), we hereby request a fee waiver for all copying costs, mailing costs, and other costs related to locating and tendering responsive documents. *See Judicial Watch v. Rossotti*, 326 F.3d 1309 (D.C. Cir. 2003). The release of these documents is not for commercial use and is in the public interest because it will significantly contribute to public understanding of government operations, particularly as they relate to Gunnison sage-grouse conservation.  Please note that the U.S. Fish and Wildlife Service, Department of Defense, National Park Service, USDA-Forest Service, Bureau of Land Management, Bureau of Indian Affairs, Department of Energy, Bureau of Reclamation, and the U.S. Geological Survey have granted requests for fee waivers in their provision of documents to the Sagebrush Sea Campaign (formerly part of American Lands Alliance) in the past.

In considering whether the Sagebrush Sea Campaign meets fee waiver criteria, the Fish and Wildlife Service must consider that FOIA carries a presumption of disclosure and that the fee waiver amendments of 1986 were designed specifically to allow organizations such as the

Sagebrush Sea Campaign access to government documents without the payment of fees. As stated by one Senator, "[a]gencies should not be allowed to use fees as an offensive weapon against requesters seeking access to Government information . . ." 132 Cong. Rec. S. 14298 (statement of Sen. Leahy). In interpreting these amendments, the Ninth Circuit Court has held that the amended statute "is to be liberally construed in favor of waivers for noncommercial requesters." *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1284 (9th Cir. 1987) (citing Sen. Leahy). Both the Ninth Circuit and the District of Columbia Circuit courts have stated that the amendments' main purpose were "to remove the roadblocks and technicalities which have been used by various Federal agencies to deny waivers or reductions of fees under the FOIA." *Id.*; *Judicial Watch*, 326 F.3d at 1315.

Thus, both Congress and the courts are clear in their interpretation that the main legislative purpose of the fee waiver amendments is to facilitate access to agency records by noncommercial requesters and "watchdog" organizations, such as conservation organizations, which use FOIA to monitor, analyze, interpret, publicize and challenge government decisionmaking. As the District of Columbia Circuit Court has stated, this waiver provision was added to FOIA "*in an attempt to prevent government agencies from using high fees to discourage certain types of requesters and requests*," in clear reference to requests from journalists, scholars, and public interest groups. *Better Gov't Ass'n v. Department of State*, 780 F.2d 86, 93-94 (D.C. Cir. 1986), quoting *Ettlinger v. FBI*, 596 F. Supp. 867, 876 (D. Mass. 1984) (emphasis added).

The following information concerning the requested documents and the Sagebrush Sea Campaign is relevant to our application for a fee waiver (responding to fee waiver criteria listed in Department of Interior FOIA regulations, Appendix D [*see* 67 Fed. Reg. 64551 (Oct. 21, 2002)]):

1. *How do these documents concern the operations or activities of the government?*

   Documents requested concern the Fish and Wildlife Service's implementation of the Endangered Species Act (ESA), and particularly the agency's final listing rule for Gunnison sage-grouse (71 Fed. Reg. 19954). Actions taken pursuant to the ESA are a specific and identifiable government activity. *See Judicial Watch*, 326 F.3d at 1313 ("[R]easonable specificity is all that FOIA requires with regard to this factor.")

2. *Will disclosure of the documents contribute to public understanding of government operations or activities?*

   The public's interest in sage grouse has increased dramatically since 1999, when grassroots conservation organizations hosted a Sage Grouse Status Conference in Boise, Idaho, to explore ways to conserve and restore the species. The Sagebrush Sea Campaign (formerly part of American Lands Alliance) and partners submitted a petition to list Gunnison sage-grouse under the ESA in 2000. Hundreds of newspaper articles and radio programs have focused on Gunnison sage-grouse and their habitat over the past six years. Recent news stories of the potential affects of listing Gunnison sage-grouse on public land users and private property owners have elevated public interest in the species to ever higher levels.

Petitioners and other conservation and avian organizations representing thousands of citizens, as well as other federal and state agencies are affected by the Fish and Wildlife Service's final rule on Gunnison sage-grouse. The Sagebrush Sea Campaign seeks the requested documents as part of our continuing campaign to educate the public about the agency's decisionmaking process.

3. *Will disclosure of the documents contribute significantly to public understanding of government operations and activities?*

Formerly part of American Lands Alliance, the Sagebrush Sea Campaign is now sponsored by Forest Guardians. The Sagebrush Sea Campaign (www.sagebrushsea.org) focuses public attention and conservation resources on protecting and restoring the vast sagebrush-steppe landscape. The campaign participates in public planning processes, advocates for natural resource protection, and uses education, research, legislation and litigation to conserve and restore the Sagebrush Sea for present and future generations. The Sagebrush Sea Campaign is based in Chandler, Arizona.

Forest Guardians (www.fguardians.org) is a 501(c)(3), non-profit membership organization dedicated to preserving and restoring native wildlands and wildlife in the American Southwest through fundamental reform of public policies and practices. Forest Guardians achieves its goals through education, public policy initiatives, and litigation. Forest Guardians has 2,000 members and maintains offices in Santa Fe, New Mexico and Denver, Colorado.

As recognized authorities on public lands management, both the Sagebrush Sea Campaign and Forest Guardians possess the necessary expertise to analyze and interpret information from the requested documents, and to disseminate this information to the public. Conservation and other organizations and the public regularly seek information and analysis from the Sagebrush Sea Campaign concerning sage grouse conservation and rely on its dissemination of information about the species. This recognized expertise and organizational capacity, and the important issues described herein, assures that provision of the requested documents to the Sagebrush Sea Campaign will significantly contribute to public understanding of government operations and activities. Documents provided by the Fish and Wildlife Service to the Sagebrush Sea Campaign in the past have contributed to a variety of studies and related projects that have increased the public's understanding of government operations as they pertain to greater sage-grouse and Gunnison sage-grouse.

Both the Sagebrush Sea Campaign and Forest Guardians use a variety of methods to disseminate information to the public, including electronic and print newsletters; news releases; presentations to members; presentations to the general public; publication of reports, factsheets and white papers; and postings on our respective web sites (www.sagebrushsea.org, www.fguardians.org).

The Sagebrush Sea also routinely shares information it has obtained with other organizations as part of collaborative projects. For example, information received from federal agencies has been shared with Animal Damage Review, California Native Plant Society, California

4

Wilderness Coalition, Center for Biological Diversity, Center for Native Ecosystems, Committee for Idaho's High Desert, Conservation Northwest, Friends of Nevada Wilderness, Idaho Conservation League, National Wildlife Federation, Natural Resources Defense Council, Oregon Natural Desert Association, Predator Project, Predator Defense Institute, Sierra Club, Western Watersheds Project, and the Wilderness Society. Information received from federal agencies is also distributed at conferences throughout the country. Finally, information provided to the Sagebrush Sea Campaign informs staff who are frequently interviewed by news media and take part in public forums to analyze and interpret government programs and activities.

As two of only a few organizations specifically dedicated to the preservation and protection of lands and waters of the sagebrush steppe, the Sagebrush Sea Campaign and Forest Guardians are important sources of information for both their members and the general public who have an interest in the health and management of our public lands.

Information received from this FOIA request will be presented to the public through one or more of the above means. In view of these facts, it can be seen that information obtained from this FOIA request will contribute to an understanding of government programs by the public-at-large, as opposed to the individual understanding of the requester or a narrow segment of interested persons.

<u>Reply to Request</u>

FOIA provides an agency twenty (20) working days to reply to an information request. If you need more time to process this request, please notify the Sagebrush Sea Campaign of the delay. We would also appreciate an opportunity to work with the Fish and Wildlife Service to limit the request in order to expedite the provision of documents.

Thank you for your attention to this request. Please contact me at mark@sagebrushsea.org with any questions. We look forward to hearing from you.

Sincerely,

Mark N. Salvo
Director

# Exhibit D:

# Index for "Administrative Record for Gunnison Sage-grouse Determination of April 18, 2006" ("FOIA AR Index")

**Administrative Record**
**for**
**Gunnison Sage-grouse Determination**
**of**
**April 18, 2006**

**Table of Contents**

Tab 1  Budget and Guidance Documents
Tab 2  Candidate Conservation Agreement with Assurances
Tab 3  Candidate Forms
Tab 4  Conference Call Notes
Tab 5  Draft Critical Habitat Information
Tab 6  Data Call Information in Addition to Unpublished Data Call Literature Cited
Tab 7  Determination and Public Outreach
Tab 8  Determination Personal Communications Cited
Tab 9  Determination Published Literature Cited
Tab 10 Determination Unpublished Literature Cited
Tab 11 Drafts of Determination
Tab 12 Garton Analysis, Peer Review Documents, and Additional Information on Garton Analysis
Tab 13 Genetic and Taxonomy Information
Tab 14 Lawsuit and Petition Documents
Tab 15 Mapping Information
Tab 16 Miscellaneous Background Documents
Tab 17 Outlines and Briefings
Tab 18 Draft PECE Information
Tab 19 Preliminary Population Trends, GUSG Rangewide Conservation Plan Viability Analysis, and Threat Ranking Information
Tab 20 Public Comments on Listing

TAB 1

**Budget and Guidance Documents**

| BATES NO. | DATE | DOCUMENT | PAGES |
|---|---|---|---|
| | 03/10/05 | Document Clearance Process | 2 |
| | 04/06/05 | On-line Rule Making References | 8 |
| | 06/07/05 | CH exclusion e-mail from K. Johnson | 1 |
| | 07/26/05 | Reference lists for rules | 2 |
| | 8/18/05 | Cost estimates for listing and CH e-mail | 1 |
| | 8/23/05 | GUSG FY06 Budget Projection | 1 |
| | 9/06/05 | Pat Mehlhop FR Citation Need E-mail | 2 |
| | 10/17/05 | Language to Include in Rules E-mail | 2 |
| | 10/26/05 | CH designation benefits memo from Director | 3 |
| | 12/08/05 | Package controversies e-mail from B. Stevens | 1 |

TAB 2

**Candidate Conservation Agreement with Assurances**

| BATES NO. | DATE | DOCUMENT | PAGES |
|---|---|---|---|
| | 05/03/05 | Draft Appendix A | 3 |
| | 05/03/05 | Draft Appendix B | 1 |
| | 05/03/05 | Draft Appendix C | 7 |
| | 05/03/05 | Draft Appendix D | 51 |
| | 05/03/05 | Draft CDOW CCAA permit application | 10 |
| | 05/03/05 | Draft CCAA cover page | 1 |
| | 05/03/05 | Draft CCAA | 20 |

TAB 3

**Candidate Forms**

| BATES NO. | DATE | DOCUMENT | PAGES |
|---|---|---|---|
| | 01/18/00 | Candidate Form for 2000 | 14 |
| | 10/17/01 | Candidate Form for 2001 | 11 |
| | 06/03/02 | Candidate From for 2002 | 15 |
| | 04/05/04 | Candidate Form for 2003 | 21 |
| | 05/02/05 | Candidate Form for 2004 | 26 |

TAB 4

**Conference Call Notes**

| BATES NO. | DATE | DOCUMENT | PAGES |
|---|---|---|---|
| | 01/05/05 | Conference call notes and briefing | 3 |
| | 02/11/05 | Conference call notes | 1 |
| | 03/10/05 | Conference call notes | 1 |
| | 03/21/05 | Conference call notes | 1 |
| | 03/24/05 | Conference call notes | 2 |
| | 03/24/05 | Conference call notes TI | 2 |

| | | |
|---|---|---|
| 04/07/05 | Conference call notes | 2 |
| 04/08/05 | Conference call notes | 1 |
| 04/15/05 | Conference call notes TI | 1 |
| 04/15/05 | Conference call notes | 16 |
| 04/22/05 | Conference call notes TI | 1 |
| 04/22/05 | Conference call notes | 8 |
| 05/13/05 | Conference call notes | 1 |
| 06/15/05 | Conference call notes TI | 1 |
| 06/15/05 | Conference call notes | 1 |
| 07/21/05 | Conference call notes | 1 |
| 07/26/05 | Conference call notes | 1 |
| 08/16/05 | Conference call notes TI | 4 |
| 08/16/05 | Conference call notes | 3 |
| 08/23/05 | Conference call notes and briefing | 4 |
| 08/24/05 | Conference call notes TI | 2 |
| 08/24/05 | Conference call notes | 1 |
| 09/01/05 | Conference call  notes | 1 |
| 09/07/05 | Conference call notes and questions | 3 |
| 09/14/05 | Conference call notes TI | 1 |
| 09/14/05 | Conference call notes | 1 |
| 09/21/05 | Conference call notes TI | 2 |
| 09/21/05 | Conference call notes | 1 |
| 09/28/05 | Conference call notes TI | 1 |
| 09/28/05 | Conference call notes | 1 |
| 10/05/05 | Conference call notes | 2 |
| 10/19/05 | Conference call notes TI | 1 |
| 10/19/05 | Conference call notes | 1 |
| 10/25/05 and 10/26/05 | E-mails and conference call notes | 4 |
| 10/26/05 | Conference call notes TI | 2 |
| 11/01/05 | Conference call agenda e-mail | 1 |
| 11/03/05 | Conference call notes | 2 |
| 11/10/05 | Conference call notes | 1 |
| 11/14/05 | Conference call notes TI | 2 |
| 11/14/05 | Conference call notes | 1 |
| 11/16/05 | Conference call notes | 1 |
| 11/22/05 | Conference call notes | 1 |
| 11/23/05 | Conference call notes | 1 |
| 11/29/05 | E-mail agenda for 12/01/05 conference call | 1 |
| 12/01/05 | Conference call notes TI | 1 |
| 12/01/05 | Conference call notes | 1 |
| 12/16/05 | Conference call notes | 1 |
| 01/12/06 | Conference call notes TI | 1 |
| 01/12/06 | Conference call notes | 1 |
| 01/18/06 | Conference call notes | 1 |

| | 02/23/06 | Conference call notes | 1 |
| | 03/00/06 | Conference call notes for both dates | 1 |
| | 04/02/06 | | |
| | 03/00/06 | Conference call notes first page of 03/00/06 | 1 |

TAB 5

**Draft Critical Habitat Information**

| BATES NO. | DATE | DOCUMENT | PAGES |
|---|---|---|---|
| | 00/00/05 | Draft Critical Habitat patches and acreages | 5 |
| | 00/00/05 | List of 18 Draft CH units and total acreage | 1 |
| | 03/25/05 | Gunnison sage-grouse timeline | 1 |
| | 04/18/05 | Proposed CH concept paper e-mail | 1 |
| | 04/18/05 | Proposed CH concept paper attachment 1 | 37 |
| | 07/03/05 | Proposed critical habitat concept paper e-mail | 1 |
| | 07/03/05 | Proposed critical habitat concept paper | 15 |
| | 10/13/05 | Draft CH concept paper | 10 |
| | 11/04/05 | E-mail on draft CH concept paper | 1 |
| | 11/04/05 | Concept paper attachment 1 | 11 |

TAB 6

**Data Call Information in Addition to Unpublished Data Call Literature Cited**

| BATES NO. | DATE | DOCUMENT | PAGES |
|---|---|---|---|
| | 03/08/05 | Data request outline e-mail from J. Garner | 1 |
| | 03/08/05 | Proposed rule information request fax to S. Whiteskunk | 11 |
| | 03/08/05 | Proposed rule information request e-mail to B. Banulis | 1 |
| | 03/08/05 | Proposed rule information request e-mail to C. Wagner | 1 |
| | 03/08/05 | Proposed rule information request e-mail to agencies | 1 |
| | 03/09/05 | Proposed rule information request e-mail to E. Neilson | 1 |
| | 03/09/05 | Proposed rule information request e-mail to L. Romin | 1 |
| | 03/10/05 | Proposed rule information request e-mail to T. Black | 1 |
| | 03/10/05 | Proposed rule information request e-mail to Utah BLM | 1 |
| | 03/16/05 | Proposed rule information request hard copy | 10 |
| | 03/23/05 | E-mail to AZ and NM of intent to write proposed rule | 1 |
| | 04/07/05 | Poncha Pass data call information from P. Clark USFS | 12 |
| | 04/07/05 | Poncha Pass grazing allotment spreadsheet | 2 |
| | 04/07/05 | Poncha Pass weeds information | 1 |
| | 04/08/05 | Dove Creek grazing allotment spreadsheet | 1 |
| | 06/17/05 | E-mail from K. Nickell on DC and SMB questions | 5 |

TAB 7

**Determination and Public Outreach**

| BATES NO. | DATE | DOCUMENT | PAGES |
|---|---|---|---|
| | 07/21/05 | Draft outreach plan e-mail | 1 |
| | 07/21/05 | Draft outreach plan attachment 1 | 4 |
| | 07/21/05 | Draft news release e-mail | 1 |
| | 07/21/05 | Draft news release attachment 1 | 3 |

| | | |
|---|---|---|
| 07/26/05 | Draft Q&A's e-mail | 1 |
| 07/26/05 | Draft Q&A's attachment 1 | 3 |
| 02/09/06 | Draft summary of 12-month finding (determination) | 2 |
| 02/16/06 | Outreach plan e-mail | 1 |
| 02/16/06 | Outreach plan attachment 1 | 4 |
| 03/28/06 | Gunnison sage-grouse outreach materials e-mail | 1 |
| 03/28/06 | Gunnison sage-grouse final outreach plan attachment 1 | 3 |
| 03/28/06 | Draft Gunnison sage-grouse Q&A's attachment 2 | 2 |
| 03/28/06 | Draft Gunnison sage-grouse news release attachment 3 | 2 |
| 03/28/06 | Gunnison sage-grouse final summary attachment 4 | 2 |
| 04/12/06 | Final Determination news release and Q&As | 4 |
| 04/13/06 | E-mail from S. Rose on outreach materials | 2 |
| 04/13/06 | E-mail to G. Skiba on Determination | 3 |
| 04/14/06 | Interested Parties Letter on Determination | 3 |
| 04/18/06 | Final Determination in FR | 30 |

TAB 8

**Determination Personal Communications Cited**

| BATES NO. | DATE | DOCUMENT | PAGES |
|---|---|---|---|
| | 06/12/98 | Clait Braun | 1 |
| | 02/25/04 | Jim Garner | 1 |
| | 11/17/04 | Tony Apa | 1 |
| | 06/20/05 | Myron Chase | 1 |
| | 06/21/05 | Guy Wallace | 1 |
| | 06/28/05 | Jim Ferguson | 1 |
| | 08/22/05 | Tony Apa | 1 |
| | 08/24/05 | Jim Garner | 1 |
| | 08/26/05 | Ron Lambeth | 1 |
| | 09/01/05 | Sandy Borthwick | 1 |
| | 09/02/05 | Tammy Wallace | 1 |
| | 09/05/05 | Kathy Nickell | 1 |
| | 09/21/05 | Paul Jones | 1 |
| | 10/03/05 | Duane Spencer | 1 |
| | 12/06/05 | Steve McCall | 1 |
| | 01/10/06 | Gary Skiba | 1 |
| | 01/10/06 | Guy Wallace | 1 |
| | 01/18/06 | Sandy Borthwick | 1 |
| | 02/14/06 | Linda Luther | 1 |

TAB 9

**Determination Published Literature Cited**

| BATES NO. | DATE | DOCUMENT | PAGES |
|---|---|---|---|

TAB 10

**Determination Unpublished Literature Cited**

| BATES NO. | DATE | DOCUMENT | PAGES |
|---|---|---|---|
| | 12/20/02 | CDOW 2002-candidate status review information | 222 |
| | 01/28/03 | Mesa County 2003-Land Use Plan information | 2 |
| | 02/23/04 | BLM 2004 Data call response | 65 |
| | 05/03/04 | CDOW 2004-Pinon Mesa Work Group letter and lek counts | 2 |
| | 00/00/05 | BLM 2005a-Grand Junction FO (Pinon Mesa) data call response | 14 |
| | 00/00/05 | CDOW 2005a-Gunnison Basin lek count report | 29 |
| | 00/00/05 | CDOW 2005d-Pinon Mesa lek count report | 1 |
| | 00/00/05 | CDOW 2005e-Crawford lek count report | 4 |
| | 00/00/05 | CDOW 2005f-Poncha Pass lek count report | 2 |
| | 04/08/05 | BLM 2005d-Uncompahgre FO (Cerro Summit, Crawford, San Miguel Basin) data call response | 60 |
| | 04/08/05 | BLM 2005g-Dolores Public Lands FO (Dove Creek and San Miguel Basin) data call response | 15 |
| | 04/08/05 | CDOW 2005g-CDOW statewide summary for data call | 152 |
| | 04/11/05 | BLM 2005i-Gunnison FO (Gunnison Basin) data call response | 35 |
| | 04/14/05 | Gunnison Watershed Noxious Weed Program 2005-Data call response | 14 |
| | 05/05/05 | BLM 2005c-Gunnison FO active mines info for data call | 2 |
| | 05/05/05 | San Juan County 2005-Data call response part 1 | 35 |
| | 05/05/05 | San Juan County 2005-Data call response part 2, Lupis Thesis | 93 |
| | 05/05/05 | San Juan County 2005-Data call response part 3, annual progress report | 19 |
| | 05/09/05 | BLM 2005h-Gunnison FO grazing allotments with GUSG objectives | 1 |
| | 05/12/05 | BLM 2005b-Gunnison FO (Gunnison Basin) mining and road info for data call | 64 |
| | 05/17/05 | BLM 2005e-Gunnison FO grazing and fire info | 3 |
| | 06/01/05 | CDOW 2005c-Dove Creek lek count report | 2 |
| | 06/15/05 | Stiver 2005-Final Report "Actual and Effective Size of GUSG Populations" | 60 |
| | 06/24/05 | CDOW 2005b-Area 18 lek count report | 10 |
| | 07/14/05 | BLM 2005f-Oil and gas lease info for all GUSG populations | 5 |
| | 12/04/05 | San Miguel County 2005-Land Use code info, etc | 8 |
| | 01/03/06 | San Miguel County 2006-Letter to CSLB Director | 2 |
| | 01/18/06 | CDOW 2006-Grouse mortality information from J. Garner | 10 |

<u>TAB 11</u>

**Drafts of Determination**

| BATES NO. | DATE | DOCUMENT | PAGES |
|---|---|---|---|

TAB 12

**Garton Analysis, Peer Review Documents, and Additional Information on Garton Analysis**

| BATES NO. | DATE | DOCUMENT | PAGES |
|---|---|---|---|
| | 09/22/05 | Uh oh, Need to discuss; E-mail from P. Deibert | 3 |
| | 11/15/05 | Garton Analysis | 29 |
| | 11/16/05 | Forwarded e-mail by P. Deibert of Garton Analysis | 2 |
| | 11/16/05 | E-mail by P. Deibert on GUSG thoughts on Garton Analysis | 2 |
| | 01/20/06 | E-mail from P. Mehlhop on new peer review guidance | 1 |
| | 01/24/06 | Forwarded e-mail from P. Mehlhop on Garton analysis | 2 |
| | 01/31/06 | E-mail on peer review letter to CDOW and UDWR | 1 |
| | 01/31/06 | 01/23/06 peer review letter to CDOW attachment 1 | 1 |
| | 01/31/06 | 01/23/06 peer review letter to UDWR attachment 2 | 1 |
| | 02/10/06 | E-mail to P. Mehlhop and T. Apa requesting contact info | 1 |
| | 02/13/06 | E-mail from T. Apa with contact information | 2 |
| | 02/14/06 | E-mail to J. Sedinger forwarding Garton analysis | 1 |
| | 02/14/06 | E-mail to K. Burhnam forwarding Garton analysis | 1 |
| | 02/16/06 | E-mail from L. Romin on UDWR peer reviewer nominations | 3 |
| | 02/16/06 | Peer review nomination letter from UDWR attachment 1 (Date incorrect on letter) | 1 |
| | 02/21/06 | E-mail to R. Gibson forwarding Garton analysis | 1 |
| | 02/22/06 | E-mail from T. Remington forwarding letter to M. King | 1 |
| | 02/22/06 | Letter to M. King nominating Garton analysis peer reviewer and providing comment on Garton analysis | 6 |
| | 02/23/06 | Peer review of Garton analysis | 3 |
| | 02/23/06 | E-mail to R. Gibson thanking for review | 1 |
| | 02/27/06 | E-mail to D. Naugle forwarding Garton analyis for peer review | 1 |
| | 03/01/06 | E-mail from J. Sedinger forwarding his Garton peer review | 1 |
| | 03/01/06 | J. Sedinger peer review | 1 |
| | 03/03/06 | E-mail to J. Sedinger thanking him for peer review | 2 |
| | 03/14/06 | Forwarded e-mail by S. Linner regarding UDWR peer review | 2 |
| | 03/15/06 | Forwarded e-mail by S. Linner on G. White peer review | 2 |
| | 03/15/06 | G. White peer review of Garton analysis | 3 |
| | 03/20/06 | E-mail from P. Mehlhop of peer review plan | 1 |
| | 03/20/06 | Peer review plan document | 2 |
| | 03/20/06 | Forwarded e-mail from B. Dach on peer review paragraph for determination | 2 |
| | 03/20/06 | E-mail from D. Naugle on Garton peer review | 1 |

| | | |
|---|---|---|
| 03/20/06 | D. Naugle peer review of Garton analysis | 2 |
| 03/21/06 | P. Mehlhop draft of peer review paragraph for determination | 2 |
| 03/21/06 | E-mail from S. Willey on peer review plan | 1 |
| 03/21/06 | Peer review plan website attachment 1 | 3 |
| 03/21/06 | Peer review plan website attachment 2 | 2 |
| 03/21/06 | E-mail from B. Dach on peer review of GUSG RCP PVA analysis | 2 |
| 03/24/06 | Forwarded e-mail by L. Romin on Howe intent to submit Garton analysis peer review | 1 |
| 03/30/06 | 212PM forwarded e-mail by P. Deibert from Garton on GUSG trend analysis model assumptions and output files | 5 |
| 03/30/06 | 212PM Assumptions of trend analysis attachment1 | 3 |
| 03/30/06 | 212PM Graph and data of trend analysis attachment2 (Crawford) | 2 |
| 03/30/06 | 212PM Graph and data of trend analysis attachment3 (Pinyon Mesa) | 2 |
| 03/30/06 | 212PM Data of trend analysis attachment 4 (Gunnison Basin) | 8 |
| 03/30/06 | 212PM Two graphs and data of trend analysis attachment 5 (Rangewide analysis) | 3 |
| 03/30/06 | 212 PM One graph and data of trend analysis attachment6 (Rangewide analysis) | 3 |
| 03/30/06 | 212 PM Data of trend analysis attachment7 (Rangewide 57-04) | 6 |
| 03/30/06 | 212 PM Data of trend analysis attachment8 (Rangewide 95-04) | 7 |
| 03/30/06 | 212PM Data of trend analysis attachment9 (San Juan County, UT) | 7 |
| 03/30/06 | 212 PM Graph and data of trend analysis attachment10 (San Juan County, Ut) | 2 |
| 03/30/06 | 212PM Graph and data of San Miguel Basin trend analysis attachment11 | 2 |
| 03/30/06 | 213PM e-mail forwarding March 30, 2006 update of November 15 2005 trend analysis | 2 |
| 03/30/06 | 213PM March 30, 2006 update of November 15, 2005 trend analysis Attachment 1 | 29 |
| 04/03/06 | E-mail from C. Clayton on draft position of peer review comments | 1 |
| 04/04/06 | F. Howe peer review of Garton analysis | 2 |
| 04/06/06 | E-mail from S. Linner on need for position statement on peer review | 1 |

TAB 13

**Genetic and Taxonomy Information**

| BATES NO. | DATE | DOCUMENT | PAGES |
|---|---|---|---|
| | 00/00/05 | Summary of genetic methods | 8 |
| | 05/04/05 | E-mail from S. Willey on 1992 genetics memo | 1 |
| | 05/04/05 | 1992 genetics memo | 4 |
| | 07/19/05 | CDOW genetics briefing | 3 |
| | 07/19/05 | Geneticist e-mail from P. Mehlhop | 2 |
| | 07/22/05 | Genetic papers e-mail to J. Parker et al. | 1 |
| | 07/26/05 | DOI genetic article request e-mail from P. Mehlhop | 1 |
| | 07/27/05 | Quinn e-mail forwarded by P. Mehlhop | 5 |
| | 08/18/05 | Fax on outside help for genetics (and comments on draft) | 5 |
| | 08/24/05 | E-mail request and response for genetic article review assistance by S. Chambers | 1 |
| | 08/24/05 | Request for assistance attachment 1 (Kahn et al. 1999) | 6 |
| | 08/24/05 | Request for assistance attachment 2 (Oyler-McCance et al. 1999) | 9 |
| | 08/24/05 | Request for assistance attachment 3 (Young et al. 1994) | 10 |
| | 08/24/05 | Request for assistance attachment 4 (Young et al. 2000) | 10 |
| | 08/24/05 | Request for assistance attachment 5 (Oyler-McCance et al. 2005) | 9 |
| | 08/26/05 | E-mail from Susan L. on factor E | 1 |
| | 09/30/05 | E-mail from S. Chambers on genetics review | 1 |
| | 09/30/05 | S. Chambers genetic review article | 3 |
| | 10/11/05 | Genetics conference call notes | 1 |
| | 11/10/05 | E-mail of draft genetics memo to Director | 1 |
| | 11/10/05 | Draft genetics memo to Director | 3 |

TAB 14

**Lawsuit and Petition Documents**

| BATES NO. | DATE | DOCUMENT | PAGES |
|---|---|---|---|
| | 01/25/00 | Petition | 254 |
| | 01/29/01 | Fax of 01/10/01 first amended complaint | 43 |
| | 02/05/03 | Fax of 01/31/03 memorandum opinion | 35 |
| | 02/07/05 | Fax of 02/04/05 Motion for summary judgement | 53 |
| | 02/07/05 | Fax of 2/04/05 Statement of facts in support of motion for summary judgement | 18 |
| | 03/17/04 | Complaint for declatory and injunctive relief | 45 |
| | 03/30/06 | E-mail from B. Dach on proposed order and joint motion extension of time | 1 |
| | 03/30/06 | 3/28/06 Extension of time attachment 1 (proposed order) | 2 |
| | 03/30/06 | 3/28/06 Extension of time attachment 2 (joint motion) | 2 |
| | 04/05/05 | Fax of 04/01/05 Plaintiff's combined reply in support of motion for summary judgement… | 36 |
| | 05/15/01 | Plaintiff's material facts not in dispute | 41 |
| | 06/29/05 | E-mail from C. Davis on Judges Order | 1 |
| | 06/29/05 | Judges order to file joint status report on settlement | 2 |

|  | | | |
|---|---|---|---|
|  | discussions | |  |
| 02/20/04 | Fax of 5/13/03 judges order for defendents motion for reconsideration to issue a 12-month finding and to use the FWS Petition Management Guidance | | 12 |
| 07/02/04 | Proposed settlement date for proposing GUSG for listing | | 2 |
| 07/22/05 | E-mail from S. Linner on Nov 16, 2005 settlement date | | 2 |
| 07/29/05 | E-mail from C. Davis on August joint status report requirement | | 1 |
| 09/09/05 | E-mail from P Mehlhop on update of GUSG settlement agreements | | 2 |
| 09/09/05 | E-mail from C Davis on informal offer of March 31, 2006 settlement date | | 3 |
| 09/14/05 | E-mail from C Davis on signing of March 2006 settlement date | | 1 |
| 09/14/05 | Fax of 080405 memo with March 9, 2006 settlement date proposal to plaintiff's | | 1 |
| 11/18/05 | E-mail from C Davis on March 31, 2006 settlement date | | 1 |
| 11/18/05 | GUSG settlement date attachment 1(Document 54) | | 2 |
| 11/18/05 | GUSG settlement date attachment 2 (Document 50) | | 8 |
| 11/30/05 | E-mail from A Pfister to BJ Johnson on proposed March 31, 2006 settlement date | | 4 |

TAB 15

**Mapping Information**

| BATES NO. | DATE | DOCUMENT | PAGES |
|---|---|---|---|
|  | 09/08/05 | E-mail to T. Thorn on Gunnison Basin mapping | 1 |
|  | 09/14/05 | E-mail from P. Mehlhop on utility websites | 1 |
|  | 09/26/05 | E-mail to A. Pfister on Thorn map | 1 |
|  | 09/26/05 | Map of Gunnison Basin attachment 1 | 1 |
|  | 10/13/05 | E-mail to A. Pfister with map attachments | 1 |
|  | 10/13/05 | GUSG historic and occupied habitat map attachment 1 | 1 |
|  | 10/13/05 | GUSG occupied habitat only map attachment 2 | 1 |
|  | 10/26/05 | E-mail to T. Thorn requesting more maps | 1 |
|  | 11/04/05 | Fax from M. Medina on BLM utility corridors | 5 |

TAB 16

**Miscellaneous Background Documents**

| BATES NO. | DATE | DOCUMENT | PAGES |
|---|---|---|---|

TAB 17

**Outlines and Briefings**
BATES NO.        DATE        DOCUMENT                                                PAGES

TAB 18

**Draft PECE Information**
BATES NO.        DATE        DOCUMENT                                                PAGES

TAB 19

**Prelimary Population Trends, GUSG Rangewide Conservation Plan Population Viability Analysis, and Threat Ranking Information**
BATES NO.        DATE        DOCUMENT                                                PAGES

TAB 20

**Public Comments on Listing**
BATES NO.        DATE        DOCUMENT                                                PAGES

# Exhibit E:

# Index, Administrative Record for Gunnison Sage-grouse Determination of April 18, 2006 ("Litigation AR Index")

**Administrative Record**
**for**
**Gunnison Sage-grouse Determination**
**of**
**April 18, 2006**

**County of San Miguel, Col. et al. v. Julie McDonald, et al.**
**(1:06-cv-1946 RBW; D.D.C.)**

**Table of Contents**

Tab 1        Budget and Guidance Documents
Tab 2        Candidate Conservation Agreement with Assurances
Tab 3        Candidate Forms
Tab 4        Conference Call Notes
Tab 5        Data Call Information in Addition to Unpublished Data Call Literature Cited
Tab 6        Determination
Tab 7        Determination Personal Communications Cited
Tab 8        Determination Published Literature Cited
Tab 9        Determination Unpublished Literature Cited
Tab 10       Drafts of Determination
Tab 11       Garton Analysis, Peer Review Documents, and Additional Information on Garton
             Analysis
Tab 12       Genetic and Taxonomy Information
Tab 13       Petition Documents
Tab 14       Mapping Information
Tab 15       Miscellaneous Background Documents
Tab 16       Outlines and Briefings
Tab 17       Draft PECE Information
Tab 18       Preliminary Population Trends, GUSG Rangewide Conservation Plan Viability
             Analysis, and Threat Ranking Information
Tab 19       Public Comments on Listing
Tab 20       Withheld Documents

**TAB 1**

**Budget and Guidance Documents**

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| 000001 | 03/10/05 | Document Clearance Process |
| 000003 | 04/06/05 | On-line Rule Making References |

**TAB 2**

**Candidate Conservation Agreement with Assurances**

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| 000011 | 05/03/05 | Draft Appendix A |
| | 05/03/05 | Draft Appendix B |
| | 05/03/05 | Draft Appendix C |
| | 05/03/05 | Draft Appendix D |
| | 05/03/05 | Draft CDOW CCAA permit application |
| | 05/03/05 | Draft CCAA cover page |
| 000084 | 05/03/05 | Draft CCAA |

**TAB 3**

**Candidate Forms**

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| 000104 | 01/18/00 | Candidate Form for 2000 |
| | 10/17/01 | Candidate Form for 2001 |
| | 06/03/02 | Candidate From for 2002 |
| | 04/05/04 | Candidate Form for 2003 |
| 000180 | 05/02/05 | Candidate Form for 2004 |

**TAB 4**

**Conference Call Notes**

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| 000194 | 02/11/05 | Conference call notes |
| | 03/21/05 | Conference call notes |
| | 03/24/05 | Conference call notes |
| | 03/24/05 | Conference call notes TI |
| 000202 | 04/07/05 | Conference call notes |
| | 04/08/05 | Conference call notes |
| | 04/15/05 | Conference call notes TI |
| | 04/15/05 | Conference call notes |
| | 04/22/05 | Conference call notes TI |

2

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| 000222 | 04/22/05 | Conference call notes |
| | 05/13/05 | Conference call notes |
| | 06/15/05 | Conference call notes TI |
| | 06/15/05 | Conference call notes |
| | 07/21/05 | Conference call notes |
| 000235 | 07/26/05 | Conference call notes |
| | 08/16/05 | Conference call notes TI |
| | 08/16/05 | Conference call notes |
| | 08/23/05 | Conference call notes and briefing |
| | 08/24/05 | Conference call notes TI |
| 000249 | 08/24/05 | Conference call notes |
| | 09/01/05 | Conference call  notes |
| | 09/07/05 | Conference call notes and questions |
| | 09/14/05 | Conference call notes TI |
| | 09/14/05 | Conference call notes |
| 000258 | 09/21/05 | Conference call notes TI |
| | 09/21/05 | Conference call notes |
| | 09/28/05 | Conference call notes TI |
| | 09/28/05 | Conference call notes |
| | 10/05/05 | Conference call notes |
| 000265 | 10/19/05 | Conference call notes TI |
| | 10/19/05 | Conference call notes |
| | 10/25/05 and 10/26/05 | E-mails and conference call notes |
| | 10/26/05 | Conference call notes TI |
| | 11/01/05 | Conference call agenda e-mail |
| 000274 | 11/03/05 | Conference call notes |
| | 11/10/05 | Conference call notes |
| | 11/14/05 | Conference call notes TI |
| | 11/14/05 | Conference call notes |
| | 11/16/05 | Conference call notes |
| 000281 | 11/22/05 | Conference call notes |
| | 11/23/05 | Conference call notes |
| | 11/29/05 | E-mail agenda for 12/01/05 conference call |
| | 12/01/05 | Conference call notes TI |
| | 12/01/05 | Conference call notes |
| 000286 | 12/16/05 | Conference call notes |
| | 01/12/06 | Conference call notes TI |
| | 01/12/06 | Conference call notes |
| | 01/18/06 | Conference call notes |
| | 02/23/06 | Conference call notes |
| 000196 | 03/00/06 | Conference call notes first page of 03/00/06 |

**TAB 5**

**Data Call Information in Addition to Unpublished Data Call Literature Cited**

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| 000287 | 03/08/05 | Data request outline e-mail from J. Garner |
| | 03/08/05 | Proposed rule information request fax to S. Whiteskunk |
| | 03/08/05 | Proposed rule information request e-mail to B. Banulis |
| | 03/08/05 | Proposed rule information request e-mail to C. Wagner |
| 000301 | 03/08/05 | Proposed rule information request e-mail to agencies |
| | 03/09/05 | Proposed rule information request e-mail to E. Neilson |
| | 03/09/05 | Proposed rule information request e-mail to L. Romin |
| | 03/10/05 | Proposed rule information request e-mail to T. Black |
| | 03/10/05 | Proposed rule information request e-mail to Utah BLM |
| 000306 | 03/16/05 | Proposed rule information request hard copy |
| | 03/23/05 | E-mail to AZ and NM of intent to write proposed rule |
| | 04/07/05 | Poncha Pass data call information from P. Clark USFS |
| | 04/07/05 | Poncha Pass grazing allotment spreadsheet |
| | 04/07/05 | Poncha Pass weeds information |
| | 04/08/05 | Dove Creek grazing allotment spreadsheet |
| 000333 | 06/17/05 | E-mail from K. Nickell on DC and SMB questions |

**TAB 6**

**Determination**

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| 000338 | 04/13/06 | E-mail to G. Skiba on Determination |
| 000341 | 04/14/06 | Interested Parties Letter on Determination |
| 000344 | 04/18/06 | Final Determination in FR |

**TAB 7**

**Determination Personal Communications Cited**

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| 000379 | 06/12/98 | Clait Braun |
| | 02/25/04 | Jim Garner |
| | 11/17/04 | Tony Apa |
| | 06/20/05 | Myron Chase |
| 000381 | 06/21/05 | Guy Wallace |
| | 06/28/05 | Jim Ferguson |
| | 08/22/05 | Tony Apa |
| | 08/24/05 | Jim Garner |
| | 08/26/05 | Ron Lambeth |
| 000386 | 09/01/05 | Sandy Borthwick |

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| | 09/02/05 | Tammy Wallace |
| | 09/05/05 | Kathy Nickell |
| | 09/21/05 | Paul Jones |
| 000390 | 10/03/05 | Duane Spencer |
| | 12/06/05 | Steve McCall |
| | 01/10/06 | Gary Skiba |
| | 01/10/06 | Guy Wallace |
| | 01/18/06 | Sandy Borthwick |
| 000377 | 02/14/06 | Linda Luther |

**TAB 8**

**Determination Published Literature Cited**

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| 000393 | | Aldridge, C. L. 2005. |
| | | Aldridge, C. L. and R. M. Brigham. 2003. |
| | | American Ornithologists' Union. 2000. |
| | | Amstrup, C. and R. L. Phillips. 1977. |
| 000517 | | Apa, A. D. 2004. |
| | | Applegate, R. D. 2001. |
| | | Autenrieth, R. E. 1981. |
| | | Back, G. N., M. R. Barrington, and J. K. McAdoo. 1987. |
| | | Barber, H. A. 1991. |
| 000723 | | Barber, T. A. 1968. |
| | | Barnett, J. F., and J. A. Crawford. 1994. |
| | | Batterson, W. M., and W. B. Morse. 1948. |
| | | Beck, T. D. I. 1977. |
| | | Beck, J. L. and D. L. Mitchell. 2000. |
| 000837 | | Bergerud, A. T. 1988. |
| | | Billings, W. D. 1994. |
| | | Blus, L. J., C. S. Staley, C. J. Henny, G. W. Pendelton, T. H. Craig, E. H. Craig, and D. K. Halford. 1989. |
| | | Boltz, M. 1994. |
| | | Borell, A. E. 1939. |
| 000900 | | Boyce, M. S. 1990. |
| | | Boyle, S. A. and F. B. Samson. 1985. |
| | | Braun, C. E. 1986. |
| | | Braun, C. E. 1987. |
| | | Braun, C. E. 1998. |
| | | Braun, C. E., and D. I. Beck. 1996. |
| 000951 | | Braun, C. E., M. F. Baker, R. L. Eng, J. W. Gashwiler, and M. H. Schroeder. 1976. |

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| 000958 | | Braun, C. E., O. O. Oedekoven, and C. L. Aldridge. 2002. |
| | | Brown, J. K. 2000. |
| | | Brown, K. G. and K. M. Clayton. 2004. |
| | | Bureau of Land Management. 1999 |
| | | Bureau of Land Management. 2000. |
| 0001383 | | Bureau of Land Management. 2003. |
| | | Bureau of Land Management. 2004. |
| | | Bureau of Land Management Instruction Memorandum IM 2003 – 137. |
| | | Bureau of Land Management Instruction Memorandum IM 2003-233. |
| | | Bureau of Land Management Instruction Memorandum IM 2005-024. |
| 002392 | | Bureau of Land Management Instruction Memorandum IM CO-2005-038. |
| | | Burkhardt, J. W., and E. W. Tisdale. 1969. |
| | | Byrne, M. W. 2002. |
| | | Call, M. W., and C. Maser. 1985. |
| | | Cappa, J. A., G. Young, J. W. Keller, C. J. Carroll, B. Widmann. 2005. |
| 002539 | | Carr, H. D., and F. A. Glover. 1970. |
| | | Charlesworth, B., M. T. Morgan, and D. Charlesworth. 1993. |
| | | Charlesworth, D., and B. Charlesworth. 1987. |
| | | Coker, C. 2001. |
| | | Colorado Department of Agriculture. 2003. |
| 002551 | | Colorado Department of Local Affairs. 2004. |
| | | Colorado Department of Public Health. 2004. |
| | | Colorado Department of Transportation. 2004. |
| | | Colorado Oil and Gas Conservation Commission. 2004. |
| | | Commons, M. L. 1997. |
| 002812 | | Commons, M. L., R. K. Baydack, and C. E. Braun. 1999. |
| | | Connelly, J. W., M. A. Schroeder, A. R. Sands, and C. E. Braun. 2000a. |
| | | Connelly, J. W., A. D. Apa, R. B. Smith, and K. P. Reese. 2000b. |
| | | Connelly, J. W., K. P. Reese, R. A. Fischer, and W. L. Wakkinen. 2000c. |
| 003466 | | Connelly, J. W., and C. E. Braun. 1997. |
| | | Connelly, J. W., H. W. Browers, and R. J. Gates. 1988. |
| | | Connelly, J. W., and O. D. Markham. 1983. |

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| 002856 | | Connelly, J. W., S. T. Knick, M. A. Schroeder, and S. Stiver.  2004. |
| | | Connelly, J. W., W. J. Arthur, and O. D. Markham.  1981. |
| | | Cote, I. M., and W. J. Sutherland.  1997. |
| | | Crawford Area Conservation Plan.  1998. |
| | | Crawford, J. A.  1982. |
| 003514 | | Crawford, J. A., R. A. Olson, N. E. West, J. C. Mosley, M. A. Schroeder, T. D. Whitson, R. F. Miller, M. A. Gregg, and C. S. Boyd.  2004. |
| | | Deibert, P. A.  1995. |
| | | DeLong, A. K., J. A. Crawford, and D. C. DeLong, Jr.  1995. |
| | | Dobkin, D. S.  1995. |
| 003740 | | Dolores County.  2002. |
| | | Drut, M. S., J. A. Crawford, and M. A. Gregg.  1994a. |
| | | Drut, M. S., W. H. Pyle, and J. A. Crawford.  1994b. |
| | | Ellis, K. L. 1985. |
| | | Emmerich, W. E.  1985. |
| 003785 | | Erickson, W. P., G. D. Johnson, M. D. Strickland, D. P. Young Jr., K. J. Sernka, and R. E. Good.  2001. |
| | | Fischer, R. A., K. P. Reese, and J. W. Connelly.  1996a. |
| | | Fischer, R. A., K. P. Reese, and J. W. Connelly.  1996b. |
| | | Forman, R. T. T.  2000. |
| | | Forman, R. T. T. and L. E. Alexander.  1998. |
| 003895 | | Franklin, I. R.  1980. |
| | | Fuhlendorf, S. D., A. J. W. Woodward, D. M. Leslie Jr., and J. S. Shackford.  2002. |
| | | Garton, E.O.  2005. |
| | | Gates, R. J.  1985. |
| | | Gelbard, J. L. and J. Belnap.  2003. |
| 003969 | | Gibson, R. M., and J. W. Bradbury.  1985. |
| | | Giezentanner, K. I., and W. H. Clark.  1974. |
| | | Grahame, J. D., and T. D. Sisk, editors.  2002. |
| | | Gratson, M. W.  1993. |
| | | Greenwood, R. J.  1986. |
| 004002 | | Gregg, M. A., M. Pope, and J. A. Crawford.  2003a. |
| | | Gregg, M. A., M. Pope, and J. A. Crawford.  2003b. |
| | | Gregg, M. A., J. A. Crawford, M. S. Drut, and A. K. DeLong.  1994. |
| | | Gunnison Basin Conservation Plan.  1997. |
| | | Gunnison County.  2001. |
| 004179 | | Gunnison Sage-grouse Rangewide Steering Committee.  2005. |

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| 004683 | | Hanna, W. C. 1936. |
| | | Hartzler, J. E. 1974. |
| | | Hays, D. W., M. J. Tirhi, and D. W. Stinson. 1998. |
| | | Hobbs, N. T., D. L. Baker, G. D. Bear, and D. C. Bowden. 1996. |
| | | Holloran, M. J. 2005. |
| 005005 | | Holloran, M. J. and S. H. Anderson 2005. |
| | | Huff, M. H. and J. K. Smith. 2000. |
| | | Hupp, J. W. 1987 |
| | | Hupp, J. W., and C. E. Braun. 1989. |
| | | Hupp, J. W., and C. E. Braun. 1991. |
| 005126 | | Johnson, D. H., A. B. Sargeant, and R. J. Greenwood. 1989. |
| | | Johnson, G. D., and M. S. Boyce. 1990. |
| | | Johnson, G. D., and M. S. Boyce. 1991. |
| | | Johnson, K. H. and C. E. Braun. 1999. |
| 005150 | | Kahn, N. W., C. E. Braun, J. R. Young, S. Wood, D. R. Mata, and T. W. Quinn. 1999. |
| | | Kilpatrick, S. 2000. |
| | | Klebenow, D. A. 1969. |
| | | Klebenow, D. A. 1970. |
| | | Klebenow, D. A., and G. M. Gray. 1968. |
| 005186 | | Klott, J. H., and F. G. Lindzey. 1989. |
| | | Knick, S. T., D. S. Dobkin, J. T. Rotenberry, M. A. Schroeder, W. M. Vander Haegen, and C. Van Riper, III. 2003. |
| | | Knight, R. L., H. A. L. Knight, and R. J. Camp. 1993. |
| | | Knight, R. L. and D. N. Cole. 1995. |
| | | Lande, R. 1995a. |
| 005245 | | Lande, R. 1995b. |
| | | Lande, R. and G. F. Barrowclough. 1987. |
| | | Laycock, W. A., D. Loper, F. W. Obermiller, L. Smith, S. R. Swanson, P. J. Urness, and M. Vavra. 1996. |
| | | Leach, H. R., and A. L. Hensley. 1954. |
| | | Livingston, M. F. 1998. |
| 005464 | | Lynch, M., J. Conery, and R. Bürger. 1995. |
| | | Lyon, A. G. 2000. |
| | | Lyon, A. G., and S. H. Anderson. 2003. |
| | | Manville, A. M. 2002. |
| | | Massey, M. 2001. |
| 005703 | | McArthur, E. D. 1994. |
| | | Miller, P. S. 2004. |
| | | Miller, R. F., and J. A. Rose. 1995. |
| | | Miller, R. F. and J. A. Rose. 1999. |

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| | | Miller, R. F., and L. L. Eddleman.  2000. |
| 005747 | | Miller, R. F., T. J. Svejcar, and J. A. Rose.  2000. |
| | | Milton, S.J., R.J. Dean, M.A. du Plessis, and W.R. Siegfried.  1994. |
| | | Montrose County.  2003. |
| | | Moore, R. and T. Mills.  1977. |
| | | Myers, O. B.  1992. |
| | | Naugle, D. E., C. L. Aldridge, B. L. Walker, T. E. Cornish, B. J. Moynahan, M. J. Holloran,  K. Brown, G. D. Johnson, E. T. Schmidtmann, R. T. Mayer, C. Y. Kato, M. R. Matchett, T. J. Christiansen, W. E. Cook, T. Creekmore, R. D. Falise, E. T. Rinkes, and M. S. Boyce.  2004. |
| | | Naugle, D. E., C. L. Aldridge, B. L. Walker, K. E. Doherty, M. R. Matchett, J. McIntosh, T. E. Cornish, and M. S. Boyce.  2005. |
| | | Nehring, J. A., and A. D. Apa.  2000. |
| 006377 | | Nelle, P. J., K. P. Reese, and J. W. Connelly.  2000. |
| | | Olson, R. A. and T. D. Whitson.  2002. |
| | | Oyler-McCance, S. J., J. St. John, S. E. Taylor, and T. W. Quinn.  2005. |
| | | Oyler-McCance, S. J., K. P. Burnham, and C. E. Braun.  2001. |
| | | Oyler-McCance, S. J., N. W. Kahn, K. P. Burnham, C. E. Braun, and T. W. Quinn.  1999. |
| 006419 | | Patterson, R. L.  1952. |
| | | Peters, E. F. and S. C. Bunting.  1994. |
| | | Peterson, J. G.  1970. |
| | | Phillips, J. B.  1990. |
| | | Proctor, B. R., R. W. Thompson, J. E. Bunin, K. W. Fucik, G. R. Tamm and E. G. Wolf.  1983. |
| | | Pyle, W. H., and J. A. Crawford.  1996. |
| 006770 | | Quinney, D. L., M. McHenry, and J. Weaver.  1996. |
| | | Rasmussen, D. I., and L. A. Griner.  1938. |
| | | Remington, T. E., and C. E. Braun.  1985. |
| | | Remington, T. E.  and C. E. Braun. 1991. |
| 006793 | | Restani, M., J. M. Marzluff, and R. E. Yates.  2001. |
| | | Riebsame, W. E., H. Gosnell, and D. M. Theobald.  1996. |
| | | Ritchie, M. E., M. L. Wolfe, and R. Danvir.  1994. |
| | | Rogers, G. E.  1964. |
| 006889 | | Root, T.  2002. |
| | | Rose, R. I.  2004. |

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| | | Rosenberg, K. V., B. Kott, R. S. Hames, R. W. Rohrbaugh, Jr., S. B. Swarthout, and J. D. Lowe. 2004. |
| | | Rowland, M. 2004. |
| 006984 | | Rowland, M. M. and M. J. Wisdom. 2002. |
| | | Sargeant, A. B., R. J. Greenwood, M. A. Sovada, and T. L. Shaffer. 1993. |
| | | Schoenberg, T. J. 1982. |
| | | Schroeder, M. A. 1997. |
| 007300 | | Schroeder, M. A., C. L. Aldridge, A. D. Apa, J. R. Bohne, C. E. Braun, S. D. Bunnell, J. W. Connelly, P. A. Deibert, S. C. Gardner, M. A. Hilliard, G. D. Kobriger, S. M. McAdam, C. W. McCarthy, J. J. McCarthy, D. L. Mitchell, E. V. Rickerson, and S. J. Stiver. 2004. |
| | | Schroeder, M. A., J. R. Young, and C. E. Braun. 1999. |
| | | Schroeder, M. A., and R. K. Baydack. 2001. |
| | | Shaffer, M. L. 1987. |
| | | Sime, C. A. 1999. |
| | | Slater, S. J. 2003. |
| 007545 | | Sovada, M. A., A. B. Sargeant, and J. W. Grier. 1995. |
| | | Steenhof, K., M. N. Kochert, and J. A. Roppe. 1993. |
| | | Summers, R. W., R. E. Green, R. Proctor, D. Dugan, D. Lambie, R. Moncrieff, R. Moss, and D. Baines. 2004. |
| | | Suter, G. W. II. 1978. |
| | | Tate, J., Jr., M. S. Boyce, and T. R. Smith. 1979. |
| 007609 | | US Centers for Disease Control and Prevention. 2004. |
| | | Utah Governors Office of Planning and Budget. 2005. |
| | | Vander Haegen, W. M., M. A. Schroeder, and R. M. DeGraaf. 2002. |
| | | Wallestad, R. O. 1975. |
| | | Wallestad, R. O, J. G. Peterson, and R. L. Eng. 1975. |
| 007691 | | Wambolt, C. L., A. J. Harp, B. L. Welch, N. Shaw, J. W. Connelly, K. P. Reese, C. E. Braun, D. A. Klebenow, E. D. McArthur, J. G. Thompson, L. A. Torell, and J. A. Tanaka. 2002. |
| | | Webb, R. 2000. |
| | | Welch, B. L., F. J. Wagstaff, and J. A. Roberson. 1991. |
| | | Welch, B. L., J. C. Pederson, and R. L. Rodriquez. 1988. |
| | | Wenger, S. R., M. R. Grode, and A. D. Apa. 2003. |
| 007875 | | Whisenant, S. G. 1990. |
| | | Wiley, R. H. 1973. |
| | | Wiley, R. H. 1974. |

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| | | Willis, M. J., G. P. Keister, Jr., D. A. Immell, D. M. Jones, R. M. Powell, and K. R. Durbin.  1993. |
| 008033 | | Wirth, T. A. and D. A. Pyke.  2003. |
| | | Wooten, J., S. Wilkerson, K. Hinson, and M. Grodowitz.  1996. |
| | | Wrobleski, D. W. and J. B. Kauffman.  2003. |
| | | Wyoming Game and Fish Department.  2003. |
| | | Young, D. P., Jr., W. P. Erickson, M. D. Strickland, R. E. Good and K. J. Sernka.  2003. |
| | | Young, J. A., and R. A. Evans.  1981. |
| | | Young, J. A. and F. L. Allen.  1997. |
| 008279 | | Young, J. A., R. E. Eckert, Jr., and R. A. Evans.  1979. |
| | | Young, J. R.  1994. |
| | | Young, J. R., C. E. Braun, S. J. Oyler-McCance, J. W. Hupp, and T. W. Quinn.  2000. |
| | | Zablan, M. A.  1993. |
| 008450 | | Zunino, G. W.  1987. |

**TAB 9**

**Determination Unpublished Literature Cited**

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| 008500 | 02/23/04 | BLM 2004 Data call response |
| | 00/00/05 | BLM 2005a-Grand Junction FO (Pinon Mesa) data call response |
| | 05/12/05 | BLM 2005b-Gunnison FO (Gunnison Basin) mining and road info for data call |
| | 05/05/05 | BLM 2005c-Gunnison FO active mines info for data call |
| 008645 | 04/08/05 | BLM 2005d-Uncompahgre FO (Cerro Summit, Crawford, San Miguel Basin) data call response |
| | 05/17/05 | BLM 2005e-Gunnison FO grazing and fire info |
| | 07/14/05 | BLM 2005f-Oil and gas lease info for all GUSG populations |
| | 04/08/05 | BLM 2005g-Dolores Public Lands FO (Dove Creek and San Miguel Basin) data call response |
| | 05/09/05 | BLM 2005h-Gunnison FO grazing allotments with GUSG objectives |
| 008729 | 04/11/05 | BLM 2005i-Gunnison FO (Gunnison Basin) data call response |
| | 12/20/02 | CDOW 2002-candidate status review information |
| | 05/03/04 | CDOW 2004-Pinon Mesa Work Group letter and lek counts |
| | 00/00/05 | CDOW 2005a-Gunnison Basin lek count report |

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| | 06/24/05 | CDOW 2005b-Area 18 lek count report |
| 009027 | 06/01/05 | CDOW 2005c-Dove Creek lek count report |
| | 00/00/05 | CDOW 2005d-Pinon Mesa lek count report |
| | 00/00/05 | CDOW 2005e-Crawford lek count report |
| | 00/00/05 | CDOW 2005f-Poncha Pass lek count report |
| | 04/08/05 | CDOW 2005g-CDOW statewide summary for data call |
| 009188 | 01/18/06 | CDOW 2006-Grouse mortality information from J. Garner |
| | 04/14/05 | Gunnison Watershed Noxious Weed Program 2005-Data call response |
| | 01/28/03 | Mesa County 2003-Land Use Plan information |
| | 05/05/05 | San Juan County 2005-Data call response part 1 |
| | 05/05/05 | San Juan County 2005-Data call response part 2, Lupis Thesis |
| 009341 | 05/05/05 | San Juan County 2005-Data call response part 3, annual progress report |
| | 12/04/05 | San Miguel County 2005-Land Use code info, etc |
| | 01/03/06 | San Miguel County 2006-Letter to CSLB Director |
| 009370 | 06/15/05 | Stiver 2005-Final Report "Actual and Effective Size of GUSG Populations" |

**TAB 10**

**Drafts of Determination**

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| 011248 | 05/16/05 | E-mail from S. Linner with theats analysis review |
| | 05/16/05 | Threats analysis review of Proposed Rule, attachment 1 |
| | 07/08/05 | E-mail from P. Deibert on review |
| | 07/08/05 | Comments on draft PR |
| 011508 | 07/25/05 | E-mail from P. Mehlop with comments on PR |
| | 07/25/05 | P. Mehlhop's comments on PR, attachment 1 |
| | 07/25/05 | J. Parker's comments on PR, attachment 2 |
| | 07/25/05 | J. Lyke's comments on PR, attachment 3 |
| | 08/05/05 | E-mail transmitting 08/05/05 draft PR |
| 011833 | 08/05/05 | Draft PR |
| | 09/08/05 | E-mail transmitting 09/08/05 draft PR |
| | 09/08/05 | Draft PR |
| | 09/26/05 | E-mail from P. Deibert transmitting draft PR Background comments |
| 012265 | 09/26/05 | Deibert Background comments |
| | 09/28/05 | Forwarded e-mail of S. Oyler-McCance comments on genetic section of draft PR |
| | 09/28/05 | S. Oyler-McCance comments on genetic section |

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| 012311 | 10/03/05 | E-mail transmitting S. Chambers comments on genetics |
| | 10/03/05 | S. Chambers comments on genetic section of draft PR |
| | 10/06/05 | E-mail from P. Mehlhop transmitting comments on revised draft Background section |
| | 10/06/05 | P. Mehlhop's comments on revised Background section |
| | 10/12/05 | E-mail transmitting P. Deibert's comments on Factor A |
| 012378 | 10/12/05 | P. Deibert's comment on factor A, attachment 1 |
| | 10/13/05 | E-mail from P. Deibert transmitting Factor A Summary and Table 1 |
| | 10/13/05 | P. Deibert's Factor A Summary, attachment 1 |
| | 10/13/05 | P. Deibert's comments on Table 1, attachment 2 |
| | 10/13/05 | E-mail, P. Deibert  transmitting comments on Factor B |
| | 10/13/05 | P. Deibert comments on Factor B, Attachment 1 |
| 012490 | 10/25/05 | E-mail, P. Deibert transmitting comments on Factor C |
| | 10/25/05 | P. Deibert comments on Factor C, attachment 1 |
| | 10/26/05 | E-mail, P. Mehlhop transmitting comments on Factor A |
| | 10/26/05 | P. Mehlhop's comments on Factor A, attachment 1 |
| 012560 | 10/28/05 | E-mail, P. Mehlhop transmitting comments on Factor BC |
| | 10/28/05 | P. Mehlhop comments on Factors B&C, attachment 1 |
| | 11/02/05 | E-mail, P. Mehlhop transmitting comments on Factor D |
| | 11/02/05 | P. Mehlhop comments on Factor D, attachment 1 |
| | 11/07/05 | E-mail, P. Deibert transmitting final section (E) of draft PR |
| | 11/07/05 | P. Deibert comments on final section (E), attachment 1 |
| 012619 | 11/09/05 | E-mail, P. Mehlhop transmitting new Background comments |
| | 11/09/05 | P. Mehlhop comments on new Background, attachment 1 |
| | 11/10/05 | E-mail, P. Mehlhop transmitting comments on Factor D |
| | 11/10/05 | P. Mehlhop comments on Factor D, Attachment 1 |
| 012674 | 11/28/05 | E-mail, P. Deibert transmitting population trend section of draft PR |
| | 11/28/05 | P. Deibert comments on Population Trend section of draft PR, attachment 1 |
| | 01/17/06 | E-mail, T. Ireland transmitting new Background of draft Determination |
| | 01/17/06 | New Background of draft Determination, Attachment 1 |
| 009471 | 01/18/06 | E-mail, T. Ireland transmitting latest Background |
| | 01/18/06 | Latest version of Background for Determination, attachment 1 |
| | 01/19/06 | E-mail, T. Ireland transmitting Factors B and C |
| | 01/19/06 | Factors B and C of draft Determination, attachment 1 |
| | 01/20/06 | E-mail, P. Mehlhop transmitting Background comments |
| 009525 | 01/20/06 | P. Mehlhop Background edits, attachment 1 |
| | 01/21/06 | E-mail, T. Ireland transmitting Factor A |

13

| BATES NO. | DATE | DOCUMENT |
| --- | --- | --- |
| | 01/21/06 | Factor A, attachment 1 |
| | 01/21/06 | E-mail, T. Ireland transmitting Factors B-E |
| | 01/21/06 | Factors B and C, attachment 1 |
| 009637 | 01/21/06 | Factor D, attachment 2 |
| | 01/21/06 | Factor E, attachment 3 |
| | 01/25/06 | E-mail, P. Mehlhop transmitting Factor A comments |
| | 01/25/06 | P. Mehlhop comments on Factor A, attachment 1 |
| | 01/31/06 | E-mail, P. Mehlhop transmitting draft Finding (Determination) |
| 009744 | 01/31/06 | P. Mehlhop draft Finding (Determination), attachment 1 |
| | 02/03/06 | P. Mehlhop Finding citations, attachment 2 |
| | 02/08/06 | E-mail, P. Mehlhop transmitting revised Determination |
| | 02/08/06 | P. Mehlhop revised Determination, attachment 1 |
| | 02/13/06 | E-mail, P. Mehlhop transmitting GUSG 12-Month Finding (Determination) |
| 010126 | 02/13/06 | P. Mehlhop's GUSG 12-Month Finding (Determination), attachment 1 |
| | 02/14/06 | E-mail, A. Pfister transmitting GUSG Finding comments |
| | 02/14/06 | A. Pfister comments on GUSG Finding, attachment 1 |
| | 02/14/06 | E-mail, T. Ireland transmitting Finding edits |
| | 02/14/06 | T. Ireland Finding (Determination) edits, attachment 1 |
| 010492 | 02/14/06 | E-mail, S. Linner transmitting GUSG 12-mo Finding comments for review |
| | 02/14/06 | S. Linner 12-mo Finding comments, Attachment 1 |
| | 02/23/06 | E-mail, P. Mehlhop transmitting GUSG 12-mo |
| | 02/23/06 | P. Mehlhop GUSG 12-mo (Determination), attachment 1 |
| | 03/10/06 | Forwarded e-mail from B. Dach on K. Johnson's comments on Determination |
| 010739 | 03/29/06 | Forwarded e-mail from P. Mehlhop on draft Determination from K. Johnson |
| | 03/29/06 | Draft Determination from K. Johnson |
| | 03/31/06 | E-mail, B. Dach transmitting latest clean version of Determination |
| | 03/31/06 | B. Dach latest clean version of Determination, attachment 1 |
| | 04/05/06 | E-mail forwarded by P. Mehlhop from B. Dach on Final, Final, Final Determination |
| | 04/05/06 | Final, Final, Final Determination, attachment 1 |
| 011245 | 04/06/06 | Forwarded e-mail by B. Dach from K. Johnson transmitting Final Determination to J. Serfis to give to FWP |
| | 04/06/06 | Final Determination to J. Serfis to give to FWP |
| | 04/06/06 | E-mail, B. Dach to K. Johson, not over yet |
| | 04/06/06 | E-mail from K. Johnson on deleting an Urban |

14

| BATES NO. | DATE | DOCUMENT |
|-----------|------|----------|
|  |  | Development paragraph in Determination |
| 011247 | 04/12/06 | Forwarded e-mail by P. Mehlhop from B. Fahey on final GUSG Determination package and final edits between D. Hall and J. McDonald |

## **TAB 11**

**Garton Analysis, Peer Review Documents, and Additional Information on Garton Analysis**

| BATES NO. | DATE | DOCUMENT |
|-----------|------|----------|
| 012824 | 11/15/05 | Garton Analysis |
|  | 11/16/05 | Forwarded e-mail by P. Deibert of Garton Analysis |
|  | 11/16/05 | E-mail by P. Deibert on GUSG thoughts on Garton Analysis |
|  | 01/20/06 | E-mail from P. Mehlhop on new peer review guidance |
|  | 01/24/06 | Forwarded e-mail from P. Mehlhop on Garton analysis |
| 012684 | 01/31/06 | E-mail on peer review letter to CDOW and UDWR |
|  | 01/31/06 | 01/23/06 peer review letter to CDOW attachment 1 |
|  | 01/31/06 | 01/23/06 peer review letter to UDWR attachment 2 |
|  | 02/10/06 | E-mail to P. Mehlhop and T. Apa requesting contact info |
|  | 02/13/06 | E-mail from T. Apa with contact information |
| 012690 | 02/14/06 | E-mail to J. Sedinger forwarding Garton analysis |
|  | 02/14/06 | E-mail to K. Burnham forwarding Garton analysis |
|  | 02/16/06 | E-mail from L. Romin on UDWR peer reviewer nominations |
|  | 02/16/06 | Peer review nomination letter from UDWR attachment 1 (Date incorrect on letter) |
|  | 02/21/06 | E-mail to R. Gibson forwarding Garton analysis |
| 012698 | 02/22/06 | E-mail from T. Remington forwarding letter to M. King |
|  | 02/22/06 | Letter to M. King nominating Garton analysis peer reviewer and providing comment on Garton analysis |
|  | 02/23/06 | Peer review of Garton analysis |
|  | 02/23/06 | E-mail to R. Gibson thanking for review |
|  | 02/27/06 | E-mail to D. Naugle forwarding Garton analyis for peer review |
| 012710 | 03/01/06 | E-mail from J. Sedinger forwarding his Garton peer review |
|  | 03/01/06 | J. Sedinger peer review |
|  | 03/03/06 | E-mail to J. Sedinger thanking him for peer review |
|  | 03/14/06 | Forwarded e-mail by S. Linner regarding UDWR peer review |
|  | 03/15/06 | Forwarded e-mail by S. Linner on G. White peer review |
| 012718 | 03/15/06 | G. White peer review of Garton analysis |
|  | 03/20/06 | E-mail from P. Mehlhop of peer review plan |

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| | 03/20/06 | Peer review plan document |
| | 03/20/06 | Forwarded e-mail from B. Dach on peer review paragraph for determination |
| | 03/20/06 | E-mail from D. Naugle on Garton peer review |
| 012727 | 03/20/06 | D. Naugle peer review of Garton analysis |
| | 03/21/06 | P. Mehlhop draft of peer review paragraph for determination |
| | 03/21/06 | E-mail from S. Willey on peer review plan |
| | 03/21/06 | Peer review plan website attachment 1 |
| | 03/21/06 | Peer review plan website attachment 2 |
| 012737 | 03/21/06 | E-mail from B. Dach on peer review of GUSG RCP PVA analysis |
| | 03/24/06 | Forwarded e-mail by L. Romin on Howe intent to submit Garton analysis peer review |
| | 03/30/06 | 212PM forwarded e-mail by P. Deibert from Garton on GUSG trend analysis model assumptions and output files |
| | 03/30/06 | 212PM Assumptions of trend analysis attachment1 |
| | 03/30/06 | 212PM Graph and data of trend analysis attachment2 (Crawford) |
| 012778 | 03/30/06 | 212PM Graph and data of trend analysis attachment3 (Pinyon Mesa) |
| | 03/30/06 | 212PM Data of trend analysis attachment 4 (Gunnison Basin) |
| | 03/30/06 | 212PM Two graphs and data of trend analysis attachment 5 (Rangewide analysis) |
| | 03/30/06 | 212 PM One graph and data of trend analysis attachment6 (Rangewide analysis) |
| | 03/30/06 | 212 PM Data of trend analysis attachment7 (Rangewide 57-04) |
| 012757 | 03/30/06 | 212 PM Data of trend analysis attachment8 (Rangewide 95-04) |
| | 03/30/06 | 212PM Data of trend analysis attachment9 (San Juan County, UT) |
| | 03/30/06 | 212 PM Graph and data of trend analysis attachment10 (San Juan County, Ut) |
| | 03/30/06 | 212PM Graph and data of San Miguel Basin trend analysis attachment11 |
| | 03/30/06 | 213PM e-mail forwarding March 30, 2006 update of November 15 2005 trend analysis |
| | 03/30/06 | 213PM March 30, 2006 update of November 15, 2005 trend analysis Attachment 1 |
| | 04/03/06 | E-mail from C. Clayton on draft position of peer review comments |
| 012822 | 04/04/06 | F. Howe peer review of Garton analysis |

**TAB 12**

**Genetic and Taxonomy Information**

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| 0012857 | 00/00/05 | Summary of genetic methods |
|  | 05/04/05 | E-mail from S. Willey on 1992 genetics memo |
|  | 05/04/05 | 1992 genetics memo |
|  | 07/19/05 | CDOW genetics briefing |
|  | 07/19/05 | Geneticist e-mail from P. Mehlhop |
| 012875 | 07/22/05 | Genetic papers e-mail to J. Parker et al. |
|  | 07/26/05 | DOI genetic article request e-mail from P. Mehlhop |
|  | 07/27/05 | Quinn e-mail forwarded by P. Mehlhop |
|  | 08/18/05 | Fax on outside help for genetics (and comments on draft) |
|  | 08/24/05 | E-mail request and response for genetic article review assistance by S. Chambers |
| 012888 | 08/24/05 | Request for assistance attachment 1 (Kahn et al. 1999) |
|  | 08/24/05 | Request for assistance attachment 2 (Oyler-McCance et al. 1999) |
|  | 08/24/05 | Request for assistance attachment 3 (Young et al. 1994) |
|  | 08/24/05 | Request for assistance attachment 4 (Young et al. 2000) |
|  | 08/24/05 | Request for assistance attachment 5 (Oyler-McCance et al. 2005) |
| 012932 | 08/26/05 | E-mail from Susan L. on factor E |
|  | 09/30/05 | E-mail from S. Chambers on genetics review |
|  | 09/30/05 | S. Chambers genetic review article |
|  | 10/11/05 | Genetics conference call notes |
|  | 11/10/05 | E-mail of draft genetics memo to Director |
| 012939 | 11/10/05 | Draft genetics memo to Director |

**TAB 13**

**Petition Documents**

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| 012942 | 01/25/00 | Petition |
| 013196 | 12/28/00 | Notice of designation of a candidate species |

**TAB 14**

**Mapping Information**

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| 013199 | 09/08/05 | E-mail to T. Thorn on Gunnison Basin mapping |
|  | 09/14/05 | E-mail from P. Mehlhop on utility websites |
|  | 09/26/05 | E-mail to A. Pfister on Thorn map |

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| | 09/26/05 | Map of Gunnison Basin attachment 1 |
| 013203 | 10/13/05 | E-mail to A. Pfister with map attachments |
| | 10/13/05 | GUSG historic and occupied habitat map attachment 1 |
| | 10/13/05 | GUSG occupied habitat only map attachment 2 |
| | 10/26/05 | E-mail to T. Thorn requesting more maps |
| 013207 | 11/04/05 | Fax from M. Medina on BLM utility corridors |

**TAB 15**

**Miscellaneous Background Documents**

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| 013215 | 02/04/05 | BLM needs for GUSG |
| | 02/23/05 | Conference call notes on GUSG information needs, TI |
| | 02/23/05 | Conference call notes on GUSG information needs |
| | 03/09/05 | E-mail on BLM protection from oil and gas leasing |
| | 03/10/05 | E-mail from A. Goodtimes to K. Nickell |
| | 03/10/05 | E-mail from B. Baker to A. Goodtimes |
| | 03/10/05 | E-mail to A. Goodtimes from TI |
| 013229 | 03/17/05 | E-mail from A. Goodtimes to TI |
| | 03/21/05 | Forwarded e-mail from A. Goodtimes to J. Garner |
| | 06/09/05 | E-mail to P. Mehlhop from TI on land ownership acreages |
| | 07/02/05 | E-mail to P. Mehlhop from TI on Proposed Rule Record of Compliance |
| 013281 | 07/02/05 | Record of Compliance, attachment 1 |
| | 08/19/05 | Forwarded e-mail from A. Pfister on Gunnison County Sage-grouse Coordinator |
| | 08/25/05 | E-mail from L. Luther and notes from H. Bloomfield on San Miguel County gas values |
| | 08/26/05 | E-mail from R. Krueger on Tribal grant funding |
| 013312 | 09/01/05 | E-mail from A. Pfister on WNV antibodies |
| | 09/12/05 | Forwarded e-mail from A. Pfister on Club 20 SG policy |
| | 09/12/05 | Proposed Club 20 Policy, attachment 1 |
| | 09/12/05 | Proposed Club 20 Policy, attachment 2 |
| 013322 | 09/22/05 | E-mail from BJ Johnson on Gunnison Basin WG meeting agenda |
| | 09/22/05 | Gunnison Basin WG meeting, attachment 1 |
| | 09/29/05 | E-mail from A. Goodtimes on San Miguel County Sage-grouse Coordinator |
| 013334 | 10/04/05 | E-mail from A. Goodtimes on cattle grazing deferment |
| | 10/13/05 | E-mail from B. Diamond on elk and grouse |
| | 10/13/05 | Elk and grouse, attachment 1 |
| | 10/13/05 | E-mail from P. Mehlhop on Monticello pipeline |

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| 013338 | 10/13/05 | E-mail from R. Sell on Clait Braun's concerns about sagebrush treatment |
| | 10/14/05 | Forwarded e-mail from G. Skiba on S. Wait write-up on elk and grouse |
| | 11/21/05 | E-mail from M. Kales to J. Whitney on GUSG status |
| | 11/21/05 | GUSG Status to J. Whitney, attachment 1 |
| 013346 | 12/29/05 | E-mail from J. Young on science and sage-grouse |
| | 01/03/06 | E-mail from G. Skiba on SWA management |
| | 01/19/06 | Letter from San Miguel County Commissioners to Director of State Land Board |
| | 02/06/06 | E-mail from Matt Kales to John Whitney |
| | 02/06/06 | Kales e-mail attachment 1 |
| | 02/06/06 | Kales e-mail attachment 2 |
| | 02/17/06 | Conference call notes with Director of State Land Board |
| 013233 | 02/27/06 | E-mail from D. Naugle on Sage Sense Article |
| | 02/27/06 | Sage Sense article, attachment 1 |
| | 03/27/06 | Denver Post Article on Audubon article |
| | 03/28/06 | America's Most Endangered Birds, Audubon article on GUSG |
| 013277 | 03/28/06 | E-mail from J. Cochran on Determination schedule |

**TAB 16**

**Outlines and Briefings**

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| 013369 | 03/29/05 | E-mail from P. Mehlhop on CH and Petition Briefings |
| | 04/14/05 | E-mail from K. Johnson on proposed rule outline |
| | 04/21/05 | E-mail from K. Johnson on proposed rule organization |
| | 04/21/05 | Revised proposed rule outline |
| | 07/13/05 | Draft briefing for Regional Director |
| 013395 | 08/23/05 | Draft briefing for Director |
| | 11/10/05 | E-mail from P. Mehlhop on example outlines |
| | 11/10/05 | Proposed rule outline template, attachment 3 |
| | 11/10/05 | E-mail from C. Nolin on proposed rule outline |
| | 11/16/05 | E-mail from T. Ireland on proposed rule summary outline and ordered references |
| 013412 | 11/22/05 | E-mail from K. Johnson on listing outline |
| | 11/22/05 | K. Johnson listing outline, attachment 1 |
| | 11/30/05 | E-mail from S. Linner on proposed rule bulleted outline |
| | 11/30/05 | S. Linner bulleted outline, attachment 1 |
| | 11/30/05 | E-mail from J. Lyke on proposed rule outline |
| 013446 | 11/30/05 | J. Lyke proposed rule outline, attachment 1 |
| | 12/15/05 | Forwarded e-mail from P. Mehlop on C. Nolin's draft |

|  |  | outline for listing determination |
|  | 12/15/05 | C. Nolin's draft outline for listing determination, attachment 1 |
|  | 12/21/05 | E-mail from P. Mehlhop on comments on C. Nolin's draft outline for listing determination |
| 013484 | 12/21/05 | P. Mehlhop's comments on draft outline for listing determination, attachment 1 |

## TAB 17

**Draft PECE Information**

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| 013500 | 09/27/05 | E-mail from A. Pfister on November PECE meeting agenda |
|  | 10/05/05 | E-mail from N. Green on PECE effort bundling |
|  | 10/18/05 | E-mail from L. Romin on PECE effort bundling |
|  | 10/25/05 | E-mail from N. Green on PECE effort bundling |
| 013504 | 10/26/05 | E-mail from N. Green on PECE policy issue/responses |
|  | 11/07/05 | Meeting notes for PECE meeting 11/07/05-11/09/05 |
|  | 11/07/05 | Draft PECE effort bundle spreadsheet |
|  | 11/07/05 | Draft PECE effort strategy and threats |
|  | 11/07/05 | Draft PECE effort examples |
| 013550 | 11/08/05 | Draft PECE effort bundle |
|  | 11/08/05 | Draft PECE criteria spreadsheet |
|  | 11/08/05 | Draft bundle spreadsheet |
|  | 11/08/05 | Draft PECE evaluation from L. Romin |
|  | 11/09/05 | Draft Certainty of Implementation spreadsheet |
| 013598 | 11/09/05 | November 9 PECE meeting agenda |

## TAB 18

**Preliminary Population Trends, GUSG Rangewide Conservation Plan Population Viability Analysis, and Threat Ranking Information**

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| 013599 | 00/00/05 | Factor A ranking of threats |
|  | 00/00/05 | Regression significance and Dove Creek graph |
|  | 03/24/05 | E-mail from K. Johnson on PVA review |
|  | 04/08/05 | E-mail from J. Cochran on her PVA review |
| 013606 | 04/21/05 | E-mail from T. Ireland on threat assessment table |
|  | 04/26/05 | Threat summary table |
|  | 06/23/05 | E-mail from T. Ireland to P. Mehlhop on lek counts |
|  | 06/24/05 | Another e-mail from T. Ireland to P. Mehlhop on lek counts |

|        | 06/27/05 | E-mail from T. Ireland to A. Pfister on GUSG population estimates |
|--------|----------|--------------------------------------------------|
| 013621 | 07/21/05 | E-mail on wetland and riparian habitat |
|        | 07/25/05 | E-mail on correct trends |
|        | 07/25/05 | E-mail on correct trends, attachment 1 |
|        | 07/26/05 | E-mail from T. Ireland on lek numbers |
|        | 07/26/05 | Lek number attachment 1 |
| 013634 | 08/04/05 | E-mail from P. Mehlhop on threats table |
|        | 08/05/05 | E-mail from T. Ireland on new threats table |
|        | 08/05/05 | New threats table, attachment 1 |
|        | 09/02/05 | E-mail from S. Linner on threat ranking definitions |
|        | 09/08/05 | E-mail from T. Ireland to A. Pfister on threat ranking table |
| 013641 | 09/08/05 | Threat ranking table, attachment 1 |
|        | 09/23/05 | E-mail from A. Pfister to J. Cochran on GUSG model |
|        | 09/26/05 | E-mail from J. Cochran to A. Pfister on GUSG model |
|        | 10/21/05 | E-mail from J. Cochran to A. Pfister on PVA discussion |
|        | 10/21/05 | J. Cochran PVA discussion review, attachment 1 |
| 013648 | 10/21/05 | Describing the modeling work |

## **TAB 19**

**Public Comments on Listing**

| BATES NO. | DATE | DOCUMENT |
|-----------|------|----------|
| 013656 | 03/11/05 | HCCA letter on Horse River Ranch road |
|        | 03/11/05 | San Miguel County Open Space letter on listing |
|        | 04/06/05 | HCCA letter on proposed rule |
|        | 04/07/05 | Delta County letter on proposed rule |
| 013661 | 04/09/05 | Forwarded e-mail from M. Salvo with attachments |
|        | 04/09/05 | M. Salvo comments on proposed rule, attachment 1 |
|        | 07/08/05 | Western Conservation Coalition letter to Senator Allard on potential GUSG listing |
|        | 08/04/05 | Gunnison County Commissioner letter to Regional Director |
|        | 09/15/05 | E-mail from L. Bjornestad to P. Mehlhop transmitting draft letter of response to Colorado Counties, Inc. |
| 013905 | 09/15/05 | Draft letter of response to Colorado Counties, Inc. letter, attachment 1 |
|        | 09/15/05 | Colorado Counties letter on GUSG listing, attachment 2 |
|        | 09/19/05 | Gunnison County Stockgrower's letter on GUSG listing |
|        | 09/19/05 | Final letter of response to Colorado Counties Inc. |
| 013650 | 01/31/06 | Gunnison stockgrower's letter on habitat protection plan |
|        | 03/23/06 | E-mail question from Clait Braun resent |
|        | 03/28/06 | E-mail from Mark Salvo with 20 attachments with |

| BATES NO. | DATE | DOCUMENT |
|---|---|---|
| | | information for listing determination |
| | 03/28/06 | Comments from Mark Salvo on Draft EA for Draft GUSG CCAA, attachment 1 |
| | 03/28/06 | Declaration from C. Braun, attachment 2 |
| 013660 | 03/28/06 | E-mail from C. Braun on AOU grouse taxonomy, attachment 3 |
| | 03/28/06 | Comments from C. Braun on draft GUSG RCP, attachment 4 |
| | 03/28/06 | C. Braun Analysis and Comments on GUSG EA and CCAA, attachment 5 |
| | 03/28/06 | M. Salvo, attachment 7 |
| | 03/28/06 | M. Salvo, attachment 8 |
| | 03/28/06 | M. Salvo, attachment 9 |
| | 03/28/06 | M. Salvo, attachment 10 |
| | 03/28/06 | M. Salvo, attachment 11 |
| | 03/28/06 | M. Salvo, attachment 12 |
| | 03/28/06 | M. Salvo, attachment 13 |
| | 03/28/06 | M. Salvo, attachment 14 |
| | 03/28/06 | M. Salvo, attachment 15 |
| | 03/28/06 | M. Salvo, attachment 16 |
| | 03/28/06 | M. Salvo, attachment 17 |
| | 03/28/06 | M. Salvo, attachment 18 |
| | 03/28/06 | M. Salvo, attachment 19 |
| | 03/28/06 | M. Salvo, attachment 20 |
| 013852 | 03/29/06 | E-mail from M. Salvo responding to Holsinger |
| 013853 | 03/29/06 | M. Salvo response to Holsinger |

**TAB 20**

**Withheld Documents**

| | DATE | DOCUMENT |
|---|---|---|
| **Attorney-client privilege** | 01/05/05 | Conference call notes and briefing |
| **Attorney-client privilege** | 03/10/05 | Conference call notes |
| **Attorney-client privilege** | 08/10/05 | Privileged Interparty Settlement Communication |
| **Attorney-client privilege** | 09/16/05 | Forwarded E-mail from C. Davis on settlement date offer by plaintiff's |
| **Attorney-client privilege** | 10/25/05 | E-mail by T. Thorn on new Gunnison Basin Map |
| **Attorney-client privilege** | 10/25/05 | Gunnison Basin Map (Sensitive-hazardous materials) |

| | DATE | DOCUMENT |
|---|---|---|
| **Attorney-client privilege** | 11/00/05 | Nine maps of Gunnison Basin (Sensitive-hazardous materials) |
| **Attorney-client privilege** | 11/29/05 | E-mail on Gunnison Basin maps for Conference call |
| **Attorney-client privilege** | 11/29/05 | Map for conference call attachment 1 (Sensitive-hazardous materials) |
| **Attorney-client privilege** | 11/29/05 | Map for conference call attachment 2 (Sensitive-hazardous materials) |
| **Attorney-client privilege** | 11/29/05 | Map for conference call attachment 3 (Sensitive-hazardous materials) |
| **Attorney-client privilege** | 11/29/05 | Map for conference call attachment 4 (Sensitive-hazardous materials) |
| **Attorney-client privilege** | 03/00/06 04/02/06 | Conference call notes for both dates |
| **Attorney-client privilege** | 03/20/06 | Forwarded e-mail from P. Mehlhop of T. Graf's comments on draft Determination |
| **Attorney-client privilege** | 03/20/06 | T. Graf comments on draft Determination |
| **Attorney-client privilege** | 03/20/06 | T. Graf Solicitor review sheet |
| **Attorney-client privilege** | 03/30/06 | E-mail from B. Dach with B. Jesup batch 1 comments on Determination |
| **Attorney-client privilege** | 03/30/06 | B. Jesup batch 1 comments on Determination, attachment 1 |
| **Attorney-client privilege** | 03/30/06 | E-mail from B. Dach with B. Jesup batch 2 comments on Determination |
| **Attorney-client privilege** | 03/30/06 | B. Jesup batch 2 comments on Determination, attachment 1 |
| **Attorney-client privilege** | 03/30/06 | E-mail from B. Dach with B Jesup batch 3 comments on Determination |
| **Attorney-client privilege** | 03/30/06 | B. Jesup batch 3 comments on Determination, attachment 1 |
| **Attorney-client privilege** | 03/30/06 | E-mail from B. Dach with B. Jesup batch 4 comments on Determination |
| **Attorney-client privilege** | 03/30/06 | B. Jesup batch 4 comments on Determination, attachment 1 |
| **Attorney-client privilege** | 03/30/06 | E-mail, A. Pfister transmitting responses to comments on GUSG Finding (Determination) |
| **Attorney-client privilege** | 03/30/06 | A. Pfister response to comments on GUSG Finding (Determination), attachment 1 |
| **Attorney-client privilege** | 03/31/06 | E-mail from B. Dach on response to Graf's comments |
| **Attorney-client privilege** | 03/31/06 | Responses to T. Graf's comments on draft Determination |

| | DATE | DOCUMENT |
|---|---|---|
| **Attorney-client privilege** | 04/03/06 | E-mail, P. Deibert transmitting first round of her responses to comments from T. Graf and J. McDonald |
| **Attorney-client privilege** | 04/03/06 | E-mail, P. Deibert GUSG again |
| **Attorney-client privilege** | 04/03/06 | E-mail, P. Deibert with more Gunnison comments |
| **Attorney-client privilege** | 04/03/06 | E-mail, P. Deibert more on Gunnison responses to T. Graf and J. McDonald comments on Determination |
| **Attorney-client privilege** | 04/05/06 | E-mail forwarded by P. Mehlhop from B. Dach on RO response to T. Graf and J. McDonald comments |
| **Attorney-client privilege** | 04/05/06 | RO response to T. Graf and J. McDonald comments, attachment 1 |
| **Attorney-client privilege** | 04/05/06 | Forwarded e-mail by P. Mehlhop from B. Fahey with WO improvements to T. Graf and J. McDonald comments on Determination |
| **Attorney-client privilege** | 04/05/06 | WO improvements to T. Graf and J. McDonald comments on Determination |
| **Attorney-client privilege** | 04/06/06 | E-mail from K. Johnson on deleting a paragraph |
| **Attorney-client privilege** | 04/06/06 | E-mail from A. Pfister responding to next #4 question |
| **Attorney-client privilege** | 04/06/06 | E-mail from S. Linner on need for position statement on peer review |
| **Attorney-client privilege** | 04/10/06 | Forwarded e-mail by P. Mehlhop from B. Dach on J. McDonald request of Determination for her editing |

# Exhibit F:

# Letter from Atwood to Maysonett
# (Aug. 13, 2007)



**Northwest**
1216 Lincoln Street
Eugene, Oregon 97401
541 485-2471
fax  485-2457
eugene@westernlaw.org

**Southwest**
P.O. Box 1507
Taos, New Mexico 87571
505 751-0351
fax  751-1775
taos@westernlaw.org

**Rocky Mountains**
679 E. 2nd Avenue, Suite 11B
Durango, Colorado 81301
970 385-6941
fax  385-6804
durango@westernlaw.org

www.westernlaw.org

# Western Environmental Law Center

**Defending the West**  Wildlands, Water, and Western Communities

August 13, 2007

<u>VIA ELECTRONIC MAIL ONLY</u>
James A. Maysonett
Department of Justice
Environment & Natural Resources Division
james.a.maysonett@usdoj.gov

Re:    Supplementation and Certification of
Administrative Record and Claims of Attorney-
Client Privilege for *County of San Miguel,
Colorado, et al. v. MacDonald, et al.*, Civ. No. 06-
1946 (D.D.C.) (RBW)

Dear Mr. Maysonett:

I am writing to facilitate supplementation of the administrative record for this case
("AR").  Having conducted an exhaustive review, plaintiffs believe that there are many records
that are not currently included in the AR but should be included because they were undoubtedly
before defendants Fish and Wildlife Service ("FWS") and Department of the Interior ("DOI")
when the "not warranted" 12-month determination for the Gunnison sage-grouse was made on
April 18, 2006.  *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971);
*Camp v. Pitts*, 411 U.S. 138, 142 (1973).  In addition, it is clear that defendants' claims of
attorney-client privilege are inadequate, and in many instances, have been waived.  Moreover,
there is no declaration certifying the contents of the AR, which is also necessary to ensure that it
was properly compiled and contains all qualifying records.  All of these matters are discussed
below.

Letter from Atwood to Maysonett
re: Administrative Record
06-1946 (D.D.C.) (RBW)
Aug. 13, 2007    Page 1 of 8

Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
541-914-8372

DISCUSSION

On April 18, 2007, the Sagebrush Sea Campaign ("SSC"), one of the plaintiffs, made a request for records to FWS, Region 6 pursuant to the Freedom of Information Act, 5 U.S.C. § 551 *et seq*. ("FOIA"). *See* Letter from Mark Salvo to Johnny Hunt, *et al*. (Apr. 18, 2006) (Attachment A). As a result of that FOIA request – which included all "public documents possessed by [FWS] that comprise the 'administrative record' for the final listing determination for Gunnison sage-grouse (*Centrocercus minimus*) as threatened or endangered under the Endangered Species Act (71 Fed. Reg. 19954)" – hundreds of records were disclosed to SSC, including most of the records that are currently included in the AR. *See, e.g.*, Index, "Administrative Record for Gunnison Sage-grouse Determination of April 18, 2006" (Attachment B). However, there are many additional records that FWS disclosed to SSC in response to its request for the "administrative record," that were not included in the AR.

It is totally unclear why the agency used apparently different criteria for compiling an "administrative record" in two different situations but for the same administrative determination. An administrative record must include all relevant records that were "before the agency at the time [it] made its decision." *American Bioscience, Inc. v. Thompson*, 243 F.3d 579, 582 (D.C. Cir. 2001) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)). Yet, FWS clearly did not rely on this expansive definition when it compiled the AR.

For example, almost wholly absent from the AR are records that reflect FWS's deliberations concerning "critical habitat" for Gunnison sage-grouse, which the agency was developing throughout most of 2005 in connection with a proposed rule to list the species as "endangered" or "threatened." *See* 16 U.S.C. § 1533(b)(6)(C)(ii); *infra* at Attachment C, Category 1. Just as certainly as the AR should include records reflecting FWS's initial (and, plaintiffs believe, lawful) determination that listing is "warranted," *see, e.g.*, AR 11995-12263 (draft proposed rule to list Gunnison sage-grouse as endangered), records generated during attendant deliberations over a critical habitat designation for the species are also clearly relevant to the ultimate, "not warranted" determination and were before the agencies at the time the ultimate determination was made. Accordingly, these records should be included in the AR as well.[1]

There are also numerous additional records that were included in categories that FWS called "Public Outreach" for SSC's FOIA, but which are now missing from the AR. *See infra* at Attachment C, Category 2. The supplemented AR should also include these, as they are also relevant and were before the decisionmaker at the time of the decision, as FWS previously recognized. Similarly, there are many records that were included in the administrative records for the first and/or second Gunnison sage-grouse ESA citizen suits – and reflect the biological and/or administrative status of the species – but which are also not included in the AR for this citizen suit. *See infra* at Attachment C, Category 3. And, there are many other, miscellaneous records that should be included as well. *See infra* at Attachment C, Category 4.

---

[1] FWS apparently understood this when it responded to SSC's FOIA request and included these records in its disclosure of the "administrative record," but apparently now consider these records to be somehow not relevant or as not having been before the decisionmaker, as they are not even listed in defendants' privilege log.

Letter from Atwood to Maysonett                Western Environmental Law Center
re: Administrative Record                         1216 Lincoln Street
06-1946 (D.D.C.) (RBW)                       Eugene, Oregon 97401
Aug. 13, 2007    Page 2 of 8                    541-914-8372

A list of the missing records by the categories set forth above is provided below.  I have listed records in chronological order by category, and enclosed copies.[2]

ATTACHMENT A

Letter from Mark Salvo, Sagebrush Sea Campaign, to Johnny Hunt, *et al.* (Apr. 18, 2006)

ATTACHMENT B

Index, "Administrative Record for Gunnison Sage-grouse Determination of April 18, 2006"

ATTACHMENT C

Category 1: Records Concerning "Critical Habitat"

| Date | Description (from SSC FOIA response) | Pages |
|------|-------------------------------------|-------|
| 00/00/05 | Draft Critical Habitat patches and acreages | 5 |
| 00/00/05 | List of 18 Draft CH units and total acreage | 1 |
| 03/25/05 | Gunnison sage-grouse timeline | 1 |
| 04/18/05 | Proposed CH concept paper e-mail | 1 |
| 04/18/05 | Proposed CH concept paper attachment 1 | 37 |
| 06/07/05 | Email from K.Johnson to T.Ireland re: GUSG Question | 1 |
| 07/03/05 | Proposed critical habitat concept paper e-mail | 1 |
| 07/03/05 | Proposed critical habitat concept paper | 15 |
| 10/13/05 | Draft CH concept paper | 10 |
| 10/26/05 | CH Designation Benefits Memo from Director | 3 |
| 11/04/05 | E-mail on draft CH concept paper | 1 |
| 11/04/05 | Concept paper attachment 1 | 11 |

Category 2: Records Pertaining to "Public Outreach"

| Date | Description (from SSC FOIA response) | Pages |
|------|-------------------------------------|-------|
| 07/21/05 | Draft outreach plan e-mail | 1 |
| 07/21/05 | Draft outreach plan attachment 1 | 4 |
| 07/21/05 | Draft news release e-mail | 1 |
| 07/21/05 | Draft news release attachment 1 | 3 |
| 07/26/05 | Draft Q&A's e-mail | 1 |
| 07/26/05 | Draft Q&A's attachment 1 | 3 |
| 02/09/06 | Draft summary of 12-month finding (determination) | 2 |

---

[2]  If the government agrees to supplement the record with these or any other records referred to in this letter, it should, of course, file a supplemental administrative record with the Court and serve it on the parties.

Letter from Atwood to Maysonett
re: Administrative Record
06-1946 (D.D.C.) (RBW)
Aug. 13, 2007     Page 3 of  8

Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
541-914-8372

| 02/16/06 | Outreach plan e-mail | 1 |
| 02/16/06 | Outreach plan attachment 1 | 4 |
| 03/28/06 | Gunnison sage-grouse outreach materials e-mail | 1 |
| 03/28/06 | Gunnison sage-grouse final outreach plan attachment 1 | 3 |
| 03/28/06 | Draft Gunnison sage-grouse Q&A's attachment 2 | 2 |
| 03/28/06 | Draft Gunnison sage-grouse news release attachment 3 | 2 |
| 03/28/06 | Gunnison sage-grouse final summary attachment 4 | 2 |
| 04/12/06 | Final Determination news release and Q&As | 4 |
| 04/13/06 | E-mail from S. Rose on outreach materials | 2 |

## Category 3: Records from Prior Litigation

| Date | Description | Pages |
| --- | --- | --- |
| 12/17/02 | Letter from J.Young, Ph.D. to A.Pfister | 2 |
| 08/07/03 | Email from J.Young, Ph.D. to T.Ireland re: drought tour | 2 |
| 10/27/03 | Denver Post, *Dwindling Grouse Face New Threat in W.Nile . . .* | 2 |
| 01/00/04 | C.Braun, Ph.D., Gunnison Sage-Grouse Population Status | 3 |
| 02/12/04 | Letter from S.Navy to A.Pfister | 5 |
| 02/15/04 | Letter from J.Young, Ph.D. to A.Pfister | 2 |

## Category 4: Other Records

| Date | Description | Pages |
| --- | --- | --- |
| 07/26/05 | Email from P.Mehlhop to T.Ireland, APfister, S.Linner re: Fw: Reference lists for rules and notes | 2 |
| 08/18/05 | Email from J.Packer to A.Pfister, J.Steffel re: Re: cost estimates for listing packages and CH | 1 |
| 08/23/05 | GUSG FY06 Budget Projection | 1 |
| 09/06/05 | Email from P.Mehlhop to A.Pfister, J.Lyke, P.Deibert, S.Linner re: GUSG PR with more changes | 2 |
| 09/22/05 | Email from P.Deibert to P.Mehlhop, A.Pfister, J.Bush, J.Lyke re: Re: Uh oh - NEED TO DISCUSS | 3 |
| 10/17/05 | Email from C.Nolin to Unknown Recipients re: General Approach Language | 2 |
| 12/08/05 | Email from E.Stevens to J.Underwood, J.Lyke, C.Nolin, N.Alt, R.Lohoefener re: Fw: Julie Request | 1 |
| 02/14/06 | Email from Rob Roy Ramey re: GuSG taxonomy | 10 |
| 02/14/06 | Ramey review of GuSG taxonomy | 17 |
| 02/20/06 | Newspaper Article: Daily Sentinel, Sage grouse abandon | 1 |

Letter from Atwood to Maysonett
re: Administrative Record
06-1946 (D.D.C.) (RBW)
Aug. 13, 2007     Page 4 of 8

Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
541-914-8372

Glade Park area

04/06/06         Email from R.Dach to B.Kelly, A.Pfister, S.Linner,      2
J.Lyke re: Fw: GUSG 12-month

## CLAIMS OF ATTORNEY-CLIENT PRIVILEGE

Defendants are also attempting to withhold 17 records from the AR (listed below) by invoking the attorney-client privilege. However, as these records have already been disclosed as part of SSC's FOIA request, the privilege has been waived. *See*, *e.g.*, *In re Grand Jury*, 475 F.3d 1299, 1305 (D.C. Cir. 2007). As the D.C. Circuit recently reiterated:

> [a]lthough the attorney-client privilege is of ancient lineage and continuing importance, the confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived. The courts will grant no greater protection to those who assert the privilege than their own precautions warrant. We therefore agree with those courts which have held that the privilege is lost even if the disclosure is inadvertent.

*Id*. (quoting *In re Sealed Case*, 877 F.2d 976, 980 (D.C. Cir.1989) (internal quotation marks and citations omitted)).

Even if it could be said that FWS's public disclosure of these 17 records does not constitute a waiver of the privilege, defendants have failed to carry their burden that the privilege applies to *any* of the records for which defendants have claimed it. The "general subject matters of clients' representations are not [attorney-client] privileged", *U.S. v. Legal Services for New York City*, 249 F.3d 1077, 1081-82 (D.C. Cir. 2001) (citing *In re Grand Jury Subpoena*, 204 F.3d 516, 520 (4th Cir. 2000)), "[n]or does the general purpose of a client's representation necessarily divulge a confidential professional communication, and therefore that data is not generally privileged." *Id*. Even a cursory review of the records that have already been publicly disclosed reveals that defendants cannot show that the privilege applies.

Ultimately, "the burden of demonstrating the applicability of the privilege lies with those asserting it." *Id*. (citing *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir.1998) (per curiam); *cf. In re Sealed Case*, 877 F.2d 976, 979-80 (D.C. Cir.1989)). And, "[t]hat burden requires a showing that the privilege applies to each communication for which it is asserted," *id*. (citing *Lindsey*, 158 F.3d at 1270-71), which defendants certainly have not done. To the contrary, defendants' cryptic entries in the privilege log provide no material information that would assist plaintiffs or a reviewing court determine whether the records are, in fact, privileged.

Accordingly, at a minimum, as to all of the records for which the privilege is claimed defendants must provide an adequate privilege log, which "make[s] the claim expressly" and "describe[s] the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection." Fed. R. Civ. P. 25(b)(5). As to the 17 records that were disclosed to SSC, the privilege has been waived, and those records must be added to the AR.

Letter from Atwood to Maysonett                               Western Environmental Law Center
re: Administrative Record                                         1216 Lincoln Street
06-1946 (D.D.C.) (RBW)                                       Eugene, Oregon 97401
Aug. 13, 2007     Page 5 of  8                                     541-914-8372

| Date | Description | Pages |
|------|-------------|-------|
| 01/01/05 | Conference call notes and briefing | 3 |
| 03/00/06 & 04/02/06 | Conference call notes for both dates | 1 |
| 03/10/05 | Conference call notes | 1 |
| 03/30/06 | Email from A.Pfister to P.Mehlhop, S.Linner re: GUSG finding comments | 1 |
| 03/30/06 | GUSG finding comments attachment 1 | 1 |
| 04/03/06 | E-mail from P.Deibert to P.Mehlhop, T.Ireland, A.Pfister re: First Round of comments | 2 |
| 04/03/06 | E-mail from P.Deibert to P.Mehlhop, T.Ireland, A.Pfister re: more on Gunnison | 2 |
| 04/03/06 | E-mail from P.Deibert to P.Mehlhop, T.Ireland, A.Pfister re: More Gunnison comments | 1 |
| 04/03/06 | E-mail from P.Deibert to P.Mehlhop, T.Ireland, A.Pfister re: Gunnison again | 1 |
| 04/05/06 | E-mail from P.Mehlhop to A.Pfister, S.Linner, T.Ireland re: Fw: RO response to Julie & Tom's comments | 2 |
| 04/05/06 | RO response to Julie & Tom's comments attachment 1 | 137 |
| 04/05/06 | E-mail from P.Mehlhop to A.Pfister, S.Linner, T.Ireland re: Fw: tom-julie.doc | 1 |
| 04/05/06 | Fw: tom-julie.doc attachment 1 | 130 |
| 04/06/06 | Email from S.Linner to B.Kelly, P.Mehlhop, R.Dach, A.Pfister re: Fw: Not over yet | 2 |
| 04/06/06 | Email from K.Johnson to B.Dach, B.Kelly, B.Fahey, D.Krofta, Pat re: Re: Next #1 | 2 |
| 04/06/06 | Email from K.Johnson to B.Dach, B.Kelly, B.Fahey, D.Krofta, Pat re: Re: Next #4 | 2 |
| 04/10/06 | Email from P.Mehlhop to A.Pfister, S.Linner, J.Lyke, re: Fw: GUSG 12-month | 2 |

## ATTACHMENT D: Certification of the Administrative Record

Finally, particularly in light of the many records that are identified in this letter – most of which FWS has either wholly failed to identify or for which the agency has made suspect or waived claims of attorney-client privilege – and because it is simply a prerequisite to certification of any administrative record, defendants must also certify, by declaration, the manner and guidelines that were used to compile the AR, what the AR contains, and importantly, what is does not. *See, e.g., Ctr. for Biological Diversity, et al. v. Kempthorne, et al.*, Civ. No. 06-04186, Order (N.D. Cal. Oct. 19, 2006) (WHA) (Attachment D) (requiring federal defendants, who had already filed an administrative record, to "promptly a detailed declaration explaining what is and is not in the 'administrative record' and the manner and guidelines by which it was compiled").

Indeed, it is necessary for plaintiffs and the Court to know this information because

Letter from Atwood to Maysonett
re: Administrative Record
06-1946 (D.D.C.) (RBW)
Aug. 13, 2007      Page 6 of  8

Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
541-914-8372

defendants' negative listing determination for Gunnison sage-grouse will be reviewed under the Administrative Procedure Act ("APA"), pursuant to which defendants' decision will be vacated if it is found to be "arbitrary, capricious, an abuse of discretion, or not in accordance with law." 5 U.S.C. § 706(2). This review is based on the "whole record or those parts of it cited by a party." *Id.* The "'whole' administrative record . . . consists of all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position." *Thompson v. United States Dep't of Labor*, 885 F.2d 551, 555 (9th Cir.1989) (emphasis in original). Thus, "documents that were *not* relied upon by a decisionmaker, or evidence relating to such documents and their non-consideration, have been held to be necessary elements of an administrative record . . .." *Id.*; *cf. Pikes Peak Family Housing, LLC v. United States*, 40 Fed. Cl. 673, 677 (1998) ("[e]ffective judicial review of an agency's exercise of discretion is irreconcilably at odds with the notion that the reviewing court's inquiry must be confined to an administrative record that is likewise the product of the agency's sole discretion").

Accordingly, if defendants refuse to provide this in this case, plaintiffs will have no choice but to ask the Court to require it of defendants.

## SUMMARY

Despite all of the records that are missing from the AR, I remain hopeful that we may resolve the omission of all of these records through a joint stipulation to supplement it. However, if we can not do so, plaintiffs will have no choice but to move for supplementation before the Court. Plaintiffs may also move the Court to evaluate defendants' privilege claims and/or Order defendants' to provide an adequate declaration that certifies the contents of the AR.

I understand that it may take your clients some time to evaluate plaintiffs' position that the AR must be supplemented with all of the above records, and therefore I am happy to consider and agree to an extension in the deadline by which the parties will submit a joint stipulation and/or plaintiffs will move for supplementation.

I look forward to your prompt response. Please do not hesitate to contact me with any questions. Thank you.

Sincerely,

Amy R. Atwood, Attorney
Western Environmental Law Center

VIA ELECTRONIC MAIL ONLY:

Steven Zwick & Becky King
stevez@sanmiguelcounty.org
beckyk@sanmiguelcounty.org
County of San Miguel, Colorado

Mark Salvo
mark@sagebrushsea.org
Sagebrush Sea Campaign

Jacob Smith & Megan Corrigan
jacob@nativeecosystems.org
megan@nativeecosystems.org
Center for Native Ecosystems

Letter from Atwood to Maysonett
re: Administrative Record
06-1946 (D.D.C.) (RBW)
Aug. 13, 2007    Page 7 of 8

Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
541-914-8372

Nicole Rosmarino
nrosmarino@fguardians.org
Forest Guardians

Rob Edward
rob@sinapu.org
Sinapu

Andy Kerr
andykerr@andykerr.net
The Larch Company

Noah Greenwald
ngreenwald@biologicaldiversity.org
Center for Biological Diversity

Jeff Ruch
jruch@peer.org
PEER

Linda Miller
bosque2@earthlink.net
Sheep Mountain Alliance

Cheryl Day
billday@paonia.com
Black Canyon Audubon Society

Letter from Atwood to Maysonett
re: Administrative Record
06-1946 (D.D.C.) (RBW)
Aug. 13, 2007     Page 8 of  8

Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
541-914-8372

# Exhibit G:

# Letter from Williams to Atwood
# (Aug. 31, 2007)



**U.S. Department of Justice**

Environment and Natural Resources Division

RPW:ks
90-8-6-06239

*Wildlife and Marine Resources Section*                                      *Telephone (202) 305-0206*
*P.O. Box 7369*                                                              *Facsimile (202) 305-0275*
*Ben Franklin Station*
*Washington, DC  20044-7369*

August 31, 2007

VIA ELECTRONIC MAIL ONLY

Amy R. Atwood
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401

        Re:    County of San Miguel, Colorado, et al. v. MacDonald, et al., Civ. No. 06-1946
               (D.D.C.) (RBW)

Dear Amy,

        This letter is in response to your letter of August 13, 2007, in which you requested
supplementation of the administrative record filed in the above-entitled case.  Your letter
requested that the record be supplemented with several categories of documents, including: (1)
documents regarding the U.S. Fish and Wildlife Service's ("Service") deliberations on the
Gunnison Sage-grouse's critical habitat designation; (2) documents pertaining to public
outreach; (3) documents from prior Endangered Species Act ("ESA") litigation involving the
Gunnison sage-grouse; (4) other miscellaneous documents; and (5) documents withheld from the
administrative record on the attorney-client privilege.  Your letter also requested that Defendants
provide a certification for the administrative record.

        As an initial matter, a certification was prepared for the administrative record, but was
inadvertently omitted.  I have provided a copy of the certification as an attachment to the
accompanying email.

        With respect to your request for supplementation, the D.C. Circuit has noted that "[i]t is
well settled that judicial review of agency action is normally confined to the full administrative
record before the agency at the time the decision was made. The focal point for judicial review
should be the administrative record already in existence, not some new record completed initially
in the reviewing court."  *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 322 (D.C. Cir. 1981).  In
this case, Defendants have compiled the administrative record and certified that it is complete.
Defendants' certification is entitled to a strong presumption of regularity.  *Citizens to Preserve
Overton Park v. Volpe*, 401 U.S. 402, 415 (1971), citing *United States v. Chemical Found.*, 272
U.S. 1, 14-15 (1926) ("The presumption of regularity supports the official acts of public officers,
and, in the absence of clear evidence to the contrary, courts presume that they have properly
discharged their official duties") (citations omitted).

        The Supreme Court has made clear that an agency's decision "stands or falls" on the

administrative record prepared by the agency. *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 549 (1978). If the agency's decision is not sustainable on the record compiled, the court must remand the matter back to the agency for further consideration. *Camp v. Pitts*, 411 U.S. 138, 143 (1973). The D.C. Circuit has recognized only two exceptions to the general principle that a court's review is limited to the administrative record compiled by the agency: when there has been a "strong showing of bad faith or improper behavior" or when "the record is so bare that it prevents effective judicial review." *Commercial Drapery Contractors, Inc.* v. *United States*, 133 F.3d 1 (D.C. Cir. 1998). In this case, there has been no showing of agency bad faith, and the Court has a more than adequate record before in on which it can judge the rationality of the agency's listing determination. We therefore do not believe that the supplementation of the administrative record that you have requested is warranted or necessary.

You assert that Plaintiffs do not understand why the administrative record in this case does not include all documents produced in response to Plaintiff's FOIA request. This is because a FOIA response and an administrative record are independent processes carried out at different times pursuant to different statutes. Although Plaintiffs' FOIA request may have asked for the "administrative record" for the final listing determination, an administrative record for a challenged action is prepared after a case is filed as required by the Administrative Procedure Act ("APA"). The standards for compiling an administrative record pursuant to the APA are quite different from those for preparing a response to a FOIA request. As you note in your letter, the "'whole' administrative record . . . consists of all documents and materials directly or indirectly considered by agency decision-makers." *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (citation omitted). The administrative record does not include "every scrap of paper that could or might have been created" on the subject. *TOMAC v. Norton*, 193 F. Supp. 2d 182, 195 (D.D.C. 2002). As the court explained in *Pacific Shores Subdiv. v. U.S. Army Corps of Eng'rs*, 448 F. Supp.2d 1 (D.D.C. 2006), interpreting the administrative record "to encompass any potentially relevant document existing within the agency or in the hands of a third party would render judicial review meaningless." *Id.* at 5 (citations omitted). To "ensure fair review of an agency decision, a reviewing court 'should have before it neither more nor less information than did the agency when it made its decision.'" *Id.*

In stark contrast to the narrow standard for compiling an administrative record, the FOIA's "basic policy [is] to encourage the maximum feasible public access to government information." *Nationwide Bldg. Maint. v. Sampson*, 559 F.2d 704, 715 (D.C. Cir. 1977). As the Supreme Court has explained, the FOIA "is broadly conceived" and reflects "'a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language.'" *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151-52 (1989) (citations omitted). Thus, a FOIA response is not the administrative record within the meaning of the APA, but rather represents all public documents that the agency has judged relevant to the substance and procedure of making its decision.

In this case, the administrative record need not include every document that was produced in response to Plaintiff's FOIA request. For example, the U.S. Fish and Wildlife Service's ("Service") deliberations on the Gunnison Sage-grouse's critical habitat designation were not part of the agency's final listing decision. As such, those documents were not directly or indirectly considered by the decision maker and are not part of the administrative record. Similarly, public outreach documents were not part of the decision record, and thus are not part of the administrative record in this case.

Notwithstanding all of the above, in an effort to address your concerns that the administrative record may be incomplete, Defendants have identified 12 additional documents

that they are willing to add to the administrative record. I have included these documents as attachments to the accompanying email. These documents were selected from categories 3 and 4 identified in your August 13, 2007 letter. Defendants believe that the remaining documents identified in your August 13 letter are not relevant to the challenged agency action (*i.e.* were not directly or indirectly considered by agency decision makers) and they will therefore, not be added to the administrative record.

Plaintiffs also argue that Defendants should add to the administrative record 17 documents withheld on attorney-client privilege because those documents were disclosed in response to Plaintiff's FOIA request, thereby waiving the privilege. Our records indicate that 16 of the 17 documents you list were disclosed in response to Plaintiff's FOIA request, and we therefore will agree to withdraw our assertion of privilege over them. Our records do not indicate that the last document on your list (04/10/06 Email from P. Mehlhop to A. Pfister, S. Linner, J. Lyke, re: Fw: GUSG 12-month) was disclosed in response to Plaintiffs' FOIA request. If Plaintiffs can demonstrate that this document was disclosed as part of Plaintiffs' FOIA request, we will withdraw our assertion of privilege over it as well.

Please let me know which of the aforementioned documents, if any, Plaintiffs would like added to the administrative record so that Defendants may include them in a supplemental administrative record for filing with the Court.

Sincerely,

/s/

Robert P. Williams
Trial Attorney

# Exhibit H:

# Supplemented Records

### Index

| Number | Date | Description | Pages |
|---|---|---|---|
| 1 | 12/17/02 | Letter from J.Young, Ph.D. to A.Pfister | 2 |
| 2 | 01/00/04 | C.Braun, Ph.D., Gunnison Sage-Grouse Population Status | 3 |
| 3 | 02/12/04 | Letter from S.Navy to A.Pfister | 5 |
| 4 | 02/15/04 | Letter from J.Young, Ph.D. to A.Pfister | 2 |
| 5 | 07/26/05 | Email from P.Mehlhop to T.Ireland, APfister, S.Linner re: Fw: Reference lists for rules and notes | 2 |
| 6 | 08/18/05 | Email from J.Packer to A.Pfister, J.Steffel re: Re: cost estimates for listing packages and CH | 1 |
| 7 | 08/23/05 | GUSG FY06 Budget Projection | 1 |
| 8 | 09/22/05 | Email from P.Deibert to P.Mehlhop, A.Pfister, J.Bush, J.Lyke re: Re: Uh oh - NEED TO DISCUSS | 3 |
| 9 | 10/17/05 | Email from C.Nolin to Unknown Recipients re: General Approach Language | 2 |
| 10 | 02/14/06 | Email from Rob Roy Ramey re: GuSG taxonomy | 10 |
| 11 | 02/14/06 | Ramey review of GuSG taxonomy | 17 |
| 12 | 04/06/06 | Email from R.Dach to B.Kelly, A.Pfister, S.Linner, J.Lyke re: Fw: GUSG 12-month | 2 |

December 17, 2002

Al Pfister
Fish and Wildlife Service
Ecological Services
764 Horizon Dr. Building B
Grand Junction, CO 81506-2778



RECEIVED
DEC 1 0 2002
ECOLOGICAL SERVICES
GRAND JUNCTION, CO

Dear Al Pfister:

I appreciate the opportunity to comment on the candidate listing for the Gunnison Sage-Grouse. As I mentioned in my letter last year, I have been in the process of trying to gather data to assess the degree to which the Gunnison Basin Sage Grouse Conservation Plan has been implemented. The working group developed a protocol to assess our plan's first two phases and to look at the degree to which our continued implementation phase had been implemented. The outcome of the assessment provides some reasonable doubt as to the local working group's ability to recover the grouse in the timeframe proposed by the plan. I am concerned about the inadequacy of existing regulatory mechanisms to prevent the Gunnison Sage-Grouse from going extinct.

While there has been a lot of hard effort put into the recovery, we are simply not completing the conservation actions or meeting the habitat objectives of the plan. We examined 78 actions that were to be completed by 2002 and 55 actions from our continued implementation portion. We found that we had completed 9% of the actions for phase 1 (which were actions to be completed by 1999) and 4% of the actions for Phase 2 (which were to be completed by 2002). We actually made the best progress on actions that were to be continually implemented (19% completed). As a group, we recognized the need for greater effort on approximately 70% of our phase 1 and phase 2 conservation actions; however, there was also significant discussion that some members felt they could give no more effort.

Perhaps my greatest concern stems from the decrease in implementation as we move forward to phases with significant habitat and management components. As a group, we identified the 28 "Critical Actions" in the three phases mentioned above. These are actions that the working group identified as having the greatest direct positive effect on population recovery. None of the critical actions were completed. In Phase 1 one quarter of the actions were ranked as having substantial progress while in Phase 2 only 9% were ranked as having substantial progress. One pattern heightening my concern is that we are getting less done in the second phase of our plan overall.

In addition to my concern about the voluntary implementation of the conservation plan, I am concerned about the degree to which the drought will impact Gunnison Sage-Grouse populations. There have been massive die-offs of sagebrush within the basin with about one third of the sagebrush being defoliated according to BLM monitoring. In addition, very few grasses were able to produce seeds and the vigor and production of plants were ranked poor to very poor for the majority of the public lands. While there was some reduction of grazing due to poor habitat condition and a lack of water, the sagebrush lands will take significant time to recover.

000863

A second concern has been the overall decline during the past three years in average number of males attending leks. Lek counts are only valuable as trend data, not as population counts; however, the trends have not shown an increase due to conservation efforts during the past few years, and the 13% decline this season is worthy of concern. Overall, trends show that the average number of males per lek (56 leks classified as active leks or which had birds on them this year) is currently 11.76. The largest numbers of attending males found on any given lek in the basin is 34. Given the recent history in the past decade of having leks with 60-100 males this decline is also of grave concern.

Finally, I encourage the Fish and Wildlife to examine the joint assessment of the level of risk for all sage grouse habitat within the Gunnison Basin. The assessment map was compiled by the Colorado Natural Heritage Program and reflects an interagency effort. The map shows significant threats due to habitat condition and potential for modification and development of Gunnison Sage-Grouse habitat within the Basin.

In conclusion, I encourage the Fish and Wildlife Service to raise the candidate species ranking of the Gunnison Sage-Grouse from a level 5 to a level 2. While I still remain optimistic in local efforts, I believe that without a significant change in our ability to implement the conservation plan and to complete the actions within it, we will witness the extinction of the Gunnison Sage-Grouse during my lifetime.

Sincerely,

Jessica Young, Ph.D.

actual only

2002 max. 617 ÷ 40 = 15.4

2001 max 712 ÷ 45 = 15.8

active + unknown

min = 617 ÷ 64 = 9.6

min = 712 ÷ 64 = 11.1

000864

# GUNNISON SAGE-GROUSE

## Population Status

*Gunnison Basin*—This is largest occupied habitat area and supports the largest population. A significant decrease (~25%) in population size occurred from 1999 to spring 2003 based on intensive counts of males associated with all known leks. The habitat in this area was affected by recurring drought during 1999-2003. Livestock grazing has continued in this interval with few changes in stocking rates and timing of grazing on most allotments. Developments continue to expand into sagebrush habitats and the effects of further development of the Gunnison County landfill are apparent on a cumulative basis. Despite the interest in this population by most agencies and the populace who live in the area, no positive actions have occurred since early 1999.

*Dry Creek/Miramonte*—This is the second largest population and occurs in at least 4 disjointed habitat patches in San Miguel County. Most of the population seasonally uses the Miramonte Reservoir area and Dry Creek Basin. All other segments depend upon the core Miramonte Reservoir area group for continued existence. The data are clear that this overall population declined from 1999 to 2003. Several small isolated active leks were found in 1999-2003 while number of males counted on "historic" leks has declined. It is likely this population was higher than shown (Table 1) in 1999. This population continues to be affected by domestic livestock grazing, especially in Dry Creek Basin, lack of management to benefit sage-grouse at 2 State Wildlife Areas, sagebrush treatments, and second home developments.

*Crawford*—This population increased after 1994 because of proper habitat treatments designed to benefit sage-grouse. The population declined after 1999, possibly because of drought but also possibly because of added habitat treatments. The future of this population depends upon the health of the population in the Gunnison Basin, as there is some linkage.

*Dove Creek*—This small population in Dolores County is about gone because of a lack of flexibility by the Natural Resources Conservation Service (requirements of the Conservation Reserve Program) and the Colorado Division of Wildlife (discontinuation of paying landowners to modify farming practices to benefit sage-grouse in late 1999). This population is functionally extinct. A few birds are expected to linger as long as a small population occurs to the west in San Juan County, Utah (Monticello Population).

*Glade Park/Pinon Mesa*—Gunnison sage-grouse no longer occur in Glade Park except as occasional stragglers. All remaining birds are associated with Pinon Mesa. Habitat treatments are underway which are designed to benefit sage-grouse. My professional judgment is that treatments are too late to improve conditions for sage-grouse. Further development of subdivisions will ensure there is no reasonable hope for Gunnison sage-grouse in the highly fragmented habitats presently available. Domestic livestock grazing practices in Glade Park have been extremely negative for sage-grouse in this area.

*Cimarron*—The few birds that presently exist in the Cimarron area are linked to those in the Gunnison Basin and at Crawford. Despite the presence of a State Wildlife Area, the entire area is overgrazed by domestic livestock, principally sheep. This population is functionally extinct.

*Poncha Pass*—The small population that presently occurs in the northern end of the San Luis Valley is the result of transplants in the early 1970's and again in 2000-03. It is functionally extinct and the size of the remaining suitable habitat suggests it is too small for sustaining a population over time (>20 years). It is unlikely to persist for 5 years.

*Sim's Mesa*—This area is on BLM land directly south of Montrose, Colorado. It supported a much larger population in the 1960's, which collapsed following extensive sagebrush treatments and continued domestic livestock (sheep) grazing. It has been functionally extinct for a number of years but continues to attract a few dispersing individuals, probably from the Gunnison Basin through either Crawford and or Cimarron.

*Monticello, Utah*—The historic size of this population is unknown. It once was linked with a small population near LaSal to the north, and is still linked with the small population to the east in Dolores County, Colorado (Dove Creek). Much of the remaining habitat on private land has been plowed to try to eliminate sagebrush and sage-grouse. The adjacent BLM land is heavily overgrazed by domestic livestock. The count data presently available would appear to overestimate total population size.

Overall Assessment

This is truly an emergency situation as my overall assessment is that all of the small (at least 6 of 8) populations are in immediate danger of extinction. Drought is offered by State and Federal agencies as the primary cause while others point to predation as being a supportive factor. Gunnison sage-grouse evolved with recurring drought and most of the present suite of common predators. They did not evolve with repetitive grazing of the same areas year after year such is now done with domestic livestock. Further, livestock stocking rates and timing of stocking are far too excessive to allow habitats to recover. Grazing as presently practiced in areas used by Gunnison sage-grouse is not sustainable and represents "mining" of the soil resources. Complicating the situation is the information that the Colorado Division of Wildlife essentially abandoned the Conservation Plan process for Gunnison sage-grouse in 1999 with cessation of funding for incentives for participation of farmers and ranchers. Elimination of short-term conservation agreements was extremely negative and implementation of Conservation Plans essentially ceased by 2000. Thus, there has been an overall decline of at least 25% in the size of the total Gunnison sage-grouse population since 1999.

Table 1. Changes in abundance[1] of Gunnison Sage-grouse, 1999 to 2003.

| Area | 1999 | 2003 |
|------|------|------|
| Gunnison Basin, CO | 2,600+ | <2,000 |
| Dry Creek/Miramonte, CO | 300+ | <200 |
| Crawford, CO | 150+ | <100 |
| Dove Creek, CO | <100 | <40 |
| Glade Park/Pinon Mesa, CO | <100 | <100 |
| Cimarron, CO | <100 | <20 |
| Poncha Pass, CO | <50 | <30 |
| Sim's Mesa, CO | <10 | <10 |
| Monticello, UT | <100 | <100 |
| Totals | ~3,510 | ~2,600 |

[1]Unpublished breeding season population data from C. E. Braun (1999) and Colorado Division of Wildlife (2003).

Clait E. Braun
Grouse Inc.
5572 No.Ventana Vista Rd.
Tucson, AZ 85750-7204

January 2004

3



# HIGH
# COUNTRY
# CITIZENS'
# ALLIANCE

RECEIVED
FEB 17 2004
ECOLOGICAL SERVICES
GRAND JUNCTION, CO

Since 1977

Allan R. Pfister                                    February 12, 2004
Assistant Colorado Field Supervisor
US Fish and Wildlife Service
764 Horizon Drive, Building B
Grand Junction, Colorado 81506

Dear Al,

Thank you for the opportunity for High Country Citizens' Alliance to comment on
the status of the Gunnison Sage Grouse at the beginning of 2004. We will follow
your outline and focus on areas in which we feel that our knowledge or expertise
will most assist in your status review.


### "Clearly their numbers are almost extinct in Colorado."
(DNR Director Greg Walcher's forewarning, Grand Junction Sentinel, 11-25-03)

It has been a discouraging year for the sage grouse and those who work to see
that they remain a permanent feature of our landscape. Over the past two years,
the population has declined 30%, despite our efforts. And, in the course of the
past year, we have seen serious miscommunication among members of our
working group, which has done little to further any productive work.

## II. Threats
### Listing Factor A: Destruction/modification/curtailment of habitat or range
i. New threats of this type will be discussed in this section and under Listing
Factor D, below.

ii. There is a new subdivision going in on the former Youmans Ranch, across
from the Ochs Ranch in Ohio Creek. Although the Ochs Ranch has recently been
put in a conservation easement, Ohio Creek remains a focal area for
development. There are also plans for a development just east of Gunnison and
an industrial park on the former uranium tailings dump site on Gold Basin Road.
Development always means new roads, more traffic, new utilities and more
recreational and other impacts. There are probably more developments brewing
with which we are not familiar.

iii. Habitat health appears to be declining due to drought and other factors, as evidenced on last year's field trip. Particularly in light of the severe drought and sagebrush dieback, more deliberate actions need to be taken to protect and improve sage grouse habitat in all seasons. High Country Citizens' Alliance will continue to advocate more diligent management of grazing allotments, including resting those that need time to recover.

### Listing Factor B: Overutilization for commercial/recreational/scientific/education purposes

iv. 1.  We are also concerned about increased impacts to the birds due to wildlife watching and recreation. While the number of birds lost due to viewing on Waunita lek has not been quantified, we feel that even with "controls" at this lek, there has likely been an impact. We worry that more remote leks, where there are no controls, will be even more affected as people learn.about them.

2.  Road and trail use has increased in the sagebrush hills. During spring mating and early brood rearing seasons, more runners, hikers, bikers and their vehicles and dogs use formerly remote areas throughout the day and evening. These uses will continue to increase and will require road closures at critical times.

### Listing Factor C: Disease/Predation

vii. We are concerned that West Nile Virus could decimate the population.

### Listing Factor D: Inadequacy of Existing Regulatory Mechanisms

viii. 1. One of the most egregious actions which could hasten the extinction of the Gunnison Sage Grouse was the passage of several detrimental amendments to Gunnison County's Land Use Resolution. These amendments were proposed by a group of primarily developers and realtors, and despite the protestations of many diverse community members and admonitions about impacts to sage grouse, Commissioners Fred Field and Perry Anderson approved the amendments. Commissioner Jim Starr voted against the amendments, saying, "The results of these changes will be to say we are wide open, come speculate in Gunnison."

The Gunnison County Land Use Resolution was intended to protect the ranching industry as well as the environment. Both of these will suffer if development proceeds without sufficient regulation. Some of the changes are:

The County will now allow two houses per 35-acre parcel, without size limit or public input on their location. There will only be administrative review, by the planning director, who is hired by the commissioners. The Gunnison County public is very concerned about sage grouse, but only proposals for 9,000 sq.ft. houses and combined square footages (including outbuildings) over 12,500' per lot will be reviewed by the planning commission as minor impacts, with public input. This provision could double the number of houses in the county, reducing

open space and removing the incentive and the need for developers to go through the review process in order to get more density. The innovative Large Parcel Incentive Process (LPIP), which had been designed to protect large percentages of open space, is now no incentive at all. We can expect to see even more exempt 35 developments. Doubling the number of houses and siting them with limited review could certainly impact sage grouse. Impacts include more roads and driveways, pets and more general use. Commissioners ignored input from other counties as to how they regulate second houses.

Commercial and industrial uses can expand and be changed with less review. Depending on location, this could have major impacts if the use were to change from a miniature golf to a shooting range, for instance.

All of this development could also impact ranchers (more traffic, more people, etc.), who might decide to sell. The problems associated with grazing would pale by comparison to development, which means the end of any possible habitat restoration. Sage grouse habitat could be greatly diminished. While exact language pertaining to sage grouse hasn't been changed, essentially deregulating land use changes adds up to impacts for the imperiled bird.

More such changes to the LUR are still to come. They could include allowing golf courses to be considered open space and allowing large water impoundments (possibly 10,000af) without county review. Buffer zone protections for water bodies and riparian areas will likely be lessened, affecting sage grouse use of these areas as well as water quality. While the impacts won't appear overnight, it's only a matter of time before unbridled development accelerates impacts on sage grouse.

2. Another action by the County Commissioners was their stated intention to go ahead with the W Mountain trail in a location that USF&W cautioned would impact sage grouse. They reasoned that if the trail were moved to accommodate sage grouse, the county would be in conflict with FAA regulations. Again, the sage grouse suffer as a result of the desires of a growing, and recreating, population.

## Listing Factor E: Other Natural or Manmade Factors
xiii. We are disturbed by the sagebrush dieback in vast areas of the basin. We don't yet know the severity of the impacts, and we know that eventually habitat will recover, but are concerned that habitat might not recover in time to benefit sage grouse. Members of our working group could not agree on which on-the-ground actions might best alleviate the situation.

## III. Pre-listing Section
### Factor A: Destruction/modification/curtailment of habitat or range
vii. High Country Citizens' Alliance continues to support our "Cows Not Condos" credo. We are very pleased with the accomplishment of the complicated Ochs

3

Ranch conservation easement which will keep 4700 acres of important sage grouse habitat in agriculture. New conservation easements in the Tomichi Valley (Irby, Puckett, Owsley, etc.) also show the concern and commitment of quite a few individual landowners. Some of these easements specify management projects to benefit sage grouse; others do not. While it may be a bit early to determine benefits to sage grouse, we truly appreciate all the landowners who have chosen the conservation easement path.

**Additional point:**
The Working Group's Information & Education sub-committee will continue to provide information on the sage grouse to the general public. I&E recently helped fund a Western State College survey on public attitudes toward the bird. We will also present the first "Sage Grouse Stewardship Award" to the Krueger brothers for their conservation efforts. T-shirt sales continue to be brisk, providing income to the I&E budget as well as raising awareness of the bird.

<u>Conclusion</u>
High Country Citizens' Alliance hopes to see conflicts resolved and more purposeful work done by members of the working group. Until our working group becomes more functional, its role in restoring sage grouse populations is greatly diminished. Our group has hired a facilitator to hopefully improve communication and get us back on track, but we don't yet know the outcome of this or even whether any renewed effort would appreciably help the sage grouse. We do know that more work needs to be done to fulfill the Conservation Plan's mission. With the best intentions, our working group's accomplishments have fallen short of our expectations.

There is still no one person coordinating our group's efforts. We feel that there would be more focus if there were a coordinator. Currently, agency personnel (BLM and others) are not able to devote enough of their time to the sage grouse effort. Funding is lacking for this coordinating position.

We rely on those who are "expert" in vegetative land management, but we realize more and more that "expert" is a relative term, and hesitate to think that no one is sufficiently skilled in knowing what treatments will be most effective in reversing the severe decline.

We appreciate those landowners who, in response to a severe drought situation, withheld cattle from their allotments in 2003. We advocate careful monitoring of drought-stressed ecosystems and improved response and proactive management of threatened habitats. BLM and DOW need to quickly identify and implement sage grouse-beneficial projects, as time is of the essence. We emphasize that there must be consistent oversight of cattle grazing on public lands allotments, including making tough choices to help the sage grouse and to maintain general habitat health.

**"We'll do everything within our power as humans to see that this species gets all the help we can give."**
(Russell George, former CDOW director, current DNR director, at the Gunnison Sage Grouse Summit, September, 2003)

High Country Citizens' Alliance continues to support the efforts of the working group, although we feel that more could and should be getting accomplished after nine years of working together. We did not join this group to prevent the bird's *listing*. We joined and have worked for nine years to prevent its *extinction*.

After all this time, we are severely disheartened to see the population of the Gunnison sage grouse continuing on its dangerous downward slide. We believe that the group's efforts are not saving the sage grouse.

In 1998, there were nearly 3,000 birds; now there may be fewer than 2,000. The Gunnison Sage Grouse is disappearing before our eyes.

At this time, High Country Citizens' Alliance asks that you change the status of the Gunnison Sage Grouse to "Endangered"—yes, we think it's time for the bird to be listed-- believing that the aforementioned threats and population numbers warrant listing. We hope that listing will result in everyone involved finding renewed purpose and the funding necessary to make a significant attempt to turn this situation around, before it's too late. This may be our last hope to rescue the sage grouse from extinction.

High Country Citizens' Alliance reached this decision after nine years of anticipating that the working group could improve the situation. It has not. We have heard representatives from US Fish & Wildlife state that listing would not automatically mean drastic changes to grazing practices, and we hope this is true. We believe that many area ranchers are doing their best to coexist with the sage grouse, and we wish to see this coexistence continue. We hope that listing will help bring more protection of the sage grouse on lands that are targeted for development.

The Gunnison Sage Grouse, which is very much endangered, should be officially classified as "Endangered" before its extinction becomes unavoidable.

Thank you for considering our comments.

Sincerely,

Sue Navy
HCCA Vice-President
Gunnison Sage Grouse Working Group member

February 15, 2004

Al Pfister
Fish and Wildlife Service
Ecological Services
764 Horizon Dr. Building B
Grand Junction, CO 81506-2778



Dear Al Pfister:

I appreciate the opportunity to comment on the candidate listing for the Gunnison Sage-Grouse. The information below clearly indicates the need for the Fish and Wildlife Service to implement emergency listing of the Gunnison Sage-Grouse. At a minimum, the need to raise the candidate species ranking from a level 5 to a level 2 is urgently needed to increase implementation of conservation actions.

Most of my comments below are directed towards threats to the grouse within the Gunnison Basin which contains approximately 80% of the species' global population. The Gunnison Basin has approximately 250,000 acres of sage grouse habitat with approximately 80% of the habitat occurring on public lands. The majority of the public land habitat is managed by the Bureau of Land Management. Since initiating discussions for developing a local conservation plan in 1995, there have been increased efforts by all public land agencies to manage for sage grouse.

Despite the efforts, there are significant threats as specified under listing factors A and D to the continued existence of the species and there are inadequate regulatory mechanisms in place to protect the grouse on public lands.

Successful on-the ground implementation of sage grouse habitat objectives has been far below the requirements outlined within the Conservation Plan. For example, out of the 60 BLM allotments that occur in sage grouse habitat within the Gunnison Basin, only 30% of the allotments have sage-grouse objectives written into them. For the 13 allotments that have allotment management plans, only 5 have sage grouse objectives written into them.

In 2002, the ecological status of over 50% of the nesting/early brood habitat and late brood-rearing habitat on all BLM land did not meet the desired future condition of nesting/early brood-rearing habitat described in the Gunnison Sage Grouse Conservation Plan. In 2003, the impacts of the drought and the subsequent monitoring clearly indicate a further downward trend of the ability of uplands and riparian areas to meet sage grouse nesting and brood rearing objectives. In addition, no comprehensive management plan has been developed to help reduce the carrying capacity of big game and livestock on the drought impacted public lands. The adaptive management that would result from such a plan is crucial given the impacts of herbivore grazing on sage grouse nesting and brood-rearing habitat.

In addition to the lack of adequate regulatory mechanisms on public lands, in 2003 Gunnison County weakened environmental protection provisions in their Land Use Regulations which may lead to greater impacts to the Gunnison Sage-Grouse on private lands.

It is commendable that the Colorado Division of Wildlife and others have helped create Conservation Easements on habitat important for the continued existence of the grouse. One challenge continues to be the failure of many of the land management plans to include specific Gunnison Sage-Grouse habitat objectives and an adequate plan for monitoring habitat conditions designed to meet sage-grouse habitat objectives on lands with conservation easements.

The grouse have also lost ground in the Gunnison Basin under listing factor B, recreational activity. Despite several years of effort, grouse at the only Watchable Wildlife site within their range continue to decline at a rate higher than the population's average. For example, during the past two years high male numbers for grouse at the Waunita Watchable site have declined by 65% while the overall decline in the Gunnison Basin is just over 30%. In addition, anecdotal reports suggest increased attempts to view grouse on undesignated viewing leks. The rapid increases in recreational activity on public lands require management strategies and plans that have not been initiated.

Perhaps the most significant new threat for the Gunnison Sage-Grouse can be found in Listing Factor C, disease. The arrival of West Nile Virus in the Gunnison Basin towards the end of mosquito season was disconcerting given the hope that it would not occur at higher elevations. The first harbinger of the affect of the virus on Greater Sage-Grouse can be seen from radio-tracking studies. Four radio tracking studies have experienced West Nile mortalities of Greater Sage-Grouse in Wyoming, Montana, and Alberta, Canada. In some cases, high proportions of the radio-marked birds have died. West Nile Virus may be the deadliest threat to sage-grouse existence in the near future. Critical to understanding the degree to which the virus may devastate sage-grouse populations will be ascertaining information from serum samples of living sage grouse to determine if sage-grouse show antibodies to the disease. Note that currently, there are insufficient radio-marked birds within the Gunnison Basin to detect the impact of West Nile Virus on the largest population of the species. In addition to disease, depredation from non-native red fox may become a grave concern. Data from populations in Utah suggest that red fox can have significant impacts on Greater Sage-Grouse populations. Currently, there are no management activities or plans underway to examine this new threat.

Finally, the current loss of 30% of the Gunnison Sage-Grouse population during the past 2 years can likely be attributed to listing factor E, the impact of natural factors such as drought. The drought has led to a loss of herbaceous cover and significant sagebrush defoliation throughout the species' range. While the lack of significant snow may have aided in winter survival, radio tracking studies suggest that production is low and well below population replacement values, and that overall adult survival is low.

In conclusion, despite sincere efforts by private landowners, and state and federal agencies, the Gunnison Sage-Grouse is still declining and faces new and significant threats due to inadequacy of existing regulatory mechanisms, drought, disease and depredation. Clearly, more effort and funds must be allocated to prevent the extinction of this species. I encourage the Fish and Wildlife Service to either list the Gunnison Sage-Grouse or raise its candidate species ranking to a level 2 to assist in bringing necessary attention and resources to aid in the recovery of the species.

Sincerely,

Jessica Young, Ph.D.

**Pat Mehlhop/R6/FWS/DOI**

07/26/2005 11:04 AM

To  Terry Ireland/R6/FWS/DOI@FWS, Al Pfister/R6/FWS/DOI@FWS, Susan Linner/R6/FWS/DOI@FWS

cc

bcc

Subject  Fw: Reference lists for rules and notes

More work for Terry!

Patricia Mehlhop, Candidate Conservation Coordinator
303-236-4215

----- Forwarded by Pat Mehlhop/R6/FWS/DOI on 07/26/2005 11:10 AM -----

**Jill Parker/R6/FWS/DOI**

07/26/2005 08:50 AM

To  Pat Mehlhop/R6/FWS/DOI@FWS, Chuck Davis/R6/FWS/DOI@FWS, Seth Willey/R6/FWS/DOI@FWS, Bridget Fahey/R6/FWS/DOI@FWS, Robert Dach/R6/FWS/DOI@FWS, Larry R Gamble/R6/FWS/DOI@FWS

cc

Subject  Fw: Reference lists for rules and notes

----- Forwarded by Jill Parker/R6/FWS/DOI on 07/26/2005 08:53 AM -----

**Elizabeth Stevens/ARL/R9/FWS/DOI**

07/26/2005 08:35 AM

To  Bryan Arroyo/RO/R2/FWS/DOI@FWS, Joy Nicholopoulos/R2/FWS/DOI@FWS, Noreen Walsh/R4/FWS/DOI@FWS, laverne_smith@fws.gov@FWS, mary_henry@fws.gov, michael_thabault@fws.gov, Paul Henson/SAC/R1/FWS/DOI, theresa_rabot@fws.gov@FWS, Wendi Weber/R3/FWS/DOI, Cynthia Barry/RO/R1/FWS/DOI@FWS, Julie Lyke/R6/FWS/DOI@FWS, Noreen Walsh/R4/FWS/DOI@FWS, gloria_bell@fws.gov, Jill Parker/R6/FWS/DOI@FWS, Martin Miller/R5/FWS/DOI@FWS, michael_fris@fws.gov@FWS, Michael Roy/R7/FWS/DOI@FWS, Patrick Sousa/RO/R1/FWS/DOI@FWS, Stuart Leon/RO/R2/FWS/DOI@FWS, TJ Miller/R3/FWS/DOI@FWS

cc  martha_balislarsen@fws.gov

Subject  Fw: Reference lists for rules and notes

FYI...

----- Forwarded by Elizabeth Stevens/ARL/R9/FWS/DOI on 07/26/2005 10:30 AM -----

**Martha BalisLarsen/ARL/R9/FWS/DOI**

07/26/2005 10:30 AM

To  Chris Nolin/ARL/R9/FWS/DOI@FWS, Rick Sayers/ARL/R9/FWS/DOI@FWS, Michelle Morgan/ARL/R9/FWS/DOI@FWS, Don Morgan/ARL/R9/FWS/DOI@FWS, Nancy Green/ARL/R9/FWS/DOI@FWS, Marjorie

|        | Nelson/ARL/R9/FWS/DOI@FWS |
| cc     | Kurt Johnson/ARL/R9/FWS/DOI@FWS, Elizabeth Stevens/ARL/R9/FWS/DOI@FWS, Nicole Alt/ARL/R9/FWS/DOI@FWS, Megan Durham/ARL/R9/FWS/DOI@FWS, Marshall Jones/ARL/R9/FWS/DOI@FWS, Matt J Hogan/ARL/R9/FWS/DOI@FWS, Renne Lohoefener/R2/FWS/DOI@FWS |
| Subject | Reference lists for rules and notes |

All, at a meeting with Dan Ashe and Megan Durham yesterday, Julie MacDonald requested the following changes to how we provide and organize references in our rule-makings and notices:

1.  All rules must have <u>all</u> references listed.

2. References organized by:
      1. Peer reviewed original research based on data
      2. Peer reviewed secondary research derived
      3. Grey research based on data
      4. Grey literature based on literature analysis
      5. Other (newspaper articles, anecdotal)

3.  Cites in rules must be complete:  title, page, publication, etc.

4.  Primary vs. Tertiary sources.

5. Include IUCN characterization of data.

This new structure should be implemented as soon as possible.  Rules on the fast track to meet deadlines in the next week are exempt, as well as rules that are already on the surname process.

Please forward as appropriate.

Martha


-------------------------------------------------------------
Martha Balis-Larsen
Acting Special Assistant, AES
202-208-4646

Jill Parker

08/18/2005 09:04 AM

To: Al Pfister/R6/FWS/DOI@FWS
cc: Judy Steffel/R6/FWS/DOI@FWS
Subject: Re: cost estimates for listing packages and CH

DC is doing it now as we speak, using 25 biodays for a 90-d, 90 biodays for a 12-m, 200 biodays for pL,
200 biodays for fL, 200 biodays for pCH, 200 biodays for fCH
DC is using the CO bioday rate Susan submitted with her WAG, which is $556
Your WAG said you needed $33,360 for fL GuSG

Al Pfister/R6/FWS/DOI

Al Pfister/R6/FWS/DOI

08/18/2005 08:45 AM

To    Jill Parker, Chuck  Davis

cc

Subject    cost estimates for listing packages and CH

would you please send me the cost estimates other regions have compiled for listing and CH packages
that you mentioned on our conf call on Tues, so I can put figures together for the briefing for Mary on Mon
and Chris on Tues.  thx

Al Pfister
Western Colorado Supervisor
Western Colorado Office - USFWS
Grand Junction, CO

(970) 243-2778 - phone
(970) 245-6933 - fax

## GUNNISON SAGE-GROUSE FY06 BUDGET PROJECTIONS
### August 23, 2005

NOTE: These calculations are based on November 2005 and November 2006 settlement dates. If dates are later, the dollar amounts should be spread between FY06 and FY07.

1.  **PECE Analysis**

| | | |
|---|---|---|
| Colorado | - 20 days | $11,120 |
| Utah | - 10 days | $5,560 |
| WY | - 10 days | $5,560 |
| Travel (CO & WY) | | $1,000 |
| **PECE Total FY06** | | **$23,240** |

2.  **Proposed Listing Rule**
    FY05: $120K
    FY06:

| | |
|---|---|
| Peer review | $3,000 |
| Public meeting | $5,000 |
| 10 staff days | $5,560 |
| **Proposed Rule Total FY06** | **$13,560** |

3.  **Final Listing Rule**
    FY06:

| | |
|---|---|
| 200 biodays | $111,200 |
| **Final Rule Total FY06** | **$111,200** |

**TOTAL FY06 LISTING REQUEST FROM WO: $148,000**

4.  **Proposed Critical Habitat Rule**
    FY05: $120K (including approx. $40K carried over into FY06)
    FY06:

| | |
|---|---|
| 100 biodays | $55,600 |
| **Proposed Rule Total FY06** | **$55,600** |

5.  **Final Critical Habitat Rule**
    FY06:

| | |
|---|---|
| 200 biodays | $111,200 |
| **Final Rule Total FY06** | **$111,200** |

**TOTAL FY06 CRITICAL HABITAT REQUEST FROM WO: $166,800**

**TOTAL FY06 REQUEST FROM WO: $314,800**



**Pat Deibert/R6/FWS/DOI**
09/22/2005 04:55 PM

To   Pat Mehlhop/R6/FWS/DOI@FWS

cc   Al Pfister/R6/FWS/DOI@FWS, Jodi
     Bush/R6/FWS/DOI@FWS, Julie Lyke/R6/FWS/DOI@FWS

bcc

Subject   Re: Uh oh - NEED TO DISCUSS

Thanks for the info Pat. I think we are much better off going with a statistician, and with the limited amount of data, it shouldn't take too long (or cost too much). It will make it a much more defensible document. I would not use Gary White for several reasons, none of them really valid except for perception. I don't know Doug Johnson. We may need to be a bit sensitive to who the State would be comfortable releasing raw data to....

I think Julie L. makes a good point about Julie M. and the range of years she would like to see. But, its also really the only time span we have for the whole population.

As for the PVA, I agree with the conclusion that it may be rosier than reality because of the lack of habitat considerations. I was also concerned with the numbers used for % males breeding (but I still need to check literature on that one). But, we can't ignore it either. As well explained in the Gunnison plan, PVA's are only tools. We need to be very clear about that, and about our concerns, then use it appropriately in our analysis. Not considering it would be an error in my opinion.

You never warned me about how much this would make my head hurt!!!!  :)  Thanks for copying this to Al - I totally spaced that out....

I will continue on with edits until we decide how to proceed on this. At this time I will focus on listing factors other than habitat. I have finished all the background material, except of course, the population trend stuff. Shall we go with our original plan for me to send that section on to you and Al?

Pat

Pat Deibert
Fish and Wildlife Biologist
U.S. Fish and Wildlife Service
Wyoming Field Office
Pat Mehlhop/R6/FWS/DOI

**Pat Mehlhop/R6/FWS/DOI**
09/22/2005 04:36 PM

To   Pat Deibert/R6/FWS/DOI@FWS

cc   Jodi Bush/R6/FWS/DOI@FWS, Julie
     Lyke/R6/FWS/DOI@FWS, Al Pfister/R6/FWS/DOI@FWS

Subject   Re: Uh oh - NEED TO DISCUSS

Pat,

Here's what I worked up in July for 10-yr trends, but it wasn't for the same reason you're requesting it. It was because Julie thinks Julie M. will only be interested in recent trends. My understanding is that the methods didn't really change over time, but that the survey effort increased, which is why we used average lek counts.

I would be much more comfortable contracting the trend analysis out to a statistician. I just wish I had thought of that last July. The questions are do we have the money (I think so; will check with Judy Steffel)

and how quickly can we get it done. Why do you think the data need to be transformed? Is Gary White too controversial or too close to CDOW to use? We could also check into Doug Johnson's availability; I like his work a lot. Anyone else?

We decided not to use the PVA because it makes the assumption that there is no habitat loss or degradation and, therefore, paints a rosier estimate than it should. We raised the issue in our comments on their draft RCP last November; they tried to add a habitat loss model in, but apparently lacked sufficient data.

Al's supposed to call me in a minute about another issue, so I'll talk statisticians with him. We should probably talk tomorrow.

[attachment "New Trends.xls" deleted by Pat Deibert/R6/FWS/DOI]

Pat

Patricia Mehlhop, Candidate Conservation Coordinator
303-236-4215
Pat Deibert/R6/FWS/DOI



| | **Pat Deibert/R6/FWS/DOI** | | |
|---|---|---|---|
| | 09/22/2005 03:47 PM | To | Pat Mehlhop/R6/FWS/DOI@FWS |
| | | cc | Julie Lyke/R6/FWS/DOI@FWS, Jodi Bush/R6/FWS/DOI@FWS |
| | | Subject | Uh oh - NEED TO DISCUSS |

Hi Pat -

I've been struggling with the population trend information presented in the GUSG package, and have come to the conclusion that it needs a bunch of re-working.

My concerns:
1.  presenting scatterplots for 6 individual populations tells me nothing about the species as a whole.
2.  there are a whole suite of errors associated with using a linear regression model for this analysis. For example, these are not independent variables and data collection methodology varied and that did not seem to be considered in the analysis. Therefore, the r squared values really don't mean much, and don't facilitate our understanding about what is going on out there.
3.  the PVA presented in the gunnison plan was not considered (and I think it should be presented here).

My solutions:
1. If scatterplots are to be used, use the average male/lek counts only for the years in which all populations have been surveyed (by my read, that limits us to the last 10 years). That will give us a much better feel for the recent trends for the entire population instead of trying to infer what is happening using different time periods and methodology. We will never get through peer review as it is.
2. The data likely need to be transformed to be properly considered in any statistical analysis. That is way beyond my comprehension. If we don't have a statistician within the Service that can help us, I think we would be very wise to contract with a statistician to get this done. This will require the raw data from CDOW and UDWR if we don't have it. I know this sounds like a pain, and I don't know what the budget is like, but I think this would be a sound investment.
3. I will read through the PVA today and tomorrow and decide how to incorporate it into the finding. I know there are concerns, but we have to acknowledge it. Depending on the outcome of my review, we may also wish to punt this to a statistician skilled in PVA analyses. I know a few folks that could do that quickly, although not necessarily for free.

I suggest we talk about this ASAP.  If you are available tomorrow, we should at least chat about options we may have.   I'll be in for another hour and half today,  but want to review the PVA before we talk about that point.

Sorry for the bombshell.  We just need to make sure we are basing our conclusions/recommendations on the correct analysis.

Pat

Pat Deibert
Fish and Wildlife Biologist
U.S. Fish and Wildlife Service
Wyoming Field Office

Subject  Fw: General Approach Language

Chris Nolin
Endangered Species
US Fish & Wildlife Service
4401 No. Fairfax Dr. Room 420
Arlington, VA 22203
703-358-2171
—— Forwarded by Chris Nolin/ARL/R9/FWS/DOI on 10/17/2005 11:27 AM ——

| | | |
|---|---|---|
| Renne Lohoefener/ARL/R9/FWS/DOI  10/17/2005 11:03 AM | To | Chris Nolin/ARL/R9/FWS/DOI@FWS |
| | cc | |
| | Subject | Fw: General Approach Language |

—— Forwarded by Renne Lohoefener/ARL/R9/FWS/DOI on 10/17/2005 11:01 AM ——

| | | |
|---|---|---|
| Julie MacDonald/ASFW/OS/DOI@DOI  10/14/2005 02:52 PM | To | Randal Bowman/ASFW/OS/DOI@DOI, Renne Lohoefener/R2/FWS/DOI@FWS |
| | cc | Craig Manson/ASFW/OS/DOI@DOI |
| | Subject | General Approach Language |

**The following language should be in all rules:**

*This paragraph should be included in the description of how determinations of critical habitat were made:*

Segments were designated based on sufficient PCEs being present to support [species name] life processes. Some segments contained all PCEs and supported multiple life processes. Some segments contained only a portion of the PCEs necessary to support the [species'name] particular use of that habitat. Where a subset of the PCEs were present (e.g., water temperature during migration flows) it has been noted that only PCEs present at designation will be protected.

*This paragraph should follow the enumeration of specific PCEs:*

Each of the areas designated in this rule have been determined to contain sufficient PCEs to provide for one or more of the life history functions of the bull trout. In some cases, the PCEs exist as a result of ongoing federal actions. As a result, ongoing federal actions at the time of designation will be included in the baseline in any consultation conducted subsequent to this designation.

```
-----------
Julie
MacDonald/ASFW/OS /DOI To
ramey@spot.colorado.edu
03/18/2005 01:30 cc
PM
Subject this is really stupid(Document
link: Julie MacDonald (Archive) )
```

I got a copy of a paper you wrote on conservation and discussing divisions
between species, subspecies, and dps... I printed out about 5 copes, all of
which I have lost and now i can't find the original... no doubt it's filed
somewhere in a strange place in my computer...
could I impose on you to send me another copy? and I had a couple of
questions about the research, so if you could call, when/if you have time,
that would be very helpful...
Thanks!


```
ramey@spot.colorado.edu
To
03/21/2005 02:05 Julie MacDonald/ASFW/OS/DOI@DOI AM Subject Re: this is
really stupid
```

Julie,
Crandall et al. (2000) is probably the paper you were thinking about. In that
paper, the authors proposed a hypothesis testing approach for recognizing
distinct populations, using the criteria of genetic and ecological
exchangeability on recent and historic time scales.
Exchangeability means that they can be mixed without deleterious effect (that
the populations are not genetically diverged). They proposed that ecological
differences among populations can reflect adaptive differences that would not
be detected by molecular markers alone. The problem with Crandall et al. is
that they have a low bar for what constitutes evidence to reject the
hypothesis of ecological exchangeability. We address that in our Preble's
paper by way of example.

In Agapow et al. (2004), the authors make the point that application of the
Phylogenetic Species Concept has led to excessive splitting of taxa into
smaller and smaller units. This translates into smaller ranges and greater
perceived "endangerment". If conservation effort is afforded to these smaller
and less distinct units, conservation of more unique taxa will be negatively
impacted. This paper is significant because new technologies (e.g.
microsatellite analyses) which provide increased resolution at low levels of
genetic divergence, can translate into more splitting.
Wehausen & Ramey (2000) is a taxonomic revision of northern bighorn sheep
based on morphometrics and mtDNA data. In that paper we treated subspecies as
testable hypotheses with unambiguous criteria. In previous paper that I
published in 1995 in Molecular Ecology (not in PDF yet - I will send a copy),
I used a hypothesis testing approach to testing taxonomies with mtDNA data.
In both papers, Sierra bighorn were unique but quite a few other treasured
subspecies bit the dust.

In Tserenbataa et. al 2004 we considered the argali sheep in Mongolia as a
singles subspecies/ESU/DPS rather than 3 different subspecies traditionally

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

considered. That paper was based on mtDNA data and behavioural/ecological
characteristics. An new paper from the Russian Academy of Sciences using
morphometrics apparently synonymized them officially (as they should be).
The significance of these papers i: 1) that there is not reason to delay
translocations (capture and moving animals to restock historic ranges) and
2) the broad geographic range for this subspecies (~1,200km) runs counter to
the current dice-and-slice DPS designations.

I have included the subspecies hybrid zone manuscript (which has been under
review for 4 months at Conservation Genetics). The significance of that paper
is that there can be a reasonable conceptual model for setting conservation
priorities in zones of contact around subspecies and DPS's.
Finally, Hendry et al. 2000 propose something radical (but practical) for
conservation, prioritize effort based on degree of differentiation.
I'll send a few more relevant articles in a couple of days.
Rob

-------

A few other thoughts:

An alternative to Crandall et al. is to revamp the DPS policy so that there
is more rigorous criteria or thresholds for what constitutes "markedly
separated" and "discontinuities" under the distinct requirement. Under the
significance requirement, the "gap" in the range of a taxon has been
interpreted by the courts as being interpreted as including a missing section
of a fence, including a "gap" at end of a fence (which seems bizarre).

Perhaps a policy that prioritizes these two types of gaps would be
worthwhile. For example, a population important to species survival (e.g.
occupying half the species range) would receive higher priority than a small
peripheral population at the edge of a species range (the gap at the end of
the fence.) In terms of improving on the priority system laid out in the '82
amendments, the number of other subspecies or DPS's within a species, should
be a deciding factor. For example, rodents tend to have many subspecies (e.g.
12 meadow jumping mice subspecies, 14 oldfield miuse subspecies), so do
plants like milk vetches. Many other species have few described subspecies.
Therefore, it would make sense in terms of biodiversity conservation to
allocate greater effort to a subspecies that is one of few in a species,
rather than one of many within a species.

-------

Below is the conclusion to our Preble's paper. We are over the limit on text
and our editor suggested that we start finding ways to shorten it.
So, this section will likely be cut and put into a companion paper or
published elsewhere. (We'll see what the reviewers and editor finally
say.) However, the points we make are important to the listing/delisting
process: set thresholds for listings and use a hypothesis testing approach.

If a minimum threshold for uniqueness is developed, a second one would not be
needed for subspecies. By developing a legal threshold or a minimum listing
standard, the biological debate about subspecies can be avoided to some
extent. Either way, examining a number of listed species through the lens of
proposed criteria would help us understand what impact such criteria would
have on the listing/delisting process and identify possible exceptions.

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

Evaluating the genetic basis of taxa and populations proposed for listing or delisting under the US-ESA Two types of error are inherent in the process of listing taxa or populations as endangered or threatened, and both can have negative effects on conservation (National Research Council, 1995). The first, as illustrated by Z. h. preblei, occurs where an invalid taxon or non-distinct population is listed. This affects other species because limited conservation resources are then misallocated. It can also have negative socioeconomic consequences, including the restriction of some benign human activities, and can undermine public support for the US-ESA. The other type of error occurs when a valid taxon is not listed because its unique properties were not identified, and it goes extinct -- an irreversible loss of biodiversity. Like Type I and II statistical error, criteria set relative to one of the ESA listing errors will influence the rate of the other type of error. Well-defined criteria and regulations are needed for US-ESA listing procedures that minimize both errors to the extent possible.

Criteria for genetic uniqueness need to adequately identify natural discontinuities in gene pool variation and distinguish these from recent (e.g. last 100 years) differences that may be due to genetic drift from human-induced population bottlenecks or isolation (Hedrick, Gutierrez-Espeleta & Lee, 2001; Brown et al., 2004). These criteria should not be so stringent that unique organisms fail to be listed.

Recognizing the problem of using only genetic data, Crandall et al. (2000) proposed that populations be recognized as distinct if they show evidence of recent genetic isolation (not genetically exchangeable) and adaptive differences (not ecologically exchangeable), or both historic and recent adaptation (not ecologically exchangeable). However, these authors did not fully address the question of how much genetic difference is sufficient for each of these distinctions.

In our study, we used a three-step approach to test the validity of subspecies, and the validity of distinct populations. This process could be reduced to two steps if candidates for listing met a minimum standard of genetic uniqueness within the conceptual framework of Crandall et al. (2000). First, test the original taxonomic or DPS description. This is especially important below the level of species, because original descriptions often relied on poorly-quantified traits that have an unknown genetic basis (Hendry et al., 2000; Wehausen & Ramey, 2000; Zink, 2004).

Second, apply critical tests (like the ones in this study) to the hypotheses of genetic and ecological exchangeability as proposed by Crandall et al. (2000). Establishing a conceptually sound and consistent methodological approach for listings is imperative because there are currently no uniform criteria among taxonomic groups (or investigators) as to what constitutes a species, subspecies, or DPS (Avise & Johns, 1999; Crandall et al. 2000). This approach applies equally to taxa being considered for listing or delisting under the US-ESA, and could also be applied to biodiversity laws in other countries. Because 561 of the 1,855 species listed under the US-ESA occur outside the US, the basis of US-ESA listings is also an international scientific issue.

(See attached file: Crandall et al. 2000.pdf)(See attached file: Agapow Species Concept.pdf)(See attached file: WehausenRamey.pdf)(See attached file: MongolianArgali.pdf)(See attached file: SubspeciesHybridZonesRRR.pdf) (See attached file: HendryConsGen2000.pdf)

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

ramey@spot.colorado.edu
To
08/27/2005 04:14 Julie MacDonald/ASFW/OS/DOI@DOI AM cc Subject Preble's/ESA
paper now published in August issue of Animal Conservation


Julie,
You may find this paper to be of some interest.
Rob
The journal website:
http://journals.cambridge.org/action/displayIssue?jid=ANI&volumeId=8&issueId=
03


(See attached file: Ramey_S1367943005002313a.pdf)


ramey@spot.colorado.edu
To
10/08/2005 05:10 Julie MacDonald/ASFW/OS/DOI@DOI PM cc Subject Species
descriptions

Julie,
You may find our recently published letter in Science of interest. We argue
that species descriptions must be accompanied by a body (or parts
thereof) as vouchers, in order to be valid under the International Code of
Zoological Nomenclature. This is significant because if standards are not
maintained, species descriptions could be made without a verifiable basis.
Dr. Timm is the new President of the American Society of Mammalogists.
Rob(See attached file: 2163.pdf)



Julie MacDonald/ASFW/OS /DOI
To ramey@spot.colorado.edu
11/01/2005 03:18 cc
PM Renne Lohoefener/R2/FWS/DOI@FWS
Subject Gunnison Sage Grouse

Per our discussion, you have received the Gunnison Sage Grouse information
that the Regional Office provided to this office. Could you please review
(adding any additional cites you think useful) and give us a precis of the
relative strengths and weaknesses of the data supporting designation of these
bird as a species.

ramey@spot.colorado.edu
To
11/03/2005 12:32 Julie MacDonald/ASFW/OS/DOI@DOI PM cc Subject
Re: Gunnison Sage Grouse

I would be glad to.

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

Julie
MacDonald/ASFW/OS/DOI To
ramey@spot.colorado.edu
11/04/2005 01:14 cc
PM
Subject
Alabama Beach Mice(Document link:
Julie MacDonald (Archive) )

The House Resources Committee has requested that the FWS examine the
taxonomic validity of several beach mice listed under the Act. The mice in
question are the Choctawhatchee, Alabama, Southeastern, St. Andrew, Anastasia
and Perdido Key Beach mice.

Could you please prepare a draft study plan that would analyze the
appropriate morphological and genetic factors necessary to make a
determination as to how distinct these mice are from one another.
Feel free to call me if you have any questions.


ramey@spot.colora
do.edu
To
11/06/2005 01:08 Julie MacDonald/ASFW/OS/DOI@DOI PM cc Subject
Re: Alabama Beach Mice

I would be happy to do this. I will first conduct a literature search on the
topic.

ramey@spot.colora
do.edu
To
11/18/2005 11:53 Julie MacDonald/ASFW/OS/DOI@DOI AM cc Subject Preble's
meadow jumping mouse reviews


As per your request, I have reviewed the documentation provided on the CD.
The CD that you sent appears to be what was provided to the peer reviewers of
the 12-Month Finding on a Petition to Delist the Preble's Meadow Jumping
Mouse (Zapus hudsonius preblei) and Proposed Delisting of the Preble's Meadow
Jumping Mouse and supporting information (the reviews are attached).
In order for the Department of Interior to have a complete picture of the
status of this listed subspecies, you will need three sources of additional
information that were not on the CD. These include: 1) data and analyses on
the current distribution and abundance of populations listed as Z. h.
preblei that were compiled from trapping records; 2) a paper by Boonstra and
Hoyle (1986) about the negative influence of meadow vole (Microtus) density
on meadow jumping mice; and 3) the recently published paper on Zapus taxonomy
by Ramey et al. (2005). These sources of information would have been
available for distribution to peer reviewers, therefore, they can be obtained
from the the USFWS.

1) The data and analyses of current distribution and abundance of Z. h.
preblei from trapping records may be obtained from the USFWS and the Wyoming
Natural Diversity Database Program. You may want to ask that the data be
presented in the following format: the number of sites where Z.

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

hudsonius were documented to historically occur; the number of sites where they occurred at the time of listing; and the number of sites where they are currently known to occur. The definition of "site" should be precisely defined, there may be more than one definition in use. You may also find it useful to have the trapping data summarized according to the number of hydrologic units where Z. hudsonius were/are found.

2) Boonstra and Hoyle (1986) discovered that Zapus hudsonius have a low trappability with live traps and therefore can easily be missed in a typical survey. For example, of 208 animals captured over a three-year study in experimental plots, 132 were captured only once, and animals known to be alive in successive years were often captured only once or twice a year. Additionally, these authors discovered that Z. hudsonius are directly limited by competition with a sympatric species, Microtus.

Removal of Microtus from experimental plots resulted in population increases of Z. hudsonius. The authors concluded that Zapus populations are perennially low throughout their range because of competition with Microtus. This has some bearing on the question of proximate and ultimate causes affecting density of listed populations of Z. hudsonius in Colorado and Wyoming. You may want to ask if there has been a similar analysis of Z. hudsonius trapping data at long-term study sites in these states.
Important here would be to test the hypothesis that Z. hudsonius trapping success is inversely correlated with Microtus trapping success.

3) The most recent paper on taxonomy of Z. h. preblei (Ramey et al. 2005) included data from microsatellites, additional analyses, and tests of ecological and genetic exchangeability that were beyond that of earlier unpublished reports (Ramey et al. 2004a,b). The manuscript that was accepted for publication was publicly available, along with associated data sets, on 1 June 2005. One of the reviewers apparently obtained the manuscript independently, while the other two reviewers made no reference to it.

I have also looked at the sources of information provided earlier by the USFWS to the peer reviewers for the reports by Ramey et al. (2004a,b). Two of the original sources of information used by the USFWS and cited in the listing notice (U.S. Fish & Wildlife Service, 1998) as evidence of taxonomic uniqueness of Z. h. preblei, were apparently not included in the materials for the peer review of the Ramey et al. (2004a,b): the original descriptions of Z. h. preblei and Z. h. intermedius by Krutzsch (1954) and the unpublished mtDNA study by Riggs et al. (1997). Reviewers may also have found the morphometric study of North American Zapus by Jones (1981) to be useful. That research, reported no support for the recognition of any subspecies of Z. hudsonius. These sources of information can be found on the CD that you sent. I hope that you find this information useful. Please feel free to contact me if you have any questions.

Rob Roy Ramey II, Ph.D.

Literature Cited:

Boonstra, R., & Hoyle, J. A. (1986) Rarity and coexistence of a small hibernator, Zapus hudsonius, with fluctuating populations of Microtus pennsylvanicus in the grasslands of southern Ontario. Journal of Animal Ecology 55: 773-784.

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

Jones, G. S. (1981) The systematics and biology of the genus Zapus (Mammalia, Rodentia, Zapodidae) unpublished Ph.D. dissertation. Indiana State University, Terre Haute.

Krutzsch, P. H. (1954) North American jumping mice (genus Zapus). University of Kansas Publications, Museum of Natural History 4: 349-472.

Ramey, R. R., H. P. Liu, and L. Carpenter (2004a) Testing the taxonomic validity of Preble's meadow jumping mouse (Zapus hudsonius preblei). Report to the Governor of Wyoming and the U.S. Fish and Wildlife Service. Denver Museum of Nature & Science.

Ramey, R. R., H. P. Liu, and L. Carpenter (2004b). Testing the uniqueness of Z. h. intermedius relative to Z. h. campestris. Denver Museum of Nature & Science Technical Report 2004 - 8.

Ramey, R. R., H. P. Liu, C. W. Epps, L. Carpenter, and J. D. Wehausen. (2005) Genetic relatedness of the Preble's meadow jumping mouse (Zapus hudsonius preblei) to nearby subspecies of Z. hudsonius as inferred from variation in cranial morphology, mitochondrial DNA, and microsatellite DNA: implications for taxonomy and conservation. Animal Conservation 8:329-346.

Riggs, L. A., J. M. Dempey, and C. Orrego. (1997) Evaluating distinctiveness and evolutionary significance of Preble's meadow jumping mouse: phylogeography of mitochondrial DNA non-coding region variation.

Final Report, submitted to Colorado Division of Wildlife, 13pp.
U.S. Fish & Wildlife Service (1998) Final rule to list the Preble's meadow jumping mouse as a threatened species. The Federal Register 53 : 26517-26530.

ramey@spot.colora
do.edu
To
12/16/2005 04:32 Julie MacDonald/ASFW/OS/DOI@DOI PM cc Subject
Re: Alabama Beach Mice

As per your request, I have developed a research proposal that could be used to test the taxonomic validity of beach-dwelling mice in Florida and Alabama. This proposal utilizes a stepwise approach, multiple lines of evidence, and thresholds of uniqueness to retest the basis of these subspecies classifications.

If you develop a request for proposals, I would suggest that the qualifications of the investigators should include: experience in morphometrics, population genetics (allozymes, DNA sequencing, and microsatellites), photography, geology (stratigraphy), and GIS. I have circulated the proposal among several colleagues (listed on the cover page) who have provided comments and have expressed interest in participation as collaborators. Should the opportunity arise, we would be interested in conducting this research.

It would be useful to initiate the project with Steps 1 and 2, to assess the availability of data and specimens, and the degree of confidence in earlier taxonomic work, prior to undertaking Steps 3-5.
Rob Roy Ramey II, Ph.D.

The House Resources Committee has requested that the FWS examine the taxonomic validity of several beach mice listed under the Act. The mice in question are the Choctawhatchee, Alabama, Southeastern, St. Andrew, Anastasia and Perdido Key Beach mice.

Could you please prepare a draft study plan that would analyze the appropriate morphological and genetic factors necessary to make a determination as to how distinct these mice are from one another. Feel free to call me if you have any questions.

(See attached file: Beach_mouse_proposal_12_17_05.pdf)

From: ramey@spot.colorado.edu
To: Julie MacDonald/ASFW/OS/DOI@DOI
cc:
01/05/2006 12:24 PM
Subject: Re: Beach-dwelling mice

As per your request, I have examined the three page summary titled " Peromyscus polionotus: Summary of Current and Ongoing Research" (hereafter referred to as the summary). The summary does not provide sufficient detail to evaluate the preliminary results of the unpublished studies. The letters by Drs. Hoekstra and Van Zant could provide a more useful, first-hand account of the hypotheses being tested, the sampling design, thresholds of uniqueness, and preliminary results. The draft manuscripts would provide far more detailed information.

It would be worthwhile to ask if the study by Van Zant and Wooten was specifically designed to test the taxonomic validity of beach-dwelling mouse subspecies (both compared to each other and to mainland subspecies). The third paragraph of the summary states that they have examined all five Gulf Coast subspecies and the fourth paragraph states that they postulate that Gulf Coast beach-dwelling mice have been differentiating from mainland subspecies for 250,000 years. To evaluate the reliability of this estimate, it would be important to know what sampling, model(s), and assumption(s) this estimate was based upon. It would be useful to know the extent to which all of the subspecies were reciprocally monophyletic with respect to mitochondrial DNA.

>From a taxonomic standpoint, it would be useful to know if these investigators only compared Gulf Coast beach-dwelling mouse subspecies to each other or if they did a broader geographic sampling to test the uniqueness of beach-dwelling mouse subspecies to nearby mainland subspecies. In other words, was the sampling representative of the distribution of the variation across subspecies and therefore designed to specifically address the question of subspecies uniqueness? Were all 100 individuals in the Van Zant and Wooten study sequenced for all 2,700 base pairs of mitochondrial DNA or a subset of it?

The study by the Drs. Hoekstra, Mullen, and Steiner appears to have compared Gulf Coast beach-dwelling mouse subspecies to each other and one nearby mainland subspecies. The other five adjacent mainland subspecies were not apparently sampled. The FST values indicated are high but below a threshold of 0.5 used in Ramey et al. (2005). It cannot be determined from the summary which subspecies had the highest or lowest values. It also cannot be determined what the sample sizes were, if there are any fixed allelic

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

differences among subspecies, or if any of these populations show evidence of a genetic bottleneck that would be expected to inflate FST values. All of this information is useful for using the preliminary results to test thresholds of genetic uniqueness among subspecies for neutral genetic markers. These investigators and others (Mullen et al., in press) previously developed 60 microsatellite loci for use in genetic studies of Peromyscus poliontus.

It cannot be determined from the summary what question is being addressed in that study and which morphological traits are being analyzed by the Hoekstra lab. Preliminary results on the effects of natural selection on beach-dwelling mice by the Hoekstra lab (summarized in Science News Focus, 2005) suggests that pelage coloration and pattern is primarily controlled by the interaction of two genes.

The proposed study by the University of Central Florida to examine current vs. historic levels of genetic variation in southeastern beach-dwelling mice uses a similar sampling strategy to that in the proposal I prepared at your request: "Testing the uniqueness of beach-dwelling mouse subspecies of the old field mouse (Peromyscus poliontus)."

In evaluating evidence used in taxonomic inference it is worthwhile asking: what were the hypotheses being tested and what thresholds were used for accepting or rejecting these hypotheses? Based on the summary, none of the studies listed appear to consider the question: "How convincing is the basis of the original taxonomic description of beach-dwelling mice?"
If additional data were gathered to expand the sampling of the studies listed in the summary, so they included all beach-dwelling mouse subspecies and adjacent mainland subspecies, and if subspecies were then tested relative to thresholds of genetic uniqueness, the analyses would fulfill most of the research proposed in Step 4 of the proposal "Testing the uniqueness of beach-dwelling mouse subspecies of the old field mouse ( Peromyscus poliontus)."
As you may recall, the first three steps of that proposal retest the original basis of these subspecies and puts their evolution in a timescale using analysis of coastal geology. In this way, the proposal is not in conflict with the ongoing studies in the summary, but fills an important information gap about the validity of the original descriptions and the evolutionary timescales involved.

Literature Cited:

Mullen, L., M., Hischmann, R. J., Prince, K. L.,. Glenn, T. C., Dewey, M. J. and Hoekstra, H. E. (in press) Sixty polymorphic microsatellite markers for the oldfield mouse developed in Peromyscus poliontus and Peromyscus maniculatus. Molecular Ecology Notes.

Ramey, R. R., Liu, H. P. Epps, C. W., Carpenter, L., and Wehausen, J. D. (2005). Genetic relatedness of the Preble's meadow jumping mouse (Zapus hudsonius preblei) to nearby subspecies of Z. hudsonius as inferred from variation in cranial morphology, mitochondrial DNA, and microsatellite DNA: implications for taxonomy and conservation. Animal Conservation 8: 329-346.
Science News Focus (2005). Color genes help mice and lizards. Science 309: 374-375.

ramey@spot.colorado.edu

To

02/14/2006 02:04 Julie MacDonald/ASFW/OS/DOI@DOI PM cc Subject Gunnison sage grouse review

As per your request, I have reviewed literature on the Gunnison sage grouse (Centrocerus minimus, Young et al. 2000) relative to the strengths and weakness of the information used in support of this being a unique species. A copy of this review is attached.(See attached file: Sage Grouse Review.doc)(See attached file: Sage Grouse Review.pdf)

To: Julie MacDonald

From: Rob Roy Ramey II, Ph.D.

Subject: Gunnison sage grouse review

Date: 14 February 2006

As per your request, I have reviewed literature on the Gunnison sage grouse (*Centrocerus minimus*, Young et al. 2000) relative to the strengths and weakness of the information used in support of this being a unique species.  For the purposes of clarity in this review, I refer to the species *Centrocerus urophasianus*, from which the Gunnison sage grouse was split, as the greater sage grouse.  Another common name for *Centrocerus urophasianus* is sage grouse.

**Reduction in historic range**

Summary

1) It is an unsubstantiated claim that the historic range of the Gunnison sage grouse extended into southern Colorado, New Mexico, Arizona, Oklahoma, and Kansas.  This has been used by some authors (e.g. Young et al. 2000; Schroeder et al. 2004) to estimate the extent of the Gunnison sage grouse decline.  However, the genetic relatedness of these extinct populations to extant populations sage grouse is unknown because only one museum specimen might exist from New Mexico (Schroeder et al. 2004) and none from Arizona, Oklahoma, or Kansas.

Discussion

From historical records, sage grouse may have inhabited a much larger range extending into southern Colorado, Utah, New Mexico, Arizona, Oklahoma, and Kansas.  Although the authors cited above, have maintained that these were also Gunnison sage grouse, there is no physical evidence to support this claim.  For example, the following statement appeared in the Notice of Designation of the Gunnison Sage Grouse as a Candidate Species (U.S. Fish and Wildlife Service 2000): *"Through museum specimens or written accounts, Braun (1995) determined that the Gunnison sage grouse's historic range occurred in southwestern Colorado, southwestern Kansas, northwestern Oklahoma, northern New Mexico, northeastern Arizona, and southeastern Utah."*

Given the absence of museum specimens outside of Colorado (none found by Young et al. 2000; one found by Schroeder et al. 2004), the statement above is obviously incorrect.  In the description of the Gunnison sage grouse as a new species (Young et al. 2000) state: *"We found no museum specimens from New Mexico, Arizona, Kansas, or Oklahoma to test the general hypothesis that sage grouse in all these locations were Gunnison sage grouse."*  These authors then postulate that these historic populations were Gunnison sage grouse for two reasons: 1) historic sagebrush habitat was nearly contiguous between the current range of the Gunnison sage grouse and those in southern Colorado, Utah, Arizona, and New Mexico, and 2) the proximity of the historic populations in Kansas and Oklahoma are closer to that of the Gunnison sage grouse than to the greater sage grouse.

If hypothesis proposed by Young et al. (2000) were correct, it would support the claim that the Gunnison sage grouse had undergone a drastic decline in range.  On the other hand, if these extinct populations were not distinguishable or formed an entirely separate taxon, it would not support this claim.  To distinguish between these two alternatives, morphological (e.g. discriminant analysis) or genetic testing (e.g. assignment tests) of an adequate sample of museum specimens would be required.  However, because no specimens are known to exist from the historic populations (with the possible exception of one specimen from New Mexico), these are not testable hypotheses.  It will remain unknown which scenario is correct.

**Geographic isolation**

Several authors have suggested that mountains surrounding the Gunnison sage grouse may have isolated these populations for other sage grouse populations, less than 100km away (Hupp and Braun 1991; Young 1994).  While mountains surround the Upper Gunnison Basin (e.g. Blue Mesa Reservoir to Monarch Pass) on three sides and can be expected to result in some degree of isolation, absolute isolation cannot be expected for several reasons.  First, the Gunnison Basin is not a closed basin surrounded by impermeable mountains, it is a river basin that drains to the west to lower elevations and more open terrain (the Lower Gunnison River Basin) via the Gunnison River.  Several of the Gunnison sage grouse populations exist in the Lower Gunnison River Basin where surrounding mountains are of lower elevation, less contiguous, and therefore less of a barrier to sage grouse movements.  Second, sage grouse have been observed in the alpine (Hoffman and Cade 1982, as cited in Hupp and Braun 1991) so, while mountains may hinder movement, they are not an absolute barrier.  Third, The genetic data do not provide compelling support for the notion of long-term isolation (e.g. since the late Pleistocene).  Otherwise, a larger number of fixed differences would be expected.  And finally, if the Gunnison Basin were completely isolated, then one must ask the question: "How did the sage grouse colonize this area in the first place?"


**Body weight**

Summary

1) Body weight differences between the Gunnison sage grouse and the greater sage grouse are not as great as previously reported by Young et al. (2000) in support of species status.

2) Body weight has been shown to vary both seasonally (a mean of 27% in adult males using data from Beck and Braun (1978)) and between years, due to nutritional differences.

3) The extent to which genetic vs. environmental factors influence body weight in sage grouse is unknown. For example, a smaller body size in the Gunnison sage grouse could be due to environmental differences (ecophenotypic variation), genetic differences, or a combination of both.

4) Body weight is not a reliable indicator of underlying genetic differences among putative sage grouse species.

Discussion

The mean body weight of Gunnison sage grouse is smaller than that found in populations of the greater sage grouse, although there is overlap.  However, the magnitude of body weight differences between the Gunnison sage grouse and the greater sage grouse are not as great as those reported by Young et al. (2000).  In support of their description of the Gunnison sage grouse as a new species, Young et al. (2000) compared the small-bodied Gunnison population to the largest-bodied sage grouse population sample reported by Beck and Braun (1978) from Jackson, Colorado.  Young et al. (2000) did not use any of the other population samples from Hupp and Braun (1991).  Two population samples of the Jackson, Colorado population were available but only the larger-bodied sample was used by Young et al. (2000).



Figure 1.  Distribution of mean body weights of male sage grouse (in kilograms). Populations are from left to right: 1) Gunnison, Colorado; 2-4) eastern Idaho; 5) southeastern Wyoming; 6) Moffat, Colorado; 7-8) central Montana; 9-10) Jackson, Colorado.  Data are from Hupp and Braun (1991).  In their description of the Gunnison sage grouse as a new species, Young et al. (2000) compared the small-bodied Gunnison population (number 1) to largest-bodied sage grouse population, from Jackson, Colorado (number 10).  Young et al. (2000) used only the larger-bodied sample from Beck and Braun (1978) and none of the other (intermediate) population samples from Hupp and Braun (1991).  If these intermediate sized populations (numbers 2 - 9) are omitted from a comparison, the size difference between the Gunnison sage grouse and the greater sage grouse appears to be greater (32% vs. 14%).

The extent to which body weight differences are due to genetic vs. nutritional differences (ecophentypic variation) is not known. Both the Biological Species Concept and the

Phylogenetic Species Concept do not rely on ecophenotypic variation (which is often found with body weight) as a basis for species status. In their summary, Beck and Braun (1978) offered the following caveats in the use of body weights for comparisons: *"Interpretation of regional differences in Sage Grouse body weight is difficult. Although regional differences occur, weight relationships between age and sex classes and seasons are similar; yet absolute differences vary as much as 24% from North Park weights (which were the highest). Lower weights reported may result from regional differences in populations and/or habitat quality. The relationship of habitat to body weight should be investigated in association with survival rates. Weight data from a specific region should not be extrapolated to other Sage Grouse populations. The marked seasonal differences in body weights throughout Sage Grouse range hinder the use of weight as a comparative parameter among populations."*

Hupp and Braun (1991) found differences in body weights between years in the Jackson population. They also reported that *"Differences in body size may have a nutritional basis as Sage Grouse in North Park* [Greater sage grouse] *and the Gunnison Basin* [Gunnison sage grouse] *feed on different species of sage brush that have dissimilar chemical composition (Remington and Braun 1985, Hupp 1987)."* If nutritional differences strongly influence body weight differences among populations, it would suggest that this trait reflects ecophenotypic variation. A potential way to assess genetic vs. environmental components of body weight in sage grouse is to measure heritability of body size in different environments.

Based on the information above, body weight is not a reliable indicator of underlying genetic differences among putative sage grouse species.

**Culmen length (beak) and tarsus length (foot)**

These two variables were reported by Hupp and Braun (1991) and Young et al. (2000) to be different in the Gunnison vs. greater sage grouse. These are structures that are not expected to vary after growth to adult size, and Hupp and Braun (1991) showed that these characters do not vary significantly between years in adults. Although the culmen was reported by Young et al. (2000) to be shorter and narrower in the Gunnison sage grouse, the extent to which there may be shape differences that are independent of skeletal size (suggesting a genetic basis), is not known. This could be determined by multivariate analysis of these traits.

**Secondary sexual characteristics of males (plumage and courtship displays)**

Summary

1) Reported differences by Young (1994) and Young et al. (2000) between the Gunnison and greater sage grouse in plumage and courtship are mostly qualitative, rely on line

drawings, artist renderings, or pictures of "typical" individuals, or have an inadequate statistical summary.

2) These traits have an inadequate population sampling because they do not compare the Gunnison populations to the range of variation found in the greater sage grouse.

3) The extent to which each of character is under genetic control is unknown.  (See section on playbacks.)

Discussion of plumage

Most of the male secondary sexual characteristics that are reported to distinguish the Gunnison sage grouse from the greater sage grouse are represented in the cited studies as line drawings, artist renderings, or pictures of "typical" individuals (Young 1994, Young et al. 2000).  These include differences in dorsal neck feathers, banding on tail feathers (called retricies), courtship displays, and vocalizations (presented in the form of sonograms).  No statistical representations of population variation of these traits were provided.  Instead, qualitative descriptions of differences are used.  For example, in Young et al. (2000), retricies are described as having *"clearly defined white or cream bars"* in the Gunnison sage grouse vs. *"indistinct barring"* in the greater sage grouse.  An artist's line drawing of two feathers from each putative species are used to illustrate differences in barring.  A similar artistic rendering is used to illustrate differences in dorsal neck feathers.  While these could be "typical" of individuals they are <u>not</u> population samples that could be used to portray the range of individual variation within and among populations and/or species.  There could be differences between the putative species, but without knowing the range and overlap in these traits the degree of phenotypic uniqueness cannot be determined.

Qualitative descriptions of measurements are used in Young et al. (2000) rather than comparisons that rely on uniform summary statistics (mean, range, standard deviation, and sample size).  For example, the lengths of male dorsal neck feathers are described as 120-173mm in the Gunnison sage grouse, and "generally less than 115mm" in the greater sage grouse.  Similarly, the length of tail feathers of Gunnison sage grouse have a mean of $347\pm0.5$, while the greater sage grouse are reported as *"generally <315mm."*  While these could be valid distinguishing characters, a lack of uniform summary statistics, information on population and species level variation (especially across the greater sage grouse), time of year sampled (tail feathers become shorter from wear, males lose dorsal neck feathers) makes reliable comparisons impossible.  Such measurements could be gathered from museum specimens or wild caught individuals in a systematic manner.

Discussion of courtship displays

Young (1994) and Young et al. (2000) concluded that *"differences in male courtship vocalizations were likely a barrier to mating between Gunnison Sage-grouse and Sage-*

*grouse. Thus Gunnison Sage-grouse appear to be reproductively isolated based on male courtship vocalizations, which act as pre-mating isolating mechanisms."* Because vocalizations play such a prominent role in the status of Gunnison sage grouse, this is an important trait to look at.

The authors above claim that Gunnison males display at a slower rate than males of other populations. In fact, only one Gunnison and two greater sage grouse populations were sampled for this trait (Mono and Jackson). While the Gunnison males did display at a significantly slower rate, the density of the Gunnison population is also lower (Young 1994). Sage grouse are known to display at faster rates when densities at leks are higher.

The authors claim that Gunnison males posses a different mating call in which they pop their air sac nine times instead of twice. The same simple line drawings of typical acoustic elements, and a single sonogram from each putative species, are presented in Young (1994) and Young et al. (2000). Seven additional spikes are visible on the sonogram of the Gunnison sage grouse, but there is no quantitative analysis of the variation of this call within or among the putative species. The additional sounds identified as air sac pops on the sonogram could be from reverberations rather than major inflation/deflations. Video of the Gunnison sage grouse and greater sage grouse are posted on the web for reference. The displays are approximately two seconds in length. Examination of these videos shows that the air sac of both species is clearly deflated (popped) twice, but additional pops may not be visible to the naked eye. Additional sonograms and video are needed to qualify the variation found in Gunnison sage grouse and greater sage grouse. Without an analysis of population level variation, there is no way of knowing the extent to which these acoustic components differ in frequency or timing within populations, and the extent of differences (or overlap) among populations.

It is also worthwhile to question the extent to which each of these traits may be under genetic control vs. environmental differences between populations.

**Playback experiment**

Summary

1) Reproductive isolation between the putative species is assumed, has not been demonstrated experimentally. The experimental design of the playback experiments lacked consistent sampling design and effort.

2) A higher degree of avoidance of a foreign playback obtained from another population does not rule out interbreeding between them.

3) Female choice of mates can be under genetic control or it can be a learned behavior (e.g. imprinting and mate copying), or it can be both.

Discussion of methods used in playback experiment

Playback experiments used by Young (1994) in comparisons between the Gunnison sage grouse and greater sage grouse are cited as evidence of reproductive isolation between these putative species. Therefore, it is worthwhile to examine the experimental design and assumptions that were used in this study.

In this experiment, the author used male vocalizations of the greater sage grouse and the Gunnison sage grouse. The recordings of the Gunnison sage grouse were obtained from that putative species in Colorado, while the greater sage grouse recordings were obtained from the Mono County, California, at the western edge of the greater sage grouse range. The recordings were digitized and rerecorded at the rate of 6.6 struts per minute prior to playback. This was the average strut rate across the one Gunnison and two greater sage grouse populations (one from Jackson County, Colorado and the other from Mono County, California). Because strut rate has been shown to affect mating success, the author reasoned that a single uniform strut rate should be used. This involved speeding up the Gunnison playbacks by approximately 8% while slowing down the greater sage grouse playbacks by approximately 13%. The extent to which this could have affected responses is unknown. The recordings were then played back in two populations: 1) the South Parlin lek near Gunnison, Colorado (Gunnison sage grouse) and 2) the Lone Tree lek in Moffat County, Colorado (greater sage grouse).

While the Gunnison sage grouse recordings were made in Colorado populations close to where they were played back (<80km), the same cannot be said for the recordings of the greater sage grouse. These were obtained from the western edge of the species range, over 800km (500 miles) away from the populations where they were played back, rather than from populations bordering the Gunnison sage grouse.

In each playback experiment, two speakers were hidden at each lek. One played the Gunnison vocalizations while the other played the Greater sage grouse vocalizations. While the author may have attempted to control for potential bias by randomizing which speaker played either call, there were aspects of the experiment that were not controlled, were not part of a reciprocal study design (not measured in both populations), or relied on untested assumptions. For example:

> The author notes (Young 1994, page 68), *"The experiment consisted of a haphazard schedule of days with playbacks and control days without playbacks."*

> The number of observers was not constant, there were *"from 2-6 observers"* per playback.

> The distance from observers to playback speakers and observation posts also were not constant: observers were in *"blinds 40 - 80m from the speakers, or from towers (1 x 3 x 3m), or trucks 100 - 200m from the lek."*

8

Sampling effort and dates of observations also differed between the two sites. Four days of observations were made at the Lone Tree lek (greater sage grouse) which was sampled from 25 - 29 March, while there were 15 days of observations at the South Parlin lek (Gunnison) which was sampled later, from 29 March - 1 May.

Females were not marked, so it is unknown whether observations were independent. In other words, to what extent were some females counted multiple times in a day or multiple times during the course of the study? The author relied on the following method but did not validate its effectiveness in avoiding recounts: *"To avoid sampling any female more than once per day, only females which arrived and were tracked prior to the departures of other females were counted. However, females could have been sampled more than once if they visited the lek on more than one day."*

Physical differences between the two leks existed, and this led to a different sampling scheme for each. For example, in the South Parlin lek (Gunnison sage grouse), males are dispersed over 200m while in the Lone Tree lek, males were *"less dispersed than those of the Gunnison males."* That led to the playback speakers being placed 180 m apart in the S. Parlin lek (Gunnison sage grouse) and 40m apart in the Lone Tree lek (Greater sage grouse). It is not detailed in the study whether both speakers were played simultaneously (each with a different call), or if these were alternated. The length of playbacks and time interval between playbacks was also not stated. This information is needed in order to know how the author measured the response coming from each speaker when females were in the zone of observation overlap between then. In other words, the playback experiment on the Lone Tree lek used speakers placed closer (40m) than the measurement distance used to record female response (50m) to them.

Densities of females were also different between leks. As the author noted: *"Female densities were too high in the Lone Tree lek, (as many as females 15 -20 females in 5 x 5 m areas) to measure visit durations; therefore, only data on arrival location and minimum distance to each speaker could be recorded."*

The results of the playback experiment presented in Table 3.1 of Young (1994) show that only one variable (*minimum distance* of females to speakers) was collected from both populations. In measuring the responses of Gunnison females (but not northern females), *duration* and *time of arrival* were measured. In measuring the responses of Northern females (but not Gunnison females), *distance on arrival* was measured. The responses of Gunnison males to playbacks included: *minimum distance,*

*duration, strut activity,* and *time of arrival.* However, no such comparisons were made of males from the Northern population.

Discussion of results from playback experiment

Central to the claim that these putative species are reproductively isolated is the following discussion of playback experiment results by Young (2000): "*Gunnison females stayed farther from and spent less time within 50m of the northern [greater sage grouse] playback, and did not mate within 50m of the speakers.*" The following details are provided to evaluate the basis of that statement:

> 1) "*Gunnison females stayed farther from* [*the northern playback*]"
> The actual difference in *minimum distances* of females to the different playbacks was less than 6m (20 feet) and no females walked up to either playback. Thus, it could also be concluded that they avoided both playbacks.

> 2) ["*Gunnison females*] *spent less time within 50m of the northern playback*"
> Gunnison females did spend significantly less time in front of the speaker in the Gunnison population; however, the mean difference in *minimum distances* was 5.5m in the Gunnison population and 4.2m in the Northern population. The authors did not consider alternative explanations for this result. A plausible alternative explanation is that the differences were due to the fact that the Gunnison call was speeded up (from ~6.1 to 6.6 struts per minute) while the Mono County, California calls were disproportionately slowed down (from ~7.5 to 6.6 struts per second).

> 3) ["*Gunnison females*] *did not mate within 50m of the speakers*"
> Young does not report whether females mated near the speakers in the population of greater sage grouse.

There are four potential hypotheses that could explain the response in the playback experiment.

> 1) There are genetic differences between species in male display and/or female choice of male characteristics (e.g. that favored by Young et al. 2000.).

> 2) Differences in playback results were due to clinal (geographic) differences in male displays rather than marked genetic differences among species.

> 3) Differences are an artifact of the experimental design.

10

4) Differences are due primarily to imprinting and/or mate copying (cultural differences) rather than genetic differences.

These hypotheses could be tested using a more controlled, reciprocal experimental design that made the same comparisons for each population, and relied on data from multiple populations. In the absence of genetic data that show long term reproductive isolation, a well designed reciprocal transplant experiment or experimental design that combines behavior and genetics, (such as that used by Gee 2005) would be needed to determine the extent to which potential reproductive isolation is due to genetics, culture, and/or environmental conditions.

**Mitochondrial DNA** (141 base pairs of DNA sequence data)

Summary

1) The one unique mtDNA haplotype found in Gunnison sage grouse has only a single mutational difference from the most common mtDNA type found in both species.

2) With the exception of this single mtDNA type, the Gunnison sage grouse mtDNAs are a subset of the variation found in the greater sage grouse.

3) Nine out of ten mtDNA types found in Gunnison sage grouse are also found in the greater sage grouse.

4) The Gunnison sage grouse are not reciprocally monophyletic (two mutually exclusive mtDNA lineages) with respect to mtDNAs of the greater sage grouse, or close to being so.

5) A table of the specimen ID, collection location, species/subspecies, and mitochondrial DNA haplotype designation is needed for both putative species to conduct a combined analysis.  Such a table may be found in (Oyler-McCance et al. 2005) for the greater sage grouse but not in Oyler-McCance et al. (1999) on the Gunnison sage grouse.

Discussion

A single unique mtDNA haplotype "G" was found in the Gunnison sage grouse.  That mtDNA haplotype is one mutational step away from a common mtDNA haplotype "A" that was found in all but one of the populations sampled by Oyler-McCance et al. (1999). The actual frequency of the "G" mtDNA type (as well as others) cannot be determined from the published paper by Oyler-McCance et al. (1999).  The mtDNA haplotype frequencies are summarized in pie diagrams rather than in a table of mtDNA haplotype frequencies for each population.

The unique mtDNA haplotype "G" is not found in all Gunnison sage grouse populations. The overall frequency of haplotype "G" in the Gunnison sage grouse is approximately 0.24. It's highest frequency is approximately 0.7 in the Crawford population and it is absent from the Dove Creek population. (Note: these are approximate frequencies obtained from the pie diagram in Oyler-McCance et al. 1999.)

Nine out of ten mtDNA haplotypes found in Gunnison sage grouse are also found in the greater sage grouse, which has 80 different mtDNA haplotypes (Oyler-McCance et al. 2005). The Gunnison sage grouse has a subset of the mtDNA variation found in the greater sage grouse. This extensive shared mtDNA variation between the two putative species shows that the Gunnison sage grouse is not reciprocally monophyletic with respect to mtDNA or close to being so.

Longer mtDNA sequences could be obtained (e.g. than the 141 base pairs used by Khan et al. 1999 and Oyler-McCance 1999, 2005) but this would not likely alter the basic results that indicate shared variation and shallow evolutionary divergence in unique mtDNA haplotype(s).

**Microsatellites** (data from 4 microsatellite loci)

Summary

1) A lack of publicly available microsatellite data from Oyler-McCance (1999, 2005), as well as the authors reliance on a selected set of summary statistics, means that the results of this study are incomplete and cannot be validated.

2) The comparison between the putative species was made using populations of the greater sage grouse from northwestern Colorado alone and not across its entire range.

3) Low genetic variation was found in the Gunnison sage grouse populations. Because the genetic variation in the Gunnison populations is 2 - 3 times lower than that of the greater sage grouse, the extent to which population bottlenecks may have increased genetic distances between the putative species needs to be determined.

4) Summary statistics, that could be used to estimate historic vs. recent rates of genetic exchange and detection of population bottlenecks, were not used in the studies by Oyler-McCance (1999, 2005).

5) The extent of mtDNA sequence divergence between the two putative species is less than that found among some populations of the greater sage grouse. The degree to which this would be found with microsatellite markers is unknown, but would be worthwhile to determine.

Discussion

Four microsatellite loci were surveyed by Oyler-McCance et al. (2005) to compare the Gunnison sage grouse with populations of greater sage grouse in northwestern Colorado. Only summary statistics of microsatellite variation are presented in their study. Without a table of allele frequencies, it cannot be determined from this paper whether unique alleles were found in the Gunnison sage grouse, and if so, at what frequencies. Young et al. (2000) stated that Oyler-McCance (1999) found three unique alleles found in the Gunnison sage grouse but did not state their frequencies or populations where they occurred.

A range-wide study of the greater sage grouse (Oyler-McCance et al. 2005) did not include comparisons with the Gunnison sage grouse, although four of the same microsatellite loci (and the same mtDNA control region segment) were used in both studies. If both putative species were analyzed together, it would provide an objective measure of differentiation (or lack thereof) between the putative species.

The studies by Oyler-McCance et al. (1999, 2005) reported microsatellite $F_{ST}$ values within each of the two putative species but made no such comparison between them. Such a comparison is important in understanding the extent of evolutionary divergence between geographically close populations of these putative species. The figures in Oyler-McCance et al. (1999) depict genetic distances from microsatellite allele frequencies without any scale that indicate the units of genetic divergence. (This is like trying to read a map without a distance scale.) As a result, it is impossible to evaluate the actual (measured) genetic divergence of populations or putative species. Oyler-McCance et al. (1999) make a number of qualitative statements regarding the uniqueness of the Gunnison sage grouse. They claim, for example that *"A similar distinction [to mtDNA] was found using microsatellites,"* but they do not quantify this claim.

The microsatellite variation was lower in Gunnison sage grouse (1.8 - 3.5 alleles per locus) compared to the greater sage grouse (5.5 - 6.5 alleles per locus). In the discussion, Oyler-McCance et al. (1999) attribute substantial structuring (local population differentiation) of Gunnison sage grouse populations due to their small population size and reduced genetic variation. However, they do not consider this as an alternative explanation when discussing the microsatellite results for the Gunnison sage grouse vs. the greater sage grouse. This is an important issue because genetic bottlenecks and very recent isolation (even within the last 50 years) can increase the apparent genetic divergence between populations (Hedrick, Gutierrez-Espeleta & Lee, 2001; Brown et al. 2004; Epps et al. 2005; Ramey et al. 2005).

Suggested data to request
It would be worthwhile to further evaluate the genetic differentiation of Gunnison sage grouse to that of greater sage grouse utilizing thresholds of genetic divergence for species, subspecies, and distinct populations (e.g. Crandall et al. 2000; Ramey et al. 2005). The previous two studies compared the Gunnison sage grouse only to greater sage grouse populations in Colorado (Oyler-McCance et al. 1999), and populations of the

greater sage grouse separately (Oyler-McCance et al. 2005). There has not yet been a combined comparison of populations across the range of both putative subspecies. Therefore, you may find it useful to request the microsatellite data used in analyses presented in the two papers on sage grouse genetics: Oyler-McCance et al. (1999 and 2005). These data would include specimen ID, collection location, species/subspecies, and microsatellite genotype for each individual. If the data were provided in electronic format it would facilitate analysis.

Also, a table of the specimen ID, collection location, species/subspecies, and mitochondrial DNA haplotype designation is needed for both putative species in order to conduct a combined analysis. Such a table may be found in (Oyler-McCance et al. 2005) but not in Oyler-McCance et al. (1999) on the Gunnison sage grouse. An earlier paper, Khan et al. (1999) did have such a table of haplotype numbers but additional mtDNA sequences were by Oyler-McCance et al. (2005).

## Minisatellites (Jeffreys 33.6 and 33.15 probes)

Summary

1) Banding patterns in hypervariable minisatellite DNA showed "no unique bands were detected specific to the Gunnison population."

Discussion

Minisatellite DNAs are tandem repeats in the nuclear genome that are of greater length than microsatellites. In this method, many hypervariable minisatellite loci are screened simultaneously, rather than one at a time as with microsatellites. Minisatellites were in broad use until the cost and ease of running microsatellites made them a marker of choice. Young (1994) found less variation (bands) in the Gunnison sage grouse than the greater sage grouse, and "no unique bands were detected specific to the Gunnison population." These results were apparently not reported in any subsequent papers.

## Conclusion

Young et al. (2000) make the following claim: *"DNA sequence information from the mitochondrial and nuclear genomes supports the hypothesis that there is a barrier to gene flow between the Gunnison Sage-Grouse and Sage-Grouse populations. This implication is made on the basis of two observations. First, there are frequency differences of shared microsatellite alleles between Sage-grouse and Gunnison Sage-Grouse. There are 3 microsatellite alleles and 1 mitochondrial DNA haplotype that have remained unique to the small-bodied populations, based on the current sampling numbers. We suggest these genetic differences are the result of reproductive isolation that is reinforced by (at minimum) the behavioral isolating mechanisms discussed*

14

*previously.  Hence we conclude these are separate species according to the biological species concept."*

As discussed in this review, there is a low (population level) amount of genetic divergence among these putative species, and extensive shared mtDNA and microsatellite variation.  Also, key evidence used in support of genetic, morphological, and behavioral differences is weak, suffers from inadequate sampling, or a lack of controlled experimental design.  While species status for the Gunnison sage grouse population appears doubtful, the same issues above apply to whether it could be considered as a subspecies (Avise and Ball 1990; Ball and Avise 1992; Zink 2004) or a distinct population segment (Cronin 1997; Crandall et al. 2000; Ramey et al. 2005).

## Literature Cited

Avise, J. C., and R. M. Ball Jr. (1990). Principles of genealogical concordance in species concepts and biological taxonomy. *Oxford Survey of Evolutionary Biology* **7**: 45–67.

Ball, M. R., and Avise, J. C. (1992) Mitochondrial DNA phylogeographic differentiation among avian populations and the evolutionary significance of subspecies. *Auk* **109**: 626-636.

Beck, T. D. I., and Braun, C. E. (1978) Weights of Colorado Sage grouse. *Condor* 80:241-243.

Braun, C. E. (1995) Distribution and status of sage grouse in Colorado. *Prairie Naturalist* 27:-9.

Brown, L.M.,.Ramey, R.R., Tamburini, B. and Gavin, T.A. (2004) Population structure and mitochondrial DNA variation in sedentary Neotropical birds isolated by forest fragmentation. *Conservation Genetics* **5**: 743-757.

Crandall.K.A., Bininda-Emonds O.R.P, Mace, G. M. and Wayne, R. K. (2000) Considering evolutionary processes in conservation biology. *Trends in Ecology and Evolution* **15**:290-295.

Cronin, M. A. (1997) Systematics, taxonomy and the Endangered Species Act: the example of the California gnatcatcher (*Polioptila californica*). *Wildlife Society Bulliten* **25**:661-666.

Epps, C. W., Palsboll, P. J., Wehausen, J. D., Roderick, G. K., Ramey II, R. R., and McCullough, D. R. (2005) Highways block gene flow and cause a rapid decline in genetic diversity of desert bighorn sheep. *Ecology Letters* **8**, 1029-1038.

Gee, J. M. (2005) No species barrier by call in avian hybrid zone between California and Gambel's quail (*Callipepla californica and C. gambelii*). *Biological Journal of the Linnean Society*. **86**:253-264.

Hupp, J. W. and Braun, C. E. (1991) Geographical variation among Sage Grouse populations in Colorado. *Wilson Bulletin* **103**:255-261.

Hedrick, P. W., Gutierrez-Espeleta, G. A. & Lee, R. N. (2001) Founder effect in an island population of bighorn sheep. *Molecular Ecology* **10**: 851-857.

Kahn, N. W., Braun, C. E., Young, J. R., Wood, S., Mata, D. R., and Quinn, T. W. (1999) Molecular analysis of genetic variation among large-and small-bodied Sage Grouse using mitochondrial control-region sequences. *Auk* **116**: 819-824.

Oyler-McCance, S. J., Kahn, N. W., Burnham, K. P., Braun, C. E., and Quinn, T. W. (1999) A population genetic comparison of large and small-bodied sage grouse in Colorado using microsatellite and mitochondrial DNA markers. *Molecular Ecology* **8**:1457-1465.

Oyler-McCance, S. J., Taylor, S. E., and Quinn, T. W. (2005) A multilocus population genetic survey of the greater sage grouse across their range. *Molecular Ecology* **14**:1293-1310.

Ramey, R.R., H.P. Liu, C. W. Epps, L. Carpenter, and J.D. Wehausen. (2005) Genetic relatedness of the Preble's meadow jumping mouse (*Zapus hudsonius preblei*) to nearby subspecies of *Z. hudsonius* as inferred from variation in cranial morphology, mitochondrial DNA, and microsatellite DNA: implications for taxonomy and conservation. *Animal Conservation* **8**:329-346.

Schroeder, M. A., Aldridge, C. L., Apa, A. D., Bohne, J. R., Braun, C. E., Bunnell, S. D., Connelly, J. W., Deibert, P. A., Gardner, S. C., Hillard, M. A., Kobriger, G. D., McAdam, S. M., McCarthy, C. W., McCarthy, J. J., Mitchel, D. L. , Rickerson, E. V. and Stiver, S. J. (2004) Distribution of Sage-grouse in North America. *Condor* **106**:363-376.

U.S. Fish and Wildlife Service  (2000) Notice of designation of the Gunnison sage grouse as a Candidate Species. *The Federal Register* **65**:82310-82312.

Young, J. R. (1994) The influence of sexual selection on phenotypic and genetic divergence among Sage Grouse populations.  Ph.D. dissertation.  Purdue University, West Lafayette, IN.  123 pages.

Young, J. R., Braun, C. E.,  Olyer-McCance, S. J., Hupp, J. and Quinn, T. W. (2000) A new species of sage-grouse (Phasianadae: *Centrocercus*) from southwestern Colorado. *Wilson Bulletin* **112**:445-453.

Young, J. R., Hupp, J. W., Bradbury, J. W., and Braun, C. E. (1994) Pheontypic divergence of secondary sexual traits among Sage Grouse populations. *Animal Behavior* 47:1353-1362.

Young, J. R. (1994) The influence of sexual selection on phenotypic and genetic divergence of Sage Grouse. Ph.D. dissertation. Purdue University, Indiana, USA.

Young, J. R., Braun, C. E., Oyler-McCance, S. J., Hupp, J. W., and T. W. Quinn. (2000) A new species of Sage-Grouse from Southwestern Colorado. *Wilson Bulletin* **112**:445-453.

Zink, R. M. (2004) The role of subspecies in obscuring avian biological diversity and misleading conservation policy. *Proccedings of the Royal Society of London* **271**: 561-564.



**Robert Dach/R6/FWS/DOI**
04/06/2006 03:39 PM

To  Brian T Kelly/R6/FWS/DOI@FWS, Al
    Pfister/R6/FWS/DOI@FWS, Susan
    Linner/R6/FWS/DOI@FWS, Julie Lyke/R6/FWS/DOI@FWS,

cc

bcc

Subject  Fw: GUSG 12- month

| History: | 🔁 This message has been forwarded. |
|---|---|

Bob Dach
Mountain Prairie Region Office
134 Union Blvd., Suite 645
Lakewood, CO  80228
303-236-4264
Fax:  303-236-0027

----- Forwarded by Robert Dach/R6/FWS/DOI on 04/06/2006 03:38 PM -----



**Kurt Johnson/ARL/R9/FWS/DOI**
04/06/2006 03:24 PM

To  Jim Serfis/ARL/R9/FWS/DOI@FWS

cc  Bridget Fahey/R6/FWS/DOI@FWS, Douglas
    Krofta/ARL/R9/FWS/DOI@FWS, Robert
    Dach/R6/FWS/DOI@FWS, Chris
    Nolin/ARL/R9/FWS/DOI@FWS, Bryan
    Arroyo/RO/R2/FWS/DOI@FWS, Pat
    Mehlhop/R6/FWS/DOI@FWS

Subject  GUSG 12- month

Jim,

Here is the version that can be printed out and given to FWP for review and surname.  Earlier I sent Tom Graf's surname to you.  That should be included in the pkg that goes to JM.

Sorry I am 8 minutes late.

Kurt



GUSG Final Listing Determination_final WO edits_4-06-06.doc

----- Forwarded by Kurt Johnson/ARL/R9/FWS/DOI on 04/06/2006 05:20 PM -----



**Kurt Johnson/ARL/R9/FWS/DOI**
04/06/2006 04:21 PM

To  Jim Serfis/ARL/R9/FWS/DOI

cc  Bridget Fahey/R6/FWS/DOI@FWS, Douglas
    Krofta/ARL/R9/FWS/DOI@FWS, Robert
    Dach/R6/FWS/DOI@FWS, Chris
    Nolin/ARL/R9/FWS/DOI@FWS

Subject  Re: Fw: GUSG 12- month

Jim,

We just had a summit meeting over here.  The decision is to work on edits until 5:15 tonight and then ship the document over to you for print out and delivery to FWP.

Kurt

# Exhibit I:

# Declaration of Charles P. Davis
# (Apr. 13, 2007)

# County of San Miguel, Col., et al. v. Julie McDonald, et al.
# 1:06-cv-1946 RBW (D.D.C.)

### GUNNISON SAGE-GROUSE 12-MONTH FINDING
### Administrative Record

#### DECLARATION OF Charles P. Davis

I, Charles P. Davis, state the following:

1. Since February 1997, I have been employed as a staff biologist in the Denver Regional Office of the United States Fish and Wildlife Service, and currently serve as the Endangered Species Litigation Coordinator.

2. The U.S. Fish and Wildlife Service, Western Colorado Ecological Field Office is the custodian for the Gunnison Sage-grouse Administrative Record, and that office provided me with copies of the documents in the record.

3. I coordinated and compiled the documents and the index that make up the Gunnison Sage-grouse Administrative Record.

4. I hereby certify that the documents identified in the index accompanying this declaration comprise the full and complete administrative record for listing decisions for the Gunnison sage-grouse.

5. This declaration is made under provision of Section 1746 of Title 28 of the United States Civil Code. I declare under penalty of perjury that the foregoing is true and correct to the best of my current knowledge.

6. Executed on April 13, 2007, at Lakewood, Colorado

Charles P. Davis
Endangered Species Litigation
Coordinator

# Exhibit J:

# Critical Habitat Records

### Index

| Number | Date | Description (from FOIA AR Index) | Pages |
|---|---|---|---|
| 1 | 00/00/05 | Draft Critical Habitat patches and acreages | 5 |
| 2 | 00/00/05 | List of 18 Draft CH units and total acreage | 1 |
| 3 | 03/25/05 | Gunnison sage-grouse timeline | 1 |
| 4 | 04/18/05 | Proposed CH concept paper e-mail | 1 |
| 5 | 04/18/05 | Proposed CH concept paper attachment 1 | 37 |
| 6 | 06/07/05 | Email from K.Johnson to T.Ireland re: GUSG Question | 1 |
| 7 | 07/03/05 | Proposed critical habitat concept paper e-mail | 1 |
| 8 | 07/03/05 | Proposed critical habitat concept paper | 15 |
| 9 | 10/13/05 | Draft CH concept paper | 10 |
| 10 | 10/26/05 | CH Designation Benefits Memo from Director | 3 |
| 11 | 11/04/05 | E-mail on draft CH concept paper | 1 |
| 12 | 11/04/05 | Concept paper attachment 1 | 11 |

| Sum of Acres | |
|---|---|
| FWS_Patch | Total |
| Beaver Mesa | 8,811 |
| Cerro/Cimarron | 31,859 |
| Crawford | 35,000 |
| Dove Creek North | 13,857 |
| Dove Creek West | 14,405 |
| Dry Creek Basin | 61,266 |
| Gunnison | 592,686 |
| Gurley Reservoir | 7,545 |
| Hamilton Mesa | 4,790 |
| Iron Springs | 6,443 |
| Miramonte | 11,642 |
| Monticello East | 65,530 |
| Monticello South | 5,100 |
| Pinon Mesa North | 2,831 |
| Pinon Mesa South | 34,055 |
| Pinon Mesa West | 2,002 |
| Poncha Pass | 20,406 |
| Sims Mesa | 5,286 |
| Grand Total | 923,514 |



Example of Population Patches
CDOW - April 8, 2005

Monticello South
Monticello East
Dove Creek West
Dove Creek North
Hamilton Mesa
Dry Creek Basin
Miramonte Reservoir
Curley
Beaver Mesa
Iron Springs
Sims Mesa
Cerro/Cimarron
Crawford
Pinon Mesa West
Pinon Mesa North
Pinon Mesa South
Gunnison
Poncha Pass

| Status | Population | Sub_pop | Hab_ |
|---|---|---|---|
| Occupied | Dove Creek | Dove Creek | 11 |
| Occupied | Dove Creek | Dove Creek | 11 |
| Occupied | Dove Creek | Dove Creek | 11 |
| Occupied | Dove Creek | Dove Creek | 11 |
| Occupied | San Miguel Basin | Beaver Mesa | 11 |
| Occupied | San Miguel Basin | Gurley Reservoir | 11 |
| Occupied | San Miguel Basin | Hamilton Mesa | 11 |
| Occupied | San Miguel Basin | Miramonte | 11 |
| Occupied | San Miguel Basin | Iron Springs | 11 |
| Occupied | San Miguel Basin | Dry Creek Basin | 11 |
| Occupied | San Miguel Basin | Dry Creek Basin | 11 |
| Occupied | Cimarron/Cerro/Sims Mesa | Sims Mesa | 11 |
| Occupied | Cimarron/Cerro/Sims Mesa | Sims Mesa | 11 |
| Occupied | Poncha Pass | Poncha Pass | 11 |
| Occupied | Poncha Pass | Poncha Pass | 11 |
| Occupied | Gunnison | Gunnison | 11 |
| Occupied | Cimarron/Cerro/Sims Mesa | Cimarron/Cerro Summit | 11 |
| Occupied | Cimarron/Cerro/Sims Mesa | Cimarron/Cerro Summit | 11 |
| Occupied | Gunnison | Gunnison | 11 |
| Occupied | Crawford | Crawford | 11 |
| Occupied | Crawford | Crawford | 11 |
| Occupied | Gunnison | Gunnison | 11 |
| Occupied | Gunnison | Gunnison | 11 |
| Occupied | Pinon Mesa | Pinon Mesa | 11 |
| Occupied | Pinon Mesa | Pinon Mesa | 11 |
| Occupied | Pinon Mesa | Pinon Mesa | 11 |
| Occupied | Pinon Mesa | Pinon Mesa | 11 |
| Occupied | Monticello | Monticello | 11 |
| Occupied | Monticello | Monticello | 11 |

| Year | COUNTY | Acres | FWS_Patch |
|------|--------|-------|-----------|
| 2004 | DOLORES | 338 | Dove Creek West |
| 2004 | DOLORES | 14,067 | Dove Creek West |
| 2004 | SAN MIGUEL | 1,004 | Dove Creek North |
| 2004 | DOLORES | 12,853 | Dove Creek North |
| 2004 | SAN MIGUEL | 8,811 | Beaver Mesa |
| 2004 | SAN MIGUEL | 7,545 | Gurley Reservoir |
| 2004 | SAN MIGUEL | 4,790 | Hamilton Mesa |
| 2004 | SAN MIGUEL | 11,642 | Miramonte |
| 2004 | SAN MIGUEL | 6,443 | Iron Springs |
| 2004 | MONTROSE | 7,386 | Dry Creek Basin |
| 2004 | SAN MIGUEL | 53,880 | Dry Creek Basin |
| 2004 | MONTROSE | 5,212 | Sims Mesa |
| 2004 | OURAY | 74 | Sims Mesa |
| 2004 | CHAFFEE | 553 | Poncha Pass |
| 2004 | SAGUACHE | 19,853 | Poncha Pass |
| 2004 | GUNNISON | 21,057 | Gunnison |
| 2004 | GUNNISON | 2,160 | Cerro/Cimarron |
| 2004 | MONTROSE | 29,699 | Cerro/Cimarron |
| 2004 | GUNNISON | 3,751 | Gunnison |
| 2004 | DELTA | 6,469 | Crawford |
| 2004 | MONTROSE | 28,531 | Crawford |
| 2004 | GUNNISON | 408,296 | Gunnison |
| 2004 | SAGUACHE | 159,581 | Gunnison |
| 2004 | MESA | 34,055 | Pinon Mesa South |
| 2004 | MESA | 345 | Pinon Mesa West |
| 2004 | MESA | 1,656 | Pinon Mesa West |
| 2004 | MESA | 2,831 | Pinon Mesa North |
| 2004 | San Juan | 65,530 | Monticello East |
| 2004 | San Juan | 5,100 | Monticello South |



Example of Population Patches
CDOW - April 8, 2005

unoccupied units.

1. 923,862 acres
2. 18 units
3.
1. Cerro Summit – Cimarron Sub-population: Gunnison and Montrose County, CO
2. Sims Mesa Sub-population: Montrose County, CO
3. Crawford: Delta and Montrose County, CO
4. Dove Creek North: Dolores and San Miguel County, CO
5. Dove Creek West: Dolores County, CO
6. Monticello East: San Juan County, UT
7. Monticello South: San Juan County, UT
8. Gunnison Basin: Gunnison and Saguache County, CO
9. Pinon Mesa South: Mesa County, CO
10. Pinon Mesa North: Mesa County, CO
11. Pinon Mesa West: Mesa County, CO
12. Poncha Pass: Saguache County, CO
13. San Miguel Basin-Iron Springs Sub-population: San Miguel County, CO
14. Beaver Mesa Sub-population: San Miguel County, CO
15. Gurley Reservoir Sub-population: San Miguel County, CO
16. Miramonte Sub-population: San Miguel County, CO
17. Hamilton Mesa Sub-population: San Miguel County, CO
18. Dry Creek Basin Sub-population: Montrose and San Miguel County, CO

4. All units occupied.



**Douglas
Krofta/ARL/R9/FWS/DOI**

03/25/2005 02:06 PM

To  Kurt Johnson/ARL/R9/FWS/DOI@FWS

cc  Al Pfister/R6/FWS/DOI@FWS, Chris
Nolin/ARL/R9/FWS/DOI@FWS, Marjorie
Nelson/ARL/R9/FWS/DOI@FWS, Rick

bcc

Subject  Re: Gunnison Sage-grouse timeline

Kurt:

Having the pCH follow the pListing and then having them meet up at the final appears to be a reasoned approach given the info you have provided.  I think it would be a matter of presenting to Beth, if Rick is in concurrence, and then having Beth present it to ASFWP, if she concurs.  This may be possible for the regular 1:00 pm meeting on Tuesday.

Doug
*****************************************
Douglas Krofta
U.S. Fish and Wildlife Service
Branch of Listing
4401 N. Fairfax Drive, Suite 420
Arlington, Virginia  22203
Phone:  703.358.2527
Fax:  703.358.1735
douglas_krofta@fws.gov

Kurt Johnson



**Kurt Johnson**

03/25/2005 01:40 PM

To:  Douglas Krofta/ARL/R9/FWS/DOI@FWS
cc:  Rick Sayers/ARL/R9/FWS/DOI@FWS, Chris
Nolin/ARL/R9/FWS/DOI@FWS, Marjorie
Nelson/ARL/R9/FWS/DOI@FWS, Al Pfister/R6/FWS/DOI@FWS
Subject:  Re: Gunnison Sage-grouse timeline

Doug,

Another issue that emerged from our conference call yesterday is the timeline for the proposed listing rule and proposed CH for Gunnison sage-grouse (GUSG).  We are looking at an early September deadline for the proposed listing rule, but the FO has not yet begun work on CH, and it is not at all clear that they can develop a legitimate CH proposal to be published concurrently with the proposed listing rule (in addition to the listing rule, they are working hot and heavy on a CCAA for GUSG too).  A more reasonable scenario is that proposed CH would publish 3 or 4 months after the proposed listing rule, but the FO/RO would fast track things so that the final listing and CH rules could publish concurrently.  There is money in the FY05 budget for CH, and the FY06 has a placeholder for the Economic Analysis -- so money availability doesn't look like it should be a question here.  The FO and RO would like to know if this is an acceptable scenario to FWP.  Do you know how we would go about running this up the flag pole to see if FWP salutes?

Thanks.

Kurt



**Kurt
Johnson/ARL/R9/FWS/DOI**

04/18/2005 03:01 PM

To   Terry Ireland/R6/FWS/DOI@FWS, Al Pfister/R6/FWS/DOI@FWS
cc   Pat Mehlhop/R6/FWS/DOI@FWS, Seth Willey/R6/FWS/DOI@FWS, Susan Linner/R6/FWS/DOI@FWS
bcc

Subject   Proposed CH Concept Paper 

All and Terry,

I have taken a first cut at editing the concept paper, and have attached my draft here.  Further work is needed, but I think this is more in the ballpark of what folks here (AD, FWP, etc.) are looking for in a concept paper.

Kurt

Gunnison SG PCH Concept paper KAJ

## CH Proposal:

The proposed CH rule will include 18 units, as follows.  These are shown in the map in Figure 1.

1.  Gunnison Basin Population – 592,926 ac occupied habitat in 1 unit
    a.  Gunnison Basin Unit, Gunnison and Saguache Co., CO

2.  Cerro Summit–Cimarron–Sims Mesa Population –  37,160 ac occupied habitat in 2 units
    a.  Cerro Summit – Cimarron Unit: Gunnison and Montrose County, CO
    b.  Sims Mesa Unit: Montrose County, CO

3.  Crawford Population – 35,014 ac of occupied habitat in 1 unit
    a.  Crawford: Delta and Montrose County, CO

4.  Monticello-Dove Creek Population – 98,920 ac occupied habitat in 2 units
    a.  Dove Creek North: Dolores and San Miguel County, CO
    b.  Dove Creek West: Dolores County, CO
    c.  Monticello East: San Juan County, UT
    d.  Monticello South: San Juan County, UT

5.  Pinon Mesa – 38,890 ac of occupied habitat in 3 units
    a.  Pinon Mesa South: Mesa County, CO
    b.  Pinon Mesa North: Mesa County, CO
    c.  Pinon Mesa West: Mesa County, CO

6.  Poncha Pass – 20,415 ac of occupied habitat in 1 unit
    a.  Poncha Pass: Saguache County, CO

7.  San Miguel Basin – 100, 317 ac of occupied habitat in 6 units
    a.  San Miguel Basin-Iron Springs Sub-population: San Miguel County, CO
    b.  Beaver Mesa Sub-population: San Miguel County, CO
    c.  Gurley Reservoir Sub-population: San Miguel County, CO
    d.  Miramonte Sub-population: San Miguel County, CO
    e.  Hamilton Mesa Sub-population: San Miguel County, CO
    f.  Dry Creek Basin Sub-population: Montrose and San Miguel County, CO

The total acreage of occupied habitat is 923,862 acres.

## Conservation Strategy:

2

**Deleted:** ¶
C

**Formatted:** Font: 14 pt

**Formatted:** Font: 14 pt

**Formatted:** Body Text, Indent: First line:  0.5"

**Formatted:** Body Text

**Deleted:** [Summary of likely CH proposal, including (1) total acreage or stream miles proposed; (2) number of units proposed; (3) location of units (counties, general geographic distribution; (4) number of occupied and unoccupied units]¶
¶
1. 923,862 acres

**Formatted:** Body Text

**Deleted:** <#>2.

**Deleted:** <#>

**Deleted:** <#>18 units¶

**Deleted:** ¶

**Deleted:** 3.

**Deleted:**   . 1. Cerro Summit – Cimarron Sub-population: Gunnison and Montrose County, CO¶
. 2. Sims Mesa Sub-population: Montrose County, CO¶
. 3. Crawford: Delta and Montrose County, CO¶
. 4. Dove Creek North: Dolores and San Miguel County, CO¶
. 5. Dove Creek West: Dolores County, CO¶
. 6. Monticello East: San Juan County, UT¶
. 7. Monticello South: San Juan County, UT¶
8.  Gunnison Basin: Gunnison and Saguache County, CO¶
9. Pinon Mesa South: Mesa County, CO¶
10. Pinon Mesa North: Mesa County, CO¶
11. Pinon Mesa West: Mesa County, CO¶
12. Poncha Pass: Saguache County, CO¶
13. San Miguel Basin-Iron Springs Sub-population: San Miguel County, CO¶
14. Beaver Mesa Sub-population: San Miguel County, CO¶
15. Gurley Reservoir Sub-popula ... [18]

**Deleted:** ¶

**Deleted:** ¶
¶

**Formatted:** Font: 14 pt

**Deleted:** METHODOLOGY¶
¶

**Formatted:** Font: 14 pt, Bold

**Deleted:** December 10, 2004¶
¶

Only areas occupied at the time of listing are being proposed as CH.

**Describe the PCEs**

Gunnison sage-grouse use a wide variety of habitats that occur in and adjacent to the sage-brush community. These habitats are important year round or seasonally. Consequently, the PCE's consist of all seasonal habitat characteristics as described below.

Habitat Requirements

Sage-grouse habitat requirements differ by season. Connelly et al. (2000) segregated GRSG habitat requirement into 4 seasons: (1) breeding habitat; (2) summer-late brood-rearing habitat; (3) fall habitat; and (4) winter habitat.

The breeding habitat category includes lekking, pre-laying female, nesting, and early brood-rearing habitat. Summer-late brood-rearing habitat includes habitat used during this period by males, non-brooding females, and females with broods. Fall habitat consists of "transition" range from late summer to winter, and can include a variety of habitats used by males and females (with and without broods). In some situations, fall and summer-late brood-rearing habitats are indistinguishable, but this depends on the movement patterns of the population and habitat availability.

Winter habitat is used by segregated flocks of males and females. Management of sage-grouse habitats should include all habitat types necessary for fulfillment of life history needs.

For the purpose of critical habitat, we have combined the summer - late brood-rearing and fall habitat into a single habitat category, "summer – fall", resulting in 3 overall seasonal habitats, rather than 4.

(1) Breeding Habitat (Leks, Pre-laying Habitat, Nesting Habitat, and Early Brood-rearing Habitat)

Table 1. GUSG breeding habitat guidelines[a]. Guidelines should be considered the minimum standards.

| Vegetation Variable | Gunnison sage-grouse | | Connelly et al. (2000) | |
|---|---|---|---|---|
| | Arid[c] | Mesic[c] | Arid | Mesic |
| Sagebrush Canopy[d] % | 15 - 25 | 10 – 20 | 15 - 25 | 15 – 25 |
| Non-sagebrush Canopy[d] % | 5 - 15 | 5 – 15 | - | - |
| Total Shrub Canopy[d] % | 20 - 40 | 15 – 35 | - | - |
| Sagebrush Height cm (inches) | 25 – 50 (9.8 - 19.7) | 30 – 50 (11.8 – 19.7) | 30 – 80 (11.8 – 31.5) | 40 – 80 (15.7 – 31.5) |
| Grass Cover[d] % | 10 - 30 | 20 – 40 | - | - |

3

Deleted: Follow the steps below to determine what to designate. ¶
¶
1. Define a species specific "rule set" for determining what areas to consider for a critical habita designation, and apply this "rule-set" consistently in the analysis of the designation. Describe the "rule-set" in the proposed and final rules.¶
¶
2.[What is meant by distances here? Distances between CH units, distances of CH units, distances between units on one end of the range versus the other?] Determine the minimum amount and optimum distribution of currently occupied habitat essential to sup... [19]

Formatted: Font: Bold ... [20]
Formatted: Underline
Deleted: Population ... [21]
Formatted: Font: Italic
Formatted: Superscript
Formatted ... [22]
Formatted: Font color: Green
Formatted: Font: Bold, Underline
Formatted: Body Text, Right: 0.45"
Deleted: . [Tables 1, 2, and 3 a... [23]
Formatted: Font color: Green
Deleted: ¶ ... [24]
Formatted: Font: 12 pt
Deleted: may
Formatted: Font: 12 pt
Deleted: (Connelly et al. 2000)
Formatted: Font: 12 pt
Deleted:
Deleted:
Deleted: In some situations, fa... [25]
Formatted: Font: 12 pt
Deleted:
Deleted:
Formatted: Font: 12 pt
Deleted: (Beck 1977)
Deleted: For the purpose of thi... [26]
Formatted: Font: 12 pt
Formatted ... [27]
Formatted ... [28]
Deleted: December 10, 2004¶ ... [29]

| Forb Cover[e]   % | 5 - 15 | 20 – 40 | ≥ 15 | ≥ 25 |
|---|---|---|---|---|
| Grass Height[f] cm | 10 – 15 | 10 – 15 | ≥ 18 | ≥ 18 |
| (inches) | (3.9 – 5.9) | (3.9 – 5.9) | (> 7.1) | (> 7.1) |
| Forb Height[f] cm | 5 – 10 | 5 – 15 | - | - |
| (inches) | (2.0 – 3.9) | (2.0 – 5.9) | - | - |

[a] Breeding habitat guidelines were developed using data in GUSG studies by Young (1994) and Apa (2004).
[b] Breeding habitat is defined as sagebrush communities delineated within 4 miles of a lek (see "GUSG Disturbance Guidelines", Appendix I, for discussion.  Breeding habitat includes lek, nesting and early brood-rearing habitat usually from mid-March through late-June.
[c] Arid or mesic communities are as defined by Winward (2004).
[d] Canopy cover measured according to Canfield (1941) and further described by Connelly et al. (2003).
[e] Understory cover measured according to Daubenmire (1959).
[f] Measured as "droop height"; the tallest portion of the naturally growing portion of the plant (Connelly et al. 2000).

Leks are usually located in small open areas adjacent to stands of sagebrush with > 20% or greater canopy cover.

Openings may be natural or human created, including (but not limited to) small burns, drill pads, irrigated pasture, and roads.

Lek sites are usually flat to gently sloping areas of <15% slope in broad valleys or on ridges.

Lek sites have good visibility and low vegetation structure and acoustical qualities that allow sounds of breeding displays to carry.

Daytime movements of adult males GRSG during the breeding season do not vary greatly.  Schoenberg (1982) found that male daily movements averaged 0.6 miles, but ranged from 0.02 – 1.5 miles.  No similar data are available for GUSG.

Summer - Fall Habitat

Table 2.  GUSG summer - fall habitat guidelines[a].  Guidelines should be considered the minimum standards.  No specific habitat guidelines have been included for riparian or wet meadow habitat used by GUSG during this period.  BLM and USFS currently have riparian and/or wet meadow management guidance which is consistent the needs of GUSG.

| SUMMER - FALL HABITAT[b] | | | |
|---|---|---|---|
| | Gunnison sage-grouse | | Connelly et al. (2000) |
| Vegetation Variable | Arid[c] | Mesic[c] | Arid | Mesic |
| Sagebrush Canopy[d] (%) | 5 – 15 | 5 – 20 | 10 – 25 | 10 – 25 |
| Non-sagebrush Canopy[d] (%) | 5 – 15 | 5 – 15 | - | - |
| Total Shrub Canopy[d] (%) | 10 - 30 | 10 – 35 | - | - |
| Sagebrush Height cm | 20 – 40 | 25 – 50 | 40 – 80 | 40 – 80 |
| (inches) | (7.9 - 15.7) | (9.8 – 19.7) | (15.7 – 31.5) | (15.7 – 31.5) |
| Grass Cover[e] (%) | 10 – 25 | 10 – 35 | - | - |
| Forb Cover[e] (%) | 5 - 15 | 15 – 35 | ≥ 15 | ≥ 15 |

4

Formatted: Font: 12 pt, Not Italic

Deleted: Leks (mid-March – mid-May)¶
¶
There are no habitat investigations specific to GUSG strutting habitat.  Most of the information collected is specific to GRSG.  ¶
Lek sites can be very traditional with grouse displaying in the very same location from year to year.  Some leks are known to have been in use since the 1950's (Rogers 1964).

Formatted: Font: 12 pt

Deleted: (Klott and Lindzey 1989).

Formatted: Font: 12 pt

Deleted: (Connelly et al. 1981, Gates 1985).

Formatted: Font: 12 pt

Deleted: Superficially, lek sites do not appear limiting (Schroeder et al. 1999), but they may vary in escape cover and quality of sagebrush (Patterson 1952, Gill 1965, Connelly et al. 1988, Connelly et al. 2000).  The amount of land needed for males to strut can vary greatly.

Formatted: Font: 12 pt

Deleted:  (Hanna 1936, Patterson 1952, Hartzler 1972, Giezentanner and Clark 1974, Wallestad 1975, Dingman 1980, Autenrieth 1981, Klott and Lindzey 1989).

Formatted: Font: 12 pt

Formatted: Font: 12 pt

Deleted: (Tate et al. 1979, Connelly et al. 1981, Gates 1985), a

Formatted: Font: 12 pt

Deleted:  (Patterson 1952, Hjorth 1970, Hartzler 1972, Wiley 1973b, 197 ... [30]

Deleted: The absence of taller shrubs/trees or other obstructions r ... [31]

Formatted: Font: 12 pt

Formatted: Font: 12 pt

Deleted: Wallestad and Schladweiler (1974) found daily movements r ... [32]

Deleted: Pre-laying Habitat (late-March – April)¶ ... [33]

Formatted: Font: Not Italic

Formatted: Font: Not Italic

Formatted: Font: Times New Roman, Not Italic

Formatted: Font: 12 pt

Deleted: December 10, 2004¶
¶

| | | | |
|---|---|---|---|
| Grass Height [f] cm (inches) | 10 – 15 (3.9 – 5.9) | 10 – 15 (3.9 – 5.9) | variable | variable |
| Forb Height [f] cm (inches) | 3 – 10 (1.2 – 3.9) | 5 – 10 (2.0 – 5.9) | variable | variable |

[a] Summer – fall habitat guidelines were developed using data in GUSG studies by Young (1994), Woods and Braun (1995), Commons (1997), and Apa (2004)
[b] Summer – fall habitat is defined as vegetation communities, including sagebrush, agricultural fields, and wet meadows (Connelly et al. 2000) that are within 4 miles (see "GUSG Disturbance Guidelines", Appendix I, for discussion) of an active strutting ground.
[c] Arid or mesic communities are as defined by Winward (2004).
[d] Canopy cover measured according to Canfield (1941) and further described by Connelly et al. (2003).
[e] Understory cover measured according to Daubenmire (1959).
[f] Measured as "droop height"; the tallest portion of the naturally growing portion of the plant (Connelly et al. 2000).

By late summer and into the early fall, females with broods, non-brood females, and groups of males become more social, and flocks are more concentrated (Patterson 1952). This is the period of time when GUSG can be observed in atypical habitat such as agricultural fields (Commons 1997).

During periods of heavy snow cover in late fall and early winter, use of mountain and Wyoming big sagebrush stands is extensive.

Winter

Table 3. GUSG winter habitat guidelines[a]. Guidelines should be considered the minimum standards.

| WINTER HABITAT[b] | | | | |
|---|---|---|---|---|
| | Gunnison sage-grouse | | Connelly et al. (2000) | |
| Vegetation Variable | Arid[c] | Mesic[c] | Arid | Mesic |
| Sagebrush Canopy [d]: % | 30 – 40 | - | 10 – 30 | 10 – 30 |
| Sagebrush Height [e]: cm (inches) | 40 – 55 (15.8 – 21.7) | - | 25 – 35 (9.8 – 13.8) | 25 – 35 (9.8 – 13.8) |

[a] Winter habitat guidelines were developed using GUSG data from Hupp (1987).
[b] Winter habitat is defined as sagebrush areas (Connelly et al. 2000) within currently occupied habitat that are available (i.e., not covered by snow) to sage-grouse in average winters.
[c] Arid or mesic communities are as defined by Winward (2004).
[d] Canopy cover measured according to Canfield (1941) and further described by Connelly et al. (2003).
[e] Measured from ground level to the tallest stem (excluding inflorescence) according to Hupp (1987).

Used sites are typically characterized by canopy cover > 25% and sagebrush > 12 - 16 inches tall associated with drainages, ridges, or southwest aspects with slopes < 15%.

Lower flat areas and shorter sagebrush along ridge tops provide roosting areas. During extreme winter conditions, GRSG will spend nights and portions of the day (when not foraging) burrowed into "snow roosts". Snow roosts are dug when snow has the proper texture by scratching with feet or by wing movements.

Most GUSG feeding activity during the winter occurred in drainages and on slopes with south or west aspects in the Gunnison Basin. In years with severe winters resulting in heavy

5

accumulations of snow the amount of sagebrush exposed above the snow can be severely limiting. Hupp and Braun (1989b) investigated GUSG feeding activity during a severe winter in the Gunnison Basin in 1984 where they estimated <10% of the sagebrush was exposed above the snow and available to sage-grouse. In these conditions the tall and vigorous sagebrush typical in drainages were an especially important food source for GUSG.

3. Describe the minimum amount and optimum distribution of currently-occupied habitat needed to support the numbers and distribution of the species necessary for conservation.

All seven extant populations are essential to the survival of the species. Multiple populations across a broad geographic area provide insurance against a catastrophic event (drought, extreme winter temperatures, disease outbreak, etc.) threatening the entire species. In addition, the aggregate number of individuals across all populations increases the probability of demographic persistence and preservation of overall genetic diversity by providing an important genetic reservoir. The Gunnison Basin contains 76% of the genetic diversity of the species but the other small populations collectively contain 24%. Even though the smaller GUSG populations have a relatively high probability of extinction, they are vital to the existence of the sage-grouse.

The Gunnison Basin population is the largest population with a low risk of extinction (< 1%) in the next fifty years according to the PVA. Other populations have a predicted risk of extinction between 6 and 42%. Results from the PVA suggest that very small GUSG populations (< 25) are at a high risk of extinction during a 50-year period, even when the population is expected to increase in size over the long-term. In contrast, individual GUSG populations can be considered "secure" (< 5% extinction probability) if they contain 500 birds or more and have a stable population size. The only population that can be concluded to be secure, however, is the Gunnison Basin that had a 2004 population estimate of 2,443. The other populations had estimates of 39 to 245 adult grouse, indicating a moderate amount of risk of extinction over a 50-year period. Even though the smaller GUSG populations have a relatively high probability of extinction, they are vital to the existence of the sage-grouse.

However, parameters that were not incorporated in the PVA included density-dependent reproduction, effects of disease, inbreeding depression, and habitat loss or fragmentation. ELABORATE…….

4. Combining the qualitative and quantitative information under Points 1, 2, and 3(a), present an explicit, deductive analysis to determine the location and amount of area that is necessary for conservation.

With populations above 500 being considered secure, none but the Gunnison Basin meeting this minimum, and a moderate risk of extinction in the small populations, all of the occupied habitat in the small populations needs to be designated as CH to provide for expansion and securement of habitat necessary to support populations of at least 500 adult sage-grouse. MORE WORK NEEDED HERE…..

5. Only if the habitat identified in step 2 is not believed sufficient to conserve the species,

6

Deleted: ¶ [34]
Formatted [35]
Formatted [36]
Formatted [37]
Formatted [38]
Deleted: Use the science behin [39]
Formatted [40]
Formatted [41]
Formatted [42]
Deleted: All 18 units of occup [43]
Deleted: (RCP 2005)
Deleted: However, parameters [44]
Deleted: (Fig. 30)
Deleted: Multiple populations [45]
Deleted: Based on recent gene [46]
Formatted [47]
Formatted [48]
Deleted: ¶
Formatted [49]
Deleted: c. Quantitatively, wh [50]
Formatted [51]
Formatted [52]
Deleted: e
Formatted [53]
Deleted: into a
Formatted [54]
Deleted: . Information such a [55]
Deleted: t in determining
Formatted [56]
Deleted: Whether or not quant [57]
Deleted: and some unknown/ [58]
Formatted [59]
Deleted: e. Review the listing [60]
Formatted [61]
Formatted [62]
Deleted: ¶ [63]
Formatted [64]
Deleted: Only if
Formatted [65]
Formatted [66]
Deleted: t
Formatted [67]
Deleted: December 10, 2004¶ [68]

should you consider **designating habitat that is currently unoccupied** or other areas outside the geographical area occupied by the species at the time of listing.

See comment in 4 above.  To have self sustaining populations of 500 or more birds restoration or enhancement of habitat will be necessary in vacant/unknown habitat and probably necessary in potential habitat.  Furthermore, habitat linkages need to be restored, enhanced and/or maintained for self sustaining populations.  MORE WORK NEEDED HERE...

## Criteria & Methodology:

Information including maps in the RCP were used.  CDOW GIS was used to develop available information.  Additional GIS work will be needed.  A LITTLE MORE NEEDED.

## Special Management:

Describe the threats that may warrant special management, and what management is necessary to ameliorate those threats.

All 18 units require special management of some sort.  SUMMARIZE TABLES INCLUDED IN PREVIOUS DRAFT...  I don't have unit by unit discussion of threats but do have population by population discussions and sub-population by sub-population descriptions in Factor A and as follows from the RCP (2005).  RCP discusses main threats within each population.

## Non-Inclusions & Exclusions

Describe all non-inclusions and exclusions.

1.  Consideration of DOD Lands

        [No DOD lands within range.]

2.  Other Exclusions

        *(a) Exclusions Under Both 3(5)(A) and 4(b)(2)*

[Areas covered under a management plan that meets all 3 criteria...from Lessons Learned. Perpetual and 20 year conservation easements with GUSG conservation objectives.  There may also be some lands not under easement but with GUSG management agreements of some sort that could perhaps be excluded.  DOUBLE CHECK THIS....]

        *(b) Exclusions Under 3(5)(A) Alone*

[NPS and NWR lands.]

        *(b) Exclusions Under 4(b)(2) Alone* [None???]

7

Deleted: would we consider [69]
Formatted [70]
Deleted: Areas unoccupied at [71]
Formatted [72]
Deleted: . [Do we care if they [73]
Deleted: Here essential means [74]
Formatted [75]
Formatted [76]
Formatted [77]
Deleted: ¶
Deleted: ¶ [78]
Formatted [79]
Deleted: Best Available Scient [80]
Formatted [81]
Deleted: ¶
Deleted: ¶ [82]
Formatted
Deleted: PECIAL [83]
Deleted: The Alameda whipsna [84]
Formatted [85]
Deleted: The whipsnake dec [86]
Deleted: ¶ [87]
Formatted [88]
Deleted: I have no unit by unit [89]
Formatted [90]
Formatted [91]
Deleted: DISCUSSION OF [92]
Formatted [93]
Deleted:
Formatted [94]
Formatted [95]
Deleted: Section 318 of the Na [96]
Formatted [97]
Deleted: *Although the comm [98]
Formatted [99]
Deleted: ¶
Formatted [100]
Formatted [101]
Deleted: [Currently proposing [102]
Formatted [103]
Deleted: When citing 4(b)(2) [104]
Formatted [105]
Deleted: *Don't use the word [106]
Formatted [107]
Deleted: a
Formatted [108]
Formatted [109]
Deleted: December 10, 2004¶ [110]

*(c) Economic Exclusions*

[None proposed at this stage.]



| Deleted: ¶ |
| Formatted: Indent: Left: 0" |
| Deleted: *Exclude "up-front" at the proposed rule stage, if we have enough information in our files to do so. This would be common for rules where we redesignating following a remand. For 4(b)(2) only cases, we could also base the intended exclusion on information in the files from past consultations etc.* ¶<br>*¶*<br>*For areas that are found to be essential but excluded up front: ¶*<br>*¶*<br>*Describe these areas specifically by name in the rule include them in the maps of proposed rules, although coded or marked differently. State that we have reviewed them and believe they are areas essential for the conservation (i.e., falling within that part of the definition).¶*<br>*¶*<br>* When we state that we are excluding these areas from the proposal, specifically request comment on whether the areas are essential, whether they warrant exclusion, and on what basis they should be excluded. Make clear that the final rule could find the areas either appropriate for exclusion 4(b)(2), or not appropriate for exclusion, in w... [111]* |
| Formatted: Font: 12 pt, Italic |
| Deleted: ¶ |
| Formatted: Normal |
| Formatted: Font: Italic |
| Formatted: Font: 12 pt, Not Bold |
| Formatted: Font: Not Bold |
| Deleted: . Isnt' that what a 4(b)(2) exclusion is????] |
| Formatted: Font color: Auto |
| Formatted: Font: Italic, No underline |
| Deleted: ¶<br>*The field office should review t... [112]* |
| Formatted ... [113] |
| Formatted: Font color: Green |
| Deleted: . ¶<br>¶ ... [114] |
| Deleted: . [No non-essential experimental populations are ex... [115] |
| Formatted: Font: 12 pt, Italic |
| Formatted: Font: 10 pt, Font color: Green |
| Deleted: December 10, 2004¶<br>¶ |

8

DRAFT
Concept Paper
**S**trategy for Designation of Critical Habitat
for the
Gunnison Sage-grouse
4/7/05

## Distribution:

The Gunnison Sage-grouse (GUSG ) currently occurs in 7 widely scattered and isolated populations in southwestern Colorado and southeastern Utah: (1) Gunnison Basin, CO; (2) Cerro Summit–Cimarron–Sims Mesa, CO; (3) Crawford, CO; (4) Piñon Mesa, CO; (5) Poncha Pass, CO; (6) San Miguel Basin, CO; and (7) Dove Creek, CO— Monticello, UT (Table1). The Cerro Summit–Cimarron–Sims Mesa, and San Miguel Basin populations are patchily distributed, and, as a result, we identify separate "subpopulations" within each.  At Cerro Summit–Cimarron–Sims Mesa there are 2 subpopulations: (1) Cerro Summit – Cimarron; and (2) Sims Mesa.  In San Miguel Basin there are 6 subpopulations: (1) Dry Creek Basin; (2) Hamilton Mesa; (3) Miramonte Reservoir; (4) Gurley Reservoir; (5) Beaver Mesa; and (6) Iron Springs.

The total number of leks is estimated to be 117, and the total population size is estimated to be 3,198 (Table 1).

| Population | Male High Count (Total for all leks) | Number of Leks (includes leks with 0 males present in 2004) | Estimated Population Size |
|---|---|---|---|
| Cerro Summit - Cimarron - Sims Mesa | 8 | 4 | 39 |
| Crawford | 26 | 5 | 128 |
| Dove Creek, CO – Monticello, UT | 33 | 11 | 162 |
| Gunnison Basin | 498 | 78 | 2,443 |
| Piñon Mesa | 29 | 8 | 142 |
| Poncha Pass | 8 | 1 | 39 |
| San Miguel Basin | 50 | 10 | 245 |
| Total | 652 | 117 | 3,198 |

Table 1.

1

Gunnison Sage-grouse Rangewide Conservation Plan

3/18/05 For Review Only

| Page 1: [1] Deleted | Kurt Johnson | 3/15/2005 3:33:00 PM |

[The distribution of the taxon as described in the listing rule plus any recent changes to that description (e.g., range expansion or contraction, population extirpation, discovery of new populations, etc.)]

| Page 1: [2] Formatted | Kurt Johnson | 4/15/2005 1:57:00 PM |

Font: 12 pt

| Page 1: [2] Formatted | Kurt Johnson | 4/15/2005 1:57:00 PM |

Font: 12 pt

| Page 1: [3] Deleted | Kurt Johnson | 4/15/2005 1:58:00 PM |

    what have previously been considered 8

| Page 1: [4] Formatted | Kurt Johnson | 4/13/2005 5:25:00 PM |

Font: 12 pt

| Page 1: [4] Formatted | Kurt Johnson | 4/13/2005 5:25:00 PM |

Font: 12 pt

| Page 1: [4] Formatted | Kurt Johnson | 4/13/2005 5:25:00 PM |

Font: 12 pt

| Page 1: [5] Deleted | Kurt Johnson | 4/13/2005 5:25:00 PM |

   (Fig. 4).  In Colorado, 7 GUSG population areas are:

| Page 1: [6] Formatted | FWS User | 4/6/2005 10:03:00 AM |

Font: 12 pt

| Page 1: [6] Formatted | FWS User | 4/6/2005 10:03:00 AM |

Font: 12 pt

| Page 1: [7] Deleted | Kurt Johnson | 4/15/2005 1:58:00 PM |

| Page 1: [7] Deleted | Kurt Johnson | 4/15/2005 1:58:00 PM |

| Page 1: [7] Deleted | Kurt Johnson | 4/15/2005 1:58:00 PM |

     -

| Page 1: [8] Formatted | FWS User | 4/6/2005 10:03:00 AM |

Font: 12 pt

| Page 1: [8] Formatted | FWS User | 4/6/2005 10:03:00 AM |

Font: 12 pt

| Page 1: [9] Deleted | Kurt Johnson | 4/15/2005 2:00:00 PM |

   , Dove Creek, Gunnison Basin,

| Page 1: [10] Formatted | FWS User | 4/6/2005 10:03:00 AM |

Font: 12 pt

| Page 1: [10] Formatted | FWS User | 4/6/2005 10:03:00 AM |

Font: 12 pt

| Page 1: [10] Formatted | FWS User | 4/6/2005 10:03:00 AM |

Font: 12 pt

| Page 1: [11] Deleted | Kurt Johnson | 4/15/2005 2:01:00 PM |

      During the winter in some or most years, GUSG also inhabit a small portion of Grand County, Utah.  These birds are believed to be part of the Piñon Mesa population that

Threats and Analysis
Threats Summarized by Listing Factor

predominantly occupies and breeds in Mesa County, Colorado.  The Utah population is located near the town of

| Page 1: [12] Formatted | FWS User | 4/6/2005 10:03:00 AM |
|---|---|---|
| Font: 12 pt | | |

| Page 1: [12] Formatted | FWS User | 4/6/2005 10:03:00 AM |
|---|---|---|
| Font: 12 pt | | |

| Page 1: [13] Formatted | FWS User | 4/6/2005 10:03:00 AM |
|---|---|---|
| Font: 12 pt | | |

| Page 1: [13] Formatted | FWS User | 4/6/2005 10:03:00 AM |
|---|---|---|
| Font: 12 pt | | |

| Page 1: [13] Formatted | FWS User | 4/6/2005 10:03:00 AM |
|---|---|---|
| Font: 12 pt | | |

| Page 1: [14] Deleted | Kurt Johnson | 4/15/2005 2:02:00 PM |
|---|---|---|

and may be contiguous with the Dove Creek population in Colorado.  Genetic data have also suggested these 2 populations could be considered one population (see "Genetics", pg. 43).  Thus, we consider them 2 subpopulations of a single population.  Because we deem these 2 former "populations" as 1 population, we consider there to currently be 7 GUSG populations.

| Page 1: [15] Deleted | Kurt Johnson | 4/15/2005 2:03:00 PM |
|---|---|---|

In addition to the Monticello – Dove Creek population, the Cerro Summit – Cimarron – Sims Mesa and San Miguel Basin populations also exhibit patchy distributions of GUSG. As a result, we identify separate "subpopulations" within each. At Cerro Summit – Cimarron – Sims Mesa there are 2 subpopulations: (1) Cerro Summit – Cimarron; and (2) Sims Mesa. In San Miguel Basin there are 6 subpopulations: (1) Dry Creek Basin; (2) Hamilton Mesa; (3) Miramonte Reservoir; (4) Gurley Reservoir; (5) Beaver Mesa; and (6) Iron Springs.

| Page 1: [16] Formatted | FWS User | 4/6/2005 10:03:00 AM |
|---|---|---|
| Body Text, Indent: First line:  0.5" | | |

| Page 1: [17] Deleted | Kurt Johnson | 3/15/2005 2:44:00 PM |
|---|---|---|
| December 10, 2004 | | |

| Page 2: [18] Deleted | Kurt Johnson | 4/18/2005 3:19:00 PM |
|---|---|---|

1. Cerro Summit – Cimarron Sub-population: Gunnison and Montrose County, CO
2. Sims Mesa Sub-population: Montrose County, CO
3. Crawford: Delta and Montrose County, CO
4. Dove Creek North: Dolores and San Miguel County, CO
5. Dove Creek West: Dolores County, CO
6. Monticello East: San Juan County, UT
7. Monticello South: San Juan County, UT
8. Gunnison Basin: Gunnison and Saguache County, CO
9. Pinon Mesa South: Mesa County, CO
10. Pinon Mesa North: Mesa County, CO
11. Pinon Mesa West: Mesa County, CO
12. Poncha Pass: Saguache County, CO
13. San Miguel Basin-Iron Springs Sub-population: San Miguel County, CO
14. Beaver Mesa Sub-population: San Miguel County, CO

Gunnison Sage-grouse Rangewide Conservation Plan

15. Gurley Reservoir Sub-population: San Miguel County, CO
16. Miramonte Sub-population: San Miguel County, CO
17. Hamilton Mesa Sub-population: San Miguel County, CO
18. Dry Creek Basin Sub-population: Montrose and San Miguel County, CO

4. All units occupied.

| Page 3: [19] Deleted | Kurt Johnson | 3/15/2005 3:53:00 PM |
| --- | --- | --- |

Follow the steps below to determine what to designate.

1. Define a species specific "rule set" for determining what areas to consider for a critical habita designation. and apply this "rule-set" consistently in the analysis of habitat to include in the designation. Describe the "rule–set" in the proposed and final rules.

2.[**What is meant by distances here?  Distances between CH units, distances of CH units, distances between units on one end of the range versus the other?**] Determine the minimum amount and optimum distribution of currently occupied habitat essential to support the numbers and distribution of the species necessary for conservation.
All of the populations are needed to sustain the survival of the species.  The Gunnison Basin contains 76% of the genetic diversity of the species but the other small populations collectively contain 24%.  Even though the smaller GUSG populations have a relatively high probability of extinction, they are vital to the existence of the sage-grouse.  Multiple populations across a broad geographic area provide insurance against a catastrophic event threatening the entire species.  In addition, the aggregate number of individuals across all populations increases the probability of demographic persistence and preservation of overall genetic diversity by providing an important genetic reservoir (RCP 2005).

*Table 7.  GUSG 2004 lek counts and population estimates.*

| Page 3: [20] Formatted | FWS User | 4/6/2005 11:24:00 AM |
| --- | --- | --- |

Font: Bold, Font color: Green

| Page 3: [21] Deleted | Kurt Johnson | 4/13/2005 5:25:00 PM |
| --- | --- | --- |

| Population | Male High Count (Total for all leks) | Number of Leks (includes leks with 0 males present in 2004) | Estimated Population Size |
| --- | --- | --- | --- |
| Cerro Summit–Cimarron - Sims Mesa | 8 | 4 | 39 |
| Crawford | 26 | 5 | 128 |
| Dove Creek | 2 | 6 | 10 |
| Gunnison Basin | 498 | 78 | 2,443 |
| Monticello, Utah | 31 | 5 | 152 |
| Piñon Mesa | 29 | 8 | 142 |
| Poncha Pass | 8 | 1 | 39 |

Gunnison Sage-grouse Rangewide Conservation Plan

| Population | Male High Count (Total for all leks) | Number of Leks (includes leks with 0 males present in 2004) | Estimated Population Size |
|---|---|---|---|
| San Miguel Basin | 50 | 10 | 245 |
| **Total** | **652** | **117** | **3,198** |

Table 1.  Areas of habitat categories (see pg. 49 for definitions) in each GUSG population area.

| GUSG Area | Occupied[1] Habitat (acres) | Potentially Suitable Habitat (acres) | Vacant/Unknown Habitat (acres) |
|---|---|---|---|
| Cerro Summit – Cimarron – Sims Mesa | 37,160 | 20,624 | 4,923 |
| Crawford | 35,014 | 62,107 | 18,192 |
| Dove Creek | 28,262 | 237,677 | 53,190 |
| Gunnison Basin | 592,926 | 157,298 | 22,937 |
| Monticello, Utah | 70,658 | 75,320 | 56,847 |
| Piñon Mesa | 38,890 | 136,414 | 63,807 |
| Poncha Pass | 20,415 | 27,875 | 0 |
| San Miguel Basin | 100,537 | 62,079 | 41,524 |
| Utah (adjacent to Piñon Mesa) | 0 | 3,788 | 2,233 |

[1]Only occupied acres are being proposed for critical habitat.

| Page 3: [22] Formatted | FWS User | 4/7/2005 2:30:00 PM |
|---|---|---|

Font color: Green, Superscript

| Page 3: [23] Deleted | Kurt Johnson | 4/18/2005 3:25:00 PM |
|---|---|---|

. [Tables 1, 2, and 3 are essentially PCE's with the remainder of the information background/supporting rationale.]

| Page 3: [24] Deleted | Kurt Johnson | 4/18/2005 3:26:00 PM |
|---|---|---|

The extensive literature describing seasonal habitat use by GRSG spans 9 western states and 60 years, but there is considerably less information available for GUSG (Hupp 1987, Hupp and Braun 1989b, Young 1994, Commons 1997, Swenson 2003, and Apa 2004). The following habitat descriptions are based on GUSG data when available, and on GRSG information when needed.  In addition, if the quality of GUSG data is questionable, information from GRSG is used.

Sage-grouse use extensive landscapes throughout the year and can move great distances or have annual migratory patterns (Beck 1975, Wallestad 1975, Hulet 1983, Berry and Eng 1985, Connelly et al. 1988, Wakkinen 1990, Fischer 1994).  Sage-grouse are wide ranging because they require a diversity of seasonal habitats (Connelly et al. 2000), and have specialized dietary requirements (see Schroeder et al. 1999 for numerous citations).  Sage-grouse may use small portions of many different landscape types during different life stages (Connelly et al. 2000) and movements between small seasonal ranges may be extensive.

| Page 3: [25] Deleted | Kurt Johnson | 4/18/2005 3:50:00 PM |
|---|---|---|

In some situations, fall and summer - late brood-rearing habitats are indistinguishable, but this depends on the movement patterns of the population and habitat availability.

| Page 3: [26] Deleted | Kurt Johnson | 4/18/2005 3:49:00 PM |
|---|---|---|

Gunnison Sage-grouse Rangewide Conservation Plan

For the purpose of this plan, we have combined the summer - late brood-rearing and fall habitat into a single habitat category, "summer – fall", resulting in 3 overall seasonal habitats, rather than 4.  Summer – late brood-rearing habitat is typically characterized by high elevation mesic areas, cropland, wet meadows, and riparian areas.  Grouse continue to use these as fall approaches and there is a slow conversion of the diet from forbs to sagebrush.  As mentioned earlier, in many cases these two seasonal habitats are indistinguishable, but in the future local information may provide additional insight as to when and where these 2 seasonal habitats can be clearly separated.

All the seasonal habitats described here include habitat used by brooding females, unsuccessful female, and male flocks.

| Page 3: [27] Formatted | FWS User | 4/6/2005 11:35:00 AM |
|---|---|---|

Font: Times New Roman, Not Italic

| Page 3: [28] Formatted | FWS User | 4/6/2005 11:35:00 AM |
|---|---|---|

Font: Times New Roman, Not Italic

| Page 1: [29] Deleted | Kurt Johnson | 3/15/2005 2:44:00 PM |
|---|---|---|

December 10, 2004

| Page 4: [30] Deleted | Kurt Johnson | 4/18/2005 3:32:00 PM |
|---|---|---|

 (Patterson 1952, Hjorth 1970, Hartzler 1972, Wiley 1973b, 1974, Bergerud 1988, Phillips 1990).

| Page 4: [31] Deleted | Kurt Johnson | 4/18/2005 3:53:00 PM |
|---|---|---|

The absence of taller shrubs/trees or other obstructions appears to be critical for continued use of these sites by displaying males.

Sites chosen for display are typically close to sagebrush that is > 6 inches tall and has a canopy cover $\geq$ 20% (Wallestad and Schadweiler 1974).  Usually leks are located in the vicinity of nesting habitat (Wakkinen et al. 1992) and are in areas intersected by high female traffic (Bradbury and Gibson 1983, Bradbury et al. 1986, Gibson et al. 1990, Gibson 1992, 1996).  These sagebrush areas are used for feeding, roosting, and escape from inclement weather and predators.  Males are usually found roosting in sagebrush stands with canopy cover of 20 - 30% (Wallestad and Schadweiler 1974).

| Page 4: [32] Deleted | Kurt Johnson | 4/18/2005 3:33:00 PM |
|---|---|---|

Wallestad and Schadweiler (1974) found daily movements ranged between 0.2 and 0.8 miles from leks, with a maximum cruising radius of 0.9 to 1.2 miles.  Ellis et al. (1987) reported that dispersal flights of male GRSG (to day-use areas) ranged from 0.3 – 0.5 miles, with the longest flights ranging from 1.2 – 1.3 miles.  Carr (1967) reported that the cruising radius of male GRSG ranged from 0.9 – 1.1 miles.  Rothenmaier (1979) found that 60 – 80% of male GRSG locations were within 0.6 – 0.7 miles of a lek.  Emmons (1980) reported that male dispersal distances to day-use areas of 0.1 miles were common and that 67% of all use areas were greater than 0.3 miles from the lek.  In addition,

| Page 4: [33] Deleted | Kurt Johnson | 4/18/2005 3:53:00 PM |
|---|---|---|

Pre-laying Habitat (late-March – April)

No information is available regarding pre-laying habitat for GUSG.  Connelly et al.

Gunnison Sage-grouse Rangewide Conservation Plan

3/18/05  For Review Only

(2000) recommend that breeding habitat should include pre-laying habitat but little is known or understood about pre-laying habitat, even for GRSG.  It has been suggested that pre-laying habitats should provide a diversity of vegetation to meet the nutritional needs of females during the egg development period.  For pre-laying females in Oregon, Barnett and Crawford (1994) suggest that the habitat should contain a diversity of forbs that are rich in calcium, phosphorous and protein.

Nesting Habitat (mid-April – June)

GRSG prefer to nest under tall (11 – 31 inches) sagebrush (Connelly et al. 2000).  Peterson (1980) found in North Park, Colorado that nest bushes averaged approximately 20 inches.  In Moffat County, Colorado this value is slightly higher and ranges from 30 – 32 inches (Hausleitner 2003).  Often, the actual nest bush is taller than the surrounding sagebrush plants (Keister and Willis 1986, Wakkinen 1990, Apa 1998).  In northwestern Colorado, the nest bush was nearly 10 inches taller than surrounding shrubs (Hausleitner 2003).  The canopy cover of sagebrush around the nest ranges from 15 - 38% (Patterson 1952, Gill 1965, Gray 1967, Wallestad and Pyrah 1974, Keister and Willis 1986, Wakkinen 1990, Connelly et al. 1991, Apa 1998, Connelly et al. 2000).  Sagebrush canopy cover around nests in northwestern Colorado had a similar range of values, and averaged 27% (Hausleitner 2003).

Young (1994) reported GUSG nesting under sagebrush that had a mean height of 16.1 inches in the Gunnison Basin.  In the Gunnison Basin, Apa (2004) found GUSG nested in areas with a mean sagebrush height of 18.6 inches.  In contrast, non-use sites exhibited average mean sagebrush heights of 3.6 inches (Apa 2004).  Average horizontal cover of sagebrush varied from 17.4 – 26.0% while non-sagebrush cover varied from 7.9 – 13.7%; non-sagebrush cover at non-use locations was 6.9%.

Good quality nesting habitat consists of live sagebrush with sufficient canopy cover, and substantial grasses and forbs in the understory (Connelly et al. 2000).  Few herbaceous plants are growing in April when nesting begins, so residual herbaceous cover from the previous growing season is critical for nest concealment in most areas, although the level of herbaceous cover depends largely on the potential of the sagebrush community (Connelly et al. 2000).  Reasonable and scientifically defensible habitat structure guidelines specific to GUSG need to be developed.

Nearly all nests are located beneath sagebrush plants (Patterson 1952, Gill 1965, Gray 1967, Wallestad and Pyrah 1974) and GRSG nesting under sagebrush plants have higher nest success than those that nest under plants other than sagebrush (Connelly et al. 1991).  Grouse nest sites also have an important component of herbaceous vegetation (Connelly et al. 2000).  Grass heights are variable and as measured across the West range from 5 – 13 inches (Connelly et al. 2000).  In addition, horizontal grass cover measurements are also variable and range from 4 – 51% cover.  These measurements are similar to northwest Colorado data; Hausleitner (2003) reported that grass heights at nests ranged from 5-6 inches, grass cover averaged approximately 4%, and forb cover averaged about 7% (Hausleitner 2003).

Although not clearly understood, it is also believed that understory herbaceous cover (horizontal and vertical) is important for GUSG nesting habitat.  Young (1994) found in the Gunnison Basin that nesting females used nest sites with horizontal grass and forb cover that

6

Threats and Analysis
Threats Summarized by Listing Factor

Gunnison Sage-grouse Rangewide Conservation Plan

averaged 9.5% and 3.7%, respectively.   Apa (2004) found across southwestern Colorado that GUSG females nested in areas with grass cover of 24.9% and forb cover of 17.6%. Grass height was 4.0 inches and forb height was 1.6 inches.


Early Brood-rearing

Early brood-rearing habitat requirements are very similar to nesting habitat requirements.  Early brood-rearing habitat is found relatively close to nest sites (Connelly et al. 2000), but individual females with broods may move large distances (Connelly 1982, Gates 1983).  Early brood-rearing habitat is typically characterized by sagebrush stands with canopy cover of 10-15% (Martin 1970, Wallestad 1971) with herbaceous understories that exceed 15% cover (Sveum et al. 1998a, Lyon 2000).  In Moffat County, Colorado, sagebrush stands average approximately 11% canopy cover and herbaceous understories average about 14% horizontal cover (Hausleitner 2003).  High plant species diversity (sometimes also referred to as species richness) is also typical in early brood-rearing habitat (Dunn and Braun 1985, Klott and Lindzey 1990, Drut et al. 1994a, Apa 1998).  Sagebrush heights ranged from 6 to 18 inches in Montana (Sveum et al. 1998a, Lyon 2000) and about 23 inches in Moffat County (Hausleitner 2003).  Adjacent shrub areas of 20-25% canopy cover have been reported as preferred for escape and day roosting (Wallestad 1971; Dunn and Braun 1987), but night roosting sites in Moffat County, Colorado had only 4% sagebrush canopy cover and sagebrush height was 20 inches

In early summer, the size of the area used appears to depend on the interspersion of sagebrush types that provide an adequate amount of food and cover.  Females and broods can select riparian habitats in the sagebrush type that have abundant forbs and moisture (Gill 1965; Klebenow 1969; Savage 1969; Connelly and Markham 1983; Gates 1983; Connelly et al. 1988; Fischer et al. 1996a).  Females with broods remain in sagebrush uplands as long as the vegetation remains succulent, but may move to wet meadows as vegetation desiccates (Fischer et al. 1996b).  Depending on precipitation and topography, some broods may stay in sagebrush/grass communities all summer while others shift to lower areas (riparian areas, hay meadows or alfalfa fields) as upland plant communities desiccate (Wallestad 1975).

| Page 6: [34] Deleted | Kurt Johnson | 4/18/2005 3:57:00 PM |
|---|---|---|

**[Since the guidelines below are considered minimum standards does that mean that habitat lower than stated below not constitute CH?  Need to consider site potential rather than look at a snapshot of habitat condition when we make the decisions on where to designate.]**

Table 1.  GUSG breeding habitat guidelines[a].  Guidelines should be considered the minimum standards.

| BREEDING HABITAT[b] |
|---|

Gunnison Sage-grouse Rangewide Conservation Plan

| Vegetation Variable | Gunnison sage-grouse | | Connelly et al. (2000) | |
|---|---|---|---|---|
| | Arid[c] | Mesic[e] | Arid | Mesic |
| Sagebrush Canopy [d] % | 15 - 25 | 10 – 20 | 15 - 25 | 15 – 25 |
| Non-sagebrush Canopy [d] % | 5 - 15 | 5 – 15 | - | - |
| Total Shrub Canopy [d] % | 20 - 40 | 15 – 35 | - | - |
| Sagebrush Height  cm (inches) | 25 – 50 (9.8 – 19.7) | 30 – 50 (11.8 – 19.7) | 30 – 80 (11.8 – 31.5) | 40 – 80 (15.7 – 31.5) |
| Grass Cover [d]   % | 10 - 30 | 20 – 40 | - | - |
| Forb Cover [e]    % | 5 - 15 | 20 – 40 | ≥ 15 | ≥ 25 |
| Grass Height [f] cm (inches) | 10 – 15 (3.9 – 5.9) | 10 – 15 (3.9 – 5.9) | > 18 (> 7.1) | > 18 (> 7.1) |
| Forb Height [f] cm (inches) | 5 – 10 (2.0 – 3.9) | 5 – 15 (2.0 – 5.9) | - | - |

[a] Breeding habitat guidelines were developed using data in GUSG studies by Young (1994) and Apa (2004).
[b] Breeding habitat is defined as sagebrush communities delineated within 4 miles of a lek (see "GUSG Disturbance Guidelines", Appendix I, for discussion.  Breeding habitat includes lek, nesting and early brood-rearing habitat usually from mid-March through late-June.
[c] Arid or mesic communities are as defined by Winward (2004).
[d] Canopy cover measured according to Canfield (1941) and further described by Connelly et al. (2003).
[e] Understory cover measured according to Daubenmire (1959).
[f] Measured as "droop height"; the tallest portion of the naturally growing portion of the plant (Connelly et al. 2000).

———————Column Break———————

Table 2.  GUSG summer - fall habitat guidelines[a].  Guidelines should be considered the minimum standards.  No specific habitat guidelines have been included for riparian or wet meadow habitat used by GUSG during this period.  BLM and USFS currently have riparian and/or wet meadow management guidance which is consistent the needs of GUSG.

| SUMMER - FALL HABITAT[b] | | | | |
|---|---|---|---|---|
| | Gunnison sage-grouse | | Connelly et al. (2000) | |
| Vegetation Variable | Arid[c] | Mesic[c] | Arid | Mesic |
| Sagebrush Canopy [d] (%) | 5 – 15 | 5 – 20 | 10 – 25 | 10 – 25 |
| Non-sagebrush Canopy [d] (%) | 5 - 15 | 5 – 15 | - | - |
| Total Shrub Canopy [d] (%) | 10 - 30 | 10 – 35 | - | - |
| Sagebrush Height cm (inches) | 20 – 40 (7.9 - 15.7) | 25 – 50 (9.8 – 19.7) | 40 – 80 (15.7 – 31.5) | 40 – 80 (15.7 – 31.5) |
| Grass Cover [e] (%) | 10 - 25 | 10 – 35 | - | - |
| Forb Cover [e] (%) | 5 - 15 | 15 – 35 | > 15 | > 15 |
| Grass Height [f] cm (inches) | 10 – 15 (3.9 – 5.9) | 10 – 15 (3.9 – 5.9) | variable | variable |
| Forb Height [f] cm (inches) | 3 – 10 (1.2 - 3.9) | 5 – 10 (2.0 - 5.9) | variable | variable |

[a] Summer - fall habitat guidelines were developed using data in GUSG studies by Young (1994), Woods and Braun (1995), Commons (1997), and Apa (2004)
[b] Summer – fall habitat is defined as vegetation communities, including sagebrush, agricultural fields, and wet meadows (Connelly et al. 2000) that are within 4 miles (see "GUSG Disturbance Guidelines", Appendix I, for discussion) of an active strutting ground.

Gunnison Sage-grouse Rangewide Conservation Plan

[c] Arid or mesic communities are as defined by Winward (2004).
[d] Canopy cover measured according to Canfield (1941) and further described by Connelly et al. (2003).
[e] Understory cover measured according to Daubenmire (1959).
[f] Measured as "droop height"; the tallest portion of the naturally growing portion of the plant (Connelly et al. 2000).

-------------------------------------------------------------Column Break---------------------------------------------------------------------

Table 3.  GUSG winter habitat guidelines[a].  Guidelines should be considered the minimum standards.

| WINTER HABITAT[b] | | | | |
|---|---|---|---|---|
| | Gunnison sage-grouse | | Connelly et al. (2000) | |
| Vegetation Variable | Arid[c] | Mesic[c] | Arid | Mesic |
| Sagebrush Canopy[d]: % | 30 – 40 | - | 10 – 30 | 10 – 30 |
| Sagebrush Height[e]: cm (inches) | 40 – 55 (15.8 – 21.7) | - | 25 – 35 (9.8 – 13.8) | 25 – 35 (9.8 – 13.8) |

[a] Winter habitat guidelines were developed using GUSG data from Hupp (1987).
[b] Winter habitat is defined as sagebrush areas (Connelly et al. 2000) within currently occupied habitat that are available (i.e., not covered by snow) to sage-grouse in average winters.
[c] Arid or mesic communities are as defined by Winward (2004).
[d] Canopy cover measured according to Canfield (1941) and further described by Connelly et al. (2003).
[e] Measured from ground level to the tallest stem (excluding inflorescence) according to Hupp (1987).

| Page 6: [35] Formatted | FWS User | 4/6/2005 4:05:00 PM |
|---|---|---|

Font: Bold, Font color: Green

| Page 6: [36] Formatted | Kurt Johnson | 4/18/2005 3:44:00 PM |
|---|---|---|

Indent: First line:  0"

| Page 6: [37] Formatted | Kurt Johnson | 3/16/2005 4:38:00 PM |
|---|---|---|

Font: Bold

| Page 6: [38] Formatted | Kurt Johnson | 3/16/2005 4:38:00 PM |
|---|---|---|

Font: Bold

| Page 6: [39] Deleted | Kurt Johnson | 4/18/2005 3:44:00 PM |
|---|---|---|

Use the science behind the recovery plan, rather than citing the recovery plan, to do the following:
a. **Describe the relevance and application of principles of conservation biology** (landscape analysis, small population dynamics, conservation genetics, risk assessment, adaptive management) for the determination of critical habitat for this particular species.
b. **Identify the most important principles to meet the objectives** (such as connectivity, size, core, isolation, mosaics, matrices, edge, fragmentation, and redundancy).

| Page 6: [40] Formatted | Kurt Johnson | 3/17/2005 2:54:00 PM |
|---|---|---|

Font: Bold

| Page 6: [41] Formatted | Kurt Johnson | 3/17/2005 2:54:00 PM |
|---|---|---|

Font: Bold

| Page 6: [42] Formatted | FWS User | 4/6/2005 11:42:00 AM |
|---|---|---|

Indent: First line:  0"

| Page 6: [43] Deleted | Kurt Johnson | 4/18/2005 3:59:00 PM |
|---|---|---|

All 18 units of occupied habitat throughout the range are needed to sustain the survival of the species.  The Gunnison Basin contains 76% of the genetic diversity of the species but the other small populations collectively contain 24%.

| Page 6: [44] Deleted | Kurt Johnson | 4/18/2005 4:24:00 PM |
|---|---|---|

3/18/05  For Review Only

10

Threats and Analysis
Threats Summarized by Listing Factor

However, parameters that were not incorporated in the PVA included density-dependent reproduction, effects of disease, inbreeding depression, and habitat loss or fragmentation.

| Page 6: [45] Deleted | Kurt Johnson | 4/18/2005 4:23:00 PM |

Multiple populations across a broad geographic area provide insurance against a catastrophic event threatening the entire species.  In addition, the aggregate number of individuals across all populations increases the probability of demographic persistence and preservation of overall genetic diversity by providing an important genetic reservoir (RCP 2005).

| Page 6: [46] Deleted | Kurt Johnson | 4/18/2005 4:24:00 PM |

Based on recent genetic analyses **(Oyler-McCance et al. in press),** there currently is little or no connection of six of the populations with each other.  Short-term maintenance of populations and genetic diversity through transplant of birds, especially for the Monticello - Dove Creek population and Pinon Mesa population will be necessary to maintain these populations.  The Poncha Pass population was reestablished in the early 1970's but was nearly extirpated by the late 1990's.  Transplants in 2000-20002 from the Gunnison Basin have kept the population extant but, obviously, as a group they are identical to the Gunnison Basin birds since that was the founder population in both the 1970's transplants and the more recent transplants.  Transplants between all populations are a potential strategy identified in the RCP (2005) to maintain genetic diversity.  However, transplanting sage-grouse takes a lot of staff time and money, not to mention causing harassment of the grouse.  Restoration, maintenance, and preservation of natural habitat linkages will also take a lot of money; however, once reestablished there should be no need for human intervention other than through habitat maintenance.

| Page 6: [47] Formatted | FWS User | 4/6/2005 12:19:00 PM |

Font: Bold, Font color: Green

| Page 6: [48] Formatted | FWS User | 4/6/2005 12:19:00 PM |

Font: Bold, Font color: Green

| Page 6: [49] Formatted | Kurt Johnson | 3/25/2005 2:05:00 PM |

Indent: First line:  0"

| Page 6: [50] Deleted | Kurt Johnson | 3/16/2005 2:10:00 PM |

c. **Quantitatively, where possible, determine important current or recent past population sizes and habitat distributions**, and identify numbers (e.g., of individuals, family groups, populations, acres, distances, densities) that have meaning to the sustained survival of the species.
d.

| Page 6: [51] Formatted | Kurt Johnson | 3/17/2005 2:54:00 PM |

Font: Bold

| Page 6: [52] Formatted | Kurt Johnson | 3/17/2005 2:54:00 PM |

Font: Bold

| Page 6: [53] Formatted | Kurt Johnson | 3/17/2005 2:54:00 PM |

Font: Bold

| Page 6: [54] Formatted | Kurt Johnson | 3/17/2005 2:54:00 PM |

Font: Bold

| Page 6: [55] Deleted | Kurt Johnson | 3/16/2005 4:35:00 PM |

. **Information such as estimates of viable population sizes, population densities, home range sizes, and dispersal distances will assist the biologis**

3/18/05  For Review Only

| Page 6: [56] Formatted | Kurt Johnson | 3/17/2005 2:54:00 PM |
|---|---|---|

Font: Bold

| Page 6: [57] Deleted | Kurt Johnson | 3/16/2005 4:36:00 PM |
|---|---|---|

Whether or not quantitative information exists, rule sets, decision trees, and other decision analysis tools can be used for a transparent, stated rationale of how size and location of the designation was determined.  This does not have to be exhaustive, just needs to explain the basis for the designation.

| Page 6: [58] Deleted | Kurt Johnson | 4/18/2005 4:50:00 PM |
|---|---|---|

**and some unknown/vacant and/or potential habitat and/or linkage areas**

| Page 6: [59] Formatted | FWS User | 4/6/2005 3:59:00 PM |
|---|---|---|

Font: Bold, Font color: Green

| Page 6: [60] Deleted | Kurt Johnson | 3/16/2005 4:38:00 PM |
|---|---|---|

e. Review the listing rule to determine which areas were described as occupied at the time of listing. Develop a definition of occupied based on such information as dispersal distances from known locations. If using dispersal distances in determining the area occupied by or essential to a species, use average dispersal distances, not maximum

f. areas occupied at the time of listing designated must contain the features essential to the conservation of the species (i.e., PCEs).  All other areas must be essential to the conservation of the species.  It should be simple to justify  areas that were not occupied at the time of listing but are now occupied,  as they are occupied.  Briefly state whether the area has the PCEs and why these areas are essential in the unit desciptions (see unit descriptions below).

g. Do not designate any areas that are merely "important to recovery" or "may be needed" or "are suitable habitat" or are "appropriate for recovery."

| Page 6: [61] Formatted | Kurt Johnson | 3/17/2005 4:03:00 PM |
|---|---|---|

Font: 12 pt

| Page 6: [62] Formatted | Kurt Johnson | 3/17/2005 4:03:00 PM |
|---|---|---|

Normal

| Page 6: [63] Deleted | Kurt Johnson | 3/16/2005 4:38:00 PM |
|---|---|---|

11

3.

| Page 6: [64] Formatted | Kurt Johnson | 3/17/2005 4:03:00 PM |
|---|---|---|

Font: 12 pt

| Page 6: [65] Formatted | Kurt Johnson | 3/17/2005 4:03:00 PM |
|---|---|---|

Font: Bold

| Page 6: [66] Formatted | Kurt Johnson | 3/17/2005 4:03:00 PM |
|---|---|---|

Font: 12 pt

| Page 6: [67] Formatted | Kurt Johnson | 3/17/2005 4:03:00 PM |
|---|---|---|

Font: Bold

| Page 1: [68] Deleted | Kurt Johnson | 3/15/2005 2:44:00 PM |
|---|---|---|

December 10, 2004

| Page 7: [69] Formatted | Kurt Johnson | 3/17/2005 4:03:00 PM |
|---|---|---|

Font: 12 pt

Threats and Analysis
Threats Summarized by Listing Factor

Gunnison Sage-grouse Rangewide Conservation Plan

| Page 7: [70] Formatted | Kurt Johnson | 3/17/2005 4:03:00 PM |
|---|---|---|

Font: Bold

| Page 7: [70] Formatted | Kurt Johnson | 3/17/2005 4:03:00 PM |
|---|---|---|

Font: 12 pt

| Page 7: [71] Deleted | Kurt Johnson | 4/18/2005 4:51:00 PM |
|---|---|---|

Areas unoccupied at the time of listing  must be found to be essential for conservation.

| Page 7: [72] Formatted | Kurt Johnson | 3/15/2005 3:37:00 PM |
|---|---|---|

Indent: Left:  0", First line:  0"

| Page 7: [73] Deleted | Kurt Johnson | 4/18/2005 4:51:00 PM |
|---|---|---|

. [Do we care if they're self sustaining or is periodic but continual transplantation of birds ok with people?  If not then perhaps we should include vacant/unknown and potential habitat in CH.  Al Pfister pointed out that the ESA states that we should support the ecosystems upon which the species depends and, therefore, we should strive for self sustaining populations.]

| Page 7: [74] Deleted | Kurt Johnson | 3/17/2005 4:01:00 PM |
|---|---|---|

Here essential means indispensable, or necessary. Thus, to be designated as critical, it is not sufficient for habitat to be suitable, or even important; rather, the habitat must be indispensable to the species long-term persistence.  In the preamble of the rule, there must be a clear and compelling statement why any areas outside the occupied at the time of listing that are included in the designation are considered essential.

| Page 7: [75] Formatted | Kurt Johnson | 4/18/2005 4:58:00 PM |
|---|---|---|

Font: 14 pt

| Page 7: [76] Formatted | Kurt Johnson | 4/18/2005 4:58:00 PM |
|---|---|---|

Font: 14 pt, Bold

| Page 7: [76] Formatted | Kurt Johnson | 4/18/2005 4:58:00 PM |
|---|---|---|

Font: 14 pt

| Page 7: [77] Formatted | Kurt Johnson | 3/17/2005 2:57:00 PM |
|---|---|---|

Indent: Left:  0", First line:  0", Right:  0.45"

| Page 7: [78] Deleted | Kurt Johnson | 3/17/2005 10:53:00 AM |
|---|---|---|

| Page 7: [79] Formatted | Kurt Johnson | 3/17/2005 3:04:00 PM |
|---|---|---|

No underline

| Page 7: [80] Deleted | Kurt Johnson | 3/16/2005 4:42:00 PM |
|---|---|---|

Best Available Scientific and Commercial Information (recent NOI)

Best available information must support the decision.  If there is no information, or insufficient information, it cannot support a decision.

PCEs (E.Dist. CA)

    In accordance with section 3(5)(A)(i) of the Act and regulations at 50 CFR § 424.12, in determining what areas are critical habitat, we shall consider those physical and biological

features that are essential to the conservation of the species and, within areas occupied by the species at the time of listing, that may require special management considerations or protection.  These generally include, but are not limited to the following:

> *1)  space for individual and population growth, and for normal behavior;  2) food, water, air, light, minerals, or other nutritional or physiological requirements; 3)  cover or shelter;  4)  sites for breeding, reproduction, rearing of offspring, germination, or seed dispersal; and  5)  habitats that are protected from disturbance or are representative of the historical geographical and ecological distributions of a species.*

In 2003, The District Court for the Eastern District of California ruled on a merits challenge of the designation of critical habitat for the Alameda whipsnake (whipsnake).  In the opinion, the Court explicitly faulted us for not 1) clearly defining the physical and biological features essential to the conservation of the whipsnake (referred to as primary constituent elements (PCEs)), and 2) showing the logical link between the PCEs and those areas defined as being essential to the conservation of the species (the areas within the boundaries of designated critical habitat).

Development of PCEs

When beginning the evaluation of what physical and biological features are essential to the conservation of a species, ask the questions as to what specific features would provide for the five life history requisites addressed in our regulations at 50 CFR § 424.12 and listed above.  For example, what are the specific features or areas that the subject species requires to provide for food, shelter, breeding, foraging, population expansion, migratory habitat-wintering and breeding grounds, seed bank, dispersal corridors, etc.?  Keep in mind that what you are attempting to define are requisite or essential features.  As defined in Webster's dictionary, essential is absolutely necessary or indispensable.  Therefore, think about those essential or absolutely necessary or indispensable features that provide for the topics covered by the regulation.

When determining and describing the PCEs, define the specific parameters of the feature, where possible, that make it essential to the conservation of the species.  If the species is aquatic, does the species require specific parameters of water temperature, pH, depth, quality, flow, etc., or if terrestrial, does the species require a certain soil type, structure and function of a particular habitat type, host plant, food source, fire-return frequency or disturbance regime, dispersal or pollinating vector, host species, etc.  If the specific parameters are not readily known, provide data concerning a range of the parameter where the species is present.  PCE's should be specific but not so specific that normal variation/fluctuation causes an area to no longer have the PCE (e.g., water temperature).

Note that PCEs are features, not locations. While not defined in the Act or regulations, the general discussion and trend has been to define PCEs as tangible, recognizable, or measurable features in the landscape, where possible, and not the processes that result in the feature.  This should allow for biologist and non-biologist to more clearly

3/18/05  For Review Only

determine the PCEs while in the field.  PCEs are not prescribing management conditions for habitat or for reducing threats.  So, for example, reduction of predation would not be a PCE.  But, the specific features of the habitat that would reduce the risk of predation could be a PCE (e.g., vegetative cover).

Similarly, a physical process such as a hydrological regime or bedrock degradation to form a particular soil type should not be the PCE, but the resulting habitat condition, such as flow speed or soil type (the end result of the process) should be the PCE.  The feature that is essential to the species is the end point of the process – the particular soil type – so the soil type is the PCE.  Since, the process is important and helps to define the PCE, the process should be discussed in the beginning of the PCE section.

Some species may have essential features that fall outside the topics covered in the regulation, e.g., essential symbiotic relationships.  In these cases, clearly and logically define the feature through discussion in the beginning of the PCE section so that a reader not familiar with the species can easily understand what and why you have determined that feature to be a PCE.

Discussion of PCEs and their Supporting Rationale

It is important to ensure that the proposed and final critical habitat designation discuss the rationale behind defining particular features as PCEs and their relationship to the species.  The lack of our supporting rationale and how the PCEs related to the species were weaknesses identified by the Court in the whipsnake decision.

The PCEs and our rationale for determining the specific features or PCEs should be discussed primarily in the Primary Constituent Elements section.  The Background section should not repeat information in the listing rule or, in the case of a final rule, in the proposed critical habitat rule but contain any new biological information.  Thus, the PCE section will contain the rationale behind each PCE.

The PCE section should be complete enough to introduce the physical and biological needs of the species, discuss the relative importance of the needs to the species, and set the stage for the later discussion where we define the feature as a PCE.  As much as possible refer to the background section, existing documents or literature such as a listing rule for the species, a recovery plan for the species, or peer reviewed literature that addresses the species and discussed the relative importance of the particular feature to the species.  The discussion of the PCEs in this section should lead the reader to a natural conclusion that the specific features discussed are the features "truly" essential to the survival and conservation of the species.  An appropriate method to focus this discussion is to couch it in terms of each of the five topics, or at least those applicable, from the regulations.  More specifically, use subheadings to define paragraphs speaking to the topics in the regulation at 50 CFR § 424.12 and listed above.  This then will provide the lead-in to the list defining the specific PCEs for the subject species.

Next, the PCE section that should discuss each of the specific PCEs and the rationale

14

Threats and Analysis
Threats Summarized by Listing Factor

Gunnison Sage-grouse Rangewide Conservation Plan

behind determining that these features are essential to the conservation of the species. The discussion in this section should be brief, but each PCE should be matched back to the regulation and provide a summary statement as to why that feature is essential to the conservation of the species. However, if it is abundantly clear through the discussion in the introductory portion of the Constituent Elements section of the preamble of why these features are essential to the conservation of the species and how they relate back to our regulations, then this discussion may be even shorter. We want to make sure that a person unfamiliar with the species and its physical and biological requisites can clearly and easily understand our reasoning and logic.

Most importantly, the language used to identify PCEs in the rule must be specific: ie. "the PCEs are:" and NOT "the PCEs can be found in" or the "PCEs include, but are not limited to:"

| Page 7: [81] Formatted | Kurt Johnson | 3/17/2005 3:04:00 PM |
|---|---|---|

Font: Not Bold

| Page 7: [82] Formatted | Kurt Johnson | 3/25/2005 2:19:00 PM |
|---|---|---|

Font: 14 pt

| Page 7: [83] Deleted | Kurt Johnson | 3/17/2005 3:02:00 PM |
|---|---|---|

## PECIAL MANAGEMENT

| Page 7: [83] Deleted | Kurt Johnson | 3/17/2005 3:03:00 PM |
|---|---|---|

(DOI/SOL)

| Page 7: [84] Deleted | Kurt Johnson | 3/16/2005 4:43:00 PM |
|---|---|---|

The Alameda whipsnake decision also discussed "Special Management." Special management is the second prong of the definition of critical habitat in areas within the geographic area of the species. "Critical habitat" is defined in section 3(5)(a) of the Act as–(i) the specific areas within the geographic area occupied by a species, at the time it is listed in accordance with the Act, on which are found those physical or biological features (I) essential to the conservation of the species and (II) that may require special management considerations or protection; and (ii) specific areas outside the geographic area occupied by a species at the time it is listed, upon a determination that such areas are essential for the conservation of the species.

| Page 7: [85] Formatted | Kurt Johnson | 3/17/2005 2:53:00 PM |
|---|---|---|

Font: Bold

| Page 7: [86] Deleted | Kurt Johnson | 3/17/2005 10:54:00 AM |
|---|---|---|

The whipsnake decision said that the Service "…was required to make a finding, prior to designating a particular area as critical habitat, that the area in question might require special management considerations and protections at some time in the future." Therefore, we must include this finding. We can do this in two ways. Ideally the unit descriptions should include unit by unit discussion of the threats that may warrant special management.

| Page 7: [87] Deleted | Kurt Johnson | 4/18/2005 4:29:00 PM |
|---|---|---|

Table 20. Current and potential issues affecting GUSG populations. Issues have been identified in the following documents: C = Local Conservation Plan; D = Colorado Division of Wildlife, Annual Candidate Status Review Summaries (Colorado Division of Wildlife 2002, 2003); F = U. S. Fish and Wildlife Service, 2003 Candidate Review Form; U = Utah Division of Wildlife, Strategic Management Plan for Sage-grouse; N =

Gunnison Sage-grouse Rangewide Conservation Plan

Table 20 (con't).  Current and potential issues affecting GUSG populations.  Issues have been identified in the following documents: C = Local Conservation Plan; D = Colorado Division of Wildlife, Annual Candidate Status Review Summaries (Colorado Division of Wildlife 2002, 2003); F = U. S. Fish and Wildlife Service, 2003 Candidate Review Form; U = Utah Division of Wildlife, Strategic Management Plan for Sage-grouse; N = The Nature Conservancy, (The Nature Conservancy 2002).

| USFWS Listing Factor | Issue Affecting GUSG | GUNNISON SAGE-GROUSE POPULATION | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Cerro - Cimarron - Sims Mesa | Crawford | Dove Creek | Gunnison Basin | Monticello Utah | Piñon Mesa | Poncha Pass | San Miguel Basin |
| C. Disease or Predation. | Disease | D, F | D, F | C, F | C, F, N | C, F | C, F | C, F | C, D, F |
| | Predation | D, F | D, F, N | F | D, F | F | F | C, F | D, F |

| USFWS Listing Factor | Issue Affecting GUSG | GUNNISON SAGE-GROUSE POPULATION | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Cerro – Cimarron - Sims Mesa | Crawford | Dove Creek | Gunnison Basin | Monticello Utah | Piñon Mesa | Poncha Pass | San Miguel Basin |
| Factor D: Inadequate Regulatory Mechanisms. | Conflicting Land Zoning | D, F | F | F | C, F | F | F | F | F |
| | Conflicting Regulations and Policies* | | C | C | C | | | | C, F |
| | Inadequate Conservation Funding | F | F | F | F | F | F | F | F |
| | Inadequate Habitat Protection Regulations | F | F | F | F | F | F | F | F |
| | Inadequate Regulations for Native/Exotic Releases | | | | | U | | | |

————————————Section Break (Continuous)————————————

3/18/05 For Review Only

Gunnison Sage-grouse Rangewide Conservation Plan
Table 20 (con't). Current and potential issues affecting GUSG populations. Issues have been identified in the following documents: C = Local Conservation Plan; D = Colorado Division of Wildlife, Annual Candidate Status Review Summaries (Colorado Division of Wildlife 2002, 2003); F = U. S. Fish and Wildlife Service, 2003 Candidate Review Form; U = Utah Division of Wildlife, Strategic Management Plan for Sage-grouse; N = The Nature Conservancy, (The Nature Conservancy 2002).

| USFWS Listing Factor | Issue Affecting GUSG | GUNNISON SAGE-GROUSE POPULATION | | | | | |
|---|---|---|---|---|---|---|---|
| | | Cerro – Cimarron - Sims Mesa | Crawford | Dove Creek | Gunnison Basin | Monticello Utah | Piñon Mesa |
| Factor E. Other Natural or Manmade Factors Affecting Species' Existence | Piñon-Juniper Encroachment | F | C, D, F | C, F | F | F, U | C, F |
| | Oakbrush Encroachment | D, F | | C, F | | | C, |
| | Fire Suppression | D | C, N | C | C, N | | C, |
| | Sagebrush Community Changes | D | C | C | C | C | C, |
| | Exotic Weed Invasion | D, N | D | | C, D, F | C | D, |
| | Drought Impacts to Sagebrush Habitat | D, F | C, D, F | C, F | C, D, F | C, F | C, |
| | Motorized Vehicles | N | C | C | C, F, N | C | C |
| | Disturbance from Construction | F | F | F | C, F | F | F |
| | Harassment from People/Pets | D, F, N | C, F | C, F | C, F, N | F | C, |
| | Noise Impacts to Leks | F | C, F | C, F | C, F | F | C, |
| | Geographic Isolation | D, F | F | F | | F, U | F |
| | Herbicide Use | D, F | C, F | F | C, F | C, F | F |
| | Insecticide Use | F | F | F | F | C, F, U | F |
| | Pollution | F | F | F | C, F | F | F |
| | Competition from Other Species | D, F | C, F | C, F | C, F | C, F | C, |
| | Inappropriate Vegetation Treatments | F, N | C, F | C, F, N | C, F, N | F | C, |
| | Soil Erosion | | C | C | C | | |

18

However, where there are very many units, we are advising that we consolidate the description of threats. For instance, we may say units x, y, and z may require special management due to threats posed by invasive species. Units j-m may require special management due to threats posed by water depletion. Where the discussion can be consolidated it should be placed in the Special Management section.

| Page 7: [88] Formatted | FWS User | 4/6/2005 4:25:00 PM |
|---|---|---|
| Indent: Left: 0", Hanging: 0.5" | | |
| Page 7: [88] Formatted | FWS User | 4/6/2005 4:25:00 PM |
| Indent: Left: 0", Hanging: 0.5" | | |
| Page 7: [88] Formatted | FWS User | 4/6/2005 4:25:00 PM |
| Indent: Left: 0", Hanging: 0.5" | | |
| Page 7: [88] Formatted | FWS User | 4/6/2005 4:25:00 PM |
| Indent: Left: 0", Hanging: 0.5" | | |
| Page 7: [88] Formatted | FWS User | 4/6/2005 4:25:00 PM |
| Indent: Left: 0", Hanging: 0.5" | | |

Threats and Analysis
Threats Summarized by Listing Factor

Gunnison Sage-grouse Rangewide Conservation Plan

3/18/05  For Review Only

| Page 7: [88] Formatted | FWS User | 4/6/2005 4:25:00 PM |
|---|---|---|
| Indent: Left:  0", Hanging:  0.5" | | |

| Page 7: [88] Formatted | FWS User | 4/6/2005 4:25:00 PM |
|---|---|---|
| Indent: Left:  0", Hanging:  0.5" | | |

| Page 7: [88] Formatted | FWS User | 4/6/2005 4:25:00 PM |
|---|---|---|
| Indent: Left:  0", Hanging:  0.5" | | |

| Page 7: [88] Formatted | FWS User | 4/6/2005 4:25:00 PM |
|---|---|---|
| Indent: Left:  0", Hanging:  0.5" | | |

| Page 7: [89] Deleted | Kurt Johnson | 4/18/2005 4:31:00 PM |
|---|---|---|

I have no unit by unit descriptions for the small units within a population, so discussing at a population by population or sub-population by sub-population level is probably most appropriate. The main threats can be discussed as requiring special management or at least the focus of management in the appropriate populations [What's the definition of special management?].  The only exception is perhaps Dove Creek sub-population where predator management may be needed to prevent extirpation.  There's already been some predator management (at least study) in Monticello sub-population but results, if monitoring was adequately done, are unknown.

| Page 7: [90] Formatted | FWS User | 4/7/2005 2:58:00 PM |
|---|---|---|
| Font color: Green | | |

| Page 7: [91] Formatted | Kurt Johnson | 3/25/2005 2:19:00 PM |
|---|---|---|
| Font: 14 pt | | |

| Page 7: [92] Deleted | Kurt Johnson | 3/16/2005 4:40:00 PM |
|---|---|---|

## DISCUSSION OF SECTION 7

The following language should be used in the disclaimer section to acknowledge the Ninth Circuit Court ruling:

We note, however, that recent judicial opinions in the 9th and 5th Circuits(Gifford Pinchot Task Force v. United State Fish and Wildlife Service, Sierra Club v. U.S. Fish and Wildlife Service et al., F.3d 434), have invalidated the Service's regulation defining destruction or adverse modification of critical habitat.  We have issued interim guidance that advises our biologists not to rely on the regulatory definitions when conducting Section 7 consultations.

| Page 7: [92] Deleted | Kurt Johnson | 3/17/2005 4:02:00 PM |
|---|---|---|

## XCLUSIONS

| Page 7: [93] Formatted | Kurt Johnson | 3/17/2005 4:03:00 PM |
|---|---|---|
| No underline | | |

| Page 7: [93] Formatted | Kurt Johnson | 3/17/2005 4:03:00 PM |
|---|---|---|

19

Threats and Analysis
Threats Summarized by Listing Factor

3/18/05  For Review Only

Gunnison Sage-grouse Rangewide Conservation Plan
No underline

| Page 7: [94] Formatted | Kurt Johnson | 3/17/2005 4:04:00 PM |
| --- | --- | --- |

No underline

| Page 7: [95] Formatted | Kurt Johnson | 3/25/2005 2:20:00 PM |
| --- | --- | --- |

Body Text Indent 3, Tabs:  0.06", Left + Not at  0" + 1" + 1.5" + 2" + 2.5" + 3" + 3.5" + 4" + 4.5" + 5" + 5.5" + 6"

| Page 7: [96] Deleted | Kurt Johnson | 3/17/2005 11:30:00 AM |
| --- | --- | --- |

Section 318 of the National Defense Authorization Act for Fiscal Year 2004 (Public Law No: 108-136) amended the Endangered Species Act by adding a new section 4(a)(3), which prohibits the Service from designating as critical habitat any lands or other geographical areas owned or controlled by the Department of Defense, or designated for its use, that are subject to an integrated natural resources management plan prepared under section 101 of the Sikes Act (16 U.S.C. 670a), if the Secretary of the Interior determines in writing that such plan provides a benefit to the species for which critical habitat is proposed for designation.

The legislative history provides some additional insight into the intent of the provision:

> The conferees would expect the Secretary of the Interior to assess an INRMP's potential contribution to species conservation, giving due regard to those habitat protection, maintenance, and improvement projects and other related activities specified in the plan that address the particular conservation and protection needs of the species for which critical habitat would otherwise be proposed. Consistent with current practice, the Secretary would establish criteria that would be used to determine if an INRMP benefits the listed species for which critical habitat would be proposed.

> A non-inclusion under Section 4(a)(3) requires that a legally operative INRMP be in place that provides a benefit to the species

The written determination that an INRMP has met this standard may be contained in the administrative record, such as a letter to the installation.  We may also include this determination in the preamble to the CH rule for installations excluded under 4(a)(3).

Note: DOD lands may still be excluded under 4(b)(2), which was also amended with the DOD authorization by inserting ''the impact on national security,'' after ''the economic impact.'' These exclusions would follow existing procedures for evaluating exclusions of DOD lands due to national security or military readiness.

When evaluating DOD lands under 4(b)(2) B:

* Assuming good ongoing cooperation with the military, areas should not be included per 4(b)(2) if there is an INRMP that is adequate and nearly complete, or we have sufficient assurances that the plan will be amended to adequately address the species or
* If we have comments in the record that indicate a national security or military readiness impact, including comments on past rules, an exclusion may be recommended up to be

20

Threats and Analysis
Threats Summarized by Listing Factor

Gunnison Sage-grouse Rangewide Conservation Plan

The Nature Conservancy, (The Nature Conservancy 2002).

| USFWS Listing Factor | Issue Affecting GUSG | GUNNISON SAGE-GROUSE POPULATION | | | | | |
|---|---|---|---|---|---|---|---|
| | | Cerro – Cimarron - Sims Mesa | Crawford | Dove Creek | Gunnison Basin | Monticello Utah | Piñon Mesa |
| **Factor A: Present or Threatened Destruction, Modification, or Curtailment of its Habitat or Range** | **Urban Development** | D, F, N | C, D, F, N | C, D, F, N | C, D, F, N | C, F | C, D, F |
| | Roads | D, F, N | C, D, F | C, D, F | C, D, F | C, F | C, D, F |
| | Utility Corridors | D, F, N | C, D, F | C, D, F | C, D, F | C, F | C, D, F |
| | Fences | D, F | C, D, F | C, D, F | C, D, F | C, F | C, D, |
| | Oil and Gas Wells | | | | | U | |
| | Oil and Gas Pipelines | N | C | C, F | C | C, U | C, N |
| | Mining | | | | C, F | | |
| | Agricultural Conversion | D, F | C, F | C, D, F, N | C, F | C, F, U | C, D, |
| | Wetland/Riparian Alteration | D, F | C, F | C, F | C, F, N | C, F | F |
| | Livestock Management | D, F, N | C, F, N | C, F, N | C, F, N | C, F, U | C, F, |
| | Big Game Grazing/Browsing | F, N | C, F | C, F | C, F | F | C, F |
| | Reservoirs | | C | | C, F | | |
| | Poor Habitat Quality/Quantity | D, F, N | C, D, F, N | C, D, F, N | C, D, F, N | C, F, U | C, D, F |
| | Habitat Fragmentation | D | C | C, D | C | C | C |

| USFWS Listing Factor | Issue Affecting GUSG | GUNNISON SAGE-GROUSE POPULATION | | | | | |
|---|---|---|---|---|---|---|---|
| | | Cerro – Cimarron - Sims Mesa | Crawford | Dove Creek | Gunnison Basin | Monticello Utah | Piñon Mesa |
| **Factor B: Overutilization for Recreational, Commercial, Scientific, or Educational Purposes** | **Lek Viewing** | | D, F | | C, D, F, N | U | |
| | Hunting | | C | | C, F | | C |
| | Poaching | | | C | C | U | |
| | Recreation | D, F, N | C | | C, F, N | C | C |
| | Lek Counts/Monitoring | | C | C | C | | C |
| | Sage-grouse Research | F | C, F | C, F | C | F | C, F |
| | Vegetation Experiments | | | | | | |

————————————Section Break (Next Page)————————————

Gunnison Sage-grouse Rangewide Conservation Plan

forwarded to the Assistant Secretary's office for their analysis.  If we received a request to exclude from the military and we determine not to exclude, forward this issue up to be given to the Assistant Secretary's office.Specifically seek input from affected installations.

| Page 7: [97] Formatted | Kurt Johnson | 3/17/2005 11:38:00 AM |
|---|---|---|
Underline

| Page 7: [97] Formatted | Kurt Johnson | 3/17/2005 1:47:00 PM |
|---|---|---|
Not Strikethrough

| Page 7: [97] Formatted | Kurt Johnson | 3/17/2005 10:56:00 AM |
|---|---|---|
Underline

| Page 7: [98] Deleted | Kurt Johnson | 3/17/2005 11:17:00 AM |
|---|---|---|

*Although the comments need to be reasonably specific about what the impact is, we are not to second-guess the military about issues on which they are the experts (i.e., national security and military readiness).  However, we must have enough justification for these impacts in our files to consider them. We cannot just rely on generalized statements. Nor is the military the expert on the likely outcome of BOs.

| Page 7: [99] Formatted | Kurt Johnson | 3/25/2005 2:19:00 PM |
|---|---|---|
Tabs:  0.5", Left + Not at  1"

| Page 7: [100] Formatted | Kurt Johnson | 3/25/2005 2:11:00 PM |
|---|---|---|
Font: Not Bold

| Page 7: [100] Formatted | Kurt Johnson | 3/25/2005 2:11:00 PM |
|---|---|---|
Font: Italic

| Page 7: [100] Formatted | Kurt Johnson | 3/25/2005 2:11:00 PM |
|---|---|---|
Font: Not Bold

| Page 7: [100] Formatted | Kurt Johnson | 3/25/2005 2:11:00 PM |
|---|---|---|
Font: Italic

| Page 7: [100] Formatted | Kurt Johnson | 3/25/2005 2:11:00 PM |
|---|---|---|
Font: Not Bold

| Page 7: [101] Formatted | Kurt Johnson | 4/18/2005 4:41:00 PM |
|---|---|---|
Tabs:  0", Left +  0.5", Left +  1.5", Left +  2", Left +  2.5", Left +  3", Left +  3.5", Left +  4", Left +  4.5", Left + 5", Left +  5.5", Left +  6", Left

| Page 7: [102] Deleted | Kurt Johnson | 4/18/2005 4:32:00 PM |
|---|---|---|

[Currently proposing to exclude everything outside of occupied habitat so this would be a 3(5)(A) exclusion.  There are no lands with CCAA coverage as of yet but there are perpetual and 20 year conservation easements on some lands; many with GUSG conservation objectives but some without.  There may also be some lands not under easement but with GUSG management agreements of some sort that could perhaps be excluded.  Should easement lands with, and perhaps without, GUSG objectives be excluded??  Easement exclusion or management agreement exclusion would fit under 3(5)(A) also, correct?] The field and regional offices  may propose exclusions in the Federal Register Documents forwarded for signature and surname whenever they determine that the benefits of exclusion outweigh the benefits of inclusion.  The Secretary will make the final determination. Exclusions can be made for adequate management, partnership, economic, and other reasons.

Gunnison Sage-grouse Rangewide Conservation Plan

3/18/05  For Review Only

| Page 7: [104] Deleted | Kurt Johnson | 3/17/2005 11:35:00 AM |

When citing 4(b)(2) in a rule, even if DOD lands are not under discussion, use the newly
   amended language.  In addition to adding section 4(a)(3), the National Defense Authorization
   Act (Public Law No: 108-136) also amended section 4(b)(2).  Section 4(b)(2) now reads as,
   "…and after taking into consideration the economic impact, the impact on national security,
   and any other relevant impact…."

Special Management Exclusions

In Arizona the court in <u>CBD v. Norton</u> (CIV-01-409-TUC ACM) for the Mexican spotted owl
invalidated our use of 3(5)(A) to exclude critical habitat. Therefore, exclusions in Arizona must
be entirely based on both 3(5)(A) and 4(b)(2).

If an area is covered under a management plan, we should evaluate that plan under the criteria
the Service uses to determine if an area is adequately managed:
   The plan/agreement provides a conservation benefit to the species;
   The plan/agreement provides reasonable assurances that the management plan
      will be implemented; and
   The plan/agreement provides reasonable assurances that the conservation effort
      will be effective.

Note that these criteria are similar to the criteria in PECE, but we are not specifically using PECE, and the level of
certainty required is not be the same.

22

If an area is covered under a management plan that meets all 3 criteria, then it is adequately
managed and does not require special management.  It is then not included in the designation on
that basis.  However, in addition, we will also evaluate any such an area under 4(b)(2) for
exclusion in the event that we should have found that those areas "may require special
management".  This is the "belt-and-suspenders 3(5)(A)/4(b)(2)."
The exception to "belt and suspenders"are NPS and Refuges.  If those are excluded on the basis
of management, use 3(5)(A) only.

Those areas that typically should not be included in the designation because they have adequate
management plans are: HCP preserve lands, tribal lands with appropriate management plans, and
lands covered by other agreements or plans that provide a conservation benefit to the species.
However, do not use 3(5)(A)/4(b)(2) to not include HCPs with reserves yet to be acquired,
instead exclude them under 4(B)(2) alone.

If an area is covered by a management plan that does not meet all 3 criteria, then it may be
considered for exclusion under 4(b)(2) (e.g., on the basis of national security, furthering private
conservation efforts, or Tribal relationships as may be appropriate).

| Page 7: [105] Formatted | Kurt Johnson | 3/25/2005 2:20:00 PM |

Font: Not Bold

| Page 7: [106] Deleted | Kurt Johnson | 3/17/2005 2:40:00 PM |

Threats and Analysis
Threats Summarized by Listing Factor

3/18/05 For Review Only

Gunnison Sage-grouse Rangewide Conservation Plan

*Don't use the word "additional" before the words "special management." The management is adequate and therefore no special management is required.*

| Page 7: [107] Formatted | Kurt Johnson | 3/25/2005 2:20:00 PM |
|---|---|---|
| Font: Italic | | |

| Page 7: [108] Formatted | Kurt Johnson | 3/25/2005 2:20:00 PM |
|---|---|---|
| Font: Italic | | |

| Page 7: [109] Formatted | FWS User | 4/6/2005 4:47:00 PM |
|---|---|---|
| Font color: Green | | |

| Page 1: [110] Deleted | Kurt Johnson | 3/15/2005 2:44:00 PM |
|---|---|---|
| December 10, 2004 | | |

| Page 8: [111] Deleted | Kurt Johnson | 3/17/2005 2:46:00 PM |
|---|---|---|

*Exclude "up-front" at the proposed rule stage, if we have enough information in our files to do so. This would be common for rules where we are redesignating following a remand. For 4(b)(2) only cases, we could also base the intended exclusion on information in the files from past consultations etc.*

*For areas that are found to be essential but excluded up front:*

> *\*Describe these areas specifically by name in the rule include them in the maps of proposed rules, although coded or marked differently. State that we have reviewed them and believe they are areas essential for the conservation (i.e., falling within that part of the definition).*

> *\* When we state that we are excluding these areas from the proposal, specifically request comment on whether the areas are essential, whether they warrant exclusion, and on what basis they should be excluded. Make clear that the final rule could find the areas either appropriate for exclusion 4(b)(2), or not appropriate for exclusion, in which case they would be made part of the designation.*

> *\*Use the following language for up-front exclusions — "We have considered but have not proposed the following areas -- _____, _____, _____, -- because we believe that: 1) their value for conservation has been addressed by existing protective actions, or 2) they are appropriate for exclusion pursuant to the "other relevant factor" provisions of section 4(b)(2). We specifically solicit comment, however, on the inclusion or exclusion of such areas."*

*The balancing narrative for HCPs excluded under 4(b)(2) should, where applicable, reference appropriate assurances conveyed at the time of permit issuance and include that assurance as a relevant factor in the balancing decision.*

| Page 8: [112] Deleted | Kurt Johnson | 3/25/2005 2:18:00 PM |
|---|---|---|

23

Threats and Analysis Threats Summarized by Listing Factor

Gunnison Sage-grouse Rangewide Conservation Plan

*The field office should review the economic analysis to determine if there are areas that suffer disproportionate cost, i.e., are there areas that have higher costs then the rest of the designation? These areas should be considered for exclusion under 4(b)(2).*

Other Exclusion Considerations [None proposed.]

Section 10(j)(2)(C)(i) states, "critical habitat shall not be designated...for any experimental population determined ...to be not essential...." If there are areas where non-essential experimental populations are expected to be established, those areas should be excluded

| Page 8: [113] Formatted | Kurt Johnson | 4/18/2005 4:38:00 PM |
|---|---|---|

Level 1, Tabs: Not at  0" + 0.5" + 1" + 1.5" + 2" + 2.5" + 3" + 3.5" + 4" + 4.5" + 5" + 5.5" + 6"

| Page 8: [114] Deleted | Kurt Johnson | 4/18/2005 4:38:00 PM |
|---|---|---|

.

UNIT DESCRIPTIONS

In each unit description, underline state whether the unit was occupied at the time of listing and whether it is occupied currently.  If unoccupied at the time of listing, briefly state why it is essential.  In addition, either in the individual unit description or in the preface of the unit descriptions, state if the unit(s) have the PCEs.

PUBLIC AND OTHER COMMENTS

State Comments (DOI)

Section 4(i) of the Endangered Species Act states, "the Secretary shall submit to the State agency a written justification for [her] failure to adopt regulations consistent with the agency's comments or petition".  This requirement is restated in regulation 50 CFR 424.18( c), without additional clarification. The requirement is also noted in the Listing Handbook under "V. Notification and Public Hearings".

Each rule should include a separate section specifically addressing comments received from any State agency and the Service's response to these comments (titled something like Section 4(i) Comments from State(s)).  By incorporating State(s) comments within the rule, we will ensure appropriate consideration and awareness of these comments and responses at all appropriate levels.

~~Take comments from states seriously.  Be extra careful~~ It only useful in drafting a response if we disagree with the state's comments. Take state opinions about the effect of state law as correct absent compelling evidence to the contrary.  In some cases it may be easier to quote State comments then attempt to summarize them when it relates to interpretation of State law or actions the State may take.

Separately, direct communication will be sent from the Director to each State agency that submitted comments.  As a courtesy, we will send responses to all State comments even if their comments are not considered to be in conflict with the final rule.  If more than one agency from a State submitted comments, the same communication will be sent to each State agency.

A template for this communication is available, and the section of the rule responding to the State agency comments will be an enclosure to the Service's response letter, to ensure consistency.  These letters should be prepared and submitted at the same time as the listing or critical habitat rule, so they can travel with the rule during the surname process and be signed at the same time as the rule.

Peer Reviewer Comment Letters

Make a separate tab labeled "Peer Review" in the rule package.  Behind the tab, put each peer

Gunnison Sage-grouse Rangewide Conservation Plan

reviewer's name and title, with a description of their biography and expertise underneath. Include the letters sent to all the peer reviewers from whom we requested review (even if they did not respond).

Be sure to include a copy of each peer reviewer response in this section as well.

<u>DOD and State Comment Letters</u>
These should be under a separate tab in the final rule package.

<u>Response to Economic Analysis Comments</u>

Here is the answer to the question about economic analysis' failure to distinguish potential costs due to designation from costs due to listing: Some commenters also have opined that because the draft economic analysis does not distinguish between these costs, it cannot exclude proposed critical habitat from a final critical habitat designation pursuant to section 4(b)(2). <u>Our response</u>: The court, as per <u>New Mexico Cattlegrowers Association v. U.S. Fish and Wildlife Service</u>, requires us to look at co-extensive costs (consideration of the impact of all section 7 effects that could be a result of the designation, even if they are the same as those that arise from the listing). This is the approach the economic analysis and addendum take. The Service recognizes that if an area is excluded under 4(b)(2), not all of the economic impacts may be avoided.

TABLES, CHARTS AND MAPS

<u>Charts and Tables</u>

Provide a chart listing HCPs (and NCCP areas when applicable) within the general area containing the proposed CH, by name, showing total acreage and preserve acreage for each.

In the table that lists the acreage considered essential, the acreage excluded under 3(5)(A), the acreage excluded under 4(b)(2), and the net acreage of the proposal, provide a listing by name of the specific areas excluded (i.e., list the HCPs and military lands that make up the exclusion acreage categories).

In final designations, include a section explaining the acreage that changed from the proposed rule broken out by unit and also noting the ownership types that were affected (i.e., how much private land increased/decreased, state, federal, etc.). OMB

Give the English measure first (particularly listing acres first when describing a critical habitat designation). If an actual measurement was reported in Metric then it is OK to provide that first followed by the English conversion.

<u>Maps (OFR)</u>

All CH maps both proposed and final must either have the species name(s) on the map or for maps that cover many species some kind of a descriptive heading--something to help a user know that they are finding the right map. Do not include the mapping disclaimer on the maps, that can be part of the methods section.

For multi-species designations we can only cross reference maps (have maps that cover more than one animal species) within a given Class. For example, "Crustaceans," several different crustacean species could share one map by printing it once for the first crustacean species and then cross-referencing it for other crustacean species. Then the map would have to be reprinted for the first species in another Class such as "Insects" and could then be cross-referenced for other insect species that share the same designation. Likewise for plants cross-referencing maps must be within the same family.

Gunnison Sage-grouse Rangewide Conservation Plan

The Office of the FR process essentially makes small, harder-to-read photocopies of the hard copy maps we give them. This means everything has to be very simplistic, large and black and white (no color, gray or "half tones"). For example, we discussed the map of Unit SP13.  1) They asked for no gray.  We either have to find a way to make the minor unnamed streams distinguishable some other way or delete them altogether.  County labels and boundaries should not be gray.  We need a new way to distinguish between areas where the critical habitat is 120 meters on each side of the stream and where it is 140 meters on each side.  The gray for 140 meters does not show up as much different than the black for 120 meters after they do what they do to the map.  The county boundaries in the map location map should be darkened or deleted.  2) Everything smaller than the labels on the creeks needs to be larger.  The numbers in the legend and on the map (route numbers 121, 96, 126, and 67) are too small. The label for Range Road is too small.

MAPS (DOI)

All CH maps should provide geographical reference points for the public, so they can better understand the location of the designation. It may be appropriate to include as such references city names, county lines, major highways or other such features.

REQUIRED DETERMINATIONS

Small Business Certification (OMB/SBA)

In the Required Determinations section of a rule under the Regulatory Flexibility Act section we must certify as to the effect of the rule on small entities.  We should no longer use the 20 % as the threshold for a substantial number of small business entities.  The Economic Analysis or Addendum, if completed, will provide a discussion of the effect on small entities, which should be used to provide the basis for the certification justification (and likewise should have been updated to not use the 20% threshold).  If they have not been completed the Washington Office will help prepare the appropriate certification statement and justification.

In proposed CH rules, we can defer our certification under reg flex until the notice of availability for the economic analysis (see boilerplate for pCH).  We must ensure that in our notice we then use the economic analysis to determine whether the rule would have a substantial economic affect.  The Final rule should also refer to the economic analysis as the basis for our certification.

Unfunded Mandates and Energy Executive Order – see boilerplate language.

ECONOMIC ANALYSES

Scope of Analysis - Current Direction (DOI)

The focus of the analyses is impacts of the designation, including any effects occurring co-extensively with the listing.  The definition of "co-extensive effects" is expanded to include impacts occurring as a result of sections 4, 7, 9 or 10 of the Endangered Species Act (the Act).  In addition, any other impacts resulting from the designation should also be included in the analyses (i.e., indirect effects).  Enforcement actions taken in response to violations of the Act should not be included in the analyses. The analysis should be both prospective and retrospective, back to the time of listing.

A method should be developed for allocating the costs of impacts that result from more than one species or designation.  For example, the total costs of developing a multiple species habitat conservation plan should not be attributed to each species covered by that plan.  Instead, the costs should be divided up among the species, potentially using a weighting system depending on the factors driving the completion of the plan. For example, protection of the gnatcatcher and its coastal sage scrub habitat is a primary goal of California's Natural Community Conservation Planning Act, resulting in the development of several multiple species habitat conservation plans in Southern California.  Therefore, the costs of the development of these plans

3/18/05  For Review Only

26

Threats and Analysis
Threats Summarized by Listing Factor

Gunnison Sage-grouse Rangewide Conservation Plan

should be heavily weighted towards the gnatcatcher, as opposed to other species also covered by the plans.

This new methodology should be applied to any economic analyses for which work was not begun as of Oct. 1, 2003.

The geographic boundary of the new analyses continues to include only lands considered in the proposed designation (i.e., lands proposed as critical habitat, as well as lands proposed for exclusion under section 4(b)(2)).[1]

In the retrospective analysis, where costs resulting from the Act are known with more certainty, a precise accounting of these costs is not required. The consultants should find a representative sample of projects based on consensus between the Service and the regulated community and use the costs of these projects as a basis for extrapolating total costs that have occurred since the listing.

Notices Of Availability For Economic Analyses

If you are reproposing the CH (i.e., including new or expanded units) in the NOA, include disclaimer language.

Include boilerplate language for the public comments solicited:

OTHER ISSUES

References

Do not include references to recovery plans. All citations must be primary sources, so you can use the sources that were also used in the recovery plan if relevant. If citing a book, include page or chapter number.

Package Assembly B References (FWS)

References should always be separate from the rest of the rule package (i.e., in their own binder) and if a copy of a reference has been provided in support of a proposed rule, a new copy does not need to be resubmitted for the final rule. However, the list of references needs to indicate if and where a reference was provided previously (i.e., in what other package was it provided).

Look to Save on Printing Costs (DOI)

Elements of Guidance: Federal Register publishing is a significant cost element for the program. We are charged $98 per typed, double-spaced page we submit to the Register. We accordingly need to do all we can to ensure that Federal Register notices contain only material essential to justify the proposed or final rule, or to comply with administrative requirements. Some things that can be done editorially to meet this goal include:

Do not repeat information provided elsewhere. If there is a species description, history of past Federal actions or other body of information that would normally be included in a notice but which has been previously published in the Register, incorporate it by reference to the prior publication rather than repeat it.

Do not repeat yourself. If an issue is addressed or explained at more than paragraph length elsewhere in the document, and needs to be raised again in a different context, refer back to the prior discussion rather than repeating it, and then add any new text that might be needed.

Write concisely. Avoid unnecessary adjectives or other words. Example: "species description", not

---

1 In situations where lands are excluded from a proposed designation because they do not meet the definition of critical habitat under section 3(5)(a), but where the Service also states that these lands, if proposed, would be excluded under 4(b)(2), these areas will also be considered in the analyses.

Gunnison Sage-grouse Rangewide Conservation Plan

"description of a species".  Avoid emphasizing by repeating the same conclusion or observation in a slightly different fashion - repetition does not confer importance or validity. Do not hesitate to seek editorial assistance from your public affairs office.

=============================Section Break (Continuous)=============================

We should look to avoid repeating in a final rule or subsequent notice background information stated in a proposed rule.  However, in the final rule and subsequent notices we should include sufficient background information such the reader can understand the final rule/notice without having to continually refer to the proposed rule.

Areas that may be able to reference the proposed rule:

Previous Federal Actions (refer reader to proposal and list actions that have occurred since the proposed rule)

Detailed species description (refer reader to proposal)

Unit descriptions, landownership types

Don't excessively repeat text within a rule B if the unit justification or description are the same for all units, describe it once and make it clear that it applies to all units.

Response to comments: refer reader to appropriate sections of the final rule rather than restating information previously stated elsewhere in the final rule.

Check with your regional Solicitor to ensure that they concur when attempting to reduce text by referencing a proposal.  If not, elevate this issue to Washington.

Be sure to accurately characterize State laws.

<u>Additional Information for Drafting a Rule or Other Documents</u>

=============================Section Break (Next Page)=============================

28

*Threats and Analysis*
*Threats Summarized by Listing Factor*

Gunnison Sage-grouse Rangewide Conservation Plan

3/18/05 For Review Only

The following are some of the on-line references you can use when questions come up regarding what is required for a rulemaking, style, etc.

NARA Drafting handbook
http://www.archives.gov/federal_register/document_drafting_handbook/document_drafting_handbook.html

United States Government Printing Office Style Manual 2000
**http://www.gpoaccess.gov/stylemanual/browse.html**

PDM=s Rulemaking Reference Guide (202 FW 1)
http://policy.fws.gov/library/RGuide.html
http://pdm.fws.gov/regs.html
Department Manual
Chapter on Federal Register Documents
http://elips.doi.gov/elips/release/3208.htm

Chapter on Record of Compliance
http://elips.doi.gov/elips/release/3207.htm

Federal Register Document Drafting Handbook
http://www.archives.gov/federal_register/document_drafting_handbook/document_drafting_handbook.html

Writing User-Friendly Documents
http://www.plainlanguage.gov/handbook/index.htm

S:\BL\GUIDANCE-POLICY\CRITICAL HABITAT\GENERAL UPDATE OCT 04.DOC

| Page 8: [115] Deleted | Kurt Johnson | 4/18/2005 4:38:00 PM |

. [No non-essential experimental populations are expected to be established.]

29

*Threats and Analysis*
*Threats Summarized by Listing Factor*



Kurt Johnson
06/07/2005 09:24 AM

To: Terry Ireland/R6/FWS/DOI@FWS
cc:
Subject: GUSG Question

Hey Terry,

Sorry I didn't get back to you right away about your GUSG question. You've probably already gotten your answer. My understanding of our current "policy" is that national parks, refuges, etc. have to have some sort of management program for the species in question that satisfy the three criteria in the 3(5)(A) analysis. Below is the text from our most recent "Guidance." Based on this, I would say that you are correct NOT to exclude any national park that doesn't have a rather specific management plan/program for the species or its habitat.

Hope this helps.

Kurt

In Arizona the court in <u>CBD v. Norton</u> (CIV-01-409-TUC ACM) for the Mexican spotted owl invalidated our use of 3(5)(A) to exclude critical habitat. Therefore, exclusions in Arizona must be entirely based on both 3(5)(A) and 4(b)(2).

If an area is covered under a management plan, we should evaluate that plan under the criteria the Service uses to determine if an area is adequately managed:
1)    The plan/agreement provides a conservation benefit to the species;
2)    The plan/agreement provides reasonable assurances that the management plan will be implemented; and
3)    The plan/agreement provides reasonable assurances that the conservation effort will be effective.

•    Note that these criteria are similar to the criteria in PECE, but we are not specifically using PECE, and the level of certainty required is not be the same.

•    If an area is covered under a management plan that meets all 3 criteria, then it is adequately managed and does not require special management. It is then not included in the designation on that basis. However, in addition, we will also evaluate any such an area under 4(b)(2) for exclusion in the event that we should have found that those areas "may require special management". This is the "belt-and-suspenders 3(5)(A)/4(b)(2)." "belt and suspenders" are to be used for all management based exclusions.

•    The exception to "belt and suspenders" are NPS and Refuges. If those are excluded on the basis of management, use 3(5)(A) only.

**Terry Ireland/R6/FWS/DOI**

07/03/2005 05:28 PM

To   Pat Mehlhop/R6/FWS/DOI@FWS, Bridget Fahey/R6/FWS/DOI@FWS, Jill Parker/R6/FWS/DOI@FWS

cc   Al Pfister/R6/FWS/DOI@FWS, Susan Linner/R6/FWS/DOI@FWS

bcc

Subject   Proposed Critical Habitat Concept Paper

Here's my attempt at addressing the questions and comments everyone had.  I put the PCE tables back in as I agreed with Al that it seemed the most succinct.  I and Al are gone next week.  If Kurt Johnson needs this by next week someone can finalize.



PCH Concept paper_7_3_05 TI edits.doc

**DRAFT Concept Paper**
**Strategy for Designation of Critical Habitat**
**for the Gunnison Sage-grouse**
7/03/05

**Distribution:** The Gunnison sage-grouse (GUSG ) currently occurs in 7 widely scattered and isolated populations in southwestern Colorado and southeastern Utah (Table1, Figure 1): (1) Gunnison Basin, CO; (2) Cerro Summit–Cimarron–Sims Mesa, CO; (3) Crawford, CO; (4) Piñon Mesa, CO; (5) Poncha Pass, CO; (6) San Miguel Basin, CO; and (7) Dove Creek, CO—Monticello, UT. The Cerro Summit–Cimarron–Sims Mesa and San Miguel Basin populations are patchily distributed, and as a result, we identify separate subpopulations within each. At Cerro Summit–Cimarron–Sims Mesa there are 2 subpopulations: Cerro Summit – Cimarron and Sims Mesa. San Miguel Basin contains 6 subpopulations: Dry Creek Basin, Hamilton Mesa, Miramonte Reservoir, Gurley Reservoir, Beaver Mesa, and Iron Springs.

Table 1.   Gunnison Sage-grouse Population Size, and Occupied Habitat Acreage.

| Population | Estimated Population Size (2005) | Total Occupied Habitat Acres | Number of Critical Habitat Units |
|---|---|---|---|
| Cerro Summit - Cimarron - Sims Mesa | 25 | 37,145 | 2 |
| Crawford | 191 | 34,908 | 1 |
| Dove Creek, CO – Monticello, UT | 196 | 86,483 | 2 |
| Gunnison Basin | 4,763 | 530,464 | 1 |
| Piñon Mesa | 167 | 24,185 | 3 |
| Poncha Pass | 44 | 14,781 | 0 |
| San Miguel Basin | 334 | 85,999 | 6 |
| Total | 5,720 | 813,965 | 15 |

**CH Proposal:** We anticipate proposing 15 critical habitat units for the GUSG. These are shown in the map in Figure 1. These units occur within 6 of the 7 extant populations of GUSG. We are not designating any critical habitat within the Poncha Pass population due to the fact that GUSG here were introduced from Gunnison Basin stock and do not represent unique characteristics or occur in an essential linkage area. For the remaining units, we are proposing all currently occupied habitat (see Table 1), which totals 799,184 acres.

Deleted: 6
Deleted: 5
Deleted: 26
Deleted: 30
Formatted: Indent: First line: 0"
Deleted: The total number of leks is estimated to be 117, and the total population size is estimated to be 3,198 (Table 1).¶
Formatted Table
Deleted: 4
Deleted: -
Deleted: 45
Deleted: 3
Deleted: 9
Deleted: 4,908
Deleted: 128
Deleted: 86,483
Deleted: 162
Deleted: 30,464
Deleted: 2,443
Deleted: 142
Deleted: Poncha Pass
Formatted: Centered
Deleted: 39
Deleted: 14,781¶
Deleted: 245
Formatted: Left
Deleted: 813,965
Deleted: 799
Deleted: 184
Deleted: 5,720
Deleted: 3,198
Deleted: Table 1.¶
Comment [BF1]: Are all units necessary? Can any of the 5 San Miguel Basin populations be lumped?
Deleted:
Deleted: b
Deleted:
Deleted: Additional acreage will be needed in all populations except the Gunnison Basin population (discussed further in numbers 4 and 5 below), with the additional acreage necessary for connectivity between habitats and ... [1]



Figure 1 (replace with new version from Terri Thorn)

In our evaluation of proposed critical habitat for the GUSG, we are selecting areas that possess the physical and biological features that are essential to the conservation of the species and that may require special management considerations or protection. The scientific information we are using includes information on the biology and ecology of the GUSG, occurrence data, and vegetation cover type data.

1. We focus on areas that are currently occupied by the species and that the RCP has identified as core populations. GUSG use three types of seasonal habitats (breeding, summer-fall, and wintering); we have designed each unit to contain all three types of habitats as well as connectivity between them.

2. Within these areas, we identify the necessary habitat features required for GUSG feeding, breeding, and sheltering.

**Describe the PCEs**

Gunnison sage-grouse use a wide variety of habitats that occur in and adjacent to the sagebrush community. Conservation of GUSG should include all habitat types necessary for fulfillment of life history needs. Sage-grouse habitat requirements differ by season. Connelly et al. (2000) segregated greater sage-grouse habitat requirements into 4 seasons: (1) breeding habitat; (2) summer-late brood-rearing habitat; (3) fall habitat; and (4) winter habitat. For the purpose of critical habitat for the GUSG, we have combined the summer - late brood-rearing and fall habitat into a single habitat category, "summer – fall", resulting in 3 overall seasonal habitats, rather than 4 – following the methodology used in the RCP (GSGRSC 2005). Each type of habitat has corresponding primary constituent elements.

Breeding habitat. Breeding habitat includes lekking, pre-laying female, nesting, and early brood-rearing habitat. GUSG use breeding habitats generally between mid-March and late-June. Young (1994) and Apa (2004) have developed breeding habitat guidelines for GUSG; this information, as consolidated in the RCP (GSGRSC 2005), was used in our development of these PCEs. To meet the GUSG's requirements for adequate cover, food, and space for mating displays during the breeding season, breeding habitat should contain the following primary constituent elements:

2

Deleted:

Deleted: y

Deleted: Designation of all

Deleted: 813,965

Deleted: 799,184 acres of occu... [2]

Deleted: In addition, some units ... [3]

Deleted: 80,000

Deleted: 18,136; Monticello-Do ... [4]

Deleted: 70,000

Deleted: 63,584;

Deleted: Poncha Pass – 28,000;

Deleted: and Cerro Summit-Cim ... [5]

Deleted: 25,000

Deleted: 4,874.  This brings the ... [6]

Deleted: 1,086,965

Deleted: 955,778 acres.

Deleted: ¶

Deleted: Conservation Strateg ... [7]

Deleted: G

Deleted: P, a multi-agency ... [8]

Deleted: ed

Deleted:

Deleted: sufficient

Deleted: habitat within each pop ... [9]

Formatted: Indent: Left:  0.25"

Deleted: …¶ ... [10]

Formatted: Bullets and Numbering

Comment [BF2]: What is this ... [11]

... [12]

... [13]

... [14]

Table 2.  GUSG breeding habitat PCE's[AB]

| Vegetation Variable | Gunnison sage-grouse | |
|---|---|---|
| | Arid[c] | Mesic[c] |
| Sagebrush Canopy[d]  % | 15 - 25 | 10 – 20 |
| Non-sagebrush Canopy[d]   % | 5 - 15 | 5 – 15 |
| Total Shrub Canopy[d]  % ¶ | 20 - 40 | 15 – 35 |
| Sagebrush Height  cm (inches) | 25 – 50 (9.8 – 19.7) | 30 – 50 (11.8 – 19.7) |
| Grass Cover[e]   % | 10 - 30 | 20 – 40 |
| Forb Cover[e]    % | 5 - 15 | 20 – 40 |
| Grass Height[f] cm (inches) | 10 – 15 (3.9 – 5.9) | 10 – 15 (3.9 – 5.9) |
| Forb Height[f] cm (inches) | 5 – 10 (2.0 – 3.9) | 5 – 15 (2.0 – 5.9) |

[A] Breeding habitat PCE's were developed using data in GUSG studies by Young (1994) and Apa (2004).
[B] Breeding habitat is defined as sagebrush communities delineated within 4 miles of a lek.   Breeding habitat includes lek, nesting and early brood-rearing habitat usually from mid-March through late-June.
[c] Arid or mesic communities are as defined by Winward (2004).
[d] Canopy cover measured according to Canfield (1941) and further described by Connelly et al. (2003).
[e] Understory cover measured according to Daubenmire (1959).
[f] Measured as "droop height"; the tallest portion of the naturally growing portion of the plant (Connelly et al. 2000).

*PCEs for Summer - Fall Habitat.*  By late summer and into the early fall, females with broods, non-brood females, and groups of males become more social, and flocks are more concentrated (Patterson 1952).  This is the period of time when GUSG can be observed in atypical habitat such as agricultural fields (Commons 1997).  During periods of heavy snow cover in late fall and early winter, use of mountain and Wyoming big sagebrush stands is extensive.  Summer-late brood-rearing habitat includes habitat used during this period by males, non-brooding females, and females with broods.  Fall habitat consists of "transition" range from late summer to winter, and can include a variety of habitats used by males and females (with and without broods).  In some situations, fall and summer-late brood-rearing habitats are indistinguishable, but this depends on the movement patterns of the population and habitat availability.  Riparian and wetland meadows used for foraging should contain grass and forb height and cover as described below.

Table 3.  GUSG summer - fall habitat PCE's[ab]

| Vegetation Variable | Gunnison sage-grouse | |
|---|---|---|
| | Arid[c] | Mesic[c] |
| Sagebrush Canopy[d] (%) | 5 – 15 | 5 – 20 |

3

Deleted: PCE #1; Sagebrush.  Presence of sagebrush is necessary for both food and shelter.  The amount of sagebrush cover present is known to vary between arid and mesic sites (as defined in Winward 2004), with arid sites containing more sagebrush.  To meet this PCE, breeding habitat must contain 10 to 25 percent sagebrush cover.  Canopy cover should be measured according to methods contained in Canfield (1941) and further described by Connelly et al. (2003).  In addition, height of sagebrush should range between 25 and 80 centimeters (10 to 30 inches) because…¶
¶
PCE #2:  Total shrub canopy.  Shrub cover is necessary to protect adults, young, and eggs from predation.  Total shrub canopy for this PCE should range between 15 and 40 percent total cover.  Canopy cover should be measured according to methods contained in Canfield (1941) and further described by Connelly et al. (2003)¶
¶
PCE #3:  Grass cover and height.  Grasses are important for GUSG because they provide cover for nest concealment, as well as habitat for GUSG prey items, particularly GUSG broods

Deleted: …T

Deleted: .  To meet the requirements for this PCE, grass cover should be between 10 and 40 percent and grass height should range between 10 and 18 centimeters (4 to 7 inches).  Canopy cover should be measured according to methods contained in Canfield (1941) and further described by Connelly et al. (2003).  Height should be measured as "droop height"; the tallest portion of the naturally growing portion of the plant (Connelly et al. 2000).¶
¶
PCE #4.  Forb cover and height.  Forbs are important for GUSG because they provide habitat for GUSG prey items which are essential to ensuring b ... [15]

Deleted: ….

Deleted: .  A high plant species diversity is also typical of early brood rearing habitat (GSGRSC 2005).

Deleted: t

Deleted: To meet the requirements for this PCE, forb cover should be between 5 and 40 present, and forb height should range between 5 and 15 centimeters (2 to 6 inches).  Understory cover should be measured according to Daubenmire (1959).  Height should be measured as "droop height"; the tallest portion ... [16]

| | | |
|---|---|---|
| Non-sagebrush Canopy [d] (%) | 5 - 15 | 5 – 15 |
| Total Shrub Canopy [d] (%) | 10 - 30 | 10 – 35 |
| Sagebrush Height cm (inches) | 20 – 40 (7.9 - 15.7) | 25 – 50 (9.8 – 19.7) |
| Grass Cover [e] (%) | 10 - 25 | 10 – 35 |
| Forb Cover [e] (%) | 5 - 15 | 15 – 35 |
| Grass Height [f] cm (inches) | 10 – 15 (3.9 – 5.9) | 10 – 15 (3.9 – 5.9) |
| Forb Height [f] cm (inches) | 3 – 10 (1.2 - 3.9) | 5 – 10 (2.0 - 5.9) |

[a] Summer - fall habitat PCE's were developed using data in GUSG studies by Young (1994), Woods and Braun (1995), Commons (1997), and Apa (2004)
[b] Summer – fall habitat is defined as vegetation communities, including sagebrush, agricultural fields, and wet meadows (Connelly et al. 2000) that are within 4 miles of an active strutting ground.
[c] Arid or mesic communities are as defined by Winward (2004).
[d] Canopy cover measured according to Canfield (1941) and further described by Connelly et al. (2003).
[e] Understory cover measured according to Daubenmire (1959).
[f] Measured as "droop height"; the tallest portion of the naturally growing portion of the plant (Connelly et al. 2000).

**PCEs for Winter Habitats.**   During winter, males and females split into segregated flocks.  Winter habitat is defined as sagebrush areas (Connelly et al. 2000) within currently occupied habitat that are available (i.e., not covered by snow) to sage-grouse in average winters.  Habitat requirements are less specific and are based primarily upon the amount and height of sagebrush.  Most GUSG winter feeding occurs in drainages and on slopes with south or west aspects in the Gunnison Basin.  In severe winters with heavy accumulations of snow, the amount of sagebrush exposed above the snow can be severely limiting.  Hupp and Braun (1989b) investigated GUSG feeding activity during a severe winter in the Gunnison Basin in 1984 where they estimated less than 10 percent of the sagebrush was exposed above the snow and available to sage-grouse.  In these conditions the tall and vigorous sagebrush typical in drainages were an especially important food source for GUSG.

Table 4.  GUSG winter habitat PCE's[ab].

| Vegetation Variable | Arid [c] |
|---|---|
| Sagebrush Canopy [d]: % | 30 – 40 |
| Sagebrush Height [e]: cm (inches) | 40 – 55 (15.8 – 21.7) |

[a] Winter habitat guidelines were developed using GUSG data from Hupp (1987).
[b] Winter habitat is defined as sagebrush areas (Connelly et al. 2000) within currently occupied habitat that are available (i.e., not covered by snow) to sage-grouse in average winters.
[c] Arid communities are as defined by Winward (2004).  There is no need to describe mesic communities.
[d] Canopy cover measured according to Canfield (1941) and further described by Connelly et al. (2003).
[e] Measured from ground level to the tallest stem (excluding inflorescence) according to Hupp (1987).

3. **Describe the minimum amount and optimum distribution of currently-occupied habitat**

4

---

**Deleted:** ¶
¶
PCEs related to summer and fall habitat.¶
¶
PCE for Riparian or wet meadow habitat?¶
¶
Habitat guidelines aren't very different for these than for breeding.  Need to capture the essential differences and add as a PCE!!!!!!!!!!!!!!!!!!!  Just seem to require slightly less sagebrush and slightly less canopy cover.¶

**Deleted:** ¶

**Deleted:**  PCE #XX;  Wintering sites.  This PCE includes sites that are characterized by greater than 25 percent canopy cover and sagebrush that is higher than 12 inches tall associated with drainages, ridges, or southwest aspects with slopes less than 15 percent .¶
¶
Lower flat areas and shorter sagebrush along ridge tops provide roosting areas.  During extreme winter conditions, GRSG will spend nights and portions of the day (when not foraging) burrowed into "snow roosts."  Snow roosts are dug when snow has the proper texture by scratching with feet or by wing movements.¶

**needed to support the numbers and distribution of the species necessary for conservation.**

Deleted: ¶

We have determined that six of the seven extant populations (all populations, except Poncha Pass, and therefore, all units within the populations) are essential to the survival of the species. These populations exist throughout the historic range of the species and are necessary to preserve the species in a significant portion of its range.  Protection of multiple populations across the range provides insurance against a catastrophic event (drought, extreme winter temperatures, disease outbreak, etc.) threatening the entire species.  In addition, the aggregate number of individuals across all populations increases the probability of demographic persistence and preservation of overall genetic diversity by providing an important genetic reservoir.  The Gunnison Basin contains 76% of the genetic diversity of the species and the other small populations collectively contain the other 24%.  Protection of the smaller GUSG populations is essential in preserving the genetic diversity of the species and decreasing extinction risk.  These smaller populations currently are at high risk of extinction and need habitat protection combined with special management to prevent extirpation.  Extirpation of any of the smaller 6 populations will result in either a range reduction or a substantial gap in the distribution of the species.

Deleted: NOTE to Grand Junction.  We need much better justifications here to show that each unit is essential to the conservation of GUSG. Break down by unit.¶

Deleted: that all

Deleted: s

Comment [BF3]: Need to somehow rectify this with the actual popn goals described in the RCP.

Deleted: a low risk of extinction (< 1%) in the next fifty years (Gunnison Sage-grouse Rangewide Steering Committee 2005)..  Other populations have a predicted risk of extinction between 6 and 42%.  Results from the PVA suggest that very small Gunnison sage-grouse populations (< 25) are at a high risk of extinction during a 50-year period, even when the population is expected to increase in size over the long-term.  In contrast, individual Gunnison sage-grouse populations can be considered "secure" (< 5% extinction probability) if they contain 500 birds or more and have a stable population size. The only population that can be concluded to be secure, however, is the Gunnison Basin that had a 2004 population estimate of 2,443. The other populations had estimates of 39 to 245 adult grouse, indicating a moderate to high level of risk of extinction over a 50-year period. ¶

Deleted: Why are each of the other

Deleted: 6

Deleted: 5 populations essential to the conservation. Explain.

Deleted: ¶
¶

Deleted: …

Deleted: .

Deleted: San Miguel¶
This population is the second-largest GUSG population and as such is the most important population to act as a refuge if catastrophic events or disease ever resulted in substantial impacts to the Gunnison population.  Any unique alleles?  Anything unique about habitat or threats?¶
¶
Dove Creek/Monticello¶
This population is essential because…¶
¶

### Gunnison Basin
The Gunnison Basin population is essential to the conservation of the GUSG because it is the largest population with the largest currently occupied range and contains 76% of the genetic diversity of the species.

### San Miguel Basin
This population and all six subpopulations (which are the critical habitat units) are extremely important because it is the second-largest GUSG population and, based on recent genetic information and geographic location, acts as a current or historic habitat and genetic linkage between all the populations.  Being the second largest population, it may also act as a refuge if catastrophic events or disease ever resulted in substantial impacts to the Gunnison Basin population.  If one of the units is no longer suitable habitat this will isolate the subpopulations from each other and further isolate the populations from each other.

### Monticello – Dove Creek Population
This population is essential because it contributes to the genetic diversity and has potential to be a large population if restoration of habitat outside of the current range occurs.   Based purely on area of historic range around this population it is possible that this was once the largest population.

### Crawford
This population is essential because it contributes to the genetic diversity of the species and the current habitat is contiguous and in relatively good condition.

### Pinon Mesa
This population is essential because it contributes to the genetic diversity of the species.

5

Although low in number the population has persisted and is the only population with an increasing population trend, albeit only slightly increasing.

Cerro Summit-Sims mesa-Cimarron:  Although this is the smallest population, it is also extremely important for the conservation of GUSG because it constitutes an essential linkage between the largest population (Gunnison Basin) and the second-largest population (San Miguel Basin).  It is possible that it provides a link between the San Miguel Basin and Crawford Area population as well, but further genetic testing will be necessary to establish this possibility.  Without this population no natural dispersal outside of, or into, the Gunnison Basin will occur, causing further isolation and increased risk of extinction amongst the small populations (see RCP for discussion on extinction risk).

4. **Combining the qualitative and quantitative information under Points 1, 2, and 3(a), present an explicit, deductive analysis to determine the location and amount of area that is necessary for conservation.**

All of the occupied habitat in all populations, except Poncha Pass, needs to be designated critical habitat to maintain current population numbers and to allow time for restoration and expansion of habitat to at least meet population goals in the RCP (see RCP for further discussion) and to hopefully attain 500 or more adult birds to secure the small populations in the future.

5. **Only if the habitat identified in step 2 is not believed sufficient to conserve the species, should you consider designating habitat that is currently unoccupied or other areas outside the geographical area occupied by the species at the time of listing.**

Currently occupied habitat is not sufficient to conserve the GUSG except for in the area occupied by the Gunnison population.  All other population goals are not being met (RCP).  To have self sustaining populations that reach the targets in the RCP, expansion into adjacent habitats will be necessary in 5 of the 6 proposed critical habitat units.  Furthermore, habitat linkages need to be restored, enhanced and/or maintained in order to provide sufficient space for self-sustaining populations.

## Criteria & Methodology:

The acreages in this concept paper were derived from existing mapping done for the GUSG (see the maps in the RCP).  Most of the acreage proposed to be designated will be using the RCP's definition of occupied habitat.  We will also use information on habitat defined as "vacant/unknown" or "potential" in the RCP to determine what areas are necessary for connectivity and expansion of habitat for those small populations, which are currently well below conservation goals contained in the RCP.  In addition to using the information contained in the RCP, we will use additional information from CDOW, UDWR, BLM or other biologists.  Additional GIS work is needed to more accurately map critical habitat.   The CDOW has tentatively agreed to assist us mapping.  Service personnel will put the maps in a format suitable

Deleted: ...¶

Deleted: s

Deleted: T

Deleted: essential

Deleted: The RCP describes this population as....

Deleted: The Gunnison sage-grouse PVA was solely used to evaluate the relative risk of extinction for each population under the current conditions (i.e., the risk of extinction if nothing changes). However, additional factors could such as density-dependent reproduction, effects of disease (e.g., West Nile virus), inbreeding depression, and habitat loss or fragmentation could increase extinction risk. No data are available to determine which or how demographic rates will be affected by these factors.

Comment [BF4]: Need to throw out 500 number and go with what is in the RCP.  Leaves us vulnerable to insist on 500 when RCP says that is unattainable.

Deleted: With populations above 500 being considered secure, none but the

Deleted: The Gunnison Basin population is the only population ...[17]

Deleted: meeting this minimum ...[18]

Deleted: All of the occupied ha ...[19]

Deleted: 7

Deleted: other 5 proposed units

Deleted: populations

Deleted: needs to be designate ...[20]

Deleted: of at least 500

Deleted: targets in the RCP

Deleted: adult sage-grouse each

Deleted: . Critical habitat in th ...[21]

Deleted: populations over 500

Deleted: the population targets ...[22]

Deleted: over 500

Deleted: size in the RCP. ¶ ...[23]

Deleted: of 500 or more

Deleted: 6

Deleted: 7

Deleted: populations

Deleted: those

Deleted:

for the Federal Register.

Information from the RCP was used to describe the PCEs

Special Management: **Describe the threats that may warrant special management, and what management is necessary to ameliorate those threats. [What the hell is the definition of special management!!!!  Is buying everybody's land to limit further development "special management" or is it just managing the best agencies' can special management? Here's my attempt at what I think it should say.]**

All 15 units require special management.  The most important immediate management rangewide is protection of habitat from development, such as urban development and oil and gas development.  The best management practices for minimizing all threats are described in the RCP.  The top four threats in each population under all five listing factors, for which critical habitat is proposed to be designated, are considered to be needing special management.

1.  In the Gunnison Basin, threats that may need special management include: human population growth and development, human infrastructure, grazing management and invasive weeds.

2.  Threats in the San Miguel population that may need special management include: human population growth and development, human infrastructure, energy development, and conversion to agriculture

3.  Threats in the Monticello-Dove Creek population that may need special management include: conversion to agriculture, human population growth and development and energy development, and limited genetic diversity.

4.  Threats in the Pinon Mesa population that may need special management include: human population growth and development, human infrastructure, native shrub or tree encroachment, and limited genetic diversity.

5.  Threats in the Crawford population that may need special management include: human growth and development, human infrastructure, conversion to agriculture, and native tree or shrub encroachment.

6.  Threats in the Cerro Summit-Cimarron-Sims Mesa population that may need special management include: human population growth and development, human infrastructure, conversion to agriculture, and energy development.

## Non-Inclusions & Exclusions

Describe all non-inclusions and exclusions.

**Deleted:** 6

**Comment [BF5]:** Sounds like everything but the kitchen sink. Focus on the real threats for each unit‖

**Deleted:**  Additional threats needing medium high to very high management attention can be broken down by population as such:¶
¶

**Deleted:** s

**Deleted:** g

**Deleted:** , habitat enhancement/restoration, habitat monitoring, habitat protection,  lek viewing, and drought impacts

**Deleted:** .

**Formatted:** Bullets and Numbering

**Deleted:** ¶
M

**Comment [BF6]:** Need to elaborate on this point.  Sounds like you are proposing to do energy development as a special mgmt measure

**Deleted:**

**Formatted:** Bullets and Numbering

**Comment [BF7]:** What do you mean by this?

**Formatted:** Indent: Left:  0.25"

**Formatted:** Bullets and Numbering

**Formatted:** Bullets and Numbering

**Deleted:** Management needs identified in the Poncha Pass population include: habitat monitoring, and translocations.  ¶
M

**Deleted:** needs identified in the Cerro Summit-Cimarron-Sims Mesa population

**Deleted:** genetics, grazing management, habitat enhancement/ restoration, habitat linkages, habitat monitoring, habitat protection, and population monitoring

1. Consideration of DOD Lands

   [No DOD lands within range.]

2. Other Exclusions

   (a) Exclusions Under Both 3(5)(A) and 4(b)(2)

Areas covered under a management plan that meet all 3 criteria from the "Lessons Learned" document includes perpetual and 20 year conservation easements with GUSG conservation objectives. Acreages to be excluded within each population are: Gunnison Basin-30,029; San Miguel – 884; Monticello/ Dove Creek- 3,581; Crawford – 1,419; Pinon Mesa – 20,803; Poncha Pass -0; and Cerro Summit-Cimarron-Sims Mesa – 3,408. Total potential exclusions: 60,124

   (b) Exclusions Under 3(5)(A) Alone

The National Park Service manages 12,400 acres in the Gunnison Basin and 4,600 acres in the Crawford population. However, the management plans for these lands do not contain management objectives for Gunnison sage-grouse and therefore should not be excluded at this time.

   (b) Exclusions Under 4(b)(2) Alone

∞   None

   (c) Economic Exclusions

None proposed at this stage.

Literature Cited

Gunnison Sage-grouse Rangewide Steering Committee. 2005. Gunnison sage-grouse rangewide
conservation plan. Colorado Division of Wildlife, Denver, Colorado, USA

Where is the rest of the lit cited.  Do we really need it for this exercise.  I propose having no Literature Cited
section.

**Deleted:** d?
――――――Section Break (Continuous)――――――

6

DRAFT

| Page 1: [1] Deleted | Ecological Services | 6/26/2005 10:50:00 AM |
|---|---|---|

Additional acreage will be needed in all populations except the Gunnison Basin population (discussed further in numbers 4 and 5 below), with the additional acreage necessary for connectivity between habitats and to reach the conservation goals identified in the rangewide conservation plan (RCP) for the species (Gunnison Sage-grouse Rangewide Steering Committee (GUSGRSC) 2005).

| Page 2: [2] Deleted | FWS User | 7/3/2005 4:17:00 PM |
|---|---|---|

799,184 acres of occupied habitat in the 6 populations is necessary to meet the conservation goals in the RCP.

| Page 2: [3] Deleted | FWS User | 7/3/2005 4:17:00 PM |
|---|---|---|

In addition, some units currently do not have sufficient occupied habitat to sustain a viable population and require additional acreage to be proposed as critical habitat in order to meet the conservation goals in the RCP. We have determined that all populations except for the Gunnison population require additional habitat to reduce extinction risk. Estimated additional unoccupied acreage necessary is as follows: San Miguel – 20,000; Crawford –

| Page 2: [4] Deleted | FWS User | 7/3/2005 4:17:00 PM |
|---|---|---|

18,136; Monticello-Dove Creek – 50,000; Piñon Mesa –

| Page 2: [5] Deleted | FWS User | 7/3/2005 4:17:00 PM |
|---|---|---|

and Cerro Summit-Cimarron-Sims Mesa –

| Page 2: [6] Deleted | FWS User | 7/3/2005 4:17:00 PM |
|---|---|---|

4,874. This brings the total estimated amount of habitat to be designated to

| Page 2: [7] Deleted | FWS User | 7/3/2005 3:18:00 PM |
|---|---|---|

**Conservation Strategy**: Our conservation strategy follows that of the RC

| Page 2: [8] Deleted | FWS User | 7/3/2005 3:18:00 PM |
|---|---|---|

P, a multi-agency conservation plan adopted by the Bureau of Land Management, Colorado Division of Wildlife, National Park Service, Natural Resources Conservation Service, North American Mediation Associates, United States Forest Service, United States Fish and Wildlife Service, and Utah Division of Wildlife Resources (GUSGRSC 2005). This document used the best available science to develop a conservation plan that, if voluntarily implemented by all necessary parties, would conserve the species in a significant portion of its current range.

The RGP proposes population targets for each population. We anticipate designating

| Page 2: [9] Deleted | FWS User | 7/3/2005 3:18:00 PM |
|---|---|---|

habitat within each population to assist in meeting these targets. Targets represent an expected long-range average, along with a range of variation expected around this long-term average, and are as follows: Gunnison – 3,000 (range 1,730-5,280), San Miguel Basin – 450 (260-792), Monticello, – 300 (173-528), Dove Creek – 200 (115-352), Crawford – 275 (159-484), Piñon Mesa – 200 (115-352), and Poncha Pass – 75 (43-132).

The RCP also identifies how many acres are now occupied, and how many GUSG could be supported by expansion into adjacent vacant habitat and potential habitats. Table 2 below contains the habitat totals necessary to meet population goals.

Table 2:  Currently unoccupied areas in GUSG former range necessary to meet population targets in the RCP

| | Currently occupied habitat acres[a] | Current size of total population[a],[b] | Population Target[a] | Additional acres needed to reach population target[c] | # of proposed units to meet target |
|---|---|---|---|---|---|
| Gunnison | 530,464 | 2,968 | 3,000 | 0 | 1 |
| Crawford | 34,908 | 196 | 275 | 18,136 | 1 |
| San Miguel | 85,999 | 304 | 450 | 20,000 | 6 |
| Dove Creek/ Monticello | 86,483 | 229 | 500 | 50,000 | 2 |
| Pinon Mesa | 24,185 | 128 | 200 | 63,584 | 3 |
| Cerro Summit-Sims Mesa—Cimarron | 37,145 | 34 | TBD | 4,874 | 2 |
| Total | 799,184 | 3898 | 4,500 + TBD | 156,594 | 15 |

══════════════════════════Section Break (Next Page)══════════════════════════

a. Columns B, C and D are from Table 32 in the RCP.

b. We used averages over the past ten years (1995 - 2004) rather than the most recent population estimates (2004; see table 1) because GUSG numbers are tied closely to the previous year's seed crop and rainfall.  Using an estimate spans a variety of weather years.

c. This column contains our preliminary estimate of unoccupied habitat necessary to meet the conservation goals in the RCP, using the modeled habitat capability of currently vacant portions of the former range from Table 32 of the RCP.  The RCP also identifies that potential habitat would need to be restored in some cases to meet population goals.  However, because potential habitat does not currently have the PCEs of critical habitat, we are not proposing to include it in our critical habitat designation.

Total Proposed CH = 955,778 acres

| Page 2: [10] Deleted | FWS User | 7/3/2005 3:20:00 PM |
|---|---|---|

| Page 2: [10] Deleted | FWS User | 7/3/2005 3:20:00 PM |
|---|---|---|

| Page 2: [11] Comment [BF2] | Bridget Fahey | 6/3/2005 8:51:00 AM |
|---|---|---|

What is this document?  Is it included in the RCP and can it be referenced there?

| Page 2: [12] Deleted | FWS User | 7/3/2005 3:20:00 PM |
|---|---|---|

 We will select additional areas to account for connectivity and population growth of sufficient size to encompass the temporal and spatial changes in habitat and food resources to maintain GUSG populations over time.

| Page 2: [12] Deleted | FWS User | 7/3/2005 2:00:00 PM |
|---|---|---|

| Page 2: [13] Deleted | Ecological Services | 6/30/2005 4:54:00 AM |
|---|---|---|

**Alternative 1:  Feeding, breeding, and sheltering approach:**

PCE #1:  The presence of leks.  Leks are usually located in small open areas adjacent to stands of sagebrush with $\geq$ 20% or greater canopy cover. Openings may be natural or human created, including (but not limited to) small burns, irrigated pasture, and roads.  Lek sites are usually flat to gently sloping areas of <15% slope in broad valleys or on ridges.  Lek sites have good visibility and low vegetation structure and acoustical qualities that allow sounds of breeding displays to carry.

PCE #2.  Sufficient space around leks to provide females with nesting and brood-rearing opportunities. Sagebrush communities delineated within 4 miles of a lek are necessary to provide females with ample nesting and brood-rearing opportunities as well as offer protection from disturbance.  See GUSG Disturbance Guidelines", Appendix I, for discussion.[BF1]

PCE # 3:  Presence of sage brush.  Presence of sagebrush is necessary for both food and shelter.  The amount of sagebrush cover present is known to vary between arid and mesic sites (as defined in Winward 2004), with arid sites containing more sagebrush.   The amount of sagebrush necessary to be used by GUSG varies by season.  To meet this PCE, breeding habitat must contain 10 to 25 percent sagebrush cover; summer-fall habitat must contain 5 to 20 percent sagebrush cover; and wintering habitat must contain 30 to 40 percent sagebrush cover.

PCE #4.  Presence of supplemental food resources.  Although GUSG depend primarily on sage brush for food, other food resources are necessary during critical GUSG life stages.  Insect forage is necessary during the early growth period of young, while grasses and forbs are essential to supplement nutritional requirements.

      PCE4a:  Insect source habitats:

      PCE4b:  Grass cover and height.  To meet the requirements for this PCE, grass cover should be between 10 and 40 percent and grass height should range between 10 and 18 centimeters (4 to 7 inches).  Canopy cover should be measured according to methods contained in Canfield (1941) and further described by Connelly et al. (2003).  Height should be measured as "droop height"; the tallest portion of the naturally growing portion of the plant (Connelly et al. 2000).

      PCE 4c.  Forb cover and height.  To meet the requirements for this PCE, forb cover should be between 5 and 40 present, and forb height should range between 5 and 15 centimeters (2 to 6 inches).  Understory cover should be measured according to Daubenmire (1959).  Height should be measured as "droop height"; the tallest portion of the naturally growing portion of the plant (Connelly et al. 2000).

PCE #5:  Sheltering habitat.  GUSG require cover to hide from predators of adults, young, and eggs.  Breeding habitat, summer-fall habitat, and wintering habitat should include 15 to 40 percent canopy cover in the shrub layer.   Canopy cover should be measured according to methods contained in Canfield (1941) and further described by Connelly et al. (2003).

PCE#6.  Winter forage.  GUSG rely on sites with tall sagebrush to survive throughout the winter.  Height of sage brush must be tall enough so that some food resources are still exposed when wintering sites are covered in snow.  To meet the requirements of this PCE, sagebrush canopy should constitute 30 to 40 percent of the site, and heights should be higher than 16 inches tall.

PCE #7:  Corridors.  Within each unit, GUSG must be able to safely travel between breeding, summer-fall, and wintering habitat through areas that do not have "typical" GUSG habitat.  Essential corridor habitats include areas that lie between  breeding, summer-fall, and wintering sites that are within 4 miles of each other.

ALTERNATIVE PCE APPROACH

| Page 2: [14] Deleted | FWS User | 7/3/2005 2:00:00 PM |
|---|---|---|

Habitat-based approach  I Think we need to go back to tables – writing out generalizes too much – Terry – your thoughts?

G

| Page 3: [15] Deleted | FWS User | 7/3/2005 3:52:00 PM |
|---|---|---|

.  To meet the requirements for this PCE, grass cover should be between 10 and 40 percent and grass height should range between 10 and 18 centimeters (4 to 7 inches).  Canopy cover should be measured according to methods contained in Canfield (1941) and further described by Connelly et al. (2003).  Height should be measured as "droop height"; the tallest portion of the naturally growing portion of the plant (Connelly et al. 2000).

PCE #4.  Forb cover and height.  Forbs are important for GUSG because they provide habitat for GUSG prey items which are essential to ensuring brood survival and rearing, as well as being a dominant summer food item (GSGRSC 2005)

| Page 3: [16] Deleted | FWS User | 7/3/2005 3:52:00 PM |
|---|---|---|

To meet the requirements for this PCE, forb cover should be between 5 and 40 present, and forb height should range between 5 and 15 centimeters (2 to 6 inches).  Understory cover should be measured according to Daubenmire (1959).  Height should be measured as "droop height"; the tallest portion of the naturally growing portion of the plant (Connelly et al. 2000).

PCE #5. Leks.   Leks are traditional breeding areas where displaying and mating occur.  Leks are usually located in small open areas, either natural or human created, and adjacent to stands of sagebrush with $\geq$ 20% or greater canopy cover and $>$ 6 inches tall.  Lek sites are usually flat to gently sloping areas of <15% slope in broad valleys or on ridges.  Lek sites have good visibility and low vegetation structure and acoustical qualities that allow sounds of breeding displays to carry (GSGRSC 2005).

| Page 6: [17] Deleted | FWS User | 7/3/2005 4:14:00 PM |
|---|---|---|

The Gunnison Basin population is the only population that could be considered "secure" in that it has a relatively low risk of extinction.

| Page 6: [18] Deleted | FWS User | 7/3/2005 4:14:00 PM |
|---|---|---|

meeting this minimum, and a moderate to high risk of extinction in the small populations, all

| Page 6: [19] Deleted | FWS User | 7/3/2005 4:14:00 PM |
|---|---|---|

All of the occupied habitat in the

| Page 6: [20] Deleted | FWS User | 7/3/2005 4:14:00 PM |
|---|---|---|

needs to be designated as CH to provide for expansion and security of habitat necessary to support populations

| Page 6: [21] Deleted | FWS User | 7/3/2005 4:14:00 PM |
|---|---|---|

.  Critical habitat in the Gunnison Basin population would be designated only in occupied habitat.  Critical habitat in the San Miguel,  Monticello-Dove Creek, and Pinon Mesa populations will all need to be expanded into adjacent habitat (defined as vacant in the RCP) in order to achieve

| Page 6: [22] Deleted | FWS User | 7/3/2005 4:14:00 PM |
|---|---|---|

the population targets in the RCP.  The Crawford, Poncha Pass, and Cerro Summit-Cimarron-Sims will all

need to be expanded into adjacent as well as restored habitat (defined as vacant and potential in the RCP) in order to achieve the target populations

| Page 6: [23] Deleted | FWS User | 7/3/2005 4:14:00 PM |
| --- | --- | --- |

size in the RCP.   [BF2]

NOTE to Grand Junction:  need to provide much more information on what the justification is for the acreages being so large.  For example, seems odd that it takes over 50,000 acres to provide habitat for 275 birds in the Crawford area. Describe biology here; occur at low densities, need large areas over which to roam…

**DRAFT Concept Paper**
**Strategy for Designation of Critical Habitat**
**for the Gunnison Sage-grouse**
**10/13/05**

**Distribution:** The Gunnison sage-grouse (GUSG) currently occurs in 7 widely scattered and isolated populations in southwestern Colorado and southeastern Utah (Table1, Figure 1) as follows: (1) Gunnison Basin, CO; (2) Cerro Summit–Cimarron–Sims Mesa, CO; (3) Crawford, CO; (4) Piñon Mesa, CO; (5) Poncha Pass, CO; (6) San Miguel Basin, CO; and (7) Dove Creek, CO—Monticello, UT. The Cerro Summit–Cimarron–Sims Mesa and San Miguel Basin populations are patchily distributed, and as a result, we identify separate subpopulations within each. At Cerro Summit–Cimarron–Sims Mesa there are 2 subpopulations: Cerro Summit – Cimarron and Sims Mesa.  San Miguel Basin contains 6 subpopulations: Dry Creek Basin, Hamilton Mesa, Miramonte Reservoir, Gurley Reservoir, Beaver Mesa, and Iron Springs.

Table 1.   Gunnison Sage-grouse Population Size, and Occupied Habitat Acreage.

| Population | Estimated Population Size (2005) | Total Occupied Habitat Acres | Number of Critical Habitat Units |
|---|---|---|---|
| Cerro Summit – Cimarron - Sims Mesa | 25 | 37,145 | 2 |
| Crawford | 191 | 34,908 | 1 |
| Dove Creek, CO – Monticello, UT | 196 | 86,483 | 2 |
| Gunnison Basin | 4,763 | 530,464 | 1 |
| Piñon Mesa | 167 | 24,185 | 3 |
| Poncha Pass | 44 | 14,781 | 0 |
| San Miguel Basin | 334 | 85,999 | 6 |
| **Total** | 5,720 | 813,965 | 15 |

**CH Proposal:**  We anticipate proposing 15 critical habitat units for the GUSG.  These are shown in the map in Figure 1.  These units occur within 6 of the 7 extant populations of GUSG.  We are not designating any critical habitat within the Poncha Pass population due to the fact that GUSG here were introduced from Gunnison Basin stock and do not represent unique characteristics or occur in an essential linkage area.  For the remaining units, we are proposing all currently occupied habitat (see Table 1), which totals 799,184 acres.

Figure 1  Locations of current Gunnison sage-grouse populations.



This figure is from the Rangewide Conservation Plan (GSRSC 2005).

In our evaluation of proposed critical habitat for the GUSG, we are selecting areas that possess the physical and biological features that are essential to the conservation of the species and that may require special management considerations or protection. The scientific information we are using includes information on the biology and ecology of the GUSG, occurrence data, and vegetation cover type data.

1. We focus on areas that are currently occupied by the species and that the RCP (GSGRSC 2005) has identified as core populations. GUSG use three types of seasonal habitats (breeding, summer-fall, and wintering); we have designed each unit to contain all three types

of habitats as well as connectivity between them.

2. Within these areas, we identify the necessary habitat features required for GUSG feeding, breeding, and sheltering.

**Describe the PCEs**:

Gunnison sage-grouse use a wide variety of habitats that occur in and adjacent to the sagebrush community. Three seasonal habitat categories are used by Gunnison sage-grouse as described in the RCP (GSGRSC 2005). These are breeding, summer-fall, and winter. Primary constituent elements include sagebrush, grasses, and forbs within sagebrush, riparian, and wet meadow communities used by sage-grouse. Sagebrush is used for hiding, resting and foraging. Sagebrush is eaten exclusively in the winter. Grasses and forbs used may occur in native sagebrush communities or hay and crop fields in close proximity (150 feet) to native sagebrush. Grasses are used solely for hiding cover but harbor insects eaten by the sage-grouse. Forbs are eaten by the sage-grouse and also harbor insect prey. Each type of habitat is described further below and specific desired conditions are described under the "Special Management" section.

Breeding habitat. Breeding habitat includes lekking, pre-laying female, nesting, and early brood-rearing habitat. The habitat occurs in native and non-native habitats within the population boundaries in Figure 1. Habitats included are those that meet the GUSG's requirements for adequate cover, food, and space for mating displays during the breeding season. GUSG use breeding habitats generally between mid-March and late-June. Young (1994) and Apa (2004) developed breeding habitat guidelines for GUSG and is consolidated in the RCP (GSGRSC 2005).

*PCEs for Summer - Fall Habitat.* By late summer and into the early fall, females with broods, non-brood females, and groups of males become more social, and flocks are more concentrated (Patterson 1952). This is the period of time when GUSG can be observed in atypical habitat such as agricultural fields (Commons 1997). During periods of heavy snow cover in late fall and early winter, use of mountain and Wyoming big sagebrush stands is extensive. Summer-late brood-rearing habitat includes habitat used during this period by males, non-brooding females, and females with broods. Fall habitat consists of "transition" range from late summer to winter, and can include a variety of habitats used by males and females (with and without broods). In some situations, fall and summer-late brood-rearing habitats are indistinguishable, but this depends on the movement patterns of the population and habitat availability. Riparian and wetland meadows are used for foraging during this time, particularly by hens with chicks but immediately adjacent sagebrush is still important for hiding and resting cover.

**PCEs for Winter Habitats.** During winter, males and females split into segregated flocks. Winter habitat is defined as sagebrush areas within currently occupied habitat that are available (i.e., not covered by snow) to sage-grouse in average winters. Habitat requirements are less specific and are based primarily upon the amount and height of sagebrush. Most GUSG winter feeding occurs in drainages and on slopes with south or west aspects in the Gunnison Basin. In

severe winters with heavy accumulations of snow, the amount of sagebrush exposed above the snow can be severely limiting. Hupp and Braun (1989b) investigated GUSG feeding activity during a severe winter in the Gunnison Basin in 1984 where they estimated less than 10 percent of the sagebrush was exposed above the snow and available to sage-grouse. In these conditions tall and vigorous sagebrush typical in drainages are an especially important food source for GUSG.

**3. Describe the minimum amount and optimum distribution of currently-occupied habitat needed to support the numbers and distribution of the species necessary for conservation.**

We have determined that six of the seven extant populations (all populations, except Poncha Pass, and therefore, all units within the populations) are essential to the survival of the species. These populations exist throughout the remaining historic range of the species and are necessary to preserve the species in a significant portion of its current range. Protection of multiple populations across the range provides insurance against a catastrophic event (drought, extreme winter temperatures, disease outbreak, etc.) threatening the entire species. In addition, the aggregate number of individuals across all populations increases the probability of demographic persistence and preservation of overall genetic diversity by providing an important genetic reservoir. The Gunnison Basin contains 76% of the genetic diversity of the species and the other small populations collectively contain the other 24%. Protection of the smaller GUSG populations is essential to preserving the genetic diversity of the species and decreasing extinction risk. These smaller populations currently are at high risk of extinction and need habitat protection combined with special management to prevent extirpation. Extirpation of any of the smaller 6 populations will result in either a range reduction or a substantial gap in the distribution of the species, as well as diminished connectivity between the remaining populations.

Gunnison Basin
The Gunnison Basin population is essential to the conservation of the GUSG because it is the largest population with the largest currently occupied range and contains 76% of the genetic diversity of the species.

San Miguel Basin
This population and all six subpopulations (which are the critical habitat units) are extremely important because it is the second-largest GUSG population and, based on recent genetic information and geographic location, acts as a current or historic habitat and genetic linkage between all the populations. Being the second largest population, it may also act as a refuge if catastrophic events or disease ever resulted in substantial impacts to the Gunnison Basin population. If one of the units is no longer suitable habitat this will isolate the subpopulations from each other and further isolate all populations from each other.

Monticello – Dove Creek Population
This population is essential because it contributes to the genetic diversity and has potential to be a large population if restoration of habitat outside of the current range occurs. Based purely on area of historic range around this population it is possible that this was once the largest

population.

Crawford
This population is essential because it contributes to the genetic diversity of the species and the current habitat is contiguous and in relatively good condition.

Pinon Mesa
This population is essential because it contributes to the genetic diversity of the species. Although low in number the population has demonstrated persistence over time indicating some attribute of its genetic diversity may be desirable trait for enhancing species persistence.

Cerro Summit-Cimarron-Sims Mesa:  Although this is the smallest population, it is also extremely important for the conservation of GUSG because it constitutes an essential linkage between the largest population (Gunnison Basin) and the second-largest population (San Miguel Basin).  It is possible that it provides a link between the San Miguel Basin and Crawford Area population as well, but further genetic testing will be necessary to establish this possibility.  Without this population no natural dispersal outside of, or into, the Gunnison Basin will occur, causing further isolation and increased risk of extinction amongst the small populations (see RCP (GSGRSC 2005) for discussion on extinction risk).

**4. Combining the qualitative and quantitative information under Points 1, 2, and 3(a), present an explicit, deductive analysis to determine the location and amount of area that is necessary for conservation.**

All of the occupied habitat in all populations, except Poncha Pass, needs to be designated critical habitat to maintain current population numbers and to allow time for restoration and expansion of habitat to at least meet population goals in the RCP (GSGRSC 2005) (see RCP for further discussion) and to hopefully attain 500 or more adult birds to secure the small populations in the future.

**5. Only if the habitat identified in step 2 is not believed sufficient to conserve the species, should you consider designating habitat that is currently unoccupied or other areas outside the geographical area occupied by the species at the time of listing.**

Currently occupied habitat is not sufficient to conserve the GUSG except for in the area occupied by the Gunnison population.  All other population goals are not being met (RCP (GSGRSC 2005)).  To have self sustaining populations that reach the targets in the RCP (GSGRSC 2005), expansion into adjacent habitats will be necessary in 5 of the 6 proposed critical habitat units.  Furthermore, habitat linkages need to be restored, enhanced and/or maintained in order to provide sufficient space for self-sustaining populations.

## Criteria & Methodology:

The acreages in this concept paper were derived from existing mapping done for the GUSG . Most of the acreage proposed to be designated will be using the RCP's (GSGRSC 2005) definition of occupied habitat. We will also use information on habitat defined as "vacant/unknown" or "potential" in the RCP (GSGRSC 2005) to determine what areas are necessary for connectivity and expansion of habitat for those small populations, which are currently well below conservation goals contained in the RCP (GSGRSC 2005). In addition to using the information contained in the RCP (GSGRSC 2005), we will use additional information from CDOW, UDWR, BLM or other biologists. Additional GIS work is needed to more accurately map critical habitat. The CDOW has tentatively agreed to assist us with mapping. Service personnel will put the maps in a format suitable for the Federal Register.

Information from the RCP (GSGRSC 2005) was used to describe the PCEs

**Special Management: Describe the threats that may warrant special management, and what management is necessary to ameliorate those threats.**

All 15 units warrant special management to maintain, enhance, or restore habitat to the specifications described below for each habitat category. Management strategies and best management practices to achieve these habitat conditions are described in the RCP (GUSGRSC 2005).

Table 2. GUSG breeding habitat PCE's[AB].

| Vegetation Variable | Gunnison sage-grouse | |
|---|---|---|
| | Arid[c] | Mesic[c] |
| Sagebrush Canopy[d] % | 15 - 25 | 10 - 20 |
| Non-sagebrush Canopy[d] % | 5 - 15 | 5 - 15 |
| Total Shrub Canopy[d] % | 20 - 40 | 15 - 35 |
| Sagebrush Height cm (inches) | 25 - 50 (9.8 - 19.7) | 30 - 50 (11.8 - 19.7) |
| Grass Cover[d] % | 10 - 30 | 20 - 40 |
| Forb Cover[e] % | 5 - 15 | 20 - 40 |
| Grass Height[f] cm (inches) | 10 - 15 (3.9 - 5.9) | 10 - 15 (3.9 - 5.9) |
| Forb Height[f] cm (inches) | 5 - 10 (2.0 - 3.9) | 5 - 15 (2.0 - 5.9) |

[A] Breeding habitat PCE's were developed using data in GUSG studies by Young (1994) and Apa (2004).
[B] Breeding habitat is defined as sagebrush communities delineated within 4 miles of a lek. Breeding habitat includes lek, nesting and early brood-rearing habitat usually from mid-March through late-June.
[c] Arid or mesic communities are as defined by Winward (2004).
[d] Canopy cover measured according to Canfield (1941) and further described by Connelly et al. (2003).
[e] Understory cover measured according to Daubenmire (1959).

[f]Measured as "droop height"; the tallest portion of the naturally growing portion of the plant (Connelly et al. 2000).

Table 3. GUSG summer - fall habitat PCE's[ab]

| Vegetation Variable | Gunnison sage-grouse | |
| | Arid[c] | Mesic[c] |
|---|---|---|
| Sagebrush Canopy[d] (%) | 5 – 15 | 5 – 20 |
| Non-sagebrush Canopy[d] (%) | 5 - 15 | 5 – 15 |
| Total Shrub Canopy[d] (%) | 10 - 30 | 10 – 35 |
| Sagebrush Height cm (inches) | 20 – 40 (7.9 - 15.7) | 25 – 50 (9.8 – 19.7) |
| Grass Cover[e] (%) | 10 – 25 | 10 – 35 |
| Forb Cover[e] (%) | 5 - 15 | 15 – 35 |
| Grass Height[f] cm (inches) | 10 – 15 (3.9 – 5.9) | 10 – 15 (3.9 – 5.9) |
| Forb Height[f] cm (inches) | 3 – 10 (1.2 - 3.9) | 5 – 10 (2.0 - 5.9) |



[a] Summer - fall habitat PCE's were developed using data in GUSG studies by Young (1994), Woods and Braun (1995), Commons (1997), and Apa (2004)

[b] Summer – fall habitat is defined as vegetation communities, including sagebrush, agricultural fields, and wet meadows (Connelly et al. 2000) that are within 4 miles of an active strutting ground.

[c] Arid or mesic communities are as defined by Winward (2004).

[d] Canopy cover measured according to Canfield (1941) and further described by Connelly et al. (2003).

[e] Understory cover measured according to Daubenmire (1959).

[f] Measured as "droop height"; the tallest portion of the naturally growing portion of the plant (Connelly et al. 2000).

Table 4. GUSG winter habitat PCE's[ab]

| Vegetation Variable | Arid[c] |
|---|---|
| Sagebrush Canopy[d]: % | 30 – 40 |
| Sagebrush Height[e]: cm (inches) | 40 – 55 (15.8 – 21.7) |

[a] Winter habitat guidelines were developed using GUSG data from Hupp (1987).

[b] Winter habitat is defined as sagebrush areas (Connelly et al. 2000) within currently occupied habitat that are available (i.e., not covered by snow) to sage-grouse in average winters.

[c] Arid communities are as defined by Winward (2004). There is no need to describe mesic communities.

[d] Canopy cover measured according to Canfield (1941) and further described by Connelly et al. (2003).

[e] Measured from ground level to the tallest stem (excluding inflorescence) according to Hupp (1987).

All 15 units also require special management to ameliorate threats to the sage-grouse. The most important immediate management rangewide is protection of habitat from development, such as urban development and oil and gas development. The best management practices for minimizing all threats are described in the RCP (GSGRSC 2005). The top four threats in each population under all five listing factors, for which critical habitat is proposed to be designated, are considered to be needing special management.

1. In the Gunnison Basin, threats that may need special management include: human population growth and development, human infrastructure, grazing management and invasive weeds.

2. Threats in the San Miguel population that may need special management include: human population growth and development, human infrastructure, energy development, and conversion to agriculture.

3. Threats in the Monticello-Dove Creek population that may need special management include: conversion to agriculture, human population growth and development and energy development, and limited genetic diversity.

4. Threats in the Pinon Mesa population that may need special management include: human population growth and development, human infrastructure, native shrub or tree encroachment, and limited genetic diversity.

5. Threats in the Crawford population that may need special management include: human growth and development, human infrastructure, conversion to agriculture, and native tree or shrub encroachment.

6. Threats in the Cerro Summit-Cimarron-Sims Mesa population that may need special management include: human population growth and development, human infrastructure, conversion to agriculture, and energy development.

## Non-Inclusions & Exclusions

Describe all non-inclusions and exclusions.

1. Consideration of DOD Lands

   [No DOD lands within range.]

2. Other Exclusions

   *(a) Exclusions Under Both 3(5)(A) and 4(b)(2)*

Areas covered under a management plan that meet all 3 criteria from the "Lessons Learned" document includes perpetual conservation easements with GUSG conservation objectives. Acreages to be excluded within each population are: Gunnison Basin-30,029; San Miguel – 884; Monticello/ Dove Creek- 3,581; Crawford – 1,419; Pinon Mesa – 20,803; Poncha Pass -0; and Cerro Summit-Cimarron-Sims Mesa – 3,408.  Total potential exclusions:  60,124

   *(b) Exclusions Under 3(5)(A) Alone*



The National Park Service manages 12,400 acres in the Gunnison Basin and 4,600 acres in the Crawford population.   However, the management plans for these lands do not contain management objectives for Gunnison sage-grouse and therefore should not be excluded at this time.

      *(b) Exclusions Under 4(b)(2) Alone*

None

      *(c) Economic Exclusions*

None proposed at this stage.



## Literature Cited

Apa, A.D. 2004. Habitat use, movements, and survival of Gunnison sage-grouse in southwestern Colorado. Unpublished report to the Colorado Division of Wildlife, Colorado.

Canfield, R. H. 1941. Application of the line interception method in sampling range vegetation. Journal of Forestry 39:388-394.

Commons, M. L. 1997. Movement and habitat use by Gunnison Sage Grouse (Centrocercus minimus) in southwestern Colorado. Thesis, University of Manitoba, Winnipeg, Manitoba, Canada.

Connelly, J. W., M. A. Schroeder, A. R. Sands, and C. E. Braun. 2000. Guidelines to manage sage grouse populations and their habitats. Wildlife Society Bulletin 28:967-985.

Connelly, J. W., K. P. Reese, and M. A. Schroeder. 2003. Monitoring of greater sage-grouse habitats and populations. Station Bulletin 80, University of Idaho, Moscow, USA.

Daubenmire, R. 1959. A canopy-coverage method of vegetational analysis. Northwest Science 33:43-64.

Gunnison Sage-grouse Rangewide Steering Committee. 2005. Gunnison sage-grouse rangewide conservation plan. Colorado Division of Wildlife, Denver, Colorado, USA

Hupp, J. W. 1987. Sage grouse resource exploitation and endogenous reserves in Colorado. Dissertation, Colorado State University, Fort Collins, Colorado.

Hupp, J. W., and C. E. Braun. 1989b. Topographic distribution of sage grouse foraging in winter. Journal of Wildlife Management 53:823-829.

Patterson, R. L. 1952. The sage grouse in Wyoming. Sage Books, Denver, Colorado.

Winward, A. H. 2004. Sagebrush of Colorado: taxonomy, distribution, ecology, and management. Colorado Division of Wildlife, Denver, Colorado, USA.

Woods, C. P., and C. E. Braun. 1995. Sage grouse investigations Glade Park and Pinon Mesa, Mesa County, Colorado. Unpublished report to the Colorado Division of Wildlife, Colorado, USA.

Young, J. R. 1994. The influence of sexual selection on phenotypic and genetic divergence among sage grouse populations. Dissertation, Purdue University, West Lafayette, Indiana.

10

# United States Department of the Interior

### FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

In Reply Refer To:
FWS/AES/DCC/022920

OCT 2 6 2005

Memorandum

To:        Regional Directors, Regions 1, 2, 3, 4, 5, 6, and 7
           Manager, California/Nevada Operations

From:      Director   *H. Dale Hall*

Subject:   Critical Habitat Designations Benefits

Although our present mode of critical habitat designation assumes a positive net benefit
to designation in the absence of a countervailing economic or policy benefits to
exclusion, concern still exists that the Service is not providing explicit descriptions of
benefits of designation. Accordingly, effective immediately, for all critical habitat
designations, benefits will be identified as follows:

1. Two months after completion of the methodology memo, the Regional Office will
   ensure that a table is prepared that lists the habitat unit (as defined by the office
   preparing the rule) and the benefits provided by critical habitat in that unit in as
   much detail as feasible (at this early stage you may only be able to identify the
   type of habitat, for example, breeding, nesting, foraging etc). The table must
   provide information on four types of potential benefits (see attached table).

2. The functional benefits provided by the units must be identified (using a method
   which is left to the discretion of the regional or field office). The specific benefits
   for each unit are to be enumerated in as much detail as feasible. For example,
   benefits provided by units that support a critical life stage of the species (e.g.,
   spawning, nesting, migratory corridors) or units that support a particular function,
   (for example, an island that supports 90% of nesting habitat for a species) should
   be identified.

3. The table must include an explicit explanation of how a critical habitat
   designation will provide more protection than would occur as a result of a habitat-
   based jeopardy determination made during the consultation process. The
   explanation should be made using the *Gifford Pinchot* decision on the definition
   of adverse modification. It may be necessary to review past consultations to
   determine whether a critical habitat designation will provide protection beyond
   those provided by jeopardy consultations. If a review is conducted, it should be
   noted.

4. How the effects of any other regulatory mechanism (such as a management plan,
   state law, or Clean Water Act protections) may change when critical habitat is
   designated must be included in the description. In other words, if a provision of

state law becomes effective in designated critical habitat but is not effective outside of designated critical habitat, the protection of that state law should be described.,

5. Finally, any educational benefits that result from critical habitat designation should be described.

A table template is attached. Critical habitat units for which no benefits can be identified will not be proposed for designation. However, they will be included in the proposal, the public will be notified that they were considered and no benefit could be identified, and public comment will be taken as to whether the designation would actually provide a benefit.

Attachment

Critical Habitat Benefits Table

| Unit Name | Functional Benefits Explain | Educational Benefits Explain | Benefits due to additional protection beyond jeopardy Explain | Benefits due to regulatory mechanisms (other than ESA) triggered by the designation Explain | Comments |
|---|---|---|---|---|---|
| "Unit 1" | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |



**"Patricia Mehlhop"**
**<pmehlhop@earthlink.net>**

**11/04/2005 02:22 PM**

Please respond to
pmehlhop@earthlink.net

To    "Pat_mehlhop" <Pat_mehlhop@fws.gov>,
      Al_pfister@fws.gov

cc    Bridget-fahey@fws.gov

bcc

Subject    Concept Paper

Please don't respond to this address.  Respond to my fws address.

Al,

Here are my edits to the concept paper.  Most are extremely minor.  I think it's in good shape.  Two things seem to need further discussion.
1. In response to #5, your argument leads me to conclude that we should designate CH in unoccupied habitat even though we aren't going to do it.
2. We're only excluding easements with GUSG cons. objectives, not all easements.  I agree with that, but on yesterday's weekly call, Pat D. and Nancy were saying any easement is great because it stops development (not entirely true if you consider energy development).  We should propably have the Team address this one before moving the doc forward.

You may want to have Linda B. look over the formatting.

Pat


--- Patricia Mehlhop
--- pmehlhop@earthlink.net
--- EarthLink: It's your Internet.



GUSG CH Concept paper110405pm.doc

**DRAFT Concept Paper**
**Strategy for Designation of Critical Habitat**
**for the Gunnison Sage-grouse**
**11/04/05**

**Distribution:**  The Gunnison sage-grouse (GUSG ) currently occurs in seven widely scattered and isolated populations in southwestern Colorado and southeastern Utah (Table1, Figure 1) as follows: (1) Gunnison Basin, CO; (2) San Miguel Basin, CO; (3) Dove Creek, CO—Monticello, UT; (4) Piñon Mesa, CO; (5) Crawford CO, CO; (6) Cerro Summit–Cimarron–Sims Mesa, CO; and (7) Poncha Pass, CO.  Two of the populations are patchily distributed, and as a result, we identify separate subpopulations within each.  At Cerro Summit–Cimarron–Sims Mesa there are two subpopulations: Cerro Summit – Cimarron and Sims Mesa.  San Miguel Basin contains six subpopulations: Dry Creek Basin, Hamilton Mesa, Miramonte Reservoir, Gurley Reservoir, Beaver Mesa, and Iron Springs.

Table 1.   Gunnison Sage-grouse Population Size, and Occupied Habitat Acreage.

| Population | Estimated Population Size (2005) | Total Occupied Habitat Acres | Number of Critical Habitat Units |
|---|---|---|---|
| Gunnison Basin | 4,763 | 530,464 | 1 |
| San Miguel Basin | 334 | 85,999 | 6 |
| Dove Creek, CO – Monticello, UT | 196 | 86,483 | 2 |
| Piñon Mesa | 167 | 24,185 | 3 |
| Crawford | 191 | 34,908 | 1 |
| Cerro Summit – Cimarron - Sims Mesa | 25 | 37,145 | 2 |
| Poncha Pass | 44 | 14,781 | 0 |
| Total | 5,720 | 813,965 | 15 |

**CH Proposal**:  We anticipate proposing 15 critical habitat units for the GUSG.  These are shown in the map in Figure 1.  These units occur within six of the seven extant populations of GUSG.  We are not designating any critical habitat within the Poncha Pass population because GUSG there were introduced from Gunnison Basin stock and do not represent unique characteristics or occur in an essential linkage area.  For the remaining units, we are proposing all currently occupied habitat (see Table 1), which totals 799,184 acres.

Figure 1  Locations of current Gunnison sage-grouse populations.  This figure is from the Rangewide Conservation Plan (RCP) (GSRSC 2005).



In our evaluation of proposed critical habitat for the GUSG, we are selecting areas that possess the physical and biological features that are essential to the conservation of the species and that may require special management considerations or protection. The scientific information we are using includes information on the biology and ecology of the GUSG, occurrence data, and vegetation cover type data.

1.  We focus on areas that are currently occupied by the species and that the RCP (GSGRSC 2005) has identified as core populations. GUSG use three types of seasonal habitats (breeding, summer-fall, and wintering); we have designed each unit to contain all three types of habitats as well as connectivity between them.

2.  Within these areas, we identify the necessary habitat features required for GUSG feeding, breeding, and sheltering.

**Describe the PCEs**:

Gunnison sage-grouse use a wide variety of habitats that occur in and adjacent to the sagebrush

community.  Three seasonal habitat categories are used by Gunnison sage-grouse as described in the RCP (GSGRSC 2005).  They are breeding, summer-fall, and winter.  Primary constituent elements include sagebrush, grasses, and forbs within sagebrush, riparian, and wet meadow communities used by sage-grouse.  Sagebrush is used for hiding, resting and foraging.  Sagebrush is eaten exclusively in the winter.  Grasses and forbs used may occur in native sagebrush communities or hay and crop fields in close proximity (150 feet) to native sagebrush.  Grasses are used solely for hiding cover but harbor insects eaten by the sage-grouse.  Forbs are eaten by the sage-grouse and also harbor insect prey.  Each type of habitat is described further below and specific desired conditions are described under the "Special Management" section.

*PCEs for **Breeding habitat**.*  Breeding habitat includes lekking, pre-laying female, nesting, and early brood-rearing habitat.  The habitat occurs in native and non-native habitats within the population boundaries in Figure 1.  Habitats included are those that meet the GUSG's requirements for adequate cover, food, and space for mating displays during the breeding season.  GUSG use breeding habitats generally between mid-March and late-June.  Young (1994) and Apa (2004) developed breeding habitat guidelines for GUSG, and it is consolidated in the RCP (GSGRSC 2005).

*PCEs for Summer -Fall Habitat.*  By late summer and into the early fall, females with broods, non-brood females, and groups of males become more social, and flocks are more concentrated (Patterson 1952).  This is the period of time when GUSG can be observed in atypical habitat such as edges of agricultural fields (Commons 1997).  Summer-late brood-rearing habitat includes habitat used during this period by males, non-brooding females, and females with broods.  Fall habitat consists of "transition" range from late summer to winter, and can include a variety of habitats used by males and females (with and without broods).  In some situations, fall and summer-late brood-rearing habitats are indistinguishable, but this depends on the movement patterns of the population and habitat availability.  Riparian and wetland meadows are used for foraging during this time, particularly by hens with chicks but immediately adjacent sagebrush is still important for hiding and resting cover.  During periods of heavy snow cover later in the fall, use of mountain and Wyoming big sagebrush stands is extensive.

*PCEs for Winter Habitats.*  During winter, males and females split into segregated flocks.  Winter habitat is defined as sagebrush areas within currently occupied habitat that are available (i.e., not covered by snow) to sage-grouse in average winters.  Habitat requirements are less specific and are based primarily upon the amount and height of sagebrush.  In the Gunnison Basin, most GUSG winter feeding occurs in drainages and on slopes with south or west aspects.  In severe winters with heavy accumulations of snow, the amount of sagebrush exposed above the snow can be severely limiting.  Hupp and Braun (1989b) investigated GUSG feeding activity during a severe winter in the Gunnison Basin in 1984 where they estimated less than 10 percent of the sagebrush was exposed above the snow and available to sage-grouse.  In these conditions, tall and vigorous sagebrush typical in drainages are an especially important food source for GUSG.

3.  **Describe the minimum amount and optimum distribution of currently-occupied habitat**

ε

**needed to support the numbers and distribution of the species necessary for conservation.**

We have determined that six of the seven extant populations (all populations, except Poncha Pass, and therefore, all units within the populations) are essential to the survival of the species. These populations exist throughout the remaining historic range of the species and are necessary to preserve the species in a significant portion of its current range.  Protection of multiple populations across the range provides insurance against a catastrophic event (drought, extreme winter temperatures, disease outbreak, etc.) threatening the entire species.  In addition, the aggregate number of individuals across all populations increases the probability of demographic persistence and preservation of overall genetic diversity by providing an important genetic reservoir.  The Gunnison Basin contains 76% of the genetic diversity of the species and the other small populations (excluding the Poncha Pass population) collectively contain the other 24%. Protection of the smaller GUSG populations is essential to preserving the genetic diversity of the species and decreasing extinction risk.  These smaller populations currently are at high risk of extinction and need habitat protection combined with special management to prevent it. Extirpation of any of the smaller five populations will result in either a range reduction or a substantial gap in the distribution of the species, as well as diminished connectivity between the remaining populations.

Gunnison Basin
The Gunnison Basin population is essential to the conservation of the GUSG because it is the largest population with the largest currently occupied range and contains 76% of the genetic diversity of the species.

San Miguel Basin
This population and all six subpopulations (which are the critical habitat units) are extremely important because it is the second-largest GUSG population and, based on recent genetic information and geographic location, acts as a current or historic habitat and genetic linkage between all the populations.  Being the second largest population, it may also act as a refuge if catastrophic events or disease ever resulted in substantial impacts to the Gunnison Basin population.  If one of the units is no longer suitable habitat this will isolate the subpopulations from each other and further isolate all populations from each other.

Monticello – Dove Creek Population
This population is essential because it contributes to the genetic diversity and has potential to be a large population if restoration of habitat outside of the current range occurs.   Based purely on area of historic range around this population it is possible that this was once the largest population.

Pinon Mesa
This population is essential because it contributes to the genetic diversity of the species. Although low in number the population has demonstrated persistence over time indicating some attribute of its genetic diversity may be desirable trait for enhancing species persistence.

Crawford
This population is essential because it contributes to the genetic diversity of the species and the current habitat is contiguous and in relatively good condition.

Cerro Summit-Cimarron-Sims Mesa:
Although this is the smallest population, it is also extremely important for the conservation of GUSG because it constitutes an essential linkage between the largest population (Gunnison Basin) and the second-largest population (San Miguel Basin). It is possible that it provides a link between the San Miguel Basin and Crawford Area population as well, but further genetic testing will be necessary to establish this possibility. Without this population no natural dispersal outside of, or into, the Gunnison Basin will occur, causing further isolation and increased risk of extinction amongst the small populations (GSGRSC 2005) for discussion on extinction risk).

**4. Combining the qualitative and quantitative information under Points 1, 2, and 3, present an explicit, deductive analysis to determine the location and amount of area that is necessary for conservation.**

All of the occupied habitat in all populations, except Poncha Pass, needs to be designated critical habitat to maintain current population numbers and to allow time for restoration and expansion of habitat to at least meet population goals in the RCP (GSGRSC 2005) (see RCP for further discussion) and to hopefully attain 500 or more adult birds to secure the small populations in the future.

**5. Only if the habitat identified in step 2 is not believed sufficient to conserve the species, should you consider designating habitat that is currently unoccupied or other areas outside the geographical area occupied by the species at the time of listing.**

Currently occupied habitat is not sufficient to conserve the GUSG except for in the area occupied by the Gunnison population. All other population goals are not being met (GSGRSC 2005). To have self sustaining populations that reach the targets in the RCP (GSGRSC 2005), expansion into adjacent habitats will be necessary in five of the six proposed critical habitat units. Furthermore, habitat linkages need to be restored, enhanced and/or maintained in order to provide sufficient space for self-sustaining populations.

## Criteria & Methodology:

The acreages in this concept paper were derived from existing mapping done for the GUSG. Most of the acreage proposed to be designated will be using the RCP's (GSGRSC 2005) definition of occupied habitat. We will also use information on habitat defined as "vacant/unknown" or "potential" in the RCP (GSGRSC 2005) to determine what areas are necessary for connectivity and expansion of habitat for those small populations, which are currently well below conservation goals contained in the RCP (GSGRSC 2005). In addition to using the information contained in the RCP (GSGRSC 2005), we will use additional information

5

Formatted: Position: Horizontal: Right, Relative to: Margin, Vertical: 0, Relative to: Paragraph, Width: Auto, Height: Auto

Deleted: (see RCP

Deleted: ¶

Deleted: (a)

Deleted: (RCP

Deleted: )

Deleted: 5

Deleted: 6

Comment [PM2]: My conclusion from this discussion id that we ought to be designating unoccupied habitat.

Comment [PM3]: Is this the correct format/font for this heading? Don't have the template to compare.

Formatted: Right: 0.25"

from the Colorado Division of Wildlife (CDOW), Utah Division of Wildlife Resources (UDWR), Bureau of Management (BLM) or other biologists. Additional GIS work is needed to more accurately map critical habitat. The CDOW has tentatively agreed to assist us with mapping. Service personnel will put the maps in a format suitable for the Federal Register.

Information from the RCP (GSGRSC 2005) was used to describe the PCEs

Special Management: **Describe the threats that may warrant special management, and what management is necessary to ameliorate those threats.**

All 15 units warrant special management to maintain, enhance, or restore habitat to the specifications described below for each habitat category. Management strategies and best management practices to achieve these habitat conditions are described in the RCP (GUSGRSC 2005).

Table 2. GUSG breeding habitat PCEs[a,b].

| Vegetation Variable | Gunnison sage-grouse | |
|---|---|---|
| | Arid[c] | Mesic[c] |
| Sagebrush Canopy [d] % | 15 – 25 | 10 – 20 |
| Non-sagebrush Canopy [d] % | 5 – 15 | 5 – 15 |
| Total Shrub Canopy [d] % | 20 – 40 | 15 – 35 |
| Sagebrush Height cm (inches) | 25 – 50 (9.8 – 19.7) | 30 – 50 (11.8 – 19.7) |
| Grass Cover [d] % | 10 – 30 | 20 – 40 |
| Forb Cover [e] % | 5 – 15 | 20 – 40 |
| Grass Height [f] cm (inches) | 10 – 15 (3.9 – 5.9) | 10 – 15 (3.9 – 5.9) |
| Forb Height [f] cm (inches) | 5 – 10 (2.0 – 3.9) | 5 – 15 (2.0 – 5.9) |

[a] Breeding habitat PCE's were developed using data in GUSG studies by Young (1994) and Apa (2004).
[b] Breeding habitat is defined as sagebrush communities delineated within 4 miles of a lek. Breeding habitat includes lek, nesting and early brood-rearing habitat usually from mid-March through late-June.
[c] Arid or mesic communities are as defined by Winward (2004).
[d] Canopy cover measured according to Canfield (1941) and further described by Connelly et al. (2003).
[e] Understory cover measured according to Daubenmire (1959).
[f] Measured as "droop height"; the tallest portion of the naturally growing portion of the plant (Connelly et al. 2000).

Table 3. GUSG summer - fall habitat PCEs[a,b]

| Vegetation Variable | Gunnison sage-grouse | |
|---|---|---|
| | Arid[c] | Mesic[c] |
| Sagebrush Canopy [d] (%) | 5 – 15 | 5 – 20 |

9

| Non-sagebrush Canopy [d] (%) | 5 - 15 | 5 – 15 |
|---|---|---|
| Total Shrub Canopy [d] (%) | 10 - 30 | 10 – 35 |
| Sagebrush Height cm (inches) | 20 – 40 (7.9 - 15.7) | 25 – 50 (9.8 – 19.7) |
| Grass Cover [e] (%) | 10 - 25 | 10 – 35 |
| Forb Cover [e] (%) | 5 - 15 | 15 – 35 |
| Grass Height [f] cm (inches) | 10 – 15 (3.9 – 5.9) | 10 – 15 (3.9 – 5.9) |
| Forb Height [f] cm (inches) | 3 – 10 (1.2 - 3.9) | 5 – 10 (2.0 - 5.9) |

[a] Summer - fall habitat PCE's were developed using data in GUSG studies by Young (1994), Woods and Braun (1995), Commons (1997), and Apa (2004)
[b] Summer – fall habitat is defined as vegetation communities, including sagebrush, agricultural fields, and wet meadows (Connelly et al. 2000) that are within 4 miles of an active strutting ground.
[c] Arid or mesic communities are as defined by Winward (2004).
[d] Canopy cover measured according to Canfield (1941) and further described by Connelly et al. (2003).
[e] Understory cover measured according to Daubenmire (1959).
[f] Measured as "droop height"; the tallest portion of the naturally growing portion of the plant (Connelly et al. 2000).

Table 4.  GUSG winter habitat PCE's[a,b]

| Vegetation Variable | Arid[c] |
|---|---|
| Sagebrush Canopy [d]: % | 30 – 40 |
| Sagebrush Height [e]: cm (inches) | 40 – 55 (15.8 – 21.7) |

[a] Winter habitat guidelines were developed using GUSG data from Hupp (1987).
[b] Winter habitat is defined as sagebrush areas (Connelly et al. 2000) within currently occupied habitat that are available (i.e., not covered by snow) to sage-grouse in average winters.
[c] Arid communities are as defined by Winward (2004).  There is no need to describe mesic communities.
[d] Canopy cover measured according to Canfield (1941) and further described by Connelly et al. (2003).
[e] Measured from ground level to the tallest stem (excluding inflorescence) according to Hupp (1987).

All 15 units also require special management to ameliorate threats to the sage-grouse.  The most important immediate management rangewide is protection of habitat from development, such as urban development and oil and gas development.  The best management practices for minimizing all threats are described in the RCP (GSGRSC 2005).  The top threats in each population under all five listing factors, for which critical habitat is proposed to be designated, are considered to be needing special management.

1.  In the Gunnison Basin, threats that may need special management include: human population growth and development, human infrastructure, grazing management and invasive weeds.

2.  Threats in the San Miguel population that may need special management include: human population growth and development, human infrastructure, energy development, and conversion to agriculture.

3.  Threats in the Dove Creek - Monticello population that may need special management include: conversion to agriculture, human population growth and development and energy

Formatted: Position: Horizontal:
Right, Relative to: Margin, Vertical:
0", Relative to: Paragraph, Width:
Auto, Height: Auto

development, and limited genetic diversity.

4.  Threats in the Pinon Mesa population that may need special management include: human population growth and development, human infrastructure, native shrub or tree encroachment, and limited genetic diversity.

5.  Threats in the Crawford population that may need special management include: human growth and development, human infrastructure, conversion to agriculture, and native tree or shrub encroachment.

6.  Threats in the Cerro Summit-Cimarron-Sims Mesa population that may need special management include: human population growth and development, human infrastructure, conversion to agriculture, and energy development.

## Non-Inclusions & Exclusions

Describe all non-inclusions and exclusions.

1.  Consideration of DOD Lands

    [No DOD lands are within range.]

2.  Other Exclusions

    *(a) Exclusions Under Both 3(5)(A) and 4(b)(2)*

Areas covered under a management plan that meet all three criteria from the "Lessons Learned" document include, perpetual conservation easements with GUSG conservation objectives. Acreages to be excluded within each population are: Gunnison Basin-30,029; San Miguel – 884; Dove Creek- Monticello - 3,581; Pinon Mesa – 20,803; Crawford – 1,419; Cerro Summit-Cimarron-Sims Mesa – 3,408 and Poncha Pass -0.  Total potential exclusions:  60,124

    *(b) Exclusions Under 3(5)(A) Alone*

The National Park Service manages 12,400 acres in the Gunnison Basin and 4,600 acres in the Crawford population.   However, the management plans for these lands do not contain management objectives for Gunnison sage-grouse and therefore should not be excluded at this time.

    *(b) Exclusions Under 4(b)(2) Alone*

None

    *(c) Economic Exclusions*

Deleted: 3

Comment [PM5]: On our weekly call yesterday, Pat D. and Nancy seemed to think that easements that precluded development, but w/o GUSG cons objectives would do a lot for GUSG.  I'm not convinced, but may need to discuss further.

Deleted: s

Deleted: Monticello/

Deleted: Crawford – 1,419;

Deleted: Poncha Pass -0; and

Comment [PM6]: We aren't considering PP, so why say zero exclusions?

Formatted: Right:  0.25"

∞

Formatted: Position: Horizontal: Right, Relative to: Margin, Vertical: Relative to: Paragraph, Width: Auto, Height: Auto

None proposed at this stage.



Formatted: Right: 0.25"

6

Formatted: Position: Horizontal:
Right, Relative to: Margin, Vertical:
0, Relative to: Paragraph, Width:
Auto, Height: Auto

## Literature Cited

Apa, A.D. 2004.  Habitat use, movements, and survival of Gunnison sage-grouse in southwestern
    Colorado.  Unpublished report to the Colorado Division of Wildlife, Colorado.

Canfield, R. H.  1941.  Application of the line interception method in sampling range vegetation.
    Journal of Forestry 39:388-394.

Commons, M. L.  1997.  Movement and habitat use by Gunnison Sage Grouse (Centrocercus
    minimus) in southwestern Colorado.  Thesis, University of Manitoba, Winnipeg,
    Manitoba, Canada.

Connelly, J. W., M. A. Schroeder, A. R. Sands, and C. E. Braun.  2000.  Guidelines to manage
    sage grouse populations and their habitats.  Wildlife Society Bulletin 28:967-985.

Connelly, J. W., K. P. Reese, and M. A. Schroeder.  2003.  Monitoring of greater sage-grouse
    habitats and populations.  Station Bulletin 80, University of Idaho, Moscow, USA.

Daubenmire, R.  1959.  A canopy-coverage method of vegetational analysis.  Northwest Science
    33:43-64.

Gunnison Sage-grouse Rangewide Steering Committee. 2005. Gunnison sage-grouse rangewide
    conservation plan. Colorado Division of Wildlife, Denver, Colorado, USA

Hupp, J. W.  1987.  Sage grouse resource exploitation and endogenous reserves in Colorado.
    Dissertation, Colorado State University, Fort Collins, Colorado.

Hupp, J. W., and C. E. Braun. 1989b.  Topographic distribution of sage grouse foraging in
    winter.  Journal of Wildlife Management 53:823-829.

Patterson, R. L.  1952.  The sage grouse in Wyoming.  Sage Books, Denver, Colorado.

Winward, A. H.  2004.  Sagebrush of Colorado: taxonomy, distribution, ecology, and
    management.  Colorado Division of Wildlife, Denver, Colorado, USA.

Woods, C. P., and C. E. Braun.  1995.  Sage grouse investigations Glade Park and Pinon Mesa,
    Mesa County, Colorado.  Unpublished report to the Colorado Division of Wildlife,
    Colorado, USA.

Young, J. R.  1994.  The influence of sexual selection on phenotypic and genetic divergence
    among sage grouse populations.  Dissertation, Purdue University, West Lafayette,
    Indiana.

Formatted: Right:  0.25"

10

| Population | Estimated Population Size (2005) | Total Occupied Habitat Acres | Number of Critical Habitat Units |
|---|---|---|---|
| Cerro Summit – Cimarron - Sims Mesa | 25 | 37,145 | 2 |
| Crawford | 191 | 34,908 | 1 |
| Dove Creek, CO – Monticello, UT | 196 | 86,483 | 2 |
| Gunnison Basin | 4,763 | 530,464 | 1 |
| Piñon Mesa | 167 | 24,185 | 3 |
| Poncha Pass | 44 | 14,781 | 0 |
| San Miguel Basin | 334 | 85,999 | 6 |
| **Total** | **5,720** | **813,965** | **15** |

# Exhibit K:

# Public Outreach Records

### Index

| Number | Date | Description (from FOIA AR Index) | Pages |
|---|---|---|---|
| 13 | 07/21/05 | Draft outreach plan e-mail | 1 |
| 14 | 07/21/05 | Draft outreach plan attachment 1 | 3 |
| 15 | 07/21/05 | Draft news release e-mail | 1 |
| 16 | 07/21/05 | Draft news release attachment 1 | 3 |
| 17 | 07/26/05 | Draft Q&A's e-mail | 1 |
| 18 | 07/26/05 | Draft Q&A's attachment 1 | 3 |
| 19 | 02/09/06 | Draft summary of 12-month finding (determination) | 2 |
| 20 | 02/16/06 | Outreach plan e-mail | 1 |
| 21 | 02/16/06 | Outreach plan attachment 1 | 4 |
| 22 | 03/28/06 | Gunnison sage-grouse outreach materials e-mail | 1 |
| 23 | 03/28/06 | Gunnison sage-grouse final outreach plan attachment 1 | 3 |
| 24 | 03/28/06 | Draft Gunnison sage-grouse Q&A's attachment 2 | 2 |
| 25 | 03/28/06 | Draft Gunnison sage-grouse news release attachment 3 | 2 |
| 26 | 03/28/06 | Gunnison sage-grouse final summary attachment 4 | 2 |
| 27 | 04/12/06 | Final Determination news release and Q&As | 4 |
| 28 | 04/13/06 | E-mail from S. Rose on outreach materials | 2 |



**Diane Katzenberger/R6/FWS/DOI**

07/21/2005 10:14 AM

To    Al Pfister/R6/FWS/DOI@FWS, Terry Ireland/R6/FWS/DOI@FWS, Pat Mehlhop/R6/FWS/DOI@FWS

cc    David Redhorse/R6/FWS/DOI@FWS, Matt Kales/R6/FWS/DOI@FWS

bcc

Subject    outreach plan - gunnison s-g

Please review and provide additions/suggestions.

Thanks,
Diane



Outreach Plan Listing Proposal.doc

---

Diane Katzenberger
U.S. Fish and Wildlife Service
Office of External Affairs
(303) 236-4578
Email: Diane_Katzenberger@fws.gov

**OUTREACH PLAN**
**For the Proposal to List the Gunnison Sage-Grouse**

**ISSUE:**

The U. S. Fish and Wildlife Service is proposing to list the Gunnison Sage-Grouse as endangered throughout its current range in southwestern Colorado and southeastern Utah.

**BASIC FACTS:**

**Range:** Historically, Gunnison sage-grouse were found in the southwestern portion of Colorado, southeastern Utah, northeastern Arizona, and northwestern New Mexico. They are currently found in seven localized populations in southwestern Colorado and southeastern Utah.

The range of the Gunnison sage-grouse has been reduced to approximately 8 percent of its historic distribution with only 1,850 square miles remaining occupied.

The separate populations are: the Cerro Summit/Cimarron/Sims Mesa population south and southeast of Montrose; the Crawford Area population south of Crawford and Hotchkiss; the Dove Creek population north and west of Dove Cree; the Gunnison Basin population around the town of Gunnison; the Pinon Mesa population south of Grand Junction; the Poncha Pass population north of Villa Grove; and the San Miguel Basin population near Norwood. The San Juan County, Utah population occurs east of Monticello. Most populations are small with the Gunnison Basin, Colorado population being the only relatively large Gunnison sage-grouse population.

**Population status:** The Gunnison Basin in Colorado contains the largest population with 971 males counted on leks in spring 2005 giving an estimated population size of 4,763, the highest number in over 20 years. The other six populations only had 5 to 68 males counted on leks in 2005, resulting in population estimates of 25 to 334. The 2005 rangewide estimate is 5,720. However the four largest populations show a significant negative trend over the past 10 to 50 years.

Although there was improvement in the population status in 2005, the long-term trends are still declining and threats to the species are continuing.

**Habitat:** Gunnison sage-grouse requires a variety of habitats such as large expanses of sagebrush with a diversity of grasses and forbs and healthy riparian ecosystems. It requires sagebrush for cover and fall and winter food.

**Listing Priority:** The Gunnison sage-grouse was put on the candidate list in January 2000 shortly before the Service received a petition for listing. It has a candidate listing priority of 2, the highest rank possible for the species.

**Litigation:** In March of 2004 several environmental organizations filed a complaint suing for

emergency listing of the species.  That case is still pending.

**Conservation Activities:**  There were six local conservation plans finalized between 1998 and 2000.  The Cerro Summit-Cimarron-Sims Mesa population is the one population that does not have a local conservation plan.  The Rangewide Conservation Plan for the Gunnison sage-grouse was completed in June 2005.  State and Federal agencies have been involved in implementation of conservation measures primarily under the local conservation plans.  There have been a number of habitat treatments and other land management actions implemented on Federal and non-Federal lands and several conservation easements and land purchases to benefit Gunnison sage-grouse.  These conservation measures have primarily been funded through Federal and State funding mechanisms.

An umbrella Candidate Conservation Agreement with Assurances is being entered into with the Colorado Division of Wildlife.

**Communication Goals:**

Ensure all parties interested in or affected by this action are informed of the Service's proposal to list the Gunnison sage-grouse as endangered.

Provide information regarding the Colorado CCAA.

The Service has been in communication with federal and state partners and local communities since the mid-1990s when local conservation plans were first being developed.  Field and regional staff recently met with the Gunnison County Commissioners to discuss their concerns regarding the potential listing as well the CCAA and other conservation efforts.  Members of Congress have been appropriately updated concerning the status of the Gunnison sage-grouse.  The region will continue these discussions during the proposal process.

**Messages/Talking Points:**

The Service believes sufficient information exists regarding the long-term decline in populations and persistence of threats that listing may be warranted.

Although there was improvement in the population status in 2005, the long-term trends are still declining and threats to the species are continuing.

The Service appreciates the states and local communities taking the lead in the development of local conservation plans and a rangewide conservation plan for the benefit of the Gunnison sage-grouse.

The conservation efforts that are underway for the Gunnison sage-grouse will allow for multiple uses of the land while still promoting recovery of this candidate species.

There has been a steady long-term decline in Gunnison sage-grouse since the 1970s which is attributed to a variety of sources.

Reduction of sagebrush habitat by direct habitat loss, conversion, or fragmentation is one of the significant factors identified as contributing to the Gunnison's decline.

The Gunnison sage-grouse uses a variety of habitats throughout the year but the primary component necessary is sagebrush and the most important species of sagebrush for this grouse is known as big sagebrush. It is used for hiding and thermal cover as well as a major source of food in the winter.

The size and range of Gunnison sage-grouse habitat have been reduced by direct habitat loss, fragmentation, and degradation from building development; road and utility corridors; fences; energy development; conversion of native habitat to hay or other crop fields; alteration or destruction of wetland and riparian areas; drought; inappropriate livestock management; creation of large reservoirs; continuous noise that impairs acoustical quality at leks; herbicides and pesticides; and disturbance by off-road vehicles; encroachment by pinyon-juniper into sagebrush country; and fire suppression, which results in decadent stands of sagebrush.

**Interested Parties:**
local landowners,
livestock organizations
local county governments
Utah Division of Wildlife Resource
Colorado Division of Wildlife
Bureau of Land Management,
U.S. Forest Service,
Natural Resource Conservation Service,
National Park Service.

Congressional representatives
Ute Mountain Ute Indian Tribe
Environmental Organizations
Plaintiffs

**Potential Controversy:**
Private landowners, livestock and agricultural producers, and developers are concerned about land use restrictions should the Gunnison sage-grouse become a listed species.

**Key date:** [publication date]

**Materials Needed:** News release, Q&As, outreach plan, range map, interested party letter

**Strategy:** A press release and Q&As will be distributed to local media and congressional representatives. Outreach materials will be posted to the Region 6 web site. In addition, telephone calls and letters will notify interested parties. Two public meetings in Colorado have been scheduled.



**Diane Katzenberger/R6/FWS/DOI**

07/21/2005 09:38 AM

To   Al Pfister/R6/FWS/DOI@FWS, Terry Ireland/R6/FWS/DOI@FWS, Pat Mehlhop/R6/FWS/DOI@FWS

cc

bcc

Subject   revised draft news release - gunnison s-g

Reworked some paragraphs ...



draft news release proposed listing.doc

---

Diane Katzenberger
U.S. Fish and Wildlife Service
Office of External Affairs
(303) 236-4578
Email: Diane_Katzenberger@fws.gov

# DRAFT NEWS RELEASE

## U.S. FISH AND WILDLIFE SERVICE
**Mountain-Prairie Region**
**134 Union Boulevard**
**Lakewood, Colorado 80228**

**Draft – Not for Release**                    Contacts:  Al Pfister 970-243-2778
                                              Diane Katzenberger 303-236-4578

### U.S. Fish and Wildlife Service Proposes Protection for the Gunnison Sage-Grouse

The U.S. Fish and Wildlife Service proposed today to list the Gunnison sage-grouse as endangered under the Endangered Species Act.  Historically, the Gunnison sage-grouse was found in the southwestern portion of Colorado, southeastern Utah, northeastern Arizona, and northwestern New Mexico.  Currently it is found in seven localized populations in southwestern Colorado and southeastern Utah representing 8 percent of its historical range.

An endangered designation means the species is in danger of extinction within all or a significant portion of its range.  A threatened designation means a species is likely to become endangered within the foreseeable future.

To ensure that the final determination regarding this proposal is as accurate and effective as possible, the Service is requesting comments or suggestions on this proposed listing from the public, government agencies, the scientific community, private landowners, industry and all other interested parties.

The Service is particularly seeking comments concerning threats to the Gunnison sage-grouse; the location of any additional populations; information concerning the range, distribution, and population size of Gunnison sage-grouse; and current or planned activities, particularly on private lands, that may affect the species.

Reduction of sagebrush habitat by direct habitat loss, conversion, or fragmentation is one of the significant factors identified as contributing to the Gunnison's decline. The Gunnison sage-grouse uses a variety of habitats throughout the year but the primary component necessary is sagebrush and the most important species of sagebrush for this grouse is known as big sagebrush. It is used for hiding and thermal cover as well as a major source of food in the winter.

There has been a steady long-term decline in Gunnison sage-grouse since the 1970s which is attributed to a variety of sources. In addition to loss of habitat, encroachment by pinyon-juniper into sagebrush country; fire suppression, which results in decadent stands of sagebrush; drought; disturbance by off-road vehicles; continuous noise that impairs acoustical quality at leks (courting areas); herbicides and pesticides; pollution; and competition for habitat from other species have caused declines in the Gunnison sage-grouse population.

Local landowners, environmental groups, livestock organizations, counties, Utah Division of Wildlife Resource, Colorado Division of Wildlife, Bureau of Land Management, U.S. Forest Service, Natural Resource Conservation Service, National Park Service and the U.S. Fish and Wildlife Service have been working together under seven locally developed plans to provide for the conservation of the Gunnison sage-grouse in Utah and Colorado.

"We are grateful to our partners for leading the way in the development of local conservation plans and a rangewide conservation plan for the benefit of the Gunnison sage-grouse," said Ralph Morgenweck, the Service's Director of the Mountain-Prairie Region. "The conservation efforts that are underway for the Gunnison sage-grouse will allow for multiple uses of the land while still promoting recovery of this native species," Morgenweck added.

On January 18, 2000 the Service determined that the Gunnison sage-grouse warranted listing as a threatened or endangered species, but listing was precluded by the need to work on other listing actions of higher priority. In March of 2004 several environmental organizations filed a complaint suing for emergency listing of the species. That case is still pending.

The Gunnison sage-grouse is designated as a sensitive species in both Colorado and Utah.

The Gunnison sage-grouse *(Centrocerus minimus)* are about one-third smaller than the greater sage-grouse, and males have more distinct, white tail feathers and filoplume. Female Gunnison and greater sage-grouse have nearly the same plumage, but the female Gunnison is again about one-third smaller than the greater sage-grouse. Male Gunnison sage-grouse conduct an elaborate display when trying to attract females to breeding grounds, or leks in the spring. They will strut, flap their wings against their white pouches and utter a distinct series of sounds by vocalizing and popping two air sacs within their pouches. Nesting begins in mid-April and continues into July.

Public hearings regarding this proposal have been scheduled for September 21, 2005 at the Norwood Community Center in Norwood, Colorado and for September 22, 2005 at the Gunnison County Fairgrounds Community Center in Gunnison, Colorado. Both meetings will begin at 5:00 pm

Written comments will be accepted until _____ and should be sent to the U.S. Fish and Wildlife Service, Western Colorado Ecological Services Office, 764 Horizon Drive, Building B, Grand Junction, Colorado 81506-3946. Comments may also be sent by electronic mail to fw6_gusg@fws.gov.

A copy of the proposed listing and other information about the Gunnison sage-grouse is available on the Internet at http://mountain-prairie.fws.gov/species/birds/gunnisonsagegrouse.

The U.S. Fish and Wildlife Service is the principal Federal agency responsible for conserving, protecting and enhancing fish, wildlife and plants and their habitats for the continuing benefit of the American people. The Service manages the 95-million-acre National Wildlife Refuge System, which encompasses 545 national wildlife refuges, thousands of small wetlands and other special management areas. It also operates 69 national fish hatcheries, 64 fishery resources offices and 81 ecological services field stations. The agency enforces federal wildlife laws, administers the Endangered Species Act, manages migratory bird populations, restores nationally significant

fisheries, conserves and restores wildlife habitat such as wetlands, and helps foreign and Native American tribal governments with their conservation efforts. It also oversees the Federal Assistance program, which distributes hundreds of millions of dollars in excise taxes on fishing and hunting equipment to state fish and wildlife agencies.

- FWS -



**Diane
Katzenberger/R6/FWS/DOI**

07/26/2005 04:25 PM

To  Al Pfister/R6/FWS/DOI@FWS, Terry Ireland/R6/FWS/DOI@FWS, Pat Mehlhop/R6/FWS/DOI@FWS

cc

bcc

Subject  Draft Q&As - Gunnison Sage-Grouse

Attached are the draft Q&As for your review.  I need some help on the second to the last question re grazing on BLM lands.

Also -

The rule states G s-g have been reduced to 10 percent of historic habitat.  The summary document states 8 percent.  Which is correct?

Why does the summary quote 2005 estimates while the rule quotes 2004 estimates?

Thanks,
Diane



Questions and Answers.doc

---

Diane Katzenberger
U.S. Fish and Wildlife Service
Office of External Affairs
(303) 236-4578
Email: Diane_Katzenberger@fws.gov

*Questions and Answers*
*Regarding the*
*Proposal to List the Gunnison Sage-Grouse as an Endangered Species*

**What action is the Service taking?**

The Service is proposing to list the Gunnison sage-grouse as endangered under the Endangered Species Act.

A plant or animal is considered endangered if it is in danger of extinction throughout all or a significant portion of its range.

**What is the range of the Gunnison sage-grouse?**

Historically, Gunnison sage-grouse were found in the southwestern portion of Colorado, southeastern Utah, northeastern Arizona, and northwestern New Mexico. They are currently found in seven localized populations in southwestern Colorado and southeastern Utah.

The range of the Gunnison sage-grouse has been reduced to approximately 8 percent of its historic distribution with only 1,850 square miles remaining occupied.

The separate populations are: the Cerro Summit/Cimarron/Sims Mesa population south and southeast of Montrose; the Crawford Area population south of Crawford and Hotchkiss; the Dove Creek population north and west of Dove Cree; the Gunnison Basin population around the town of Gunnison; the Pinon Mesa population south of Grand Junction; the Poncha Pass population north of Villa Grove; and the San Miguel Basin population near Norwood. The San Juan County, Utah population occurs east of Monticello. Most populations are small with the Gunnison Basin, Colorado population being the only relatively large Gunnison sage-grouse population.

**Why does the Service believe the Gunnison sage-grouse is endangered?**

There has been a steady long-term decline in Gunnison sage-grouse since the 1970s. The Service believes sufficient information exists regarding this decline and persistence of threats that listing may be warranted.

Although there was improvement in the population status in 2005, the long-term trends are still declining and threats to the species are continuing.

**What are the threats to the survival of the Gunnison sage-grouse?**

The size and range of Gunnison sage-grouse habitat have been reduced by direct habitat loss, fragmentation, and degradation from building development; road and utility corridors; fences; energy development; conversion of native habitat to hay or other crop fields; alteration or destruction of wetland and riparian areas; drought; inappropriate livestock management; creation of large reservoirs; continuous noise that impairs acoustical quality at leks; herbicides and

pesticides; and disturbance by off-road vehicles; encroachment by pinyon-juniper into sagebrush country; and fire suppression, which results in decadent stands of sagebrush.

**What is the procedure for listing the Gunnison sage-grouse as an endangered species under the Endangered Species Act?**

Publication of the proposed rule in the *Federal Register* on _____ opened a 30-day comment period to solicit comments and biological information from the public, state and federal agencies, and the conservation and scientific community regarding the distribution, population status, and threats related to the Gunnison sage-grouse. During the comment period, the FWS will hold two public hearings in Colorado to gather written and oral comments. The FWS will also accept written comments during this time. Following closure of the comment period, the FWS will review collected material and determine how to proceed. The FWS has up to a year to make that determination. Information received in public comments will be analyzed and considered in our final rulemaking process. The public comment period will close on_____.

**What factors are considered when making a final listing determination?**

The Service must determine if presence of one or more of the five factors listed below have caused a species' status to decline to where it meets the definition of endangered or threatened.

A.    The present or threatened destruction, modification, or curtailment of its habitat or range.
B.    Overutilization for commercial, recreational, scientific, or educational purposes.
C.    Disease or predation.
D.    Inadequacy of existing regulatory mechanisms.
E.    Other natural or manmade factors affecting its continued existence.

Definition of endangered/threatened:
Endangered: Any species which is in danger of extinction throughout all or a significant portion of its range.
Threatened: Any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.

**What do Gunnison sage-grouse look like?**

The Gunnison sage-grouse *(Centrocerus minimus)* are about one-third smaller than the greater sage-grouse, and males have more distinct, white tail feathers and filoplume. Female Gunnison and greater sage-grouse have nearly the same plumage, but the female Gunnison is again about one-third smaller than the greater sage-grouse. Male Gunnison sage-grouse conduct an elaborate display when trying to attract females to breeding grounds, or leks in the spring. They will strut, flap their wings against their white pouches and utter a distinct series of sounds by vocalizing and popping two air sacs within their pouches. Nesting begins in mid-April and continues into July.

**Would a Gunnison sage-grouse listing shut down grazing and other activities on Federal lands?**

In the vast majority of cases, modifications to reviewed projects are possible that reduce or eliminate impacts to listed species, allowing project activities to continue or go forward.

Anything going on with BLM?

**What currently is being done to conserve Gunnison sage-grouse populations?**

Local landowners, environmental groups, livestock organizations, counties, Utah Division of Wildlife Resource, Colorado Division of Wildlife, Bureau of Land Management, U.S. Forest Service, Natural Resource Conservation Service, National Park Service and the U.S. Fish and Wildlife Service have been working together under seven locally developed plans to provide for the conservation of the Gunnison sage-grouse in Utah and Colorado.

In addition, the Colorado Division of Wildlife and the Fish and Wildlife Service are preparing a conservation agreement known as a Candidate Conservation Agreement with Assurances (CCAA) to implement conservation measures for the Gunnison sage-grouse in 15 counties in southwestern Colorado.  The conservation measures would be implemented by the Colorado Division of Wildlife and by participating landowners.  The selected conservation measures would primarily come from the Gunnison Sage-Grouse Rangewide Conservation Plan which was completed in April 2005 by numerous cooperating agencies and nongovernmental organizations.

Under a Candidate Conservation Agreement with Assurances, participating landowners voluntarily implement conservation activities on their properties to benefit species that are proposed for listing under the ESA, candidate species, or other sensitive species.  CCAAs encourage private and other non-Federal property owners to implement conservation efforts and reduce threats to unlisted species by assuring them they will not be subjected to increased property use restrictions if the species should become listed under the ESA.

For more information about the CCAA contact _____.

**SUMMARY**
**12-Month Finding for the Gunnison Sage-grouse (*Centrocercus minimus*)**

**ACTION:** A 12-month finding that determines that the Gunnison sage-grouse (*Centrocercus minimus*) does not warrant listing as a threatened or endangered species and removes it from the candidate list. This finding was made by the Regional Director, Region 6, and is subject to concurrence by the Director.

On January 26, 2000, The American Lands Alliance, Biodiversity Legal Foundation, and others petitioned the Service to list the species. In 2003, the U.S. District Court ruled that the species was designated as a candidate by the Service prior to receipt of the petition. Currently, the Service is under court order to do a listing determination by March 31, 2006. This finding is based in part on a November 2005 report that determined that the rangewide population has been stable over both the past 50 years and the past 10 years. In addition, the Service concluded that perceived threats to the species, principally from habitat loss and modification, were not substantial.

**DESCRIPTION:** Young et al. (2000) identified Gunnison sage-grouse as a distinct species based on morphology, genetics, behavioral and geographical isolation. Gunnison sage-grouse are most easily identified by their dark brown color, distinctive black bellies, long, pointed tails and association with sagebrush habitats. They are dimorphic in size, with females being smaller. Both sexes have yellow-green eye combs, which are less prominent in females. Sage-grouse are known for their elaborate mating ritual where males congregate on strutting grounds called leks and "dance" to attract a mate. During the breeding season males have conspicuous filoplumes (specialized erectile feathers on the neck), and exhibit yellow-green apteria (fleshy bare patches of skin) on their breasts.

Most nests are located less than 4 miles from the lek (Apa 2004). Nesting success is highest in areas where forb and grass cover are found below a sagebrush canopy cover of 15-30 percent (Young et al. 2000). Eggs hatch in June; chicks are precocial and move with the female to areas containing succulent forbs and insects, often in wet meadow habitat. From late autumn through early spring the diet of Gunnison sage-grouse is almost exclusively sagebrush (Young et al. 2000).

**LOCATION:** Historically, Gunnison sage-grouse are considered to have occupied southwestern Colorado and southeastern Utah, south to northeastern Arizona and northwestern New Mexico (Schroeder et al. 2004). Currently, they occur in seven disjunct populations, six in Colorado and one in Colorado and Utah. The only large population (approximately 3,000 birds) is in the Gunnison Basin in Colorado.

**STATUS:** A recent population trend analysis concluded that there have been no declines in the past 50 years and none in the past decade (Garton 2005). That document is under peer review. Based on that analysis, we have concluded that perceived threats to the species, particularly those that could cause habitat loss or modification, are not of sufficient magnitude to warrant listing.

**STATE POSITION:** In an effort to ensure the grouse's continued conservation, the Colorado Division of Wildlife has taken the lead and worked with the Utah Division of Wildlife Resources and other stakeholders in developing a Rangewide Conservation Plan that was signed in 2005 and will conserve the species in a proactive manner. The CDOW also has submitted to the Service a draft Candidate Conservation Agreement with Assurances (CCAA); which should be signed in the near future. Under the CCAA, CDOW plans to enroll landowners to voluntarily maintain or restore habitat for the species on their private lands.

**FEDERAL INVOLVEMENT:** The Service, Bureau of Land Management, U.S. Forest Service, and National Park Service have all signed the Rangewide Conservation Plan, which lays out rangewide and local strategies and actions to conserve the species.

**PRE-PROPOSAL ACTIVITIES:** Led by the CDOW, the Service and other stakeholders in Colorado and Utah signed a Rangewide Conservation Plan in 2005. The CDOW and the Service anticipate signing a CCAA for the species throughout Colorado.

**EXPRESSION OF INTEREST OR CONCERN:** There have been numerous newspaper articles. Stakeholders, in particular those associated with the Gunnison Basin population, have met with the Regional Director to discuss potential impacts to the grazing industry.

**POTENTIALLY CONTROVERSIAL ISSUES:** Plaintiffs may not agree that the threats are not of sufficient magnitude to warrant listing.

**MEDIA INTERESTS:** We expect significant media interest, especially in Colorado.

**LISTING DETERMINATION DUE DATE:** April 7, 2006.

Prepared by:   Pat Mehlhop
Telephone:     (303) 236-4215
Date:          February 9, 2006
WO Contact:    Kurt Johnson
Telephone:     (703) 358-1917

**Terry Ireland/R6/FWS/DOI**
02/16/2006 01:14 PM

To   Sharon R Rose/R6/FWS/DOI

cc   Pat Mehlhop/R6/FWS/DOI, Al Pfister/R6/FWS/DOI@FWS, Susan Linner/R6/FWS/DOI

bcc

Subject   Outreach Plan

Sharon,

I cut this down quite a bit.  Seemed like there was a lot we didn't need to mention.  At some point we'll work on a letter to interested parties.  I need to get back to the CCAA now.



12 Month Outreach Plan 2-16-06 TI Edits.doc

**Outreach Plan for the Gunnison Sage-Grouse**
**Not warranted for listing and Removal from**
**The Candidate List**
**2/15/06**

**ISSUE:**

In a 12-month finding on the status of the Gunnison sage-grouse, the U.S. Fish and Wildlife Service today determined that the sage-grouse is not warranted for listing as a threatened or endangered species under the Endangered Species Act of 1973, as amended (ESA), and it will be removed from the candidate species list.

**BASIC FACTS:**

On January 18, 2000, the Director of the Service designated the Gunnison sage-grouse as a candidate species under the Act. The Federal Register notice regarding this decision was published December 28, 2000 (65 FR 82310, December 28, 2000).

The Service collected information on the Gunnison sage-grouse, its habitats, threats, and environmental factors affecting the species, from a wide array of sources to determine whether listing under the ESA was warranted or not. We received a substantial amount of unpublished information from other Federal agencies, States, counties, non-profit organizations, and individuals. We also solicited information on all Federal, State, or local conservation efforts currently in operation or planned for the Gunnison sage-grouse or its habitats.

**Conservation Activities:** **[Is this under BASIC FACTS? If not, all letters should be capitalized to be consistent with other headings.]**

There were six local conservation plans finalized between 1997 and 2000. The Cerro Summit-Cimarron-Sims Mesa population is the one population that does not have a local conservation plan. A Rangewide Conservation Plan for the Gunnison sage-grouse was completed in June 2005. State and Federal agencies have been involved in implementation of conservation measures primarily under the local conservation plans. There have been a number of habitat treatments and other land management actions implemented on Federal and non-Federal lands and several conservation easements and land purchases to benefit Gunnison sage-grouse. These conservation measures have primarily been funded through Federal and State funding mechanisms.

In April 2005, Colorado Division of Wildlife (CDOW) applied to the Service for an Enhancement of Survival Permit for the Gunnison sage-grouse pursuant to section 10(a)(1)(A) of the Act. The permit application included a proposed Candidate Conservation Agreement with Assurances (CCAA) between CDOW and the Service. The Permit, CCAA and associated documents are currently being finalized. Landowners with eligible property in southwestern Colorado who wish to participate can voluntarily sign up under the CCAA through a Certificate of Inclusion.

**BACKGROUND:**

Deleted: pecies

Deleted: should

Deleted:

Deleted: and that it is not warranted for listing as a threatened or endangered species under the Endangered Species Act of 1973

Deleted: systematically

Deleted: ¶
¶
The scientific literature on Gunnison sage-grouse and its sagebrush habitats is moderate so, where information was lacking and as appropriate, greater sage-grouse information was used to analyze habitat usage, threats, and environmental factors affecting the Gunnison sage-grouse. In addition w

Comment [ES1]: We heard from ranching interests as well as environmental

Deleted: environmental

Deleted:
On January 18, 2000, the Director of the Service designated the Gunnison sage-grouse as a candidate species under the Act, with a listing priority of 5. However, the Federal Register notice regarding this decision was not published until December 28, 2000 (65 FR 82310, December 28, 2000).

Deleted: (A listing priority of 5 indicates that there is a high magnitude of threats, but they are considered non-imminent.)¶
¶
On January 26, 2000, The American Lands Alliance, Biodiversity Legal Foundation, and others petitioned the Service to list the species. In 2003, the U.S. District Court ruled that the species was designated as a candidate by the Service prior to receipt of the petition because the candidate form was signed on January 18, 2000, and that the determination that a species should be on the candidate list is equivalent to a 12-month finding.¶

Deleted: 8

Deleted: The

Deleted: The standard that a CCAA must meet is that the benefits of the conservation measures implemented under a CCAA, when combined with those benefits that would be achieved if it is assumed that conservation measures were also to be implemented on ot … [1]

Deleted: . These participants provide certain Gunnison sage-grouse habitat protection or enhancement measures on their lands. If the Gunnison sage- … [2]

**Biology:** For many years sage-grouse were considered a single species. In 2000, the Gunnison sage-grouse (Centrocercus minimus) was identified as a distinct species based on morphological, genetic and behavioral differences and geographical isolation(AOU 2000; Young et al. 2000). Gunnison sage-grouse are smaller than greater sage-grouse, weighing approximately 1/3 less. Their filoplumes (specialized feathers on the neck) are longer and give the appearance of a "ponytail" during the courtship display, unlike the shorter and sparser filoplumes on greater sage-grouse. Gunnison sage-grouse tail feathers have distinctive barring, unlike the mottled pattern on greater sage-grouse. Mating calls also are distinct. The current ranges of the two species are not overlapping.

**Range:** Historically, Gunnison sage-grouse were found in the southwestern portion of Colorado, southeastern Utah, northeastern Arizona, and northwestern New Mexico.

The Gunnison sage-grouse currently exists in seven isolated populations, six in Colorado and one in both Colorado and Utah. These include the Gunnison Basin, San Miguel Basin, Monticello-Dove Creek, Pinon Mesa, Crawford, Cerro Summit-Cimarron-Sims Mesa, and Poncha Pass. The current range of the species is approximately 8.5 percent of its historic range. The Gunnison Basin population is the largest and represents the best opportunity for long-term conservation of the species.

**Habitat:** Gunnison sage-grouse requires a variety of habitats within the sage-steppe ecosystem such as large expanses of sagebrush with a diversity of grasses and forbs and healthy riparian ecosystems. It requires sagebrush for cover and food, especially in winter.

**COMMUNICATION GOALS:**
The 12-month finding was arrived at using the best available scientific information available. The listing determination was based on a recent population trend analysis and no evidence of substantial threats at the time of the determination.

Provide information regarding voluntary conservation efforts for landowners who own land where Gunnison sage-grouse live.

**Messages/Talking Points:**

The Service will continue to informally monitor the status of the sage-grouse, will, to the best of our ability, continue to participate in local and RCP meetings, and will work with CDOW and landowners on implementation of conservation measures under, and outside of, the CCAA process.

The Service appreciates the States and local communities taking the lead in the development of local conservation plans and the Rangewide Conservation Plan for the benefit of the Gunnison sage-grouse.

Voluntary conservation efforts underway for the Gunnison sage-grouse allow for multiple uses of the land while still promoting conservation of the species.

Deleted: T

Deleted: specialized neck feathers

Deleted: Based on these morphologic, behavioral, and genetic differences the American Ornithologist's Union (2000) accepted the Gunnison sage-grouse as a distinct species.

Deleted: They are currently found in seven localized populations in southwestern Colorado and southeastern Utah.

Deleted: The range of the Gunnison sage-grouse is approximately 1,820 square miles or 8.5 percent of its historic distribution. ¶

Deleted: fall and winter

Deleted: ¶

Deleted: The Gunnison sage-grouse uses a variety of habitats throughout the year but the primary component necessary is sagebrush

Deleted: and the most important species of sagebrush for this grouse is known as big sagebrush

Deleted: . It is used for hiding and thermal cover as well as a major source of food

Deleted: in the winter

Deleted: . ¶

Deleted: o let media, congressionals and others know t

Deleted: , including

Deleted: the apparent lack of

Comment [ES2]: This is a repetition of what's above.

Deleted: The 12-month finding was arrived at using the best available scientific information available, including a recent population trend analysis and the apparent lack of substantial threats.¶

Deleted: s

Deleted: a

Deleted: r

Deleted: c

Deleted: p

Deleted: also

**Interested Parties:**

Landowners,                                                          Deleted: local

livestock organizations
county governments                                                  Deleted: local
Utah Division of Wildlife Resource
Colorado Division of Wildlife
Bureau of Land Management,
U.S. Forest Service,
Natural Resource Conservation Service,
National Park Service.

Congressional representatives (Districts?)
Ute Mountain Ute Indian Tribe
Environmental Organizations
Plaintiffs

**Key date:**  [publication date]

**Materials Needed:**  News release, Q&As, outreach plan

**Strategy:** A press release and Q&As will be distributed to local media and congressional
representatives.  Outreach materials will be posted to the Region 6 web site.  In addition,
letters will notify interested parties (ES?).

Comment [ES3]: Should I give our
Field Office a heads up to do this?

| Page 1: [1] Deleted | IrelandT | 2/16/2006 12:10:00 PM |
|---|---|---|

The standard that a CCAA must meet is that the benefits of the conservation measures implemented under a CCAA, when combined with those benefits that would be achieved if it is assumed that conservation measures were also to be implemented on other necessary properties, would preclude or remove any need to list the species."

| Page 1: [2] Deleted | IrelandT | 2/16/2006 12:10:00 PM |
|---|---|---|

. These participants provide certain Gunnison sage-grouse habitat protection or enhancement measures on their lands. If the Gunnison sage-grouse is listed under the Act, the permit authorizes incidental take of Gunnison sage-grouse due to otherwise lawful activities in accordance with the terms of the CCAA (e.g., crop cultivation, crop harvesting, livestock grazing, farm equipment operation, commercial/residential development, etc.), as long as the participating landowner is performing activities identified in the

**Pat Mehlhop/R6/FWS/DOI**

03/28/2006 04:10 PM

To  Al Pfister/R6/FWS/DOI@FWS, Susan Linner/R6/FWS/DOI@FWS, Terry Ireland/R6/FWS/DOI@FWS, Henry

cc

bcc

Subject  Fw: Gunnison sage grouse outreach as of 3/28/06

Patricia Mehlhop, Candidate Conservation Coordinator
303-236-4215
----- Forwarded by Pat Mehlhop/R6/FWS/DOI on 03/28/2006 04:09 PM -----



**Sharon R Rose/R6/FWS/DOI**

03/28/2006 03:46 PM

To  Michael Gale/ARL/R9/FWS/DOI@FWS

cc  Pat Mehlhop/R6/FWS/DOI@FWS, Matt Kales/R6/FWS/DOI@FWS

Subject  Gunnison sage grouse outreach as of 3/28/06

  12moOutreach Planfinalterry021706.doc

  questions&answersterryfinal021706.doc

  12monewsrelterryfinal021706.doc

  Summary03282003revsrr.doc

Sharon Rose
External Affairs
P.O. Box 25486
Denver, CO  80225
303-236-4580
sharon_r_rose@fws.gov

**Outreach Plan for the Gunnison Sage-Grouse**
**Not warranted for listing and Removal from**
**The Candidate List**
**2/17/06**

**ISSUE:**

In a 12-month finding on the status of the Gunnison sage-grouse, the U.S. Fish and Wildlife Service today determined that the sage-grouse is not warranted for listing as a threatened or endangered species under the Endangered Species Act of 1973, as amended (ESA), and it will be removed from the candidate species list.

**BASIC FACTS:**

On January 18, 2000, the Director of the Service designated the Gunnison sage-grouse as a candidate species under the Act. The Federal Register notice regarding this decision was published December 28, 2000 (65 FR 82310, December 28, 2000).

The Service collected information on the Gunnison sage-grouse, its habitats, threats, and environmental factors affecting the species from a wide array of sources to determine whether listing under the ESA was warranted or not. We received a substantial amount of unpublished information from other Federal agencies, States, counties, non-profit organizations and individuals. We also solicited information on all Federal, State, or local conservation efforts currently in operation or planned for the Gunnison sage-grouse or its habitats.

**Conservation Activities:** There were six local conservation plans finalized between 1997 and 2000. The Cerro Summit-Cimarron-Sims Mesa population is the one population that does not have a local conservation plan. A Rangewide Conservation Plan for the Gunnison sage-grouse was completed in June 2005. State and Federal agencies have been involved in implementation of conservation measures primarily under the local conservation plans. There have been a number of habitat treatments and other land management actions implemented on Federal and non-Federal lands and several conservation easements and land purchases to benefit Gunnison sage-grouse. These conservation measures have primarily been funded through Federal and State funding mechanisms.

In April 2005, Colorado Division of Wildlife (CDOW) applied to the Service for an Enhancement of Survival Permit for the Gunnison sage-grouse pursuant to section 10(a)(1)(A) of the Act. The permit application included a proposed Candidate Conservation Agreement with Assurances (CCAA) between CDOW and the Service. The Permit, CCAA and associated documents are currently being finalized. Landowners with eligible property in southwestern Colorado who wish to participate can voluntarily sign up under the CCAA through a Certificate of Inclusion.

**BACKGROUND:**

**Biology:** For many years sage-grouse were considered a single species. In 2000, the Gunnison sage-grouse (Centrocercus minimus) was identified as a distinct species based

on morphological, genetic and behavioral differences and geographical isolation. Gunnison sage-grouse are smaller than greater sage-grouse, weighing approximately 1/3 less. Their filoplumes (specialized feathers on the neck) are longer and give the appearance of a "ponytail" during the courtship display, unlike the shorter and sparser filoplumes on greater sage-grouse. Gunnison sage-grouse tail feathers have distinctive barring, unlike the mottled pattern on greater sage-grouse. Mating calls also are distinct. The current ranges of the two species are not overlapping.

**Range:** Historically, Gunnison sage-grouse were found in the southwestern portion of Colorado, southeastern Utah, northeastern Arizona, and northwestern New Mexico.

The Gunnison sage-grouse currently exists in seven widely scattered and isolated populations, six in Colorado and one in both Colorado and Utah. These include the Gunnison Basin, San Miguel Basin, Monticello-Dove Creek, Piñon Mesa, Crawford, Cerro Summit-Cimarron-Sims Mesa, and Poncha Pass. The Gunnison Basin population is the largest and represents the best opportunity for long-term conservation of the species.

**Habitat:** Gunnison sage-grouse requires a variety of habitats within the sage-steppe ecosystem such as large expanses of sagebrush with a diversity of grasses and forbs and healthy riparian ecosystems. It requires sagebrush for cover and food, especially in winter.

## COMMUNICATION GOALS:
The 12-month finding was arrived at using the best available scientific information available. The listing determination was based on a recent population trend analysis and no evidence of substantial threats at the time of the determination.

Provide information regarding voluntary conservation efforts for landowners who own land where Gunnison sage-grouse live.

**Messages/Talking Points:**

The Service will continue to informally monitor the status of the sage-grouse, will, to the best of our ability, continue to participate in local and RCP meetings, and will work with CDOW and landowners on implementation of conservation measures under, and outside of, the CCAA process.

The Service appreciates the States and local communities taking the lead in the development of local conservation plans and the Rangewide Conservation Plan for the benefit of the Gunnison sage-grouse.

Voluntary conservation efforts underway for the Gunnison sage-grouse allow for multiple uses of the land while still promoting conservation of the species.

## INTERESTED PARTIES:

landowners,
livestock organizations
county governments
Utah Division of Wildlife Resource
Colorado Division of Wildlife
Bureau of Land Management,
U.S. Forest Service,
Natural Resource Conservation Service,
National Park Service.

Congressional representatives (Districts?)
Ute Mountain Ute Indian Tribe
Environmental Organizations
Plaintiffs

**KEY DATE:**  [publication date]

**MATERIALS NEEDED:**  News release, Q&As, outreach plan

**STRATEGY:** A press release and Q&As will be distributed to local media and congressional representatives.  Outreach materials will be posted to the Region 6 web site.  In addition, letters will notify interested parties (ES field office).

QUESTIONS AND ANSWERS
GUNNISON SAGE-GROUSE FOUND NOT WARRANTED FOR
PROTECTION UNDER THE ENDANGERED SPECIES ACT
2/17/06


1.     **Q.  What information did the U.S. Fish and Wildlife Service use to make this determination?**

**A.** The Service systematically collected information on the Gunnison sage-grouse, its habitats, threats and environmental factors affecting the species from a wide array of sources.  The scientific literature on Gunnison sage-grouse and its sagebrush habitats is moderate so, where information was lacking and as appropriate, greater sage-grouse information was used to analyze habitat usage, threats, and environmental factors affecting the Gunnison sage-grouse.  In addition, the Service received a substantial amount of unpublished information from other Federal agencies, States, counties, non-governmental organizations and individuals.  We also solicited information on all Federal, State or local conservation efforts currently in operation or planned for the Gunnison sage-grouse or its habitats.

2.     **Q.  Did the CCAA, Rangewide Conservation Plan or local conservation plans help the Service avoid listing the Gunnison sage-grouse?**

**A.** No.  The CCAA and associated documents were not finalized when making the listing determination.  The Rangewide Conservation Plan and the local conservation plans were finalized prior to the Finding but actions taken under them, or actions planned to be taken under them, were not considered since there was no evidence at the time of the Finding that potential threats were influencing the species survival.

3.     **Q.  What does a Conservation Agreement with Assurances (CCAA) do for the species and the landowner?**

**A.** The standard that a CCAA must meet is that the benefits of the conservation measures implemented under a CCAA, when combined with those benefits that would be achieved if it is assumed that conservation measures were also to be implemented on other necessary properties, would preclude or remove any need to list the species.  Landowners provide certain Gunnison sage-grouse habitat protection or enhancement measures on their lands.  If the Gunnison sage-grouse is listed under the Act, the permit obtained under the CCAA authorizes incidental take of Gunnison sage-grouse due to otherwise lawful activities in accordance with the terms of the CCAA (crop cultivation, crop harvesting, livestock grazing, farm equipment operation, commercial/residential development, etc.), as long as the participating landowner is performing activities identified in the Certificate of Inclusion.  Conservation measures deemed

necessary on parcels of land will primarily be drawn from the Rangewide Conservation Plan or local conservation plans.

**4.    Q.  What are some of the differences between the greater sage-grouse and the Gunnison sage-grouse?**
   A.  Gunnison sage-grouse weigh 1/3 less than greater sage-grouse.  The specialized feathers on the neck (filoplumes) are longer and give the appearance of a "ponytail" during the courtship display, unlike the greater sage-grouse.  Mating calls are distinct between the two species.  The current ranges of the two species are not overlapping.  In summary, they're different genetically, morphologically and behaviorally.

**5.    Q.  What foods do Gunnison sage-grouse eat?**
   A.  Food of the Gunnison sage-grouse is composed of nearly 100 percent sagebrush in the winter.  Forbs and insects are important during the summer and early fall.  Unlike many other game birds, Gunnison and greater sage-grouse do not possess muscular gizzards and, therefore, lack the ability to grind and digest seeds.

**6.    Q.  Where did the Gunnison sage-grouse occur historically?**
   A.  Historically, the Gunnison sage-grouse occurred in southwestern Colorado, northwestern New Mexico, northeastern Arizona and southeastern Utah.  Accounts of Gunnison sage-grouse in Kansas and Oklahoma are now believed to be reports of mistaken locations or misidentification of lesser prairie chickens and not considered within the historic range.

**7.    Q.  Where do Gunnison sage-grouse presently occur?**
   A.  Gunnison sage-grouse currently occur in seven widely scattered and isolated populations in Colorado and Utah, occupying 1,820 square miles.  The seven populations are Gunnison Basin, San Miguel Basin, Monticello-Dove Creek, Piñon Mesa, Crawford, Cerro Summit-Cimarron-Sims Mesa, and Poncha Pass.

**8.    Q.  Where is the largest population of Gunnison sage-grouse and who manages the land?**
   A.  The Gunnison Basin, which is roughly centered on the town of Gunnison and covers roughly 593,000 acres, contains the largest population of Gunnison sage-grouse.  Approximately 51 percent of the occupied sage-grouse range in Gunnison Basin is managed by the Bureau of Land Management, 14 percent by the U.S. Forest Service, 2 percent by the National Park Service, 1 percent by Colorado Division of Wildlife, 1 percent by the Colorado State Land Board, and 31 percent is privately owned.

**GUNNISON SAGE-GROUSE FOUND NOT TO CURRENTLY BE IN NEED
OF PROTECTION BY THE ENDANGERED SPECIES ACT
Draft 2/17/06**

In a 12-month finding on the status of the Gunnison sage-grouse, the U.S. Fish and Wildlife Service today determined that the species is not warranted for listing as a threatened or endangered species under the Endangered Species Act of 1973 and will be removed from the candidate list.

Based on the best available scientific and commercial information, including a recent population trend analysis and no evidence of substantial threats at the time of the finding, the U.S. Fish and Wildlife Service determined that the status of the Gunnison sage-grouse was such that it did not need the protection of the ESA.

The Gunnison sage-grouse was added to the Service's candidate list in 2000. Candidate species are plants or animals that the Service has determined need to be listed as threatened or endangered but action is precluded by higher listing priorities for other species. In November 2005, a trend analysis funded by the Service determined that individual populations of Gunnison sage-grouse and all populations combined have been stable for the last 10 years. Based on this analysis, the Service concluded that the impacts to the grouse and its habitat do not rise to the level of threat originally believed. The analysis was peer reviewed.

The Gunnison sage-grouse currently exists in seven widely scattered and isolated populations, six in Colorado and one in both Colorado and Utah. These include the Gunnison Basin, San Miguel Basin, Monticello-Dove Creek, Pinon Mesa, Crawford, Cerro Summit-Cimarron-Sims Mesa and Poncha Pass populations. The Gunnison Basin population is the largest and represents the best opportunity for long-term conservation of the species.

Interest has been expressed in voluntary conservation efforts with 72 landowners who own 102,000 acres of land where Gunnison sage-grouse live. This would involve a candidate conservation agreement with assurances that includes conservation measures that benefit the grouse while still allowing the landowners to conduct their business. Local conservation plans have been approved by the Service for six of the seven populations. A rangewide Gunnison sage-grouse conservation plan was also completed and signed by Colorado Division of Wildlife, Utah Division of Wildlife Resources, the Service and other Federal agencies in June 2005.

Gunnison sage-grouse are smaller than greater sage-grouse, weighing approximately 1/3 less. The specialized feathers on the neck are longer and give the appearance of a "ponytail" during the courtship display, unlike those on the greater sage-grouse. Mating calls also are distinct. Differences in courtship vocalizations are likely a barrier to mating between Gunnison and greater sage-grouse. The current ranges of the two species are not overlapping. Based on these morphologic, behavioral and genetic

differences, the American Ornithologists' Union accepted the Gunnison sage-grouse as a distinct species.

Gunnison sage-grouse historically occurred in southwestern Colorado, northwestern New Mexico, northeastern Arizona, and southeastern Utah, including 21,370 square miles. Historic records had Gunnison sage-grouse occurring in Kansas and western Oklahoma.  However, it is now believed that those reports were based on mistaken locations or misidentification of lesser prairie chickens.  Presently the Gunnison sage-grouse occupies 1,820 square miles.

The U.S. Fish and Wildlife Service is the principal Federal agency responsible for conserving, protecting and enhancing fish, wildlife and plants and their habitats for the continuing benefit of the American people. The Service manages the 95-million-acre National Wildlife Refuge System, which encompasses 545 national wildlife refuges, thousands of small wetlands and other special management areas. It also operates 69 national fish hatcheries, 64 fishery resources offices and 81 ecological services field stations. The agency enforces federal wildlife laws, administers the Endangered Species Act, manages migratory bird populations, restores nationally significant fisheries, conserves and restores wildlife habitat such as wetlands, and helps foreign and Native American tribal governments with their conservation efforts. It also oversees the Federal Assistance program, which distributes hundreds of millions of dollars in excise taxes on fishing and hunting equipment to state fish and wildlife agencies.

- FWS -
For more information about the U.S. Fish and Wildlife Service,
visit our home page at http://www.fws.gov

**SUMMARY**
**12-Month Finding for the Gunnison Sage-grouse** (*Centrocercus minimus*)

**ACTION:** A 12-month finding that determines that the Gunnison sage-grouse (*Centrocercus minimus*) does not warrant listing as a threatened or endangered species and removes it from our candidate list. This finding was made by the Regional Director, Region 6, and is subject to concurrence by the Director.

On January 26, 2000, The American Lands Alliance, Biodiversity Legal Foundation, and others petitioned the Service to list the species. In 2003, the U.S. District Court ruled that the species was designated as a candidate by the Service prior to receipt of the petition. Currently, we are under court order to do a listing determination by March 31, 2006. This finding is based in part on a November 2005 report that determined that the rangewide population has been stable over both the past 50 years and the past 10 years. In addition, we concluded that perceived threats to the species, principally from habitat loss and modification were not substantial.

**DESCRIPTION:** Young et al. (2000) identified Gunnison sage-grouse as a distinct species based on morphology, genetics, behavioral and geographical isolation. Gunnison sage-grouse are most easily identified by their dark brown color, distinctive black bellies, long, pointed tails and association with sagebrush habitats. They are dimorphic in size, with females being smaller. Both sexes have yellow-green eye combs, which are less prominent in females. Sage-grouse are known for their elaborate mating ritual where males congregate on strutting grounds called leks and "dance" to attract a mate. During the breeding season males have conspicuous filoplumes (specialized erectile feathers on the neck), and exhibit yellow-green apteria (fleshy bare patches of skin) on their breasts.

Most nests are located less than 4 miles from the lek (Apa 2004). Nesting success is highest in areas where forb and grass cover are found below a sagebrush canopy cover of 15-30 percent (Young et al. 2000). Eggs hatch in June; chicks are precocial and move with the female to areas containing succulent forbs and insects, often in wet meadow habitat. From late autumn through early spring the diet of Gunnison sage-grouse is almost exclusively sagebrush (Young et al. 2000).

**LOCATION:** Historically, Gunnison sage-grouse are considered to have occupied southwestern Colorado and southeastern Utah, south to northeastern Arizona and northwestern New Mexico (Schroeder et al. 2004). Currently, they occur in seven disjunct populations, six in Colorado and one in Colorado and Utah. The only large population (approximately 3,000 birds) is in the Gunnison Basin in Colorado.

**STATUS:** A recent population trend analysis concluded that there have been no declines in the past 50 years and none in the past decade (Garton 2005). That document is under peer review. Based on that analysis, we have concluded that perceived threats to the species, particularly those that could cause habitat loss or modification, are not of sufficient magnitude to warrant listing.

**STATE POSITION:**  In an effort to ensure the grouse's continued conservation, the Colorado Division of Wildlife has taken the lead and worked with the Utah Division of Wildlife Resources and other stakeholders in developing a Rangewide Conservation Plan that was signed in 2005 and will conserve the species in a proactive manner.  The CDOW also has submitted to the Service a draft Candidate Conservation Agreement with Assurances (CCAA); which should be signed in the near future.  Under the CCAA, CDOW plans to enroll landowners to voluntarily maintain or restore habitat for the species on their private lands.

**FEDERAL INVOLVEMENT:**  The Service, Bureau of Land Management, U.S. Forest Service, and National Park Service have all signed the Rangewide Conservation Plan, which lays out rangewide and local strategies and actions to conserve the species.

**PRE-PROPOSAL ACTIVITIES:**  Led by the CDOW, the Service and other stakeholders in Colorado and Utah signed a Rangewide Conservation Plan in 2005.  The CDOW and the Service anticipate signing a CCAA for the species throughout Colorado.

**EXPRESSION OF INTEREST OR CONCERN:**  There have been numerous newspaper articles.  Stakeholders, in particular those associated with the Gunnison Basin population, have met with the Regional Director to discuss potential impacts to the grazing industry.

**POTENTIALLY CONTROVERSIAL ISSUES:**  Plaintiffs may not agree that the threats are not of sufficient magnitude to warrant listing.

**MEDIA INTERESTS:**  We expect significant media interest, especially in Colorado.

**LISTING DETERMINATION DUE DATE:**  March 31, 2006.

Prepared by:   Pat Mehlhop
Telephone:     (303) 236-4215
Date:          February 9, 2006
WO Contact:  Kurt Johnson
Telephone:     (703) 358-1917

# NEWS RELEASE

## U.S. FISH AND WILDLIFE SERVICE
### Mountain-Prairie Region
### 134 Union Boulevard
### Lakewood, Colorado 80228

**06-33**
**April 12, 2006**
**For Immediate Release**

**Contact:  Sharon Rose 303-236-4580**
**Pat Mehlhop 303-236-4215**

## GUNNISON SAGE-GROUSE WILL NOT BE LISTED AS ENDANGERED, REMOVED FROM CANDIDATE LIST

The U.S. Fish and Wildlife Service announced today that following a comprehensive review, it will not be adding the Gunnison sage-grouse to the Federal list of threatened or endangered species under the Endangered Species Act (ESA) and will also remove the species from the candidate list.

Based on information on the lack of population declines, the Service has determined that threats to the Gunnison sage-grouse are neither imminent nor of such magnitude that they threaten or endanger the existence of the species. Although various factors are believed to, or could potentially, be impacting the populations, these factors have not caused significant declines in the species throughout its range.

"Based on the best available scientific and commercial information, including a recent population trend study and finding no evidence of substantial threats, the Service has determined the Gunnison sage-grouse does not need the protection of the ESA," said Mitch King, director of the Service's Mountain-Prairie Region.

The Gunnison sage-grouse was added to the Service's candidate list in 2000. Candidate species are plants or animals the Service has determined need to be listed as threatened or endangered but the action is precluded by higher listing priorities for other species. In November 2005, a trend analysis funded by the Service found populations of Gunnison sage-grouse have been stable for the last 10 years. Based on peer-reviewed analysis, the Service concluded impacts to the grouse and its habitat are not at the level of threat originally believed. However, the Service and the Colorado Division of Wildlife, in cooperation with local landowners, will continue to informally monitor the status of populations.

The Gunnison sage-grouse currently exists in seven populations, six in Colorado and one in both Colorado and Utah. These include the Gunnison Basin, San Miguel Basin, Monticello-Dove Creek, Pinon Mesa, Crawford, Cerro Summit-Cimarron-Sims Mesa and Poncha Pass populations. The Gunnison Basin population is the largest and represents the best opportunity for long-term conservation of the species.

The Service and the Colorado Division of Wildlife will also continue to work cooperatively to further the conservation interests of the sage-grouse. Seventy-two landowners who own 102,000 acres of land where the Gunnison sage-grouse live have expressed interest in voluntary conservation efforts, such as candidate conservation agreements with assurances. These are voluntary arrangements under the ESA designed to prevent the need for listing through preventive conservation efforts. Agreements would outline conservation measures to benefit the grouse while still allowing the landowners to use their lands.

Local conservation plans have been approved by the Service for six of the seven populations. A range-wide Gunnison sage-grouse conservation plan was also completed and signed by Colorado Division of Wildlife, Utah Division of Wildlife Resources, the Service and other Federal agencies in June 2005.

Gunnison sage-grouse historically occurred in southwestern Colorado, northwestern New Mexico, northeastern Arizona, and southeastern Utah, an area of 21,370 square miles.

The U.S. Fish and Wildlife Service is the principal Federal agency responsible for conserving, protecting and enhancing fish, wildlife and plants and their habitats for the continuing benefit of the American people. The Service manages the 95-million-acre National Wildlife Refuge System, which encompasses 545 national wildlife refuges, thousands of small wetlands and other special management areas. It also operates 69 national fish hatcheries, 64 fishery resources offices and 81 ecological services field stations. The agency enforces federal wildlife laws, administers the Endangered Species Act, manages migratory bird populations, restores nationally significant fisheries, conserves and restores wildlife habitat such as wetlands, and helps foreign and Native American tribal governments with their conservation efforts. It also oversees the Federal Assistance program, which distributes hundreds of millions of dollars in excise taxes on fishing and hunting equipment to state fish and wildlife agencies.

- FWS -

For more information about the U.S. Fish and Wildlife Service,
visit our home page at http://www.fws.gov

**QUESTIONS AND ANSWERS**
**GUNNISON SAGE-GROUSE FOUND NOT WARRANTED FOR**
**PROTECTION UNDER THE ENDANGERED SPECIES ACT**

1.  **Q. What information did the U.S. Fish and Wildlife Service use to make this determination?**
    **A.** The Service systematically collected information on the Gunnison sage-grouse, its habitats, threats and environmental factors affecting the species from a wide array of sources. The scientific literature on Gunnison sage-grouse and its sagebrush habitats is moderate so, where information was lacking and as appropriate, greater sage-grouse information was used to

analyze habitat usage, threats, and environmental factors affecting the Gunnison sage-grouse. In addition, the Service received a substantial amount of unpublished information from other Federal agencies, States, counties, non-governmental organizations and individuals. We also solicited information on all Federal, State or local conservation efforts currently in operation or planned for the Gunnison sage-grouse or its habitats.

2.    **Q. Did the CCAA, Rangewide Conservation Plan or local conservation plans help the Service avoid listing the Gunnison sage-grouse?**
**A.** No. The Service's decision not to list the Gunnison sage-grouse was based on a recent population trend analysis and a lack of evidence on substantial threats at the time of the finding. Even though we did not directly apply the CCAA, Rangewide Conservation Plan and local conservation plans to our decision, these efforts represent important conservation actions that will help ensure the long-term conservation of Gunnison sage-grouse and we encourage their continued development and implementation..

3.    **Q. What does a Conservation Agreement with Assurances (CCAA) do for the species and the landowner?**
**A.** The standard that a CCAA must meet is that the benefits of the conservation measures implemented under a CCAA, when combined with those benefits that would be achieved if it is assumed that conservation measures were also to be implemented on other necessary properties, would preclude or remove any need to list the species. Landowners provide certain Gunnison sage-grouse habitat protection or enhancement measures on their lands. If the Gunnison sage-grouse is listed under the Endangered Species Act (ESA), the permit obtained under the CCAA authorizes incidental take of Gunnison sage-grouse due to otherwise lawful activities in accordance with the terms of the CCAA (crop cultivation, crop harvesting, livestock grazing, farm equipment operation, commercial/residential development, etc.), as long as the participating landowner is performing activities identified in the Certificate of Inclusion. Conservation measures deemed necessary on parcels of land will primarily be drawn from the Range-wide Conservation Plan or local conservation plans.

4.    **Q. What are some of the differences between the greater sage-grouse and the Gunnison sage-grouse?**
**A.** Gunnison sage-grouse weigh one-third less than greater sage-grouse. The specialized feathers on the neck (filoplumes) are longer and give the appearance of a "ponytail" during the courtship display, unlike the greater sage-grouse. Mating calls are distinct between the two species. The current ranges of the two species are not overlapping. In summary, they're different genetically, morphologically and behaviorally.

5.  **Q. What foods do Gunnison sage-grouse eat?**

    **A.** Food of the Gunnison sage-grouse is composed of nearly 100 percent sagebrush in the winter. Forbs and insects are important during the summer and early fall. Unlike many other game birds, Gunnison and greater sage-grouse do not possess muscular gizzards and, therefore, lack the ability to grind and digest seeds.

6.  **Q. Where did the Gunnison sage-grouse occur historically?**

    **A.** Historically, the Gunnison sage-grouse occurred in southwestern Colorado, northwestern New Mexico, northeastern Arizona and southeastern Utah. Accounts of Gunnison sage-grouse in Kansas and Oklahoma are now believed to be reports of mistaken locations or misidentification of lesser prairie chickens and not considered within the historic range.

7.  **Q. Where do Gunnison sage-grouse presently occur?**

    **A.** Gunnison sage-grouse currently occur in seven widely scattered and isolated populations in Colorado and Utah, occupying 1,820 square miles. The seven populations are Gunnison Basin, San Miguel Basin, Monticello-Dove Creek, Piñon Mesa, Crawford, Cerro Summit-Cimarron-Sims Mesa, and Poncha Pass.

8.  **Q. Where is the largest population of Gunnison sage-grouse and who manages the land?**

    **A.** The Gunnison Basin, which is roughly centered on the town of Gunnison and covers roughly 593,000 acres, contains the largest population of Gunnison sage-grouse. Approximately 51 percent of the occupied sage-grouse range in Gunnison Basin is managed by the Bureau of Land Management, 14 percent by the U.S. Forest Service, 2 percent by the National Park Service, 1 percent by Colorado Division of Wildlife, 1 percent by the Colorado State Land Board, and 31 percent is privately owned.



**Sharon R Rose/R6/FWS/DOI**

04/13/2006 09:05 AM

To   Laura Romin/R6/FWS/DOI@FWS, Henry
     Maddux/R6/FWS/DOI@FWS, Al
     Pfister/R6/FWS/DOI@FWS, Terry
cc
bcc

Subject   Fw: Gunnison S-G outreach

We got the final approved versions from WO late in the day and hurried to get it sent out to all our media. But, I forgot to send it directly to you folks. My apologies. Here it is ....

In a separate email I will also forward you 1 or two other documents (summary and maybe another one—can't remember??) that we received from DC--finals.

Sharon Rose
External Affairs
P.O. Box 25486
Denver, CO 80225
303-236-4580
sharon_r_rose@fws.gov

----- Forwarded by Sharon R Rose/R6/FWS/DOI on 04/13/2006 09:03 AM -----



**Debbie Schreiner/R6/FWS/DOI**

04/12/2006 04:53 PM

To   Sharon R Rose/R6/FWS/DOI@FWS
cc
Subject   Fw: Gunnison S-G news release

----- Forwarded by Debbie Schreiner/R6/FWS/DOI on 04/12/2006 04:53 PM -----

**Diane Katzenberger/R6/FWS/DOI**

04/12/2006 04:00 PM

To   Debbie Schreiner/R6/FWS/DOI@FWS
cc
Subject   Gunnison S-G news release

Debbie,

Please distribute the news release with Q&As attached to the Utah and Colorado congressional district offices, Tribes, and to the following media:

Denver Post, Rocky Mtn News, Grand Junction Sentinel, Montrose DAily Press, Alamosa VAlley Courier, Durango Herald, Pueblo Chieftain, Gunnison Country Times, Glenwood Springs Post-Independent

SLC Tribune, SLC Deseret, Ogden STandard Examiner, St. George Spectrum, Provo Daily Herald

Thanks,
Diane



06-33 Gunnison S-G.doc

---

Diane Katzenberger
U.S. Fish and Wildlife Service
Office of External Affairs
(303) 236-4578
Email: Diane_Katzenberger@fws.gov

# Exhibit L:

# Other Records

### Index

| Number | Date | Description | Pages |
|---|---|---|---|
| 29 | 08/07/03 | Email from J.Young, Ph.D. to T.Ireland re: drought tour | 2 |
| 30 | 10/27/03 | Denver Post, *Dwindling Grouse Face New Threat in W.Nile* . . . | 2 |
| 31 | 09/06/05 | Email from P.Mehlhop to A.Pfister, J.Lyke, P.Deibert, S.Linner re: GUSG PR with more changes | 2 |
| 32 | 12/08/05 | Email from E.Stevens to J.Underwood, J.Lyke, C.Nolin, N.Alt, R.Lohoefener re: Fw: Julie Request | 1 |

>growth of grasses and forbs next year, and then figure out what we need to
>do based on that information.  However, as Monsen suggested, plan for and
>continue with understory (possibly in conjunction with live and/or dead
>overstory) treatments where we can.  Since it did not sound like aerial
>application of forb seeds was going to be effective, the slower but more
>assured way to get more understory growth was for ground disking or
>drilling but that will only be done a few thousand acres a year at most.
>Obviously, we (the Gunnison WG) need to determine where the highest
>priority areas are to treat to get the most and fastest bang for the buck.
>That's the most positive I can be.
>
>
>
>
>
>                          Jessica
> Young
>                          <jyoung@western.e        To:
> Terry_Ireland@fws.gov
>                          du>                      cc:
>
>                                                   Subject:  drought
> tour
>                          08/07/03 05:54
> PM
>
>
>
>
>
>
>
>
>
>Terry,
>
>I really appreciate the time you and Al Pfister took to come out on the
>drought tour.  I remain concerned about the effects of the drought on
>Gunnison Sage-Grouse.  I heard at the end you felt that the die-back would
>be beneficial for the grouse.
>
>Can you tell me on what time scale you believe the die-back would be
>beneficial for grouse?  My concerns were heightened by comments made by
>professional plant ecologists during the tour.  While I agree that where
>there is sufficient seed source in well managed areas within the die-back
>area, the naturally occurring drought event may be beneficial to the
>shrub-steppe ecosystem and to the grouse on a 10-20 year plus time scale; I
>
>do not believe we have the luxury of that length of time for recovery of
>the Gunnison Sage-Grouse species.
>
>What I saw was a loss of herbaceous (grass and forbs) and a large scale
>loss of up to 90% of sagebrush foliage in areas that had poor grass and
>understory and historical grazing mismanagement.  While there were some
>comments from non-ecologists that the grass and forbs would quickly fill up
>
>the gaps since sagebrush was no longer competing with them; there were
>comments from Sandy Hayes and Steve Monson that suggested that such would
>not be the case.  Steve Monson refuted the idea that the understory was
>lacking because of plant competition and strongly stated that it issue was
>management (e.g., I am assuming grazing history).  Both Steve and Sandy

>discussed the challenges of re-establishing grass seedlings.  Sandy
>mentioned the rarity of seed establishment in her 19 years experience even
>in areas of shrub die-back such as the Tebuthiuron treatments.  Steve
>mentioned that even with treatments such as mulching of the existing
>sagebrush in areas of sufficient seed source or with seeding and having or
>providing good moisture that seedling establishment was about 2%.
>
>Therefore, my conclusions from the tour would be that there are significant
>
>areas of grouse habitat that will not recover during the next 5 years and
>perhaps during the next 10-20 years to a level that will cause grouse
>populations to increase.
>
>The challenge we face is one of time.  We have witnessed an approximately
>30% population loss within the Gunnison Basin during the past two years
>according to the CDOW lek counts.  The area of the greatest sagebrush
>die-back is within one of the two largest remaining breeding centers of the
>
>Gunnison Sage-Grouse.  We continue to be in a serious drought (see the
>handout provided by the BLM during the tour).  Our discussions on the
>ground and in meetings focus on treatments rather than on issues pertaining
>
>to management changes (e.g. grazing management, big game population
>targets, recreation etc.) which may provide the grouse with some immediate
>and positive changes to their habitat.
>
>My conclusions as a member of the working group and as a Gunnison
>Sage-Grouse biologist is that the species may not persist to enjoy the
>recovery of the sagebrush ecosystem 10-20 years down the road.  I believe
>that the threats to the species persistence are greater now then when they
>were first listed as a Candidate 5 species.  If the species continues to
>decline at the rate it has during these past two drought years, it will
>become extinct within 5-10 years.
>
>I personally could use some optimism at this point.  Did you see or hear
>anything during the tour that led you to believe that the drought and the
>accompanying sagebrush and herbaceous die-back would be a positive
>influence on Gunnison Sage-Grouse during these next critical 5-10 years?
>
>
>Jessica Young


Dr. Jessica Young - http://www.western.edu/bio/young/Welcome.html
Director of Environmental Studies
Department of Natural and Environmental Sciences
Western State College
Gunnison, CO 81231
(970) 943-2514

# *Archives*

**The Denver Post**

## Dwindling grouse face new threat in W. Nile
## Wyoming birds dying; W. Slope may be next

October 27, 2003
Section: DENVER AND WEST
Page: B-01
  Diedtra Henderson

Denver Post Science Writer
Caption: PHOTO: The Denver Post file photo

The flamboyant Gunnison sage grouse, a candidate for the endangered species list, may further decline next year as West Nile virus moves into its range

West Nile virus has killed almost two dozen of Wyoming's greater sage grouse, a species already imperiled by drought, overgrazing and the splintering of the sagebrush steppe they need to survive.

Experts say the deaths foreshadow what could occur in Colorado next year, when the Western Slope is expected to suffer more intense West Nile infection.

Already, 19 sage grouse in Wyoming, the state with the West's last sizable stand of the birds, have succumbed to West Nile. That number will grow.

"I've still got about six birds left to test and probably more on the way," said Todd Cornish, a veterinary pathologist at the Wyoming State Veterinary Laboratory. "People have collected more. They're in freezers waiting for analysis."

The loss of a few dozen birds would normally ruffle few feathers, but these deaths are worrisome.

"Sage grouse are in trouble everywhere, including Wyoming. Their numbers are down," Cornish said. "Sage grouse don't need yet one more thing killing them."

In Montana, at least three sage grouse died this summer from West Nile. Across the border in Alberta, more sage grouse perished.

In Colorado, where Gunnison sage grouse are a candidate for listing as an endangered species, no one knows whether any of those birds got sick.

Ex. L: Other Records                    Page 3 of 7

"You may be a year away from seeing it in sage grouse in Colorado simply because your sage grouse are on the Western Slope and [West Nile has] just gotten there," said Tom Christiansen, sage grouse coordinator at Wyoming Game and Fish.

Sage grouse experts will exchange notes on the West Nile infections when they meet in Boulder in early November. Already, there have been renewed calls to list the greater sage grouse and its Colorado cousin, the Gunnison sage grouse, as endangered species.

"The sage grouse issue is hot, it's really hot. And it's going to get even hotter," said sage grouse expert Clait E. Braun, a retired research biologist with the Colorado Division of Wildlife, "Right now, most of the heat is in Wyoming."

Across the West, wildlife watchers trek to leks, mating grounds where grouse return each spring, watching males strut, drumming their inflated chests, flaring head feathers and hooting "oo-widoo-widoo-wup" to attract females.

Across the West, concerns about sage grouse health have bubbled into activism to list the greater sage grouse, protecting the sagebrush terrain across their Western range.

Environmentalists suspect the nation's first West Nile deaths among sage grouse were caused by man-made problems. They say extraction of coal-bed natural gas in northeast Wyoming created pools of standing water, compounding the birds' woes by creating mosquito breeding grounds within striking distance.

In Wyoming, environmentalists have clashed with government agencies over coal-bed methane operations. The Bureau of Land Management, they argue in lawsuits, gave short shrift to sage grouse and black-tailed prairie dog well-being when it permitted the companies to drill 60,000 wells.

The coal-bed methane ponds linger later in the season in a river basin that usually lacks standing water, said Erik Molvar, a wildlife biologist with the Biodiversity Conservation Alliance. The Laramie-based nonprofit is a plaintiff in the BLM lawsuit.

While sage grouse have died elsewhere in Wyoming, the state's hot spot - 13 of 19 fatalities - is within that natural gas exploration region.

In the Powder River Basin, companies siphon off water to free methane trapped within coal seams. Relieving the water pressure lets the drillers get to methane.

"It's like pulling the tab off a Coke can. You release the pressure and out (the gas) comes," said John Robitaille, vice president of the Petroleum Association of Wyoming.

Robitaille doubts the ponds are to blame for the West Nile fatalities among sage grouse.

"There have been historic things, such as irrigation, out there. There's been puddling of water. The Powder River, itself, will dry up and leave puddles." Robitaille said. "There's more than what we're doing to create breeding grounds for mosquitoes."

Mosquitoes harvested from the coal-bed ponds are being tested to determine if they're infected with West Nile.

Reach Denver Post science writer Diedtra Henderson at dhenderson@denverpost.com or 303-820-1910.

Pat Mehlhop/R6/FWS/DOI
09/06/2005 05:01 PM

To  Terry Ireland/R6/FWS/DOI@FWS

cc  Al Pfister/R6/FWS/DOI@FWS, Julie
Lyke/R6/FWS/DOI@FWS, Pat Deibert/R6/FWS/DOI@FWS,
Susan Linner/R6/FWS/DOI@FWS

bcc

Subject  Re: GUSG PR with more changes

Terry,

We don't need to cite FR notices other than to give the vol, page and date in the body of the PR.  The rest need to be cited.  Everything needs to be in the admin record.  Pat D. has electronic versions of most or all (definitely of the IMs I cited) and can provide them.

Pat

Patricia Mehlhop, Candidate Conservation Coordinator
303-236-4215
Terry Ireland/R6/FWS/DOI

Terry Ireland/R6/FWS/DOI
09/06/2005 01:16 AM

To  Pat Mehlhop/R6/FWS/DOI@FWS, Pat
Deibert/R6/FWS/DOI@FWS, Susan
Linner/R6/FWS/DOI@FWS, Al Pfister/R6/FWS/DOI@FWS,
Julie Lyke/R6/FWS/DOI@FWS

cc

Subject  GUSG PR with more changes

Hi all,

Here's the PR with a few more changes.  The new changes from the 9/2 version and this version are still highlighted in yellow.  Too many changes through track changes to allow you to figure out what the changes are that way.  A question for the RO; do we need to cite policies, FR notices, BLM Instruction Memorandums, BLM and USFS planning handbooks, etc?  Do we need to include them in the admin record?  If so, there's going to be some huge documents, especially the BLM and USFS planning docs.  I noticed Pat M. had not given me citations for a couple IM's in a previous revision so I'm hoping the answer is no.

[attachment "Proposed Rule 9-4-05.doc" deleted by Pat Mehlhop/R6/FWS/DOI]

Terry Ireland/R6/FWS/DOI
09/23/2005 01:31 PM

To   Pat Mehlhop/R6/FWS/DOI,  Cathey Willis/R6/FWS/DOI,
cc
bcc
Subject   Re: GUSG admin record

Thanks Pat and Cathy, some good news for once.
Pat Mehlhop/R6/FWS/DOI

Pat Mehlhop/R6/FWS/DOI
09/22/2005 11:05 AM

To   Terry Ireland/R6/FWS/DOI@FWS
cc   Pat Deibert/R6/FWS/DOI@FWS, Al
Pfister/R6/FWS/DOI@FWS
Subject   GUSG admin record

Cathy Willis says we don't need copies of FR documents and CFRs in our admin record, but since IMs
aren't as readily available, we should include them,

Pat

Patricia Mehlhop, Candidate Conservation Coordinator
303-236-4215

cc    Oms/RO/R2/FWS/DOI@FWS, Jeff
       Underwood/R5/FWS/DOI@FWS, Julie
       Lyke/R6/FWS/DOI@FWS
       Chris Nolin/ARL/R9/FWS/DOI@FWS,
       nicole_alt@fws.gov@FWS, renne_lohoefener@fws.gov

Subject    Fw: Julie Request


Please make sure that the information your folks provide on proposed and final listings and critical
habitats include a discussion of any controversies...your help overseeing the input from your folks is very
much appreciated...

B


----- Forwarded by Elizabeth Stevens/ARL/R9/FWS/DOI on 12/08/2005 04:53 PM -----

Chris Nolin/ARL/R9/FWS/DOI

12/08/2005 01:28 PM

To    Marjorie_Nelson@fws.gov@FWS,
       nancy_green@fws.gov@FWS
cc    Rick Sayers/ARL/R9/FWS/DOI@FWS, Elizabeth
       Stevens/ARL/R9/FWS/DOI@FWS

Subject    Julie Request


Marj and Nancy,

At Julie MacDonald's request, can you ask staff to make sure they include in the Directors notes about
each package, the following information (and not much more than this is necessary in most instances).
We'll need to ask the regions to provide the controversy information in the briefing paper for each
package, and to provide that early enough in the process.

Due date, name of species, affected states, if a CHD, roughly the number of acres proposed, whether
there has been much controversy over the listing/CHD and if so why.

Also, a reminder that when something goes on the chart in the front, we need a paragraph for the back.

Thanks!


Chris Nolin
Endangered Species
US Fish & Wildlife Service
4401 No. Fairfax Dr. Room 420
Arlington, VA 22203
703-358-2171

# Exhibit M:

## *American Lands Alliance, et al. v. Norton, et al.*, Civ. No. 04-0434, Joint Stip.
## (Dock. No. 33)
## (D.D.C. Mar. 15, 2005) (RBW)

*ECF*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN LANDS ALLIANCE,      )      Civil No. 1:04CV00434 (RBW)
et al.,                       )
           Plaintiffs,   )
                              )
       v.                )
                              )
GALE NORTON,                  )
et al.,                       )
          Defendants.    )
_____)

## JOINT STIPULATION TO SUPPLEMENT THE ADMINISTRATIVE RECORD

WHEREAS, this case concerns plaintiffs' challenge to defendants' alleged failure to protect the Gunnison sage grouse under the Endangered Species Act, 16 U.S.C. § 1531, *et seq.*, and Administrative Procedure Act, 5 U.S.C. § 551, *et seq.*; and

WHEREAS, on September 22, 2004, defendants filed with the Court and provided to counsel for plaintiffs copies of the "Administrative Record" in this case; and

WHEREAS, on December 14, 2004, plaintiffs informed defendants by letter of the existence of at least 162 records that plaintiffs believe should be included in the Administrative Record for this case, but which were not included in the record submitted to the Court on September 22, 2004; and

WHEREAS, on January 31, 2005, counsel for defendants informed plaintiffs that it would not agree to supplement the Administrative Record with the records identified by plaintiffs in their letter of December 14, 2004; and

WHEREAS, on February 4, 2005, plaintiffs filed their Motion For Summary Judgment, and attached Exhibits A-CC, including six specific records that were not included in the Administrative Record that was compiled by defendants; and

WHEREAS, the extra-record Exhibits attached in support of Plaintiffs' Motion For Summary

Judgment include: (1) Exhibit J, Colorado Division of Wildlife, Draft Gunnison Sage-Grouse Conservation Plan (Nov. 19, 2004) (excerpts); (2) Exhibit K, Clait E. Braun, Ph.D., Gunnison Sage Grouse: Population Status (Jan. 2004); (3) Exhibit M, electronic mail communication from Jessica Young, Ph.D. to Terry Ireland, Fish and Wildlife Service (Aug. 7, 2003); (4) Exhibit S, Dr. Randy Webb, *et al.*, Status Review and Petition to List the Gunnison Sage Grouse (*Centrocercus minimus*) (Jan. 25, 2000); (5) Exhibit T, Letter from Ralph O. Morgenweck, fish and Wildlife Service to Randy Webb (Feb. 24, 2000); (6) Exhibit V, Diedtra Henderson, Denver Post, *Grouse Face New Threat In W. Nile* (Oct. 27, 2003); and

WHEREAS, plaintiffs informed the Court, in their Memorandum In Support Of Plaintiffs' Motion For Summary Judgment, of their letter to defendants of December 14, 2004 and the government's response, see Pl. Memo. at 16-17 n.4, n.5; and

WHEREAS, plaintiffs informed the Court that they planned to file a motion to supplement the Administrative Record with certain records included as Exhibits in support of their Motion, see Pl. Memo. at 17 n.5; and

WHEREAS, the parties have since conferred on this issue; and

WHEREAS, the parties agree that the documents set out as Exhibits K, M, S, T, and V attached in support of Plaintiffs' Motion for Summary Judgment are properly included in the Administrative Record; and

WHEREAS, the parties continue to disagree on the inclusion of Exhibit J attached in support of Plaintiffs' Motion for Summary Judgment in the Administrative Record,

The parties hereby stipulate that:

1.    The documents set out as Exhibits K, M, S, T, and V attached in support of Plaintiffs'

2

Motion for Summary Judgment are properly included in the Administrative Record; and

  2. Defendants will supplement the Administrative Record to include the documents set

out in Exhibits K, M, S, T, and V attached in support of Plaintiffs' Motion for Summary Judgment.


          Respectfully submitted,


AMY R. ATWOOD      . THOMAS L. SANSONETTI
(D.C. Bar No. 470258)      Assistant Attorney General
Western Environmental Law Center  Environment & Natural Resources Division
1216 Lincoln Street
Eugene, Oregon 97401      JEAN E. WILLIAMS, Chief
541-485-2471         Wildlife and Marine Resources Section
541-485-2457 (f)
Attorney for Plaintiffs      LISA L. RUSSELL, Assistant Chief
              Wildlife and Marine Resources Section

              JAMES A. MAYSONETT, Trial Attorney
              (D.C. Bar No. 463856)
              Ben Franklin Station, PO Box 7369
              Washington, D.C. 20044-7369
              Ph: (202) 305-0216
              Fax: (202) 305-0275
              Attorneys for Defendants

March 14, 2005


## **ORDER**


  The terms and conditions of this Joint Stipulation To Supplement The Administrative Record

are hereby adopted as an ORDER of this Court.

**DATED** this _15th_ day of _march_____, 2005.

                Hon. Reggie B. Walton
                United States District Judge


3

# Exhibit N:

## *Ctr. for Biological Diversity, et al. v. Kempthorne, et al.,* Civ. No. 06-04186, Order (N.D. Cal. Oct. 19, 2006) (WHA)

United States District Court

For the Northern District of California

1

2

3

4

5

6                        IN THE UNITED STATES DISTRICT COURT

7

8                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   CENTER FOR BIOLOGICAL DIVERSITY,
     a New Mexico non-profit corporation, KLAMATH
11   SISKIYOU WILDLANDS CENTER, CASCADIA                    No. C 06-04186 WHA
     WILDLANDS PROJECT, OREGON NATURAL
12   RESOURCES COUNCIL, Oregon non-profit
     corporations, and ENVIRONMENTAL
13   PROTECTION INFORMATION CENTER,                         **CASE MANAGEMENT**
     a California non-profit corporation,                   **ORDER**
14
                  Plaintiffs,
15
       v.
16
     DIRK KEMPTHORNE, Secretary of the U.S.
17   Department of Interior, and UNITED STATES
     FISH AND WILDLIFE SERVICE, an agency of
18   the U.S. Department of Interior,
19                Defendants.
     _____/
20

21
            After a case management conference, the Court enters the following order pursuant to
22
     Rule 16 of the Federal Rules of Civil Procedure ("FRCP") and Civil Local Rule 16-10:
23
            The following procedure will be used.  Defendant has already filed the "administrative
24
     record."  Defendant shall file promptly a detailed declaration explaining what is and is not in
25
     the "administrative record" and the manner and guidelines by which it was compiled.  Then
26
     plaintiff's motion for summary judgment shall be filed on **NOVEMBER 13**, with the opposition
27

28

on **December 13** and the reply on **December 27**. The hearing will be at **8:00 a.m. on January 18, 2007**.

**IT IS SO ORDERED.**

Dated: October 19, 2006.

_____
William Alsup
United States District Judge

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COUNTY OF SAN MIGUEL,                )
COLORADO, *et al.*,                         )
                                                       )        Case No. 1:06-CV-1946 (RBW)
               Plaintiffs,                       )
                                                       )
                           v.                       )
                                                       )
MACDONALD, *et al.*,                    )
                                                       )
               Defendants.                     )
                                                       )

**[PROPOSED] ORDER ON PLAINTIFFS' COMBINED MOTION FOR
SUPPLEMENTATION OF THE ADMINISTRATIVE RECORD, ADEQUATE
CERTIFICATION OF THE RECORD, CHALLENGING DEFENDANTS' CLAIMS OF
ATTORNEY-CLIENT PRIVILEGE AND FOR *IN CAMERA* REVIEW OF
DEFENDANTS' PRIVILEGE CLAIMS, AND FOR JUDICIAL NOTICE OF AN
INSPECTOR GENERAL REPORT ON JULIE MACDONALD**

Having reviewed Plaintiffs' Combined Motion For Supplementation of the

Administrative Record, Adequate Certification Of The Record, Challenging Defendants' Claims

of Attorney-Client Privilege And For *In Camera* Review Of Defendants' Privilege Claims, And

For Judicial Notice Of An Inspector General Report On Julie MacDonald, and supporting

documents, Defendants' and Defendant-Intervenors' memoranda in opposition, and supporting

documents, it is hereby

ORDERED that Plaintiffs' Combined Motion is GRANTED, and it is hereby further

ORDERED that federal defendants' shall supplement the administrative record with the

32 specific records identified by plaintiffs' motion, and it is hereby further

ORDERED that defendants shall file promptly a detailed declaration explaining what is and

is not in the "administrative record" and the manner and guidelines by which it was compiled, as

well as the circumstances by which the declaration that was signed on April 13, 2007 was

1

inadvertently omitted from the Record that was filed with the Court on April 16, 2007, and it is hereby further

ORDERED that defendants shall, within 14 days of the date of this Order, produce a privilege log that makes any privilege claims expressly and describes the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection, and it is hereby further

ORDERED that defendants shall, within 14 days of the date of this Order, produce the 23 records withheld under claims of attorney-client privilege identified in plaintiffs' motion for *in camera* inspection by the Court as to the applicability of defendants' claims of privilege, and it is hereby further

ORDERED that the Court takes judicial notice of the Inspector General Investigative Report on Julie MacDonald.

Dated this _____ day of _____, 2007,

_____
HONORABLE REGGIE B. WALTON

2