IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COUNTY OF SAN MIGUEL, COLORADO, et al.,

      Plaintiffs,

v.

MACDONALD, et al.,

      Defendants,

and

COLORADO CATTLEMEN'S ASSOCIATION,        Civ. No. 06-1946 (RBW)
8833 Ralston Rd.
Arvada, CO  80002-2239

PARTNERSHIP FOR THE WEST, and
350 Indiana Street, Suite 640
Golden, CO  80401

WESTERN CONSERVATION COALITION
1074 24 Road
Grand Junction, CO  81505

Intervenors

**DEFENDANT-INTERVENORS COLORADO CATTLEMEN'S ASSOCIATION, PARTNERSHIP FOR THE WEST, AND WESTERN CONSERVATION COALITION'S RESPONSE TO PLAINTIFFS' COMBINED MOTION FOR SUPPLEMENTATION OF THE ADMINISTRATIVE RECORD, ADEQUATE CERTIFICATION OF THE RECORD, CHALLENGING DEFENDANT'S CLAIMS OF ATTORNEY-CLIENT PRIVILEGE AND FOR *IN CAMERA* REVIEW OF DEFENDANT'S PRIVILEGE CLAIMS, AND FOR JUDICIAL NOTICE OF AN INSPECTOR GENERAL REPORT ON JULIE MACDONALD**

      The Colorado Cattlemen's Association, the Partnership for the West and the Western Conservation Coalition collectively referred to herein as ("Defendant-Intervenors") oppose Plaintiffs' Combined Motion for Supplementation of the Administrative Record, Certification of the Record, Challenging Defendant's Claims of

Attorney-Client Privilege and For *In Camera* Review of Defendant's Privilege Claims,

and for Judicial Notice of an Inspector General Report on Julie MacDonald.

Defendant-Intervenors submit an attached Memorandum in Response to Plaintiffs

Combined Motion.  This response is filed concurrently with the following documents:

MEMORANDUM IN RESPONSE TO PLAINTIFFS' COMBINED MOTION FOR SUPPLEMENTATION OF THE ADMINISTRATIVE RECORD, ADEQUATE CERTIFICATION OF THE RECORD, CHALLENGING DEFENDANT'S CLAIMS OF ATTORNEY-CLIENT PRIVILEGE AND FOR IN CAMERA REVIEW OF DEFENDANT'S PRIVILEGE CLAIMS, AND FOR JUDICIAL NOTICE OF AN INSPECTOR GENERAL REPORT ON JULIE MACDONALD;

EXHIBIT A: PAIGE'S COLO. SPRINGS GAZETTE ARTICLE, BOTH SIDES: NOW MORE TO JULIE MACDONALD CASE THAN MEETS THE EYE; AND

EXHIBIT B: JULIE MACDONALD'S RESPONSE TO INSPECTOR GENERAL REPORT.

Submitted this 12th day of October, 2007.


/s/ Anurag Varma
_____
Anurag Varma
(D.C. Bar No. 471615)
PATTON BOGGS LLP
2550 M Street N.W.
Washington, D.C. 20037
Telephone: (202) 457-6490
Facsimile: (202) 457-6315
avarma@pattonboggs.com

/s/ Kent H. Holsinger
_____
Kent H. Holsinger
Admitted *pro hac vice*
(CO Bar No. 33907)
HOLSINGER LAW, LLC
350 Indiana Street, Suite 640

Golden, CO  80401
Telephone:  (303) 577-4621
Facsimile:  (303) 496-1025
kent@holsingerlaw.com

*Attorneys for Defendant-Intervenors*
*Colorado Cattlemen's Association, Partnership for*
*the West and Western Conservation Coalition*

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2007, I electronically filed the foregoing with the Clerk of the Court via the CM/ESF system, which will send notification of such to the attorneys of record.

Courtney Taylor
courtney.taylor@usdoj.gov

Amy Atwood
atwood@westernlaw.org

James A. Maysonett
James.a.maysonett@usdoj.gov

Geoff Hickcox
ghickcox@gmail.com

Thomas Graf
sausatomgraf@hotmail.com

Rebekah S. King
beckyk@sanminguelcounty.org

s/ Anurag Varma

_____

ANURAG VARMA

s/ Kent H. Holsinger

_____

KENT H. HOLSINGER

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COUNTY OF SAN MIGUEL, COLORADO, et al.,

      Plaintiffs,

v.

MACDONALD, et al.,

      Defendants,

and

COLORADO CATTLEMEN'S ASSOCIATION,    Civ. No. 06-1946 (RBW)
8833 Ralston Rd.
Arvada, CO  80002-2239

PARTNERSHIP FOR THE WEST, and
350 Indiana Street, Suite 640
Golden, CO  80401

WESTERN CONSERVATION COALITION
1074 24 Road
Grand Junction, CO  81505

Defendant-Intervenors

**DEFENDANT-INTERVENORS COLORADO CATTLEMEN'S ASSOCIATION, PARTNERSHIP FOR THE WEST, AND WESTERN CONSERVATION COALITION'S MEMORANDUM IN RESPONSE TO PLAINTIFFS' COMBINED MOTION FOR SUPPLEMENTATION OF THE ADMINISTRATIVE RECORD, ADEQUATE CERTIFICATION OF THE RECORD, CHALLENGING DEFENDANT'S CLAIMS OF ATTORNEY-CLIENT PRIVILEGE AND FOR *IN CAMERA* REVIEW OF DEFENDANT'S PRIVILEGE CLAIMS, AND FOR JUDICIAL NOTICE OF AN INSPECTOR GENERAL REPORT ON JULIE MACDONALD**

On behalf of the Colorado Cattlemen's Association ("Cattlemen's"), the Partnership for the West ("Partnership") and the Western Conservation Coalition ("Western") collectively referred to herein as ("Defendant-Intervenors"), we hereby submit this Memorandum in Response to Plaintiffs' Combined Motion for

Supplementation of the Administrative Record, Certification of the Record, Challenging

Defendant's Claims of Attorney-Client Privilege and For *In Camera* Review of

Defendant's Privilege Claims, and for Judicial Notice of an Inspector General Report on

Julie MacDonald, hereafter ("Pls.' Mem.").

## STANDARD OF REVIEW

Section 706 of the Administrative Procedure Act ("APA") directs a court

reviewing an agency decision to "review the whole record or those parts of it cited by a

party."   5 U.S.C. § 706.   Judicial review under the APA must examine the full

administrative record to determine if it supports the Fish and Wildlife Service's ("FWS")

listing determination.  *FPC v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 331

(1976); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88 (1951).

Upon reviewing the administrative record, a court will set aside an agency action

only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with the law."   *Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of

Engineers*, 448 F.Supp. 2d 1, 4 (D.D.C. 2006) (citing 5 U.S.C. § 706(2)(A)).   The

"'arbitrary and capricious' standard of review is a highly deferential one, and presumes

the agency's action to be valid."   *Pac. Shores*, 448 F.Supp. 2d at 4.   Under this narrow

standard, a court cannot substitute its judgment for that of the agency.  *Id*.

The Supreme Court has held that a decision is arbitrary and capricious "if the

agency has relied on factors which Congress has not intended it to consider, entirely

failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

Also, an agency action is arbitrary and capricious if the agency fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 158 (1962)).

Plaintiffs argue that the court "will be asked to determine whether FWS considered all the factors that are relevant to the question of whether Gunnison sage-grouse are endangered or threatened under the ESA." Pls.' Mem. at 7. However, the court must also consider "whether there has been a <u>clear error</u> of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1941) (citations omitted) (emphasis added). Although the inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. *Overton Park*, 401 U.S. at 416. The court is not empowered to substitute its own judgment for that of the agency. *Id.*

Plaintiffs argue a multitude of documents reflect "biological facts" and relate to the "nature and scope" of FWS's listing determination such that they must be included in the administrative record. Pls.' Mem. at 1. The court limits its inquiry to whether the agency's findings were rational ones based on the record before it. *Prima v. Dep't of Interior*, No. CIV.A.963578, 1998 WL 87912, at *4 (E.D. La. 1998). When reviewing technical matters within an agency's area of expertise, the reviewing court must exercise a narrowly defined duty of holding agencies to certain minimal standards of rationality. *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C Cir. 1976); *see also Prima*, 1998 WL 87912, at *4.

Plaintiffs argue the "not warranted" listing decision was arbitrary and capricious because there may have been some level of disagreement within certain agency staff as to what the listing determination would ultimately be. *See* Pls.' Mem. at 8, n. 5. However, it is the agency's final action which is at issue here. *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, No. 06-340 slip op. at 11 (U.S. June 25, 2007). The mere fact that there may have been disagreement among some FWS staff "does not render the decisionmaking process arbitrary and capricious." *Id*. To the contrary, an agency is fully entitled to change its mind, so long as proper procedures are followed. *See id*.

## ARGUMENT

1.  **Supplementation of the Administrative Record Should Be Denied Because the Documents Plaintiffs' Seek Were Not Before the Decision-Makers at the Time of the Decision**

The administrative record filed by the agency must be the whole record that was before the agency decisionmakers at the time they made their decision. *Pac. Shores*, 448 F.Supp. 2d at 4 (citing *Overton Park*, 401 U.S. at 420). The "whole record" consists of all documents and materials directly or indirectly considered by agency decision-makers. *Maritel, Inc. v. Collins*, 422 F.Supp. 2d 188, 196 (D.D.C. 2006); *Fund II*, 391 F.Supp. 2d at 196. To ensure fair review of an agency action, the court "should have before it neither more nor less information than did the agency when it made it decision." *Maritel*, 422 F.Supp. 2d at 196. Consequently, the administrative record "should not include materials that were not considered by agency decisionmakers." *Pac. Shores*, 448 F.Supp. 2d at 4 (citing *Novartis Pharms. Corp. v. Shalala*, No. 99-323, 2000 U.S. Dist. LEXIS 6152, at *1, *11-12 (D.D.C. Apr. 28, 2000).

Courts grant motions to supplement the administrative record only in <u>exceptional</u> cases. *Fund for Animals v. Williams*, 391 F.Supp.2d 191, 197 (D.D.C. 2005) ("Fund II") (citing *Fund for Animals v. Williams*, 245 F.Supp. 2d 49, 58 (D.D.C. 2003) ("Fund I") (emphasis added)). In challenging the completeness of the administrative record, the challenging party must identify "reasonable, non-speculative grounds for its belief that materials considered by the agency are not included in the record." *Novartis Pharms.Corp. v. Sangstat Medical Corp.(Sangstat)*, No. CIV.A.99-323TFHAK, 2000 WL 1769589, at *4 (D.D.C. Nov. 27, 2000).

Here, Plaintiffs have not proven that these documents were before the FWS's decisionmakers. Documents within an agency are not on their face considered to be before the actual agency decision makers. *See Pac. Shores*, 448 F.Supp. 2d at 6-7. That documents were obtained by a Freedom of Information Act request does not mean they were relied upon by FWS decisionmakers. *Id*. at 7.

Nor have Plaintiffs identified reasonable, non-speculative grounds that these documents were considered by the agency but not included in the record. *See Overton Park*, 401 U.S. at 420. FWS is not obligated to include every potentially relevant document existing within its agency. *Pac. Shores*, 448 F.Supp. 2d at 8. And the court "should have before it neither more nor less information than did the agency when it made it decision." *Maritel*, 422 F.Supp. 2d at 196.

Plaintiffs argue that the records were known to the agency decisionmakers at the time of the decision because some of the documents were "created in whole or in part by FWS personnel." Pls.' Mem. at 11. Not all of the documents Plaintiffs seek to include in the administrative record were created by agency personnel. *See* Pls.' Mem. at 4. And

even documents created by agency staff are not *ipso facto* before agency <u>decisionmakers</u>. Indeed, there are some 80,000 employees and 180,000 volunteers of the Department of Interior, located at approximately 2,400 locations.  *About the Department of Interior*, available at http://www.doi.gov.

A.      **Critical Habitat Documents Should Be Excluded From the Record Because They Are Irrelevant to the Listing Decision**

The ESA requires the agency, "to the maximum extent prudent and determinable," to designate critical habitat for a species at the time the species is proposed for listing as endangered or threatened. 16 U.S.C. § 1533(a)(3).  Here, the FWS determined that listing was unwarranted.  Final Listing Determination for the Gunnison Sage-Grouse as Threatened or Endangered, 71 Fed. Reg. 19954 (Apr. 18, 2006) ("Listing Determination").

The FWS has been sued repeatedly for its failure to designate critical habitat.  *See Biodiversity Legal Found. v. Badgley*, 284 F.3d 1046 (9th Cir. 2002); *Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999); *Natural Res. Def. Council v. U.S. Dep't of the Interior*, 113 F.3d 1121 (9th Cir. 1997); *Conservation Council for Hawaii v. Babbitt*, 2 F.Supp. 2d 1280 (D.Haw. 1998); *Marbled Murrelet v. Babbitt*, 918 F.Supp. 318 (W.D. Wash. 1996); *N. Spotted Owl v. Lujan*, 758 F. Supp. 621 (W.D. Wash. 1991). Even Plaintiffs have been known to sue the FWS on critical habitat designations.  *See* Western Environmental Law Center, *Protecting the Endangered Kootenai River White Sturgeon*, available at http://www.westernlaw.org/our-work/cases/kootenai-river-white-sturgeon/. It is only prudent, then, for the FWS to make preparations for critical habitat designations concurrent with its consideration of the listing factors of the ESA.  *See* 16 U.S.C. § 1533(a)(3)(A).

### B.    Public Outreach Records Should Be Excluded Because They Are Irrelevant to the Listing Determination

The ESA requires FWS to make the listing decision "solely on the basis of the best scientific and commercial data available."  16 U.S.C. § 1533(b)(1)(A).  Press releases and outreach plans do not constitute scientific or commercial data relevant to a listing determination.  Sixteen (16) of thirty-two (32) records Plaintiffs seek to supplement the record are Outreach plans, draft new releases, and questions and answers.  Pls.' Mem. at 14.  That agency decisionmakers relied upon such documents in making the Listing Determination is implausible at best, and inconsistent with the requirements of 16 U.S.C. § 1533(b)(1)(A) of the ESA.

### C.    Other Records Must be Excluded From Supplementation of the Record As They Were Not Before FWS Decisionmakers

The 2003 electronic communication from Jessica Young was provided to FWS thirty-two (32) months prior to the Listing Determination at issue.  The 2003 Denver Post article was published thirty (30) months prior to the Listing Determination.  Plaintiffs had ample opportunity to submit these documents for the record during the public comment period for this Listing Determination.  Here, Plaintiffs have failed to demonstrate that these materials were before the decisionmakers <u>at the time they made the Listing Determination</u>.  *See Overton Park*, 401 U.S. at 420; *see also Pac, Shores,* 448 F.Supp. 2d at 7-8.  The existence of isolated electronic mail correspondence by certain FWS staff does not overcome this burden.  Pls.' Mem. at 11.

**D.     The Court's Decision to Supplement the Record Rests on Whether the Documents Were Before Decisionmakers, Not Whether the Documents are Adverse.**

Plaintiffs argue that all of the contested documents are adverse to the FWS's Listing Determination and should therefore be used to supplement the administrative record. Pls.' Mem. at 1. The Plaintiffs should not be allowed to bolster the record with documents solely because they support the Plaintiffs' position. Such a circumstance is hardly the "exceptional case" where an administrative record should be supplemented. *See Fund II*, 391 F.Supp.2d at 197. Plaintiffs allege that FWS excluded these documents from the administrative record because they were unfavorable. Pls. Mem. at 17. But the proper standard for supplementation of an administrative record is whether such documents were before agency decisionmakers. *Overton Park*, 401 U.S. at 420. As previously stated, this threshold requirement has not been met. The administrative record should not include documents that were not considered by the agency decisionmakers. *Novartis Pharms.*, 2000 U.S. Dist. LEXIS 6152 at *11-12.

**1.     There is No Need to Consider Extra-Record Evidence in this Case.**

To the extent Plaintiffs seek to introduce documents as extra-record evidence, Plaintiffs have not met their burden. Plaintiffs' seem to confuse the concept of extra-record evidence with supplementation. Pls. Mem. at 18-20. Supplementing the record relates to adding to the volume of the administrative record with documents the agency considered. *Pac. Shores*, 448 F.Supp. 2d at 5. Extra-record evidence equates to viewing evidence (that was not considered by the agency) outside of, or in addition to, the administrative record. *Id*.

Consideration of extra-record evidence is appropriate when reviewing the administrative record is not enough to resolve the case. *Id.* at 6 (citing *Esch v. Yeutter*, 876 F.2d 976, 991 (D.D.C. 1989). To introduce extra-record evidence, Plaintiffs must demonstrate bad faith or improper behavior on the part of the agency, or that the record is so bare that it prevents effective judicial review. *Fund I*, 245 F.Supp. 2d at 57-58 (citations omitted). Plaintiffs present no such evidence here.

## 2.     The FWS Properly Designated the Administrative Record

An agency "enjoys a presumption that it properly designated the administrative record absent clear evidence to the contrary." *Fund II*, 391 F. Supp. 2d at 197 (citing *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993); *Amfac Resorts, LLC v. Dep't of Interior*, 143 F.Supp.2d 7, 12 (D.D.C. 2001). A party must put forth concrete evidence to show that the record was not properly designated. *See Pac. Shores*, 448 F.Supp. 2d at 6.

Here, Plaintiffs have not met their burden. In fact, Plaintiffs concede that on April 13, 2007, Mr. Charles P. Davis, Endangered Species Litigation Coordinator, certified that he compiled and indexed "the full and complete administrative record for listing decisions for the Gunnison sage-grouse." Pls.' Ex. I. And certification is entitled to a strong presumption of regularity. *Overton Park,* 401 U.S. at 415.

## 3.     Plaintiffs' Request for an Accounting of What is Not Contained in the Record is Speculative and Should be Denied

Plaintiffs argue that proper certification must "explain the manner and guidelines that were used to compile the Record; and identify what the Record contains, and importantly, what it does not contain." Pls.' Mem. at 22. Plaintiffs seek to impose a new and untenable burden on the FWS: to document what the administrative record does

not contain.  As authority, Plaintiffs cite a case management order from the Northern District of California.  Such is hardly binding precedent before the U.S. District Court for the District of Columbia.  *See*, *e.g. U.S. v. Articles of Drugs Consisting of 203 Paper Bags, etc.*, 818 F.2d 569, 572 (7th Cir. 1987).

The Plaintiffs also rely upon a case from the Ninth Circuit to argue that FWS must provide an accounting of materials the agency did not rely on when making the Gunnison sage grouse Listing Decision.  Pls.' Mem. at 23 (citing *Trout Unlimited, et al. v. Lohn, et al.*, No.  C05-1128C,  2006 WL 1207901, at *3 (W.D. Wash. 2006).  But the *Trout Unlimited* court simply directed the agency to make sure the administrative record was correctly compiled.  *Trout Unlimited*, 2006 WL 1207901, at *3.  Further, the Plaintiffs misquoted the *Trout Unlimited* case as citing *State Farm* to stand for the proposition that documents that were not relied upon by a decisionmaker have been necessary elements of an administrative record.  Pls.' Mem. at 23 (citing *State Farm*, 463 U.S. at 43).  A careful reading of the case reveals that the court merely quoted *State Farm* when it articulated when an agency's action may be found to be arbitrary and capricious. *Trout Unlimited*, 2006 WL 1207901, at *3.

Plaintiffs bald assertion that it is "quite possible if not highly likely that there are still more relevant and adverse records that are missing from the Record" (Pls.' Mem. at 24) does not rise to the level of "reasonable, non-speculative grounds" for supplementation.  *Novartis Pharms.*, 2000 U.S. Dist. LEXIS 6152 at *4.  Plaintiffs' request for an accounting of what the record does not contain, then, should be denied.

**4.    Defendants Have Met the Burden of Proving Attorney-Client Privilege, Therefore Plaintiffs' Request for *In Camera* Review of Privilege Claims Should be Denied**

The party claiming the privilege bears the burden of proving that the communications are protected. *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998). Only communications that seek "legal advice" from a "professional legal adviser in his capacity as such" are protected. *Id*. (citation omitted). The privilege applies only if the person to whom the communication was made is "a member of the bar of a court" who "in connection with the communication is acting as a lawyer." *Id*. (citations omitted). And, the communication must have been made "for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding." *Id*. (citations omitted).

Moreover, Fed. R. Civ. P. 26(b)(5)[1] provides that when a party withholds information by claiming that it is privileged, "the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced in a manner that, without revealing information itself privileged or protected." Fed. R. Civ. P. 26(b)(5).

Defendants have provided Plaintiffs with a log of withheld documents. Pls.' Mem. at 25. The log contains information regarding each document withheld, with the date and subject of each document. In addition, entries include the persons involved in the document and the reason for the privilege. Some of the documents discuss "sensitive-hazardous materials" and others are between FWS and attorneys with the Office of the Solicitor, U.S. Department of Interior. The log is neither vague or cryptic.

---

1 Plaintiffs' Combined Motion cites Fed. R. Civ. P. 25(b)(5). However, Fed. R. Civ. P. 25 addresses Substitution of Parties. Fed. R. Civ. P. 26 provides the General Provisions Governing Discovery, including claims of privilege.

A government attorney-client privilege has long been recognized. *In re Lindsey*, 158 F.3d at 1268. In this case, Plaintiffs appear to argue that a heightened level of scrutiny should apply. *See* Pls.' Mem. at 26. But government attorney-client privilege claims should be examined in the same way as private attorney-client privilege claims. *Id.* at 1269 (citing *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C.Cir. 1980)). While Plaintiffs characterize the privilege log as a "blanket application" (Pls.' Mem. at 26), Defendants have provided a detailed log for each of the documents for which the privilege is asserted. There is no reason, then, to grant Plaintiffs' request for *in camera* review.

### 5. The Inspector General Report is Inappropriate for Judicial Notice

The Inspector General Report on former Deputy Assistant Secretary Julie MacDonald ("IG Report") is not relevant to this proceeding. Even if it was, the IG Report does not conclude that Ms. MacDonald improperly influenced any listing decisions, let alone the case at bar. *See Results in Brief*, IG Report, Pls.' Ex. B. And inquiry into the mental processes of administrative decisionmakers is generally to be avoided. *Overton Park,* 401 U.S. at 420 (citing *United States. v. Morgan*, 313 U.S. 409, 422 (1941)).

As former Assistant Secretary of Interior for Fish, Wildlife and Parks, Ms. MacDonald had oversight of FWS operations which included the examination of listing decisions and critical habitat reviews. *See* 16 U.S.C. § 742(b). Interestingly, Plaintiffs seek to supplement the administrative record in this proceeding with correspondence that contradicts a recurrent theme in their complaint: that the Listing Determination was somehow improperly influenced. Pls.' Mem. at 2, 26-27. Ms. MacDonald's influence

appears to have been limited to ensuring that the Listing Determination was, indeed, based upon the best available science.  She directed FWS staff to include, for all listing determinations, a complete list of references, clear delineation of references that were peer-reviewed, and complete citations.  *See* Pls.' Ex. L (Email from Martha Balis-Lauren, Acting Special Assistant, AES to Kurt Johnson, FWS (July 26, 2005)).

By seeking notice of the IG Report, Plaintiffs have embarked upon a thinly-veiled attempt to supplement the administrative record in this proceeding with highly politicized insinuations.  The IG Report is not an appropriate item for judicial notice.  A judicially noticed adjudicative fact must be one not subject to reasonable dispute in that it is either 1) generally known or 2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b).  Adjudicative facts are facts pertinent to a particular case.  Fed. R. Evid. 201 advisory committee's note. Furthermore, "a high degree of indisputability is the essential prerequisite" to an adjudicative fact.  *Id*.  The tradition has been one of caution in requiring that the matter be beyond reasonable controversy.  *Id*.

Such is not the case here.  The IG Report was released to the press and environmental groups before Ms. MacDonald had the opportunity to review it.  *See* S. Paige, *Both sides:  now more to Julie MacDonald case than meets the eye*, Colo. Springs Gazette (Sept. 6, 2007) attached hereto as Exhibit A *available at*: http://www.gazette.com/opinion/macdonald_26957_article.html/report)esa.html. Moreover, Ms. MacDonald had no opportunity to submit a response or rebuttal to the IG Report before it was publicized.  *Id*.  Ms. MacDonald's rebuttal is attached hereto as Exhibit B.  Should this court take judicial notice of the IG Report, Defendant-Intervenors

respectfully request the court take judicial notice of Ms. MacDonald's Response to the IG Report as well.

**6.    Conclusion**

For all the reasons above, Defendant-Intervenors oppose Plaintiffs' Combined Motion for Supplementation of the Administrative Record, Certification of the Record, Challenging Defendant's Claims of Attorney-Client Privilege and For *In Camera* Review of Defendant's Privilege Claims, and for Judicial Notice of an Inspector General Report on Julie MacDonald.

Submitted this 12th day of October, 2007.


/s/ Anurag Varma
_____
Anurag Varma
(D.C. Bar No. 471615)
Patton Boggs LLP
2550 M Street N.W.
Washington, D.C. 20037
Telephone: (202) 457-6490
Facsimile: (202) 457-6315
avarma@pattonboggs.com


/s/ Kent H. Holsinger
_____
Kent H. Holsinger
Admitted *pro hac vice*
(CO Bar No. 33907)
Holsinger Law, LLC
350 Indiana Street, Suite 640
Golden, CO  80401
Telephone:  (303) 577-4621
Facsimile:  (303) 496-1025
kent@holsingerlaw.com

*Attorneys for Defendant-Intervenors*
*Colorado Cattlemen's Association, Partnership for*
*the West and Western Conservation Coalition*

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2007, I electronically filed the foregoing with the Clerk of the Court via the CM/ESF system, which will send notification of such to the attorneys of record.

Courtney Taylor
courtney.taylor@usdoj.gov

Amy R. Atwood
atwood@westernlaw.org

James A. Maysonett
james.a.maysonett@usdoj.gov

Geoff Hickcox
ghickcox@gmail.com

Thomas Graf
sausatomgraf@hotmail.com

Rebekah S. King
beckyk@sanmiguelcounty.org

s/ Anurag Varma

_____

ANURAG VARMA

s/ Kent H. Holsinger

_____

KENT H. HOLSINGER



EXHIBIT A

## Our View - Friday

September 6, 2007 - 10:47PM

**Both sides now**
**More to Julie MacDonald case than meets the eye**

There are at least two sides to every story. But until recently we had never heard the other side of Julie Mac-Donald's story, freeing her enemies to paint as unflattering a portrait of the former Interior Department official as possible. But getting a more complete and balanced story is important, since the case could continue to impact many Endangered Species Act decisions — including the proposed de-listing of the Preble's meadow jumping mouse.

MacDonald resigned as deputy assistant secretary for fish, wildlife and parks in May, not long after an inspector general report seemed to confirm that she misused her position to browbeat subordinates into altering agency science to advance political aims. As well, the IG confirmed that she provided internal agency documents to outside parties. No laws were broken, according to the IG, but her actions were questionable and created the appearance that politics unduly influenced ESA-related decisions.

Because the report was leaked to the media minus any rebuttal (which Macdonald says was never solicited by the IG), this simplistic, one-sided version of events became accepted "truth" among those who have their own political reasons for discrediting MacDonald and the Bush administration. And the repercussions didn't end with MacDonald's resignation.

The IG's report, along with politicized congressional probes of "politicized" science inside federal agencies, have been seized upon by administration foes and knee-jerk ESA defenders to raise doubts about the the integrity of every ESA-related decision in which MacDonald took part. The media now routinely report these allegations as fact. H. Dale Hall, the director of the U.S. Fish and Wildlife Service, has ordered reviews of eight or nine major ESA decisions, including the Preble's mouse, in response to the furor. The IG's report is serving as a basis for new legal challenges of agency decisions.

But it appears to us, now that we've read the IG's report and acquired a copy of MacDonald's response — which has never before been reported on, as far as we know — that she's been railroaded. So many partisans and interest groups have a vested interest in her continued vilification, however, and in the claim of politicized science inside the administration, that the record may be impossible to set straight.

Advertisement



Print Powered By FormatDynamics



But let us at least try, by taking a closer look at a few points of contention. The IG's report insinuated that MacDonald altered range estimates for a protected bird, the southwest willow flycatcher, because a critical habitat designation might impact her "ranch" in California. But MacDonald's property — which is not a sprawling "ranch," but 80 acres of row crops — is nearly 300 miles from flycatcher habitat. She also notes that her alteration of the bird's range was approved by the agency's supposed experts, including Hall. If Hall believed the science was unsound, why didn't he object?

The IG suggested that MacDonald took an inordinate interest in ESA rulings involving California out of self-interest, because she's from there. MacDonald counters that she was responsible for signing off on all ESA decisions as part of her job. "Most ESA listing and critical habitat designations are in California," she points out. And these are often among the most contentious, high-profile cases.

The IG claimed MacDonald attempted to alter river flow requirements for the Kootenai sturgeon. She says all she was trying to do was bring clarity to "confusing and internally inconsistent language in the rule," in the interest of preventing a flawed ruling and future legal problems. She includes e-mail exchanges that seem to support her explanation.

The IG report suggested MacDonald made unreasonable demands for supporting documents from staff. She says she was authorized to make such requests and that they were "not unusual." The IG seemed to confirm allegations that she rejected the scientific findings of agency biologists. MacDonald said the law requires that the best available science be used, but she found that "FWS did not always consider all the data and often 'cherry picked' for sources and reviewers which supported their position." That's a serious allegation. We wonder why the IG isn't looking into the selective or self-serving use of science by agency insiders.

Much has been made, by the IG and others, of the fact that MacDonald is not a biologist. "She has no formal educational background in natural sciences, such as biology," noted the IG. But this criticism "implies that the absence of a degree in biology makes one unfit to review and comment on FWS rulemakings," wrote McDonald. "That perspective, if applied to virtually any supervisory position, would result in many executives being found unfit." All she attempted to do — and was encouraged to do by her boss — was ensure that statements contained in rules were supported by data. "It requires no specialized knowledge," according to MacDonald — just a willingness to question what gets passed up the chain of command.

Much of the rest of the allegations boil down to matters of personal style. Some underlings and field personnel apparently felt intimidated by

Advertisement



A bright idea in online advertising.

FormatDynamics

Print Powered By [F] FormatDynamics™



MacDonald, or chafed at her persistent
questions. They evidently were used to rubber
stamps from political appointees. Some feelings
and egos were bruised in the process. And these
people served as the primary sources for the
IG's obviously half-baked, one-sided
report.

None of this made it into the IG report —
which MacDonald says she never even saw
before it was leaked to the media. None of this
has been factored into the simplistic story line
and morality play presented by the rest of the
media. Readers wanting to read the IG's
report and MacDonald's rebuttal can find
links in today's opinion section at
Gazette.com. Fair and open-minded folks may
come away — as we did — doubting
the widely-accepted version of events.

We're reminded of the question former
Secretary of Labor Raymond Donovan asked,
after he was similarly dragged through the mud.
Where does Julie MacDonald go to get her
reputation back?

Advertisement



Honorable Dirk Kempthorne
Secretary of the Interior
Department of the Interior
1849 C Street, NW
Washington, DC 20240

EXHIBIT B

May 6, 2007

Dear Secretary Kempthorne,

Attached is a copy of a letter I sent to Inspector General Earl Devaney responding to and
correcting inaccuracies in his IG Report: File No. PI-06-0267-I. The report addresses allegations
made in an anonymous letter regarding activities I undertook as Deputy Assistant Secretary of
Fish and Wildlife and Parks. While much of the information included in my letter to the IG was
offered to the Deputy Secretary after the report was leaked to the press, - violating my privacy
rights – the offer was ignored.  I, therefore, am providing you with my formal response to the
allegations.

As I note in my letter to the Inspector General, at no point was I provided a formal opportunity to
respond to the allegations contained in the Report. I was never formally provided an official copy
of the full report, the redacted report, or the executive summary, prior to the report being leaked
nor after it was leaked.  In fact, I was told that Inspector General Devaney had refused to
authorize my receipt of any part of the report.  Eventually I was allowed to read a copy of the
redacted report.  I also printed out a copy of the summary report from the Center for Biological
Diversity's web page.  Based on the information contained in those two documents, I provided the
Inspector General the attached corrections and supporting documentation.  The information is
intended to allow him to address the most glaring inaccuracies in a revised or corrected report.
Unfortunately, even if the report is corrected, it is unlikely that the broader record will be corrected
and the incorrect report will continue to circulate.

The Deputy Secretary has stated that the Interior Conduct Accountability Board provides a
process for reviewing the IG report and where warranted, recommending an appropriate
response.  When the Accountability Board met I was not allowed to be present nor to be a part of
the presentation or discussion, nor was I informed of their recommendation if there was one.  The
Board's existence implies that due process is available and also provides the impression that all
issues were considered in an impartial manner and any action predicated on the report is valid.
The reality is that I was accused and judgment was rendered, with absolutely no opportunity to
defend myself or correct the record.  Clearly the Board could not have come to a fair conclusion
without the attached information.  It is incomprehensible to me why it would be in the interest of
the Interior Department or of any department to allow spurious charges against executive staff not
only to remain unchallenged but also to be leaked to the press and others, apparently with the
sole purpose of destroying my professional and personal reputation and providing a platform to
unfairly criticize the President.

This has been a difficult experience for me.  As a result of the refusal to address my responses
and documentation, my professional and personal reputation and behavior have been publicly
misrepresented.  The inaccuracies included in the report have been widely reported, all over the
world.  My professional reputation and integrity is being impugned in the press as a result of the
Department's cavalier response to the allegations in the report and continued leaks to the press.
I have no other option than to provide you with a formal rebuttal, in order to correct the record.

Sincerely,

Julie MacDonald

Honorable Dirk Kempthorne
Secretary of the Interior                                     May 6, 2007
Department of the Interior
1849 C Street, NW
Washington, DC 20240


Dear Secretary Kempthorne,

Attached is a copy of a letter I sent to Inspector General Earl Devaney responding to and correcting inaccuracies in his IG Report: File No. PI-06-0267-I. The report addresses allegations made in an anonymous letter regarding activities I undertook as Deputy Assistant Secretary of Fish and Wildlife and Parks. While much of the information included in my letter to the IG was offered to the Deputy Secretary after the report was leaked to the press, - violating my privacy rights – the offer was ignored. I, therefore, am providing you with my formal response to the allegations.

As I note in my letter to the Inspector General, at no point was I provided a formal opportunity to respond to the allegations contained in the Report. I was never formally provided an official copy of the full report, the redacted report, or the executive summary, prior to the report being leaked nor after it was leaked. In fact, I was told that Inspector General Devaney had refused to authorize my receipt of any part of the report. Eventually I was allowed to read a copy of the redacted report. I also printed out a copy of the summary report from the Center for Biological Diversity's web page. Based on the information contained in those two documents, I provided the Inspector General the attached corrections and supporting documentation. The information is intended to allow him to address the most glaring inaccuracies in a revised or corrected report. Unfortunately, even if the report is corrected, it is unlikely that the broader record will be corrected and the incorrect report will continue to circulate.

The Deputy Secretary has stated that the Interior Conduct Accountability Board provides a process for reviewing the IG report and where warranted, recommending an appropriate response. When the Accountability Board met I was not allowed to be present nor to be a part of the presentation or discussion, nor was I informed of their recommendation if there was one. The Board's existence implies that due process is available and also provides the impression that all issues were considered in an impartial manner and any action predicated on the report is valid. The reality is that I was accused and judgment was rendered, with absolutely no opportunity to defend myself or correct the record. Clearly the Board could not have come to a fair conclusion without the attached information. It is incomprehensible to me why it would be in the interest of the Interior Department or of any department to allow spurious charges against executive staff not only to remain unchallenged but also to be leaked to the press and others, apparently with the sole purpose of destroying my professional and personal reputation and providing a platform to unfairly criticize the President.

This has been a difficult experience for me. As a result of the refusal to address my responses and documentation, my professional and personal reputation and behavior have been publicly misrepresented. The inaccuracies included in the report have been widely reported, all over the world. My professional reputation and integrity is being impugned in the press as a result of the Department's cavalier response to the allegations in the report and continued leaks to the press. I have no other option than to provide you with a formal rebuttal, in order to correct the record.

                              Sincerely,


                              Julie MacDonald

Earl Devaney                                          May 6, 2007
Inspector General
Department of the Interior
Office of the Inspector General
1849 C Street, NW
Washington, DC 20240


Dear Mr. Devaney,

I write to correct inaccurate information included in the contents of your IG Report: File No. PI-06-0267-I, initiated on the basis of an anonymous letter.

Your investigators were provided incomplete and inaccurate information during the investigative process for this report. The report was released to the press and others before I was able to identify and correct this inaccurate and incomplete information. While the contents of your report can be no better than the information provided by those interviewed, your office can take steps to ensure that the information is as complete as possible. For whatever reason, that process did not occur in my case. Accordingly, I am providing additional information, including documentation that addresses many of the specific allegations made regarding my activities as Deputy Assistant Secretary for Fish and Wildlife and Parks.

A brief synopsis of the allegations and my response to each of them follows. The referenced attachments address the allegations in detail.

- ALLEGATION: Changed the range of the southwest willow flycatcher critical habitat to avoid affecting the family ranch. FACT: As your investigators were aware, my family does not own a ranch, we have 80 acres of row crop land with an agricultural business on site. The land is nearly 300 miles north of any of the proposed or final flycatcher habitat. **Attachment 1**
- ALLEGATION: Unilaterally changed the science related to the range of the southwest willow flycatcher. FACT: The change was discussed with Director Williams and Regional Director Hall who did not object. **Attachment 1**
- ALLEGATION: Paid particular attention to all California activities because the family ranch was in California. FACT: Reviewed and was responsible for surnaming all ESA regulatory packages prior to their submittal for the Assistant Secretary's signature. **Attachment 2**
- ALLEGATION: Tried to force a change in flows for the Kootenai sturgeon, abandoned the effort when Director Hall required documentation. FACT: For 3 months requested clarification of confusing and internally inconsistent language in the rule. Did not require

1

any particular flow, rather required that the regulation be internally consistent and supported by the research cited. **Attachment 3**

- ALLEGATION: Placed unreasonable demands on staff by requesting 4,000 documents. FACT: Requested the citations of scientific publications supporting the rulemakings as well as public comment letters. These requests are not unusual, the Administrative Procedures Act requires that the Service provide access to such documents. **Attachment 4**

- ALLEGATION: Released non-public information in violation of departmental rules. FACT: Released information which I had the authority to release. **Attachment 6**

Had you verified the accuracy of the accusations prior to preparation and release of the report I could have provided this documentation. To date your office has denied me a full copy of the report and as a result I can provide specific evidence of inaccuracy based only on information included in news accounts and other sources. The other more personal observations of the staff interviewed are subjective in nature and generally not possible to refute factually. However **Attachment 7** addresses a number of specific statements contained in the report. I note that none of the personal observations implicates waste, fraud, or abuse.

The incomplete research and fact checking coupled with the leaks to the press and others has resulted in my reputation and behavior being widely misrepresented nationally and internationally. Your office represents a position of trust and wields tremendous power to address wrongdoing within the government. However, that power carelessly or maliciously misused has the ability to visit harm on innocent individuals. I was not allowed to read, rebut nor correct anything in the report until it was released. As a result, information which you should have known was inaccurate is now in the public domain, and practically speaking I have very little ability to undo the harm your report has done. This letter is one avenue I have taken. In the future however, I strongly recommend that in order to avoid repeating such injustice, including violating the privacy rights of the person being investigated, you address specific allegations with the accused, and confirm factual information before releasing your reports.

Yours truly,

Julie MacDonald

**ATTACHMENT 1 – Southwest Willow Flycatcher**

The report implies that DAS MacDonald changed a critical habitat designation to benefit her family's property holdings.

1. **Family property is over 200 miles north of flycatcher habitat**. The distance from the location of the family property to the largest city in the northernmost flycatcher habitat is roughly 300 miles. **(directions attached)**

2. **Range was changed from 25 to 18 miles, the high end of the normal range, not from 2.1 to 1.8 as stated by the Director**. The initial draft proposed to base the designation on the farthest recorded range of 25 miles. I discussed this with Director Williams because of a concern that it would be difficult to defend a range based on the exception rather than the usual range identified in the research.

> Excerpt from the proposed rule:'... *Most recorded between-year movements occurred within the same drainage from 1.6 to 29 km (1 and 18 mi), but movements as far as 40 km (25 mi) were recorded (Luff et al. 2000; Kenwood and Paxton 2001; E. Paxton, USGS, e-mail).*'

As a result, 18 miles was used because it represented the high range of where most of the movements occurred. This was after a discussion with FWS Director Steve Williams regarding the radius as well as a more thorough discussion of the fact that many many miles of critical habitat were included, based on these overlapping radii. I asked then Director Williams biologically speaking how one could develop a decision rule that properly identified habitat without also including non-habitat areas such as towns and cities (which was the case for the draft rule). Director Williams indicated that generally, overlapping ranges would not be used for species like the flycatcher, but that instead, the data would be examined to find where densest concentrations of sightings were found and those areas designated. I relayed that information to the AD for Endangered Species and also the field.

3. Regional Director Hall was consulted and did not object (**email attached**). Had RD Hall objected he could have raised those objections to Director Williams. Had Director Williams objected he would have discussed the issue with Judge Manson. At no time did I have the authority to overrule a Regional Director or the Director of the FWS. If and when resolution on an issue could not be resolved, it was elevated. Then, as Supervisor of the Director of the FWS, the Assistant Secretary was the final arbiter.

1. Distance from family property to SouthWest Willow Flycatcher northernmost critical habitat.

from: Dixon, CA to: bakersfield california - Google Maps                    Page 2 of 2

**Dixon, CA**

Drive: 299 mi (about 4 hours 43 mins)

| | | |
|---|---|---|
| 1. Head east on E a St toward S 7th St | 0.3 mi | |
| 2. Continue on Dixon Ave E | 0.4 mi | |
| ← 3. Turn left at Pedrick Rd | 2.9 mi | 8 mins |
| ← 4. Turn left to merge onto I-80 E toward Sacramento | 14.6 mi | 15 mins |
| 5. Continue on Capital City Fwy/I-80-BR E/US-50 E (signs for US-50/ Capital City Fwy/I-80-BR/Sacramento/S Lake Tahoe) | 5.2 mi | 5 mins |
| 6. Take the exit onto CA-99 S toward Fresno | 274 mi | 4 hours 11 mins |
| 7. Take the California Ave exit toward Civic Center | 0.2 mi | |
| ← 8. Turn left at California Ave | 1.4 mi | 4 mins |
| → 9. Turn right at Chester Ave | 0.1 mi | 1 min |

**Bakersfield, CA**

These directions are for planning purposes only. You may find that construction projects, traffic, or other events may cause road conditions to differ from the map results.

Map data ©2007 NAVTEQ™

http://maps.google.com/maps?ie=UTF-8&oe=UTF-8&hl=en&tab=wl&q=                    5/5/2007

2.  Notification of Director Hall of the use of 18 mile diameter circles to designation

|  |  |
|---|---|
| Julie<br>MacDonald/ASFW/OS/DOI<br>11/05/2004 03:31 PM | To   Dale Hall |
|  | cc |
|  | bcc |
|  | Subject   southwest willow flycatcher |

I need to talk to you about this critical habitat designation.   I'd like to have a quick 60,000 foot discussion, and then can talk more specifically to your staff, but I want to run a few things by you first.

1. Extension of comment period deadline,
2. Lambreth's ruling on piping plover and the resulting effects on our designations
   a. occupied at the time of listing,
   b. PCEs must be present at the time of designation
3. Invasive species (tamarisk and russian olive)
4. The use of 18 mile diameter circles to designate,
5. Designation of unoccupied habitat.

thank you!

**ATTACHMENT 2**

**Attachment 2**

The Assistant Secretary for Fish and Wildlife and Parks has the statutory duty of supervising the Director of the Fish and Wildlife Service. Part of the supervisory duties undertaken by the Assistant Secretary's office is the review of rulemaking packages. Those rules are reviewed for legal sufficiency, scientific accuracy, policy consistency, and readability. DAS MacDonald was the primary reviewer of ESA rulemaking packages prior to the Assistant Secretary approving them for release.

1. A review by the investigators of the surnames on all the ESA regulatory packages would demonstrate that my surname is on the vast majority of the ESA regulatory packages.
2. A review of the administrative record for each of the ESA regulatory packages would demonstrate that I was meticulous in my review of all packages, not just California packages.

**ATTACHMENT 3 – KOOTENAI STURGEON FLOW REQUIREMENTS**

The report implies that DAS MacDonald tried to impose flow requirements that would benefit operators of a Corps of Engineers dam. The email threads below demonstrate that DAS MacDonald did not require a particular flow, but rather required that the flow required by the Service be supported by the research available. There is ample evidence attached to demonstrate that DAS MacDonald was not trying to force a particular flow, but was trying to ensure that the Service accurately conveyed the facts in the rulemaking.

Julie
MacDonald/ASFW/OS/DOI
11/30/2005 11:23 AM

To  Renne Lohoefener/R2/FWS/DOI@FWS

cc  Michelle McBryde/ASFW/OS/DOI@DOI, Craig
    Manson/ASFW/OS/DOI@DOI

bcc

Subject  koolnai Sturgeon

I am very concerned about this proposed rule. After reading the decision, I believe that there are significant issues that must be addressed. Michelle will be setting up a meeting with David Verhay, yourself, me, Bob Comer from the Denver Solicitor's office to discuss the issues. In addition, if you could please set up a meeting with your staff here and/or in Denver to discuss the issues raised with the rule as soon as possible I would very much appreciate it.

thank you

Renne
Lohoefener/ARL/R9/FWS/DO
I@FWS

12/06/2005 02:14 PM

To  Julie MacDonald/ASFW/OS/DOI@DOI

cc  Elizabeth Stevens/ARL/R9/FWS/DOI@FWS, Chris
Nolin/ARL/R9/FWS/DOI@FWS, Rick
Sayers/ARL/R9/FWS/DOI@FWS

bcc

Subject  Kootenei sturgeon CH

revised proposal attached

Biology wise, it is unknown why the sturgeon doesn't spawn in the stretch of river below the dam - substrate may be wrong, water may be too fast, water may be too cold.

They try to spawn in the stretch currently critical habitat but not well.

They currently do not spawn in the proposed ch, but we think they should.

Ren

Sturgeon CH proposed 12_6_05.doc

Renne
Lohoefener/ARL/R9/FWS/DO
I@FWS

12/28/2005 03:31 PM

To  Julie MacDonald/ASFW/OS/DOI@DOI

cc  Chris Nolin/ARL/R9/FWS/DOI@FWS

bcc

Subject  Kootenai sturgeon critical habitat

Julia

Revised version based on the comments you gave me over the telephone is attached.   Your comments were incorporated unless noted.  We will need to get this one moving upon your return as time is quickly running out.

Thanks

Ren

Sturgeon CH proposed 12_28_05.doc

9

Julie
MacDonald/ASFW/OS/DOI
12/29/2005 05:44 PM

To   Renne Lohoefener/ARL/R9/FWS/DOI@FWS

cc

bcc

Subject   Re: Kootanei sturgeon critical habitat[ ]

Renne, we need to discuss my edits. Can we get Ben Jessup or whoever he thinks necessary in the discussion? Thank you.

kootnai12.29.doc

Renne Lohoefener@FWS

Renne
Lohoefener@FWS
12/28/2005 03:31 PM

To: Julie MacDonald/ASFW/OS/DOI@DOI
cc: Chris Nolin/ARL/R9/FWS/DOI@FWS
Subject: Kootanei sturgeon critical habitat

Julia

Revised version based on the comments you gave me over the telephone is attached.   Your comments were incorporated unless noted.  We will need to get this one moving upon your return as time is quickly running out.

Thanks

Ren

Sturgeon CH proposed 12_28_05.doc

10

Dale
Hall/ARL/R9/FWS/DOI@FWS

01/05/2006 05:04 PM

To  Julie MacDonald/ASFW/OS/DOI@DOI

cc  Elizabeth Stevens/ARL/R9/FWS/DOI@FWS, Renne
Lohoefener/R2/FWS/DOI@FWS, Theresa
Rabot/RO/R1/FWS/DOI@FWS

bcc

Subject  Re: ☐

Thanks Julie.  Everyone please look this over to see if it depicts and clarifies, for example, the PCE of
flows that meet biological information we have, while recognizing that other PCEs may not be present (nor
subject to AM/Destruction consideration).  Julie and I talked specifically about recognizing that
cobble/rock may be burried under sediment and the depth may not be there, but still want to accurately
look at flows.  The considerations may vary among PCEs as existing conditions at various places under
consideration.  What we're trying to nail down is which PCEs occur where and which ones don't.

Dale

Julie MacDonald/ASFW/OS/DOI@DOI

Julie
MacDonald/ASFW/OS/DOI@
DOI

01/05/2006 03:30 PM

To  Theresa Rabot/RO/R1/FWS/DOI@FWS

cc  Renne Lohoefener/R2/FWS/DOI@FWS, Elizabeth
Stevens/ARL/R9/FWS/DOI@FWS, Dale Hall

Subject

All, attached is a copy of the Kootenai rule with some specific edits for discussion purposes only.  I took
another stab at trying to articulate our point.  I am not sure I have the biology right, so biologists please
correct me if it's wrong.

discussion Sturgeon CH proposed 12_28_05.doc

11

Julie
MacDonald/ASFW/OS/DOI
01/06/2006 06:58 PM

To   Renne Lohoefener/ARL/R9/FWS/DOI@FWS
cc
bcc
Subject   Re: Fw: K. Sturgeon PCE comparison

Thank you Renne.   Following is an excerpt from the 12/29 version of the draft critical habitat document:

*Paragamian et al. (2001) observed mean water column velocities between RM 141.6 and 149.4 (RKM 228 and 240.5) during spawning events and in 2002, Paragamian et al. (2002) hypothesized that spawning sturgeon may select sites further upstream with greater water velocities as depth increases due to the backwater from Kootenai Lake. Parsley and Beckman (1994) suggested, based on information from four lower Columbia River sites were white sturgeon successfully reproduce, that optimal spawning habitat may occur when mean water column velocity is 5.9 ft/s (1.8 m/s) or greater. Based on these studies it appears that white sturgeon use velocity as a cue for spawning.*

I note that the peak average velocities shown in the Berenbrock work are a little less than 3fps, which is significantly below that which triggers spawning.   This is consistent with the information I received on the braided reach.  If indeed the sturgeon are looking for faster flows, areas farther from the backwater of the lake will certainly have more rapid flows.  However, it is difficult to understand how we can find that a mean velocity which is roughly half the optimal velocity is appropriate for triggering spawning.

Perhaps I'm missing something.

Renne Lohoefener@FWS

Renne
Lohoefener@FWS
01/06/2006 03:57 PM

To: Julie MacDonald/ASFW/OS/DOI@DOI
cc:
Subject: Fw: K. Sturgeon PCE comparison

----- Forwarded by Renne Lohoefener/ARL/R9/FWS/DOI on 01/06/2003 03:56 PM -----

Theresa
Rabot/RO/R1/FWS/DOI
01/06/2006 03:52 PM

To   Renne Lohoefener/ARL/R9/FWS/DOI@FWS,
elizabeth_stevens@fws.gov, Dale
Hall/ARL/R9/FWS/DOI@FWS
cc   patricia_kennedy@fws.gov
Subject   Fw: K. Sturgeon PCE comparison

for the 1:00

----- Forwarded by Theresa Rabot/RO/R1/FWS/DOI on 01/06/2006 12:51 PM -----

Susan

12

Julie
MacDonald/ASFW/OS/DOI
01/20/2006 06:12 PM

To   Renne Lohoefener/R2/FWS/DOI@FWS
cc
bcc
Subject   kootnai comments

Renne, my rewrite. This may be wrong, but I could not make heads nor tails out of the document I got. So I tried to string together various portions of the draft into a different order and have it make sense.

kootenai comments 1-20-06.doc

Julie
MacDonald/ASFW/OS/DOI
01/23/2006 09:54 AM

To   Renne Lohoefener/R2/FWS/DOI@FWS
cc
bcc
Subject   kootenai

Could I please get copies of the cites from the rule. Generally they can either email them, if they are not voluminous or fedex a cd containing them. And they might as well send any substantive comment letters from the first rule when they send the cites.

Thank you.

13



Julie
MacDonald/ASFW/OS/DOI
01/30/2006 02:43 AM

To   Renne Lohoefener/ARL/R9/FWS/DOI@FWS
cc   Dale Hall/ARL/R9/FWS/DOI@FWS
bcc
Subject   Fw: Re: Fw: K. Sturgeon PCE comparison

I reviewed the literature send by Scott several weeks ago as cited in the rule. Parsley and Beckman
(1994) which was the basis for the original requirement of 5.9l/s velocity, is a very detailed study tracking
the response of white sturgeon to varying flow/depth parameters downstream from dams. The work is
quite persuasive.

Unfortunately, the newest cite that the field provided (Schaffter 1997) was not included in the original cites
that were forwarded in Scott's email. All I have to review is the one page reference faxed late Friday. The
page forwarded includes the abstract which references finding eggs at substrate sites where flow
velocities exceeded 1 m/s (or 3.26 fps (my conversion)). Apparently, the field staff now prefers the results
of this study to the Parsley and Beckman study which has been part of their rule from the beginning.

Until I have a complete copy of the study, I can't make any judgement as to its validity compared to the
Parsley work. Accordingly, could you please ask the staff to email me copies of the entire Schaffter work,
as well as any other work upon which they now wish to rely, but which was not previously provided.

I'll review either Monday night when I get in or Tuesday morning and call you.

I must note that it would have been preferable for the staff to do this level of review of their work and
findings prior to the last week before the rule was due; Ben Jessup and I had this conversation regarding
the discrepancy between the 5.9fps figure in the rule and the actual peak flows of 2.6 fps with the staff
quite explicitly nearly a month ago.

Thank you very much.
----Forwarded by Julie MacDonald/ASFW/OS/DOI on 01/30/2006 02:20AM ----

To: Renne Lohoefener/ARL/R9/FWS/DOI@FWS
From: Julie MacDonald/ASFW/OS/DOI
Date: 01/06/2006 06:58PM
Subject: Re: Fw: K. Sturgeon PCE comparison

Thank you Renne.    Following is an excerpt from the 12/29 version of the draft critical habitat document:

*Paragamian et al. (2001) observed mean water column velocities between RM 141.6 and 149.4
(RKM 228 and 240.5) during spawning events and in 2002, Paragamian et al. (2002)
hypothesized that spawning sturgeon may select sites further upstream with greater water
velocities as depth increases due to the backwater from Kootenai Lake. Parsley and Beckman
(1994) suggested, based on information from four lower Columbia River sites were white
sturgeon successfully reproduce, that optimal spawning habitat may occur when mean water
column velocity is 5.9 ft/s (1.8 m/s) or greater. Based on these studies it appears that white
sturgeon use velocity as a cue for spawning.*

I note that the peak average velocities shown in the Berenbrock work are a little less than 3fps, which is
significantly below that which triggers spawning. This is consistent with the information I received on the
braided reach. If indeed the sturgeon are looking for faster flows, areas farther from the backwater of the
lake will certainly have more rapid flows. However, it is difficult to understand how we can find that a

14

Julie
MacDonald/ASFW/OS/DOI
01/31/2006 08:13 PM

To  Matt J Hogan/ARL/R9/FWS/DOI@FWS

cc

bcc

Subject  Fw: Kootenai Sturgeon Revised Draft Rule

Here is the string where I gave them my comments and requested we have a meeting to walk through the changes and what/why... I received absolutely no response from the FWS... not Renne, not Dale, and not Kurt.  I was quite clear in my original email I had concerns about my edits and asked to get us all on the phone to discuss.  Instead, you receive a rule with none of the issues resolved, about 6 hours before you have to take it to the register.  I might note that this brinksmanship puts you, as Acting Assistant Secretary at risk of contempt, not me and not Dale.

----- Forwarded by Julie MacDonald/ASFW/OS/DOI on 01/31/2006 08:09 PM -----

Julie
MacDonald/ASFW/OS/DOI
01/27/2006 10:55 AM

To  Kurt Johnson/ARL/R9/FWS/DOI@FWS, Renne Lohoefener

cc  Dale Hall, Marshall Jones/ARL/R9/FWS/DOI@FWS

Subject  Re: Kootenai Sturgeon Revised Draft Rule

Where is the draft and when is the meeting going to be scheduled?  This rule is due to the register next Wednesday, there was supposed to be a meeting set up yesterday and there was no meeting set up for yesterday or today.  With the amount of difficulty we have had drafting this in a manner that is factually accurate, we need to see a new draft ASAP and have this meeting.

thank you.
Kurt Johnson/ARL/R9/FWS/DOI@FWS

Kurt
Johnson/ARL/R9/FWS/DOI@
FWS
01/25/2006 01:59 PM

To  Julie MacDonald/ASFW/OS/DOI@DOI

cc

Subject  Re: Kootenai Sturgeon Revised Draft Rule

Will do.  Here is the draft EA that we discussed yesterday.

Kurt Johnson

Kootenai DEA 01-13-06.doc

Julie MacDonald/ASFW/OS/DOI@DOI

Julie
MacDonald/ASFW/OS/DOI
01/25/2006 01:49 PM

To  Kurt Johnson/ARL/R9/FWS/DOI@FWS

cc  Chris Nolin/ARL/R9/FWS/DOI@FWS, John
Fay/ARL/R9/FWS/DOI@FWS, Renne

16

Julie
MacDonald/ASFW/OS/DOI
01/31/2006 01:46 PM

To    Matt J Hogan/ARL/R9/FWS/DOI@FWS

cc

bcc   David Bernhardt/SIO/OS/DOI@DOI; Brian
      Waidmann/SIO/OS/DOI@DOI

Subject   kootenai sturgeon.

The rule is due today.

I sent this over the weekend, as I was worried about the rule and the basis for the designation. We are required to designate based on the best available data, and also based on the PCEs that are <u>present.</u>

In all the previous draft rules for this designation presented by the Service the 5.9fps number was cited as the basis for their designation and the requirement for spawning. Unfortunately, that PCE does not occur in the braided reach (which is the area the court directed them to designate). This has been an issue for over a month. The FWS staff in Region 1 presented modeling done by the USGS demonstrating that peak flows (occuring once or twice a decade) occur, but the peak velocity is 2.6-2.7 fps. Suddenly, in this new rule, they have cited new (1997) research (which was not, and has not been provided) and wish to base their new 3.3fps PCE on this data. The cite, which is referenced in the thread attached was never provided to this office. The FWS did not even give me the courtesy of a reply to the attached email, but I understand moved ahead with the rule unilaterally and presented it to you for signature today.

The new velocity number, 3.3 fps, is not achieved in the newly designated braided reach, since the maximum achieved is 2.6-2.7 fps, which is about 20% less than the minimum required. The modeling predicts the number is not reached and the model prediction is supported empirically by the fact that the sturgeon occur in that reach, but don't spawn.

The research cited refers to sturgeon in the Sacramento River, not sturgeon in the pacific nw which the earlier cite relied on for their 3.9 fps recommendation. The FWS has not demonstrated they are using the best available data and they are deliberately not providing the last study which they rely upon to support their new PCE. I have absolutely no basis for believing this 3.3 fps number is valid or that the PCE occurs in the reach.

Finally, I have not received a draft of the rule since my last comments were submitted on the 25th. It may be correct and it may not be, the but FWS is not providing the basis for their decision, nor are they responding to my requests.

I cannot recommend signature of this rule and I strongly recommend that we resolve these process issues with Dale as soon as possible. If my review is redundant, then I would prefer to not waste time on it.

---- Forwarded by Julie MacDonald/ASFW/OS/DOI on 01/31/2006 01:24 PM ----

Julie
MacDonald/ASFW/OS/DOI
01/30/2006 02:13 AM

To    Renne Lohoefener/ARL/R9/FWS/DOI@FWS

cc    Dale Hall/ARL/R9/FWS/DOI@FWS

Subject   Fw: Re: Fw: K. Sturgeon PCE comparison

I reviewed the literature send by Scott several weeks ago as cited in the rule. Parsley and Beckman (1994) which was the basis for the original requirement of 5.9f/s velocity, is a very detailed study tracking the response of white sturgeon to varying flow/depth parameters downstream from dams. The work is quite persuasive.

Unfortunately, the newest cite that the field provided (Schaffter 1997) was not included in the original cites that were forwarded in Scott's email. All I have to review is the one page reference faxed late Friday. The page forwarded includes the abstract which references finding eggs at substrate sites where flow velocities exceeded 1 m/s (or 3.26 fps (my conversion)). Apparently, the field staff now prefers the results of this study to the Parsley and Beckman study which has been part of their rule from the beginning.

Until I have a complete copy of the study, I can't make any judgement as to its validity compared to the Parsley work. Accordingly, could you please ask the staff to email me copies of the entire Schaffter work, as well as any other work upon which they now wish to rely, but which was not previously provided.

I'll review either Monday night when I get in or Tuesday morning and call you.

I must note that it would have been preferable for the staff to do this level of review of their work and findings prior to the last week before the rule was due; Ben Jessup and I had this conversation regarding the discrepancy between the 5.9fps figure in the rule and the actual peak flows of 2.6 fps with the staff quite explicitly nearly a month ag
Thank you very much.
-----Forwarded by Julie MacDonald/ASFW/OS/DOI on 01/30/2006 02:20AM -----

To: Renne Lohoefener/ARL/R9/FWS/DOI@FWS
From: Julie MacDonald/ASFW/OS/DOI
Date: 01/06/2006 06:58PM
Subject: Re: Fw: K. Sturgeon PCE comparison

Thank you Renne.   Following is an excerpt from the 12/29 version of the draft critical habitat document:

*Paragamian et al. (2001) observed mean water column velocities between RM 141.6 and 149.4 (RKM 228 and 240.5) during spawning events and in 2002, Paragamian et al. (2002) hypothesized that spawning sturgeon may select sites further upstream with greater water velocities as depth increases due to the backwater from Kootenai Lake. Parsley and Beckman (1994) suggested, based on information from four lower Columbia River sites were white sturgeon successfully reproduce, that optimal spawning habitat may occur when mean water column velocity is 5.9 ft/s (1.8 m/s) or greater. Based on these studies it appears that white sturgeon use velocity as a cue for spawning.*

I note that the peak average velocities shown in the Berenbrock work are a little less than 3fps, which is significantly below that which triggers spawning. This is consistent with the information I received on the braided reach. If indeed the sturgeon are looking for faster flows, areas farther from the backwater of the lake will certainly have more rapid flows. However, it is difficult to understand how we can find that a mean velocity which is roughly half the optimal velocity is appropriate for triggering spawning.

Perhaps I'm missing something.

Renne Lohoefener@FWS

Renne
Lohoefener@FWS            To:   Julie
01/06/2006 03:57 PM  MacDonald/ASFW/OS/DOI@DOI
                             cc:
                             Subject:   Fw: K. Sturgeon PCE

Renne
Lohoefener/ARL/R9/FWS/DO
I@FWS
02/01/2006 02:36 PM

To   Julie MacDonald/ASFW/OS/DOI@DOI

cc   Marshall Jones/ARL/R9/FWS/DOI@FWS

bcc

Subject   review of our phone conversation

History:            📄 This message has been replied to.

Thank you for taking my call and helping reach resolution.  Very much appreciated.   Please let me know immediately if your recollection differs from what I captured.

"successful spawning" will be changed to something like "successful production of larval sturgeon", the issue being that spawning is technically milt meeting egg

"May and June" will be changed to "May into July", the issue being some successful production does occur in early July

"intermittent depths of 1 to 16 meters"  will be changed to "depths of at least 5 meters", the issue again being successful production of young fish and we don't want to require agencies to consult on lesser water depths.

"within the entire braided reach" will be changed to something like "throughout (but not uniformly occuring) in the entire braided reach"  the issue being that the braided reach has a patchy distribution of water depths and bottom types

The draft EA will accompany the interim final rule

I believe these were the important issues and the rule will be changed to reflect consistency throughout.

I have talked to Ben and he had no issues.  He has reservations about the clarity of the paragraph that reads:

"Each of the areas designated contain PCEs that provide for one or more of the life history functions of the sturgeon.  In some cases the PCEs may exist as a result of ongoing federal actions.  However, the Service does not foresee that continued operations of Libby Dam in manner consistent with past management would result in destruction or adverse modification of critical habitat.  These conditions are part of the current baseline."

but realizes this is a policy level discussion.

Ren

Renne
Lohoefener/ARL/R9/FWS/DO
I@FWS

02/01/2006 02:52 PM

To  Julie MacDonald/ASFW/OS/DOI@DOI

cc  Dale Hall/ARL/R9/FWS/DOI@FWS, David
Bernhardt/SIO/OS/DOI@DOI, Matt J
Hogan/ARL/R9/FWS/DOI@FWS, Renne

bcc

Subject  Re: Kootenai Sturgeon Rule☐

History:        ⇨ This message has been replied to.

Julie

We are in agreement except for #1. Our biologists believe that water depths of at least 5 meters are
needed for successful production of young sturgeon.  There is no upper boundary that we know of.  I
believe you will be okay with this clarification since it narrows the conditions where this PCE would be
present.

The rule was changed to reflect "greater than 5 meters" throughout.  Please call immediately if this is a
problem.

tks

Ren
Julie MacDonald/ASFW/OS/DOI@DOI

Julie
MacDonald/ASFW/OS/DOI@
DOI

02/01/2006 02:46 PM

To  Matt J Hogan/ARL/R9/FWS/DOI@FWS

cc  Renne Lohoefener/R2/FWS/DOI@FWS, Dale Hall, David
Bernhardt/SIO/OS/DOI@DOI

Subject  Kootenai Sturgeon Rule

This email is to confirm the telephone conversation I had with Renne.  We agreed that the following
changes are appropriate and the field will make them:

1. PCE for depth would be from 5 to 16 feet and conforming changes would be made throughout the rule.
2. The velocities and flows throughout the braided reach would be intermittant, seasonal, and the actual
occurance would be somewhat scattered (Renne will work with solicitors to craft the language)
3. The rule will not refer to spawning habitat, as spawning is only one of several specific steps required to
successfully generate sturgeon young, Renne will work with the field to come up with an appropriate
phrase to capture the idea of habitat that supports all of the lifestages of spawning, incubation, and mobile
embryo survival.
4. Edits to the version provided this morning will be accepted <u>unless</u> they affect the biology, Renne will be
notified immediately to address any issues related to biology and will contact me if any other changes are
needed.
5. Renne will double check with Solicitor's office to ensure this morning's edits are ok.

There won't be sufficient time for me to actually review the document prior to it going to the Register, but
based on Renne's assurances listed above, I am comfortable the package will be ready for the Register
and recommend signature.

Renne, if I missed any of the issues you raised, please supplement with another email, I think I got them
all, but may have missed one or two.

**ATTACHMENT 4 – Document requests**

Director Hall asserted that DAS MacDonald made unreasonable document requests of staff. The Administrative Procedures Act requires the Service to make the research supporting the rule and the comment letters from the public available. For the past several years, it has been the practice of the Assistant Secretary's Office to review comment letters and research on most major rules. While there are many of these document requests, it appears that the specific request that Director Hall references is related to the rule making on the red-legged frog.

1. **DAS MacDonald requested 164 not 4,000 comment letters on the Red-legged frog.** In an email Director Hall asserted there were 4,000 documents contained in the request. The federal register notice for the red-legged frog notes there were 164 comment letters received (88 in the first request for comment and 76 in the second request for comment).

2. It is important to note that under the APA, the documents requested must be provided to anyone as part of the administrative record of the rulemaking. Staff was not requested to provide anything out of the ordinary.

3. It is also important to note that the Assistant Secretary's office had a longstanding practice of requesting comment letters and cites, and that the Service was free to provide just the substantive comments when the volume was large, such as when numerous form letters had been sent. This practice is documented in a number of emails over the years. The information was readily available for the investigators.

- **Email from Dale Hall asserting several thousand comments**.



Dale_Hall@fws.gov
03/01/2006 12:27 PM

To    "Matt Hogan" <matt_hogan@fws.gov>
cc    Julie MacDonald/ASFW/OS/DOI@DOI
bcc
Subject  Fw: re some of your questions

Matt:

I received the request below from Julie and cannot agree to have our staff
copy several thousand comments for a policy review. I'm afraid that,
between the unacceptable treatment of my staff (highlighted last Friday),
and astonishing requests like this that I must ask you to understand that I
will no longer honor requests unless they come directly from you. This is
truly unfortunate, but while I'm aggressively working with the Directorate
and our employees to heighten professionalism and accountability, there
seems to be an endless stream of unusual requests and hostility towards my
staff that undermine timelines and workload. I'll be back in the office on
Friday if you'd like to talk about it. Our employees deserve one chain of
comand that hands out assignments and gives instructions. For us, that's me
to you to Lynn to the Secretary. I realize your staff advisor is important
to you, but I simply have to get control if I'm to be held accountable.

Thanks for all your support and dedication.

Dale
---------------------------
Sent from my BlackBerry Wireless Handheld


    From: Julie MacDonald
    Sent: 02/28/2006 01:39 PM
    To: Dale Hall
    Cc: Matt Hogan
    Subject: Fw: re some of your questions

I am sorry to have to raise these issues to you, but as you asked me to on
Monday, I have several requests. Thank you for your help in advance.

I requested copies of the comment letters on this listing on the 24th of
February (see attached email).  I have heard nothing regarding the request.
Today, at the endangered species staff meeting, I asked if the request for
comment letters had been made to the field.  It had not, and Marge told me
that she did not know if the request had gone to you yet.  So I am
formally requesting that these documents be made available for my review as
soon as possible.  These are public documents that anyone off the street
can request under FOIA and the Service would provide them.  In order to
properly review the final rule, I need these documents.  The later I
receive them, the more difficult it becomes for me to complete my review in
time to surname the rule.  I appreciate your consideration in this matter.

In addition, the delisting for the marbled murrelet DPS was due here at the
end of January.  Renne and I discussed this schedule some months ago.  It
is now over a month past the time it was expected.  Could you please let me
know what is happening with this package?  I am anxious that we move

**Federal Register Notice Detailing Comment Letters**

impacts from critical habitat designation challenge these designations. The cycle of litigation appears endless, and is very expensive, thus diverting resources from conservation actions that may provide relatively more benefit to imperiled species.

The costs resulting from the designation include legal costs, the cost of preparation and publication of the designation, the analysis of the economic effects and the cost of requesting and responding to public comment, and in some cases the costs of compliance with the National Environmental Policy Act (NEPA) (42 U.S.C. 4321 et seq.). These costs, which are not required for many other conservation actions, directly reduce the funds available for direct and tangible conservation actions.

**Background**

It is our intent to discuss only those topics directly relevant to the designation of critical habitat in this rule. For more information on the California red-legged frog, refer to the revised proposed critical habitat designation published in the Federal Register on November 3, 2005 (70 FR 66906).

**Previous Federal Actions**

Previous Federal actions for the California red-legged frog can be found in our revised proposal of critical habitat for the California red-legged frog, published in the Federal Register on November 3, 2005 (70 FR 66906). That information is incorporated by reference into this final rule. On November 24, 2005, the federal district court in the Eastern District of California granted a motion to extend the deadline for publication of this final critical habitat until March 31, 2006. This final designation is being completed and published in the Federal Register in compliance with that court order.

**Summary of Comments and Recommendations**

We requested written comments from the public on the proposed designation of critical habitat for the California red-legged frog published on April 13, 2004 (69 FR 19620). We also requested written comments from the public on the revised proposed designation of critical habitat for the California red-legged frog published on November 3, 2005 (70 FR 66906). We also contacted appropriate Federal, State, and local agencies, scientific organizations, and other interested parties and invited them to comment on both the proposed and the revised proposed rule. This

comment period for the initial proposed rule opened on April 13, 2004, and closed on June 14, 2004. We extended the period from June 14, 2004 to July 14, 2004 (69 FR 32966). Comments and new information received in response to the first proposed rule which were relevant to the revised proposal and final designation were incorporated in the final rule as appropriate and are summarized with the comments received in response to the revised proposed rule below.

During the comment period for the initial proposed rule, we received a total of 88 comment letters from Federal, State, and local governments, and private individuals. Of those comment letters, 30 commenters generally supported the initial proposed designation of 4.1 million acres (1.6 million hectares) or provided specific information pertaining to the subspecies or habitat, and 58 commenters generally did not support the initial proposed designation or without or did not support the inclusion of certain lands. Of the 88 total comment letters, 39 comment letters focused on land areas that we later determined to be nonessential to the conservation of the subspecies and that we are no longer including in this final designation. In summary, in our revised proposed rule and in this final designation, we used the best scientific information available in determining the areas essential for the California red-legged frog and removed all areas that we determined are not essential for the conservation of this subspecies and therefore do not meet the definition of critical habitat. We reexamined all initially proposed areas and removed any areas that do not contain one or more of the PCEs or that were determined to be nonessential for the conservation of the subspecies because: (1) The area is highly degraded and may not be restorable; (2) the area is small, highly fragmented, or isolated and may provide little or no long-term conservation value; and/or (3) other areas within the geographic region were determined to be sufficient to meet the subspecies needs for conservation.

We also considered several criteria in the selection of areas that contain the features essential for the conservation of California red-legged frog and focused on designation units: (1) Throughout the current geographic, elevational, and ecological distribution of the subspecies; (2) that would maintain the current population structure across the subspecies' range; (3) that retain or provide for connectivity between breeding sites allowing for the continued existence of viable and essential metapopulations, despite

fluctuations in the status of subpopulations; (4) that possess large continuous blocks of occupied habitat, representing source populations and/or unique ecological characteristics; and (5) that contain sufficient upland habitat around each breeding location to allow for sufficient survival and recruitment to maintain a breeding population over the long term. We proposed critical habitat units in areas that have the highest likelihood to contain self-sustaining populations of California red-legged frog based on the presence of the PCEs, the density of California red-legged frog occurrences, and the kind, amount, and quality of habitat associated with these occurrences. We believe this strategy allowed us to narrow our initial focus down to the habitat that meet the definition of critical habitat and are essential to the conservation of the subspecies.

During the comment period associated with the revised proposed rule that opened on November 3, 2005, and closed on February 1, 2006, we received 76 comments directly addressing the revised proposed critical habitat designation and the draft economic analysis. Of those comments, three were from peer reviewers, one from a Federal agency, and 42 from organizations. Five commenters supported the designation of critical habitat for the California red-legged frog, and 55 opposed the designation. Sixteen letters included comments or information, but did not express support or opposition to the revised proposed critical habitat designation. Comments received were grouped into 15 general issues specifically relating to the revised proposed critical habitat designation for the California red-legged frog, and are addressed in the following summary and/or incorporated into the final rule as appropriate. We did not receive any requests for a public hearing, however, we did receive one request for a public workshop from the Calaveras County Farm Bureau. On January 10, 2006, we held a public workshop in San Andreas, California, and on January 17, 2006, we held an additional public workshop for the Calaveras County Board of Supervisors and the general public.

**Peer Review**

In accordance with our policy published on July 1, 1994 (59 FR 34270), we solicited expert opinions from five knowledgeable individuals with scientific expertise that included familiarity with the subspecies, the geographic region in which the subspecies occurs, and conservation biology principles. We received responses from two of the peer

**ATTACHMENT 5**


**Attachment 5**


<u>**BODY OF THE INVESTIGATIVE REPORT**</u>


Pg. 3 Employee 1

<u>**Assertion**</u>**: Bypassed staff and discussed with Field regularly**.


<u>**Response:**</u>   All discussions with staff were the result of the Washington Office and then the Regional Director's request..   This was the process followed until Director Hall required that ASFWP staff only interact with senior staff.  That request was honored.


<u>**Assertion:**</u>   DAS MacDonald determined the economic cost of designating the area as a critical habitat was unacceptable and ordered revision of the report.

<u>**Response:**</u>   The determination to exclude the areas was that of the Assistant Secretary, and authorized under Section 4(b) (2) of the ESA.  Revision of the report was ordered upon direction by the Assistant Secretary.


Pg. 4 Employee 1


<u>**Assertion:**</u> Interference minimized the ESA and ensnared it in litigation.


<u>**Response:**</u>  The ESA program was already ensnared in litigation when the Bush Administration took office.  All the work done by ASFWP was designed to improve the regulatory packages in order to assure their ability to survive a court challenge.  Often rules were poorly written and appeared to be arbitrary and capricious because of the FWS's failure to elucidate the reasons for final determinations.

**Assertion:** Based the Vernal Pools analysis on incorrect information and business development figures.

**Response:** The information used was from the State of California's Department of Finance. Population, gross annual product, and unemployment rates were used to assess the fiscal health of the affected counties. The mathematical error was real, but because the comparisons involved were relative comparisons, it did not change the relative values which were the basis for the determination. Section 4(b)(2) of the Act is designed to provide an opportunity for the Secretary to make critical habitat designation decisions based on considerations other than the biology. It is specifically designed to take into account economic issues.

Pg. 4 Employee 2

**Assertion:** MacDonald would not accept the FWS scientific findings and applied alternative outside sources and insisted on changes.

**Response:** The ESA requires that the best available data be used in decision making. The FWS did not always consider all the data, and often 'cherry picked' for sources and reviewers which supported their position. I looked at all the data available, particularly that which was provided through the comment process. Where a study appeared to be newer/better than that which the FWS relied upon, I asked for an explanation of why the newer work was not used. The comment period required by the APA during rulemaking is there for a purpose. FWS had a tendency to ignore or discount any information received during the comment period unless it supported the rule.

Pg. 4 Employee 3

**Assertion:** Required scientific proof to regulate

**Response:** The statement is partially accurate. Data was required to support assertions and assertions supporting data were deleted from the text. However, proof was not required, just a basis in fact evidenced by data. The ESA requires data to support findings. If there is no data, the FWS does not have the authority to act under the law.

Pg. 4 Employee 4

**Assertion:** Preamble language undermined position of FWS.

**Response:**  The preamble language was the product of work between the Assistant Secretary who is a former judge and a lawyer himself, and the Solicitor's office, not DAS MacDonald.

**Assertion:**  California Tiger Salamander:  allegedly changed science to force FWS to proposed listing as one population.

**Response:**  The science was not changed.  The DPS policy requires that differences be significant.  At question was how to define significance.  Tiger salamanders as a whole show a 7% range in genetic differences within the population.  California Tiger Salamanders had only a 2% difference, well within the normal range.  As a matter of policy, the ASFWP determined that 2% was not sufficient difference to be significant.  That determination was a policy decision.

Pg. 6 Employee 5

**Assertion:** There is still an ongoing lawsuit against FWS for not delisting the delta smelt.

**Response:**  To my knowledge, there is no lawsuit pending on this issue.  But even if there was, the email explicitly supported the FWS determination that the smelt was still threatened.

**Assertion:**  DAS MacDonald challenged the accuracy of the delta smelt population index that was used in the Delta Smelt status review.

**Response:**  The challenge was correct.  The index is not accurate.  It is an amalgamation of sampling efforts at different times, using different protocols.  Currently, there is no accepted protocol for sampling smelt, because biologists cannot decide how to accurately count them.  The fish appear randomly, so it is not possible to be certain whether populations are dropping, or that they are just found in areas where no sampling is taking place.  The FWS was directed to identify the inadequacies in the index and the weaknesses in the science so as to avoid giving the impression that our state of knowledge regarding the biology of the smelt was good.  This direction was given with the knowledge and consent of the Assistant Secretary.

26

**Assertion:**  DAS MacDonald said the USGS peer review of the Delta Smelt status review was 'no good'.

**Response:**  While the exact wording of the statement regarding the peer review is unknown, DAS MacDonald did take issue with the fact that most of the peer reviews appeared to be a synopsis of whether the reviewer agreed with the FWS determination rather than a critique of the analysis and science used to arrive at the answers.  Much of the language in the peer reviews was intemperate and merely stated the reviewers position as to whether the smelt should be listed.

**Assertion:** The email makes FWS appear confused about its own stance on the smelt's delisting.

**Response:**  That statement is inaccurate.  The email explicitly supports the FWS determination that the species remain listed.  The issues raised are related to the characterization of the science involved in the determination.  At issue was the fact that the FWS did not accurately convey to the public the profound level of uncertainty related the science used to list the smelt.

**Assertion:** JM was pressuring him to make subtle changes to his report or research.

**Response:**  I did not pressure him to make changes to the research.  I most definitely wanted the final determination to provide far more daylight as to the uncertainties around the science being used to support the listing.  The proposed status review asserted certainty where none existed. In the case of the smelt, where very little is fully understood, an assertion of certainty in a federal rule results in rigidity in regulatory actions that is not supported by the science, makes the FWS vulnerable to lawsuits related to regulatory actions, and ultimately limits our ability to take actions designed to assist the species.


Page 7 Employee 6

**Assertion:**  JM would curse and yell at her.

**Response:**  I do not yell at people.  I have cursed at times.  Generally, I match the tone of the person I am speaking to.

Page 8 Employee 7

**Assertion:** MacDonald wanted to hire an outside consultant other than SEI

**Response:** Employee had no knowledge of what I did or did not want. I did not discuss issues with this employee. In fact, I recommended SEI as a consultant to Director Hall based on the work they had done on the Northern Spotted Owl.

Page 7 Employee 8

**General observation about Employee:** Employee does not agree with the Administration policy goals. Every time employee was in a meeting, employee monopolized the time with a running diatribe on the Administration's policies and why they were wrong. While employee is entitled to his opinions, as long as the President is in office, his policies are the policies of the Department. The employee's continued intransigence on this issue was brought to the attention of the Solicitor.

**Assertion:** PECE policy statement that ...'*MacDonald wanted to use attorneys to stomp down FWS staff and lie that the states were doing a better job than they actually were...*'

**Response:** The statement is purely false. The PECE policy is designed to provide a method for evaluating conservation actions in order to determine whether to include them in a listing decision. One of the requirements is that the actions be effective. In the case of the Sage grouse, states and private landowners were taking conservation actions based on the verbal and written advice they received from the FWS.

The FWS evaluation of the various state and landowner actions was predicated on a very narrow reading of the PECE policy by the FWS. That narrow reading resulted in a determination by the FWS that unless states and others could provide published peer reviewed documentation that their particular actions were effective, those actions could not be considered conservation actions in the listing determination. As a result, actions recommended by the FWS were not considered effective conservation actions <u>by the FWS</u>! This result was completely contradictory to the purpose of the PECE policy which was to encourage states and private landowners to take conservation actions prior to listings, in order to avoid species declining to the point that listing was necessary. In addition, that narrow reading gave lie to FWS recommendations. Finally, that narrow reading imposed an effectiveness standard that was beyond any that the FWS itself used

in listing, biological opinions, and recovery activities.

Apparently, the employee took exception to the ASFWP pointing out the inconsistencies in approach.

Page 15 Employee 9

**Assertion:** DAS MacDonald asked to have several employees removed.

**Response:** Supervisor was not requested to remove any employees. However, there are two employees that were specifically mentioned to the supervisor, as a result of complaints that were more serious and specific in nature than normal. DAS MacDonald relayed the complaints to the supervisor who had the authority and information to determine whether the complaints were valid and should be acted upon. This was done to fulfill the ASFWP's responsibility to the public and the Department to relay complaints received to those who are able to judge the merits of the complaint.

In the case of the first employee, on two separate occasions, two different people recounted conversations in which the employee threatened them. Because of the seriousness of the allegations, the comments were relayed to the supervisor. Both complainants were known to the supervisor and would have been considered reliable as they work often with the FWS in the region.

With respect to the second employee, continued complaints about the employee's professional integrity led to the suggestion that perhaps replacing the employee with a staff member better able to interact with the community (this was a cooperative conservation project) would be constructive and result in faster completion of the project. Again, it was a suggestion and no other action was taken. It is the responsibility of Executive staff to make managers aware when there are complaints and if appropriate I make suggestions. It is not inappropriate to suggest a response. Clearly, from the fact that the supervisor did not act on either complaint, the supervisor was neither intimidated nor did he feel he had received a directive.

Page 15 Dale Hall

**Assertion:** Has a *'running battle'* with her attempts to go outside the chain of command.

**Response:**  Director Hall has misrepresented the facts.  Since Mr. Hall became Director and requested that DAS MacDonald only interact with senior staff, that request has been respected. Prior to Director Hall's tenure, DAS MacDonald routinely interacted with all staff when directed by the AD for Endangered Species. Mr. Hall's characterization of a 'running battle' is his own.  The business of the Assistant Secretary's office was conducted in a manner consistent with Director Hall's preferences.

**Assertion:**  In Southwest Willow Flycatcher MacDonald decided that 1.8 not 2.1 miles was more accurate for nesting radius.

**Response:**  The information provided by Director Hall is inaccurate.  Based on the text of the proposed rule, the data the FWS had indicated:

> ...' *Most recorded between-year movements occurred within the same drainage from 1.6 to 29 km (1 and 18 mi), but movements as far as 40 km (25 mi) were recorded (Luff et al. 2000; Kenwood and Paxton 2001; E. Paxton, USGS, e-mail).*'

The initial draft proposed to base the designation on the farthest range of 25 miles.  This appeared to be excessive, from a policy perspective.  Generally speaking, regulation is not based on the exception.  Instead, 18 miles was used because it represented the high range of where most of the movements occurred.  This determination followed a discussion with FWS Director Steve Williams regarding the appropriate range as well as a more thorough discussion of the fact that many miles of habitat lacking the physical and biological characteristics of critical habitat were included, based on these overlapping radii.  I asked then Director Williams biologically speaking how one could develop a decision rule that properly identified habitat without also including developed areas such as towns and cities (which was the case for the draft rule). Director Williams indicated that generally, overlapping ranges would not be used for species like the flycatcher, but that instead, the data would be examined to find where densest concentrations of sightings were found and those areas designated.  I relayed that information to the AD for Endangered Species and also the field.  It was ignored.

**Assertion:**  Forced staff to change to 1.8 miles because it would avoid listing in California

**Response:** <u>Director Hall has misrepresented the facts.</u> Avoiding listing in California was not a goal, and in fact, both the proposed and final rule includes lands in California. In addition, at no time was property owned by DAS MacDonald's family even close to being affected by a flycatcher listing. Had the family's property been affected, I would have immediately recused myself from working on the rule. <u>I would note that the IG had to have been fully aware of this fact, as the action implied would have been a violation of the government's conflict of interest prohibitions.</u>

**Assertion:** DAS MacDonald had a particular interest in all California work because of a family ranch and previous work experience.

**Response:** <u>Director Hall's statement is false.</u> Most of the ESA listings and critical habitat designations are in California. At times other staff in the Assistant Secretary's office worked on ESA rule makings generally, because of familiarity with the regions. But virtually all ESA regulatory documents were reviewed and approved by DAS MacDonald. The statement that DAS MacDonald focused on California actions because of family property is not accurate and further, is misleading in that it implies improper activity on my part. Had family property been affected by any rule making, DAS MacDonald would not have been able to work on the listing because of conflict of interest prohibitions.

**Assertion:** Facedown on Kootenai Sturgeon. Hall challenged DAS MacDonald assertions and requested that she put in writing her position. DAS MacDonald relented and kept the 2.3 to 5.9 range.

**Response:** Director Hall's statement is inaccurate. <u>At no time did DAS MacDonald require any particular range;</u> rather the DAS pressed the FWS to clarify the rule and the scientific basis for its contents.

The entire discussion on the Kootenai sturgeon occurred between 11/2005 and 2/2006. The Service prepared a draft rule that was internally inconsistent and basically incoherent. ASFWP repeatedly requested information, resolution and clarification of the inconsistencies. FWS was non-responsive. There are numerous emails documenting the apparent inconsistencies, and requesting clarification. Draft language was provided by the DAS and the DAS repeatedly asked for confirmation as to whether the language was correct. In a 1/22/2006 email to the AD

31

Endangered Species DAS MacDonald stated:

> ' It is becoming increasingly troubling that the regional director, the regional solicitor, and everyone else with an interest in producing a defensible rule does not seem to be troubled by this apparent inconsistencies. The region seems unable to construct a rule that lays out the fact and logically proceeds to a conclusion. I am <u>still</u> unclear as to what the actual facts of the matter are, I have cobbled together what I think I am reading, but again, the apparent contradictions and muddiness of the statements in the rule, lead me to wonder if I might still not have gotten it quite right.'

DAS MacDonald requested a meeting for clarification, and received no response from FWS. A final rule was delivered to ASFWP. DAS MacDonald refused to surname the rule because it was not possible to recommend to the Assistant Secretary that the rule was adequate. At that point, the FWS AD for Endangered Species resolved the outstanding issues and clarified the points necessary.

**Assertion:** DAS MacDonald circumvented the chain of command and went directly to the field for documents.

**Response:** <u>The statement is inaccurate.</u> DAS MacDonald interacted with the Service in the manner preferred by the Director of the FWS. Under the tenure of Director Williams DAS MacDonald worked directly with staff. Once Director Hall requested that interactions only occur with senior staff that request was honored. Director Hall's characterizations of DAS MacDonald circumventing the chain of command is a disingenuous effort to confuse the issue and impose his preferred method of management on another Director.

**ATTACHMENT 6 – DOCUMENT RELEASE**

The report notes there was no criminal activity and then asserts that DAS MacDonald violated the Code of Federal Regulations. The report asserts DAS MacDonald gave preferential treatment to individuals by releasing non-public information. The Inspector General apparently takes the position that only a FOIA Office can make a determination to release documents. DAS MacDonald had the authority to release the documents. No rule was violated in the release. Further, had the investigators reviewed the practice of the FOIA office in releasing documents requested, they would have found many similar documents released under FOIA.

1. <u>EPA draft rule (2002)</u>: A draft EPA rulemaking was transmitted to a chemist working for Chevron. It was sent because there were a number of technical terms that were unclear. It is not clear that the person ever received the draft. No response was received, and no action was ever taken on the rule by EPA.

This, of all the allegations in the report, is most troubling. While the release of the document was not illegal, it was foolish. Relative inexperience is the only explanation. DAS MacDonald was a Special Assistant and had been working for the Department only a short time.

2. <u>Draft Critical Habitat Guidance:</u> The document was an early theoretical draft. DAS MacDonald had the authority to release the draft. As a practical matter, the draft contained nothing that provided PLF information upon which to base a suit. The fact that no suits were filed predicated on the contents is *prima facie* evidence that this is case, and your investigators were given that information. Had I released the document to the Center for Biological Diversity, who was regularly suing the Service on critical habitat, it would have been more arguable. The document primarily laid out the legal basis upon which practical guidance for developing critical habitat would be based.

3. <u>Delta Smelt Email</u> The document was released by DAS MacDonald at the request of the Farm Bureau. The document was not pre-decisional and was released by the FOIA office on July 7, 2004. The release was based on a formal FOIA request from the Farm Bureau. The report implies that there was an improper relationship and that the relationship generated the release of the document. In fact, a review of the FOIA requests received by ASFWP will demonstrate that the request, the specificity of the request, and the nature of the request were not unusual. The impropriety is implied by the report and does not exist in fact.

**ATTACHMENT 7**

**<u>Staff Interactions</u>**

The report contains a number of statements regarding negative interactions with staff. These allegations are virtually impossible to refute as they address verbal communication. However, your staff did review the numerous emails written over the past 5 years. This email correspondence demonstrates a uniform level of professional courtesy. It contains a multitude of polite requests for briefings and information that are replete with phrases like 'please could you...', 'would it be possible to...", as well as thanks and recognition of staff when a job was well done, or a compliment received. The comments on draft rulemakings that have been the subject of discussion were generally prefaced by a cover letter noting they could be wrong, and requesting staff review them. Finally, a review of draft and final responses to my comments demonstrate that staff routinely rejected my comments and suggestions. This written record does not support the assertions of intimidation made by those interviewed.

**<u>Criticism of fitness to review biological documents</u>**

Your report implies that an absence of a degree in biology makes one unfit to review and comment on FWS rulemakings. That perspective if applied to virtually any supervisory position, would result in many executives being found unfit. The review of the rules provided to the ASFWP consists of a check to ensure that the science is accurately represented, that the statements contained in the rules are supported by data, as required by the statute, and that the rules are internally consistent and consistent with other Service publications. All this can be done by reviewing the documentation supporting the rule. It requires no specialized knowledge.

In order to ensure the rules accurately represent the science, the cited literature is reviewed to ascertain whether it supports the statements in the rule. This does not require any expertise in biology. It merely requires the ability to read and confirm that research findings support the Service's statements.

The ESA requires that final rules be supported by data. Again, it does not require a degree in biology to understand whether there is data available to support a statement made by the

Service.  If the data is available, the Service should be able to produce it, which is what was required.

Rulemakings must be internally consistent, or they are subject to challenge.  For example, in the Bull Trout draft critical habitat, the Service identified virtually pristine water quality as being essential to the conservation of the species.  That means, in order to designate any occupied lands as critical, the water quality must be pristine.  The Service then proposed to designate as critical habitat stream reaches which had such poor water quality they were superfund sites.  If pristine water quality is required for designation, then a designated site may not have poor water quality.  By designating a site with poor water quality and requiring pristine water quality, the Service would have left the government open to a suit that either challenged the biological requirement of pristine water quality, or the designation of the superfund reach.  My review was designed to avoid such situations, and in this case, the Service chose to remove the streams from the designation, rather than change the water quality requirement.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COUNTY OF SAN MIGUEL, COLORADO, et al., | |
| Plaintiffs, | |
| v. | |
| MACDONALD, et al., | |
| Defendants, | |
| and | |
| COLORADO CATTLEMEN'S ASSOCIATION, 8833 Ralston Rd. Arvada, CO 80002-2239 | Civ. No. 06-1946 (RBW) |
| PARTNERSHIP FOR THE WEST, and 350 Indiana Street, Suite 640 Golden, CO 80401 | |
| WESTERN CONSERVATION COALITION 1074 24 Road Grand Junction, CO 81505 | |
| Defendants-Intervenors | |

**[PROPOSED] ORDER ON PLAINTIFFS' COMBINED MOTION FOR
SUPPLEMENTATION OF THE ADMINISTRATIVE RECORD, ADEQUATE
CERTIFICATION OF THE RECORD, CHALLENGING DEFENDANTS'
CLAIMS OF ATTORNEY-CLIENT PRIVILEGE AND FOR *IN CAMERA*
REVIEW OF DEFENDANTS' PRIVILEGE CLAIMS, AND FOR JUDICIAL
NOTICE OF AN INSPECTOR GENERAL REPORT**

Having reviewed the Plaintiffs' Combined Motion for Supplementation of the

Administrative Record, Adequate Certification of the Record, Challenging Defendants'

Claims of Attorney-Client Privilege and For *In Camera* Review of Defendants' Privilege

Claims, and for Judicial Notice of an Inspector General Report, and supporting documents, Defendants' and Defendant-Intervenors' response in opposition, and supporting documents, it is hereby

ORDERED that the Plaintiffs' Combined Motion in this case is DENIED.

IT IS SO ORDERED this _____ day of _____, 2007.

_____
HONORABLE REGGIE B. WALTON
UNITED STATES DISTRICT JUDGE