**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| COUNTY OF SAN MIGUEL, | ) | |
| COLORADO, *et al.*, | ) | |
| | ) | Case No. 1:06-CV-1946 (RBW) |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MACDONALD, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' COMBINED MOTION FOR
SUPPLEMENTATION OF THE ADMINISTRATIVE RECORD, ADEQUATE
CERTIFICATION OF THE RECORD, CHALLENGING DEFENDANTS' CLAIMS OF
ATTORNEY-CLIENT PRIVILEGE AND FOR *IN CAMERA* REVIEW OF
DEFENDANTS' PRIVILEGE CLAIMS, AND FOR JUDICIAL NOTICE OF AN
INSPECTOR GENERAL REPORT ON JULIE MACDONALD**

**INTRODUCTION**

Far from demonstrating that the Litigation AR is complete, their privilege claims are

justified, or that judicial notice of the Inspector General Report on Julie MacDonald is not

appropriate, Plaintiffs' Exhibit ("Ex.") B ("IG Report"), defendants and intervenors only manage

to demonstrate further that the contested records are adverse to their position that listing

Gunnison sage-grouse is not warranted, and support plaintiffs' position that the administrative

record for this litigation ("Litigation AR") should be supplemented.

Defendants also make self-serving assertions that it is not "necessary" for the Court to

see the contested materials, or that the records are somehow unrelated to the Gunnison sage-

grouse listing decision – even though the vast majority of the records were generated by Fish and

Wildlife Service ("FWS") staff and biologists for the express purpose of listing Gunnison sage-

grouse as endangered or threatened under the Endangered Species Act, 16 U.S.C. § 1531, *et seq*.

("ESA" or "Act"), *see generally* Critical Habitat Records (Ex. J); Public Outreach Records (Ex. K) at pp. 1-12, or in connection with the final decision, *see* Public Outreach Records (Ex. K) at pp. 13-35, and other contested records contain information that is clearly relevant to whether Gunnison sage-grouse is threatened with extinction. *See* Other Records (Ex. L) at pp. 1-4.

Moreover, defendants have yet to produce an adequate sworn declaration that certifies and designates the Litigation AR or a privilege log that supports their claims of attorney-client privilege, and although they have now conceded that their existing privilege log is deficient, they have yet to produce a sufficient one. Defendants also have yet to refute that judicial notice of the IG Report (Ex. B) is appropriate.

Accordingly, as plaintiffs have already demonstrated in their memorandum ("Pl. Memo.") but as further demonstrated below, plaintiffs' combined motion (Dock. No. 34) should be granted, and the Court should order defendants to supplement the Litigation AR with all of the contested materials. The Court should also order defendants to produce an adequate declaration that certifies the record. Also, since defendants still have not satisfied their burden to show that the attorney-client privilege applies to the records for which it is claimed, the Court should conduct an *in camera* inspection of all remaining records still withheld on this basis, or at the very least, order defendants to produce an adequate privilege log immediately. Finally, should the Court take notice of any additional materials on Ms. MacDonald, it should also take judicial notice of a FWS Region 6 memorandum that specifically documents her interference with the challenged Gunnison sage-grouse decision. *See* Memorandum from Assistant Regional Director, Fisheries – Ecological Services, Region 6 to Regional Director, Region 6 (June 21, 2007) (Ex. O).

Each of these points is explained below.

## ARGUMENT

I. **THE RECORD MUST INCLUDE EVERYTHING THAT WAS DIRECTLY OR INDIRECTLY CONSIDERED BY THE AGENCY, NOTHING MORE OR LESS.**

 A. **Defendants' Characterization Of The Litigation AR As "Adequate" Is Self-Serving And Should Be Rejected Out Of Hand, And The Relevant Inquiry Is Whether The Record Is Complete.**

Defendants repeatedly state that supplementation of the Litigation AR is not "necessary" because it is already "quite extensive" and "more than adequate."  Defendants' Opposition (Dock. No. 38) ("Df. Opp.") at 4, 5; *see also id.* at 13 ("all *necessary* documents, facts, and agency analyses are already in the administrative record") (emphasis added); *id.* at 16 ("the Court has a more than adequate record before it").  The Litigation AR in its current form is indeed extensive – and, as plaintiffs will explain in their briefs on the merits in this case, demonstrates that Gunnison sage-grouse is imperiled with extinction in the foreseeable future, and that defendants' final determination that listing it under the ESA is "not warranted" is arbitrary, capricious, an abuse of discretion, and not in accordance with the ESA.  16 U.S.C. § 1533(a); 5 U.S.C. § 706(2)(A).  However, for purposes of compiling the administrative record for this case, the question is not whether, in defendants' self-serving view, supplementation of the record is "necessary," but whether the record is *complete*.

The administrative record must form the basis for judicial review and include *all* of the information that the agency "directly or indirectly considered" in making the challenged determination – "neither more nor less."  *Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 196-97 (D.D.C. 2005).  As Judge Friedman of this court recognized in rejecting the same argument that defendants make here, there is "no reason to decline supplementation simply

3

because the additional information might be cumulative." *Ad Hoc Metals Coalition v. Whitman*, 227 F. Supp. 2d 134, 139 n. 4 (D.D.C. 2002); *see also id.* (agency's "reliance on an already robust record does not negate the fact" that omitted information "was considered and is necessary to complete the record") (citing *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir.1989); *Carlton v. Babbitt*, 26 F. Supp. 2d 102, 107 (D.D.C. 1998)).

In claiming that the Litigation AR need not be supplemented because it is adequate, or because it is not "necessary" for the Court to see the contested materials, defendants are improperly attempting to "skew the record in [their] favor by excluding pertinent but unfavorable information." *See Envtl. Def. Fund v. Blum*, 458 F. Supp. 650, 661 (D.D.C. 1978); *see also, e.g., Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1992) (for a court "to review less than the full administrative record might allow a party to withhold evidence unfavorable to its case"); *Fund for Animals*, 391 F. Supp. 2d at 197 ("an agency may not unilaterally determine what constitutes the administrative record").

    **B.**    <u>Defendants Construe The Relevant Decision Too Narrowly In Order To Avoid Supplementation With Highly Relevant Materials.</u>

        **1.**    <u>The Critical Habitat Records Were Generated By FWS Staff Concurrently With And For The Purpose Of Listing Gunnison Sage-Grouse.</u>

Defendants argue that supplementation of the Litigation AR with materials related to F'S's consideration and development of critical habitat, *see generally* Ex. J, is not warranted because the agency's development of critical habitat is a separate decision from whether to list Gunnison sage-grouse under the ESA. *See* Df. Opp. (Dock. No. 38) at 8. This argument lacks merit for several reasons.

First, F'S is required, under the ESA, to designate critical habitat "concurrently" with the

agency's development of a proposed rule to list a species, to the maximum extent prudent and

determinable. *See* 16 U.S.C. § 1533(a)(3)(A)(I) ("The Secretary, by regulation . . . and to the

maximum extent prudent and determinable . . . shall, concurrently with making a determination

under paragraph (1) that a species is an endangered species or a threatened species, designate

any habitat of such species which is then considered to be critical habitat").  Notwithstanding

defendants' attempts to split hairs, the two decisions are in fact very closely related, as they are

both required by the same section of the ESA and Congress expressly intended that they be

carried out at the same time, as intervenors recognize.  *See* Int. Opp. (Dock. No. 35) at 6 ("It is

only prudent . . . for the F'S to make preparations for critical habitat designations concurrent

with its consideration of the listing factors of the ESA.").

Additionally, while generated in connection with FWS's consideration and development

of critical habitat, the critical habitat records contain information about the biological status and

needs of Gunnison sage-grouse that relates to whether, and to what degree, the species is

threatened with extinction as a result of low population numbers and habitat loss and

degradation, as well as what habitat will be necessary to avert its extinction.  *See*, *e.g.*, Critical

Habitat Records (Ex. J) at pp. 10-14, 19-45, 48-58, 63-72, 77-87 (describing specialized habitat

needs of Gunnison sage-grouse); *see also*, *e.g.*, *id*. at 19 (noting that "[e]ven though the smaller

GUSG populations have a relatively high probability of extinction, they are vital to the existence

of the sage-grouse" as "[m]ultiple populations across a broad geographic area provide insurance

against a catastrophic event threatening the entire species" and "provid[e] an important genetic

reservoir"); *id*. at 26 (noting that since "there currently is little or no connection of six of the

populations with each other," in the short-term it will be necessary" to transplant birds between

populations); *id.* at 28 (to be consdered "critical," habitat must be "indispensable to the species['] long-term persistence"); *id.* at 29-31 (discussing development and evaluation of "primary constituent elements" – *i.e.*, those "physical and biological features [that] are essential to the conservation of a species").[1]

Agency staff's ready acceptance of the species' imperiled biological status as a result of habitat loss and low population size, reflected by their development of proposed critical habitat, is relevant not only because the listing and critical habitat decisions are to be conducted concurrently, but also because FWS must consider the same underlying information – the species' loss of habitat and range – for *both* decisions. *See* 16 U.S.C. 1533(a)(1)(A) (a species may be endangered or threatened based on "the present or threatened destruction, modification, or  curtailment of its habitat or range"); 16 U.S.C. § 1532(5) ("critical habitat" consists of areas that are deemed "essential for the conservation of the species").

Moreover, the records are relevant because they show the extent to which FWS staff and biologists ventured down the path toward listing before reversing course. Indeed, the records reflect that agency personnel were so accepting of the species' endangered (or threatened) status, and were so deep into the listing process, that they actually considered what areas should be designated as critical habitat. *See*, *e.g.*, Critical Habitat Records (Ex. J) at p. 28 (habitat designated as "critical" "must be indispensable to the species['] long-tem persistence"); .

--------

[1]  The critical habitat records also reflect deliberations about legal requirements and management considerations in connection with the agency's development of critical habitat areas. *See*, *e.g.*, *id.* at 46 (electronic mail correspondence between agency staff discussing whether to exclude national parks from critical habitat designations); *id.* at 73 (memo from FWS Director regarding method for providing explicit descriptions of the benefits of critical habitat designation); *id.* at 76 (discussing whether to designate unoccupied habitat as critical habitat).

Although critical habitat designation is required by the ESA to be completed "concurrently" with listing to the maximum extent practicable, it is regularly deferred by FWS on those occasions when the agency does list species under the ESA. *See, e.g.*, *Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999); *Natural Resources Defense Council v. U.S. Dep't of the Interior*, 113 F.3d 1121 (9th Cir. 1997).

By any objective measure, it is completely nonsensical for FWS to claim that the critical habitat records are somehow unrelated to the challenged decision. Indeed, these records do not merely "contain" information "about" Gunnison sage-grouse generally, *see* Df. Opp. (Dock. No. 38) at 7, they were specifically generated by FWS *for the express purpose of listing the species*. The fact that this initial decision was later reversed by a discredited Department of Interior ("DOI") political appointee does not negate this basic fact. *See, e.g.*, *Delano v. Roche*, 391 F. Supp. 2d 79, 89 (D.D.C. 2005) (adopting a "broad interpretation of relevancy" for purposes of evaluating contents of an administrative record, consistent with Federal Rule of Evidence 401). The critical habitat records are clearly "related" to the Gunnison sage-grouse listing decision.

## 2.     Defendants Concede That The Records Are Adverse To Their Position.

Defendants acknowledge that the contested records do not support the final decision not to list Gunnison sage-grouse, but were generated in connection with several draft proposed rules to list the species under the Act. *See* Df. Opp. (Dock. No. 38) at 6 (stating that records 1-5, 10-12, 13-18, 29-30 support recommendation to list the species). Thus, defendants effectively concede that plaintiffs have met the third *prima facie* element supporting supplementation of the record with these materials. *See Fund for Animals*, 391 F. Supp. 2d at 198 ("A plaintiff can make a *prima facie* showing that an agency excluded adverse information from the record by

proving that the documents at issue . . . 'are adverse to the agency's decision.'") (quoting *Public Citizen v. Heckler*, 653 F. Supp. 1229, 1237 (D.D.C. 1987)).

Defendants certainly do not otherwise refute that contested records are adverse to the final decision adopted by the agency. Although defendants attempt to distinguish the relevant cases, in doing so they perpetuate the same rationale – *i.e.*, that the "documents at issue here are not related to the Service's [final, 'not warranted'] decision." Df. Opp. (Dock. No. 38) at 11. Again, however, this only confirms that the records *are* related to the initial decision to list, and therefore contain information that is adverse to defendants' contrary position that listing is "not warranted."[2]

The fact that some of the public outreach records were developed to explain the final decision not to list Gunnison sage-grouse also does not negate that the records are adverse to defendants' position. These records are adverse because they reflect the agency's reversal of course and the chronology of that reversal, from proposed listing to the final, not warranted decision. *Compare, e.g.,* Public Outreach Records (Ex. L) at pp. 10-12 (draft "Questions and Answers" for proposed listing from July 26, 2005) with *id.* at pp. 13-14 (draft summary of

---

[2] Intervenors claim that the question of whether the Litigation AR should be supplemented does not turn on whether the contested records contain information that is adverse to defendants' position. Int. Opp. (Dock. No. 35) at 8-9. This is simply not correct. D.C. Circuit precedent is clear that "[s]upplementation of the record may be necessary when an agency excludes information adverse to its position from the administrative record." *Public Citizen v. Heckler*, 653 F. Supp. at 1237 (citing *San Luis Obispo Mothers for Peace*, 751 F.2d 1287, 1327 (D.C. Cir. 1984)); *see also Fund for Animals*, 391 F. Supp. 2d at 198 ("Supplementation of the record may be necessary when an agency excludes information adverse to its position from the administrative record."); *Ad Hoc Metals Coal.*, 227 F. Supp. 2d at 139 (finding that omitted record "must be included in the administrative record, particularly given the adverse nature of its contents") (citing *Walter O. Boswell Mem'l Hospital v. Heckler*, 749 F.2d at 792 (reviewing less than the full administrative record would allow agency to withhold evidence adverse to its position)).

negative listing decision dated seven months later).  In addition, the records show that F'S had to "delete" information in order to support the final decision not to list, such as the fact that the species' range has been reduced to approximately "8.5 percent of its historic distribution."  *See id.* at 17.

<div align="center">

**3.**    **Defendants Construe The Relevant "Decision" Narrowly In Order To Skew The Administrative Record In Their Favor.**

</div>

In characterizing the relevant decision as one *not* to list – as opposed to one of *whether* to list – defendants' take a position that, taken to its logical end, would allow the government to avoid including *any* information that does not support the final decision taken by the agency. This would be untenable, as even defendants appear to recognize, as they have already compiled numerous materials – including numerous drafts of a proposed rule to list the species – that support or were generated in connection with the initial decision to list Gunnison sage-grouse, and do not support the final decision not to list the species.  *See, e.g.,* AR 11248-12680.

In addition, defendants' interpretation of the relevant "decision" is inconsistent with the law of this Circuit.  For example, in evaluating the administrative record for a challenge to FWS's failure to perform requisite environmental analysis for rules increasing hunting in wildlife refuges, Judge Urbina found that four contested records – which contained information about the impacts of hunting on wildlife and habitat in refuges – were "directly relevant to the promulgation of rules opening refuges to hunting."  *Fund for Animals*, 391 F. Supp. 2d at 198. Judge Urbina construed the relevant decision as one concerning hunting in refuges generally, not as a specific decision to promulgate or adopt particular rules or agency policies related to hunting in refuges.  *Id.*

Similarly, in *Ad Hoc Metals Coalition v. Whitman*, Judge Friedman determined that

<div align="center">9</div>

contested information were "directly related to *the issue decided*" by the agency – not the particular position adopted by the agency on that issue in the administrative or litigation contexts – and determined that because the records were "adverse to the agency's position, supplementation of the administrative record [wa]s appropriate." *See Ad Hoc Metals Coal.*, 227 F. Supp. 2d at 139 (emphasis added).

Indeed, in *Delano v. Roche*, this Court applied a "broad interpretation" of relevance consistent with Federal Rule of Evidence 401 – *i.e.*, as "'evidence having any tendency to make the existence of *any fact that is of consequence* to the determination of the action more probable or less probable than it would be without the evidence.'" *See Delano v. Roche*, 391 F. Supp. 2d at 89 (quoting Fed. R. of Evid. 401) (emphasis added). Certainly, that FWS staff and biologists identified large areas of critical habitat necessary to save Gunnison sage-grouse from extinction, *see generally* Critical Habitat Records (Ex. J), or concluded that Gunnison sage-grouse currently occupies 8.5 percent of its historic range, Public Outreach Records (Ex. K) at 17, are facts "of consequence" to whether the species is likely to become extinct in the foreseeable future such that listing under the ESA is warranted.

At bottom, defendants' arguments are simply a recycled attempt to exclude information on the basis that the agencies did not *rely on* the excluded information in making the final decision not to list Gunnison sage-grouse. However, this argument has already been squarely rejected by D.C. district courts in numerous decisions. *See*, *e.g.*, *Ad Hoc Metals Coal.*, 227 F. Supp. 2d at 139 ("[t]o the extent that [the agency] relies on fine distinctions between the phrase 'relied upon' and the word 'considered,' its argument is without merit"); *Fund for Animals*, 391 F. Supp. 2d at 196 (agency may not "exclude information on the grounds that it did not 'rely' on

the excluded information in its final decision"); *accord*, *Fund for Animals v. Williams*, 245 F.
Supp. 2d 49, 55 (D.D.C. 2003); *Amfac Resorts, L.L.C. v. Dep't of Interior*, 143 F. Supp. 2d 7, 12
(D.D.C. 2001);  *Kent County, Del. Levy Court v. EPA*, 963 F.2d 391, 395-96 (D.C. Cir. 1992);
*see also Envtl. Defense Fund v. Blum*, 458 F. Supp. at 661 (agencies may not skew the record by
excluding information that has "great pertinence" to the proceedings).  Accordingly, the Court
should reject it here as well.

> ### 4.    Defendants Do Not Address The Fact That FWS Initially Compiled The "Administrative Record" To Include Most Of The Contested Materials.

Defendants' attempts to distance themselves from their initial compilation of the
"administrative record" in responding to Sagebrush Sea Campaign's ("SSC") request under the
Freedom of Information Act, 5 U.S.C. § 551, *et seq*. ("FOIA"), are unavailing.  Defendants
attempt to rely on cases that (accurately) observe that FOIA has a broad disclosure mandate, *see*
Df. Opp. (Dock. No. 38) at 9, but these cases do not help them here.

Indeed, defendants never address the central point raised by plaintiffs, which is that it
was the *agencies* who construed SSC's FOIA request – for the "administrative record" for the
Gunnison sage-grouse listing decision, *see* Letter from Salvo to Hunt, *et al*. (Apr. 18, 2006) (Ex.
C) – to include most of the contested materials.  *See* Index for "Administrative Record for
Gunnison Sage-grouse Determination of April 18, 2006" (FOIA AR Index") (Ex. D).
Defendants have offered no compelling rationale for why these records were not then included in
the "administrative record" that has been compiled for this litigation, and there is no legal
mandate under either FOIA or the ESA that required defendants to disclose these records when
responding to SSC's FOIA request but withhold them from the Litigation AR.  The fact that
FWS considered most of the materials to comprise part of the administrative record for the

challenged decision is highly persuasive evidence that FWS "directly or indirectly considered" them, and, therefore, the Litigation AR should be supplemented to include these records as well. *Fund for Animals*, 391 F. Supp. 2d at 196-97.

> C.    **Notwithstanding Defendants' Confusion, The D.C. Circuit Made Clear In *Esch v. Yeutter* That Supplementation Is Appropriate When Materials That Were Considered By The Agency Are Not Included In The Record, And *Esch* Remains Good Law.**

Although defendants attempt to undermine the principles set forth by the D.C. Circuit in *Esch v. Yeutter*, Df. Opp. (Dock. No. 38) at 13 n.3, numerous D.C. courts, including this Court, have recently recognized that supplementation with extra-record evidence is warranted under the exceptions set forth in that decision. *See, e.g., Delano v. Roche*, 391 F. Supp. 2d at 88, 89 (citing *Esch* exceptions, and supplementing administrative record where "where supplemental information [wa]s relevant to the final decision"); *see also Pacific Shores Subdivision California Water Dist. v. U.S. Army Corps of Eng'rs.*, 448 F. Supp. 2d 1, 6 (D.D.C. 2006) (referring to the "eight recognized exceptions to the general prohibition against extra-record review" set forth in *Esch*); *Partlo v. Johanns*, 2006 WL 1663380 at *26 (D.D.C. June 11, 2006) ("The *Esch* decision, and related rulings, stand for the principle that while a court is generally confined to the administrative record upon APA review, 'it may sometimes be appropriate to resort to extra-record information to enable judicial review to become effective.'") (quoting *Esch*, 876 F.2d at 991); *Ad Hoc Metals Coal.*, 227 F. Supp. 2d at 137 (*Esch* supported decision to consider evidence that was considered by the agency but not included in the record); *Carlton v. Babbitt*, 26 F. Supp. 2d at 107 (supplementing record with evidence agency considered by failed to include in the record) (citing *Esch*, 876 F.2d at 991); *cf. Amfac Resorts, L.L.C. v. U.S. Dep't of Interior*, 282 F.3d 818, 830 (D.C. Cir. 2002) (citing *Esch* for principle that judicial review of a

challenged regulation must be confined to the administrative record, except in limited circumstances).  Defendants' attempt to undermine *Esch v. Yeutter* is neither candid nor credible; *Esch* remains good law.[3]

In addition, by focusing on four "exceptions" to the record-review principle set forth by the D.C. Circuit in *James Madison, Ltd. v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996), defendants have "conflated the act of supplementing the record with permitting consideration of extra-record evidence."  *See Pacific Shores*, 448 F. Supp. 2d at 5-6.

In *James Madison, Ltd.*, the D.C. Circuit described four instances in which a court may deem supplementation of an administrative record necessary.  *See, e.g.*, *Ad Hoc Metals*, 227 F. Supp. 2d at 137.  As explained above and in plaintiffs' memorandum (Dock. No. 34), at 10-18, one of these instances is present here – *i.e.*, when "it appears the agency deliberately or negligently excluded documents adverse to its decision."  *James Madison, Ltd.*, 82 F.3d at 1095; *Fund for Animals*, 391 F. Supp. 2d at 196.  Plaintiffs have made a *prima facie* showing, which defendants have not refuted, that FWS excluded adverse information from the record because the

---

[3]  Defendants' attempts to distinguish the cases cited by plaintiffs do not withstand scrutiny.  For example, in attempting to distinguish this Court's application of *Esch* in *Delano v. Roche*, defendants claim that *D*elano is factually distinct for the familiar reason the contested materials here do not relate to (or support) FWS's final decision not to list Gunnsion sage-grouse.  Df. Opp. (Dock. No. 38) at 14.  As explained above, this is an overly narrow construction of the relevant decision, and is inconsistent with defendants' own practice of including records in the Litigation AR, including drafts of proposed rules, that *do* support listing Gunnison sage-grouse under the ESA.  *See, e.g.,* AR 11248-12680.  Defendants' attempt to distinguish *Fund for Animals* is equally thin; although Judge Urbina applied *James Madison, Ltd.* to permit supplementation of the record, he also cited *Esch* favorably.  *See Fund for Animals*, 391 F. Supp. 2d at 197-98.  In any event, plaintiffs cited *Fund for Animals* for a different reason, *i.e.*, as authority for the principle that FWS may not exclude information on the grounds that it did not "rely on" it, *see* Pl. Memo. at 19 – which is itself another argument that defendants do not address, let alone refute.

contested documents were known to FWS at the time of its decision, directly relate to the

Gunnison sage-grouse listing decision, and are adverse to the agency's final decision. *See* Pl.

Memo. (Dock. No. 34) at 10-18; *supra* at 7-9.

These four instances in which supplementation of the record is appropriate under *James*

*Madison, Ltd.* are distinct from those situations where consideration of "extra-record" evidence

is appropriate pursuant to one or more of the eight exceptions set forth in *Esch*. *See Pacific*

*Shores*, 448 F. Supp. 2d at 5-6 ("for a court to review extra-record evidence, the moving party

must prove applicable one of the eight recognized exceptions to the general prohibition against

extra-record review"); *Esch*, 876 F. 2d at 991.

Defendants apparently do not recognize this distinction. Df. Opp. (Dock. No. 38) at 13-

14. However, plaintiffs have demonstrated that under the applicable D.C. Circuit precedent,

supplementation of the Litigation AR is warranted here because: (1) the agency deliberately or

negligently excluded documents that may have been adverse to its decision, which is not

permitted under *James Madison Ltd.*, 82 F.3d at 1095, *see* Pl. Memo. (Dock. No. 34) at 10-18;

(2) defendants considered the contested materials but failed to include them in the record, which

is an extra-record exception set forth in *Esch*, 876 F.2d at 991, *see* Pl. Memo. at 18-20; and (3)

even if defendants did not consider the materials, then supplementation is nevertheless

appropriate under another *Esch* exception that permits the court to review extra-evidence to

evaluate whether defendants considered all of the relevant factors. *Esch*, 876 F.2d at 991; Pl.

Memo. at 20-22.

**D.** **Plaintiffs Need Not Show That Judicial Review Based On The Existing**
**Litigation AR Would Be Frustrated For Supplementation To Be Warranted.**

Plaintiffs demonstrated that even if defendants did not "consider" the contested records,

14

then under *Esch*, consideration of this "extra-record" evidence is still appropriate in order to permit the Court evaluate whether defendants considered all of the relevant factors when deciding not to list Gunnison sage-grouse.  Pl. Memo. (Dock. No. 34) at 20-21; *see also Delano v. Roche*, 391 F. Supp. 2d at 88.  Defendants respond that, in order for this exception to apply, plaintiffs must demonstrate that judicial review on existing Litigation AR would be frustrated. Df. Opp. (Dock. No. 38) at 16.  However, there is no requirement that plaintiffs make such a showing in order for consideration of extra-record evidence to be warranted.[4]

Thus, if defendants did not "consider" the information in these materials, then supplementation is appropriate to allow the Court to evaluate whether they should have.  For example, if FWS did not consider information about the impacts of drought to Gunnison sage-grouse that was submitted to a FWS wildlife biologist by Gunnison sage-grouse expert Jessica Young, Ph.D., *see* Other Records (Ex. L) at pp. 1-2 – and defendants do claim that they did not consider this information, *see* Df. Opp. (Dock. No. 38) at 9 – then the fact that FWS *ignored*

---

[4]  The case cited by defendants for this assertion, *Envtl. Def. Fund v. Costle*, 657 F.2d. 275 (D.C. Cir. 1981), was decided many years before *Esch*.  Since *Esch* was decided, it has been applied by courts without a requiring that judicial review would be frustrated without supplementation.  *See Fund for Animals*, 391 F. Supp. 2d at 199; *Carlton v. Babbitt*, 26 F. Supp. 2d at 106-08 *see also Ad Hoc Metals Coal.*, 227 F. Supp. 2d at 140 n.5 ("Contrary to defendants' contention, a showing of bad faith or improper behavior is not required for a court to supplement the record").  In making this assertion, defendants conflate one of the circumstances articulated by the D.C. Circuit in *James Madison, Ltd.* – which provides that a court may deem supplementation necessary "where the agency failed 'to explain administrative action so as to frustrate effective judicial review'", *Nat'l Wilderness Institute v. U.S. Army Corps of Engineers*, 2005 WL 691775 at *10 (D.D.C. Mar. 23, 2005) (quoting *James Madison, Ltd.*, 82 F.3d at 1095) – with the *Esch* exception that plaintiffs are invoking here.  *See Delano v. Roche*, 391 F. Supp. 2d at 88 (consideration of extra-record evidence is appropriate "when the supplemental information is relevant to the final decision") (citing *Esch*, 876 F.2d at 991); *see also Pacific Shores*, 448 F. Supp. 2d at 5-6 ("Defendants appear to have conflated the act of supplementing the record with permitting consideration of extra-record evidence.").

highly pertinent information from a respected Gunnison sage-grouse expert would be very important for the Court to know.[5]

    In requesting the Court to supplement the Litigation AR with this and other information, plaintiffs are simply seeking to ensure that the Court has before it "neither more nor less information" than the agency did when it made its decision.  *Fund for Animals*, 245 F. Supp. 2d at 56.  FWS has asserted that it did not directly or indirectly consider information that was either generated by the agency itself or provided to it by third parties like Dr. Young – which, if true, only supports supplementation of the Litigation AR to allow the Court to evaluate whether FWS considered all of the relevant factors.[6]

## II.    DEFENDANTS SHOULD BE ORDERED TO PRODUCE AN ADEQUATE DECLARATION THAT DESIGNATES THE RECORD.

    It is axiomatic that the agency only enjoys a presumption that it properly designated an administrative record if it prepares a sworn declaration that certifies its contents.  *See Fund for Animals*, 245 F. Supp. 2d at 57; *see also id*. at 58 (presumption applies only once the agency has properly designated the record).  This requirement can only be meaningful, however, if the declaration provides basic information and transparency as to how the record was compiled and

---

    [5] Defendants agreed to stipulate to include the email from Dr. Young, as well as the *Denver Post* article regarding the threat of West Nile virus to Gunnison sage-grouse, in the administrative record for the second Gunnison sage-grouse case.  *American Lands Alliance, et al. v. Norton, et al.*, Civ. No. 04-0434 (D.D.C.) (RBW); *see* Stip. (Ex. L).  It remains unclear why they are refusing to do the same thing in this case.

    [6] In responding to this argument, defendants repeat that the existing Litigation AR is "more than adequate" for the Court's review, *see* Df. Opp. (Dock. No. 38) at 16, but such claims are self-serving and violate the well-settled principle that "an agency may not unilaterally determine what constitutes the administrative record."  *Fund for Animals*, 391 F. Supp. 2d at 197.

what it does and does not contain.  Anything less would render certification a make-work

exercise of no significance – which is exactly how defendants have treated it here.  *See*

Declaration of Charles P. Davis (Apr. 13, 2007) (Ex. I).[7]

Judge Alsup of the U.S. District Court for the Northern District of California implicitly

recognized this when he ordered FWS to "file promptly a detailed declaration explaining what is

and is not in the 'administrative record' and the manner and guidelines by which it was

compiled" in a lawsuit involving a challenge to a negative ESA listing determination.  *See Ctr.*

*for Biological Diversity, et al. v. Kempthorne, et al.*, Civ. No. 06-04186, Order (N.D. Cal. Oct.

19, 2006) (WHA)) (Ex. N).  Indeed, the declaration to which Judge Alsup was responding in that

case provided *more* information about the administrative record than does defendants' sworn

declaration here.  *Compare* Ex. I (Davis Decl.) *with* Certification of U.S. Fish and Wildlife

Service Administrative Record (Oct. 5, 2006), *Ctr. for Biological Diversity, et al. v.*

*Kempthorne, et al.*, Civ. No. 06-04186 (N.D. Cal.) (WHA) (Ex. P).

As Exhibit Q shows, however, after Judge Alsup ordered FWS to file promptly a

"detailed declaration," FWS filed a declaration that comes much closer to providing the kind of

information that is necessary, and illustrates what is still needed here.  *See* Declaration of Phil

Detrich Regarding Compilation of the U.S. Fish and Wildlife Service Administrative Record,

and Certification of Supplement to Administrative Record and Supplement to the Privilege Log

---

[7]  Not every requirement for properly compiling the record can be found in the text of the
ESA or APA, as defendants suggest.  Df. Opp. (Dock. No. 38) at 17-18.  For example, the
requirement that the record must include everything that was "directly or indirectly considered"
by the decisionmaker is not set forth in the text of the ESA and APA, but this certainly does not
render this basic requirement voluntary.  *See Fund for Animals*, 391 F. Supp. 2d at 197
(collecting cases).

(Nov. 2, 2006) (Ex. Q) at ¶ 6 (explaining that "[t]he only documents excluded from the administrative record are ancillary documents and emails that did not form a substantive part of the decision-making process and were not before the decision maker").

**III.    DEFENDANTS HAVE YET TO SATISFY THEIR BURDEN TO SHOW THAT THE ATTORNEY-CLIENT PRIVILEGE APPLIES, AS THEY HAVE YET TO PRODUCE AN ADEQUATE PRIVILEGE LOG, AND THIS ONLY FURTHER CONFIRMS THE NEED FOR *IN CAMERA* INSPECTION BY THE COURT.**

Although plaintiffs explained to defendants that their privilege log is deficient, *see* Atwood to Maysonett (Ex. F) at 5-6, defendants did not meaningfully respond, indicate that they agreed, or provide an adequate privilege log.  *See* Letter from Williams to Atwood (Ex. G) at 3. Now that plaintiffs have moved for *in camera* inspection based in part on defendants' inadequate privilege claims, defendants have finally conceded that "the privilege is deficient."  Df. Opp. (Dock. No. 38) at 3.

However, defendants have yet to provide a sufficient privilege log that satisfies their burden to claim the privilege and withhold relevant materials from the record, and they have made no commitment as to when, exactly, they will do so.  Defendants' continued stalling only further justifies plaintiffs' request that the Court review defendants' privilege claims *in camera*.[8]

Indeed, a review of the records for which defendants initially attempted to claim the privilege, but for which any privilege claims had been waived, demonstrates that defendants have not applied the privilege lawfully to these records.  *See* Privilege-Waived Records (Ex. R). These records do not "disclose a confidential communication from [a] client to an attorney for the purpose of securing legal advice."  *United States v. M & T Mortgage Corp.*, 242 F.R.D. 16,

---

[8]  Intervenors attempt to defend the privilege log, *see* Int. Opp. (Dock. No. 35) at 18, but since federal defendants admit it is deficient, plaintiffs will not respond to these arguments.

18

22 (D.D.C. 2007) (citing *United States ex rel. Fago v. M & T Mortgage Corp.*, 235 F.R.D. 11, 10-11 (D.D.C.2006)). Rather, these records further illuminate and detail Ms. MacDonald's interference in the listing decision. *See* Privilege-Waived Records (Ex. R) at pp. 7-15. These records – which, were it not for SSC's FOIA, would have never seen the light of day – are clearly not privileged, and this only further supports the need for the Court to review all of defendants' privilege claims *in camera*.

**IV.**     **JUDICIAL NOTICE OF THE IG REPORT IS APPROPRIATE, AND IF THE COURT OPENS THE DOOR TO ADDITIONAL RECORDS IT SHOULD JUDICIALLY NOTICE OF A MEMORANDUM THAT SPECIFICALLY DISCUSSES MS. MACDONALD'S INTERFERENCE IN THE GUNNISON SAGE-GROUSE LISTING DECISION.**

Defendants oppose judicial notice of the IG Report by arguing that administrative record should not be supplemented to include it. Df. Opp. (Dock. No. 38) at 12-14 This falsely portrays this as a record supplementation issue. Plaintiffs are not seeking to supplement the record with the IG Report pursuant to one or more extra-record exceptions. Plaintiffs are requesting the Court to take judicial notice of the fact that the IG Report has been published and of its general nature and conclusions. Fed. R. Evid. 201(b). Indeed, as a government publication, the IG Report is appropriate for judicial notice. *See*, *e.g.*, *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 332 & n.10 (1961) (taking judicial notice of a government publication).[9]

---

[9] The IG Report is the result of a request by the Chairman of the House Committee on Natural Resources to the Office of Inspector General ("OIG") to investigate "allegations that Deputy Assistant Secretary for Fish and Wildlife and Parks, Julie MacDonald, had interfered with scientific findings of Fish and Wildlife staff relative to Endangered Species Act issues." *See* Letter from DOI Inspector General Earl E. Devaney to Congressman Nick J. Rahall, II (Mar. 23, 2007) (Ex. S). The OIG subsequently produced the IG Report, which addressed complaints that "MacDonald had bullied, insulted, and harassed the professional staff of the [FWS] to

Additionally, defendants can point to no support for their bald accusation that it is "clear" that plaintiffs actually seek judicial notice of the IG Report in order to "offer post hoc opinions and criticisms" of FWS decision not to list Gunnison sage-grouse. Certainly, plaintiffs intend to criticize the agencies' final decision not to list the species under the Act in their briefs on the merits (and those criticism will be legitimate) – indeed, it is well within the purview of this citizen suit for plaintiffs to make such criticisms. However, judicial notice of the IG Report is appropriate for another reason, *i.e.*, because it confirms that the DOI official who was most directly involved in the challenged Gunnison sage-grouse listing decision, MacDonald, reshaped scientific reports from the field in ESA decisionmaking. IG Report (Ex. B) at 1. Defendants may not be pleased with the report's conclusions, but this does not negate them or minimize their relevance to this case.

Indeed, intervenors claim that the IG Report should not be judicially noticed because it is not pertinent to this case, Int. Opp. (Dock. No. 35) at 13, but this stretches pertinence to its outer limits. Though incomplete, even the existing Litigation AR reflects that MacDonald heavily edited, commented on, and reshaped the recommendations of FWS staff and biologists to list Gunnison sage-grouse under the ESA. *See, e.g.*, Privilege-Waived Records (Ex. R) at pp. 7-15. This is consistent with the IG Report's conclusion, which confirmed that MacDonald was "heavily involved in editing, commenting on, and reshaping the Endangered Species Program's scientific reports from the field." *See* IG Report (Ex. B) at 1. Given this conclusion, it is impossible to see how the IG Report is not pertinent – indeed, it would be remiss for the Court

---

change documents and alter biological reporting regarding the Endangered Species Program." IG Report (Ex. B) at 2.

*not* to take judicial notice the IG Report in light of the striking similarity between the report's conclusions and the circumstances of this case.

Intervenors alternatively accuse plaintiffs of seeking to politicize this proceeding by requesting judicial notice of the IG Report. Int. Opp. (Dock. No. 35) at 13. However, as reflected by the contents of the IG Report itself, it is MacDonald – not plaintiffs – who politicized ESA decisionmaking, which is what led to the OIG Investigation and the IG Report. For instance, the IG Report explains that, according to professional FWS staff (including the former Director of the Endangered Species Program), MacDonald and other DOI political appointees "made changes to [ESA] reports to reflect their political philosophy," and that MacDonald – who came to DOI in 2002 and was promoted to the position of Deputy Assistant Secretary in 2004 – "regularly bypassed managers to speak directly with field staff, often intimidating and bullying them into producing documents that had the desired effect she and the former Assistant Secretary wanted." *Id*. at 4. The "desired effect" was to avoid and/or weaken federal safeguards for imperiled species that had been advocated by the professional staff in FWS. *See id*. ("The former ES Director said that overall, MacDonald did not want to accept petitions to list species as endangered, and did not want to designate critical habitats. He said the overall effect was to minimize the [ESA] as much as possible or ensnare it in court litigation, which happened often."). Indeed, the IG Report sets forth numerous examples of species listings, critical habitat designations, and other ESA regulatory decisions that FWS's staff (including the current Director of the Service) believed had been improperly influenced by non-scientific political considerations during the last several years. *Id*. at 16.

Finally, intervenors request judicial notice of MacDonald's "rebuttal" to the IG Report,

believing that it somehow calls the IG Report's conclusion into dispute.  Int. Opp. (Dock. No.

35) at 13-14.  However, as intervenors themselves recognize, judicial notice can only occur if the

material is "one not subject to reasonable dispute" and "either 1) generally known or 2) capable

of accurate and ready determination by resort to sources whose accuracy cannot reasonably be

questioned."  *Id.* at 13 (citing Fed. R. Evid. 201(b)).  MacDonald's "rebuttal" meets none of

these thresholds, and is simply not appropriate material for judicial notice as it is nothing more

than a *post hoc* rationalization of her own actions.  Perhaps most notably, it does not refute the

IG Report's central conclusion, *i.e.*, that MacDonald heavily edited, commented on, and

reshaped the recommendations of FWS staff and biologists.

　　　　However, should the Court decide to take judicial notice of Ms. MacDonald's rebuttal, it

should also judicially notice a June 21, 2007 memorandum of Region 6 of FWS, which reflects

that Region's observation that the "increased level of scrutiny on Service listing packages by Ms.

MacDonald may have influenced the final [Gunnison sage-grouse] listing decision by the

Regional Office."  *See* Memorandum from Assistant Regional Director, Fisheries – Ecological

Services, Region 6 to Regional Director, Region 6 (June 21, 2007) (Ex. O).  The memorandum,

which discusses Ms. MacDonald's interference with numerous ESA regulatory decisions in

Region 6, observes that:

> In several conversations with the Washington Office and Regional Office, numerous
> comments were made that listing Gunnsion sage-grouse would not get through Ms.
> MacDonald (though no specifics were stated as to what it would take to get it
> through her).

*Id.* at 4.  Given the direct pertinence of this material to the circumstances of this case, then under

intervenors' own rationale, judicial notice of this record is appropriate.  *See* Int. Opp. (Dock. No.

35) at 13 (noting that a "judicially noticed adjudicative fact" must be "pertinent to a particular

case").

## CONCLUSION

For all of the reasons set forth above and in plaintiffs' memorandum, plaintiffs' combined motion should be granted.

DATED:      October 19, 2007                Respectfully submitted,


                                            ___/s/_____
                                            Amy R. Atwood
                                            D.C. Bar No. 470258
                                            Center for Biological Diversity
                                            PO Box 11374
                                            Portland, OR 97211
                                            503-283-5474 phone
                                            503-283-5528 fax
                                            atwood@biologicaldiversity.org

                                            Geoff Hickcox
                                            admitted *pro hac vice*
                                            Western Environmental Law Center
                                            679 East Second Ave, Suite 11B
                                            Durango, CO 81301
                                            970-382-5902
                                            970-385-6804 (fax)
                                            ghickcox@gmail.com

                                            Rebekah S. King
                                            admitted *pro hac vice*
                                            Assistant San Miguel County Attorney
                                            P.O. Box 791
                                            333 W. Colorado Ave., Third Floor
                                            Telluride, CO 81435
                                            970-728-3879
                                            970-728-3718 (fax)
                                            beckyk@sanmiguelcounty.org

                                            Attorneys for Plaintiffs

# Exhibit O:

# Memorandum from Assistant Regional Director, Fisheries – Ecological Services, Region 6 to Regional Director, Region 6 (June 21, 2007)




# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Mountain-Prairie Region

IN REPLY REFER TO:

FWS/R6
FR-ES

MAILING ADDRESS:
P.O. Box 25486, DFC
Denver, Colorado 80225-0486

STREET LOCATION:
134 Union Boulevard
Lakewood, Colorado 80228-1807

## JUN 2 1 2007

Memorandum

To:        Regional Director, Region 6

From:      Assistant Regional Director, Fisheries – Ecological Services, Region 6

Subject:   Region 6 Decisions Influenced by Julie MacDonald

In response to your request for a review of all decisions that may have been affected by former Deputy Assistant Secretary Julie MacDonald, I have consulted with our field and regional staff. The following list includes actions where either Ms. MacDonald was involved but did not influence the final outcome, or had no involvement of which we are aware.

## SOME INVOLVEMENT

### Gunnison Prairie-Dog; 90-day Finding, Not Substantial (February 2006)

**FIELD OFFICE INPUT** - The South Dakota Field Office drafted a 90-day finding on this petition that concluded that the information presented by the petitioners was substantial and warranted further review of the species' status. Our "substantial" finding was based primarily upon 1) the documented threat to prairie dogs from plague; and 2) results of site-specific monitoring that indicated that all intensively monitored populations had declined. Although we determined that the petition presented substantial information, we were optimistic that Statewide surveys underway would provide better information on the range-wide threat than the localized declines previously documented. We were cooperating with the States to get the results before the due date for our 12-month finding. The finding was surnamed as "substantial" by the Field Office, Regional Office, and Washington Office. We received an e-mail from Chris Nolin instructing us to revise the finding to negative "per Julie's instructions."

**REGIONAL OFFICE INPUT** - We were informed that the decision to change the finding occurred within the Fish and Wildlife Service (Ren Lohoefener and Dale Hall) because they decided that the petition finding should not be substantial.

**RECOMMENDED CORRECTIVE ACTION** - As a result of litigation, we have proposed to submit a revised 90-day finding to the *Federal Register* in February 2008.

**Salt Creek Tiger Beetle; Proposed Critical Habitat Designation (under development)**

**FIELD OFFICE INPUT** - The Nebraska Field Office (NEFO) feels that Ms. MacDonald's demands influenced the feedback they received from the Regional Office and Washington Office on Salt Creek tiger beetle proposed critical habitat designation. Although they did not speak directly to, nor were influenced directly by, Ms. MacDonald during the course of many conference calls with Regional Office and Washington Office personnel, the field office was told that "the amount of acreage the NEFO was proposing would not get past Julie MacDonald..."

The NEFO originally identified primary constituent elements and critical habitat for the Salt Creek tiger beetle that resulted in their recommendation to designate 7,300 acres of critical habitat. Subsequent to this analysis, the NEFO was told to designate only in occupied areas and exclude corridor habitats for dispersal. The NEFO was directed to reduce the final amount of acres to no more than 1,500 acres within four areas. The NEFO was directed to outline these four areas based on where the "Salt Creek tiger beetle was walking around" and add a 0.25-mile buffer.

**REGIONAL OFFICE INPUT** - The original proposal submitted to the Regional Office by the NEFO contained 100 times the amount of habitat known to be occupied by the species. It also included several habitat types that were unable to support Salt Creek tiger beetles and that could not be shown to contain the physical and biological features essential to the conservation of the species. Based upon our interpretation of current policy regarding critical habitat designation, we instructed the NEFO to focus on areas either known to be occupied or unoccupied areas that were essential to the conservation.

**RECOMMENDED CORRECTIVE ACTION** - None required at this time. The draft proposed rule includes the limited occupied and unoccupied areas essential to the conservation of the species, and the public will have an opportunity to comment on the proposal this fall.

**Arctic Grayling; Distinct Population Segment Determination**

**FIELD OFFICE INPUT** - Prior to 1994 the Service determined the fluvial Arctic grayling constituted a distinct population segment (DPS) that qualified as a candidate for listing. In 2004, drought and irrigation resulted in extremely low flows in the Upper Big Hole River, site of the last remnant of the fluvial grayling in the lower 48 States. Service staff briefed Ms. MacDonald on the grayling situation at which time she clearly disagreed that the DPS was valid. The Service settled litigation that required a final listing decision for the fluvial Arctic grayling by April 2007. Based on direction from Service decision-makers, a finding was issued that the fluvial grayling did not constitute a DPS and, therefore, was not a listable entity in 2007.

**REGIONAL OFFICE INPUT** - The decision that the Arctic grayling did not constitute a listable entity was made in the Regional Office. The final decision is consistent with the latitude in the DPS policy.

**RECOMMENDED CORRECTIVE ACTION** - None.

## Greater Sage-grouse; 12-month Finding, Not Warranted (January 2005)

FIELD OFFICE INPUT - In January 2005, the Service determined that listing the greater sage-grouse was not warranted based on input provided by an independent panel of experts and a structured decision-making process. Ms. MacDonald was very involved in discussions surrounding the decision-making process though she was not part of the panel of agency administrators that developed a "not warranted" recommendation for the Director. For example, Ms. MacDonald significantly edited and critiqued a "synthesis document" of scientific information that was to provide a basis for discussion among the experts who participated in the structured decision-making panel. In it, Ms. MacDonald asserts that greater sage-grouse are not sagebrush obligates. However, the Service provided the panel with both her document and the earlier, unedited version. In spite of Ms. MacDonald's attempts to influence the outcome of this finding, Service managers ultimately concluded that the greater sage-grouse does not warrant listing as the result of a scientifically sound structured decision making process that is well documented in the record.

REGIONAL OFFICE INPUT - Concur with Field Office characterization.

RECOMMENDED CORRECTIVE ACTION - None.

## Black-Tailed Prairie Dog; Candidate Removal and Subsequent Forest Service Control Proposals (August 2004)

FIELD OFFICE INPUT - Black-Tailed Prairie Dog candidate removal occurred in August 2004 despite Washington Office reservations. The South Dakota Field Office was supportive of earlier removal. Immediately thereafter the Forest Service moved via a fast track Forest Plan Amendment to control prairie dogs on Forest Service lands supporting black-footed ferrets adjacent to private lands and used an unusual "emergency" partnership with the Animal and Plant Health Inspection Service prior to Amendment completion that required fast-tracking Service support. A year later, in the fall of 2005, Ms. MacDonald was scheduled to attend a Forest Service meeting with West River ranchers from South Dakota and Nebraska where Mr. Tenney of the Department of Agriculture suggested that additional prairie dog control could occur in the interior portions of the Conata Basin ferret area. Another Forest Plan Amendment is now proposed to address this action.

REGIONAL OFFICE INPUT - Despite initial reservations, we were persuaded by the analysis conducted by the Field Office and concurred with the removal of the species from the candidate list. Additionally, the decision to amend its Forest Plan for the Conata Basin is at the discretion of the Forest Service.

RECOMMENDED CORRECTIVE ACTION - None for the black-tailed prairie dog removal from the candidate list. Defer to the Forest Service on their Forest Plan revision.

## Gunnison Sage-grouse; 12-month Finding, Not Warranted (April 2006)

FIELD OFFICE INPUT - The Field Office prepared an endangered listing package and started on a critical habitat package that had been briefed with the Regional Office and Washington Office and had their initial support. Internal discussions with the Regional Office and Washington Office in the spring and summer of 2005 led us to change the proposed listing status to threatened. After an unpublished population trend analysis (Garton 2005) concluded that there have been no declines in the past 50 years and none in the past decade came out in November 2005, the Field Office was told by the Washington Office and Regional Office to prepare a withdrawal package, even though the Field Office still believed that listing as threatened was warranted. In several conversations with the Washington Office and Regional Office, numerous comments were made that listing the Gunnison sage-grouse would not get through Ms. MacDonald (though no specifics were stated as to what it would take to get it through her). Ms. MacDonald's interference in this issue is documented on the web at http://www.sagebrushsea.org/sp_gunn_grouse_interference.htm.

REGIONAL OFFICE INPUT - The increased level of scrutiny on Service listing packages by Ms. MacDonald may have influenced the final decision by the Regional Office. However, our determination also was significantly influenced by the inability of the Field Office to draft a cogent argument for listing based on known threats to the species.

RECOMMENDED CORRECTIVE ACTION - We have been sued on this determination. A scheduling conference will take place July 11, 2007, at which time the parties will propose a briefing schedule. If we want to settle the case and redo the 12-month finding we should propose a settlement to Plaintiffs at this time.

## NO INVOLVEMENT

## Topeka Shiner; Final Critical Habitat Designation (July 2004)

The Topeka shiner has been cited as an example of a decision influenced by Ms. MacDonald. However, we are unaware that she directly influenced the final designation of critical habitat for this fish. The most controversial aspect of this rule is that the Office of Management and Budget urged us to delete references to the benefits of designating critical habitat in our economic analysis.

## Boreal Toad; Withdrawal from Candidate List

The boreal toad candidate withdrawal has been cited as an example of a decision influenced by Ms. MacDonald. However, our withdrawal was based on new genetic information indicating that the entity is not a discrete population segment of a species with a wide range in the western United States.

## Wolverine; 90-day Not Substantial Finding

The wolverine "not substantial" finding has been cited as an example of a decision influenced by Ms. MacDonald. However, the ultimate decision was consistent with what the Field Office originally recommended. We determined that petition to list the species was not substantial given the lack of information on population status and threats. Due to a court order, we are conducting a 12-month finding this fall.

## Mountain Plover; Withdrawal from Candidate List

The mountain plover candidate withdrawal has been cited as an example of a decision influenced by Ms. MacDonald. However, the ultimate decision was made by the Regional Office. We have no record of Ms. MacDonald's involvement in this decision.

# Exhibit P:

Certification of U.S. Fish and Wildlife Service
Administrative Record (Oct. 5, 2006),
*Ctr. for Biological Diversity, et al. v.
Kempthorne, et al.*,
Civ. No. 06-04186 (N.D. Cal.) (WHA)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | No. C-06-04186   WHA |
| | ) | |
| vs. | ) | CERTIFICATION OF |
| | ) | U.S. FISH AND WILDLIFE SERVICE |
| KEMPTHORNE, *et al.*, | ) | ADMINISTRATIVE RECORD |
| | ) | |
| Defendants | ) | |
| | ) | |
| | ) | |

I, Phil Detrich, state the following:

1. I am the Field Supervisor for the Yreka Fish and Wildlife Office for the United States Fish and Wildlife Service (FWS).

2. As Field Supervisor, I am responsible for all of this office's activities including those activities involving listing determinations under Section 4 of the Endangered Species Act. I am custodian of all FWS documents relating to listing determinations originating from this office.

3. Records for the April 17, 2006, 90-day petition finding regarding the Siskiyou Mountains Salamander and Scott Bar Salamander under Section 4 of the Endangered Species Act are located in this office.

4. Under my direction and supervision, employees in this office diligently compiled the administrative record for the 90-day petition finding.

5. I hereby certify that the documents identified in the enclosed index and privilege log constitute the complete administrative record for the 90-day petition finding regarding the Siskiyou Mountains Salamander and Scott Bar Salamander.

6. This declaration is made under the provision of 28 U.S.C. 1746. I declare under penalty of perjury that the foregoing is true and correct to the best of my current knowledge.

Executed on _OCTOBER 5_____, 2006, in Yreka, California

_____

Phil Detrich, Field Supervisor
U.S. Fish and Wildlife Service
Yreka, California

# Exhibit Q:

Declaration of Phil Detrich
Regarding Compilation of the U.S. Fish and
Wildlife Service Administrative Record,
and Certification of Supplement
to Administrative Record
and Supplement to the Privilege Log
(Nov. 2, 2006)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al*. | ) | |
| | ) | |
| Plaintiffs, | ) | No. C-06-04186   WHA |
| | ) | |
| vs. | ) | DECLARATION OF PHIL DETRICH |
| | ) | REGARDING COMPILATION OF THE |
| KEMPTHORNE, *et al*., | ) | U.S FISH AND WILDLIFE SERVICE |
| | ) | ADMINISTRATIVE RECORD, AND |
| Defendants | ) | CERTIFICATON OF SUPPLEMENT TO |
| | ) | ADMINISTRATIVE RECORD AND |
| | ) | SUPPLEMENT TO PRIVILEGE LOG |

I, Phil Detrich, state the following:

1.   I am the Field Supervisor for the Yreka Fish and Wildlife Office for the United States Fish and Wildlife Service (FWS).

2.   As Field Supervisor, I am responsible for all of this office's activities including those activities involving listing determinations under Section 4 of the Endangered Species Act. I am custodian of all FWS documents relating to listing determinations originating from this office.

3.   Records for the April 17, 2006, 90-day petition finding regarding the Siskiyou Mountains Salamander and Scott Bar Salamander under Section 4 of the Endangered Species Act are located in this office.

4.   Under my direction and supervision, employees in this office diligently compiled the administrative record for the 90-day petition finding.  We searched all records in our office relevant to the status of Siskiyou Mountains Salamander and Scott Bar Salamander and development of the finding and  requested and obtained all records of communications involving the 90 day finding

among FWS employees at the California/Nevada Operations Office and Fish and Wildlife Service Headquarters Office in Washington, D.C. who were involved in developing and/or reviewing the finding. All of such records are included in the previously filed Administrative Record and Privilege Log or the Supplement to Administrative Record and Privilege Log filed herewith.

5. The administrative record contains all documents relating to the substance and procedure of making the 90 day finding. This includes scientific literature, data, email and fax communications, and policy guidance that were considered in the finding. It includes working drafts containing substantive comments regarding the interpretation of information and policy that influenced the evolution of the agency decision. Email and fax communications among FWS staff directly involved with making the finding, as well as between FWS staff at various levels, scientists, and other agencies were also included in the administrative record if they contained relevant information, analyses, discussion of the interpretation or guidance used in making the finding.

6. The only documents excluded from the administrative record are ancillary documents and emails that did not form a substantive part of the decision-making process and were not before the decision maker. These documents consist of internal working drafts of the finding that included only comments pertaining to format, clarity, and grammar, and email communications that discuss transmittal of drafts or other non-substantive aspects of developing the finding document.

7. I hereby certify that the documents identified in, and accompanying the enclosed Index to Supplement to Adminstrative Record and Index to Supplement to Privilege Log together with the previously Filed Administrative Record and Privilege Log constitute the complete administrative record for the 90-day petition finding regarding the Siskiyou Mountains Salamander and Scott Bar Salamander.

8.   This declaration is made under the provision of 28 U.S.C. 1746. I declare under penalty of perjury that the foregoing is true and correct to the best of my current knowledge.

Executed on <u> Nov. 2 </u>, 2006, in Yreka, California

**Phil Detrich, Field Supervisor**
**U.S. Fish and Wildlife Service**
**Yreka, California**

# Exhibit R:

# Privilege-Waived Records

### Index

| Date | Description (from Litigation AR Index) | Pages |
|------|----------------------------------------|-------|
| 01/01/05 | Conference call notes and briefing | 3 |
| 03/00/06 & 04/02/06 | Conference call notes for both dates | 1 |
| 03/10/05 | Conference call notes | 1 |
| 03/30/06 | Email from A.Pfister to P.Mehlhop, S.Linner re: GUSG finding comments | 1 |
| 03/30/06 | GUSG finding comments attachment 1 | 1 |
| 04/03/06 | E-mail from P.Deibert to P.Mehlhop, T.Ireland, A.Pfister re: First Round of comments | 2 |
| 04/03/06 | E-mail from P.Deibert to P.Mehlhop, T.Ireland, A.Pfister re: more on Gunnison | 2 |
| 04/03/06 | E-mail from P.Deibert to P.Mehlhop, T.Ireland, A.Pfister re: More Gunnison comments | 1 |
| 04/03/06 | E-mail from P.Deibert to P.Mehlhop, T.Ireland, A.Pfister re: Gunnison again | 1 |
| 04/05/06 | E-mail from P.Mehlhop to A.Pfister, S.Linner, T.Ireland re: Fw: RO response to Julie & Tom's comments | 2 |
| 04/05/06 | RO response to Julie & Tom's comments attachment 1 | 137 |
| 04/05/06 | E-mail from P.Mehlhop to A.Pfister, S.Linner, T.Ireland re: Fw: tom-julie.doc | 1 |
| 04/05/06 | Fw: tom-julie.doc attachment 1 | 130 |
| 04/06/06 | Email from S.Linner to B.Kelly, P.Mehlhop, R.Dach, A.Pfister re: Fw: Not over yet | 2 |
| 04/06/06 | Email from K.Johnson to B.Dach, B.Kelly, B.Fahey, D.Krofta, Pat re: Re: Next #1 | 2 |
| 04/06/06 | Email from K.Johnson to B.Dach, B.Kelly, B.Fahey, D.Krofta, Pat re: Re: Next #4 | 2 |
| 04/10/06 | Email from P.Mehlhop to A.Pfister, S.Linner, J.Lyke, re: Fw: GUSG 12-month | 2 |

DATE: January 5, 2005                           STATE: CO

BRIEFING FOR THE REGIONAL DIRECTOR

PREPARED BY: Terry Ireland, Fish and Wildlife Biologist, Grand Junction, Colorado, Ecological Services Office

FROM: ARD Ecological Services

SUBJECT: Umbrella CCAA for the Gunnison Sage-grouse

PURPOSE OF BRIEFING DOCUMENT: Update on the feasibility of an umbrella CCAA with the Colorado Division of Wildlife (CDOW) for the Gunnison sage-grouse.

BACKGROUND:

- The historic range of the Gunnison sage-grouse is in southwestern Colorado, northern New Mexico, northeastern Arizona and southeastern Utah. There are currently seven population areas in Colorado and one population in Utah. The 2004 total population estimate was 3,198 birds with 2,443 occurring in the Gunnison Basin population and all other populations having 10 to 245 birds. Long-term trends since at least the 1970s have shown steady declines despite efforts in recent years to reverse them.
- Between 1998 and 2000, local working groups consisting of Federal and State agencies, County representatives, livestock organizations, environmental organizations, and private landowners completed six local Conservation Plans in Colorado and one in Utah, covering all but one small Colorado population. Numerous conservation actions identified in the local Conservation Plans have been completed. The plans do not appear to be adequate to preclude listing under PECE. Work group activity since signing of the plans has varied widely.
- A State-led Rangewide Conservation Plan (RCP) is currently being developed with CDOW, UDWR, BLM, USFS, NPS, NRCS, and FWS and the local working groups to address conservation issues in the extant populations, and help prioritize local and collective conservation actions. The RCP focuses on maintaining, expanding, and linking extant populations but does not include reintroduction efforts in New Mexico or Arizona.
- A statewide Candidate Conservation Agreement with Assurances (CCAA) has been drafted with CDOW with the intent of having it in place by May 2005 to allow CDOW time to begin implementation and preclude the need to list. It is intended that the CCAA will implement the applicable conservation measures in the RCP. Until the RCP is completed, it will be difficult to complete the CCAA, so the May target date is likely to slip.
- In its current draft, the RCP may not be sufficient to preclude listing, principally because population targets for all but the Gunnison Basin population are not high, there is no schedule for implementing the conservation measures, language for some conservation measures is so flexible that sufficient conservation may not be achieved and economics, rather than science, appears to be driving some of the conservation measures. One peer reviewer provided additional comments on the limitations of the PVA done in the RCP. Since the RCP is intended to form the management foundation for the CCAA, it may be difficult to issue a CCAA without changes in the RCP.

ISSUES:

- We have not yet reached a settlement with the plaintiffs on a date for a listing decision. Realistically, we do not anticipate making a listing proposal before September 2005 and a final decision before September 2006.
- Even if an umbrella CCAA adequately addresses Gunnison sage-grouse on non-Federal lands and is being properly implemented, it may not be sufficient to preclude listing because much of the occupied, potential and vacant habitat is on federally managed land, primarily BLM. For example, the BLM manages 51% of the habitat in the Gunnison Basin, which is the stronghold for the species. As of 2003 (most recent data), only 24% of 62 grazing allotments

*[Handwritten margin note, top right:] McClosky concerns; our hypothesis*

there contain conservation measures for sage-grouse, although they do cover 45% of the habitat.

*[Handwritten margin note, top left:] know nothing about*

- Local CDOW employees have not expressed concerns about legal implications of the CCAA or monetary obligations. Potential issues of concern, that have been discussed previously with CDOW are: some confusion within CDOW on the applicability of the "No Surprises" policy to CCAAs; extension of comment period on the RCP and its impact on the CCAA timeline, and the timeline associated with a final listing decisions; and the limited number of CCAAs that have been issued nationwide and this one being the first for an entire species.

*[Handwritten margin note, left:] Pam / CCAA lead may not to clarify*

*[Handwritten margin note, right:] Dec Mtg - discussions Pam said clarify for her*

*[Handwritten margin note, left:] we are very concerned about spp. status*

**MAIN DECISION OR MESSAGE:** Despite numerous conservation actions being implemented, rangewide declines matched with persistent and potentially additional threats, cause concern about the species' status. Although an umbrella CCAA with CDOW may not preclude listing, it will provide a level of assurance for CDOW and participating landowners about what will be expected of them regardless of whether it is listed.

*[Handwritten margin note, left:] have encouraged all along*

**BUREAU PERSPECTIVE:** We will continue to work with CDOW on drafting an acceptable umbrella CCAA and with all involved entities on the RCP and conservation of the species under local Conservation Plans as we proceed with our listing decision. The Field Office has a meeting set up on 1/11/05 with CDOW to discuss population and habitat targets.

**CONTACT:** Mary Henry, Assistant Regional Director, Ecological Services (303) 236-4210.

*[Handwritten:] reconcile diff on #1*

*[Handwritten:] PVA ⇒ ID demographic stages in life history*

*[Handwritten:] ✳ exercise w/ DOW on doing PECE analysis*

*[Handwritten:] ✳ ⇒ specifics of what need to know from BLM ⇒ by 1/14/05 & BLM language for it*

*[Handwritten:] Allot x, y, z doesn't have cons. measures    existing → range conditions*

Private % BLM CDOW NPS FS

Sims etc     76(28K) 13     11  <1
37k

Crow    ✓   24(8K) 63         13
35

Gunn   ✓   31(83K) 51     2    2   14
(593K)

Dove Cr.   87 (25K) 13
28K

Monticello   95(67K) 4      1(UT)
(76K)

Piñon Mesa  ✓70(27K) 28              2
(39K)

Poncha Pass  24(44K) 4 8    2(Co)    2L
20

San Miguel ✓ 53    36      8          1
(57K)          2(G)
376K

close to mill overall occupied

600 K Gunn.

100K San Miguel

92y ≈ 43% private ownership
occupied habitat

—what do OK's mean?   OK as is or agree w/comment

p. 88 -protect

p. 105   PECE, BLM
disclaimer language

—Brian — ~~or request~~

— inform Mitch of effort underlying

p. 110

Same for Factor E
ask for conclusion
after each section,
but wrote one
overall

Terry — Oyler McCance article
—Table
—positive & neg. of fire    p. 76
—hunting in other pops in '90s?

4/2/06 Conversation
of Ben Jessup
—unpack analysis
—what does this mean for conservation of GUSG
grazing, roads, pesticides, etc =

walk
thru
for Sol &/or
judge
{
1.) Facts
2.) analysis
3.) Conclusion
}

ex. why pesticides not problem

—try to show how every sentence fits in
if nothing else, spell out at 2nd grade
level ⇒ connect the dots

—explain why prof judgment gets to where to
we got to

G USG - Proposed Rule / Listing Conf. call 3/10/05

Kurt Johnson (wo), P. Nehlbop, Seth Willey, Susan Linner, Al P., the Chuck Davis (at end of meeting)

Kurt will ask Nancy Green about need for PECE review.

Kurt will also ask about need to do PCH by July 1.

Kurt will ask about structured decision making process.

Chuck D. said Sept. 2 may be the settlement date.

**Al Pfister/R6/FWS/DOI**
03/30/2006 01:11 PM

To  Pat Mehlhop/R6/FWS/DOI@FWS, Susan
Linner/R6/FWS/DOI@FWS

cc

bcc

Subject  GUSG finding comments

here's a shot at what I believe was being requested



GUSG finding document review.doc


Al Pfister
Western Colorado Supervisor
Western Colorado Office - USFWS
Grand Junction, CO

(970) 243-2778 - phone ext. 29
(970) 245-6933 - fax

The following comments are based on a limited review of the GUSG finding which included comments from Tom Graf and Julie McDonald (ie I only had time to read those sections where they had commented), and with the realization that the version being reviewed is not a current version.

The main areas where it is difficult to support the current wording/or comments in the document are species designation, the PVA discussion, urban development section, and the finding conclusion.

1.  The species designation issue is one that should NOT be questioned.  We have not been provided any science that disputes GUSG species designation.

2.  The PVA section states that the "PVA purpose was to assist the CDOW in evaluating the relative conservation value of each Gunnison sage-grouse population and to identify critical gaps in the knowledge of Gunnison sage-grouse in prioritizing management options for this species, particularly in relation to maintenance of genetic diversity and the need for population augmentation".  The RCP states that the PVA was "used to evaluate the relative risk of extinction for each population under the current conditions (ie the risk of extinction if nothing changes" and "to estimate relative extinction probabilities and loss of genetic diversity over time for various population sizes, and to determine the sensitivity of GUSG population growth rates to various demographic parameters". The fact that the PVA does not deal with habitat fragmentation or loss has also been deleted from the finding, which would show that we are making this finding even though we are aware of this limitation.
Graf's comments (TG#26) on what the PVA does/says are not appropriate.

3.  Urban development  Statements made and population projections added to this document do not address the potential or actual impact of urban development on GUSG. It is not just an issue of number of people but the distribution of urban development relative to key GUSG habitat that will affect the future of the species.  This information was in previous versions.  This concern is similar to the note inserted in the end of this section, so I don't know how this issue has been addressed in the current version.

4.Other concerns exist for statements inserted relative to the impact of roads and "us having no reason to believe that they will have a significant effect".  We have a reason to believe they may have a significant effect, we just don't have any science that documents that they are.  Conclusion statements relative to invasive species and powerlines are also not supportable, they are conjecture are part of the author of the insertions.

5. Graf comment #91 that the populations discussed are stable is not an accurate statement and should not be addressed.  The correction that needs to be made is that the PVA did not analyze the relative extinction probability of just the Dove Creek group, so the statement as written is not accurate.



**Pat Deibert/R6/FWS/DOI**
04/03/2006 12:52 PM

To   Pat Mehlhop/R6/FWS/DOI@FWS

cc   Terry Ireland/R6/FWS/DOI@FWS, Al
     Pfister/R6/FWS/DOI@FWS

bcc

Subject   First round of comments

Hi Pat -

Since we haven't been able to connect by phone, I thought I'd send you my comments/responses on the first 25 pages or so.  I should be able to finish all of it in the next few hours, as the number of comments declined significantly after the first 30 pages or so....

Page 2 - TG comment - call of the listing office in DC

Page 5 - TG comment regarding why we haven't been sued on the greater finding - Based on my conversations with the petitioners, his conclusion on the lack of legal actions are not entirely accurate.  Yes, the petitioners are giving folks a year to get something together.  But they have also told me they don't believe they have a legal case based on the data presented.  They can only pursue us on technical reasons (missed dates, etc.).  Also, the CCAA has not been signed to my knowledge, and last I knew (Feb. 06) we were still a few miles apart on the agreement.  You better check with Terry on that one.

Page 6 - JM moving the species description - I didn't find where she moved it to.  I think this section should be re-inserted.  Also, the only person who thinks the species designation is flawed is Rob Ramey, and his work on other species is under question now (also, he has never done any analysis on Gunnison, except for his speculative review).   I would simply state that the scientific data, and community, has accepted the separation of the two species, and we do not have any data to reverse that decision.

Page 7 - deletions - again, there is no reason to remove these phrases, as they are accepted by the grouse community.

Page 7 - JM comment regarding Tony Apa - he is the Gunnison expert, and a PhD.   His "opinion" is based on years of research and observation.

Page 11 - JM comment - you asked me specifically to address this one and I don't understand it.  I would just delete the added "generally" and call it good (even with her deletions).

Page 13 - JM comment regarding nest fidelity.  Yes, Connelly et al. 2004 DOES support nest fidelity for sage-grouse on the page citations she provided.  Movements of a 1000m or so between nest sites for a species that moves up to 50 miles are year definitely demonstrate a fidelity to an area.  Additional citations for nest site fidelity include Holloran and Anderson (2005, page 749), and Lyon (2000, page 21).

Page 13 - TG comment regarding steering committees and school boards....  You should check with Terry, but I do believe the group contracted the document out to a consulting firm.  It is a well-done document, and full of good, literature supported, scientific information.

Page 15 - deletions regarding historic distribution - these deletions need to be re-inserted as removing them misrepresents the original literature (Schroeder et al. 2004, page 370).

Page 15 - TG comment regarding support for number - the estimate is just that, an estimate.  We can't say if its maximum or minimum.  Also, the estimate reported by the GRGSC is greater than reported by Schroeder et al. 2004 (55,350 vs. 46,251 sq km).  I don't know the reason for the discrepancy - we need to clarify with Terry.  However, the difference between estimates (historic and present) is still a bit unnerving. (maybe these two estimates should be the range of estimates that TG asked for?).   I also don't know where the statement regarding only part of the range was occupied at any one time came from, but that citation should be added (it may have been the GSRSC).

Page 18 - Comment by JM regarding the high counts in 2005. The actual error statement came from Tony Apa, and was quoted by Garton. Perhaps we should cite it that way. I think its a good point, as no grouse populations have ever been known to increase that much in one year. However, I know the CDOW's letter on peer review questioned the estimate being too high as well, so we need to reconcile that difference. I also don't understand the deletion regarding historic distribution in all sagebrush.

page 20 - Tg comment - a citation really is needed here.

Page 21 - JM comment - I think the deletion should be re-inserted, as it goes to reduction in range question. Is there a better citation in the GSRSC?

Page 22 - Unfortunately, I couldn't check the literature on this page as I don't which article Connelly et al. 2000a is (I don't have the list of references for the finding). If you can tell me which article it is, I will check the content referred to in the JM comment. As for TG comment on how do we know this was Gunnison - greater and gunnison are not sympatric. Therefore, if you were in Gunnison range, they had to be Gunnison, even if they hadn't been separated into two species at that point.

Page 22 - I would re-insert the deletions regarding the genetic data between Monticello and Dove Creek - I believe that is Sara Oyler-McCance's work, which would be a better citation if it is (but I don't have the article).
Page 22 - JM comment on fragmented historical distribution - According to distribution maps in Rogers (1964, page 22 and 23), yes, gunnison metapopulations have been separated in the past. However, the maps follow the distribution of sagebrush, and demonstrate that Gunnison were once much more widely distributed. Also, the populations in the past (1942) were much closer together, so we really don't know how biologically "fragmented" they really were. So, JM is sort of right here, but for the wrong reason (grouse followed sagebrush, and were not fragmented were habitat was present). Also, the data in Rogers was based on formal landowner and game warden surveys, which can be anecdotal I guess, but there wasn't much other way of getting the information at that time. The surveys were followed up with on-the-ground lek surveys, which substantiated the landowner and game warden surveys.

Page 22 - JM comment on "speculation". Its not speculation - its true that we can't get access to all leks, because of weather or private lands, or both. You can cite me if you wish as I am one of many who have experienced both situations (Tony Apa would be a better choice). I would add Gunnison in front of the last sentence of the Pinon mesa population paragraph. I would also return the deleted sentence there as well. But, we do need a citation for the occupation statement regarding the Uncompahgre Plateau.

Page 23 - TG comments 22 and 23 - Terry would be the best person to check with on these, as they came from the GSRSC, which I can't seem to find my copy....

Page 23 - TG comment 24 - I don't know how to respond to this comment, as I don't know how this observation by Rogers relates to current distribution. If the population is gone, then TG's comment is irrelevant. If the population still persists, we need to address TG's comment.


That's all I have for now. Going to get some lunch, then I'll be back at it!

Pat


Pat Deibert
Fish and Wildlife Biologist
U.S. Fish and Wildlife Service
Wyoming Field Office



**Pat Deibert/R6/FWS/DOI**
04/03/2006 05:05 PM

To    Pat Mehlhop/R6/FWS/DOI@FWS

cc    Terry Ireland/R6/FWS/DOI@FWS, Al Pfister/R6/FWS/DOI@FWS

bcc

Subject    more on Gunnison

Pat -

My comments up to page 44 (urban development)

I don't have any comments on pages 32-33 as most of the critiques seemed editorial in nature.

Page 34 - JM comment regarding Wilcove et al. 1986 - Schroeder and Baydack (2001, page 25 and 27) is a more appropriate citation, which says the same thing (so you don't have to change text).

Page 34 - uncertain why all the deletions - they are accurate and well-supported.

Page 35 - JM comment 43 - Current range is occupied - but not every square inch.  Range maps typically include unsuitable habitat - they are just a boundary.

Comments on page 36 - we need to check the GSRSC for clarification

Page 37 (where to begin....)
        Not sure why the reservoir section was deleted.  It was habitat loss.
        Roads - the first paragraph was correct until someone added the words sage-grouse to the first sentence.  The citations also supported the paragraph until sage-grouse added.  The deletions from the first paragraph are not necessary if the word sage-grouse is taken out of the first sentence.
        Aldridge and Brigham (2003, page 31) talk about a network of roads, trails and powerlines in their discussion of powerlines.  I do not know why this portion of the sentence, and the citation were deleted, as they were accurate.
        JM comment 50 - Forman and Alexander does discuss exotic species as spread by roads on page 210.  I believe her comment was generated by their statement that there are few documented cases.
        JM comment 51 - Forman 200 does discuss plants, and invasives, on page 33
        JM comment 52 - not sure what this comment reeres too.  Connelly et al. 2004 does discuss wires and corvid predation
        JM comment 53 - the model is very strong, has withstood peer review, and is currently in review for publishing (and was produced and fully supported by USGS).
        The deletion of the citations weakens the paragraph
        JM comment  54 - the study did look at noise from roads.  The results were inconsistent, not nonexistent.
        JM comment 55 - it was implied, but a better suggestion is Lyon 2000, page 7
        JM comment 56 - not sure what the comment was meant to be here, but the citation is correct.

As for how to "fix" the first paragraph under Roads, I would restore the original text.  Then add something like:  "Specific impacts of these potential factors on Gunnison sage-grouse are discussed below."

Page 38 - JM comment 57 - the reference is on geothermal development, but it does discuss noise impacts, including traffic, on page 7
        JM comments 58 and 59 - Braun 1986 discusses the loss of a lek as a result of haul road noise on page 228.  It also discusses failure to recruit yearling males due to noise on page 229.  We can also add Holloran 2005 to this citation on failure to recruit.

Page 38 - I'm not sure what the edits are all about in this paragraph.  I think the initial statement following the chemicals used for road maninfence was meant only as a summary.  The new additions only confuse

the issue.

Page 39 - JM comment 60 - the reference JM refers to states" Roads provide a major conduit for spread of exotic plants into native areas....." page 421, and then goes on to discuss verges.  So the reference is accurate.

JM comment 61 - cite Oyler-McCance et al. 1991, page 330 here. It definitely supports the statement.

I'm not clear why we deleted the comments under JMcomment 63.  They are relevant and accurate, and I'm not sure the re-write gets to the point.

Page 40 - JM comment 64 - Knick et al. 2003 does state that powerlines can facilitate invasive plant species (page 619)

TG comment 65 - Oyler-McCance et al. 1991, page 330 is a good citation here.  its all about predation and Gunnison.

Page 41 - JM comment 66 - Gelbard and Belnap does support this statement.
The end of the paragraph in which comments 66 and 67 are inserted - this makes no sense, and if retained needs a citation.

Page 42 - the deleted text should remain.

Page 43 - the added text starting with "Where thera are maintained trails.... should be removed, along with the Braun 1998 citation.  The other citations are sufficient and its more than an assertion.
Comment JM 72 - the anomaly referred to in this comment was not presented as such in the article.  We should add Braun et al. 2002 to the citations here.
Comment TG 73 - Commenter apparently does not understand the difference between using habitat, and flying over objects.  Fences up to 0.5 miles from a lek can kill birds, even if the birds don't walk right up to them.

Pat Deibert
Fish and Wildlife Biologist
U.S. Fish and Wildlife Service
Wyoming Field Office



**Pat Deibert/R6/FWS/DOI**
04/03/2006 05:40 PM

To  Pat Mehlhop/R6/FWS/DOI@FWS

cc  Al Pfister/R6/FWS/DOI@FWS, Terry
Ireland/R6/FWS/DOI@FWS

bcc

Subject  More Gunnison comments

Comments on the PVA and trend analysis -
Page 28 - TG comment 26 - the poncha pass population cannot be considered to be relatively stable, as it
has to be augmented to survive.  This statement is biologically incorrect.

TG comment 27 - this can be corrected by citing the PVA here.

Page 29 - strikethrough text at the top of the page - we should clarify whether or not this statement applies
to the "inbetween size" populations.

TG comment 28 - contradicts TG comment 2 on page 5.

Page 29 - the first sentence of the next paragraph starting "Trends in abundance....".  The ending clause
of this sentence needs to be removed as it is not true (stop sentence at peer reviewed).  The method has
been peer reviewed, in Connelly et al. 2004.  The trend analysis  formed a strong basis for the greater
finding, and stating that it has a low level of confidence sets that finding up for a fall.  This is a very
dangerous statement.

Aberrant should be explained.  I'm not sure where TG got the idea it was rain, but we need to clarify that it
was snow precluding lek attendance.

Page 30 - TG comment 31 - the table was for 10 years, not 50.  Also, it is apparent that TG does not
realize that we are talking about 2 different models addressing 2 very different items.....

I'm not sure why the text regarding the genetic analysis was deleted.  It is accurate and appropriate.

More to come....

Pat Deibert
Fish and Wildlife Biologist
U.S. Fish and Wildlife Service
Wyoming Field Office



**Pat Deibert/R6/FWS/DOI**
04/03/2006 06:19 PM

To Pat Mehlhop/R6/FWS/DOI@FWS

cc Al Pfister/R6/FWS/DOI@FWS, Terry Ireland/R6/FWS/DOI@FWS

bcc

Subject Gunnison again

History: 📩 This message has been replied to.

More comments - just exactly when is COB?

I have ignored most the comments that focus primarily on editorial questions or math.

page 44 - Urban development - I see no problem with retaining this paragraph as it is a good prelude to understanding impacts.  Maybe we need to add a sentence at the end, as with the road section, stating that specific effects follow.

Page 45 - the deletion from the beginning of the last paragraph on this page deletes important information.  The insertion in the first sentence is also unnecessary.

Page 47 - JM comment 78 - we do need to clarify this - if I remember right, isn't that the land just isn't "pretty" enough to attract the kind of development we anticipate in other areas (I might be all wet on this one).

Page 50 - TG comment 83 - Reclamation had been underway for about 20 years at the time the article was written.  I doubt that weather had that much of an effect.

Page 57 - TG comment 84 - the study was actually in the Pinedale anticline, which up until about 10 years ago had no development.  Well densities are still fairly low, and not proposed to come close to those in the Jonah field.  although well densities are anticipated to increase, those are future effects in Pinedale. So the effects we are seeing now in Pinedale may be realized in Gunnison habitat where oil and gas are proposed.

page 63 - TG comment 87 - The citation is correct and is a summary of research.  It was included in the greater sage-grouse finding on page 2259.

page 67 - TG comments 88 and 89 - based on my conversations with BLM WO, little of the BLM strategy, beyond administrative actions, have been implemented.  The strategy calls for assessments first, not conservation actions.

page 81 - TG comment 90 - cumulatively works fine here - all the previous stuff is cumulative effects, is it not?

page 121 - TG comment 91 - Again, TG does not understand the difference between the PVA and the trend analysis.  We cannot re-write as suggested, because that would make our presentation of the PVA wrong.

I'll be in all day tomorrow (I usually arrive around 8:15), but need to leave around 5:50 as I am teaching hunter education tomorrow night.  Let me know if I can help....

Pat

Pat Deibert
Fish and Wildlife Biologist
U.S. Fish and Wildlife Service
Wyoming Field Office

| | |
|---|---|
| **Pat Mehlhop/R6/FWS/DOI**<br>04/05/2006 12:30 PM | To  Al Pfister/R6/FWS/DOI@FWS, Susan Linner/R6/FWS/DOI@FWS, Terry Ireland/R6/FWS/DOI@FWS |
| | cc |
| | bcc |
| | Subject  Fw: RO respose to Julie and Tom's comments |



Tom-Julie Gunnison SG-RO RESPONSE.doc

Patricia Mehlhop, Candidate Conservation Coordinator
303-236-4215
----- Forwarded by Pat Mehlhop/R6/FWS/DOI on 04/05/2006 12:29 PM -----

| | |
|---|---|
| **Pat Mehlhop/R6/FWS/DOI**<br>04/05/2006 12:25 PM | To  Kurt Johnson/ARL/R9/FWS/DOI |
| | cc  Bridget Fahey/R6/FWS/DOI@FWS, Douglas Krofta/ARL/R9/FWS/DOI@FWS, Robert Dach/R6/FWS/DOI@FWS |
| | Subject  Re: RO respose to Julie and Tom's comments 🗒 |

Kurt,

By the time we received the draft with Julie's comments added to Tom's, we were 5 versions later than the one they commented on.  The 4/6 version of the finding is so changed from the Tom/Julie comment version that there's no value in accepting or rejecting their insertions and deletions.  Our response in their comment balloons will have to suffice to guide the reviewers on what we did.  Basically, we thried to accpt everything that made sence and we had a citation to go with it.  The exceptions are several of Tom's comments where he disagreed with the approach Chris Nolin wanted us to take, assuming the 3 smallest populations would go extinct.  Hope this helps.

Pat

Patricia Mehlhop, Candidate Conservation Coordinator
303-236-4215
Kurt Johnson/ARL/R9/FWS/DOI

| | |
|---|---|
|  | **Kurt Johnson/ARL/R9/FWS/DOI**<br>04/05/2006 12:09 PM |
| | To  Pat Mehlhop/R6/FWS/DOI@FWS |
| | cc  Bridget Fahey/R6/FWS/DOI@FWS, Robert Dach/R6/FWS/DOI@FWS, Douglas Krofta/ARL/R9/FWS/DOI@FWS |
| | Subject  Re: RO respose to Julie and Tom's comments 🗒 |

Which version of the finding did you use here?  Why are there still editorial changes other than the comment "balloons"?  So the SOL will have to compare this document to the revised finding to find out how all comments were addressed?

Kurt

Pat Mehlhop/R6/FWS/DOI

| | | | |
|---|---|---|---|
| **Pat Mehlhop/R6/FWS/DOI** | | To | Bridget Fahey/R6/FWS/DOI@FWS, Kurt Johnson/ARL/R9/FWS/DOI@FWS |
| 04/05/2006 01:55 PM | | cc | Robert Dach/R6/FWS/DOI@FWS |
| | | Subject | RO respose to Julie and Tom's comments |

Here it is.  I missed JM79 and TG80 in our editing of the finding.  It would be good to add Braun et al. 2002 to the Braun 1998 citation or substitute it.  I think this is it unless you two have additional questions or tasks for us.  Pat

[attachment "Tom-Julie Gunnison SG-RO RESPONSE.doc" deleted by Kurt Johnson/ARL/R9/FWS/DOI]

Patricia Mehlhop, Candidate Conservation Coordinator
303-236-4215

Billing Code 4310-55-P

DEPARTMENT OF THE INTERIOR

Fish and Wildlife Service

50 CFR Part 17

Endangered and Threatened Wildlife and Plants; 12-Month Finding on a Petition to List the Gunnison Sage-grouse as Threatened or Endangered

AGENCY:  Fish and Wildlife Service, Interior.

ACTION:  Notice of a 12-Month Petition Finding

SUMMARY:  We, the U.S. Fish and Wildlife Service (Service), announce a 12-month finding to list the Gunnison sage-grouse (Centrocercus minimus) as threatened or endangered under the Endangered Species Act of 1973, as amended (Act).  After reviewing the best available scientific and commercial information, we find that listing is not warranted.  Thus, we also no longer consider the species to be a candidate for listing.

1

We ask the public to submit to us any new information that becomes available concerning the status of or threats to the species. This information will help us monitor and encourage the conservation of this species.

**Comment [TG1]:** Do we need to affirmatively withdraw this as a candidate also? YES. ALREADY DONE.

DATES: The finding announced in this document was made on [**Insert date that this finding is signed**]. Although further listing action will not result from this finding, we request that you submit new information concerning the status of or threats to this species whenever it becomes available.

ADDRESSES: Comments and materials received, as well as supporting documentation used in the preparation of this 12-month finding, will be available for inspection, by appointment, during normal business hours at the Western Colorado Ecological Services Field Office, U.S. Fish and Wildlife Service, 764 Horizon Drive, Building B, Grand Junction, Colorado 81506-3946. Submit new information, materials, comments, or questions concerning this species to the Service at the above address.

FOR FURTHER INFORMATION CONTACT: Allan Pfister, Western Colorado Supervisor (see ADDRESSES section), by telephone at (970) 243-2778, by facsimile at (970) 245-6933, or by electronic mail at fw6_sagegrouse@fws.gov.

SUPPLEMENTARY INFORMATION:

Previous Federal Action

2

On January 18, 2000, the Director of the Service designated the Gunnison sage-grouse as a candidate species under the Act, with a listing priority of 5. However, the Federal Register notice regarding this decision was not published until December 28, 2000 (65 FR 82310, December 28, 2000). Candidates are species for which the Service has determined that the species warrants listing as a threatened or endangered species, but listing is precluded by higher listing priorities for other species. A listing priority of 5 indicates that there is a high magnitude of threats, but they are considered non-imminent.

On January 26, 2000, The American Lands Alliance, Biodiversity Legal Foundation, and others petitioned the Service to list the species (Webb 2000). On January 10, 2001, some of the same plaintiffs sued the Service in an attempt to force a petition process. In 2003, the U.S. District Court ruled that the species was designated as a candidate by the Service prior to receipt of the petition because the candidate form was signed on January 18, 2000, and that the determination that a species should be on the candidate list is equivalent to a 12-month finding (American Lands Alliance v. Gale A. Norton, C.A. No. 00-2339, D.D.C.).

The 2003 Candidate Notice of Review elevated the species' listing priority number to 2 (69 FR 24876), as the immanency of the perceived threats had increased. The 2004 Candidate Notice of Review (70 FR 24870) maintained the listing priority number as a 2.

3

Plaintiffs amended their complaint in May 2004 to allege that the Service's

warranted but precluded finding and our decision not to emergency list the Gunnison

sage grouse were in violation of the ESA.  Both parties filed a stipulated settlement

agreement with the court on November 14, 2005, which includes a provision that the

Service would make a proposed listing determination by March 31, 2006.

Section 4(b)(1)(A) of the Act requires us to consider the best scientific and

commercial data available as well as efforts being made by States or other entities to

protect a species when making a listing decision.  To meet this standard we

systematically collected information on the Gunnison sage-grouse, its habitats, threats,

and environmental factors affecting the species, from a wide array of sources.  The

scientific literature on Gunnison sage-grouse and its sagebrush habitats is moderate so,

where information was lacking and as appropriate, greater sage-grouse information was

used to analyze habitat usage, threats, and environmental factors affecting the Gunnison

sage-grouse.  In addition we received a substantial amount of unpublished information

from other Federal agencies, States, counties, environmental organizations, and

individuals.  We also solicited information on all Federal, State, or local conservation

efforts currently in operation or planned for the Gunnison sage-grouse or its habitats.

In April 2005, Colorado Division of Wildlife (CDOW) applied to the Service for an

Enhancement of Survival Permit for the Gunnison sage-grouse pursuant to

section 10(a)(1)(A) of the Act.  The permit application included a proposed Candidate

Conservation Agreement with Assurances (CCAA) between CDOW and the Service.

**Formatted:** Line spacing:  Double

4

The standard that a CCAA must meet is that the benefits of the conservation measures implemented under a CCAA, when combined with those benefits that would be achieved if it is assumed that conservation measures were also to be implemented on other necessary properties, would preclude or remove any need to list the species." The CCAA, the permit application, and the Environmental Assessment were made available for public comment on July 6, 2005 (70 FR 38977). Public comments and other internal comments from the Service and CDOW were incorporated into revisions of the CCAA and Environmental Assessment; the documents are scheduled to be finalized shortly. Landowners with eligible property in southwestern Colorado who wish to participate can voluntarily sign up under the CCAA and associated permit through a Certificate of Inclusion. These participants provide certain Gunnison sage-grouse habitat protection or enhancement measures on their lands. If the Gunnison sage-grouse is listed under the Act, the permit authorizes incidental take of Gunnison sage-grouse due to otherwise lawful activities in accordance with the terms of the CCAA (e.g., crop cultivation, crop harvesting, livestock grazing, farm equipment operation, commercial/residential development, etc.), as long as the participating landowner is performing activities identified in the Certificate of Inclusion.

**Comment [TG2]:** Shouldn't we report any improvement/successes etc. that have occurred as a result of these efforts? Of if they are not measured as of yet, what Colorado is doing in future to measure success of these efforts? I understand that withdrawal is not based on conservation efforts, but it doesn't hurt to close the loop on the discussion started here regarding the CCAA…_Legal Implication_ – If potential plaintiff sees that we have alternative argument for withdrawal, they will be less likely to challenge withdrawal based on biology if they know we can add conservation efforts as an additional reason to withdraw at any time. This is one of the reasons we haven't been sued so far on greater sage grouse, another not-warranted finding not dependent on future conservation efforts.
DISAGREE. POSSIBLE ACTIVITIES HAVE BEEN WRITTEN, BUT WE DO NOT KNOW WHICH ONES WILL GO INTO REAL CIS, SO WE SHOULDN'T GUESS.

We should also add that our analysis of the best available scientific data revealed that the Gunnison sage-grouse is not a threatened species, and in making this finding it was not necessary to rely on the contributions of any of the local, State, or other planned conservation efforts like those anticipated under the CCAA.
RO DID NOT DISCUSS NOT USING PLANS IN MAKING DETERMINATION, WHICH WE BELIEVE IS SUFFICIENT CLARIFICATION.

**Formatted:** Font: Times New Roman, 12 pt

Species Information

The sage-grouse (Centrocercus spp.) is the largest grouse in North America and was first described by Lewis and Clark in 1805 (Schroeder et al. 1999). Sage-grouse are

5

most easily identified by their large size, dark brown color, distinctive black bellies, long, pointed tails and association with sagebrush habitats. They are dimorphic in size, with females being smaller. Both sexes have yellow-green eye combs, which are less prominent in females. Sage-grouse are known for their elaborate mating ritual where males congregate on strutting grounds called leks and "dance" to attract a mate. During the breeding season males have conspicuous filoplumes (specialized erectile feathers on the neck), and exhibit yellow-green apteria (fleshy bare patches of skin) on their breasts (Schroeder et al. 1999).

For many years sage-grouse were considered a single species. Young et al. (2000) identified Gunnison sage-grouse (Centrocercus minimus) as a distinct species based on morphological (Hupp and Braun 1991; Young et al. 2000), genetic (Kahn et al. 1999; Oyler-McCance et al. 1999), and behavioral (Barber 1991; Young 1994; Young et al. 2000) differences and geographical isolation. Based on morphologic, behavioral, and genetic differences identified in various studies the American Ornithologist's Union (2000) accepted the Gunnison sage-grouse as a distinct species (see discussion under species considerations). The current ranges of the two species are not overlapping (Schroeder et al. 2004).

Gunnison sage-grouse and greater sage-grouse have similar life histories and habitat requirements (Young 1994). Nesting success for Gunnison sage-grouse is highest in areas where forb and grass covers are found below a sagebrush canopy cover of 15-30 percent (Young et al. 2000). These numbers are comparable to those reported for

6

**Comment [JM3]:** Moved IT WAS MOVED TO THE END OF THE DOC. SO RO DELETED IT.

**Deleted:** Gunnison

**Deleted:** sage-grouse are smaller than greater sage-grouse (C. urophasianus), weighing approximately 1/3 less (Hupp and Braun 1991; Young et al. 2000). Their filoplumes (specialized feathers on the neck) are longer and give the appearance of a "ponytail" during the courtship display, unlike the filoplumes on greater sage-grouse. Gunnison sage-grouse retrices (tail feathers) have distinctive barring, unlike the mottled pattern on greater sage-grouse retrices (Young et al. 2000). Gunnison sage-grouse mating displays are slower than greater sage-grouse (Young et al. 2000). Mating calls also are distinct. Gunnison sage-grouse "pop" their apteria nine times instead of twice like greater sage-grouse (Young et al. 2000). Young (1994) found that female Gunnison sage-grouse avoided playbacks of male greater sage-grouse mating calls. She concluded that differences in courtship vocalizations were likely a barrier to mating between Gunnison and greater sage-grouse. The DNA sequence information from mitochondrial and nuclear genomes indicate there is no gene flow between Gunnison and greater sage-grouse (Oyler-McCance et al. 1999; Young et al. 2000).

**Deleted:** these

**Deleted:** .

**Deleted:** Although

**Deleted:** are different genetically, morphologically, and behaviorally, their

**Comment [JM4]:** I think this document makes a good case for the Gunnison not being distinctive, but I also think it is important to highlight the serious flaws in the designation of the Gunnison as a separate species. That can be done at the end of the finding, and is not essential, but I do think it's important. RO BELIEVES IT BEST TO STAY QUIET ON THE SPECIES VALIDITY ISSUE AS THE BODY OF PEER REVIEWED LITERATURE WEIGHS IN SUPPORT OF IT AS A DISTINCT SPECIES. WE ACCEPTED THE DELETION OF THE COMPARISON WITH GRSG.

**Deleted:** are similar

the greater sage-grouse (Connelly et al. 2000a).  Connelly et al. (2000a) also state that

nest success for greater sage-grouse is greatest where grass cover is present.  Therefore,

factors identified in the greater sage-grouse literature that affect nesting habitat quality

can affect Gunnison sage-grouse nesting habitat.  Characteristics of sage-grouse winter

habitats are similar through the range of both species (Connelly et al. 2000a).  In winter,

Gunnison sage-grouse are restricted to areas of 15-30 percent sagebrush cover, similar to

the greater sage-grouse (Connelly et al. 2000a; Young et al. 2000).  However, unlike the

greater sage-grouse, Gunnison sage-grouse will use areas with more deciduous shrubs

during the winter (Young et al. 2000).

Food habits of the two species also are similar, being composed of nearly

100 percent sagebrush in the winter (Schroeder et al. 1999; Young et al. 2000).  Forbs

and insects are important during the summer and early fall.  Unlike many other game

birds, Gunnison and greater sage-grouse do not possess muscular gizzards and, therefore,

lack the ability to grind and digest seeds (Rasmussen and Griner 1938; Leach and

Hensley 1954).  While no formal diet studies have been conducted, Gunnison

sage-grouse dietary requirements are presumed to be similar to greater sage-grouse since

they are within the same genus (Tony Apa, CDOW, pers. comm. 2005).  Gunnison

sage-grouse chick dietary requirements of insects and forbs also are expected to be

similar to greater sage-grouse and other grouse species (Tony Apa, CDOW, pers. comm.

2005).

**Deleted:** presumably

**Deleted:** in a similar manner if those factors occur within the range of the Gunnison sage-grouse

**Comment [JM5]:** I am very uncomfortable with citing a personal communication.  If that's a standard biological assumption, then we should just say so… but someone's opinion doesn't hold much more weight than the Service's. DELETED CITATION

7

Given the ecological similarities between the two species, information on life history and habitat requirements presented in this finding use Gunnison sage-grouse information except where it is lacking and greater sage-grouse information is used. Except where referenced, the following life history information is taken from Schroeder et al. (1999).

In the spring, sage-grouse gather on traditional breeding areas referred to as leks (Patterson 1952). Lek displaying occurs from mid-March through late May, depending on elevation (Rogers 1964). For Gunnison sage-grouse, 87 percent of all nests were located less than 6 kilometers (km) (4 miles (mi)) from the lek of capture (Apa 2004). Mean clutch size for Gunnison sage-grouse is $6.8 \pm 0.7$ eggs (Young 1994). Most eggs hatch in June, with a peak between June 10 and June 20. Renesting rates following the loss of the original nest appear very low in Gunnison sage-grouse, with one study reporting 4.8 percent (Young 1994).

During the pre-egg laying period, female sage-grouse select forbs that have generally higher amounts of calcium and crude protein than sagebrush has (Barnett and Crawford 1994). Females with chicks move to areas containing succulent forbs and insects, often in wet meadow habitat, where cover is sufficiently tall to conceal broods and provide shade. Forbs dominate the summer diet of adult grouse, and sagebrush leaves are used the rest of the year (Leach and Hensley 1954; Wallestad 1975).

8

Chicks are precocial and leave the nest with the hen shortly after hatching. The availability of food and cover are key factors that affect chick and juvenile survival. During the first 3 weeks after hatching, insects are the primary food of chicks (Patterson 1952; Klebenow and Gray 1968; Peterson 1970; Johnson and Boyce 1990; Johnson and Boyce 1991; Drut et al. 1994b; Pyle and Crawford 1996; Fischer et al. 1996b). Diets of 4- to 8-week old greater sage-grouse chicks were found to have more plant material (approximately 70 percent of the diet, of which 15 percent was sagebrush) (Peterson 1970). Succulent forbs are predominant in the diet until chicks exceed 3 months of age, at which time sagebrush becomes a major dietary component (Klebenow 1969; Connelly and Markham 1983; Connelly et al. 1988; Fischer et al. 1996b).

**Deleted:** greater (and presumably Gunnison) sage-grouse

During late summer and early fall, intermixing of broods and flocks of adult birds is common and the birds move from riparian areas to sagebrush-dominated landscapes that continue to provide green forbs. From late autumn through early spring the diet of greater and Gunnison sage-grouse is almost exclusively sagebrush (Rasmussen and Griner 1938; Bean 1941; Batterson and Morse 1948; Patterson 1952; Leach and Hensley 1954; Barber 1968; Wallestad et al. 1975; Young et al. 2000). Many species of sagebrush can be consumed (Remington and Braun 1985; Welch et al. 1988, 1991; Myers 1992). Flock size in winter is variable (15 to 100+), and flocks frequently consist of a single sex (Beck 1977; Hupp 1987). During particularly severe winters sage-grouse are dependent on tall sagebrush, which is exposed even above deep snow, providing a consistently available food source. In response to severe winters, Gunnison sage-grouse have been documented moving as far as 27 km (17 mi) (Root 2002). The extent of

9

movement varies with severity of winter weather, topography, and vegetation cover. Sage-grouse may travel short distances or many miles between seasonal ranges. Movements in fall and early winter (September-December) exceed 3 km (2 mi).

Gunnison sage-grouse survival from April 2002 through March 2003 was 48 ($\pm$ 7) percent for males and 57 ($\pm$ 7) percent for females (Apa 2004). Higher survival rate of female sage-grouse may be due to sexual dimorphism (Schroeder et al. 1999). Gunnison sage-grouse female survival in small isolated populations was 52 ($\pm$ 8) percent, compared to 71 ($\pm$ 11) percent survival in the Gunnison Basin, the only population with greater than 500 individuals (Apa 2004). Other factors impacting survival rates include year and age (Zablan 1993).

Habitat

Sage-grouse are sagebrush obligates (Patterson 1952; Braun et al. 1977; Connelly et al. 2000a). They depend on a variety of shrub-steppe habitats throughout their life cycle and are considered obligate users of several species of sagebrush (Patterson 1952; Braun et al. 1976; Schroeder et al. 1999; Connelly et al et al. 2000a; Connelly et al. 2004). Sagebrush serves as a primary food for adults year-round (Wallestad et al. 1975) and also provides cover for nests (Connelly et al. 2000a). Sage-grouse move between seasonal ranges based on suitable habitat availability. Connelly et al. (2000a) segregated habitat requirements into four seasons: (1) breeding; (2) summer - late brood-rearing;

10

(3) fall; and (4) winter. Depending on habitat availability and proximity, some seasonal habitats may be indistinguishable.

Breeding habitat includes leks, pre-laying, nesting, and early brood-rearing areas. Male Gunnison sage-grouse attend leks from mid-March to mid-May, which are typically in the same location from year to year. Some Gunnison sage-grouse leks have been used since the 1950s (Rogers 1964). Leks are usually flat to gently sloping areas of less than 15 percent grade in broad valleys or on ridges (Hanna 1936; Patterson 1952; Giezentanner and Clark 1974; Wallestad 1975; Autenrieth 1981; Klott and Lindzey 1989). Leks have good visibility and low vegetation structure (Tate et al. 1979; Connelly et al. 1981; Gates 1985), and acoustical qualities that allow sounds of breeding displays to carry (Patterson 1952; Wiley 1973, 1974; Bergerud 1988; Phillips 1990). Leks are often surrounded by denser shrub-steppe cover, which is used for escape, thermal, and feeding cover.

Leks can be formed opportunistically at any appropriate site within or adjacent to nesting habitat (Connelly et al. 2000a) and, therefore, lek habitat availability is not considered to be a limiting factor for sage-grouse (Schroeder 1997). A relatively small number of dominant males accounts for the majority of breeding on each lek (Schroeder et al. 1999).

The pre-laying period is from late-March to April. Generally, pre-laying habitats for sage-grouse need to provide a diversity of vegetation including forbs that are rich in

**Comment [JM6]:** We made a valid assumption, stick with it. ACCEPTED

**Deleted:** Although

**Deleted:** little is known about pre-laying habitat for Gunnison sage-grouse,

**Deleted:** greater

11

calcium, phosphorous, and protein to meet the nutritional needs of females during the egg

development period (Barnett and Crawford 1994; Connelly et al. 2000a).


Nesting occurs from mid-April to June.  Gunnison sage-grouse typically select

nest sites under sagebrush cover with some forb and grass cover (Young 1994), and

successful nests were found in higher shrub density and greater forb and grass cover than

unsuccessful nests (Young 1994).  The sagebrush understory of productive sage-grouse

nesting areas contains native grasses and forbs, with horizontal and vertical structural

diversity that provides an insect prey base, herbaceous forage for pre-laying and nesting

hens, and cover for the hen while she is incubating (Schroeder et al. 1999; Connelly et al.

2000a; Connelly et al. 2004).  Shrub canopy and grass cover provide concealment for

sage-grouse nests and young, and are critical for reproductive success (Barnett and

Crawford 1994; Gregg et al. 1994; DeLong et al. 1995; Connelly et al. 2004).  Few

herbaceous plants are growing in April when nesting begins, so residual herbaceous

cover from the previous growing season is critical for nest concealment in most areas

(Connelly et al. 2000a).


Female sage-grouse have been documented to travel more than 20 km (13 mi) to

their nest site after mating (Connelly et al. 2000a).  Young (1994) found that

radio-tracked Gunnison sage-grouse nested an average of 4.3 km (2.7 mi) from the lek

nearest their capture site, with almost half nesting with 3 km (2 mi) of their capture site.

While earlier studies indicated that most greater sage-grouse hens nest within 3 km (2 mi)

of a lek, more recent research indicated that many hens actually move much further from

12

leks to nest based on nesting habitat quality (Connelly et al. 2004). Female Gunnison and greater sage-grouse exhibit general fidelity to nesting locations (Connelly et al. 1988; Young 1994; Connelly et al. 2004). The degree of fidelity to a specific nesting area appears to diminish if the female's first nest attempt in that area was unsuccessful (Young 1994; Connelly et al. 2004). However, there is no statistical indication that movement to new nesting areas results in increased nesting success (Connelly et al. 2004).

**Comment [JM7]:** See Connelly 2004 pps 3-6 and 4-5. This cite does not support the statement, but Connelly 2004 does if you add my edit. RO ADDED ADDITIONAL CITATIONS TO SUPPORT NOT ADDING EDIT

Early brood-rearing habitat is found close to nest sites (Connelly et al. 2000a), although individual females with broods may move large distances (Connelly 1982; as cited in Connelly et al. 2000a). Young (1994) found that Gunnison sage-grouse with broods used areas with lower slopes than nesting areas, high grass and forb cover, and relatively low sagebrush cover and density. Broods frequently used hay meadows, but were often flushed from interfaces of wet meadows and habitats providing more cover, such as sagebrush or willow-alder (Salix-Alnus). Forbs and insects are essential nutritional components for sage-grouse chicks (Klebenow and Gray 1968; Johnson and Boyce 1991; Connelly et al. 2004). Therefore, early brood-rearing habitat must provide adequate cover adjacent to areas rich in forbs and insects to assure chick survival during this period (Connelly et al. 2004).

As fall approaches sage-grouse move from riparian to upland areas and start to shift to a winter diet (Gunnison Sage-grouse Rangewide Steering Committee [GSRSC] 2005). By late summer and into the early fall, individuals become more social, and flocks are more concentrated (Patterson 1952). This is the period when Gunnison

**Comment [TG8]:** We're citing to a steering committee for this kind of data!! *Legal implication* – Since when do steering committees of local schnooks produce best available science. Was this committee all scientists? This statement and cite do not pass the legal term of art known as the "straight face test!" What did this steering committee do? They are cited to extensively. I was not provided list of References… Should they be cited like a published report??? I can't tell if we are giving this group too much credit or not enough??? Didn't we know this tidbit on sage grouse movements before 2005??
THE STEERING COMMITTEE AUTHORED THE PLAN, SO WE ARE CITING THEM CORRECTLY.

13

sage-grouse can be observed in atypical habitat such as agricultural fields (Commons 1997). However, radio-tracking studies in the Gunnison Basin have found that broods typically do not use hay meadows further away than 50 meters (m) (165 feet [ft]) of the edge of sagebrush stands (Gunnison Basin Conservation Plan 1997).

Movements to winter ranges are slow and meandering. Sagebrush stand selection in winter is influenced by snow depth (Patterson 1952; Connelly 1982 as cited in Connelly et al. 2000a) and in some areas, topography (Beck 1977; Crawford et al. 2004). Winter areas are typically characterized by canopy cover greater than 25 percent and sagebrush greater than 30-41 cm (12-16 in.) tall (Shoenberg 1982) associated with drainages, ridges, or southwest aspects with slopes less than 15 percent (Wallestad 1975; Beck 1977). Lower flat areas and shorter sagebrush along ridge tops provide roosting areas. In extreme winter conditions, greater sage-grouse will spend nights and portions of the day burrowed into "snow roosts" (Back et al. 1987).

Hupp and Braun (1989) found that most Gunnison sage-grouse feeding activity in the winter occurred in drainages and on slopes with south or west aspects in the Gunnison Basin. During a severe winter in the Gunnison Basin in 1984, less than 10 percent of the sagebrush was exposed above the snow and available to sage-grouse. In these conditions, the tall and vigorous sagebrush typical in drainages was an especially important food source.

Historical Distribution

14

Based on historical records, museum specimens, Gunnison sage-grouse historically occurred in southwestern Colorado, southeastern Utah and possibly northwestern New Mexico. Accounts of Gunnison sage-grouse in Kansas and Oklahoma, as suggested by Young et al. (2000), are not supported with museum specimens and Schroeder et al. (2004) found inconsistencies with the historic records and the sagebrush habitat currently believed to be necessary for Gunnison sage-grouse survival available in those areas. Applegate (2001) found that none of the sagebrush species closely associated with sage-grouse occurred in Kansas. He attributed historical, anecdotal reports as mistaken locations or misidentification of lesser prairie chickens. For these reasons, southwestern Kansas and western Oklahoma are not considered within the historic range of Gunnison sage-grouse (Schroeder et al. 2004). The historic range was modified from Schroeder et al. (2004), based on more complete knowledge of historic and current habitat and the distribution of the species (GSRSC 2005). Based on this information, the maximum Gunnison sage-grouse historical (presettlement) range is estimated to have been 55,350 square kilometers (sq km) (21,370 square miles [sq mi]) (GSRSC 2005), although to be clear, only a portion of this range would have been occupied at any one time.

Current Distribution and Population Estimates

Gunnison sage-grouse currently occur in seven widely scattered and isolated populations in Colorado and Utah, occupying 4,720 sq km (1,820 sq mi) (GSRSC 2005)

15

**Deleted:** and potential sage-grouse habitat, Schroeder et al. (2004) concluded that

**Comment [ES9]:** RO REJECTED EDITS BECAUSE WE ARE LEFT WITH NO CITATION AND WOULD BE MISREPRESENTING WHAT IS IN THE PEER REVIEWED LITERATURE.

**Deleted:** northeastern Arizona, and southeastern Utah

**Deleted:** not all

**Comment [TG10]:** We need much more support/evidence for this number included in this finding. As with greater sage grouse, these historical estimates of habitat are more guess than science. What is the "more complete knowledge." What I would prefer a historical range of estimates from conservative estimate to the number presented here. Plus, if the current range has been constant for the past 50/30/20 years, we need to say that. Then this dovetails with the relatively stable population estimates in Table 1. _Legal Implication_ – Such a dramatic drop(from 21K square miles to 1.8K sq. mi., without explanation, i.e. little drop in occupied habitat in last 10/20/50 years – fuels claim that we are arbitrary and capricious by withdrawing #2 candidate which has suffered such a precipitous drop in habitat. ADDRESSED

(Figure 1).  The seven populations are Gunnison Basin, San Miguel Basin,

Monticello-Dove Creek, Piñon Mesa, Crawford, Cerro Summit-Cimarron-Sims Mesa,

and Poncha Pass.

16

**Figure 1.  Locations of Current Gunnison Sage-grouse Populations.**



17

Formatted: Left: 1.5", Top: 1", Width: 8.5", Height: 11"

Gunnison Basin Population - The Gunnison Basin is an intermontane basin that includes parts of Gunnison and Saguache Counties, Colorado. The current Gunnison Basin population is distributed across approximately 240,000 hectares (ha) (593,000 acres (ac)), roughly centered on the town of Gunnison. Elevations in the area range from 2,300-2,900 m (7,500-9,500 ft). Big sagebrush (Artemesia tridentata) dominates the upland vegetation and has a highly variable growth form depending on local site conditions. Approximately 51 percent of the occupied sage-grouse range in Gunnison Basin is managed by the Bureau of Land Management (BLM), 14 percent by the U.S. Forest Service (USFS), 2 percent by the National Park Service (NPS), 1 percent by CDOW, 1 percent by the Colorado State Land Board, and 31 percent is privately owned (GSRSC 2005).

Up to 84 leks have been surveyed annually for breeding activity in the Gunnison Basin (CDOW, unpubl. lit. 2005a). Approximately 37 percent of these leks occur on private land and 63 percent on public land, primarily BLM (GSRSC 2005). In 2005, 44 of these leks were active, 38 inactive, and 2 are of unknown status. The 2005 Gunnison Basin sage-grouse population estimate is 4,763 (CDOW, unpubl. lit. 2005a), up from 2,443 the previous year (GSRSC 2005. Rogers (1964) stated that Gunnison County had one of the largest sage-grouse populations in Colorado. The historic range has contracted 15-20 percent at its periphery. Citation?

**Comment [JM11]:** Remove or put the reason for the concern. If it's just someone's opinion, that's a problem if they have some factual reason (two counters in the same place on the same day likely counting the same birds twice) then explain why there is concern the count may be high. The comment just results in more questions than it answers. ACCEPTED EDIT.

**Deleted:** ), but

**Deleted:** there is concern that the 2005 estimate may be high (Garton 2005).

**Comment [JM12]:** Is this statement based on any kind of data or is it opinion? GSRSC doesn't have the same requirements for best data that we have. ADDED CITATION. DELETED SENTENCE BELOW.

**Deleted:** Historically, Gunnison sage-grouse likely occurred in all suitable sagebrush habitats in the Gunnison Basin (GSRSC 2005).

18

San Miguel Basin Population - The San Miguel Basin population is in Montrose and San Miguel Counties in Colorado, and is composed of six groups using different areas—Dry Creek Basin, Hamilton Mesa, Miramonte Reservoir, Gurley Reservoir, Beaver Mesa, and Iron Springs.  Some of these six areas are used year-round by sage-grouse, and others are used seasonally.  Recent radiotelemetry studies have suggested that sage-grouse in the San Miguel Basin move widely and between these areas (Apa 2004; Stiver, unpubl. lit. 2005).

The area in the Dry Creek Basin occupied by Gunnison sage-grouse is approximately 24,800 ha (61,300 ac) (GSRSC 2005).  Sagebrush habitat in this area is patchily distributed and the understory is either lacking in grass and forb diversity (i.e., less than three species per acre), or nonexistent.  Where irrigation is possible, private lands in the southeast portion of Dry Creek Basin are cultivated.  Sagebrush habitat on private land has often been heavily thinned, or removed entirely. Citation?

The Dry Creek area is managed by BLM (57 percent), CDOW (12 percent), Colorado State Land Board (1 percent), and 30 percent is privately owned (GSRSC 2005).  Occupied habitat on the Hamilton Mesa is approximately 1,900 ha (4,800 ac).  Gunnison sage-grouse use this area in the summer, but use during other seasons is unknown.

Hamilton Mesa is primarily in private ownership (85 percent), with limited Colorado State Land Board (11 percent) and BLM (4 percent) managed property.  Miramonte Reservoir occupied sage-grouse habitat is approximately 4,700 ha (11,600 ac)

19

(GSRSC 2005).  Sagebrush stands are generally contiguous with a mixed grass and forb

understory.  Land ownership is 76 percent private, 15 percent CDOW, 7 percent USFS,

and 2 percent BLM (GSRSC 2005).


Occupied habitat at the Gurley Reservoir area is about 3,000 ha (7,500 ac)

(GSRSC 2005).  Sagebrush habitat is heavily fragmented and the understory is a mixed

grass and forb community.  Farming attempts in the early 20th century led to the removal

of much of the sagebrush.  Agricultural activities now are restricted primarily to the

seasonal irrigation of pasture.  Sagebrush has reestablished in most of the failed pastures,

but grazing pressure and competition from introduced grass species have kept the overall

sagebrush representation low.  A large portion of the area (91 percent) is privately owned

with the rest being managed by USFS (4 percent), BLM (3 percent), and the Colorado

State Land Board (2 percent) (GSRSC 2005).

> **Comment [TG13]:** These statements need support! Legal sufficiency nexus – Unsupported statements garner little discretion from courts. Similar statements elsewhere in finding do have citations attached, so should these. ADDED CITATION
>
> **Comment [JM14]:** What's the basis for this statement. ADDED CITATION


There are approximately 2,600 ha (6,400 ac) of occupied habitat at Iron Springs

and 3,600 ha (8,800 ac) at Beaver Mesa (GSRSC 2005).  Sagebrush stands in these areas

are contiguous with a mixed grass understory.  The Beaver Mesa area has numerous

scattered patches of oakbrush (Quercus gambelii).  Land ownership in both areas is

mainly private (Beaver Mesa, 99.5 percent; Iron Springs, 89 percent).  The remaining

portion of Beaver Mesa (0.5 percent) is managed by BLM.  At Iron Springs the

remainder is managed by USFS (6 percent), and the Colorado State Land Board

(5 percent) (GSRSC 2005).

20

The 2005 population estimate for the entire San Miguel Basin was 334 (CDOW, unpubl. lit. 2005b) on 9 leks. Rogers (1964) reported that all big sagebrush-dominated habitats in San Miguel and Montrose Counties were historically used by sage-grouse. The historic distribution was highly fragmented by forests, rocky canyons and dry basins void of sagebrush habitats.

Monticello-Dove Creek Population - This population has two disjunct groups of Gunnison sage-grouse. Currently, the largest group is near the town of Monticello, Utah. Gunnison sage-grouse in this group inhabit a broad plateau on the northeast side of the Abajo Mountains with fragmented patches of sagebrush interspersed with large grass pastures and agricultural fields. The Utah Division of Wildlife Resources (UDWR) estimates that Gunnison sage-grouse currently occupy about 24,000 ha (60,000 ac) in the Monticello group. Most currently-occupied habitat is in private ownership (95 percent) with 4 percent BLM and 1 percent State of Utah land (GSRSC 2005). The 2005 population estimate for Monticello was 162 individuals with 2 active and 2 inactive leks (G. Wallace, UDWR pers. comm. 2005). Leks in the Monticello area were first identified and counted in 1968. Personal accounts of

> **Comment [JM15]:** Anecdote. And it doesn't matter, what we care about is what is happening now in terms of threats. ACCEPTED DELETION.
>
> **Deleted:** Gunnison sage-grouse observations from long-time county residents indicate that the historic range in the Monticello area extended from the current distribution about 40 km (25 mi) north, about 24 km (15 mi) south, east to the Colorado border, and west to the base of the Abajo Mountains (GSRSC 2005).

The Dove Creek group is located primarily in western Dolores County, Colorado, north and west of Dove Creek, although a small portion of occupied habitat extends north into San Miguel County. The estimated occupied area is 11,500 ha (28,300 ac). Habitat north of Dove Creek is characterized as mountain shrub habitat, dominated by oakbrush interspersed with sagebrush. The area west of Dove Creek is dominated by sagebrush,

21

but the habitat is highly fragmented. Approximately 87 percent of occupied habitat is privately owned, and 13 percent is managed by BLM (GSRSC 2005). Lek counts in the Dove Creek area were over 50 males in 1999, suggesting a population of about 245 birds, but declined to 7 males in 2005, with a resulting population estimate of 34 (CDOW, unpubl. lit. 2005c). All leks are located in agricultural fields on private lands. Low sagebrush canopy cover, as well as low grass height, exacerbated by drought, may have led to nest failure and subsequent population declines (Connelly et al. 2000a; Apa 2004). Rogers (1964) reported that all sagebrush-dominated habitats in Dolores and Montezuma Counties in Colorado were historically used by sage-grouse. The historic distribution was highly fragmented by pinyon, juniper, and rocky canyons. ↓

Piñon Mesa Population - The Piñon Mesa population occurs on the northwest end of the Uncompahgre Plateau in Mesa County, about 35 km (22 mi) southwest of Grand Junction, Colorado. The estimated occupied range is 15,700 ha (38,900 ac). Land ownership is 70 percent private, 28 percent BLM, and 2 percent USFS (GSRSC 2005). The 2005 population estimate for this area is 167 (CDOW, unpubl. lit. 2005d). Eight leks are known (CDOW, unpubl. lit. 2004). However, one is inactive and another was not active in 2005 (CDOW unpubl. lit. 2005d). The Piñon Mesa area may have additional leks, but the high percentage of private land, a lack of roads, and heavy snow cover during spring makes locating additional leks difficult. ↓ Sage-grouse occupied an area of the Uncompahgre Plateau to the south as recently as the 1980s.

Crawford Population - The Crawford population of Gunnison sage-grouse is in Montrose County, Colorado, about 13 km (8 mi) southwest of the town of Crawford and

**Comment [JM16]:** Is it possible that the birds went elsewhere? NO; LEK COUNTS WOULD HAVE DETECTED IT.

**Comment [TG17]:** What does Rogers(1964) say about Gunnison Sage grouse as opposed to Greater Sage Grouse. GSG wasn't recognized species in 1964…. How do we know that Rogers is always talking about GSG and not Greater Sage grouse??
GUSG WAS THE ONLY ONE IN THOSE COUNTIES. THEY ARE OUTSIDE THE RANGE OF GRSG

**Comment [JM18]:** I think this sentence means that historically the distribution was always fragmented? Or does it mean that it has been fragmented from what it was historically. Also, the 1964 cite is based on data or anecdote? DELETED SENTENCE SINCE NO CITATION

**Comment [JM19]:** Is this important? We aren't really providing this information in any of the other descriptions of the habitats. DELETED SENTENCE

**Deleted:** Genetic

**Deleted:** data suggest that the Monticello group and the Dove Creek group are one population (GSRSC 2005), although there appears to be a relatively recent physical separation due to habitat changes.¶

**Comment [JM20]:** Speculation. Also, doesn't really matter, we're looking at the situation today. DELETED SENTENCE

**Comment [JM21]:** Do they not occupy it now? Or we don't know because it's private land. EDITED TEXT

**Deleted:** Gunnison

**Deleted:** sage-grouse likely occurred historically in all suitable sagebrush habitat in the Piñon Mesa area (Rogers 1964), an area much larger than the currently occupied habitat.

**Comment [TG22]:** Citation? ADDED

22

north of the Gunnison River.  Approximately 14,000 ha (35,000 ac) of habitat are

currently occupied.  Basin big sagebrush (<u>A. t. tridentata</u>) and black sagebrush

(<u>Artemesia nova</u>) dominate the mid-elevation uplands.  Approximately 63 percent is

managed by BLM, 13 percent NPS, and 24 percent is privately owned (GSRSC 2005).

**Comment [TG23]:** Does this report support the previous two sentences as well?? YES ADDED CITATION

The 2005 population estimate for Crawford is 191 (CDOW, unpubl. lit. 2005e).

Currently there are four active leks in the Crawford population on BLM lands in

sagebrush habitat adjacent to a 11-km (7-mi) stretch of road.  This area represents the

largest contiguous sagebrush-dominated habitat within the Crawford boundary.

**Comment [TG24]:** Citation? ADDED

<u>Cerro Summit–Cimarron–Sims Mesa Population</u> - This population is in Montrose

County, Colorado and has an estimated population of 25 birds (CDOW, unpubl. lit.

2005b).  The Cerro Summit-Cimarron group is centered about 24 km (15 mi) east of

Montrose, and occupies approximately 13,100 ha (32,300 ac).  The habitat consists of

patches of sagebrush habitat fragmented by oakbrush and irrigated pastures.  Land

ownership is approximately 81 percent private, 12 percent CDOW (Cimarron State

Wildlife Area), and 7 percent BLM land (GSRSC 2005).  Three leks are known in the

Cerro Summit-Cimarron group, but only one was verified to be active in 2005.  Rogers

(1964) noted a small population of sage-grouse in the Cimarron River drainage, but did

not report population numbers.  He noted that lek counts at Cerro Summit in 1959 listed

four individuals.

**Comment [TG25]:** This is an example of a small populations that has not blinked out and one that may be better off now than it was 40 years ago….*Legal implication*: This information needs to be squared with your statements in the next section in support of the model that claims small populations like this will go extinct in 5 years…Consistency and transparent analyses are important to gain discretion and avoid being labeled as arbitrary and capricious. ADDRESSED ELSEWHERE IN DOC. WE CHOSE THE CONSERVATIVE ROUTE AND MADE THE ASSUMPTION IT WOULD GO EXTINCT AS THE PVA PREDICTS

The 2,100-ha (5,300-ac) Sims Mesa area about 11 km (7 mi) south of Montrose

consists of small patches of sagebrush that are heavily fragmented by pinyon-juniper,

23

residential and recreational development, and agriculture. Land ownership is approximately 43 percent private, 51 percent BLM, and 6 percent CDOW (GSRSC 2005). The one known lek in Sims Mesa is inactive. Rogers (1964) counted eight males in a lek count at Sims Mesa in 1960. It is not known if sage-grouse move between the Cerro-Summit-Cimarron and Sims Mesa groups.

Poncha Pass Population - The Poncha Pass sage-grouse population is located in Saguache County, approximately 16 km (10 mi) northwest of Villa Grove, Colorado. This population was established through the introduction of 30 birds from the Gunnison Basin in 1971 and 1972 during efforts to reintroduce the species to the San Luis Valley (GSRSC 2005). The known population distribution is in sagebrush habitat from the summit of Poncha Pass extending south for about 13 km (8 mi) on either side of U.S. Highway 285. The estimated range of the population is about 8,300 ha (20,400 ac). Sagebrush in this area is extensive and continuous with little fragmentation; sagebrush habitat quality throughout the area is adequate (Nehring and Apa 2000). San Luis Creek runs through the area, providing a year-round water source and lush, wet meadow riparian habitat for brood-rearing. The BLM manages 48 percent of the area, USFS manages 26 percent, 24 percent is in private holdings, and 2 percent is managed by the Colorado State Land Board (GSRSC 2005). The 2005 Poncha Pass sage-grouse population estimate is 44 (CDOW, unpubl. lit. 2005f). The only current lek is located on BLM-administered land. In 1992, a CDOW effort to simplify hunting restrictions inadvertently opened the Poncha Pass area to sage-grouse hunting and at least 30 grouse were harvested from this population. Due to declining population numbers since the

24

1992 hunt, CDOW transplanted 24 additional birds from the Gunnison Basin (Nehring

and Apa 2000).  In 2001 and 2002, 20 and 7 birds respectively also were moved to the

Poncha Pass by CDOW (GSRSC 2005).  Transplanted females have bred successfully

(Apa, CDOW, pers. comm. 2004) and display activity resumed on the historic lek in

spring 2001.

Please make a chart like the following (you can change the words etc, I cut and pasted from the prose above) but it would be helpful to see this information tabulated so that each area gets the same information.

**Comment [ES26]:** DONE

25



| Population | Range Size | Habitat description | Population Description | Development pressure |
|---|---|---|---|---|
| Gunnison Basin Population | 240,000 hectares (ha) (593,000 acres (ac)) | Approximately 51 percent of the occupied sage-grouse range in Gunnison Basin is managed by the Bureau of Land Management (BLM), 14 percent by the U.S. Forest Service (USFS), 2 percent by the National Park Service (NPS), 1 percent by CDOW, 1 percent by the Colorado State Land Board, and 31 percent is privately owned (GSRSC 2005). | The 2005 Gunnison Basin sage-grouse population estimate is 4,763 (CDOW, unpubl. lit. 2005a), up from 2,443 the previous year (GSRSC 2005) | |
| San Miguel Basin Population | | | | |
| Monticello-Dove Creek Population | | | | |
| Piñon Mesa Population | | | | |
| Crawford Population | | | | |
| Cerro Summit–Cimarron–Sims Mesa Population | | | | |
| Poncha Pass Population | 8,300 ha (20,400 ac) | Sagebrush in this area is extensive and continuous with little | 65 birds, some transplanted and thriving. | Little development pressure |

Formatted: Font: Bold

Formatted: Line spacing: single

Formatted: Line spacing: single

Formatted: Line spacing: single

Formatted: Line spacing: single

Formatted: Line spacing: single

Formatted: Line spacing: single

Formatted: Line spacing: single

Comment [JM27]: Is this right? Can't tell from the writeup, but assumed since silent, it isn't a problem.  RO CLARIFIED

26

| | | fragmentation; sagebrush habitat quality throughout the area is adequate | | |
|---|---|---|---|---|
| | | | | |
| | | | | |

Formatted: Line spacing: single

Formatted: Line spacing: single

Formatted: Line spacing: single

Population Analyses

Deleted: ¶

27

The CDOW contracted for a population viability analysis (PVA) for the Gunnison sage-grouse (Miller 2004). The PVA is a tool used to predict the probability of extinction for a wildlife population under various management scenarios. They are typically based on available population data which are often inadequate for a complete understanding of complex systems. Therefore, PVAs only provide an approximation of how a species may respond to various management alternatives without consideration of threats. Also, since a PVA is a model, it does not present a complete picture of the system (GSRSC 2005 and references therein).

The purpose of the Gunnison sage-grouse PVA was to assist the CDOW in evaluating the relative conservation value of each Gunnison sage-grouse population and to identify critical gaps in the knowledge of Gunnison sage-grouse in prioritizing management options for this species, particularly in relation to maintenance of genetic diversity and the need for population augmentation. The results of this analysis indicated that small populations (<50 birds) are at a serious risk of extinction within the next 50 years. In contrast, populations in excess of 500 birds had an extinction risk of less than 5 percent within the same time period. These results suggest that the Gunnison Basin population is likely to persist long term and, in the absence of intervention, the Cerro Summit-Cimarron-Sims Mesa and Poncha Pass populations and the Dove Creek group of the Monticello-Dove Creek population are likely to be extirpated.

The remaining populations currently have estimated numbers between 150 and 350 birds, up from 125-250 in 2004, and their relative extinction risk as determined by

**Formatted:** Font: 12 pt

**Formatted:** Line spacing: Double

**Comment [TG28]:** We just learned that Ponch Pass population with 44 birds is relatively stable and responding to man. Actions by CDOW etc…doesn't sound like that are at a serious risk of extinction…..Small populations, where threats are not controlled, and where re-introduction does not occur, may be at risk, but not all small populations…. THE PONCHA PASS POP WAS AUGMENTED TO PREVENT ITS EXTINCTION. THIS IS EXPLAINED ELSEWHERE IN THE DOC

**Comment [TG29]:** Without discussing specific situations/risks, we cannot say this!! SEE PREVIOUS COMMENT RESPONSE

**Formatted:** Font: 12 pt

28

Formatted: Strikethrough

the PVA is between those extremes. ~~The model summary concludes that loss of quality habitat will lead to increases in extinction risk unless remedial measures are taken (GSRSC~~ 2005).

**Comment [TG30]:** I would suggest totally rewriting this paragraph. Remedial measures are taken all the time…Dozens of major remedial measures have been completed in past few years. But this finding is not dependent on conservation actions in the future…it is based on current status. Keeping this last sentence in is a kiss of death to this finding, because it says we need conservation measures to make this species viable, and we are supposed to say that this finding is not dependent on future conservation actions….. Legal sufficiency analysis – This last sentence is a fatal flaw and will likely lead to an arbitrary and capricious finding if it remains as is in this finding! SEE 2 PREVIOUS COMMENT RESPONSE AND REWRITTEN DISCUSSION NOW IN FACTOR E

Trends in abundance were analyzed for individual populations and the species rangewide using male lek count data from CDOW and UDWR (Garton 2005). While this analysis has not yet been peer reviewed, and thus has a lower level of confidence, it is the best available information at this time. Due to inconsistencies in data collection over time, trend analyses were conducted for two time periods--the entire number of years lek data have been collected (1957–2005), and from 1995-2005 when sampling methodologies have been more consistent. Raw data collected for 2005 show a large increase in the numbers of males attending leks, but CDOW believes this may have been the result of "double counting" males as a result of aberrant weather conditions (Garton 2005). Because of this, the analyses were conducted both with and without 2005 data.

**Comment [TG31]:** What do you mean "aberrant weather conditions" Do you mean rain? REWROTE

Statistical analyses of the Cerro Summit-Cimarron-Sims Mesa and Dove Creek populations could not be completed due to low lek counts and inconsistencies in sampling over time. Similarly, the small Poncha Pass population was not analyzed because it has been surveyed for only 6 years and in that time the population was augmented with birds from Gunnison Basin.

**Comment [TG32]:** Double counting is always an issue! Other surveys have accounted for this, this one should have also…So if there is drought, we have few males, and everybody wrings their hands and cries the sky is falling! When it rains and sage grouse numbers improve, we questions the increase because our surveyors don't like to count birds in the rain…Good grief! Is Garton with CDOW? If he is not, then why are we citing to him for an alleged DCOW belief?? How does an agency believe? Why is double-counting in quotes? If it is from a statement from CDOW, then cite to that statement. *Legal sufficiency analysis* – Sloppy citations and insufficient support for statements in finding lead to lost credibility, which leads to a loss of deference, which leads to more of a likelihood this finding will be declared arbitrary and capricious. REWROTE

The long-term analysis (1957-2005) found that the rangewide population of Gunnison sage-grouse was neither increasing nor decreasing during that time period.

29

Annual rates of change were highly variable, most likely as a result of sampling error rather than actual changes in population sizes. The shorter analysis period (1995-2005) yielded the same results, although the variability was reduced, likely due to more consistent data collection methods. Individual populations reflected the trends in the rangewide analysis, in that some populations were slightly increasing and some were slightly decreasing (Table 1). Estimates did not change significantly when the 2005 lek counts were omitted in this analysis. As with similar analyses conducted for the greater sage-grouse (Connelly et al. 2004), density-dependent models appeared to more accurately describe observed population trends (Garton 2005).

Table 1. Summary of population trends for the Gunnison sage-grouse. Values are the finite rate of change in the population, where 1 is no change, numbers less than 1 indicate a decline, and numbers greater than 1 indicate an increase. The analysis is for 1995-2005 (data from Garton 2005).

| POPULATION | FINITE RATE OF CHANGE |
|---|---|
| Rangewide | 0.98 |
| Gunnison Basin | 1.05 |
| Piñon Mesa | 1.09 |
| San Miguel Basin | 0.9 |
| Crawford | 0.999 |
| Monticello | 0.99 |

Summary of Factors Affecting the Species

Section 4 of the Act (16 U.S.C. 1533) and regulations (50 CFR Part 424) promulgated to implement the listing provisions of the Act set forth the procedures for adding species to the Federal lists. A species may be determined to be an endangered or

30

**Comment [TG33]:** This table points to the fact that GSG have been pretty stable during the past 50 years…this is contradictory with prior analysis which stated that the small pops among these should have blinked within 5 years of when they were counted…Why can't small populations be stable or growing? *Legal sufficiency analysis* – The model is not consistent with historical fact. I think we should jettison the part of the PVA analysis that claims small populations will blink out within 5 years. Then what we know about these small pops will be consistent the trend data and the finding that GSG has been stable over time. We can be internally consistent without stretching the truth or misrepresenting the facts and science. We can say that we are not adopting the model's prediction of extinction because reality shows that these populations have not blinked out. If there are other factors (threats) that cause us to believe these small populations will go extinct within 5 years, then we need to state what those threats are and why we believe they are serious. We don't do that here. Instead, we rely on a model's prediction that is contrary to known facts and data, an arbitrary and capricious decision in my opinion.
THESE NUMBERS REFER TO PAST CHANGES, WHEREAS THE PVA LOOKED AT RELATIVE RISK OF EXTINCTION OVER THE NEXT 50 YEARS

**Comment [TG34]:** We need two tables…One for 1995-2005 and one 1957 to 2005. WE USE THE SHORTER PERIOD SINCE THE LISTING DETERMINATION IS BASED ON CURRENT AND FUTURE, NOT PAST.

**Comment [JM35]:** Moved, not deleted. IT WAS MOVED TO THE END OF THE DOC. SO RO DELETED; HOWEVER, THE DELETION RENDERS THE SECTION INCOMPLETE BECAUSE THE GENETIC STUDY HAD POPULATION IMPLICATIONS.

**Deleted:** ¶
Oyler

**Deleted:** -McCance et al, (2005) conducted a genetic analysis of Gunnison sage-grouse populations using mitochondrial DNA sequence and nuclear microsatellite data. The Cerro Summit-Cimarron-Sims Mesa population was not included in this analysis due to inadequate sample sizes. The Poncha Pass population also was not included as it is composed of individuals transplanted from Gunnison Basin. In general, Gunnison sage-grouse have low levels of genetic diversity when compared to the greater sage-grouse (Oyler-McCan... [1]

threatened species due to one or more of the five factors described in section 4(a)(1). Using population estimate numbers determined in the PVA to represent high relative extinction risk, we have assumed that the Cerro Summit-Cimarron-Sims Mesa, and Poncha Pass populations and the Dove Creek group of the Monticello-Dove Creek population may be extirpated in the foreseeable future. These populations do not comprise a significant portion of the range of the Gunnison sage-grouse, as they are small and isolated. If the species as a whole faced similar extinction risk, it would meet the definition of threatened or endangered. However, the PVA does not support that conclusion. However, the PVA does not take into consideration future threats and therefore, an analysis of threats is required for those remaining populations to determine whether the species as a whole meets the definition of threatened or endangered.

| Deleted: allow us to draw |
| Deleted: In addition, |
| Deleted: . T |

The Service considers the foreseeable future in Gunnison sage-grouse to be between 30 and 100 years based on 10 Gunnison sage-grouse generations to 2 sagebrush habitat regeneration cycles. This is consistent with our 12-month finding for the greater sage-grouse (70 FR 2244). In preparing the greater sage-grouse document, we relied on the consensus of an expert panel which concluded that 30-100 years was a reasonable timeframe. Because the Gunnison sage-grouse has the same generation time and occupies habitat similar to the greater sage-grouse, we consider it prudent to use the same definition for foreseeable future.

**A. The Present or Threatened Destruction, Modification, or Curtailment of Its Habitat or Range.**

| Deleted: A. |

31

**NOTE:** This section was very disjointed and difficult to follow. Most importantly, we make no distinction between past effects and threats, and ongoing activities that are damaging sage grouse habitat and threatened activities that will damage habitat. Many of the statistics in paragraph form would be better displayed in tables. Also, we don't provide the same information for each of the population areas. For example, we note the Gunnison basin is safe from development and then note several others are not, but as to the remainder we are silent. It would be useful to have this information tabulated, and to provide the same information for all the populations. We also draw no conclusions after spending lots of time discussing various habitat impacts. The point of this entire exercise is to draw conclusions and support them. Finally, we do not adequately characterize the data. In several places, and the roads section comes to mind, we make a number of assertions, all of which are supported by only one paper, but explicitly contradicted by others; we ought to mention that there is disagreement on the issue, and not leave the impression that the assertion is a settled fact.

Pre-European settlement, we have data indicating that the the Gunnison sage-grouse was found in central and southwest Colorado, southeast Utah, northwestern New Mexico, and northeastern Arizona (GSRSC 2005, modified from Schroeder et al. 2004). Gunnison sage-grouse currently occupy 4,719 sq km (1,822 sq mi) in [list states] (GSRSC 2005, modified from Schroeder et al. 2004). The current habitat range and quality varies from high to low and fragmented.

Current threat due to habitat Fragmentation

| Deleted: available habitat for |
| Deleted: is estimated at 55,360 sq km (21,376 sq mi) |
| Deleted: r |
| Deleted: of the habitat |
| Deleted: has been reduced primarily by habitat loss, modification, and fragmentation |
| Deleted: H |

32

Habitat fragmentation is the separation or splitting apart of previously contiguous, functional habitat of a species.  Fragmentation can result from direct habitat losses that leave the remaining habitat in noncontiguous patches, or from modification of habitat areas that render the modified patches unusable to a species (i.e., functional habitat loss). Functional habitat losses include disturbances that remove one or more habitat functions, introduce physical barriers that prevent the use of otherwise suitable areas, and that prevent animals from using suitable habitat patches due to behavioral avoidance.

Fragmentation of sagebrush habitats has been cited as a primary cause of the decline of sage-grouse populations (Patterson 1952; Connelly and Braun 1997; Braun 1998; Johnson and Braun 1999; Connelly et al. 2000a; Miller and Eddleman 2000; Schroeder and Baydack 2001; Aldridge and Brigham 2003; Pedersen et al. 2003; Connelly et al. 2004; Schroeder et al. 2004).  While sage-grouse are dependent on interconnected expanses of sagebrush (Patterson 1952; Connelly et al. 2004), data are not available regarding optimum or even minimum sagebrush patch sizes to support populations of sage-grouse.  In addition, there is a lack of data to assess how fragmentation influences specific sage-grouse life history parameters such as productivity, density, and home range.  Notwithstanding the lack of specificity on effects of fragmentation,  it is clear that as a whole, fragmentation can have an adverse effect on sage grouse populations.  The following sections examine activities that can contribute to habitat fragmentation to determine whether their existence threatens Gunnison sage grouse habitat.

33

**Formatted:** Indent: First line:  0"

**Comment [JM36]:** This needs clarification, habitat's successional state is constantly changing as habitat grows. What we are talking about is a sudden change that results in removal or significant reduction in a successional state when there is no replacement habitat of suitable quality. DELETED SENTENCES

**Deleted:** change a habitat's successional state or

**Deleted:** clude

**Deleted:** activities

**Comment [TG37]:** e have to start talking specifically about Gunnison Sage Grouse…not greater sage grouse!!Legal analysis – This sloppiness not only threatens this finding, it makes Interior vulnerable on the greater sage grouse finding.
DISAGREE.  WE DISCUSSED THE APPROPRIATENESS OF GREATER SG DATA EARLIER IN THE FINDING.

**Deleted:** .

**Comment [JM38]:** Deleted this phrase because we can't say how large or how contiguous.  The point is the same, it's fragmentation that's a problem. ACCEPTED

**Deleted:** since

**Deleted:**  the species requires large expanses of contiguous sagebrush

**Deleted:** However,

**Deleted:** H



Water development and conversion to agriculture

Early explorers reported seeing little fauna for days prior to settlement of the sage grouse lands. (Owynhee County public comments on Greater Sage Grouse listing petition). However, in the mid-1800s western rangelands were converted to agricultural lands on a large scale beginning with the series of Homestead Acts in the 1800s (Braun 1998; Hays et al. 1998), especially where suitable deep soil terrain and water were available (Rogers 1964). Initially, increased water supplies and native predator control increased sage grouse populations. However, as time passed, introduced predators and plants as well as influences resulting from urban and agricultural activities reduced available habitat for sage grouse to the point it exists today.

Dams reduced land available to grouse and the irrigation projects associated with them has resulted in additional sage-grouse habitat loss (Braun 1998). Past reservoir development in the Gunnison Basin flooded 3,700 ha (9,200 ac or 1.5 percent) of likely sage-grouse habitat. Three other reservoirs inundated approximately 11 percent of habitat in the San Miguel Basin population area. We are unaware of any plans for additional reservoir construction in the foreseeable future and thus do not consider water development and the associated agricultural conversion to be a threat.

Agricultural conversion can provide some limited habitat for sage grouse. Some crops such as alfalfa (Medicago sativa) and young bean sprouts (Phaseolus spp.) are eaten

Comment [JM39]: This little sentence is a non-sequitur. We accept that fragmentation is a problem, even though we can't assign cause and effect more specifically. ACCEPTED

Deleted: abita

Deleted: t fragmentation can allow the incursion of different species between areas of suitable habitat and along the edge of the remaining habitat. Some of these species may be predators (Wilcove et al. 1986).¶

Comment [JM40]: This cite is not applicable. They examined passerine birds, not galliform birds which is the order that sage grouse belong to. DELETED PARAGRAPH

Deleted: While sage-grouse are dependent on interconnected expanses of sagebrush (Patterson 1952; Connelly et al. 2004), data are not available regarding minimum sagebrush patch sizes to support populations of sage-grouse. Estimating the impact of habitat fragmentation on sage-grouse is complicated by time lags in response to habitat changes, particularly since sage-grouse will continue to return to altered breeding areas (leks, nesting areas, and early brood-rearing areas) due to strong site fidelity despite nesting or productivity failures (Wiens and ... [2]

Comment [JM41]: Moved, not deleted. IT WAS MOVED TO EN ... [3]

Deleted: Oyler

Deleted: -McCance et al. (2005) concluded that gene flow among ... [4]

Deleted: C

Deleted: A

Comment [ES42]: RO COULD NOT ACCEPT BECAUSE SOURCE N ... [5]

Deleted: W

Deleted: I

Deleted: adjoining sagebrush habitats extend into those habitats, and include

Comment [ES43]: NOT ABLE TO ACCEPT. NO CITATIONS AND ... [6]

Comment [JM44]: Moved DID NOT FIND WHERE MOVED. SINCE ... [7]

Deleted: increased predation and reduced nest success due to predat ... [8]

Deleted: development of irrigation projects to support agricultural ... [9]

Deleted: Though some crops such as alfalfa (Medicago sativa) and yo ... [10]

Deleted: ¶

Formatted: Indent: First line: 0"

34

or used for cover by sage-grouse (C. Braun, CDOW, pers. comm. 1998).  However, crop

monocultures do not provide adequate year-round food or cover (GSRSC 2005).

Gunnison sage-grouse will use hay pastures for foraging within about 50 m (165 ft) of the

edge of the field but do not forage further into the pasture due to lack of suitable habitat

(Gunnison Basin Conservation Plan 1997).

With respect to Acreage in cropland declined from 1992 to 1997 in Delta,

Gunnison, Mesa, Montrose, and Saguache Counties by 3, 22, 6, 17, and 10 percent,

respectively (Colorado Department of Agriculture 2004).  However, it increased by

28 percent in San Miguel County.  Acreage in pastureland also decreased from

1992-1997 in Gunnison, Mesa, Montrose, and San Miguel Counties, by 20, 6, 21, and

13 percent, respectively.  Pastureland increased in Delta County by 7 percent and

Saguache County by 1 percent.  What were the reductions replaced by?  Development?

Or was the land allowed to lie fallow? I think it makes a difference.

> **Comment [JM45]:** there is no context for these numbers.  Are the percentage decreases available in acres?  And the conversions, did they take place 100 years ago or 10 years ago?  TOOK PLACE 1992-1997 AS STATED.  RO DOES NOT HAVE TIME TO FIND THE ACREAGES, BUT SEE ACRES IN PARAGRAPHS BELOW.

> **Comment [JM46]:** Is there no more recent data?  1997 was nearly a decade ago.  THERE ARE NO DATA THAT ARE MORE RECENT.  THE DATA WERE MADE AVAILABLE IN 2004.  IT TOOK THAT LONG FOR THE ANALYSIS.

> **Comment [ES47]:** THAT WASN'T ADDRESSED IN THE ANALYSIS. WE DO NOT KNOW.

In the Gunnison Basin approximately 17,328 ha (42,800 ac) or 8 percent of the

current range was converted to agricultural activities in the past (GSRSC 2005).

Approximately 5,700 ha (14,000 ac) or 7 percent of habitat in the San Miguel Basin has

been converted to agriculture.  The arrangement of these converted lands has contributed

to habitat fragmentation in this area.

> **Comment [JM48]:** Does that mean that the current range is occupied despite ag conversion or that the ag conversion was allowed to lapse back into pasture.  NO.  RO CLARIFIED SENTENCE.

Approximately 30 percent of the 40,048 ha (98,920 ac) of total occupied habitat

in the Monticello-Dove Creek population has been converted to agriculture (GSRSC

35

2005). In the Monticello group, 43 percent has been converted to pasture (GSRSC 2005). San Juan County, Utah, where the Monticello group resides, also has approximately 15,000 ha (37,000 ac) enrolled in Conservation Reserve Program (CRP), of which about half is within the current sage-grouse range (San Juan County Gunnison Sage-grouse Work Group [GSWG], unpubl. lit. 2005; GSRSC 2005). Under CRP, cropland is planted to pastureland and, except in emergency situations, not hayed or grazed. The CRP fields are used heavily by grouse as brood-rearing areas but vary greatly in plant diversity and forb abundance, and generally lack any shrub cover (GSRSC 2005). Sagebrush patches have progressively become smaller and more fragmented limiting the amount of available winter habitat for the Monticello group (GSRSC 2005). Significant use of CRP as nesting or winter habitat will require establishment of sagebrush stands in these fields. The CRP has protected this area from more intensive agricultural use and development, and approximately 16,000 ha (40,000 ac) of CRP are up for renewal under the Farm Bill in the next 2-3 years. If this program is not continued, most of these lands will likely be put back into crop production (GSRSC 2005).

Comment [TG49]: We don't know that. Some of these lands may also be subject to State conservation easements etc.
DELETED SENTENCE

Comment [JM50]: What are the odds of this occurring? We are trying to assess threats here, so, the program has been in place for 20 years, and there is no move to discontinue it, it's not likely to go away, so we ought not be raising it as an issue. If however, we have reason to believe it won't be continued, then we should say so and include it as a threat.
DELETED SENTENCE

Conversion to agriculture is limited in the Piñon Mesa area, with only 5 percent (500 ha (1,214 ac)) of the current range classified as grass/forb rangeland (GSRSC 2005). Sagebrush occurs in some areas that may be converted to grassland for livestock (BLM, unpubl. lit. 2005a), but the continued conversion is considered to be a minor impact in the foreseeable future. Habitat conversion in the Crawford area due to agricultural activities has been limited (GSRSC 2005).

36

We need to draw a conclusion here.  We have talked about reductions and conversion and past activities and current ranges, and there is no context.  In addition, we draw no conclusion.  One approach might be to say… there are X acres currently available to sage grouse, they are [include a description of the lands, by county or basin or however].  Of those X acres, Y are unlikely to be converted to agriculture or developed, and Z are subject to some kind of pressure that could reduce their suitability for sage grouse habitat.  As it stands, this section provides the reader no information as to to threat habitat/ag conversion represents.  Another chart might be helpful, but I'm not sure.

<u>Roads</u>

Impacts to sage grouse from roads may include direct habitat loss, direct mortality, (Forman and Alexander 1998), expansion into previously unused areas, spread of invasive weeds (; Gelbard and Belnap 2003; Connelly et al. 2004), noise in the vicinity of leks (; Braun 1986; Forman and Alexander 1998), and increased recreational use and associated human disturbances (Forman and Alexander 1998; Massey 2001; Wyoming Game and Fish Department 2003).

Braun et al. (2002) suggested that daily vehicular traffic along road networks for oil wells can impact Gunnison and greater sage-grouse breeding activities based on lek population patterns.  Modeling done in Connelly et al. (2004) found that the number of active leks, lek persistence and lek activity increased with increasing distance from an

37

**Comment [ES51]:** RO ADDRESSED AS BEST WE COULD WITH LIMITED TIME.

**Comment [JM52]:** Moved. RO REARRANGED BUT KEPT

**Deleted:** Additional habitat loss has resulted from reservoir development in some of the population areas.  Past

**Deleted:** reservoir development in the Gunnison Basin flooded 3,700 ha (9,200 ac or 1.5 percent) of likely sage-grouse habitat.  Three other reservoirs inundated approximately 11 percent of habitat in the San Miguel Basin population area.  We are unaware of any plans for additional reservoir construction in the foreseeable future.¶

**Comment [JM53]:** The cite does not support this.  They speak generally of roads being a barrier and reference beetles, small mammals and amp... [11]

**Comment [JM54]:** Cites do not support the statement.  SEE RES... [12]

**Comment [JM55]:** Cites do not support the statement.  RO CHE... [13]

**Deleted:** creation

**Deleted:** of barriers to migration corridors or seasonal habitats

**Deleted:** facilitation of mammalian (Forman and Alexander 1998; F... [14]

**Deleted:** and corvid predation (Connelly et al. 2000b; Aldridge... [15]

**Deleted:** and

**Comment [JM56]:** Forman and Alexander 1998 state specifically... [16]

**Comment [JM57]:** Forman 2000 does not address plants at all, but prim... [17]

**Comment [JM58]:** Does not support, correlates wires and corvid preda... [18]

**Comment [JM59]:** Does not support other than uses a model that incl... [19]

**Deleted:** Forman and Alexander 1998

**Deleted:** ; Forman 2000

**Deleted:** Knick et al. 2003

**Comment [JM60]:** They looked at mining noise, and how it might a... [20]

**Deleted:** Amstrup and Phillips 1977

**Comment [JM61]:** Lyon and Anderson made no such suggesti... [21]

**Deleted:** Lyon and Anderson (2003) suggested that roads may be the c... [22]

**Comment [JM62]:** Page 344 of the cite.  JM EDIT MAKES SENTE... [23]

**Deleted:** abandonment

interstate highway.  Other than this single predictive model output, we have no

quantitative information on the current impact of roads to Gunnison sage-grouse.  It is

unclear what specific factor relative to roads sage-grouse are responding to, and Connelly

et al. (2004) caution that they have not included other potential sources of disturbance

(e.g., powerlines) in their analyses.

Deleted: study,

　　Roads may have additional indirect effects that result from birds' behavioral

avoidance of road areas because of noise, visual disturbance, pollutants, and predators

moving along them.  The absence of screening vegetation in arid and semiarid regions

further exacerbates any problems.  Male sage-grouse depend on acoustical signals to

attract females to leks (Gibson and Bradbury 1985; Gratson 1993).  If noise interferes

with mating displays, and thereby female attendance, it is possible that younger males

will not be drawn to the lek and eventually leks will become inactive ().  Dust from roads

and exposed roadsides can damage vegetation through interference with photosynthetic

activities; the actual amount of potential damage depends on winds, wind direction, the

type of surrounding vegetation and topography (Forman and Alexander 1998).

Chemicals used for road maintenance, particularly in areas with snowy or icy

precipitation, can affect the composition of roadside vegetation (Forman and Alexander

1998).  While all these potential effects have been identified, we were unable to data

documenting these potential effects have actually affected sage-grouse populations

individually or at a species level.  In fact, the same studies which correlated invasive

species with road presence also found that local conditions can affect exotic richness,

particularly in low moisture availability, shallow depth and/or low nutrient levels,

Deleted: Additional indirect effects of r

Comment [JM63]: Cite did not examine that issue at all, it's about geothermal.  IT DISCUSSES NOISE FROM TRAFFIC ON P.7

Deleted: the

Deleted: (Suter 1978

Deleted: )

Comment [JM64]: This cite asked the question but was unable to answer it. BRAUN 1986 DISCUSSES LOSS OF A LEK DUE TO HAUL ROAD NOISE ON P.228. ON P.229 IT DISCUSSES FAILURE TO RECRUIT YEARLING MALES.  RO ADDED ADDITIONAL CITE.

Comment [JM65]: This is a study on coal mines, and did not tie noise to leks, it is also very oddly worded, finds an increase in population and the proceeds to question individual decreases. SEE PREVIOUS COMMENT RESPONSE.

Deleted: Amstrup and Phillips 1977

Deleted:  Braun 1986

Deleted: find any

Deleted: relating

Deleted: to impacts on

38

arguably at least one of those factors exists in the sagebrush steppe habitat favored by sage grouse (Gelbard and Belnap, 2003 pp 429).

The habitat of the Gunnison Sage Grouse is already fragmented by a number of roads. New roads and increased traffic on existing roads may cause some impact to the Dry Creek Basin birds in the San Miguel Basin, primarily due to ongoing gas field development and exploration on both the eastern and western edges of the current range. Increases in truck traffic have been noted on 24 km (15 mi) of road that cross the center of the current range in Dry Creek Basin.  However, only two sage-grouse have been killed on the roads in Dry Creek Basin since 2003 (CDOW, unpubl. lit. 2006).    No paved roads occur in the current range for the Piñon Mesa population, but with projected human population increases of 91 percent by 2030 (Colorado Department of Local Affairs [CDLA] 2004), we anticipate that new or existing roads will be paved in the foreseeable future.

The new roads will result in additional habitat loss and fragmentation, as well as increased disturbance and chance of direct mortality.  However, based on the data available to us, we have no reason to believe that the continuing effects of existing roads in general, and the new roads specifically will have a significant effect on the Gunnison Sage Grouse.

Powerlines

**Comment [JM66]:** Also check out the fact that this study references another that found no relationship between native cover and exotic species richness in sagebrush steppe habitat.  This study really didn't examine whether the roads actually facilitated transport, but really examined whether roadside verges are more or less suitable for exotics based on their level of disturbance.  The conclusion that roads facilitate transport because there are more exotics at roadsides does not necessarily follow from the fact that there are more exotics by roadsides.  There is an issue of causality that is not addressed.  SEE P.421 OF CITE.

**Deleted:** parameters

**Comment [JM67]:** The cited literature does not support the statement. SEE OYLER-MCCANCE ET AL. 2001, P.330

**Comment [JM68]:** It is unclear to me why we are cataloguing the amount of roads in the affected areas.  The roads are there, the habitat fragmented, and the real question is whether the grouse is threatened by the current situation or by new road construction that is planned. DELETED DATA ON MILES OF ROADS.  RO KEPT OYLER CI[ ... [24] ]

**Deleted:** Road

**Deleted:** development within Gunnison sage-grouse habitats precluded movement of sage-grouse between the resultant patches, presumably to[ ... [25] ]

**Deleted:**

**Deleted:** Basin is bisected by State Highway 50, a major highway with high traffic volume.  Two other State highways further intersect this[ ... [26] ]

**Deleted:** N

**Deleted:** , expected as oil and gas development continues (see discussion below),

**Comment [JM69]:** Moved ACCEPTED AND ACCEPTED DELETIONS

**Deleted:** Only two sage-grouse have been killed on the roads in Dry Creek Basin since 2003 (CDOW, unpubl. lit. 2006).  In the combined San Mig[ ... [27] ]

**Deleted:** paved roads occur in the current range for the Piñon Mesa population, but with projected human population increases of 91 perce[ ... [28] ]

**Deleted:** The cumulative impact of roads through sage-grouse habitat has not been measured, so we do not know the magnitude of this potential threat[ ... [29] ]

**Deleted:** ¶

39

The most detrimental effect that powerlines have is to provide a convenient perch for predators.  There are reports that they can also directly affect sage-grouse by posing a collision and electrocution hazard (Braun 1998; Connelly et al. 2000a and fragmenting habitat (Braun 1998).  However, although death through collision and electrocution are widely referenced, only one cite, Borell (1939) actually provides any data to support the claim with a report of the deaths of three adult sage-grouse as a result of colliding with a telegraph line in Utah (Borell 1939).  Both Braun (1998) and Connelly et al. (2000a) report that sage-grouse collisions with powerlines occur, but no specific instances were presented.

In areas where the vegetation is low and the terrain relatively flat, power poles provide an attractive hunting and roosting perch, as well as nesting stratum for many species of raptors (Steenhof et al. 1993; Connelly et al. 2000a; Manville 2002; Vander Haegen et al. 2002).  Power poles increase a raptor's range of vision, allow for greater speed during attacks on prey, and serve as territorial markers (Steenhof et al. 1993; Manville 2002).  Raptors may actively seek out power poles where natural perches are limited.  For example, within 1 year of construction of a 596-km (373-mi) transmission line in southern Idaho and Oregon, raptors and common ravens (Corvus corax) began nesting on the supporting poles (Steenhof et al. 1993).  Within 10 years of construction, 133 pairs of raptors and ravens were nesting along this stretch (Steenhof et al. 1993).  The increased abundance of raptors and corvids within the current Gunnison sage-grouse range can result in increased predation.  Ellis (1985) reported that golden eagle predation on greater sage-grouse on leks increased from 26-73 percent of the total predation after

40

**Deleted:** P

**Deleted:** ), and can have indirect effects by increasing predation (Connelly et al. 2004),

**Comment [JM70]:** powerlines don't facilitate invasive plants, no data provided to support the assertion.. ACCEPTED

**Deleted:** , and facilitating the invasion of exotic annual plants (Knick et al. 2003; Connelly et al. 2004

**Deleted:** )

**Deleted:** In 1939,

**Deleted:** ed

**Deleted:** although

**Comment [TG71]:** You can't talk about greater and then stick in an unsupported statement regarding Gunnison. ADDED CITATION

completion of a transmission line within 200 m (656 ft) of an active sage-grouse lek in northeastern Utah. The lek was eventually abandoned, and Ellis (1985) concluded that the presence of the powerline resulted in changes in sage-grouse dispersal patterns and fragmentation of the habitat. Leks within 0.4 km (0.25 mi) of new powerlines constructed for coalbed methane development in the Powder River Basin of Wyoming had significantly lower growth rates, as measured by recruitment of new males onto the lek, compared to leks further from these lines, which was presumed to be the result of increased raptor predation (Braun et al. 2002). The presence of a powerline may fragment sage-grouse habitats even if raptors are not present. Braun (unpubl. lit. 1998) found that use of otherwise suitable habitat by sage-grouse near powerlines increased as distance from the powerline increased for up to 600 m (1,969 ft) and reported that the presence of powerlines may limit sage-grouse use within 1 km (0.6 mi) in otherwise suitable habitat.

Linear corridors through sagebrush habitats can facilitate the spread of invasive species, such as cheatgrass (Bromus tectorum) (Gelbard and Belnap 2003; Connelly et al. 2004). However, we were unable to find any information regarding the amount of invasive species incursion as a result of powerline construction and it is unlikely that such incursion is significant when compared to the invasive species that occur as a result of past land use practices of the federal land management agencies.

> **Comment [JM72]:** See my note on Gelbard and Belnap above…. It doesn't really support this statement. RO DELETED CITES
>
> **Comment [JM73]:** Does not support. DELETED CITE
>
> **Deleted:** Knick et al. 2003
>
> **Deleted:** ;
>
> **Comment [ES74]:** DID NOT ACCEPT. WE HAVE NO CITATION TO SUPPORT IT.

On 121,000 ha (300,000 ac) of BLM land in Gunnison Basin there are 36 rights-of-way for power facilities, power lines, and transmission lines, which have

41

resulted in the direct loss of 350 ha (858 ac) of occupied habitat (BLM, unpubl. lit. 2005c).  A transmission line runs through the Dry Creek Basin group in the San Miguel Basin population, and the Beaver Mesa group has two.  None of the transmission lines in the San Miguel Basin have raptor proofing (BLM, unpubl. lit. 2005d), nor do most distribution lines (Jim Ferguson, BLM, pers. comm. 2005).  One major electric transmission line runs east-west in the northern portion of the current range of the Monticello group and one powerline runs east-west in the northern part of the current range (San Juan County GSWG, unpubl. lit. 2005).  Powerlines are not present in sufficient density to pose a significant threat to Gunnison sage-grouse in the Piñon Mesa population at this time.  One transmission line parallels Highway 92 in the Crawford population and distribution lines run from there to homes on the periphery of the current range (J. Ferguson, BLM, pers. comm. 2005).  Where there is projected human population growth in and near Gunnison sage-grouse populations we expect an increase in powerlines with a concomitant increase in predation from raptors and corvids.  However, the future increase will be small in proportion to the powerlines currently existing in the grouse's range, and accordingly, do not expect any increase in predation related to the increase to be significant.

| Deleted: With projected human population growth in and near Gunnison sage-grouse populations we expect an increase in powerlines in all populations but future impacts are unknown at this time |

Fences

| Comment [JM75]: Is this right? Your paragraph does not draw a conclusion… but certainly begs for one. RO EDITED TO CORRECT INSERTION. |
| Comment [TG76]: Do we need a conclusion that powerlines do not pose a threat?  ADDED CONCLUSION |
| Deleted: ¶ |

        Fences are used to delineate property boundaries and to manage livestock (Braun 1998; Connelly et al. 2000a).  The effects of fencing on sage-grouse include direct mortality through collisions, creation of predator (raptor) perch sites, the potential creation of a predator corridor along fences (particularly if a road is maintained next to

42

the fence), incursion of exotic species along the fencing corridor, and habitat

fragmentation (Call and Maser 1985; Braun 1998; Connelly et al. 2000a; Beck et al.

2003; Knick et al. 2003; Connelly et al. 2004).


Sage-grouse frequently fly low and fast across sagebrush flats and new fences can

create a collision hazard (Call and Maser 1985).  Thirty-six carcasses of greater

sage-grouse were found near Randolph, Utah, along a 3.2-km (2-mi) fence within

3 months of its construction (Call and Maser 1985).  Twenty-one incidents of mortality

through fence collisions near Pinedale, Wyoming, were reported in 2003 to the BLM

(Connelly et al. 2004.  Fence collisions continue to be identified as a source of mortality

for both species (Braun 1998; Connelly et al. 2000a; Oyler-McCance et al. 2001;

Connelly et al. 2004, San Juan County GSWG, unpubl. lit. 2005), although effects on

populations are not understood.  Braun (1998) suggested that collision with fences,

especially woven wire fences, was a potential factor in sage-grouse decline.  Connelly et

al. (2000a) noted that grouse have been observed hitting or narrowly missing fences and

that grouse remains are frequently found next to fences.  The impact of collisions on

populations of grouse has not been investigated.  Fences provide perch sites for avian

predation and depending on their design may also cause habitat loss and fragmentation.

Where there are maintained trails alongside the fence, there are assertions invasive weeds

may increase(Braun 1998; Connelly et al. 2000a; Oyler-McCance et al. 2001; Gelbard

and Belnap 2003; Knick et al 2003; Connelly et al. 2004).  Where sage-grouse avoid

habitat adjacent to fences, presumably to minimize the risk of predation, effective habitat

fragmentation results even if the actual habitat is not removed (Braun 1998).

Comment [JM77]: Fences do not always have roads associated with them, particularly if you are talking about grazing lands.  Not only that, we've already discussed roads.  ACCEPTED

Deleted: (and their associated roads) also cause habitat loss and fragmentation, increases in invasive weeds, and

Comment [JM78]: Assertions only, no data.  ACCEPTED

Deleted: S

Deleted: ance of

Deleted: ly results in

Comment [JM79]: I will just note, that Braun's comments here were opinion and anecdotal.  Not only that, he mentions one specific area where this has happened, as thought it is an anomaly.  BRAUN ET AL 2002 WOULD BE A BETTER REFERENCCE HERE, BUT THE DOCUMENT HAS GONE TO WO.

Comment [TG80]: If they avoid the habitat adjacent to fences, how are they being killed by the fences. If they are staying away from the habitat, they are staying away from the fences. You can't have it both ways, you can't say they are avoiding fences and flying into fences in the same section.
BRAUN ET AL 2002 WOULD BE A BETTER REFERENCCE HERE, BUT THE DOCUMENT HAS GONE TO WO.

43

There are at least 1,540 km (960 mi) of fence within BLM lands within the Gunnison Basin (BLM, unpubl. lit. 2005f) and an unquantified amount on other land ownerships.  While these fences  contribute to habitat fragmentation in this area and increase the potential for loss of individual grouse through collisions or enhanced predation; such effects have been ongoing since the first agricultural conversions occurred in the sage grouse habitat.  We have been unable to identify any reason to expect a major increase in the number of fences and we have no data other than anecdotal information to identify any significant existing threat to Gunnison sage grouse from fences.

**Deleted:** , further
**Deleted:** ing
**Deleted:** the habitat
**Deleted:** , as well as
**Deleted:** ing
**Deleted:** .  In 2003, a Monticello sage-grouse was documented as killed by colliding with a fence (San Juan County GSWG, unpubl. lit. 2005).
**Deleted:** were
**Comment [TG81]:** Fences and powerlines sections should be consistent with  Greater Sage grouse finding. RO MODIFIED SUBSTANTIALLY
**Deleted:** determine any estimate of fences and their impacts on Gunnison sage-grouse for the other populations

## Urban Development

Urban development has affected or eliminated much sage-grouse habitat in the West (Braun 1998).  Interrelated effects from urban/suburban development include construction of associated infrastructure (roads, powerlines, and pipelines) which have been discussed as well as predation threats from the introduction of domestic pets and increases in predators subsidized by human activities (e.g., landfills).  Urban expansion into rural areas also results in habitat fragmentation, direct habitat loss and conversion, as well as alteration of remaining sage-grouse habitats around these areas due to the presence of humans and pets (Braun 1998; Connelly et al. 2000a).

**Comment [JM82]:** We need to focus on effect to Gunnison Habitat. ACCEPTED
**Deleted:** It
**Deleted:**  is estimated that 3-5 percent of all sage-grouse historical habitat in Colorado has already been converted into urban areas (Braun 1998).
**Deleted:** and
**Deleted:** Recent u
**Deleted:** is
**Deleted:** ing
**Comment [JM83]:** This should talk about the Gunnison Counties. ACCEPTED
**Deleted:** In some Colorado counties, up to 50 percent of sage-grouse habitat is under rural subdivision development (Braun 1998
**Deleted:** ).

44

U.S. Census Bureau projections show that human population growth varies widely across the current distribution of Gunnison sage-grouse (CDLA 2004). Public ownership in the Crawford and Gunnison Basin areas, and portions of the San Miguel Basin will limit potential impacts from development in those particular areas. However, even these public lands are intersected by private lands. Conservation easements also may help alleviate potential impacts of the expansion effects of urban and suburban development. Existing and contemplated conservation easements in the Gunnison Sage Grouse range are addressed in more detail under the existing State regulatory protections considerations in Factor D.

Aldridge (2005) used spatial modeling to determine various habitat, climatic, and anthropogenic factors that influence greater sage-grouse nest and brood habitat selection and to determine nest and brood success. He determined that broods avoided habitats with a high density of urban development and areas close to cropland. A single human-use feature did not appear to affect nest occurrence but sage-grouse strongly avoided nesting in areas when roads, well sites, urban habitats, and cropland were analyzed in combination. Aldridge (2005) agreed with Fuhlendorf et al. (2002) that this may be due to predator avoidance behavior.

It is possible that residential development that is not managed to account for the needs of the Gunnison Sage Grouse could destroy and fragment habitat for the Gunnison Basin population. Gunnison County currently has a low population density of

45

5 people/sq mi in 2000 (GSRSC 2005), with projected growth rates ranges from .1 to 1.6 percent per year.  These rates result in a population increase of  about 5700 people by 2030 (41% or 7 people/sq mi) (CDLA 2004).  A 30 percent housing increase is projected from 2000-2020 (GSRSC 2005).  The town of Gunnison is located near the center of this population.  Growth from the town of Crested Butte, on the northern end of this population, is expanding southward.  Population growth estimates are not available for the portion of Saguache County that comprises approximately 25 percent of this population's current range, although county-wide the projected population growth from 3 people/sq mi in 2000 (GSRSC 2005) to 2030 is 45 percent (CDLA 2004).  Currently, an estimated 100-500 people live in the Gunnison Basin portion of Saguache County so the estimated population in 2030 will be between 145 and 725 people.

| Deleted: but |
| Deleted: 41 percent between 2000 and |
| Deleted: to |
| Deleted: is projected |
| Deleted: and |
| Deleted: a |

| Deleted: (Paul Jones, CDOW, pers. comm. 2004) |

Sixty-nine percent of the current range within the Gunnison Basin is under public ownership.  However, 37 percent of leks, 33 percent of nesting and brood-rearing areas, and 31 percent of winter range are privately-owned (GSRSC 2005).  Much of the riparian habitat, including some lek sites, north of the town of Gunnison, is privately owned and is currently under development pressure.  There were no new platted subdivisions from 2002-2004 in the current range in Gunnison County (Gunnison County, unpubl. lit. 2003; Paul Jones, CDOW, pers. comm. 2005).  The apparent current and projected slow rate of development in the Gunnison Basin suggests that urban and exurban development is not a significant threat to that Gunnison sage-grouse population.

46

Dry Creek Basin is the only group within the San Miguel Basin population with significant Federal and State land ownership (70 percent). This population is made up of 4(?) groups, the Iron Springs Mesa, Gurley Reservoir, Miramonte Reservoir and Dry Creek Basin. San Miguel County had 9 people/sq mi in 2000 (GSRSC 2005); most residents live in the town of Telluride or several smaller communities, including Norwood. The population in San Miguel County is expected to double to 18 people/sq mi between 2000 and 2030 (CDLA 2004), accompanied by a 62 percent increase in housing units by 2020 (GSRSC 2005). Based upon the location of current subdivided areas, expansion into sage-grouse habitat is certain without some action by local government (GSRSC 2005). Residential development is likely to affect the Iron Springs Mesa and Gurley Reservoir groups (GSRSC 2005). Subdivision development increased during 2003 and 2004 and at Gurley Reservoir, a 260-ha+ (640-ac+) area has been broken up into 16, 16-ha (40-ac) tracts for development. Approximately 8 percent of the current range for this portion of the San Miguel Basin population will be developed. Continued development in the area threatens to cause habitat loss, fragmentation, and future connection of the San Miguel Basin population to others. The Miramonte Reservoir group has a long-term threat of housing development (GSRSC 2005). However, the Dry Creek Basin group, which is the largest, has little expected threat from development (GSRSC 2005). We conclude that development is not a significant threat to this population of Gunnison sage-grouse.

The Monticello group of the Monticello-Dove Creek population is in San Juan County, Utah, which has approximately 2 people/sq mi (GSRSC 2005) with a projected

47

**Deleted:** be an impact in

**Deleted:** .

**Deleted:** A

**Comment [JM84]:** Doesn't make sense, there is a missing word. ADDRESSED

**Formatted:** Highlight

**Comment [JM85]:** Why? Is the Dry Creek Basin Group that much bigger? Are the conservation plans that strong? We just spent a whole paragraph laying out the threats, and then we expect the reader to believe us that it's not threatened? We really need to explain why we think this. ADDRESSED

increase of roughly 18% to 2600 people (2.4 people/sq mi) by 2030 (Utah Governor's Office of Planning and Budget 2005). Almost all the current range in both States is in private ownership.

The Piñon Mesa population is in Mesa County, which had a population density of 55 people/sq mi in 2000 (GSRSC 2005) with a projected increase to 105 people/sq mi by 2030 (CDLA 2004). Approximately 70 percent of the current range is in private ownership. Expansion of growth from the nearby city of Grand Junction poses a threat of permanent habitat loss and fragmentation. The eastern 33 percent of the current range is privately owned and contains 810 ha (2,000 ac) in tracts less than 65 ha (160 ac), and an additional 1,500 ha (3,600 ac) in tracts between 65 and 130 ha (160 and 320 ha), all of which can be further subdivided (GSRSC 2005). However, 19 percent of the private land containing occupied habitat is currently in conservation easements with additional lands being negotiated for conservation easements with the landowners, thereby limiting the threat of development (See Factor D for further discussion of easements).

There was an estimate of 24 people/sq mi living in and near the Crawford Area population in 2000 (GSRSC 2005). Montrose County contains the southeastern 75 percent of the current range of the Crawford population. The county was identified as one of the fastest growing counties in the country, with human population expected to double from 2000-2030 (CDLA 2004) and housing expected to increase by 68 percent by 2020. Growth will likely fragment and destroy current habitat and potential linkages to the San Miguel and Cerro Summit-Cimarron-Sims Mesa populations (GSRSC 2005),

48

**Deleted:** to

**Deleted:** 3.6

**Comment [JM86]:** Math is not working here. 18% increase confirmed in your staff notes. That results in only a 2.4 density. In addition, how can you have a 54% increase in housing over 20 years, when you are only expecting a 20% increase in housing for 30 years? Clarify or delete. UNCERTAIN WHAT STAFF NOTES WERE REFERENCED. PERHAPS THEY WERE MISREAD; 18% IS THE INCREASE FOR SAN MIGUEL COUNTY THAT IS DISCUSSED IN THE DOC. CORRECTED TO REFLECT THE FIGURES RO HAS.

**Deleted:** and a 54 percent increase in housing by 2020 (GSRSC 2005).

**Comment [JM87]:** Math doesn't work, please explain or remove. MATH LOOKS OK TO RO. THERE WOULD BE ~2 PEOPLE PER HOUSE.

**Deleted:** and 56 percent in housing units by 2020 (GSRSC

**Deleted:** 2005).

**Comment [JM88]:** The following sentences are confusing. So 5600 acres is in small tracts that could be subdivided. But then… 19% is in conservation easements… is that 19% of the 70 percent? Or 19% of the 5600 acres? And what proportion of the 33% is at risk? And how big is the 70%... there is no frame of reference for the reader to understand the relative risks we are talking about. RO ATTEMPTED TO CLARIFY.

**Deleted:** -

creating further isolation of this population (see Factor E for further discussion).  The northwestern 25 percent of the current range is in Delta County, which is projected to increase in population by 79 percent by 2030 (CDLA 2004) with an increase in housing of 58 percent by 2020 (GSRSC 2005).

Human population growth and housing development is occurring in all of the Gunnison sage-grouse populations and is projected to continue to do so over the next 2 decades.  However, with the exception of the Piñon Mesa population, human population densities are low and do not appear to pose a significant threat.  At Piñon Mesa, the threat of development may be diminished by current conservation easements with additional easements planned.

NOTE:  generally, this is a very confusing section.  All the information is relative and so there is no way to really understand the amount of habitat that is safe from development and the amount that we are writing off.  We talk about increases in densities but we don't tell people what densities pose a small threat or conversely, whether the bulk of the growth will be concentrated in areas that will not affect sage grouse.  Ie… is the growth spread evenly throughout the county (which is the per acre density) or whether all growth will take place in cities, or how it will be allocated.  I think this kind of explanation would go a long way to bolstering our argument that it's not likely to affect the grouse.

Energy Development

49

The development of oil and gas resources requires surveys for economically recoverable reserves, construction of well pads and access roads, subsequent drilling and extraction, and transport of oil and gas, typically through pipelines. Ancillary facilities can include compressor stations, pumping stations and electrical facilities (Connelly et al. 2004). Surveys for recoverable resources occur primarily through seismic activities, using vibroesis trucks or shothole explosives. Well pads vary in size from 0.10 ha (0.25 ac) for coalbed natural gas wells in areas of level topography to greater than 7 ha (17 ac) for deep gas wells (Connelly et al. 2004). Pads for compressor stations require 5-7 ha (12-17 ac) (Connelly et al. 2004). Well densities and spacing are typically designed to maximize recovery of the resource and are administered by State agencies (Connelly et al. 2004).

Direct habitat losses result from construction of well pads, roads, pipelines, powerlines, and the crushing of vegetation during seismic surveys. As disturbed areas are reclaimed, sage-grouse may repopulate the area. However, re-population may take 20-30 years, as habitat conditions are not immediately restored (Braun 1998; 2003a). For most developments, return to pre-disturbance population levels is not expected due to a net loss and fragmentation of habitat (Braun et al. 2002). After 20 years, sage-grouse have not recovered to pre-development numbers in Alberta, even though well pads in these areas have been reclaimed (Braun et al. 2002). In some reclaimed areas, sage-grouse have not returned (Aldridge and Brigham 2003).

> **Comment [JM89]:** This paragraph is an incomplete picture. IT REFLECTS THE AVAILABLE SCIENCE TO THE EXTENT THE RO IS AWARE.

> **Comment [TG90]:** The growing season in Alberta is significantly shorter than the one in SW Colorado….Common sense would dictate that reclamation in these northern areas will be slow…also we don't know the reclamation requirements in Alberta and Canada, and whether they are as rigorous as those in Colorado/U.S. RECLAMATION WAS UNDERWAY ~20 PRIOR TO THE ARTICLE, PLENTY OF TIME REGARDLESS OF WEATHER.

50

Noise can drive away wildlife, cause physiological stress, and interfere with auditory cues and intraspecific communication, as discussed previously. Aldridge and Brigham (2003) reported that, in the absence of stipulations to minimize the effects, mechanical activities at well sites may disrupt sage-grouse breeding and nesting activities. Greater sage-grouse hens that bred on leks within 3 km (2 mi) of oil and gas development in the upper Green River Basin of Wyoming selected nest sites with higher total shrub canopy cover and average live sagebrush height than hens nesting away from disturbance (Lyon 2000). The author hypothesized that exposure to road noise associated with oil and gas drilling may have been one cause for the difference in habitat selection. However, noise could not be separated from the potential effects of increased predation resulting from the presence of a new road. Above-ground noise is typically not regulated to mitigate effects to sage-grouse or other wildlife (Connelly et al. 2004). Gunnison sage-grouse were observed flushing from a lek when a compressor station switched on, disrupting breeding behavior (Jim Garner, CDOW, pers. comm. 2004). However, this was a single incident, and we have no information to conclude that noise from energy development poses a significant threat to the species.

Water quality and quantity may be affected in oil and gas development areas. However, since, sage-grouse do not require free water (Schroeder et al. 1999) we anticipate that impacts to water quality from mining activities would have minimal effects on them.

51

Increased human presence resulting from oil and gas development also can impact sage-grouse either through avoidance of suitable habitat, disruption of breeding activities, or increased hunting and poaching pressure (Aldridge and Brigham 2003; Braun et al. 2002; BLM 2003).  Sage-grouse also may be at increased risk for collision with vehicles simply due to the increased traffic associated with oil and gas activities (BLM 2003).

Only a few studies have examined the effects of oil and gas development on sage-grouse.  While each of these studies reported sage-grouse population declines, specific causes for the negative impacts were not determined.  In Alberta, Canada, the development of well pads and associated roads in the mid-1980s resulted in the abandonment of three greater sage-grouse lek complexes within 200 m (656 ft) of these features (Braun et al. 2002).  Those leks have not been active since that time.  A fourth lek complex has gone from three to one lek with fewer numbers of sage-grouse on it (Braun et al. 2002).  The well pads have since been reclaimed, but greater sage-grouse numbers have not recovered (we do not have information on post-reclamation vegetation).  Subsequent to the development of the Manyberries Oil Field in high quality greater sage-grouse habitat in Alberta, male sage-grouse counts fell to the lowest known level (Braun et al. 2002).  Two additional leks were directly disturbed, and neither of these leks has been active within the past 10 years (Braun et al. 2002).  The development of oil reserves in Jackson County, Colorado, was concurrent with decline of greater sage-grouse numbers in the oil field area (Braun 1998).  Sage-grouse populations still occur in at least one long-term oil field development in Colorado where leks are not within line-of-sight of an active well or powerline (Braun et al. 2002).  Although the

52

number of active leks has declined in this field, sage-grouse have been consistently documented there since 1973.  Lyon and Anderson (2003) concluded that impacts of oil and gas development extend over 0.40 km (0.25 mi) from well pads.

Of particular relevance to estimating oil and gas development impacts is the fidelity of sage-grouse hens to nesting and summer brood-rearing areas demonstrated by Lyon and Anderson (2003).  Hens that have successfully nested will return to the same areas to nest every year.  If these habitats are affected by oil and gas development, there is a strong potential that previously successful hens will return but not initiate nesting (Lyon 2000).  Depending on the number of hens affected, local populations could decline.

The reauthorization of the Energy Policy and Conservation Act in 2000 dictated reinventory of Federal oil and gas reserves, which identified extensive reserves in the Greater Green River Basin of Colorado, Utah, and Wyoming, and the San Juan Basin of New Mexico and Colorado (Connelly et al. 2004).  Energy development on Federal (BLM and USFS) lands is regulated by the BLM and can contain conservation measures for wildlife species (see Factor D for a more thorough discussion).  The BLM (1999) classified the area encompassing all Gunnison sage-grouse habitat for its gas and oil potential.  Three of the populations have areas with high (San Miguel Basin, Monticello group) or medium (Crawford) oil and gas potential.  San Miguel County, where much oil and gas activity has occurred in the last few years, ranked 8 out of 64 in counties producing natural gas in 2002 (Colorado Oil and Gas Conservation Commission 2004).

53

In the current sage-grouse range in the Gunnison Basin 33 percent of the area ranked as low potential, with the remainder having no potential for oil and gas development (BLM 1999; GSRSC 2005). No federally-leased lands exist within the population area (BLM, unpubl. lit. 2005g). However, one active well and six inactive wells are on non-Federal lands in the current range in the northern part of the Gunnison Basin (BLM, unpubl. lit. 2005g).

The entire San Miguel Basin population area is classified as having high potential for oil and gas development (BLM 1999; GSRSC 2005)). Natural gas exploration in the San Miguel Basin has increased in recent months (CDOW, unpubl. lit. 2005g), with 49 percent of the current range on public and private land with Federal leases for gas development (BLM, unpubl. lit. 2005g). As a general practice, all currently unleased BLM lands within the current sage-grouse range in the San Miguel Basin are being deferred for oil and gas leasing until completion of the Resource Management Plans (RMPs) covering the habitat for this population (anticipated in 2007 and 2008).

The Colorado State Land Board (CSLB) offered four sections of State school section land for oil and gas leasing in the San Miguel Basin population in February 2006. One of these is in occupied habitat of the Miramonte Reservoir group and the other three are in the Dry Creek Basin group. The San Miguel County Board of Commissioners requested that they withdraw those sections or at least place a "no surface occupancy" prescription on the land with adherence to conservation measures in the RCP (San

54

Miguel County, unpubl. lit. 2006). The CSLB stipulated that well pads would be placed out of Gunnison sage-grouse habitat [to the extent possible] on one parcel in Dry Creek Basin where the surface and the mineral rights are owned by the CSLB (Linda Luther, San Miguel County, pers. comm. 2006). However, the other three parcels are split estate (private surface, CSLB-owned minerals) and the CSLB was unwilling to, or believed they could not, put stipulations for sage-grouse on those parcels. San Miguel County will continue to work with the landowners, CSLB, and oil and gas companies to place stipulations on the parcels (Linda Luther, San Miguel County, pers. comm. 2006) but whether stipulations will occur is uncertain. Nonetheless, this illustrates a strong conservation commitment by the County for the San Miguel Basin population.

One oil and gas operator, who holds several leases in the San Miguel Basin, has decided to temporarily abandon drilling on its leases in the Hamilton Mesa, Miramonte Reservoir, Gurley Reservoir, Beaver Mesa, and Iron Springs Mesa areas because they are not expected to be economically feasible. However, exploration and production may continue in the future (CDOW, unpubl. lit. 2005g). Fifty-one oil and gas wells have been developed in the current range in the San Miguel Basin. All but 1 is in the Dry Creek Basin and 47 are on federally-leased land (BLM, unpubl. lit. 2005g). Additional wells on existing leases are proposed for this area in the next 10 years. Five gas pipelines are proposed for this development, one of which is expected to transect winter habitat and another will remove habitat in places (BLM, unpubl. lit. 2005h). The exact locations of any future drill sites are not known, but because the area is small, they will likely lie within 3 km (2 mi) of one of only three leks in this group (CDOW, unpubl. lit. 2005g).

55

The Monticello group is in an area of high energy potential (GSRSC 2005).  Oil and gas leases with State and Federal mineral rights have been acquired or applied for on over 2,000 ha (5,000 ac) (6 percent) in the current range (Tammy Wallace, BLM, pers. comm. 2005a).  One new well pad was constructed in 2005 (San Juan County GSWG, unpubl. lit. 2005) and additional drilling is expected to occur in the next few years.  However, BLM is currently deferring new leases in the current range.

No oil and gas wells are within the current range in the Piñon Mesa area, although oil and gas leases occupy 17 percent of this habitat (BLM, unpubl. lit. 2005g).  The remaining portion of the current range has no potential for oil or gas in this area except for a small portion on the eastern edge of the largest habitat block (BLM 1999; GSRSC 2005).  The Crawford population is in an area with high to medium potential for oil and gas development (BLM 1999; GSRSC 2005).  However, no Federal leases and only one well (on non-Federal lease property) are in the current range (BLM, unpubl. lit. 2005g).  The BLM will defer Federal oil and gas leases in the current range in this population.  Future development could occur on State and private land in the Crawford area under Colorado Oil and Gas Commission regulation and on BLM land if their future RMP allows it.

In summary, some Gunnison sage-grouse habitat is in areas with high potential for oil and gas development, particularly in the San Miguel Basin.  However, while a few studies on greater sage-grouse reported population declines in response to oil and gas

56

development (Braun et al. 2002; Lyon and Anderson 2003), specific causes for the declines were not determined.  A recent study of greater sage-grouse in Wyoming found that as oil and gas development increased, lek activity declined, up to 100 percent (Holloran 2005).  Negative impacts to active leks extended to a distance of 5 km (3 mi) from an active drilling rig.  Similarly, juvenile male recruitment to impacted leks also fell.  Nesting females avoided areas with high well densities, although site fidelity to previous nesting locations may result in delayed population response to the habitat changes associated with development.  While some birds were displaced by the disturbance, Holloran (2005) also found that many sage-grouse discontinued breeding attempts, and others died at a higher rate than birds from unaffected areas.  He concluded that stipulations placed on oil and gas development were insufficient to maintain sage-grouse breeding populations.  Application of these impacts from gas development to the San Miguel and Crawford populations and Monticello group could threaten their long-term persistence.  However, the immediate threat to Gunnison sage-grouse is curtailed by BLM lease deferments and economic infeasibility of extraction.

> **Comment [TG91]:** This is a very loaded paraphrase of a very specific study in Jonah field in Wyoming. Legal sufficiency analysis -- What are the range of impacts … Also, this study was done on a very extensively developed area…Needless to say, this kind of density will not be duplicated in Gunnison habitat. What was the range of impacts?
> THE STUDY WAS IN THE PINEDALE ANTICLINE, WHERE WELL DENSITIES ARE FAIRLY LOW AND SIMILAR TO THOSE IN THE GUSG RANGE.

Colorado has been the largest producer of coalbed methane in the country since 2002, and production has increased (Cappa et al. 2005).  Deposits exist under the current range of the San Miguel and Crawford populations (Cappa et al. 2005), although no wells have been drilled to date in those areas (D. Spencer, BLM, pers. comm. 2005).

Renewable energy resources, such as windpower, require many of the same features for construction and operation as do nonrenewable energy resources.  Therefore,

57

we anticipate that potential impacts from direct habitat losses, habitat fragmentation through roads and powerlines, noise, and increased human presence (Connelly et al. 2004) will generally be the same as already discussed for nonrenewable energy development.  Windpower may have additional mortalities resulting from sage-grouse flying into turbine rotors or meteorological towers (Erickson et al. 2001).  One greater sage-grouse was found dead within 45 m (148 ft) of a turbine on the Foote Creek Rim wind facility in south-central Wyoming, presumably from flying into a turbine (Young et al. 2003).  During 3 years of monitoring operation, this is the only known sage-grouse mortality at this facility.

Current interest and speculation in wind energy exists in the Monticello area.  A wind test tower (anemometer) has been erected at a site approximately 2.4 km (1.5 mi) from a lek (GSRSC 2005), and landowners in the area have been contacted by power company contractors about leases for wind power development.  Depending on the location and number of wind turbines placed near leks and other important habitat in the Monticello group, Gunnison sage-grouse in this area may be impacted.  We are not aware of any other wind energy development proposed throughout the rest of the Gunnison sage-grouse current range.

> **Comment [TG92]:** Do we need a conclusion on energy development? DONE

Mining

Surface mining for any mineral resource (coal, uranium, copper, bentonite, gypsum, oil shale, phosphate, limestone, gravel, etc.) will result in direct habitat loss for

58

Gunnison sage-grouse if the mining occurs in current sagebrush range.  Direct loss of sage-grouse habitat also can occur if the overburden and/or topsoil resulting from mining activities are stored in sagebrush habitats.  The actual effect of this loss depends on the quality, amount, and type of habitat disturbed, the scale of the disturbance, and if non-breeding habitat is affected, the availability of adjacent habitats (Proctor et al. 1983; Remington and Braun 1991).

Regulation of non-coal mining in the United States is at the discretion of the individual States.  New vegetation types including exotic species may become established on mined areas (Moore and Mills 1977), altering their suitability for sage-grouse.  If reclamation plans call for the permanent conversion of the mined area to a different habitat type (e.g., agriculture) the habitat loss becomes permanent.  Invasive exotic plants also may establish on the disturbed surfaces.  Removal of the overburden and target mineral may result in changes in topography, subsequently resulting in changes in microclimates and microhabitats (Moore and Mills 1977).  Additional habitat losses can occur if supporting infrastructure, such as roads, railroads, utility corridors, buildings, etc., become permanent landscape features after mining and reclamation are completed (Moore and Mills 1977), which is allowed in Colorado (Colorado Statute Title 34, Article 32) and Utah (R647-4-110).

Other indirect effects from mining can include reduced air quality from fugitive dust, degradation of surface water quality and quantity, disturbance from noise, human presence, and mortality from collision with mining equipment (Moore and Mills 1977;

59

Brown and Clayton 2004).  Fugitive dust could affect local vegetative and insect

resources (Moore and Mills 1977).  Most large surface mines are required to control

fugitive dust, so these impacts are probably limited.  Since sage-grouse do not require

free water (Schroeder et al. 1999), we anticipate that impacts to water quality from

mining activities would have minimal population-level effects.  The possible exception is

degradation or loss of riparian areas, which could result in brood habitat loss.  The effects

on sage-grouse of noise from mining are unknown, but sage-grouse also depend on

acoustical signals to attract females to leks (Gibson and Bradbury 1985; Gratson 1993).

If noise does interfere with mating display and thereby female attendance, younger males

will not attend the lek, and eventually leks will become inactive (Amstrup and Phillips

1977; Braun 1986).  Mining also can impact sage-grouse through the increased presence

of human activity, either through avoidance of suitable habitat adjacent to mines or

through collisions with vehicles associated with mining operations (Moore and Mills

1977; Brown and Clayton 2004).  However, we were unable to find any information

regarding increased mortality of Gunnison sage-grouse as a result of this effect.


Within Gunnison sage-grouse current range, coal, uranium, and vanadium are

most commonly mined and have begun to increase in recent years (Cappa et al. 2005).

These minerals were mined historically in the San Miguel area and impacted an unknown

amount of the range.  Uranium deposits are within the current range of the San Miguel

Basin population and Monticello group (Cocker 2001; Cappa et al. 2005) and three mines

near the San Miguel Basin population were reopened in 2004 (Cappa et al. 2005).

60

Six active hardrock, gravel or road fill mines are on BLM land in sage-grouse range in the Gunnison Basin (BLM, unpubl. lit. 2005c). Total disturbance, excluding roads, is 39 ha (96 ac). Two hundred ninety-one inactive or abandoned mines and numerous miles of road have caused unquantified past habitat loss and fragmentation (BLM, unpubl. lit. 2005b), but future impact of hardrock, gravel, or road fill mines are likely limited.

We conclude that present and future mining activities appear to be limited and do not pose a significant threat to Gunnison sage-grouse.

Grazing

Grazing is the dominant use of sagebrush rangelands in the West (Connelly et al. 2004); almost all sagebrush areas are managed for livestock grazing (Knick et al. 2003). Although we lack information on the proportion of occupied Gunnison sage-grouse habitat that is grazed, we expect that it is a vast majority. Excessive grazing by domestic livestock during the late 1800s and early 1900s, along with severe drought, significantly impacted sagebrush ecosystems (Knick et al. 2003). Although current livestock stocking rates are substantially lower than high historic levels (Laycock et al. 1996), long-term effects from this overgrazing, including changes in plant communities and soils, persist today. Although it is likely that livestock grazing and associated land treatments have altered plant composition, increased topsoil loss, and increased spread of exotic plants, the impacts on sage-grouse are not clear. Few studies have directly addressed the effect

61

of livestock grazing on sage-grouse (Beck and Mitchell 2000; Wamboldt et al. 2002; Crawford et al. 2004), and there is little direct experimental evidence linking grazing practices to sage-grouse population levels (Braun 1987, Connelly and Braun 1997). Rowland (2004) conducted a literature review and found no experimental research that demonstrates grazing alone is responsible for the reduction in sage-grouse numbers.

The GSRSC (2005) could not find a direct correlation between causative historic conditions and reduced sage-grouse numbers. It has been demonstrated that the reduction of grass heights due to livestock grazing of sage-grouse nesting and brood-rearing habitat negatively affects nesting success by reducing cover necessary for predator avoidance (Gregg et al. 1994; Delong et al. 1995; Connelly et al. 2000a). Nest success in Gunnison sage-grouse is related to greater grass and forb height and shrub density (Young 1994). In addition, livestock consumption of forbs may reduce food availability for sage-grouse. This is particularly important for pre-laying hens, as forbs provide essential calcium, phosphorus, and protein. A hen's nutritional condition affects nest initiation rate, clutch size, and subsequent reproductive success (Connelly et al. 2000a). Livestock grazing can reduce the forage availability in breeding and brood-rearing habitat, subsequently negatively affecting sage-grouse populations (Braun 1987; Young 1994; Dobkin 1995; Beck and Mitchell 2000). Exclosure studies have demonstrated that domestic livestock grazing also reduces water infiltration rates and cover of herbaceous plants and litter, as well as compacting soils and increasing soil erosion (Braun 1998). This results in a change in the proportion of shrub, grass, and forb components in the affected area, and an increased invasion of exotic plant species that do not provide suitable habitat for

**Comment [TG93]:** Do we mean "historic grazing" if so, just say so!! ADDRESSED

62

sage-grouse (Miller and Eddleman 2000). Thus, important factors of livestock operations related to impacts on sage-grouse include stocking levels and season and duration of use.

**Comment [TG94]:** Until this theory is tested, it should not be cited as a finding, but as a hypothesis or deleted altogether. This wasn't even in the first draft of the greater sage grouse finding. CITATION IS CORRECT AND WAS INCLUDED IN THE GRSG FINDING ON P.2259.

**Deleted:** Hulet (1983, as cited in Connelly et al. 2000a) found that heavy grazing could lead to increases in ground squirrels that depredate sage-grouse nests

**Deleted:** .

Other consequences of grazing include several related to livestock trampling. Outright nest destruction by livestock trampling does occur and the presence of livestock can cause sage-grouse to abandon their nests (Rasmussen and Griner 1938; Patterson 1952; Call and Maser 1985; Crawford et al. 2004). Call and Maser (1985) indicate that forced movements of cattle and sheep could have significant effects on nesting hens and young broods caught in the path of these drives. Livestock also may trample sagebrush seedlings thereby removing a source of future sage-grouse food and cover (Connelly et al. 2000a), and trampling of soil by livestock can reduce or eliminate biological soil crusts making these areas susceptible to cheatgrass invasion (Mack 1981 as cited in Miller and Eddleman 2000; Young and Allen 1997; Forman and Alexander 1998).

Livestock grazing also may compete directly with sage-grouse for rangeland resources. Aldridge and Brigham (2003) suggest that poor livestock management in mesic sites results in a reduction of forbs and grasses available to greater sage-grouse chicks, thereby affecting chick survival. Pedersen et al. (2003) documented sheep consumption of rangeland forbs in areas where sage-grouse occur. The effects of direct competition between livestock and sage-grouse depend on condition of the habitat and grazing practices.

63

Development of springs and other water sources to support livestock in upland shrub-steppe habitats can artificially concentrate domestic and wild ungulates in important sage-grouse habitats, thereby exacerbating grazing impacts in those areas through vegetation trampling, etc. (Braun 1998). Diverting water sources has the secondary effect of changing the habitat present at the water source before diversion. This could result in the loss of either riparian or wet meadow habitat important to sage-grouse as sources of forbs or insects.

Sagebrush removal to increase herbaceous forage and grasses for domestic and wild ungulates is a common practice in sagebrush ecosystems (Connelly et al. 2004). Herbicide, especially Tebuthiuron applications were commonly used to kill large expanses of sagebrush, but it also killed many forbs used for brood-rearing (Crawford et al. 2004). Thinning, rather than removal, of sagebrush using Tebuthiuron has been the focus of some treatments (Emmerich 1985; Olson and Whitson 2002).

Sage-grouse response to herbicide treatments depends on the extent to which forbs and sagebrush are killed. Chemical control of sagebrush has resulted in declines of sage-grouse breeding populations through the loss of live sagebrush cover (Connelly et al. 2000a). Herbicide treatment also can result in sage-grouse emigration from affected areas (Connelly et al. 2000a), and has been documented to have a negative effect on nesting, brood carrying capacity (Klebenow 1970), and winter shrub cover essential for food and thermal cover (Pyrah 1972 and Higby 1969 as cited in Connelly et al. 2000a). Carr and Glover (1970) found that greater sage-grouse would use block-sprayed areas for

64

strutting but not for other activities.  They found that adults would move the 1.6 km

(1.0 mi) across the sprayed areas but believed that movement across the area may cease

as dead standing sagebrush deteriorated.  They also determined that broods were impeded

from moving to a previously used riparian area due to killing of the sagebrush between

nesting sites and the riparian area.  Winter use also did not occur in the area due to lack of

live sagebrush for forage.


Small treatments interspersed with non-treated sagebrush habitats did not affect

sage-grouse use, presumably due to minimal effects on food or cover (Braun 1998).

Also, application of herbicides in early spring to reduce sagebrush cover may enhance

some brood-rearing habitats by increasing the coverage of herbaceous plant foods

(Autenrieth 1981).


Mechanical treatments are designed to either remove the above-ground portion of

the sagebrush plant (mowing, roller chopping, and rotobeating), or to uproot the plant

from the soil (grubbing, bulldozing, anchor chaining, cabling, railing, raking, and

plowing; Connelly et al. 2004).  These treatments were begun in the 1930s and continued

at relatively low levels to the late 1990s (Braun 1998).  Mechanical treatments, if

carefully designed and executed, can be beneficial to sage-grouse by improving

herbaceous cover, improving forb production, and resprouting sagebrush (Braun 1998).

However, adverse effects also have been documented (Connelly et al. 2000a).

Mechanical treatments in blocks greater than 100 ha (247 ac), or of any size seeded with

65

exotic grasses, degrade sage-grouse habitat by altering the structure and composition of the vegetative community (Braun 1998).

For Gunnison sage-grouse the best available measure of potential grazing impacts is derived from monitoring habitat conditions in grazing allotments and comparing them to habitat objectives, although this comparison has not occurred for most BLM lands in the Gunnison sage-grouse range. Where information is available, it is presented below.

Within the current range in the Gunnison Basin, 23 of 66 BLM allotments have sage-grouse habitat objectives and conservation measures incorporated into the allotment management plans or Records of Decision for permit renewals (BLM, unpubl. lit. 2005i). In 2002, 50 percent of the Wyoming big sagebrush/Indian ricegrass (Achnathrum hymenoides) vegetation, which accounts for a significant portion of the nesting/early brood-rearing habitat, met the desired condition on BLM lands in the area (GSRSC 2005). In 2003, 75 percent of 32,000 ha (80,000 ac) of nesting/early brood-rearing habitat monitored met habitat objectives (BLM, unpubl. lit. 2004). Under 50 percent of the 579 km (360 mi) of riparian areas, which are important for brood-rearing, met desired conditions identified in the Gunnison Basin Conservation Plan (1997) and 85 percent met short-term stubble height objectives (nesting cover) (BLM, unpubl. lit. 2004). In 2004, 23,000 ha (56,000 ac) were monitored within a 3-km (2-mi) radius of a lek, and less than 2 percent met the local (Gunnison Basin Conservation Plan 1997) objectives for grass stubble height (BLM, unpubl. lit. 2005j). However, grass growth may have been

66

suppressed by effects of drought, which appeared to be impacting habitat in most populations in 2004 (See Factor E for further drought discussion).

Although BLM has stated that it does not consider grazing to be problematic in the portions of the San Miguel Basin they manage (BLM, unpubl. lit. 2005d), no sage-grouse habitat objectives or conservation measures are in allotment management plans or grazing permits for their allotments (BLM, unpubl. lit. 2005d and 2005g). On BLM land in the Dry Creek Basin group remaining sagebrush patches have been subjected to overgrazing and continue to succeed to a late-seral sagebrush community lacking in understory. This is not optimal for sage-grouse use (CDOW, unpubl. lit. 2005g). We were unable to acquire information on grazing intensity on public or private land.

Eight BLM grazing allotments totaling 2,700 ha (6,700 ac) occur within the current range in the Monticello group (San Juan County GSWG, unpubl. lit. 2005). Few or no habitat objectives or conservation measures have been incorporated in BLM allotment management plans, nor have changes in grazing intensity been implemented for sage-grouse in the group. No data are available on whether grazing lands on BLM or private land are meeting sage-grouse habitat objectives for the Monticello group. The CRP has provided a considerable amount of brood-rearing habitat in the Monticello group because of its forb component. Grazing of CRP in Utah occurred in 2002 under emergency Farm Bill provisions due to drought. Radio-collared males and non-brood-rearing females exhibited temporary avoidance of grazed fields during and

67

**Formatted:** Font: 12 pt

**Formatted:** Line spacing: Double

**Comment [TG95]:** We need to insert what the BLM sage grouse strategy is accomplishing. There are specific terms and conditions and stipulations out there on specific allotments that may not show up in AMPs. I seriously doubt that there are no conservation measures in any permit anywhere in the Gunnison's habitat. I'd like Colorado State office of BLM to check the validity of this statement.
BASED IN DISCUSSION WITH BLM WO, LITTLE OF THE BLM STRATEGY BEYOND ADMIN ACTIONS HAVE BEEN IMPLEMENTED. THE STRATEGY CALLS FOR ASSESSMENTS FIRST, NOT ACTIONS

**Formatted:** Font: 12 pt

after grazing (San Juan County GSWG, unpubl. lit. 2005), although one hen with a brood

continued to use a grazed CRP field.

Comment [TG96]: We need to insert what the BLM sage grouse strategy is accomplishing. There are specific terms and conditions and stipulations out there on specific allotments that may not show up in AMPs. I seriously doubt that there are no conservation measures in any permit anywhere in the Gunnison's habitat. I'd like Colorado State office of BLM to check the validity of this statement.
SEE PREVIOUS COMMENT RESPONSE.

Formatted: Font: 12 pt

Fifty grazing allotments on BLM land are within the current range in the Piñon

Mesa population (BLM, unpubl. lit. 2005a).  We do not know the extent of grazing on the

private land within the Piñon Mesa sage-grouse range.  Only three BLM allotments

(6 percent) have Gunnison sage-grouse habitat objectives incorporated into the allotment

management plan or grazing permit in this area.

In the Crawford population there are nine BLM grazing allotments, totaling about

8,500 ha (21,000 ac) or 60 percent of the habitat.  Sage-grouse conservation measures

have been incorporated into seven of the allotment plans.  The BLM (unpubl. lit. 2005c)

believes that livestock grazing is not a threat, at least on BLM land, to the Crawford

population due to reductions of Animal Unit Months and recent changes in grazing

management.  The Gunnison Gorge Land Health Assessment showed that

34,000 out of 44,000 ha (84,000 out of 110,000 ac), or 76 percent of the current range,

met the land health standard for threatened and endangered species (including Gunnison

sage-grouse habitat).  The extent of livestock grazing on private land is unknown.

In conclusion, overgrazing and habitat manipulations to improve livestock forage

can impact sage-grouse habitat.  However, it is unclear whether effects from current

68

livestock grazing management, such as reduction of vegetation or spread of weeds

threaten Gunnison sage-grouse at a population or rangewide level.

We lack adequate information on the effect of deer and elk grazing on Gunnison

sage-grouse and their habitat to fully address this potential impact. Overgrazing by deer

and elk may cause local degradation of habitats by removal of forage and residual hiding

and nesting cover. Hobbs et al. (1996) documented a decline in available perennial

grasses as elk densities increased. Such grazing could negatively impact nesting cover

for sage-grouse. Excessive but localized deer and elk grazing has been documented in

the Gunnison Basin (BLM, unpubl. lit. 2005j; Paul Jones, CDOW, pers. comm. 2005).

The winter range of deer and elk overlaps the year-round range of the Gunnison

sage-grouse. Deer and elk herds were above the carrying capacity of their winter range

before the 2002 drought and were not significantly reduced during or after it (BLM,

unpubl. lit. 2005j). However, no evidence exists that competition for resources is

limiting Gunnison sage-grouse in the Gunnison Basin. Although grazing by deer and elk

occurs in all population areas, information on overgrazing by deer or elk in other

populations has not been reported.

Invasive Weeds

Invasive species have been defined as those that are not native to an ecosystem

and whose introduction causes, or is likely to cause, economic or environmental harm or

harm to human health (Executive Order 13112, 1999). Invasive species often cause

69

declines in native plant populations by reducing light, water, and nutrients, and they grow

so quickly that they outcompete other species (Wooten et al. 1996). Exotic plants can

reduce and eliminate populations of plants that sage-grouse use for food and cover.

Frequent fires with short intervals within sagebrush habitats favor invasion of cheatgrass,

which is unsuitable as sage-grouse habitat (Schroeder et al. 1999). Cheatgrass then

shortens the fire interval (from approximately 30 years down to 5 years), perpetuating its

own persistence and spread, and exacerbating the effects of fire in remaining sage-grouse

habitats (Whisenant 1990; Billings 1994; Grahame and Sisk 2002; Connelly et al. 2004).

A cheatgrass invasion into sagebrush habitat can lead to an eventual conversion of

sagebrush/perennial grass community to sagebrush/annual grass or annual grass

rangeland (Connelly et al. 2000a; Miller and Eddleman 2000). Rehabilitation of an area

to sagebrush after cheatgrass becomes established is extremely difficult (Connelly et al.

2004). In some cases cheatgrass invasion encourages other exotic species such as

knapweed and thistle (Grahame and Sisk 2002).


Cheatgrass has invaded areas in Gunnison sage-grouse range, supplanting

sagebrush plants upon which the species depend. Connelly et al. (2000a) indicated that

some greater sage-grouse populations have been affected and some will decline due to

projected, continuing spread of cheatgrass domination in the absence of effective

management. There has not been a demonstrated change in fire cycle in any population

of the Gunnison sage-grouse, so they may not be as threatened as greater sage-grouse.

While all of the Colorado Gunnison sage-grouse counties have noxious weed programs,

none identify cheatgrass as a noxious weed for control purposes (Colorado Department of

Agriculture 2003). The BLM, on whose land many acres of cheatgrass occur, is currently restricted to application of 6 ha (15 ac) of an effective herbicide per Field Office per year, limiting their ability to control this noxious weed (BLM, unpubl. lit. 2005j).

Approximately 14,249 ha (35,200 ac) have been invaded by cheatgrass in the Gunnison Basin, equaling 6 percent of the current range (BLM, unpubl. lit. 2005j) with 405 ha (1,000 ac) considered dominated by cheatgrass (Sandy Borthwick, BLM, pers. comm. 2005) despite past treatments to control this weed (Gunnison Watershed Noxious Weed Program, unpubl. lit. 2005). In addition, cheatgrass has been found at 50 other locations and 21 roads or road segments throughout the Gunnison Basin population's range. Although disturbed areas contain the most weeds, they can readily spread into undisturbed habitat. Given its invasive nature, cheatgrass may increase in the Gunnison Basin in the future, but the actual extent or rate of increase is uncertain. Cheatgrass is present throughout much of the current range in the San Miguel Basin (BLM, unpubl. lit. 2005d). It is sparsely scattered in the five Gunnison sage-grouse groups east of Dry Creek Basin, which are at higher elevation, and does not appear to pose a serious threat to them (CDOW, unpubl. lit. 2005g). Because cheatgrass can readily dominate native plant communities at lower elevations (CDOW, unpubl. lit. 2005g), it may be an impact to the Dry Creek Basin group, which comprises 62 percent of the San Miguel Basin population. Invasive species are present at low levels in the Monticello groups (San Juan County GSGWG, unpubl. lit. 2005). However, there is no evidence that they are impacting the population. Cheatgrass dominates 10-15 percent of the sagebrush understory in the current range of the Piñon Mesa population (R. Lambeth, BLM, pers. comm. 2005). It

71

occurs in the lower elevation areas below Piñon Mesa that were formerly Gunnison

sage-grouse range.  It invaded two small prescribed burns in or near occupied habitat

conducted in 1989 and 1998 (BLM, unpubl. lit. 2005a), and continues to be a concern

with any ground disturbing projects.  Four invasive weedy forbs also occur in the area,

but occupy less than 4 ha (10 ac) (BLM, unpubl. lit. 2005a).  Invasive weeds, especially

cheatgrass, occur primarily along roads, other disturbed areas, and isolated areas of

untreated vegetation in the Crawford population.  No current estimates of the extent of

weed invasion are available (BLM, unpubl. lit. 2005d).

Although invasive weeds, especially cheatgrass, have impacted some sage-grouse

habitat, the impacts do not appear to be threatening individual populations or the species

rangewide.

Fire

There have been significant changes in fire frequency, distribution, and intensity

since European settlement (Young et al. 1979; Miller and Eddleman 2000).  The effects

of fire on sagebrush habitats vary according to the species and subspecies of sagebrush

and other plant species present (e.g., the understory) and the frequency, size and intensity

of fires.  Widely variable estimates of mean fire intervals have been described in the

literature--35-100 years (Brown 2000), greater than 50 years for big sagebrush

communities (McArthur 1994), 12-15 years for mountain big sagebrush (Artemesia

tridentata vaseyana) (Miller and Rose 1999), 20-100 years (Peters and Bunting 1994),

72

10-110 years depending on sagebrush species or subspecies and specific geographic area (Kilpatrick 2000), and 13-25 years (Frost 1998 cited in Connelly et al. 2004).

Fire tends to extensively reduce the sagebrush component within the burned areas. Time needed for most sagebrush species and subspecies to reestablish after burning suggests they evolved in an environment where wildfire was infrequent (interval of 30-50 years) and patchy in distribution (Braun 1998). Prior to European settlement, fire patterns in sagebrush communities were patchy, particularly in Wyoming big sagebrush, due to the discontinuous and limited fuels and unburned islands that remained after a fire (Miller and Eddleman 2000). Huff and Smith (2000) noted that these unburned islands appear to be important to the future recolonization of the sagebrush community by providing sources of sagebrush seed. Where sagebrush habitat has become fragmented and limited, there is potential for fire to eliminate the existing seed source, reducing the likelihood of natural regeneration.

A variety of techniques have been attempted at re-establishing sagebrush post-fire, with mixed success (Quinney et al. 1996, Livingston 1998). Restoration of the sagebrush biome following a fire has been complicated not only by the invasion of exotic annual plant species, but the difficulty associated with establishing sagebrush seedlings (Boltz 1994). Wirth and Pyke (2003) reported that forb response post-fire is dependant on the forb community pre-burn.

73

A clear positive response of sage-grouse to fire has not been demonstrated (Braun 1998). Call and Maser (1985) noted that fires could cause adverse conditions where cover is limited. Studies of prescribed fire in mountain big sagebrush at Hart Mountain National Antelope Refuge demonstrate short-term benefits in certain forbs, but the reduction in sagebrush cover potentially rendered habitat less suitable for nesting and brood-rearing for greater sage-grouse (Rowland and Wisdom 2002). Similarly, Nelle et al. (2000) reported that the removal of greater sage-grouse nesting and brood-rearing habitat by fire resulted in no increase in invertebrate abundance in the first year post-fire and hence, no benefit for greater sage-grouse chick foraging. This loss of nesting habitat created a long-term negative impact which would require 20 years of sagebrush regrowth before sufficient canopy cover was available for nesting birds (Nelle et al. 2000). Byrne (2002) reported the general avoidance of available burned habitats by nesting, brood-rearing, and broodless female greater sage-grouse. Connelly et al. (2000c) and Fischer et al. (1996) found that prescribed burning did not improve greater sage-grouse brood-rearing habitat in Wyoming big sagebrush, as forbs did not increase and insect populations declined as a result of the treatment. Hence fire in this sagebrush type may negatively affect brood-rearing habitat rather than improve it (Connelly and Braun 1997). However, Klebenow (1970), Gates (1983, as cited in Connelly et al. 2000c), Sime (1991 as cited in Connelly et al. 2000a), and Pyle and Crawford (1996) all indicated that fire could improve brood-rearing habitat. Slater (2003) reported that greater sage-grouse using burned areas were rarely found more than 60 m (200 ft) from the edge of the burn. In southeastern Idaho, Connelly et al. (2000c) concluded that, even though sage-grouse populations were in decline across the study area, population declines were more severe

74

in the post-fire years.  Fischer et al. (1997) concluded that habitat fragmentation, as a result of fire, may influence distribution or migratory patterns in sage-grouse.

Three prescribed burns have occurred in the Gunnison Basin since 1984, totaling 700 ha (1,700 ac).  The fires created large sagebrush-free areas that were further degraded by poor post-burn livestock management (BLM, unpubl. lit 2005b).  Two prescribed burns conducted in 1986 (105 ha (260 ac)) and 1992 (140 ha (350 ac)) on BLM land in the San Miguel Basin on the north side of Dry Creek Basin had negative impacts on sage-grouse.  The burns were conducted for big game forage improvement, but Land Health Assessments in 2004, noted that sagebrush had died and largely been replaced with weeds (BLM, unpubl. lit. 2005h).  The 2002 Burn Canyon fire in the Dry Creek Basin and Hamilton Mesa areas created a short-term habitat loss of 890 ha (2,200 ac).  Fire has apparently not occurred recently in the Monticello group.

One wildfire in the Gunnison Basin burned 445 ha (1,098 ac) in June 2002 (Sandy Borthwick, BLM, pers. comm. 2006).  There appears to be a good response to the fire from grass and forbs.  Mountain big sagebrush also appears to have responded well based on seedling establishment in seeded and non-seeded areas.  Some cheatgrass, suspected to have come in with the sagebrush seed, was observed on the seeded sites but was sparse (Sandy Borthwick, BLM, pers. comm. 2006)  At least four wildfires in the last 20 years burned 39,300 ha (97,200 ac) in the current range in the Piñon Mesa area and created large expanses almost devoid of sagebrush and invaded by cheatgrass and Russian thistle (Salsola spp) (BLM, unpubl. lit. 2005a).  Some wildfire suppression has occurred in

75

sage-grouse habitat in the vicinity of residences.  Fire occurs infrequently in the Crawford

area.  The Fruitland wildfire burned 240 ha (600 ac) of pinyon-juniper and old sagebrush

in 1996.  Two efforts to reseed the area with sagebrush and native forbs and grasses

failed and the area is now dominated by cheatgrass (BLM, unpubl. lit. 2005d).  Spread of

cheatgrass into other areas is an increasing threat due to its establishment in the burned

area.

Where fire suppression has occurred, sagebrush communities may advance

successionally to pinyon pine and juniper (Burkhardt and Tisdale 1969; Young and Evans

1981; Miller and Rose 1995; Miller et al. 2000; Wrobleski and Kauffman 2003),

eventually resulting in a near total loss of shrubs and sage-grouse habitat (Miller and

Eddleman 2000).  Gambel oak invasion as a result of fire suppression also has been

identified as a potential threat to Gunnison sage-grouse (CDOW, unpubl. lit. 2002).

Trees provide perches for raptors; consequently, Gunnison sage-grouse avoid areas with

pinyon-juniper (Commons et al. 1999).

Native tree or shrub encroachment on 11,336 ha (28,000 ac) or 5 percent of the

current range has occurred in the Gunnison Basin.  Oakbrush encroachment is a potential

threat in the San Miguel Basin, especially in the five easterly and higher elevation groups.

Approximately 2,955 ha (7,300 ac) or 9 percent of the current range in these areas are

dominated by oakbrush.  Mountain shrubs also have encroached on about 3,280 ha

(8,100 ac) or 9 percent of habitat in the San Miguel Basin population (GSRSC 2005).  No

pinyon-juniper dominated areas are within the current range.

76

The Monticello area has 1,170 ha (2,889 ac) or 5 percent of the current range dominated by oakbrush (GSRSC 2005). Pinyon and juniper trees are reported to be encroaching throughout the current range in the Monticello group, based on a comparison of historical versus current aerial photos, but there has been no quantification or mapping of the encroachment (San Juan County GSWG, unpubl. lit. 2005). A relatively recent invasion of pinyon and juniper trees between the Dove Creek and Monticello groups appears to be contributing to their isolation from each other (GSRSC 2005).

About 1,600 ha (3,935 ac) of trees and shrubs dominate 16 percent of the current range in the Piñon Mesa area (GSRSC 2005). In addition to limiting habitat, tree and shrub encroachment is further isolating Piñon Mesa from the Crawford and San Miguel populations, thereby impacting connectivity and maintenance of genetic diversity (see discussion under Factor E). Approximately 9 percent of the 1,300 ha (3,200 ac) of the current range in the Crawford population is classified as dominated by pinyon-juniper (GSRSC 2005). However, BLM (unpubl. lit. 2005f) estimates that as much as 20 percent of the population area is occupied by pinyon-juniper. The Crawford population also has about 400 ha (953 ac) or 3 percent of oakbrush-dominated land in the current range (GSRSC 2005).

Although fire suppression has likely caused low to moderate levels of native tree and shrub encroachment in the populations we copnsidered, none of the encroachment is sufficient to pose threat to the Gunnison sage-grouse at a population or rangewide level.

77

Fires can cause spread of weeds and burn suitable sage-grouse habitat, but they do not threaten the species currently and we do not anticipate that they will in the future.  Fires can be beneficial by rejuvenating forbs and grasses and reducing encroachment of native trees and shrubs.

Conclusion for Factor A

Habitat fragmentation resulting in elimination or near elimination of exchange of individual Gunnison sage-grouse among populations is occurring in all populations.  Population isolation is most pronounced in Pinon Mesa and Monticello.  There also is some evidence that the Monticello and Dove Creek groups have recently been separated from each other by habitat changes; however, there is no evidence that habitat fragmentation has limited exchange of sage-grouse within other populations, including the San Miguel Basin population which has six groups separated by 1-4 air miles.

Forty three percent of the occupied habitat in the Monticello group was converted to agriculture in the past, but little conversion is expected there in the future.  Other occupied population areas have had lower percentages of converted land with no conversion expected in the future.  There is evidence that Gunnison sage-grouse will not use agricultural fields further than about 50 m (160 ft) from the edge for foraging but no evidence that agricultural conversion has led to rangewide threats to the sage-grouse.  Reservoirs caused fragmentation and/or loss of a small percentage of habitat in the Gunnison Basin population and the Gurley and Miramonte groups in the San Miguel

78

Basin population.  There is no evidence that reservoir development has caused

range-wide or population-wide threats to the Gunnison sage-grouse.

Other than two direct mortalities in the San Miguel Basin population, we were

unable to find any data directly relating effects of roads to impacts on Gunnison

sage-grouse populations.  Based on the stable population trend, the current network of

roads does not appear to be a threat to the species, and we have no information that

indicates that future road development will pose a threat to the species rangewide.

Despite the presence of powerlines in all populations there also is no evidence that they

are threatening Gunnison sage-grouse populations rangewide or within populations.

Urban or exurban development does not appear to be a threat to the sage-grouse

based on the low human population densities in all but one county with Gunnison

sage-grouse.  Projections of human population growth and housing development are not

known to be a rangewide threat.

High potential for oil and gas development only exists in the San Miguel Basin

population and Monticello group; high to medium potential exists in the Crawford

population.  Low or no potential exists in the Gunnison Basin and Pinon Mesa

populations.  Energy development on Federal lands can contain conservation measures

for wildlife species (see Factor D for a more thorough discussion).  We have no evidence

that oil and gas development will threaten the Gunnison sage-grouse rangewide in the

foreseeable future.  Other energy development activities, such as wind turbine

79

development, are not expected to cause a threat to the Gunnison sage-grouse rangewide in the foreseeable future. Additionally, coal or hardrock mining appears to pose little threat to occupied habitat.

Although overgrazing can impact habitat, it is unclear whether effects from current livestock grazing management, such as reduction of vegetation below suitable conditions or spread of weeds threaten the Gunnison sage-grouse at a population or rangewide level. Cheatgrass may impact sage-grouse habitat in nearly all Gunnison sage-grouse populations, but there has not been a demonstrated change in fire cycle in any population, nor is it documented that cheatgrass, at its current distribution and density, will threaten the Gunnison sage-grouse in the foreseeable future. Invasive weeds other than cheatgrass occur in some populations but at levels that do not cause a threat to the Gunnison sage-grouse.

Fires can cause spread of weeds and burn suitable sage-grouse habitat, but also may be beneficial by rejuvenating forbs and grasses and reducing encroachment of native trees and shrubs. Fire can be both beneficial and detrimental depending on location, size, and intensity and is not expected to be a rangewide threat in the foreseeable future. Although there has been low to moderate levels of native tree and shrub encroachment in nearly all the populations, most likely as a result of fire suppression, none of the encroachment is great enough to cause a documented threat to the Gunnison sage-grouse at a rangewide level.

80

Although various factors discussed in this section are believed to, or could potentially be, impacting the populations individually these factors have not caused significant declines in individual populations or the species rangewide.  Thus, based on the best scientific and commercial data available, we have concluded that destruction, modification, or curtailment of its habitat or range does not threaten or endanger the Gunnison sage-grouse throughout all or a significant portion of its range in the foreseeable future.

**Deleted:** or cumulatively,

**Comment [TG97]:** We have no support to state there may be cumulative impacts, therefore, it should be deleted. REVISIONS MADE

**B.  Overutilization for Commercial, Recreational, Scientific, or Educational Purposes.**

Hunting

**Formatted:** Strikethrough

~~Studies suggest that recreational hunting of sage-grouse may be compensatory (i.e., harvest replaces mortality that would have happened otherwise due to causes such as predation; or mortality is compensated by increased productivity [Crawford 1982]), have no measurable effect on spring sage-grouse densities (Braun and Beck 1996), or may be additive (i.e., harvest adds more deaths per year to the total otherwise attributable to other causes, and is not compensated by increased productivity [Zunino 1987; Connelly et al. 2000a]).  Johnson and Braun (1999) concluded that harvest mortality may be additive for sage-grouse if adult females and young birds sustain the highest hunting mortality within a population.  No studies have demonstrated that regulated hunting is a primary cause of widespread reduced numbers of greater sage-grouse (Connelly et al. 2004).~~

**Formatted:** Strikethrough
**Formatted:** Strikethrough
**Formatted:** Strikethrough

**Formatted:** Strikethrough
**Formatted:** Strikethrough
**Formatted:** Strikethrough

81

~~Hunting of Gunnison sage-grouse is regulated by the State wildlife agencies~~
~~(GSRSC 2005). Hunting in the Gunnison Basin appears to have been compensatory, as it~~
~~had little if any impact on the population (CDOW, unpubl. lit. 2005g). However,~~
Sage-grouse hunting was eliminated in the Gunnison Basin in 2000 due to concerns with

Deleted: s

meeting population objectives as suggested in the Gunnison Basin Conservation Plan

(1997). It is not known if hunting contributed to the failure to meet these objectives.

Hunting has not occurred in the other Colorado populations of Gunnison sage-grouse

since 1995 when the Pinon Mesa area was closed (GSRSC 2005). Utah has not allowed

hunting since 1989. Both States have committed to disallow hunting until the species is

no longer a candidate for listing or no longer federally-listed and will only consider

hunting if populations can sustain (GSRSC 2005). Furthermore, hunting will be

restricted to only 5-10 percent of the fall population, and will be structured to limit

harvest of females to the extent possible (GSRSC 2005). Public input will be considered

when determining if hunting seasons should be reinstated (GSRSC 2005). We are not

aware of any studies or other data that demonstrate that poaching (illegal harvest) has

contributed to Gunnison sage-grouse population declines in either State.

<u>Lek Viewing</u>

The Gunnison sage-grouse is a newly designated species, which prompts bird

watchers to view it for their "life lists" and may lead to disturbance in commonly known

leks. Daily human disturbances on sage-grouse leks could cause a reduction in mating,

82

and some reduction in total production (Call and Maser 1985). Boyko et al. (2004, as cited in GSRSC 2005) determined that human disturbance, particularly if additive to disturbance by predators, could reduce the time a lek is active, as well as reduce its size by lowering male attendance. Smaller lek sizes have been hypothesized to be less attractive to females, thereby conceivably reducing the numbers of females mating there. Disturbance during the peak of mating also could result in some females not breeding (GSRSC 2005). Lek viewing might affect nesting habitat selection by females (GSRSC 2005), as leks are typically close to areas in which females nest. If females move to poorer quality habitat farther away from disturbed leks, nest success could decline. If chronic disturbance causes sage-grouse to move to a new lek site away from preferred and presumably higher-quality areas, both survival and nest success could decline. Whether any or all of these have significant population effects would depend on timing and degree of disturbance (GSRSC 2005).

The BLM closed a lek in the Gunnison Basin to viewing in the late 1990s due to declining population counts which were perceived as resulting from recreational viewing activities, although no scientific studies were conducted (BLM, unpubl. lit. 2005j; GSRSC 2005). A comparison of male counts on a designated viewing lek versus male counts on other leks in the general area, show that the viewing lek's counts followed the same trend line as leks in the rest of the area (GSRSC 2005). Lek viewing protocols on designated leks have generally been followed (GSRSC 2005). Two lek-viewing tours are organized and led by UDWR per year in the Monticello group without noticeable effects

83

(Guy Wallace, UDWR, pers. comm. 2006).  Data collected by CDOW indicates that controlled lek visitation also has not impacted greater sage-grouse (GSRSC 2005).

Scientific Research

Gunnison sage-grouse have been the subject of scientific research studies, some of which included the capture and handling of the species.  Few, direct mortalities have occurred during recent studies and it does not appear that research is having any significant impacts on the sage-grouse (Apa 2004; CDOW, unpubl. lit. 2005g).  Most research is conducted in the Gunnison and San Miguel Basin populations; the two largest populations.  Based on the available information, we believe scientific research on Gunnison sage-grouse is a relatively minor impact, with only short-term effects to individuals in localized areas.

Conclusion for Factor B

We have no evidence suggesting that hunting has resulted in overutilization of Gunnison sage-grouse.  Future hunting restrictions should adequately conserve Gunnison sage-grouse.  Based on limited data it appears that lek viewing has not impacted the Gunnison sage-grouse and lek viewing protocols designed to reduce disturbance have generally been followed.  Scientific research appears to be limited to short-term impacts of individuals in localized areas and is not a rangewide threat.  We know of no overutilization for commercial or educational purposes.  Thus, based on the best scientific

84

and commercial data available, we have concluded that overutilization for commercial,

recreational, scientific, or educational purposes does not threaten or endanger the

sage-grouse throughout all or a significant portion of its range in the foreseeable future.

**C. Disease or Predation.**

Disease

Nothing has been published about the types or pathology of diseases in Gunnison

sage-grouse.  However, multiple bacterial and parasitic diseases have been documented

in greater sage-grouse (Patterson 1952; Schroeder et al. 1999).  Some early studies have

suggested that greater sage-grouse populations are adversely affected by parasitic

infections (Batterson and Morse 1948).  No parasites have been documented to cause

mortality in Gunnison sage-grouse, but the protozoan, Eimeria spp., which causes

coccidiosis, has been reported to cause death (Connelly et al. 2004).  Infections tend to be

localized to specific geographic areas and no cases of greater sage-grouse mortality

resulting from coccidiosis have been documented since the early 1960s (Connelly et al.

2004).

Parasites also have been implicated in greater sage-grouse mate selection, with

potentially subsequent effects on the genetic diversity of this species (Boyce 1990;

Deibert 1995).  Connelly et al. (2004) note that while these relationships may be

important to the long-term ecology of greater sage-grouse, they have not been shown to

85

be significant to the immediate status of populations.  However, Connelly et al. (2004) have suggested that diseases and parasites may limit isolated sage-grouse populations such as most of the Gunnison sage-grouse populations.  However, we have no evidence indicating that bacterial or parasitic diseases are affecting Gunnison sage-grouse individuals or populations.

Greater sage-grouse also are subject to a variety of bacterial, fungal, and viral pathogens.  The bacteria Salmonella spp., has caused mortality in the greater sage-grouse; the bacteria is apparently contracted through exposure to contaminated water supplies around livestock stock tanks (Connelly et al. 2004).  Other bacteria found in sage-grouse include Escherichia coli, botulism (Clostridium spp.), avian tuberculosis (Mycobacterium avium), and avian cholera (Pasteurella multocida).  These bacteria have never been identified as a cause of mortality in greater sage-grouse and the risk of exposure and hence, population effects, is low (Connelly et al. 2004).  We have no reason to expect that mortality and exposure risk are different in Gunnison sage-grouse.

West Nile virus (WNv; Flavivirus) was first diagnosed in greater sage-grouse in 2003, and has been shown to affect their survival rates.  Experimental results, combined with field data, suggest that a widespread WNv infection could negatively impact greater sage-grouse (Naugle et al. 2004; Naugle et al. 2005).  Summer habitat requirements of sage-grouse potentially increase their exposure to WNv.  Sage-grouse hens and broods congregate in mesic habitats in the mid- to late summer, thereby placing them in the same potential habitats as the WNv mosquito (Culex spp.), vector when the mosquitoes are

86

likely to be active. Surface water sources that have been created for agricultural, livestock, and energy and mining activities may increase the contact between sage-grouse and the mosquito vector. To date, WNv has not been documented in Gunnison sage-grouse despite the presence of WNv-positive mosquitoes in all counties throughout their range (Colorado Department of Public Health 2004; Centers for Disease Control and Prevention 2004).

Predation

Predation is the most commonly identified cause of mortality in sage-grouse (Bergerud 1988; Schroeder et al. 1999; Connelly et al. 2000b). The composition and density of predator communities can vary greatly across space and time (Greenwood 1986; Johnson et al. 1989; Sargeant et al. 1993; Sovada et al. 1995). The effect of predation on the demographic structure and population fluctuations of Gunnison sage-grouse is unknown will depend on the composition of the predator community, grouse population levels, and habitat condition. In a study of nesting Gunnison sage-grouse, Young (1994) documented only 1 predation event in 37 nesting attempts. Predation on greater sage-grouse has been well documented. Predators of adult greater sage-grouse include coyotes (Canis latrans), bobcats (Lynx rufus), weasels (Mustela spp.), golden eagles, red-tailed hawks (Buteo jamaicensis), Swainson's hawks (B. swainsoni), and ferruginous hawks (B. regalis) (Hartzler 1974; Schroeder et al. 1999; Schroeder and Baydack 2001). Avian predators, primarily corvids (Corvus spp., were major predators of greater sage-grouse nests in Idaho (Autenrieth 1981) and Washington

87

(Vander Haegen 2002), while ground squirrels and badgers (<u>Taxidea taxus</u>) were major

nest predators in Wyoming (Patterson 1952).  Most mammalian predation is on eggs;

only coyotes and red foxes (<u>Vulpes vulpes</u>) are likely to prey on all sage-grouse life

stages (GSRSC 2005).  Young (1994) found that the most common predators of

Gunnison sage-grouse eggs were weasels, ground squirrels and coyotes.  Most raptor

predation of sage-grouse is on juveniles and older age classes, while corvids mainly

affect clutches (GSRSC 2005).

Predation rates vary seasonally.  The period of highest mortality for yearling and

adult males occurs during the lekking season, as they are very conspicuous while

performing their mating display.  Adult female greater sage-grouse are most susceptible

to predators while on the nest or during brood-rearing when they are with young chicks

(Schroeder and Baydack 2001).  Autenrieth (1981) concluded that predation of eggs was

the most important population constraint in Idaho at that time, and this appears to be the

case for Gunnison sage-grouse, based on limited data (Young 1994).  Schroeder and

Baydack (2001) suggest that high variation in nest success may be due to nest predators.

Nest predation may be higher, more variable, and have a greater impact on small,

fragmented Gunnison sage-grouse populations (GSRSC 2005).

The population viability analysis of Gunnison sage-grouse (GSRSC 2005) found

that mortality of chicks and breeding-age hens contributed substantially to increasing the

relative probability of extinction because these two groups contribute most significantly

to population productivity.  Gregg <u>et al.</u> (2003a, 2003b) found that chick predation

88

mortality in greater sage-grouse ranged from 10 to 51 percent from 2002-2003 on three study sites in Oregon.  The juvenile mortality rate, during the first few weeks after hatching, has been estimated to be 63 percent (Wallestad 1975 in Schroeder and Baydack 2001).  While chicks are very vulnerable to predation during this period, other causes of mortality, such as weather, are included in this estimate.

Female Gunnison sage-grouse with nests that were predated nested in sites with lower shrub density and lower forb and grass cover (Young 1994).  Habitat alteration that reduces cover for young greater sage-grouse chicks can increase the rate of predation on this age class (Schroeder and Baydack 2001).

Increasing residential development increases the likelihood that feral cats (Felis domesticus) and dogs (Canis domesticus) will be introduced into local Gunnison sage-grouse populations.  Development also can contribute to increased populations of predators (e.g., red foxes, American crows (Corvus americanus)) that are frequently associated with altered landscapes (GSRSC 2005).  Agricultural development, landscape fragmentation, and human populations have the potential to increase predation pressure by forcing birds to nest in marginal habitats, by increasing travel time through habitats where they are vulnerable to predation, and by increasing the diversity and density of predators (Ritchie et al. 1994; Schroeder and Baydack 2001; Connelly et al. 2004; Summers et al. 2004).  Where greater sage-grouse habitat has been altered in localized areas, the influx of predators can limit populations (Gregg et al. 1994; Braun 1998; DeLong et al. 1995; Schroeder and Baydack 2001).  Habitat fragmentation and the

89

resultant predation increase may be a limiting factor for the Gunnison sage-grouse (Oyler-McCance et al. 2001).

Municipal solid waste landfills have been shown to contribute to increases in common raven populations (Knight et al. 1993; Restani et al. 2001; Webb et al. 2004). Ravens are known to prey on sage-grouse and have been considered a restraint on sage-grouse population growth in some locations (Batterson and Morse 1948; Autenrieth 1981; Altstatt 1995). However, no studies could be found that linked landfill presence, common raven populations, and sage-grouse population levels.

The effect of predation on the fluctuations and viability of sage-grouse populations has never been investigated (Connelly and Braun 1997; Connelly et al 2000b; Schroeder and Baydack 2001). Research conducted to determine survival and nest success in greater sage-grouse concluded that predation typically does not limit sage-grouse numbers (Connelly and Braun 1997; Connelly et al. 2000a; Connelly et al. 2000b; Wambolt et al. 2002). This conclusion is supported by evidence showing that predator removal does not have long-lasting effects on sage-grouse population size or stability over large regions (Cote and Sutherland 1997; Schroeder et al. 1999; Wambolt et al. 2002). For example, Slater (2003) demonstrated that coyote control failed to produce an effect on greater sage-grouse nesting success in southwestern Wyoming. In their review of literature regarding predation, Connelly et al. (2004) noted that only two of nine studies examining survival and nest success indicated that predation had limited a sage-grouse population by decreasing nest success. However, both studies indicated that

90

low nest success due to predation was ultimately related to poor nesting habitat. Connelly et al. (2004) further noted that the idea that predation is not a widespread factor depressing sage-grouse populations is supported by studies of nest success rates, by the relatively high survival of adult birds, and by the lack of an effect on nesting success as a result of coyote control.

In a study of 28 radio-collared Gunnison sage-grouse in the Monticello group, 11 birds died, but only 4 of these could be attributed to predation by coyotes or eagles (San Juan County GSWG, unpubl. lit. 2005). However, demographic studies of Gunnison sage-grouse in the San Miguel Basin population suggests, but does not conclusively prove, that predation may be impacting this population (CDOW, unpubl. lit. 2005g). No information is available for the other populations considered.

Conclusion for Factor C

No rangewide or population level impacts of bacterial, viral, fungal, or parasitic diseases on Gunnison sage-grouse have been reported, including WNv. There also is no evidence to suggest that predation is a population or rangewide threat to Gunnison sage-grouse. Thus, based on the best scientific and commercial data available, we have concluded that disease and predation do not threaten or endanger the sage-grouse throughout all or a significant portion of its range in the foreseeable future.

**D. The Inadequacy of Existing Regulatory Mechanisms.**

91

Local Laws and Regulations

Approximately 43 percent of occupied Gunnison sage-grouse habitat is privately owned (GSRSC 2005).  Gunnison County and San Miguel County, Colorado, are the only entities that have ordinances within the species' range that provide a level of conservation consideration specifically for the Gunnison sage-grouse or their habitats on private land (Dolores County 2002; Mesa County, unpubl. lit. 2003; Montrose County 2003).  In 2001, Gunnison County, Colorado developed Land Use Resolutions (LUR) to be consistent with the Memorandum of Agreement (MOA) signed for the Gunnison Basin Conservation Plan in 1998 (Gunnison County 2001).  In the MOA, Gunnison County agreed to "…reasonably consider sage-grouse conservation actions in its regulation of land use…" and to implement the Gunnison Basin Conservation Plan to the best of their ability.  In 2003, the LUR was revised slightly to allow two houses on 35 acres rather than one house without County review.  In 2005, San Miguel County amended its Land Use Codes to include consideration and implementation, to the extent possible, of conservation measures for the sage-grouse when considering land use activities and development located in Gunnison sage-grouse habitat (San Miguel County, unpubl. lit. 2005).  In addition to the county protections, Gunnison County has hired a Gunnison Sage-grouse Coordinator and organized a Strategic Committee to facilitate implementation of conservation measures in the Gunnison Basin under both the local Conservation Plan and RCP.  San Miguel County is currently pursuing hiring a Gunnison

92

Sage-grouse Coordinator for the San Miguel Basin population.  The efforts of these two counties reflect positively on their willingness to conserve Gunnison sage-grouse.

Colorado State statute (C.R.S. 30-28-101) exempts parcels of land of 14 ha (35 ac) or more per home from regulation, so county zoning laws in Colorado can only restrict developments with housing densities greater than one house per 14 ha (35 ac). We could find no data on the precise threshold of the number of acres per house that will impact Gunnison sage-grouse.

Habitat loss is not regulated or monitored in Colorado counties where Gunnison sage-grouse occurs.  Therefore, conversion of agricultural land from one use to another, such as native pasture containing sagebrush converted to another use, such as cropland, would not normally come before a county zoning commission.

We recognize that county or city ordinances in San Juan County, Utah, that address agricultural lands, transportation, and zoning for various types of land uses have the potential to influence sage-grouse.  However, we were unable to obtain information regarding the nature or extent of zoning efforts and their direct or indirect effects on populations and habitats.

State Laws and Regulations

93

Colorado Revised Statutes, Title 33 Article 1 give CDOW responsibility for the management and conservation of wildlife resources within State borders.  Title 33 Article 1-101, Legislative Declaration requires a continuous operation of planning, acquisition, and development of wildlife habitats and facilities for wildlife-related opportunities.  The CDOW is required by statute (C.R.S. 106-7-104) to provide counties with information on "significant wildlife habitat," and provide technical assistance in establishing guidelines for designating and administering such areas, if asked.  The CDOW also has authority to regulate possession of the Gunnison sage-grouse, set hunting seasons, and issue citations for poaching.  The Wildlife Resources Code of Utah (Title 23) provides UDWR the powers, duties, rights, and responsibilities to protect, propagate, manage, conserve, and distribute wildlife throughout the State.

Section 23-13-3 declares that wildlife existing within the State, not held by private ownership and legally acquired, is property of the State.  Sections 23-14-18 and 23-14-19 authorize the Utah Wildlife Board to prescribe rules and regulations for the taking and/or possession of protected wildlife, including Gunnison sage-grouse.

Gunnison sage-grouse are managed by CDOW and UDWR on all lands within each State as resident native game birds.  In both states this classification allows the direct human taking of the bird during hunting seasons authorized and conducted under State laws and regulations.  However, in 2000, CDOW closed the hunting season for Gunnison sage-grouse in the Gunnison Basin, the only area then open to hunting for the species.  The hunting season for Gunnison sage-grouse in Utah has been closed since 1989.  The Gunnison sage-grouse is listed as a species of special concern in Colorado and

94

a sensitive species in Utah providing heightened priority for management (Gary Skiba, CDOW, pers. comm. 2006; Guy Wallace, UDWR pers. comm. 2006).

Easements that prevent long-term or permanent habitat loss by prohibiting development are held by CDOW, UDWR, Natural Resources Conservation Service (NRCS), NPS, and non-governmental organizations (Table 2). Some of the easements include conservation measures that are specific for Gunnison sage-grouse, while most are directed at other species, such as big game (GSRSC 2005). We do not have information on the location or size of the easements with sage-grouse specific conservation measures and, therefore, we cannot assess their overall value to Gunnison sage-grouse.

Table 2. Acres of conservation easements by population and percentages of occupied habitat protected by easements (GSRSC 2005).

| POPULATION | NUMBER OF ACRES | % OF OCCUPIED HABITAT |
|---|---|---|
| Gunnison Basin | 26,145 | 4 |
| San Miguel Basin | 844 | 1 |
| Monticello | 2,560 | 1 |
| Piñon Mesa | 7,314 | 19 |
| Crawford | 523 | 2 |

The CDOW has been gathering information from landowners who may be interested in signing up under the CCAA referenced earlier in this document. As of January 2006, 72 landowners owning 41,278 ha (102,000 ac) have expressed an interest in enrolling their lands under the CCAA.

Regulation of non-coal mining in the United States is at the discretion of the individual States. Colorado law (State Statute Title 34, Article 32) contains language

95

intended to protect wildlife resources through appropriate reclamation and encourages

revegetation using native species.  Utah mining regulations (R647-4-110) allow

reclamation to wildlife resource use.

    We are not aware of any conservation measures implemented for potential oil and

gas development impacts to Gunnison sage-grouse on private lands underlain with

privately-owned minerals, which are regulated by the Colorado Oil and Gas Conservation

Commission or the Utah Division of Oil, Gas, and Mining.  Colorado and Utah have laws

that directly address the priorities for use of State school section lands, which require that

management of these properties be based on maximizing financial returns.  We are not

aware of any conservation measures established for Gunnison sage-grouse on State

school section lands other than a request to withdraw or apply "no surface occupancy"

and conservation measures from the RCP to four sections available for oil and gas leasing

in the San Miguel Basin population (see Factor A for further discussion).  State school

section lands account for only 1 percent of occupied habitat in Colorado and 1 percent in

Utah so impacts may be considered negligible.  The UDWR does not own any land

within occupied habitat in Utah.  The CDOW owns 2 percent of the occupied habitat in

Colorado, with some management for Gunnison sage-grouse on those lands.

Federal Laws and Regulations

    Gunnison sage-grouse are not covered or managed under the provisions of the

Migratory Bird Treaty Act (16 U.S.C. 703-712).  Federal agencies are responsible for

96

managing 55 percent of the total Gunnison sage-grouse habitat (GSRSC 2005). The

Federal agencies with the most sagebrush habitat are BLM, an agency of the Department

of the Interior, and USFS, an agency of the U.S. Department of Agriculture. The NPS in

the Department of the Interior also has responsibility for lands that contain sage-grouse

habitat.

About 42 percent of occupied habitat is on BLM-administered land (GSRSC

2005). The Federal Land Policy and Management Act of 1976 (FLPMA)

(43 U.S.C. 1701 et seq.) is the primary Federal law governing most land uses on

BLM-administered lands. Section 102(a)(8) of FLPMA specifically recognizes wildlife

and fish resources as being among the uses for which these lands are to be managed.

Regulations pursuant to FLPMA and the Mineral Leasing Act (30 U.S.C. 181 et seq.) that

address wildlife habitat protection on BLM-administered land include 43 CFR 3162.3-1

and 43 CFR 3162.5-1; 43 CFR 4120 et seq.; 43 CFR 4180 et seq.

The BLM policy regarding candidate species occurring on BLM-managed land is

addressed under BLM Manual 6840-Special Status Species Management (BLM 2001).

Required actions include implementation of management plans for conserving the species

and its habitats; ensuring actions authorized, funded, or carried out by BLM do not

contribute to the need for the species to become listed; ensuring the species are

considered in RMPs; developing and participating in management plans and species and

habitat assessments; and monitoring the species for evaluation of management objectives

(BLM 2001).

Resource Management Plans (RMPs) are the basis for all actions and authorizations involving BLM-administered lands and resources.  They establish allowable resource uses, resource condition goals and objectives to be attained; program constraints and general management practices needed to attain the goals and objectives; general implementation sequences; and intervals and standards for monitoring and evaluating the plan to determine its effectiveness and the need for amendment or revision (43 CFR 1601.0-5(k)).

The RMPs provide a framework and programmatic guidance for activity plans, which are site-specific plans written to implement decisions made in a RMP.  Examples include Allotment Management Plans that address livestock grazing, oil and gas field development, travel management, and wildlife habitat management.  Activity plan decisions normally require additional planning and National Environmental Policy Act (NEPA) analysis.  With regard to special status species, including candidate species, BLM Manual 6840.22A states "Implementation-level planning should consider all site-specific methods and procedures which are needed to bring the species and their habitats to the condition under which the provisions of the Act are not necessary, current listings under special status species categories are no longer necessary, and future listings under special status species categories would not be necessary."  Within the Gunnison Basin population 56 percent of the BLM allotment acreage in occupied habitat has Gunnison sage-grouse habitat objectives incorporated into the allotment management plans (BLM, unpubl. lit. 2005i).  Rangewide, only 20 percent of BLM grazing allotments

98

have incorporated Gunnison sage-grouse conservation measures and/or habitat objectives into the allotment management plans or in permit renewals.

On November 16, 2004, BLM Instruction Memorandum (IM) 2005-024 transmitted information to all BLM field and Washington Office officials regarding the development of a National BLM Sage-grouse Habitat Conservation Strategy for BLM-administered lands. This strategy is described as the framework to address the conservation of sage-grouse and risk to sagebrush habitats on lands and activities administered by BLM. It commits BLM to work with States and local interests on this issue. The IM instructed BLM State Directors to develop a process and schedule to update deficient RMPs to adequately address sage-grouse and sagebrush conservation needs. The BLM has developed a process to update RMPs in Colorado, and has notified the Service of general timeframes for RMP updates but specific deadlines have not been provided. The BLM continues to update applicable RMPs and activity plans.

The BLM has regulatory authority for oil and gas leasing, as provided at 43 CFR 3100 et seq., and they are authorized to require stipulations as a condition of issuing a lease. The BLM is planning handbook has program-specific guidance for fluid minerals (which include oil and gas) that specifies that RMP decisions will identify restrictions on areas subject to leasing, including closures, as well as lease stipulations (BLM 2000). The handbook also specifies that all stipulations must have waiver, exception, or modification criteria documented in the plan, and notes that the least restrictive constraint to meet the resource protection objective should be used (BLM

99

2000). The BLM has regulatory authority to condition "Application for Permit to Drill" authorizations, conducted under a lease that does not contain sage-grouse conservation stipulations (BLM 2004). Also, some oil and gas leases have a 193.12-km (0.12-mi) stipulation, which allows movement of the drilling area by that distance (BLM 2004). The BLM states that many of their field offices work with the operators to move a proposed drilling site farther or justify such a move through the site-specific NEPA process (BLM 2004).

For existing oil and gas leases on BLM land in occupied Gunnison sage-grouse habitat, oil and gas companies can conduct drilling operations if they wish. The BLM has stopped issuing new drilling leases in occupied sage-grouse habitat in Colorado at least until the new RMPs are in place. All occupied habitat acreages in the Crawford Area and Gunnison Basin populations are covered by this policy. However, leases already exist in 17 percent in the Pinon Mesa population, and 49 percent in the San Miguel Basin population. Enforcement of environmental compliance also may be difficult with limited staff and budgets. The Government Accountability Office (2005) concluded that the number of oil and gas operations has increased so much the last 6 years that BLM staff cannot adequately conduct followup environmental inspections to help protect the environment from natural gas development impacts in Colorado, Utah, and three other western States.

The oil and gas leasing regulations authorize BLM to modify or waive lease terms and stipulations if the authorized officer determines that the factors leading to inclusion

100

of the term or stipulation have changed sufficiently to no longer justify protection, or if

proposed operations would not cause unacceptable impacts (43 CFR 3101.1-4).

"Unacceptable impacts" has not been defined as to whether the impacts to an imperiled

species override other resource values, or where this criteria comes into consideration.

The Service does not have information on the type or number, or the basis for,

exceptions, modifications, or waivers of stipulations pertaining to the Gunnison

sage-grouse and/or their habitat that have been granted by BLM, or information on any

impacts this would have on the Gunnison sage-grouse.

 

     The Energy Policy and Conservation Act of 2000 included provisions requiring

the Secretary of the Department of the Interior to conduct a scientific inventory of all

onshore Federal lands to identify oil and gas resources underlying these lands and the

nature and extent of any restrictions or impediments to the development of such resources

(U.S.C. Title 42, Chapter 77, §6217(a)).  On May 18, 2001, the President signed

Executive Order 13212-Actions to Expedite Energy-Related Projects (66 FR 28357,

May 22, 2001), which states that it is the Administration's policy that the executive

departments and agencies shall take appropriate actions, to the extent consistent with

applicable law, to expedite projects that will increase the production, transmission, or

conservation of energy.  The Executive Order specifies that this includes expediting

review of permits or taking other actions as necessary to accelerate the completion of

projects, while maintaining safety, public health, and environmental protections.  The

BLM has responded to these declarations with the issuance of several IMs to their staff

that may influence sage-grouse conservation during these actions, including providing

101

guidance for planning relative to oil and gas operations and focusing efforts for resource

recovery in seven areas, two of which are within Gunnison sage-grouse habitats

(IM 2003-137, April 3, 2003; IM 2003-233, July 28, 2003; IM CO-2005-038, July 12,

2005).

     The BLM regulatory authority for grazing management is provided at

43 CFR 4100 (Regulations on Grazing Administration Exclusive of Alaska).  Livestock

grazing permits and leases contain terms and conditions determined by BLM to be

appropriate to achieve management and resource condition objectives on the public lands

and other lands administered by BLM, and to ensure that habitats are, or are making

significant progress toward being, restored or maintained for BLM special status species

(43 CFR 4180.1(d)).  The State or regional standards for grazing administration must

address habitat for endangered, threatened, proposed, candidate, or special status species,

and habitat quality for native plant and animal populations and communities

(43 CFR 4180.2(d)(4) and (5).  The guidelines must address restoring, maintaining or

enhancing habitats of BLM special status species, including candidate species, to

promote their conservation, as well as maintaining or promoting the physical and

biological conditions to sustain native populations and communities

(43 CFR 4180.2(e)(9) and (10).  The BLM is required to take appropriate action not later

than the start of the next grazing year upon determining that existing grazing practices or

levels of grazing use are significant factors in failing to achieve the standards and

conform with the guidelines (43 CFR 4180.2(c)).  The BLM agreed to work with their

resource advisory councils to expand the rangeland health standards required under

102

43 CFR 4180 so that there are public land health standards relevant to all ecosystems, not just rangelands, and that they apply to all BLM actions, not just livestock grazing (BLM Manual 180.06.A). Both Colorado and Utah have resource advisory councils. However, we have no information on how these rangeland health categories affect Gunnison sage-grouse habitats.

On December 8, 2003, BLM issued a proposed rule (68 FR 68452) to modify the current grazing management regulation in two ways: (1) it provides that assessment and monitoring standards are needed to support a determination that livestock grazing significantly contributes to not meeting a standard or conforming with a guideline; and (2) it requires BLM to analyze, formulate and propose appropriate action within 24 months of the determination rather than before the start of the next grazing year.

No RMPs have been updated to include Gunnison sage-grouse habitat objectives or conservation measures. We do not have data assessing whether current management practices facilitate habitat conditions necessary for the conservation of the Gunnison sage-grouse as outlined in the structural habitat guidelines in Appendix H of the RCP (GSRSC 2005).

However, in signing the RCP (GSRSC 2005), BLM has agreed to follow recommendations for conservation efforts addressing the effects of grazing, oil and gas development and other threats. To address the time requirement necessary to revise and incorporate Gunnison sage-grouse conservation measures and habitat objectives in

103

RMPs, the Colorado Office of the BLM issued IM CO-2005-038, which provides an interim policy to implement the RCP. The IM directs that the RCP guidance and strategies be applied through site-specific analysis consistent with NEPA for all projects or actions in Gunnison sage-grouse habitat. For surface disturbing activities such as oil and gas development the IM directs BLM staff to work with the operator to minimize habitat loss and fragmentation. Additionally, if the local conservation plans for each population have additional measures that address local conditions the IM directs BLM staff to consider if they are more effective than guidance in the RCP and, if so, to implement them. Full implementation of the RCP, according to the IM, will occur as guidance and strategies are considered and analyzed during RMP revisions and/or amendments.

The USFS has management authority for 10 percent of the occupied Gunnison sage-grouse habitat (GSRSC 2005). Management of Federal activities on National Forest System lands is guided principally by the National Forest Management Act (NFMA) (16 U.S.C. 1600-1614, August 17, 1974, as amended. The NFMA specifies that all National Forests must have a Land and Resource Management Plan (LRMP) (16 U.S.C. 1600) to guide and set standards for all natural resource management activities on each National Forest or National Grassland. The NFMA requires USFS to incorporate standards and guidelines into LRMPs (16 U.S.C. 1600). This has historically been done through a NEPA process, including provisions to manage plant and animal communities for diversity, based on the suitability and capability of the specific land area in order to

104

meet overall multiple-use objectives.  The USFS planning process is similar to that of
BLM.

The 1982 NFMA implementing regulation for land and resource management
planning (1982 rule, 36 CFR 219), under which all existing forest plans were prepared,
requires USFS to manage habitat to maintain viable populations of existing native
vertebrate species on National Forest System lands (1982 rule, 36 CFR 219.19).  A new
USFS planning regulation was implemented on January 5, 2005 (70 FR 1023).  Plans
developed under the new regulation are to be more strategic and less prescriptive in
nature than those developed under the 1982 planning rule.  For example, previous plans
might have included a buffer for activities near the nest sites of birds sensitive to
disturbance.  Under the new regulation a desired condition description and guidelines will
be provided, rather than a set of prescriptive standards that apply to projects.  Planning,
and decisions for projects and activities, will address site-specific conditions and identify
appropriate conservation measures to take for each project or activity.

Under the new regulation, the purpose of forest plans is to establish goals and to
set forth guidance to follow in pursuit of those goals.  The rule calls for five components
of plans: desired conditions; objectives; guidelines; suitability of areas; and special areas
(36 CFR 219.7(a)(2)).  The rule states that these components are intended to provide
general guidance and goals or other information to be considered in subsequent project
and activity decisions, and that none of these components are commitments or final
decisions approving projects and activities (36 CFR 219.7(a)(2)).  Approval of a plan,

105

plan amendment, or plan revision comprised of these five components may be categorically excluded from NEPA documentation (36 219.4(b)).

The new regulation does not include provisions regarding habitat for species viability. Rather, with regard to ecological sustainability, plans are to provide a framework to contribute to sustaining native ecological systems by providing ecological conditions to support diversity of native plants and animal species in the plan area (36 CFR 219.10 (b)). Ecosystem diversity is described as being the primary means by which a plan contributes to sustaining ecological systems (36 CFR 219.10 (b)), and USFS states that this focus is expected to conserve most species. The regulation defines species-of-concern as "Species for which the Responsible Official determines that management actions may be necessary to prevent listing under the Endangered Species Act" (36 CFR 219.16).

For each unit of the National Forest System, the transition period for the new regulation is 3 years (36 CFR 219.14). A document approving a plan developed, revised, or amended using the new regulation must include a description of the effects of the plan on existing permits, contracts, or other instruments implementing approved projects and activities (36 219.8(a)).

The Gunnison sage-grouse is designated as a USFS sensitive species in Region 2 (Colorado) and Region 4 (Utah). The forests within the range of sage-grouse provide important seasonal habitats for the species, particularly the Grand Mesa, Uncompahgre,

106

and Gunnison National Forests.  While the 1982 planning regulation, including its provision for population viability, was used in the development of the existing Forest Plans, no information has been provided regarding specific implementation of the above new regulations and policies for the Gunnison sage-grouse.

We did not receive information from the USFS on whether habitat objectives and conservation measures have been incorporated into grazing allotments and whether local conservation plan sage-grouse habitat objectives and conservation measures have been incorporated into Forest Plans or LRMPs.

The USFS would have to revise their Forest Plans to withdraw oil and gas activity on their land.  To date USFS has not deferred or withdrawn oil and gas leasing in occupied habitat, but sage-grouse conservation measures can be included at the "Application for Permit to Drill" stage.  The BLM, which regulates oil and gas leases on USFS lands, has the authority to defer leases.  However, the only population with USFS lands that are in areas of high or even medium potential for oil and gas reserves is the San Miguel Basin and USFS lands only make up 1.4 percent of that population (GSRSC 2005).

The NPS is responsible for managing 2 percent of occupied Gunnison sage-grouse habitat (GSRSC 2005).  The NPS Organic Act (39 Stat. 535; 16 U.S.C. 1, 2, 3, and 4) states that NPS will administer areas under their jurisdiction "...by such means and measures as conform to the fundamental purpose of said parks, monuments, and

107

reservations, which purpose is to conserve the scenery and the natural and historical objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  Lands in the Black Canyon of the Gunnison National Park and the Curecanti Recreation Area include portions of occupied habitat of the Crawford and Gunnison Basin populations.  Gunnison sage-grouse conservation measures are not included in the General Management Plan, but are included in current RMPs.  They also will be incorporated when the RMPs are revised or amended.  The NPS is currently following conservation measures in the local conservation plans and the RCP (Myron Chase, NPS, pers. comm. 2005).

The NRCS of the U.S. Department of Agriculture assists farmers, ranchers, and other private landowners in reducing threats to sage-grouse habitat by providing technical assistance and financial resources to support management and habitat restoration efforts, helping farmers and ranchers maintain and improve habitat as part of larger management efforts, and developing technical information to assist NRCS field staff with sage-grouse considerations when working with private landowners.  The NRCS has the Wildlife Habitat Incentive Program and Environmental Quality Incentive Program that can be used to fund projects implementing conservation measures in Gunnison sage-grouse habitat.  The Service's Partners for Fish and Wildlife Program also can fund conservation measures for Gunnison sage-grouse.

Conclusion for Factor D

108

Gunnison sage-grouse conservation has been addressed through numerous local, State, and Federal plans, laws, regulations, and policies. Current county regulations provide some ability to limit impacts to sage-grouse habitat from housing developments where the area is zoned for under 14 ha (35 ac) per house. Both counties where the largest populations of Gunnison sage-grouse occur have Land Use Resolutions or Codes to promote Gunnison sage-grouse conservation. The CDOW and UDWR have implemented and continue to pursue conservation easements in Colorado and Utah, respectively, to conserve Gunnison sage-grouse habitat and the species' needs. State wildlife regulations provide opportunities to address other conservation needs of the species.

Impacts resulting from current leases for oil and gas development on Federal lands may still be regulated at the "Application for Permit to Drill" stage as protective stipulations are applied through guidance in IM CO-2005-038. Grazing impacts can be adequately regulated with existing laws, regulations, and policies. Laws, regulations, and policies guiding development and implementation of land management plans for all the Federal agencies, will address conservation of Gunnison sage-grouse habitat. Given that implementation of the aforementioned laws, regulations, and policies has not resulted in a decline within recent timeframes, as analyzed by Garton (2005) and, based on the best scientific and commercial data available we have concluded that inadequacy of existing regulatory mechanisms does not threaten or endanger the sage-grouse throughout all or a significant portion of its range in the foreseeable future.

109

**E.  Other Natural or Manmade Factors Affecting Its Continued Existence.**

Other factors potentially affecting the Gunnison sage-grouse's continued

existence include genetic risks, drought, recreational activities, and pesticides.

Genetics

Small populations face three primary genetic risks: inbreeding depression; loss of

genetic variation; and accumulation of new mutations.  Inbreeding can have individual

and population consequences by either increasing the phenotypic expression of recessive,

deleterious alleles (Charlesworth and Charlesworth 1987) or by reducing the overall

fitness of individuals in the population.  Estimates for how large populations must be to

prevent inbreeding depression vary dramatically.  For example, Lande (1995b), Lynch et

al. (1995), and Charlesworth et al. (1993) suggested that populations will need to have a

genetic effective population size of 1,000, 100, and 12 individuals, respectively, to avoid

accumulating deleterious mutations.  However, if mutation accumulation is a threat to

small populations, it is expected to take hundreds to thousands of generations to occur

(GSRSC 2005).  No information is available to evaluate the threat of inbreeding to

Gunnison sage-grouse or whether inbreeding depression is of concern.

Small, isolated, populations may suffer from loss of genetic diversity (Trombulak

et al. 2004), causing physical problems and eventual extirpation of the population.

110

Adaptation to local changes in the environment is more likely to occur if there is high genetic variation among individuals in a population (GSRSC 2005). In principle, populations with high genetic variation will have a greater chance of coping with climate change, exotic diseases, or other stresses (GSRSC 2005).

As a result of habitat fragmentation, Gunnison sage-grouse have been isolated into several populations with little or no genetic interchange between them and little genetic diversity (Kahn et al. 1999). Oyler-McCance et al. (2005) investigated population structure of Gunnison sage-grouse using mitochondrial DNA sequence data from seven geographic areas (Cerro Summit-Cimarron-Sims Mesa, Crawford, Gunnison Basin, Curecanti area of the Gunnison Basin, Monticello-Dove Creek, Piñon Mesa, and San Miguel Basin). They found that levels of genetic diversity were highest in the Gunnison Basin, which consistently had more alleles and contained most of the alleles present in other populations. All other populations had much lower levels of diversity. These lower diversity levels are linked to small population sizes and a high degree of geographic isolation. Collectively, the smaller populations contain 24 percent of the genetic diversity of the species. Individually, each of the small populations may not be important genetically to the survival of the species, but collectively it is possible that 24 percent of the genetic diversity is important to future rangewide survival of the species. All populations sampled were found to be genetically discrete units (Oyler-McCance et al. 2005), so the loss of any of them would result in a decrease in genetic diversity of the species. In addition, multiple populations across a broad geographic area provide insurance against a single catastrophic event (such as drought),

111

and the aggregate number of individuals across all populations increases the probability of demographic persistence and preservation of overall genetic diversity by providing an important genetic reservoir (GSRSC 2005).

Historically, the Monticello-Dove Creek, San Miguel, Crawford, and Piñon Mesa populations were larger and were connected through more contiguous areas of sagebrush habitat. Oyler-McCance et al. (2001) documented a 20 percent loss and 37 percent fragmentation of sagebrush habitat in southwestern Colorado between the late 1950s and the early 1990s, which led to the current isolation of these populations and is consistent with the documented low amounts of gene flow and isolation by distance (Oyler-McCance et al. 2005). However, Oyler-McCance et al. (2005) noted that a few individuals in their analysis appeared to have the genetic characteristics of a population other than their own, suggesting they were dispersers from a different population. Two probable dispersers were individuals moving from San Miguel into Monticello-Dove Creek and Crawford. The San Miguel population itself appeared to have a mixture of individuals with differing probabilities of belonging to different clusters. This suggests that the San Miguel population may act as a conduit of gene flow among the satellite populations surrounding the larger population in Gunnison. Additionally, Oyler-McCance et al. (2005) found that another potential disperser into Crawford was from the Gunnison Basin. This is not surprising given their close geographic proximity.

While no consensus exists on the population size needed to retain a level of genetic diversity that maximizes evolutionary potential (i.e., the ability to adapt to local

112

changes), suggests range from 500-5,000 individuals (Franklin 1980; Lande and Barrowclough 1987; Lande 1995a). Similarly, population sizes in the upper 100s-1,000s are reported to be required for a higher probability of persistence over 100 years (Shaffer 1987). While the persistence of wild populations is usually influenced more by ecological rather than by genetic effects, once they are reduced in size, genetic factors become increasingly important (Lande 1995a).

The population viability analysis for Gunnison sage-grouse presented in the RCP stated that there is less than 1 percent probability that the Gunnison Basin population of the sage-grouse will go extinct in the next 50 years (GSRSC 2005). As discussed in the Background section, Garton's (2005) analysis of population trends also supports a relatively stable rangewide population, as well as a stable Gunnison Basin population for the last 10 years and longer. The RCP (GSRSC 2005) identified the need to increase gene flow among populations by improving corridors for between-population movement or translocation of selected genotypes from the Gunnison Basin to smaller populations, and vice-versa for population augmentation and maintenance of genetic diversity.

Drought/Weather

Drought is a common occurrence throughout the range of the Gunnison sage-grouse (Braun 1998). Drought reduces vegetation cover (Milton et al. 1994; Connelly et al. 2004), potentially resulting in increased soil erosion and subsequent reduced soil depths, decreased water infiltration, and reduced water storage capacity.

113

Drought also can exacerbate other natural events, such as defoliation of sagebrush by insects.  Approximately 2,544 sq km (982 sq mi) of sagebrush shrublands died in Utah in 2003 as a result of drought and infestations with the <u>Aroga</u> (webworm) moth (Connelly <u>et al.</u> 2004).  Sage-grouse are affected by drought through the potential loss of vegetative habitat components and reduced insect production (Connelly and Braun 1997).  These habitat component losses can result in declining sage-grouse populations due to increased nest predation and early brood mortality associated with decreased nest cover and food availability (Braun 1998; Schroeder <u>et al.</u> 1999).

Greater sage-grouse populations declined during the 1930s period of drought (Patterson 1952; Willis <u>et al.</u> 1993; Braun 1998).  Drought conditions in the late 1980s and early 1990s also coincided with a period when sage-grouse populations were at historically low levels (Connelly and Braun 1997).  Although drought has been a consistent and natural part of the sagebrush-steppe ecosystem, drought impacts on sage-grouse can be exacerbated when combined with other habitat impacts that reduce cover and food (Braun 1998).

Drought began in the Gunnison Basin at least by 2001 and was most severe in 2002 (BLM, unpubl. lit. 2005j).  The drought fully or partially killed approximately 40,470 ha (100,000 ac) (17 percent) of sagebrush in occupied range of the sage-grouse in the Gunnison Basin in 2002 (BLM, unpubl. lit. 2005j).  About 35,000 ha (86,000 ac) had significant dieback and 5,700 ha (14,000 ac) had moderate to light dieback of sagebrush and other shrubs.  An estimated 4,000 ha (10,000 ac) (2 percent) had substantial mortality

114

of grasses and forbs.  <u>Phlox</u> spp., a forb that is important sage-grouse forage in the spring and summer, had 50- to 80-percent mortality in areas where sagebrush dieback was over 50 percent (BLM, unpubl. lit. 2005j).  In 2003, 48 percent of all sagebrush plants were defoliated and 17 percent were dead (Wenger <u>et al.</u> 2003).  By 2004, there was only modest recovery with increased moisture (BLM, unpubl. lit. 2005j).  By 2005, sagebrush plants that were partially killed were recuperating (Sandy Borthwick, BLM, pers. comm. 2005).

The drought also impacted sagebrush communities in the San Miguel Basin population, particularly in the Dry Creek Basin area.  During the late fall and winter of 2003-2004, CDOW conducted sagebrush transects in Dry Creek Basin to monitor drought-related impacts.  Approximately 75 percent of the sagebrush canopy in Dry Creek Basin was lost to sagebrush defoliation due to drought (Wenger <u>et al.</u> 2003).  Although most plants survived and exhibited signs of recovery in 2003, large areas, particularly at low elevation, lost over 90 percent of the plants (Wenger <u>et al.</u> 2003).  These communities started to recover in the spring of 2004, and plants that survived had heavy seed crops in the fall of 2004.  Recuperation of these communities continued in 2005 (Kathy Nickell, BLM, pers. comm. 2005).  Detrimental effects on Gunnison sage-grouse, particularly on the birds attending the Desert Lek in Dry Creek Basin were observed after the drought.  This lek had the greatest number of males counted (12-18) of the 3 leks in the population from 1996 through 2002, but was reduced to 0 in 2004 and 2005 (CDOW, unpubl. lit. 2005b).

In the Monticello group, most nesting areas are in poor condition due to lack of herbaceous cover as a result of drought and grazing (GSRSC 2005). Long-term drought also has reduced the availability of wet meadow habitat for brood-rearing (GSRSC 2005). Rains in 2005 have replenished some wet meadow habitats or riparian areas (Tammy Wallace, BLM, pers. comm. 2005). In the Piñon Mesa population the recent drought may have caused some limited, but unquantified, sagebrush and herbaceous understory die-back at lower elevations. Most plants affected do not appear to have died completely and sagebrush conditions have improved in 2004 and 2005 (CDOW, unpubl. lit. 2005g). Drought has been identified as a primary threat to the Crawford population (Crawford Area Conservation Plan 1998, GSRSC 2005). Drought conditions occurred there between 1999 and 2003 (Jim Ferguson, BLM, pers. comm. 2005). No quantitative habitat data are available, but little grass, forb or sagebrush growth occurred during this period (Jim Ferguson, BLM, pers. comm. 2005). Since 1999, lek counts have declined. The BLM cut back on grazing animal unit months and there were no other identifiable negative impacts to BLM lands in the area during this timeframe, suggesting drought as the primary cause of decline (Jim Ferguson, BLM, pers. comm. 2005).

The Gunnison sage-grouse appears capable of enduring moderate or severe, but relatively short-term, drought as observed from persistence of the populations during drought conditions from 1999-2003 throughout much of the range. Habitat appeared to be negatively impacted by drought across a broad area of the Gunnison sage-grouse's range. However, the reduction of sagebrush density in some areas, allowing for greater

116

herbaceous growth, and stimulating the onset of sagebrush seed crops (Wenger et al. 2003) may actually be beneficial to sagebrush habitats over the long term.

Recreation

Studies have determined that non-consumptive recreational activities can degrade wildlife resources, water, and the land by distributing refuse, disturbing and displacing wildlife, increasing animal mortality, and simplifying plant communities (Boyle and Samson 1985). Sage-grouse response to disturbance may be influenced by the type of activity, recreationist behavior, predictability of activity, frequency and magnitude, timing, and activity location (Knight and Cole 1995).

Recreation from off-highway vehicles, hikers, mountain bikes, campers, snowmobiles and other sources has impacted many parts of the range, especially portions of the Gunnison Basin and Pinon Mesa population (BLM, unpubl. lit. 2005j; CDOW, unpubl. lit. 2005g). These activities can result in abandonment of lekking activities and nest sites, energy expenditure reducing survival, and greater exposure to predators (GSRSC 2005). Recreation is a significant land use on lands managed by BLM (Connelly et al. 2004) and recreational use of national forests has increased 76 percent since 1977 (Rosenberg et al. 2004).

Recreational activities within the Gunnison Basin are widespread, occur during all seasons of the year, and have expanded as more people move to the area or come to

117

recreate (BLM, unpubl. lit. 2005i). A comprehensive plan to manage motorized and non-motorized recreation is not available for BLM land in the Gunnison Basin, nor has there been monitoring or research on the extent of impacts (BLM, unpubl. lit. 2005i). The BLM has seasonal closures on 17 roads with 6 of these protecting leks, but many more roads provide access to leks (BLM, unpubl. lit. 2005i). Road closures are frequently violated (BLM, unpubl. lit. 2005i). The Gunnison BLM has only one ranger with responsibility for the Gunnison Basin, Cerro Summit-Cimarron-Sims Mesa, and San Miguel Basin populations, thereby limiting BLM's effectiveness in enforcing road closures.

Dispersed camping occurs at a low level on public lands in all of the populations, particularly during the hunting seasons for other species. A designated campground is located on BLM land near occupied habitat on Piñon Mesa (BLM, unpubl. lit. 2005j). No studies on recreational effects in the Piñon Mesa population have occurred. With its proximity to Grand Junction and expected growth in Mesa County and the Glade Park area, recreational impacts are expected to increase in the Pinon Mesa population area.

Domestic dogs accompanying recreationists can disturb, harass, displace, or kill Gunnison sage-grouse. Authors of many wildlife disturbance studies concluded that dogs with people, dogs on leash, or loose dogs provoked the most pronounced disturbance reactions from their study animals (Sime 1999 and references within). The primary consequences of dogs being off leash is harassment, which can lead to physiological

118

stress as well as the separation of adult and young birds, or flushing incubating birds from their nest.

Pesticides

Insects are an important component of sage-grouse chick and juvenile diets (Patterson 1952, Klebenow and Gray 1968, Johnson and Boyce 1990, Fischer et al. 1996a).  Insects, especially ants (Hymenoptera) and beetles (Coleoptera), can comprise a major proportion of the diet of juvenile sage-grouse (Patterson 1952) and are important components of early brood-rearing habitats (Drut et al. 1994a); however, most pesticide applications are not directed at control of such resources.  Pesticides are used primarily to control insects causing damage to cultivated crops on private lands and to control grasshoppers (Orthoptera) and Mormon crickets (Mormonius sp.) on public lands. Infestations of Russian wheat aphids (Diuraphis noxia) have occurred in Gunnison sage-grouse occupied range in Colorado and Utah (GSRSC 2005).  Disulfoton, a systemic organophosphate extremely toxic to wildlife, was routinely applied to over a million acres of winter wheat crops to control the aphids during the late 1980s but effects if any are unknown (GSRSC 2005).  One instance of greater sage-grouse mortality was reported following application of organophosphate and carbamate pesticides to cultivated crops in Idaho (Blus et al. 1989),  More recently, an infestation of army cutworms (Euxoa auxiliaries) occurred in sage-grouse habitat along the Utah-Colorado State line. Thousands of acres of winter wheat and alfalfa fields were sprayed with insecticides such

119

as permethrin by private landowners to control them (GSRSC 2005) but again, effects, if any, are unknown.

Use of insecticides to control mosquitoes is infrequent and probably do not have detrimental effects on sage-grouse.  Available insecticides that kill adult mosquitoes include synthetic pyrethroids such as permethrin, which are applied at very low concentrations and have very low vertebrate toxicity (Rose 2004).  Organophosphates such as malathion have been used at very low rates to kill adult mosquitoes for decades, and are judged relatively safe for vertebrates (Rose 2004).

Conclusion for Factor E

Although genetic consequences of low Gunnison sage-grouse population numbers could express themselves, there is no evidence that genetic factors have thus far caused a threat to the Gunnison sage-grouse and it is unlikely that genetic factors (even without connectivity corridors or population augmentation) will be a threat for many generations. Effects of the severe drought centered on the year 2002 appear to have been ameliorated starting in 2004, and the sage-grouse survived the drought as they have survived other droughts in the past.  Despite potentially greater effects to the smaller populations we have no evidence that drought is a threat to the sage-grouse.  Although disturbance and habitat destruction, fragmentation, or degradation may result from recreational activities, no studies have been conducted on recreational impacts to Gunnison sage-grouse to demonstrate that recreation is or may become a threat to the species.  Based on the

120

available information, there appears to be infrequent use of insecticides in populations of

the Gunnison sage-grouse. The most likely impact of pesticides on Gunnison

sage-grouse is the reduction of insect prey items. However, we could find no information

to indicate that use of pesticides, in accordance with their label instructions, is a threat to

Gunnison sage-grouse. Thus, based on the best scientific and commercial data available,

we have concluded that other natural or manmade factors do not threaten or endanger the

sage-grouse throughout all or a significant portion of its range in the foreseeable future.


Finding


We have assessed the best scientific and commercial information available and

have determined that the Gunnison sage-grouse is not warranted for listing under the

Endangered Species Act, as amended. We also no longer consider the species to be a

candidate for listing. The PVA (GSRSC 2005) concluded that the Cerro Summit-

Cimarron-Sims Mesa and Poncha Pass populations and the Dove Creek group of the

Monticello-Dove Creek population have a high probability of extirpation in the

foreseeable future. These populations do not comprise a significant portion of the range

of the Gunnison sage-grouse, as they are small and isolated. However, we continue to

encourage CDOW and other interested parties to take necessary management actions to

prevent their extirpation as the genetic material from these populations will be helpful in

insuring the species does not become threatened or endangered in the future. For the

remaining populations, numerous impacts pose potential threats to the Gunnison

sage-grouse when considered under the listing factors. However, there is no evidence

**Comment [TG98]:** Rewrite to include these populations as stable and viable based on recent history. WECANNOT REVISE AS REQUESTED BECAUSE THE PVA CONCLUDES OTHERWISE.

121

that the impacts are causing rangewide threats to the sage-grouse, or are likely to cause

them in the foreseeable future.

     If impacts to the species rise to the level of being a threat in the future or if the

Service finds that the populations are declining significantly faster than they were found

to have done in the past (Garton 2005), the Service will reexamine the listing status of the

Gunnison sage-grouse.  We will continue to monitor the status of the Gunnison

sage-grouse and its habitat and will continue to accept additional information and

comments from all governmental agencies, the scientific community, industry, or any

other interested party concerning this finding.

References

     A complete list of references used in the preparation of this finding is available

upon request from the Western Colorado Field Office (see ADDRESSES section).

Author

     The primary author of this finding is the staff of the Western Colorado Ecological

Services Field Office (see ADDDRESSES).

Authority

<div align="center">122</div>

The authority for this action is the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 et seq.).

Gunnison sage-grouse are smaller than greater sage-grouse (C. urophasianus), weighing approximately 1/3 less (Hupp and Braun 1991; Young et al. 2000). Their filoplumes (specialized feathers on the neck) are longer and give the appearance of a "ponytail" during the courtship display, unlike the filoplumes on greater sage-grouse. Gunnison sage-grouse retrices (tail feathers) have distinctive barring, unlike the mottled pattern on greater sage-grouse retrices (Young et al. 2000). Gunnison sage-grouse mating displays are slower than greater sage-grouse (Young et al. 2000). Mating calls also are distinct. Gunnison sage-grouse "pop" their apteria nine times instead of twice like greater sage-grouse (Young et al. 2000). Young (1994) found that female Gunnison sage-grouse avoided playbacks of male greater sage-grouse mating calls. She concluded that differences in courtship vocalizations were likely a barrier to mating between Gunnison and greater sage-grouse. The DNA sequence information from mitochrondrial and nuclear genomes indicate there is no gene flow between Gunnison and greater sage-grouse (Oyler-McCance et al. 1999; Young et al. 2000).

Oyler-McCance et al. (2005) conducted a genetic analysis of Gunnison sage-grouse populations using mitochondrial DNA sequence and nuclear microsatellite data. The Cerro Summit-Cimarron-Sims Mesa population was not included in this analysis due to inadequate sample sizes. The Poncha Pass population also was not included as it is composed of individuals transplanted from Gunnison Basin. In general, Gunnison sage-grouse have low levels of genetic diversity when compared to the greater sage-grouse (Oyler-McCance et al. 2005). Within the species, the Gunnison Basin birds had higher levels of genetic diversity than the other populations. Lower genetic diversity is consistent with small population size and geographical isolation (Oyler-McCance et al. 2005).

123

Oyler-McCance et al. (2005) concluded that gene flow among populations of Gunnison sage-grouse is limited.  The loss of genetic diversity in the Piñon Mesa and Monticello-Dove Creek populations suggests that habitat fragmentation has resulted in cessation or near cessation of emigration and immigration from and to other populations because genetic differences between populations of Gunnison sage-grouse increase as the geographical separation of the populations increases (Oyler-McCance et al. 2005).  This is supported by the documented loss and fragmentation of sagebrush vegetation in southwestern Colorado (Oyler-McCance et al. 2001).  It suggests that habitat fragmentation is precluding movements among populations.  Occasional migration among some populations may still occur (Oyler-McCance et al. 2005).  Gunnison sage-grouse are known to migrate several miles between areas within the San Miguel Basin population (Apa 2004), crossing unsuitable habitat such as the San Miguel River valley and roads.  Each of the six groups in the San Miguel Basin population are separated by 1-4 air miles (GSRSC 2005).

124

Dated:_____

Signed:_____

     Director, U.S. Fish and Wildlife Service

[Endangered and Threatened Wildlife and Plants; 12-Month Finding to List the Gunnison

Sage-grouse as Threatened or Endangered]

125

| Page 30: [1] Deleted | Julie MacDonald | 3/23/2006 10:28:00 AM |

-McCance et al. (2005) conducted a genetic analysis of Gunnison sage-grouse

populations using mitochondrial DNA sequence and nuclear microsatellite data. The

Cerro Summit-Cimarron-Sims Mesa population was not included in this analysis due to

inadequate sample sizes. The Poncha Pass population also was not included as it is

composed of individuals transplanted from Gunnison Basin. In general, Gunnison

sage-grouse have low levels of genetic diversity when compared to the greater

sage-grouse (Oyler-McCance et al. 2005). Within the species, the Gunnison Basin birds

had higher levels of genetic diversity than the other populations. Lower genetic diversity

is consistent with small population size and geographical isolation (Oyler-McCance et al.

2005).

| Page 34: [2] Deleted | Julie MacDonald | 3/23/2006 11:03:00 AM |

While sage-grouse are dependent on interconnected expanses of sagebrush

(Patterson 1952; Connelly et al. 2004), data are not available regarding minimum

sagebrush patch sizes to support populations of sage-grouse. Estimating the impact of

habitat fragmentation on sage-grouse is complicated by time lags in response to habitat

changes, particularly since sage-grouse will continue to return to altered breeding areas

(leks, nesting areas, and early brood-rearing areas) due to strong site fidelity despite

nesting or productivity failures (Wiens and Rotenberry 1985).[JM1]

| Page 34: [3] Comment [JM41] | Julie MacDonald | 4/3/2006 1:22:00 PM |

Moved, not deleted. IT WAS MOVED TO END OF DOC. RO DELETED THE IRRELEVANT
SENTENCES.

| Page 34: [4] Deleted | Julie MacDonald | 3/23/2006 10:49:00 AM |

-McCance et al. (2005) concluded that gene flow among populations of Gunnison

sage-grouse is limited. The loss of genetic diversity in the Piñon Mesa and

Monticello-Dove Creek populations suggests that habitat fragmentation has resulted in

cessation or near cessation of emigration and immigration from and to other populations

because genetic differences between populations of Gunnison sage-grouse increase as the

geographical separation of the populations increases (Oyler-McCance et al. 2005).  This

is supported by the documented loss and fragmentation of sagebrush vegetation in

southwestern Colorado (Oyler-McCance et al. 2001).  It suggests that habitat

fragmentation is precluding movements among populations.  Occasional migration

among some populations may still occur (Oyler-McCance et al. 2005).  Gunnison

sage-grouse are known to migrate several miles between areas within the San Miguel

Basin population (Apa 2004), crossing unsuitable habitat such as the San Miguel River

valley and roads.  Each of the six groups in the San Miguel Basin population are

separated by 1-4 air miles (GSRSC 2005).

| Page 34: [5] Comment [ES42] | Ecological Services | 4/5/2006 9:30:00 AM |
|---|---|---|

RO COULD NOT ACCEPT BECAUSE SOURCE NOT PEER REVIEWED OR PUBLISHED AND
THERE IS NO DECUMENTED CREDIBILITY TO THE STATEMENT.

| Page 34: [6] Comment [ES43] | Ecological Services | 4/5/2006 9:29:00 AM |
|---|---|---|

NOT ABLE TO ACCEPT.  NO CITATIONS AND RO IS UNCERTAIN OF THE VALIDITY.

| Page 34: [7] Comment [JM44] | Julie MacDonald | 4/5/2006 9:29:00 AM |
|---|---|---|

Moved  DID NOT FIND WHERE MOVED.  SINCE RO COULD NOT ACCEPT ALTERNATE
INSERTION, KEPT THIS LANGUAGE.

| Page 34: [8] Deleted | Julie MacDonald | 3/23/2006 11:34:00 AM |
|---|---|---|

increased predation and reduced nest success due to predators associated with

agriculture (Connelly et al. 2004).  Past

| Page 34: [9] Deleted | Julie MacDonald | 3/23/2006 11:09:00 AM |
|---|---|---|

development of irrigation projects to support agricultural production has resulted

in additional sage-grouse habitat loss (Braun 1998).

| Page 34: [10] Deleted | Julie MacDonald | 3/23/2006 11:41:00 AM |
|---|---|---|

Though some crops such as alfalfa (Medicago sativa) and young bean sprouts

(Phaseolus spp.) are eaten or used for cover by sage-grouse (C. Braun, CDOW, pers.

comm. 1998), crop monocultures do not provide adequate year-round food or cover

(GSRSC 2005). Gunnison sage-grouse will use hay pastures for foraging within about

50 m (165 ft) of the edge of the field but do not forage further into the pasture due to lack

of suitable habitat (Gunnison Basin Conservation Plan 1997).

| Page 37: [11] Comment [JM53] | Julie MacDonald | 4/5/2006 8:39:00 AM |
|---|---|---|

The cite does not support this. They speak generally of roads being a barrier and reference beetles, small mammals and amphibians. However, there is no reference to birds either specifically or generally, and none of the other cites document roads being a barrier for grouse, which makes sense because they can fly right over. THIS PARAGRAPH IS ABOUT IMPACTS OF ROADS IN GENERAL. RO ADDED SENTENCE AT END OF PARA TO CLARIFY.

| Page 37: [12] Comment [JM54] | Julie MacDonald | 4/5/2006 9:26:00 AM |
|---|---|---|

Cites do not support the statement. SEE RESPONSE TO PREVIOUS COMMENT.

| Page 37: [13] Comment [JM55] | Julie MacDonald | 4/5/2006 9:26:00 AM |
|---|---|---|

Cites do not support the statement. RO CHECKED CITES; THEY DO SUPPORT IT.

| Page 37: [14] Deleted | Julie MacDonald | 3/23/2006 12:08:00 PM |
|---|---|---|

facilitation of mammalian (Forman and Alexander 1998; Forman 2000)

| Page 37: [15] Deleted | Julie MacDonald | 3/23/2006 12:08:00 PM |
|---|---|---|

and corvid predation (Connelly et al. 2000b; Aldridge and Brigham 2003;

Connelly et al. 2004)

| Page 37: [16] Comment [JM56] | Julie MacDonald | 4/5/2006 8:44:00 AM |
|---|---|---|

Forman and Alexander 1998 state specifically that roads are not an important conduit for plans (pp 211) SEE P.210 FOR SPECIFIC LANGUAGE.

| Page 37: [17] Comment [JM57] | Julie MacDonald | 4/5/2006 8:44:00 AM |
|---|---|---|

Forman 2000 does not address plants at all, but primarily focuses on noise. SEE P.33 FOR PLANT DISCUSSION

| Page 37: [18] Comment [JM58] | Julie MacDonald | 4/5/2006 8:48:00 AM |
|---|---|---|

Does not support, correlates wires and corvid predation, not roads. DELETED CITE

| Page 37: [19] Comment [JM59] | Julie MacDonald | 4/5/2006 9:51:00 AM |
|---|---|---|

Does not support other than uses a model that includes roads as a component. THE MODEL IS STRONG, HAS WITHSTOOD PEER REVIEW AND IS SUBMITTED FOR PUBLICATIUON.

| Page 37: [20] Comment [JM60] | Julie MacDonald | 4/5/2006 9:53:00 AM |
|---|---|---|

They looked at mining noise, and how it might affect lek use, and got not results. THE STUDY LOOKED AT NOISE FROM ROADS. THE RESULTS WERE INCONSISTENT, NOT NONEXISTENT.

| Page 37: [21] Comment [JM61] | Julie MacDonald | 4/5/2006 11:37:00 AM |
|---|---|---|

Lyon and Anderson made no such suggestion. They examined nesting effects of roads and found no significant different between disturbed and undisturbed hens. Although they do go on to justify their difference as biologically significant, I'm not sure what that means when you are trying to distinguish between a real difference and random noise in the system. ADDED ALTERNATE CITATION

| Page 37: [22] Deleted | Julie MacDonald | 3/23/2006 12:24:00 PM |
|---|---|---|

Lyon and Anderson (2003) suggested that roads may be the primary impact of oil and gas development to greater sage-grouse, due to their persistence and continued use even after drilling and production have ceased[JM2].

| Page 37: [23] Comment [JM62] | Julie MacDonald | 4/3/2006 3:59:00 PM |
|---|---|---|

Page 344 of the cite.  JM EDIT MAKES SENTENCE MISLEADING.  RO REWORDED ORIGINAL SENTENCE TO CLARIFY.

| Page 39: [24] Comment [JM68] | Julie MacDonald | 4/3/2006 4:16:00 PM |
|---|---|---|

It is unclear to me why we are cataloguing the amount of roads in the affected areas.  The roads are there, the habitat fragmented, and the real question is whether the grouse is threatened by the current situation or by new road construction that is planned. DELETED DATA ON MILES OF ROADS.  RO KEPT OYLER CITE BECAUSE IT RESPONDS TO THE LAST SENTENCE IN THIS COMMENT.

| Page 39: [25] Deleted | Julie MacDonald | 3/23/2006 7:12:00 PM |
|---|---|---|

development within Gunnison sage-grouse habitats precluded movement of sage-grouse between the resultant patches, presumably to minimize their exposure to predation (Oyler-McCance et al. 2001).

| Page 39: [26] Deleted | Julie MacDonald | 3/23/2006 7:17:00 PM |
|---|---|---|

Basin is bisected by State Highway 50, a major highway with high traffic volume. Two other State highways further intersect this population.  The BLM estimates that paved, gravel, and dirt roads total 7,400 km (4,600 mi) in the current range in the Gunnison Basin (BLM, unpubl. lit. 2005b), although the Colorado Department of Transportation (CDOT) (2005) reports only 2,650 km (1,650 mi) for all of Gunnison County.  There are 2,050 km (1,300 mi) of roads in San Miguel County (CDOT 2005).

| Page 39: [27] Deleted | Julie MacDonald | 3/23/2006 7:23:00 PM |
|---|---|---|

Only two sage-grouse have been killed on the roads in Dry Creek Basin since 2003 (CDOW, unpubl. lit. 2006).  In the combined San Miguel Basin, Crawford, and Cerro Summit-Cimarron-Sims Mesa populations there are 1,350 km (840 mi) of paved and unpaved roads on BLM lands, which accounts for 38 percent of the current range in those populations.  Mileage for these roads was not available by Gunnison sage-grouse

population.  San Miguel, Delta, and Montrose Counties contain a total of 9,400 km

(5,830 mi) of roads (CDOT 2005) some of which pass through the current range (Jim

Ferguson, BLM, pers. comm. 2005).  One paved road (Highway 92) occurs on the

southeastern edge of the current range in the Crawford population, along with a few dirt

and several two-track roads of unknown mileage.


Two paved highways run through the current range in the Monticello group.  Dirt

roads and other minor roads occur throughout the Monticello group at approximately

every 0.8-1.6 km (0.5-1 mi) (San Juan County GSWG, unpubl. lit. 2005) causing loss of

habitat, habitat fragmentation, disturbance from traffic, increased incursion of weeds and

the potential for increased predation.  No

| Page 39: [28] Deleted | Julie MacDonald | 3/23/2006 7:18:00 PM |

paved roads occur in the current range for the Piñon Mesa population, but with

projected human population increases of 91 percent by 2030 (Colorado Department of

Local Affairs [CDLA] 2004), we anticipate that new or existing roads will be paved in

the foreseeable future.  A moderate number of dirt roads are on public and private land,

but we do not know the number of miles they cover.

| Page 39: [29] Deleted | Julie MacDonald | 3/23/2006 7:23:00 PM |

The cumulative impact of roads through sage-grouse habitat has not been

measured, so we do not know the magnitude of this potential threat to the species.

**Pat Mehlhop/R6/FWS/DOI**

04/05/2006 03:15 PM

To    Al Pfister/R6/FWS/DOI@FWS, Susan Linner/R6/FWS/DOI@FWS, Terry Ireland/R6/FWS/DOI@FWS

cc

bcc

Subject    Fw: tom-julie doc

With WO improvements.

Patricia Mehlhop, Candidate Conservation Coordinator
303-236-4215

----- Forwarded by Pat Mehlhop/R6/FWS/DOI on 04/05/2006 03:15 PM -----



**Bridget Fahey/R6/FWS/DOI**

04/05/2006 03:10 PM

To    Pat Mehlhop/R6/FWS/DOI@FWS

cc

Subject    Re: tom-julie doc 

hope i got it right

![Word icon] Tom-Julie Gunnison SG-RO RESPONSE.doc

Pat Mehlhop/R6/FWS/DOI

**Pat Mehlhop/R6/FWS/DOI**

04/05/06 04:53 PM

To    Bridget Fahey/R6/FWS/DOI@FWS

cc

Subject    tom-julie doc

Bridget,

When you finish editing the response to comments doc, please send us a copy so we have it for the admin record.

Pat

Patricia Mehlhop, Candidate Conservation Coordinator
303-236-4215

Billing Code 4310-55-P

DEPARTMENT OF THE INTERIOR

Fish and Wildlife Service

50 CFR Part 17

Endangered and Threatened Wildlife and Plants; 12-Month Finding on a Petition to List the Gunnison Sage-grouse as Threatened or Endangered

AGENCY:  Fish and Wildlife Service, Interior.

ACTION:  Notice of a 12-Month Petition Finding

SUMMARY:  We, the U.S. Fish and Wildlife Service (Service), announce a 12-month finding to list the Gunnison sage-grouse (Centrocercus minimus) as threatened or endangered under the Endangered Species Act of 1973, as amended (Act).  After reviewing the best available scientific and commercial information, we find that listing is not warranted.  Thus, we also no longer consider the species to be a candidate for listing.

Formatted: Font: 12 pt

Formatted: Line spacing:  Double

1

We ask the public to submit to us any new information that becomes available concerning the status of or threats to the species. This information will help us monitor and encourage the conservation of this species.

> **Comment [TG1]:** Do we need to affirmatively withdraw this as a candidate also? YES. ALREADY DONE.

DATES: The finding announced in this document was made on [**Insert date that this finding is signed**]. Although further listing action will not result from this finding, we request that you submit new information concerning the status of or threats to this species whenever it becomes available.

ADDRESSES: Comments and materials received, as well as supporting documentation used in the preparation of this 12-month finding, will be available for inspection, by appointment, during normal business hours at the Western Colorado Ecological Services Field Office, U.S. Fish and Wildlife Service, 764 Horizon Drive, Building B, Grand Junction, Colorado 81506-3946. Submit new information, materials, comments, or questions concerning this species to the Service at the above address.

FOR FURTHER INFORMATION CONTACT: Allan Pfister, Western Colorado Supervisor (see ADDRESSES section), by telephone at (970) 243-2778, by facsimile at (970) 245-6933, or by electronic mail at fw6_sagegrouse@fws.gov.

SUPPLEMENTARY INFORMATION:

Previous Federal Action

<center>2</center>

On January 18, 2000, the Director of the Service designated the Gunnison sage-grouse as a candidate species under the Act, with a listing priority of 5.  However, the Federal Register notice regarding this decision was not published until December 28, 2000 (65 FR 82310, December 28, 2000).  Candidates are species for which the Service has determined that the species warrants listing as a threatened or endangered species, but listing is precluded by higher listing priorities for other species.  A listing priority of 5 indicates that there is a high magnitude of threats, but they are considered non-imminent.

On January 26, 2000, The American Lands Alliance, Biodiversity Legal Foundation, and others petitioned the Service to list the species (Webb 2000).  On January 10, 2001, some of the same plaintiffs sued the Service in an attempt to force a petition process.  In 2003, the U.S. District Court ruled that the species was designated as a candidate by the Service prior to receipt of the petition because the candidate form was signed on January 18, 2000, and that the determination that a species should be on the candidate list is equivalent to a 12-month finding (American Lands Alliance v. Gale A. Norton, C.A. No. 00-2339, D.D.C.).

The 2003 Candidate Notice of Review elevated the species' listing priority number to 2 (69 FR 24876), as the immanency of the perceived threats had increased. The 2004 Candidate Notice of Review (70 FR 24870) maintained the listing priority number as a 2.

3

Plaintiffs amended their complaint in May 2004 to allege that the Service's warranted but precluded finding and our decision not to emergency list the Gunnison sage grouse were in violation of the ESA. Both parties filed a stipulated settlement agreement with the court on November 14, 2005, which includes a provision that the Service would make a proposed listing determination by March 31, 2006.

Section 4(b)(1)(A) of the Act requires us to consider the best scientific and commercial data available as well as efforts being made by States or other entities to protect a species when making a listing decision. To meet this standard we systematically collected information on the Gunnison sage-grouse, its habitats, threats, and environmental factors affecting the species, from a wide array of sources. The scientific literature on Gunnison sage-grouse and its sagebrush habitats is moderate so, where information was lacking and as appropriate, greater sage-grouse information was used to analyze habitat usage, threats, and environmental factors affecting the Gunnison sage-grouse. In addition we received a substantial amount of unpublished information from other Federal agencies, States, counties, environmental organizations, and individuals. We also solicited information on all Federal, State, or local conservation efforts currently in operation or planned for the Gunnison sage-grouse or its habitats.

In April 2005, Colorado Division of Wildlife (CDOW) applied to the Service for an Enhancement of Survival Permit for the Gunnison sage-grouse pursuant to section 10(a)(1)(A) of the Act. The permit application included a proposed Candidate Conservation Agreement with Assurances (CCAA) between CDOW and the Service.

**Formatted:** Line spacing: Double

4

The standard that a CCAA must meet is that the benefits of the conservation measures implemented under a CCAA, when combined with those benefits that would be achieved if it is assumed that conservation measures were also to be implemented on other necessary properties, would preclude or remove any need to list the species." The CCAA, the permit application, and the Environmental Assessment were made available for public comment on July 6, 2005 (70 FR 38977). Public comments and other internal comments from the Service and CDOW were incorporated into revisions of the CCAA and Environmental Assessment; the documents are scheduled to be finalized shortly. Landowners with eligible property in southwestern Colorado who wish to participate can voluntarily sign up under the CCAA and associated permit through a Certificate of Inclusion. These participants provide certain Gunnison sage-grouse habitat protection or enhancement measures on their lands. If the Gunnison sage-grouse is listed under the Act, the permit authorizes incidental take of Gunnison sage-grouse due to otherwise lawful activities in accordance with the terms of the CCAA (e.g., crop cultivation, crop harvesting, livestock grazing, farm equipment operation, commercial/residential development, etc.), as long as the participating landowner is performing activities identified in the Certificate of Inclusion.

Species Information

The sage-grouse (Centrocercus spp.) is the largest grouse in North America and was first described by Lewis and Clark in 1805 (Schroeder et al. 1999). Sage-grouse are

5

**Comment [TG2]:** Shouldn't we report any improvement/successes etc. that have occurred as a result of these efforts? Of if they are not measured as of yet, what Colorado is doing in future to measure success of these efforts? I understand that withdrawal is not based on conservation efforts, but it doesn't hurt to close the loop on the discussion started here regarding the CCAA....._Legal Implication_ – If potential plaintiff sees that we have alternative argument for withdrawal, they will be less likely to challenge withdrawal based on biology if they know we can add conservation efforts as an additional reason to withdraw at any time. This is one of the reasons we haven't been sued so far on greater sage grouse, another not-warranted finding not dependent on future conservation efforts.
NOT INCLUDED. POSSIBLE ACTIVITIES HAVE BEEN WRITTEN, BUT WE DO NOT KNOW WHICH ONES WILL GO INTO REAL CERTIFICATES OF INCLUSION, SO DON'T WANT TO PUT THINGS IN HERE THAT MAY NOT BE IMPLEMENTED IN THE FUTURE.

We should also add that our analysis of the best available scientific data revealed that the Gunnison sage-grouse is not a threatened species, and in making this finding it was not necessary to rely on the contributions of any of the local, State, or other planned conservation efforts like those anticipated under the CCAA.
WE CHOSE NOT TO DISCUSS CCAA BECAUSE IT IS NOT COMPLETED, WE DON'T KNOW HOW QUICKLY IT WILL BE IMPLEMENTED, HOW EFFECTIVE IT WILL BE, AND DID NOT RELY ON IT TO SUPPORT OUR DETERMINATION.

**Formatted:** Font: Times New Roman, 12 pt

most easily identified by their large size, dark brown color, distinctive black bellies, long, pointed tails and association with sagebrush habitats.  They are dimorphic in size, with females being smaller.  Both sexes have yellow-green eye combs, which are less prominent in females.  Sage-grouse are known for their elaborate mating ritual where males congregate on strutting grounds called leks and "dance" to attract a mate.  During the breeding season males have conspicuous filoplumes (specialized erectile feathers on the neck), and exhibit yellow-green apteria (fleshy bare patches of skin) on their breasts (Schroeder et al. 1999).

For many years sage-grouse were considered a single species.  Young et al. (2000) identified Gunnison sage-grouse (Centrocercus minimus) as a distinct species based on morphological (Hupp and Braun 1991; Young et al. 2000), genetic (Kahn et al. 1999; Oyler-McCance et al. 1999), and behavioral (Barber 1991; Young 1994; Young et al. 2000) differences and geographical isolation.  Based on morphologic, behavioral, and genetic differences identified in various studies the American Ornithologist's Union (2000) accepted the Gunnison sage-grouse as a distinct species (see discussion under species considerations).  The current ranges of the two species are not overlapping (Schroeder et al. 2004).

Gunnison sage-grouse and greater sage-grouse have similar life histories and habitat requirements (Young 1994).  Nesting success for Gunnison sage-grouse is highest in areas where forb and grass covers are found below a sagebrush canopy cover of 15-30 percent (Young et al. 2000).  These numbers are comparable to those reported for

6

---

**Comment [JM3]:** Moved  IT WAS MOVED TO THE END OF THE DOC SO DELETED IT HERE.

**Deleted:** Gunnison

**Deleted:**  sage-grouse are smaller than greater sage-grouse (C. urophasianus), weighing approximately 1/3 less (Hupp and Braun 1991; Young et al. 2000).  Their filoplumes (specialized feathers on the neck) are longer and give the appearance of a "ponytail" during the courtship display, unlike the filoplumes on greater sage-grouse.  Gunnison sage-grouse retrices (tail feathers) have distinctive barring, unlike the mottled pattern on greater sage-grouse retrices (Young et al. 2000).  Gunnison sage-grouse mating displays are slower than greater sage-grouse (Young et al. 2000).  Mating calls also are distinct.  Gunnison sage-grouse "pop" their apteria nine times instead of twice like greater sage-grouse (Young et al. 2000).  Young (1994) found that female Gunnison sage-grouse avoided playbacks of male greater sage-grouse mating calls.  She concluded that differences in courtship vocalizations were likely a barrier to mating between Gunnison and greater sage-grouse.  The DNA sequence information from mitochondrial and nuclear genomes indicate there is no gene flow between Gunnison and greater sage-grouse (Oyler-McCance et al. 1999; Young et al. 2000).

**Deleted:** these

**Deleted:** .

**Deleted:** Although

**Deleted:** are different genetically, morphologically, and behaviorally, their

**Comment [JM4]:** I think this document makes a good case for the Gunnison not being threatened, but I also think it is important to highlight the serious flaws in the designation of the Gunnison as a separate species.  That can be done at the end of the finding, and is not essential, but I do think it's important.  THE BODY OF PEER REVIEWED LITERATURE CURRENTLY WEIGHS IN SUPPORT OF GUSG AS A DISTINCT SPECIES, THUS WE THINK IT BEST TO STAY QUIET ON THE SPECIES VALIDITY ISSUE.  WE ACCEPTED THE DELETION OF THE COMPARISON WITH GRSG.

**Deleted:** are similar

the greater sage-grouse (Connelly et al. 2000a).  Connelly et al. (2000a) also state that

nest success for greater sage-grouse is greatest where grass cover is present.  Therefore,

factors identified in the greater sage-grouse literature that affect nesting habitat quality

can affect Gunnison sage-grouse nesting habitat.  Characteristics of sage-grouse winter

habitats are similar through the range of both species (Connelly et al. 2000a).  In winter,

Gunnison sage-grouse are restricted to areas of 15-30 percent sagebrush cover, similar to

the greater sage-grouse (Connelly et al. 2000a; Young et al. 2000).  However, unlike the

greater sage-grouse, Gunnison sage-grouse will use areas with more deciduous shrubs

during the winter (Young et al. 2000).

Food habits of the two species also are similar, being composed of nearly

100 percent sagebrush in the winter (Schroeder et al. 1999; Young et al. 2000).  Forbs

and insects are important during the summer and early fall.  Unlike many other game

birds, Gunnison and greater sage-grouse do not possess muscular gizzards and, therefore,

lack the ability to grind and digest seeds (Rasmussen and Griner 1938; Leach and

Hensley 1954).  While no formal diet studies have been conducted, Gunnison

sage-grouse dietary requirements are presumed to be similar to greater sage-grouse since

they are within the same genus (Tony Apa, CDOW, pers. comm. 2005).  Gunnison

sage-grouse chick dietary requirements of insects and forbs also are expected to be

similar to greater sage-grouse and other grouse species (Tony Apa, CDOW, pers. comm.

2005).

**Deleted:** presumably

**Deleted:** in a similar manner if those factors occur within the range of the Gunnison sage-grouse

**Comment [JM5]:** I am very uncomfortable with citing a personal communication.  If that's a standard biological assumption, then we should just say so… but someone's opinion doesn't hold much more weight than the Service's. DELETED CITATION

7

Given the ecological similarities between the two species, information on life history and habitat requirements presented in this finding use Gunnison sage-grouse information except where it is lacking and greater sage-grouse information is used. Except where referenced, the following life history information is taken from Schroeder et al. (1999).

In the spring, sage-grouse gather on traditional breeding areas referred to as leks (Patterson 1952). Lek displaying occurs from mid-March through late May, depending on elevation (Rogers 1964). For Gunnison sage-grouse, 87 percent of all nests were located less than 6 kilometers (km) (4 miles (mi)) from the lek of capture (Apa 2004). Mean clutch size for Gunnison sage-grouse is 6.8 ± 0.7 eggs (Young 1994). Most eggs hatch in June, with a peak between June 10 and June 20. Renesting rates following the loss of the original nest appear very low in Gunnison sage-grouse, with one study reporting 4.8 percent (Young 1994).

During the pre-egg laying period, female sage-grouse select forbs that have generally higher amounts of calcium and crude protein than sagebrush has (Barnett and Crawford 1994). Females with chicks move to areas containing succulent forbs and insects, often in wet meadow habitat, where cover is sufficiently tall to conceal broods and provide shade. Forbs dominate the summer diet of adult grouse, and sagebrush leaves are used the rest of the year (Leach and Hensley 1954; Wallestad 1975).

8

Chicks are precocial and leave the nest with the hen shortly after hatching.  The

availability of food and cover are key factors that affect chick and juvenile survival.

During the first 3 weeks after hatching, insects are the primary food of chicks (Patterson

**Deleted:** greater (and presumably Gunnison) sage-grouse

1952; Klebenow and Gray 1968; Peterson 1970; Johnson and Boyce 1990; Johnson and

Boyce 1991; Drut et al. 1994b; Pyle and Crawford 1996; Fischer et al. 1996b).  Diets of

4- to 8-week old greater sage-grouse chicks were found to have more plant material

(approximately 70 percent of the diet, of which 15 percent was sagebrush) (Peterson

1970).  Succulent forbs are predominant in the diet until chicks exceed 3 months of age,

at which time sagebrush becomes a major dietary component (Klebenow 1969; Connelly

and Markham 1983; Connelly et al. 1988; Fischer et al. 1996b).

During late summer and early fall, intermixing of broods and flocks of adult birds

is common and the birds move from riparian areas to sagebrush-dominated landscapes

that continue to provide green forbs.  From late autumn through early spring the diet of

greater and Gunnison sage-grouse is almost exclusively sagebrush (Rasmussen and

Griner 1938; Bean 1941; Batterson and Morse 1948; Patterson 1952; Leach and Hensley

1954; Barber 1968; Wallestad et al. 1975; Young et al. 2000).  Many species of

sagebrush can be consumed (Remington and Braun 1985; Welch et al. 1988, 1991; Myers

1992).  Flock size in winter is variable (15 to 100+), and flocks frequently consist of a

single sex (Beck 1977; Hupp 1987).  During particularly severe winters sage-grouse are

dependent on tall sagebrush, which is exposed even above deep snow, providing a

consistently available food source.  In response to severe winters, Gunnison sage-grouse

have been documented moving as far as 27 km (17 mi) (Root 2002).  The extent of

9

movement varies with severity of winter weather, topography, and vegetation cover. Sage-grouse may travel short distances or many miles between seasonal ranges. Movements in fall and early winter (September-December) exceed 3 km (2 mi).

Gunnison sage-grouse survival from April 2002 through March 2003 was 48 ($\pm$ 7) percent for males and 57 ($\pm$ 7) percent for females (Apa 2004). Higher survival rate of female sage-grouse may be due to sexual dimorphism (Schroeder et al. 1999). Gunnison sage-grouse female survival in small isolated populations was 52 ($\pm$ 8) percent, compared to 71 ($\pm$ 11) percent survival in the Gunnison Basin, the only population with greater than 500 individuals (Apa 2004). Other factors impacting survival rates include year and age (Zablan 1993).

Habitat

Sage-grouse are sagebrush obligates (Patterson 1952; Braun et al. 1977; Connelly et al. 2000a). They depend on a variety of shrub-steppe habitats throughout their life cycle and are considered obligate users of several species of sagebrush (Patterson 1952; Braun et al. 1976; Schroeder et al. 1999; Connelly et al et al. 2000a; Connelly et al. 2004). Sagebrush serves as a primary food for adults year-round (Wallestad et al. 1975) and also provides cover for nests (Connelly et al. 2000a). Sage-grouse move between seasonal ranges based on suitable habitat availability. Connelly et al. (2000a) segregated habitat requirements into four seasons: (1) breeding; (2) summer - late brood-rearing;

10

(3) fall; and (4) winter.  Depending on habitat availability and proximity, some seasonal habitats may be indistinguishable.

Breeding habitat includes leks, pre-laying, nesting, and early brood-rearing areas. Male Gunnison sage-grouse attend leks from mid-March to mid-May, which are typically in the same location from year to year.  Some Gunnison sage-grouse leks have been used since the 1950s (Rogers 1964).  Leks are usually flat to gently sloping areas of less than 15 percent grade in broad valleys or on ridges (Hanna 1936; Patterson 1952; Giezentanner and Clark 1974; Wallestad 1975; Autenrieth 1981; Klott and Lindzey 1989).  Leks have good visibility and low vegetation structure (Tate et al. 1979; Connelly et al. 1981; Gates 1985), and acoustical qualities that allow sounds of breeding displays to carry (Patterson 1952; Wiley 1973, 1974; Bergerud 1988; Phillips 1990).  Leks are often surrounded by denser shrub-steppe cover, which is used for escape, thermal, and feeding cover.

Leks can be formed opportunistically at any appropriate site within or adjacent to nesting habitat (Connelly et al. 2000a) and, therefore, lek habitat availability is not considered to be a limiting factor for sage-grouse (Schroeder 1997).  A relatively small number of dominant males accounts for the majority of breeding on each lek (Schroeder et al. 1999).

The pre-laying period is from late-March to April.  Generally, pre-laying habitats for sage-grouse need to provide a diversity of vegetation including forbs that are rich in

**Comment [JM6]:** We made a valid assumption, stick with it. ACCEPTED

**Deleted:** Although

**Deleted:**  little is known about pre-laying habitat for Gunnison sage-grouse,

**Deleted:** greater

11

calcium, phosphorous, and protein to meet the nutritional needs of females during the egg

development period (Barnett and Crawford 1994; Connelly et al. 2000a).

     Nesting occurs from mid-April to June.  Gunnison sage-grouse typically select

nest sites under sagebrush cover with some forb and grass cover (Young 1994), and

successful nests were found in higher shrub density and greater forb and grass cover than

unsuccessful nests (Young 1994).  The sagebrush understory of productive sage-grouse

nesting areas contains native grasses and forbs, with horizontal and vertical structural

diversity that provides an insect prey base, herbaceous forage for pre-laying and nesting

hens, and cover for the hen while she is incubating (Schroeder et al. 1999; Connelly et al.

2000a; Connelly et al. 2004).  Shrub canopy and grass cover provide concealment for

sage-grouse nests and young, and are critical for reproductive success (Barnett and

Crawford 1994; Gregg et al. 1994; DeLong et al. 1995; Connelly et al. 2004).  Few

herbaceous plants are growing in April when nesting begins, so residual herbaceous

cover from the previous growing season is critical for nest concealment in most areas

(Connelly et al. 2000a).

     Female sage-grouse have been documented to travel more than 20 km (13 mi) to

their nest site after mating (Connelly et al. 2000a).  Young (1994) found that

radio-tracked Gunnison sage-grouse nested an average of 4.3 km (2.7 mi) from the lek

nearest their capture site, with almost half nesting with 3 km (2 mi) of their capture site.

While earlier studies indicated that most greater sage-grouse hens nest within 3 km (2 mi)

of a lek, more recent research indicated that many hens actually move much further from

12

leks to nest based on nesting habitat quality (Connelly et al. 2004). Female Gunnison and greater sage-grouse exhibit general fidelity to nesting locations (Connelly et al. 1988; Young 1994; Connelly et al. 2004). The degree of fidelity to a specific nesting area appears to diminish if the female's first nest attempt in that area was unsuccessful (Young 1994; Connelly et al. 2004). However, there is no statistical indication that movement to new nesting areas results in increased nesting success (Connelly et al. 2004).

Early brood-rearing habitat is found close to nest sites (Connelly et al. 2000a), although individual females with broods may move large distances (Connelly 1982; as cited in Connelly et al. 2000a). Young (1994) found that Gunnison sage-grouse with broods used areas with lower slopes than nesting areas, high grass and forb cover, and relatively low sagebrush cover and density. Broods frequently used hay meadows, but were often flushed from interfaces of wet meadows and habitats providing more cover, such as sagebrush or willow-alder (Salix-Alnus). Forbs and insects are essential nutritional components for sage-grouse chicks (Klebenow and Gray 1968; Johnson and Boyce 1991; Connelly et al. 2004). Therefore, early brood-rearing habitat must provide adequate cover adjacent to areas rich in forbs and insects to assure chick survival during this period (Connelly et al. 2004).

As fall approaches sage-grouse move from riparian to upland areas and start to shift to a winter diet (Gunnison Sage-grouse Rangewide Steering Committee [GSRSC] 2005). By late summer and into the early fall, individuals become more social, and flocks are more concentrated (Patterson 1952). This is the period when Gunnison

13

Comment [JM7]: See Connelly 2004 pps 3-6 and 4-5. This cite does not support the statement, but Connolly 2004 does if you add my edit. ADDED ADDITIONAL CITATIONS TO SUPPORT STATEMENT AS WRITTEN

Comment [TG8]: We're citing to a steering committee for this kind of data!! *Legal implication* – Since when do steering committees of local schnooks produce best available science. Was this committee all scientists? This statement and cite do not pass the legal term of art known as the "straight face test!" What did this steering committee do? They are cited to extensively. I was not provided list of References... Should they be cited like a published report??? I can't tell if we are giving this group too much credit or not enough??? Didn't we know this tidbit on sage grouse movements before 2005??
THE STEERING COMMITTEE AUTHORED THE RANGEWIDE CONSERVATION PLAN, SO WE ARE CITING THEM CORRECTLY.

sage-grouse can be observed in atypical habitat such as agricultural fields (Commons 1997). However, radio-tracking studies in the Gunnison Basin have found that broods typically do not use hay meadows further away than 50 meters (m) (165 feet [ft]) of the edge of sagebrush stands (Gunnison Basin Conservation Plan 1997).

Movements to winter ranges are slow and meandering. Sagebrush stand selection in winter is influenced by snow depth (Patterson 1952; Connelly 1982 as cited in Connelly et al. 2000a) and in some areas, topography (Beck 1977; Crawford et al. 2004). Winter areas are typically characterized by canopy cover greater than 25 percent and sagebrush greater than 30-41 cm (12-16 in.) tall (Shoenberg 1982) associated with drainages, ridges, or southwest aspects with slopes less than 15 percent (Wallestad 1975; Beck 1977). Lower flat areas and shorter sagebrush along ridge tops provide roosting areas. In extreme winter conditions, greater sage-grouse will spend nights and portions of the day burrowed into "snow roosts" (Back et al. 1987).

Hupp and Braun (1989) found that most Gunnison sage-grouse feeding activity in the winter occurred in drainages and on slopes with south or west aspects in the Gunnison Basin. During a severe winter in the Gunnison Basin in 1984, less than 10 percent of the sagebrush was exposed above the snow and available to sage-grouse. In these conditions, the tall and vigorous sagebrush typical in drainages was an especially important food source.

Historical Distribution

14

Based on historical records, museum specimens, Gunnison sage-grouse historically occurred in southwestern Colorado, southeastern Utah  and possibly northwestern New Mexico.  .  Accounts of Gunnison sage-grouse in Kansas and Oklahoma, as suggested by Young et al. (2000), are not supported with museum specimens and Schroeder et al. (2004) found inconsistencies with the historic records and the sagebrush habitat currently believed to be necessary for Gunnison sage-grouse survival available in those areas.  Applegate (2001) found that none of the sagebrush species closely associated with sage-grouse occurred in Kansas.  He attributed historical, anecdotal reports as mistaken locations or misidentification of lesser prairie chickens.  For these reasons, southwestern Kansas and western Oklahoma are not considered within the historic range of Gunnison sage-grouse (Schroeder et al. 2004).  The historic range was modified from Schroeder et al. (2004), based on more complete knowledge of historic and current habitat and the distribution of the species (GSRSC 2005).  Based on this information, the maximum Gunnison sage-grouse historical (presettlement) range is estimated to have been 55,350 square kilometers (sq km) (21,370 square miles [sq mi]) (GSRSC 2005), although to be clear, only a portion of this range would have been occupied at any one time.

Current Distribution and Population Estimates

Gunnison sage-grouse currently occur in seven widely scattered and isolated populations in Colorado and Utah, occupying 4,720 sq km (1,820 sq mi) (GSRSC 2005)

**Deleted:** and potential sage-grouse habitat, Schroeder et al. (2004) concluded that

**Comment [ES9]:** THE SUGGESTED EDITS WOULD RENDER THE CITATION INCORRECT AND WOULD BE MISREPRESENTING WHAT IS IN THE PEER REVIEWED LITERATURE.  THUS, LEFT AS IS.

**Deleted:** northeastern Arizona, and southeastern Utah

**Deleted:** not all

**Comment [TG10]:** We need much more support/evidence for this number included in this finding. As with greater sage grouse, these historical estimates of habitat are more guess than science. What is the "more complete knowledge." I would prefer a historical range of estimates from conservative estimate to the number presented here. Plus, if the current range has been constant for the past 50/30/20 years, we need to say that. Then this dovetails with the relatively stable population estimates in Table 1. *Legal Implication* – Such a dramatic drop(from 21K square miles to 1.8K sq. mi., without explanation, i.e. little drop in occupied habitat in last 10/20/50 years – fuels claim that we are arbitrary and capricious by withdrawing #2 candidate which has suffered such a precipitous drop in habitat. ADDRESSED

15

(Figure 1).  The seven populations are Gunnison Basin, San Miguel Basin,

Monticello-Dove Creek, Piñon Mesa, Crawford, Cerro Summit-Cimarron-Sims Mesa,

and Poncha Pass.

16

**Figure 1.  Locations of Current Gunnison Sage-grouse Populations.**



17

Formatted: Left: 1.5", Top: 1", Width: 8.5", Height: 11"

Gunnison Basin Population - The Gunnison Basin is an intermontane basin that includes parts of Gunnison and Saguache Counties, Colorado. The current Gunnison Basin population is distributed across approximately 240,000 hectares (ha) (593,000 acres (ac)), roughly centered on the town of Gunnison. Elevations in the area range from 2,300-2,900 m (7,500-9,500 ft). Big sagebrush (Artemesia tridentata) dominates the upland vegetation and has a highly variable growth form depending on local site conditions. Approximately 51 percent of the occupied sage-grouse range in Gunnison Basin is managed by the Bureau of Land Management (BLM), 14 percent by the U.S. Forest Service (USFS), 2 percent by the National Park Service (NPS), 1 percent by CDOW, 1 percent by the Colorado State Land Board, and 31 percent is privately owned (GSRSC 2005).

Up to 84 leks have been surveyed annually for breeding activity in the Gunnison Basin (CDOW, unpubl. lit. 2005a). Approximately 37 percent of these leks occur on private land and 63 percent on public land, primarily BLM (GSRSC 2005). In 2005, 44 of these leks were active, 38 inactive, and 2 are of unknown status. The 2005 Gunnison Basin sage-grouse population estimate is 4,763 (CDOW, unpubl. lit. 2005a), up from 2,443 the previous year (GSRSC 2005. Rogers (1964) stated that Gunnison County had one of the largest sage-grouse populations in Colorado. The historic range has contracted 15-20 percent at its periphery. Citation?

**Comment [JM11]:** Remove or put the reason for the concern. If it's just someone's opinion, that's a problem if they have some factual reason (two counters in the same place on the same day likely counting the same birds twice) then explain why there is concern the count may be high. The comment just results in more questions than it answers. ACCEPTED EDIT.

**Deleted:** ), but

**Deleted:** there is concern that the 2005 estimate may be high (Garton 2005).

**Comment [JM12]:** Is this statement based on any kind of data or is it opinion? GSRSC doesn't have the same requirements for best data that we have. ADDED CITATION. DELETED SENTENCE BELOW.

**Deleted:** Historically, Gunnison sage-grouse likely occurred in all suitable sagebrush habitats in the Gunnison Basin (GSRSC 2005).

San Miguel Basin Population - The San Miguel Basin population is in Montrose and San Miguel Counties in Colorado, and is composed of six groups using different areas—Dry Creek Basin, Hamilton Mesa, Miramonte Reservoir, Gurley Reservoir, Beaver Mesa, and Iron Springs.  Some of these six areas are used year-round by sage-grouse, and others are used seasonally.  Recent radiotelemetry studies have suggested that sage-grouse in the San Miguel Basin move widely and between these areas (Apa 2004; Stiver, unpubl. lit. 2005).

The area in the Dry Creek Basin occupied by Gunnison sage-grouse is approximately 24,800 ha (61,300 ac) (GSRSC 2005).  Sagebrush habitat in this area is patchily distributed and the understory is either lacking in grass and forb diversity (i.e., less than three species per acre), or nonexistent.  Where irrigation is possible, private lands in the southeast portion of Dry Creek Basin are cultivated.  Sagebrush habitat on private land has often been heavily thinned, or removed entirely. Citation?

The Dry Creek area is managed by BLM (57 percent), CDOW (12 percent), Colorado State Land Board (1 percent), and 30 percent is privately owned (GSRSC 2005).  Occupied habitat on the Hamilton Mesa is approximately 1,900 ha (4,800 ac).  Gunnison sage-grouse use this area in the summer, but use during other seasons is unknown.

Hamilton Mesa is primarily in private ownership (85 percent), with limited Colorado State Land Board (11 percent) and BLM (4 percent) managed property.  Miramonte Reservoir occupied sage-grouse habitat is approximately 4,700 ha (11,600 ac)

19

(GSRSC 2005).  Sagebrush stands are generally contiguous with a mixed grass and forb

understory.  Land ownership is 76 percent private, 15 percent CDOW, 7 percent USFS,

and 2 percent BLM (GSRSC 2005).

Occupied habitat at the Gurley Reservoir area is about 3,000 ha (7,500 ac)

(GSRSC 2005).  Sagebrush habitat is heavily fragmented and the understory is a mixed

grass and forb community.  Farming attempts in the early 20th century led to the removal

of much of the sagebrush.  Agricultural activities now are restricted primarily to the

seasonal irrigation of pasture.  Sagebrush has reestablished in most of the failed pastures,

but grazing pressure and competition from introduced grass species have kept the overall

sagebrush representation low.  A large portion of the area (91 percent) is privately owned

with the rest being managed by USFS (4 percent), BLM (3 percent), and the Colorado

State Land Board (2 percent) (GSRSC 2005).

Comment [TG13]: These statements need support! Legal sufficiency nexus – Unsupported statements garner little discretion from courts. Similar statements elsewhere in finding do have citations attached, so should these. ADDED CITATION

Comment [JM14]: What's the basis for this statement. ADDED CITATION

There are approximately 2,600 ha (6,400 ac) of occupied habitat at Iron Springs

and 3,600 ha (8,800 ac) at Beaver Mesa (GSRSC 2005).  Sagebrush stands in these areas

are contiguous with a mixed grass understory.  The Beaver Mesa area has numerous

scattered patches of oakbrush (Quercus gambelii).  Land ownership in both areas is

mainly private (Beaver Mesa, 99.5 percent; Iron Springs, 89 percent).  The remaining

portion of Beaver Mesa (0.5 percent) is managed by BLM.  At Iron Springs the

remainder is managed by USFS (6 percent), and the Colorado State Land Board

(5 percent) (GSRSC 2005).

20

The 2005 population estimate for the entire San Miguel Basin was 334 (CDOW, unpubl. lit. 2005b) on 9 leks.  Rogers (1964) reported that all big sagebrush-dominated habitats in San Miguel and Montrose Counties were historically used by sage-grouse. The historic distribution was highly fragmented by forests, rocky canyons and dry basins void of sagebrush habitats.

Monticello-Dove Creek Population - This population has two disjunct groups of Gunnison sage-grouse.  Currently, the largest group is near the town of Monticello, Utah. Gunnison sage-grouse in this group inhabit a broad plateau on the northeast side of the Abajo Mountains with fragmented patches of sagebrush interspersed with large grass pastures and agricultural fields.  The Utah Division of Wildlife Resources (UDWR) estimates that Gunnison sage-grouse currently occupy about 24,000 ha (60,000 ac) in the Monticello group.  Most currently-occupied habitat is in private ownership (95 percent) with 4 percent BLM and 1 percent State of Utah land (GSRSC 2005).  The 2005 population estimate for Monticello was 162 individuals with 2 active and 2 inactive leks (G. Wallace, UDWR pers. comm. 2005).  Leks in the Monticello area were first identified and counted in 1968.  Personal accounts of

> **Comment [JM15]:** Anecdote. And it doesn't matter, what we care about is what is happening now in terms of threats. ACCEPTED DELETION.

> **Deleted:** Gunnison sage-grouse observations from long-time county residents indicate that the historic range in the Monticello area extended from the current distribution about 40 km (25 mi) north, about 24 km (15 mi) south, east to the Colorado border, and west to the base of the Abajo Mountains (GSRSC 2005).

The Dove Creek group is located primarily in western Dolores County, Colorado, north and west of Dove Creek, although a small portion of occupied habitat extends north into San Miguel County.  The estimated occupied area is 11,500 ha (28,300 ac).  Habitat north of Dove Creek is characterized as mountain shrub habitat, dominated by oakbrush interspersed with sagebrush.  The area west of Dove Creek is dominated by sagebrush,

21

but the habitat is highly fragmented. Approximately 87 percent of occupied habitat is privately owned, and 13 percent is managed by BLM (GSRSC 2005). Lek counts in the Dove Creek area were over 50 males in 1999, suggesting a population of about 245 birds, but declined to 7 males in 2005, with a resulting population estimate of 34 (CDOW, unpubl. lit. 2005c). All leks are located in agricultural fields on private lands. Low sagebrush canopy cover, as well as low grass height, exacerbated by drought, may have led to nest failure and subsequent population declines (Connelly et al. 2000a; Apa 2004). Rogers (1964) reported that all sagebrush-dominated habitats in Dolores and Montezuma Counties in Colorado were historically used by sage-grouse. The historic distribution was highly fragmented by pinyon, juniper, and rocky canyons. ↓

Piñon Mesa Population - The Piñon Mesa population occurs on the northwest end of the Uncompahgre Plateau in Mesa County, about 35 km (22 mi) southwest of Grand Junction, Colorado. The estimated occupied range is 15,700 ha (38,900 ac). Land ownership is 70 percent private, 28 percent BLM, and 2 percent USFS (GSRSC 2005). The 2005 population estimate for this area is 167 (CDOW, unpubl. lit. 2005d). Eight leks are known (CDOW, unpubl. lit. 2004). However, one is inactive and another was not active in 2005 (CDOW unpubl. lit. 2005d). The Piñon Mesa area may have additional leks, but the high percentage of private land, a lack of roads, and heavy snow cover during spring makes locating additional leks difficult. ↓ Sage-grouse occupied an area of the Uncompahgre Plateau to the south as recently as the 1980s.

Crawford Population - The Crawford population of Gunnison sage-grouse is in Montrose County, Colorado, about 13 km (8 mi) southwest of the town of Crawford and

**Comment [JM16]:** Is it possible that the birds went elsewhere? NO; LEK COUNTS WOULD HAVE DETECTED IT.

**Comment [TG17]:** What does Rogers(1964) say about Gunnison Sage grouse as opposed to Greater Sage Grouse. GSG wasn't recognized species in 1964…. How do we know that Rogers is always talking about GSG and not Greater Sage grouse?? GUSG WAS THE ONLY ONE IN THOSE COUNTIES. THEY ARE OUTSIDE THE RANGE OF GRSG

**Comment [JM18]:** I think this sentence means that historically the distribution was always fragmented? Or does it mean that it has been fragmented from what it was historically. Also, the 1964 cite is based on data or anecdote? DELETED SENTENCE SINCE NO CITATION

**Comment [JM19]:** Is this important? We aren't really providing this information in any of the other descriptions of the habitats. DELETED SENTENCE

**Deleted:** Genetic

**Deleted:** data suggest that the Monticello group and the Dove Creek group are one population (GSRSC 2005), although there appears to be a relatively recent physical separation due to habitat changes.¶

**Comment [JM20]:** Speculation. Also, doesn't really matter, we're looking at the situation today. DELETED SENTENCE

**Comment [JM21]:** Do they not occupy it now? Or we don't know because it's private land. EDITED TEXT

**Deleted:** Gunnison

**Deleted:** sage-grouse likely occurred historically in all suitable sagebrush habitat in the Piñon Mesa area (Rogers 1964), an area much larger than the currently occupied habitat.

**Comment [TG22]:** Citation? ADDED

22

north of the Gunnison River.  Approximately 14,000 ha (35,000 ac) of habitat are currently occupied.  Basin big sagebrush (A. t. tridentata) and black sagebrush (Artemesia nova) dominate the mid-elevation uplands.  Approximately 63 percent is managed by BLM, 13 percent NPS, and 24 percent is privately owned (GSRSC 2005).

The 2005 population estimate for Crawford is 191 (CDOW, unpubl. lit. 2005e).  Currently there are four active leks in the Crawford population on BLM lands in sagebrush habitat adjacent to a 11-km (7-mi) stretch of road.  This area represents the largest contiguous sagebrush-dominated habitat within the Crawford boundary.

> **Comment [TG23]:** Does this report support the previous two sentences as well?? YES ADDED CITATION

> **Comment [TG24]:** Citation? ADDED

Cerro Summit–Cimarron–Sims Mesa Population - This population is in Montrose County, Colorado and has an estimated population of 25 birds (CDOW, unpubl. lit. 2005b).  The Cerro Summit-Cimarron group is centered about 24 km (15 mi) east of Montrose, and occupies approximately 13,100 ha (32,300 ac).  The habitat consists of patches of sagebrush habitat fragmented by oakbrush and irrigated pastures.  Land ownership is approximately 81 percent private, 12 percent CDOW (Cimarron State Wildlife Area), and 7 percent BLM land (GSRSC 2005).  Three leks are known in the Cerro Summit-Cimarron group, but only one was verified to be active in 2005.  Rogers (1964) noted a small population of sage-grouse in the Cimarron River drainage, but did not report population numbers.  He noted that lek counts at Cerro Summit in 1959 listed four individuals.

> **Comment [TG25]:** This is an example of a small populations that has not blinked out and one that may be better off now than it was 40 years ago….*Legal implication*: This information needs to be squared with your statements in the next section in support of the model that claims small populations like this will go extinct in 5 years…Consistency and transparent analyses are important to gain discretion and avoid being labeled as arbitrary and capricious. ADDRESSED ELSEWHERE IN DOC. WE CHOSE THE CONSERVATIVE ROUTE AND MADE THE ASSUMPTION IT WOULD GO EXTINCT AS THE PVA PREDICTS

The 2,100-ha (5,300-ac) Sims Mesa area about 11 km (7 mi) south of Montrose consists of small patches of sagebrush that are heavily fragmented by pinyon-juniper,

23

residential and recreational development, and agriculture.  Land ownership is

approximately 43 percent private, 51 percent BLM, and 6 percent CDOW (GSRSC

2005).  The one known lek in Sims Mesa is inactive.  Rogers (1964) counted eight males

in a lek count at Sims Mesa in 1960.  It is not known if sage-grouse move between the

Cerro-Summit-Cimarron and Sims Mesa groups.

Poncha Pass Population - The Poncha Pass sage-grouse population is located in

Saguache County, approximately 16 km (10 mi) northwest of Villa Grove, Colorado.

This population was established through the introduction of 30 birds from the Gunnison

Basin in 1971 and 1972 during efforts to reintroduce the species to the San Luis Valley

(GSRSC 2005).  The known population distribution is in sagebrush habitat from the

summit of Poncha Pass extending south for about 13 km (8 mi) on either side of U.S.

Highway 285.  The estimated range of the population is about 8,300 ha (20,400 ac).

Sagebrush in this area is extensive and continuous with little fragmentation; sagebrush

habitat quality throughout the area is adequate (Nehring and Apa 2000).  San Luis Creek

runs through the area, providing a year-round water source and lush, wet meadow

riparian habitat for brood-rearing.  The BLM manages 48 percent of the area, USFS

manages 26 percent, 24 percent is in private holdings, and 2 percent is managed by the

Colorado State Land Board (GSRSC 2005).  The 2005 Poncha Pass sage-grouse

population estimate is 44 (CDOW, unpubl. lit. 2005f).  The only current lek is located on

BLM-administered land.  In 1992, a CDOW effort to simplify hunting restrictions

inadvertently opened the Poncha Pass area to sage-grouse hunting and at least 30 grouse

were harvested from this population.  Due to declining population numbers since the

24

1992 hunt, CDOW transplanted 24 additional birds from the Gunnison Basin (Nehring and Apa 2000). In 2001 and 2002, 20 and 7 birds respectively also were moved to the Poncha Pass by CDOW (GSRSC 2005). Transplanted females have bred successfully (Apa, CDOW, pers. comm. 2004) and display activity resumed on the historic lek in spring 2001.

Please make a chart like the following (you can change the words etc, I cut and pasted from the prose above) but it would be helpful to see this information tabulated so that each area gets the same information.

Comment [ES26]: DONE

25

| Population | Range Size | Habitat description | Population Description | Development pressure |
|---|---|---|---|---|
| Gunnison Basin Population | 240,000 hectares (ha) (593,000 acres (ac)) | Approximately 51 percent of the occupied sage-grouse range in Gunnison Basin is managed by the Bureau of Land Management (BLM), 14 percent by the U.S. Forest Service (USFS), 2 percent by the National Park Service (NPS), 1 percent by CDOW, 1 percent by the Colorado State Land Board, and 31 percent is privately owned (GSRSC 2005). | The 2005 Gunnison Basin sage-grouse population estimate is 4,763 (CDOW, unpubl. lit. 2005a), up from 2,443 the previous year (GSRSC 2005) | |
| San Miguel Basin Population | | | | |
| Monticello-Dove Creek Population | | | | |
| Piñon Mesa Population | | | | |
| Crawford Population | | | | |
| Cerro Summit– Cimarron–Sims Mesa Population | | | | |
| Poncha Pass Population | 8,300 ha (20,400 ac) | Sagebrush in this area is extensive and continuous with little | 65 birds, some transplanted and thriving. | Little development pressure |

Formatted: Font: Bold

Formatted: Line spacing:  single

Formatted: Line spacing:  single

Formatted: Line spacing:  single

Formatted: Line spacing:  single

Formatted: Line spacing:  single

Formatted: Line spacing:  single

Comment [JM27]: Is this right? Can't tell from the writeup, but assumed since silent, it isn't a problem.  RO CLARIFIED

26

| | | fragmentation; sagebrush habitat quality throughout the area is adequate | | |
|---|---|---|---|---|
| | | | | |
| | | | | |

Population Analyses

27

The CDOW contracted for a population viability analysis (PVA) for the Gunnison sage-grouse (Miller 2004). The PVA is a tool used to predict the probability of extinction for a wildlife population under various management scenarios. They are typically based on available population data which are often inadequate for a complete understanding of complex systems. Therefore, PVAs only provide an approximation of how a species may respond to various management alternatives without consideration of threats. Also, since a PVA is a model, it does not present a complete picture of the system (GSRSC 2005 and references therein).

The purpose of the Gunnison sage-grouse PVA was to assist the CDOW in evaluating the relative conservation value of each Gunnison sage-grouse population and to identify critical gaps in the knowledge of Gunnison sage-grouse in prioritizing management options for this species, particularly in relation to maintenance of genetic diversity and the need for population augmentation. The results of this analysis indicated that small populations (<50 birds) are at a serious risk of extinction within the next 50 years. In contrast, populations in excess of 500 birds had an extinction risk of less than 5 percent within the same time period. These results suggest that the Gunnison Basin population is likely to persist long term and, in the absence of intervention, the Cerro Summit-Cimarron-Sims Mesa and Poncha Pass populations and the Dove Creek group of the Monticello-Dove Creek population are likely to be extirpated.

The remaining populations currently have estimated numbers between 150 and 350 birds, up from 125-250 in 2004, and their relative extinction risk as determined by

**Formatted:** Font: 12 pt

**Formatted:** Line spacing: Double

**Comment [TG28]:** We just learned that Ponch Pass population with 44 birds is relatively stable and responding to man. Actions by CDOW etc…doesn't sound like that are at a serious risk of extinction…..Small populations, where threats are not controlled, and where re-introduction does not occur, may be at risk, but not all small populations…. THE PONCHA PASS POP WAS AUGMENTED TO PREVENT ITS EXTINCTION. THIS IS EXPLAINED ELSEWHERE IN THE DOC

**Comment [TG29]:** Without discussing specific situations/risks, we cannot say this!! SEE PREVIOUS COMMENT RESPONSE

**Formatted:** Font: 12 pt

28

the PVA is between those extremes.  ~~The model summary concludes that loss of quality habitat will lead to increases in extinction risk unless remedial measures are taken (GSRSC~~ 2005).

**Formatted:** Strikethrough

**Comment [TG30]:** I would suggest totally rewriting this paragraph..Remedial measures are taken all the time….Dozens of major remedial measures have been completed in past few years. But this finding is not dependent on conservation actions in the future…it is based on current status. Keeping this last sentence in is a kiss of death to this finding, because it says we need conservation measures to make this species viable, and we are supposed to say that this finding is not dependent on future conservation actions….. Legal sufficiency analysis – This last sentence is a fatal flaw and will likely lead to an arbitrary and capricious finding if it remains as is in this finding! SEE 2 PREVIOUS COMMENT RESPONSE AND REWRITTEN DISCUSSION NOW IN FACTOR E

Trends in abundance were analyzed for individual populations and the species rangewide using male lek count data from CDOW and UDWR (Garton 2005).  While this analysis has not yet been peer reviewed, and thus has a lower level of confidence, it is the best available information at this time.  Due to inconsistencies in data collection over time, trend analyses were conducted for two time periods--the entire number of years lek data have been collected (1957–2005), and from 1995-2005 when sampling methodologies have been more consistent.  Raw data collected for 2005 show a large increase in the numbers of males attending leks, but CDOW believes this may have been the result of "double counting" males as a result of aberrant weather conditions (Garton 2005).  Because of this, the analyses were conducted both with and without 2005 data. Statistical analyses of the Cerro Summit-Cimarron-Sims Mesa and Dove Creek populations could not be completed due to low lek counts and inconsistencies in sampling over time.  Similarly, the small Poncha Pass population was not analyzed because it has been surveyed for only 6 years and in that time the population was augmented with birds from Gunnison Basin.

**Comment [TG31]:** What do you mean "aberrant weather conditions" Do you mean rain? REWROTE

**Comment [TG32]:** Double counting is always an issue! Other surveys have accounted for this, this one should have also…So if there is drought, we have few males, and everybody wrings their hands and cries the sky is falling! When it rains and sage grouse numbers improve, we questions the increase because our surveyors don't like to count birds in the rain…Good grief! Is Garton with CDOW? If he is not, then why are we citing to him for an alleged DCOW belief?? How does an agency believe? Why is double-counting in quotes? If it is from a statement from CDOW, then cite to that statement.  *Legal sufficiency analysis* – Sloppy citations and insufficient support for statements in finding lead to lost credibility, which leads to a loss of deference, which leads to more of a likelihood this finding will be declared arbitrary and capricious. REWROTE

The long-term analysis (1957-2005) found that the rangewide population of Gunnison sage-grouse was neither increasing nor decreasing during that time period.

29

Annual rates of change were highly variable, most likely as a result of sampling error rather than actual changes in population sizes. The shorter analysis period (1995-2005) yielded the same results, although the variability was reduced, likely due to more consistent data collection methods. Individual populations reflected the trends in the rangewide analysis, in that some populations were slightly increasing and some were slightly decreasing (Table 1). Estimates did not change significantly when the 2005 lek counts were omitted in this analysis. As with similar analyses conducted for the greater sage-grouse (Connelly et al. 2004), density-dependent models appeared to more accurately describe observed population trends (Garton 2005).

Table 1. Summary of population trends for the Gunnison sage-grouse. Values are the finite rate of change in the population, where 1 is no change, numbers less than 1 indicate a decline, and numbers greater than 1 indicate an increase. The analysis is for 1995-2005 (data from Garton 2005).

| POPULATION | FINITE RATE OF CHANGE |
|---|---|
| Rangewide | 0.98 |
| Gunnison Basin | 1.05 |
| Piñon Mesa | 1.09 |
| San Miguel Basin | 0.9 |
| Crawford | 0.999 |
| Monticello | 0.99 |

Summary of Factors Affecting the Species

Section 4 of the Act (16 U.S.C. 1533) and regulations (50 CFR Part 424) promulgated to implement the listing provisions of the Act set forth the procedures for adding species to the Federal lists. A species may be determined to be an endangered or

30

**Comment [TG33]:** This table points to the fact that GSG have been pretty stable during the past 50 years…this is contradictory with prior analysis which stated that the small pops among these should have blinked within 5 years of when they were counted…Why can't small populations be stable or growing? *Legal sufficiency analysis* – The model is not consistent with historical fact. I think we should jettison the part of the PVA analysis that claims small populations will blink out within 5 years. Then what we know about these small pops will be consistent the trend data and the finding that GSG has been stable over time. We can be internally consistent without stretching the truth or misrepresenting the facts and science. We can say that we are not adopting the model's prediction of extinction because reality shows that these populations have not blinked out. If there are other factors (threats) that cause us to believe these small populations will go extinct within 5 years, then we need to state what those threats are and why we believe they are serious. We don't do that here. Instead, we rely on a model's prediction that is contrary to known facts and data, an arbitrary and capricious decision in my opinion. THESE NUMBERS REFER TO PAST CHANGES, WHEREAS THE PVA LOOKED AT RELATIVE RISK OF EXTINCTION OVER THE NEXT 50 YEARS

**Comment [TG34]:** We need two tables…One for 1995-2005 and one 1957 to 2005. WE USE THE SHORTER PERIOD SINCE THE LISTING DETERMINATION IS BASED ON CURRENT AND FUTURE, NOT PAST.

**Comment [JM35]:** Moved, not deleted. IT WAS MOVED TO THE END OF THE DOC. SO RO DELETED; HOWEVER, THE DELETION RENDERS THE SECTION INCOMPLETE BECAUSE THE GENETIC STUDY HAD POPULATION IMPLICATIONS.

**Deleted:** ¶
Oyler

**Deleted:** -McCance et al, (2005) conducted a genetic analysis of Gunnison sage-grouse populations using mitochondrial DNA sequence and nuclear microsatellite data. The Cerro Summit-Cimarron-Sims Mesa population was not included in this analysis due to inadequate sample sizes. The Poncha Pass population also was not included as it is composed of individuals transplanted from Gunnison Basin. In general, Gunnison sage-grouse have low levels of genetic diversity when compared to the greater sage-grouse (Oyler-McCan[ ... [1] ]

threatened species due to one or more of the five factors described in section 4(a)(1).

Using population estimate numbers determined in the PVA to represent high relative

extinction risk, we have assumed that the Cerro Summit-Cimarron-Sims Mesa, and

Poncha Pass populations and the Dove Creek group of the Monticello-Dove Creek

population may be extirpated in the foreseeable future. These populations do not

comprise a significant portion of the range of the Gunnison sage-grouse, as they are small

and isolated. If the species as a whole faced similar extinction risk, it would meet the

definition of threatened or endangered. However, the PVA does not support that

conclusion. However, the PVA does not take into consideration future threats and

therefore, an analysis of threats is required for those remaining populations to determine

whether the species as a whole meets the definition of threatened or endangered.

| | Deleted: allow us to draw |
| | Deleted: In addition, |
| | Deleted: . T |

The Service considers the foreseeable future in Gunnison sage-grouse to be

between 30 and 100 years based on 10 Gunnison sage-grouse generations to 2 sagebrush

habitat regeneration cycles. This is consistent with our 12-month finding for the greater

sage-grouse (70 FR 2244). In preparing the greater sage-grouse document, we relied on

the consensus of an expert panel which concluded that 30-100 years was a reasonable

timeframe. Because the Gunnison sage-grouse has the same generation time and

occupies habitat similar to the greater sage-grouse, we consider it prudent to use the same

definition for foreseeable future.

**A. The Present or Threatened Destruction, Modification, or Curtailment of Its**

**Habitat or Range.**

| | Deleted: A. |

31

**NOTE:**  This section was very disjointed and difficult to follow.  Most importantly, we make no distinction between past effects and threats, and ongoing activities that are damaging sage grouse habitat and threatened activities that will damage habitat. Many of the statistics in paragraph form would be better displayed in tables.  Also, we don't provide the same information for each of the population areas. For example, we note the Gunnison basin is safe from development and then note several others are not, but as to the remainder we are silent.  It would be useful to have this information tabulated, and to provide the same information for all the populations.  We also draw no conclusions after spending lots of time discussing various habitat impacts.  The point of this entire exercise is to draw conclusions and support them.  Finally, we do not adequately characterize the data.  In several places, and the roads section comes to mind, we make a number of assertions, all of which are supported by only one paper, but explicitly contradicted by others; we ought to mention that there is disagreement on the issue, and not leave the impression that the assertion is a settled fact.

Pre-European settlement, we have data indicating that the the Gunnison sage-grouse was found in central and southwest Colorado, southeast Utah, northwestern New Mexico, and northeastern Arizona (GSRSC 2005, modified from Schroeder et al. 2004).

Gunnison sage-grouse currently occupy 4,719 sq km (1,822 sq mi) in [list states] (GSRSC 2005, modified from Schroeder et al. 2004).  The current habitat range and quality varies from high to low and fragmented.

Current threat due to habitat Fragmentation

| Deleted: | available habitat for |
| Deleted: | is estimated at 55,360 sq km (21,376 sq mi) |
| Deleted: | r |
| Deleted: | of the habitat |
| Deleted: | has been reduced primarily by habitat loss, modification, and fragmentation |
| Deleted: | H |

32

Habitat fragmentation is the separation or splitting apart of previously contiguous, functional habitat of a species.  Fragmentation can result from direct habitat losses that leave the remaining habitat in noncontiguous patches, or from modification of habitat areas that render the modified patches unusable to a species (i.e., functional habitat loss). Functional habitat losses include disturbances that remove one or more habitat functions, introduce physical barriers that prevent the use of otherwise suitable areas, and that prevent animals from using suitable habitat patches due to behavioral avoidance.

Fragmentation of sagebrush habitats has been cited as a primary cause of the decline of sage-grouse populations (Patterson 1952; Connelly and Braun 1997; Braun 1998; Johnson and Braun 1999; Connelly et al. 2000a; Miller and Eddleman 2000; Schroeder and Baydack 2001; Aldridge and Brigham 2003; Pedersen et al. 2003; Connelly et al. 2004; Schroeder et al. 2004).  While sage-grouse are dependent on interconnected expanses of sagebrush (Patterson 1952; Connelly et al. 2004), data are not available regarding optimum or even minimum sagebrush patch sizes to support populations of sage-grouse.  In addition, there is a lack of data to assess how fragmentation influences specific sage-grouse life history parameters such as productivity, density, and home range.  Notwithstanding the lack of specificity on effects of fragmentation,  it is clear that as a whole, fragmentation can have an adverse effect on sage grouse populations.  The following sections examine activities that can contribute to habitat fragmentation to determine whether their existence threatens Gunnison sage grouse habitat.

33

**Formatted:** Indent: First line:  0"

**Comment [JM36]:** This needs clarification, habitat's successional state is constantly changing as habitat grows. What we are talking about is a sudden change that results in removal or significant reduction in a successional state when there is no replacement habitat of suitable quality. DELETED SENTENCES

**Deleted:** change a habitat's successional state or

**Deleted:** clude

**Deleted:** activities

**Comment [TG37]:** e have to start talking specifically about Gunnison Sage Grouse…not greater sage grouse!!Legal analysis – This sloppiness not only threatens this finding, it makes Interior vulnerable on the greater sage grouse finding.
WE DISCUSSED THE APPROPRIATENESS OF GREATER SG DATA EARLIER IN THE FINDING.

**Deleted:** .

**Comment [JM38]:** Deleted this phrase because we can't say how large or how contiguous.  The point is the same, it's fragmentation that's a problem. ACCEPTED

**Deleted:** since

**Deleted:**  the species requires large expanses of contiguous sagebrush

**Deleted:** However,

**Deleted:** H

Water development and conversion to agriculture

Early explorers reported seeing little fauna for days prior to settlement of the sage grouse lands. (Owynhee County public comments on Greater Sage Grouse listing petition). However, in the mid-1800s western rangelands were converted to agricultural lands on a large scale beginning with the series of Homestead Acts in the 1800s (Braun 1998; Hays et al. 1998), especially where suitable deep soil terrain and water were available (Rogers 1964). Initially, increased water supplies and native predator control increased sage grouse populations. However, as time passed, introduced predators and plants as well as influences resulting from urban and agricultural activities reduced available habitat for sage grouse to the point it exists today.

Dams reduced land available to grouse and the irrigation projects associated with them has resulted in additional sage-grouse habitat loss (Braun 1998). Past reservoir development in the Gunnison Basin flooded 3,700 ha (9,200 ac or 1.5 percent) of likely sage-grouse habitat. Three other reservoirs inundated approximately 11 percent of habitat in the San Miguel Basin population area. We are unaware of any plans for additional reservoir construction in the foreseeable future and thus do not consider water development and the associated agricultural conversion to be a threat.

Agricultural conversion can provide some limited habitat for sage grouse. Some crops such as alfalfa (Medicago sativa) and young bean sprouts (Phaseolus spp.) are eaten

34

**Comment [JM39]:** This little sentence is a non-sequitur. We accept that fragmentation is a problem, even though we can't assign cause and effect more specifically.  ACCEPTED

**Deleted:** abita

**Deleted:** t fragmentation can allow the incursion of different species between areas of suitable habitat and along the edge of the remaining habitat.  Some of these species may be predators (Wilcove et al. 1986).¶

**Comment [JM40]:** This cite is not applicable.  They examined passerine birds, not galliform birds which is the order that sage grouse belong to.  DELETED PARAGRAPH

**Deleted:** While sage-grouse are dependent on interconnected expanses of sagebrush (Patterson 1952; Connelly et al. 2004), data are not available regarding minimum sagebrush patch sizes to support populations of sage-grouse. Estimating the impact of habitat fragmentation on sage-grouse is complicated by time lags in response to habitat changes, particularly since sage-grouse will continue to return to altered breeding areas (leks, nesting areas, and early brood-rearing areas) due to strong site fidelity despite nesting or productivity failures (Wiens and [...2]

**Comment [JM41]:** Moved, not deleted. IT WAS MOVED TO EN [...3]

**Deleted:** Oyler

**Deleted:** -McCance et al. (2005) concluded that gene flow among [...4]

**Deleted:** C

**Deleted:** A

**Comment [ES42]:** DID NOT ACCEPT BECAUSE SOURCE N [...5]

**Deleted:** W

**Deleted:** I

**Deleted:** adjoining sagebrush habitats extend into those habitats, and include

**Comment [ES43]:** NOT ABLE TO ACCEPT.  NO CITATIONS AND [...6]

**Comment [JM44]:** Moved  DID NOT FIND WHERE MOVED.  THUS, [...7]

**Deleted:** increased predation and reduced nest success due to predat [...8]

**Deleted:** development of irrigation projects to support agricultural [...9]

**Deleted:** Though some crops such as alfalfa (Medicago sativa) and yo [...10]

**Deleted:** ¶

**Formatted:** Indent: First line: 0"

or used for cover by sage-grouse (C. Braun, CDOW, pers. comm. 1998).  However, crop

monocultures do not provide adequate year-round food or cover (GSRSC 2005).

Gunnison sage-grouse will use hay pastures for foraging within about 50 m (165 ft) of the

edge of the field but do not forage further into the pasture due to lack of suitable habitat

(Gunnison Basin Conservation Plan 1997).

With respect to Acreage in cropland declined from 1992 to 1997 in Delta,

Gunnison, Mesa, Montrose, and Saguache Counties by 3, 22, 6, 17, and 10 percent,

respectively (Colorado Department of Agriculture 2004).  However, it increased by

28 percent in San Miguel County.  Acreage in pastureland also decreased from

1992-1997 in Gunnison, Mesa, Montrose, and San Miguel Counties, by 20, 6, 21, and

13 percent, respectively.  Pastureland increased in Delta County by 7 percent and

Saguache County by 1 percent. What were the reductions replaced by?  Development?

Or was the land allowed to lie fallow? I think it makes a difference.

> **Comment [JM45]:** there is no context for these numbers.  Are the percentage decreases available in acres?  And the conversions, did they take place 100 years ago or 10 years ago?  TOOK PLACE 1992-1997 AS STATED.  DO NOT HAVE TIME TO FIND THE ACREAGES, BUT SEE ACRES IN PARAGRAPHS BELOW.

> **Comment [JM46]:** Is there no more recent data?  1997 was nearly a decade ago.  THERE ARE NO DATA THAT ARE MORE RECENT.  THE DATA WERE MADE AVAILABLE IN 2004.  IT TOOK THAT LONG FOR THE ANALYSIS.

> **Comment [ES47]:** THAT WASN'T ADDRESSED IN THE ANALYSIS. WE DO NOT KNOW.

In the Gunnison Basin approximately 17,328 ha (42,800 ac) or 8 percent of the

current range was converted to agricultural activities in the past (GSRSC 2005).

Approximately 5,700 ha (14,000 ac) or 7 percent of habitat in the San Miguel Basin has

been converted to agriculture.  The arrangement of these converted lands has contributed

to habitat fragmentation in this area.

> **Comment [JM48]:** Does that mean that the current range is occupied despite ag conversion or that the ag conversion was allowed to lapse back into pasture.  NO.  RO CLARIFIED SENTENCE.

Approximately 30 percent of the 40,048 ha (98,920 ac) of total occupied habitat

in the Monticello-Dove Creek population has been converted to agriculture (GSRSC

35

2005).  In the Monticello group, 43 percent has been converted to pasture (GSRSC 2005).

San Juan County, Utah, where the Monticello group resides, also has approximately

15,000 ha (37,000 ac) enrolled in Conservation Reserve Program (CRP), of which about

half is within the current sage-grouse range (San Juan County Gunnison Sage-grouse

Work Group [GSWG], unpubl. lit. 2005; GSRSC 2005).  Under CRP, cropland is planted

to pastureland and, except in emergency situations, not hayed or grazed.  The CRP fields

are used heavily by grouse as brood-rearing areas but vary greatly in plant diversity and

forb abundance, and generally lack any shrub cover (GSRSC 2005).  Sagebrush patches

have progressively become smaller and more fragmented limiting the amount of available

winter habitat for the Monticello group (GSRSC 2005).  Significant use of CRP as

nesting or winter habitat will require establishment of sagebrush stands in these fields.

The CRP has protected this area from more intensive agricultural use and development,

and approximately 16,000 ha (40,000 ac) of CRP are up for renewal under the Farm Bill

in the next 2-3 years.  If this program is not continued, most of these lands will likely be

put back into crop production (GSRSC 2005).

**Comment [TG49]:** We don't know that. Some of these lands may also be subject to State conservation easements etc.
DELETED SENTENCE

**Comment [JM50]:** What are the odds of this occurring?  We are trying to assess threats here, so,  the program has been in place for 20 years, and there is no move to discontinue it, it's not likely to go away, so we ought not be raising it as an issue.  If however, we have reason to believe it won't be continued, then we should say so and include it as a threat.
DELETED SENTENCE

Conversion to agriculture is limited in the Piñon Mesa area, with only 5 percent

(500 ha (1,214 ac)) of the current range classified as grass/forb rangeland (GSRSC 2005).

Sagebrush occurs in some areas that may be converted to grassland for livestock (BLM,

unpubl. lit. 2005a), but the continued conversion is considered to be a minor impact in the

foreseeable future.  Habitat conversion in the Crawford area due to agricultural activities

has been limited (GSRSC 2005).

36

We need to draw a conclusion here. We have talked about reductions and conversion and past activities and current ranges, and there is no context. In addition, we draw no conclusion. One approach might be to say… there are X acres currently available to sage grouse, they are [include a description of the lands, by county or basin or however]. Of those X acres, Y are unlikely to be converted to agriculture or developed, and Z are subject to some kind of pressure that could reduce their suitability for sage grouse habitat. As it stands, this section provides the reader no information as to to threat habitat/ag conversion represents. Another chart might be helpful, but I'm not sure.

Roads

Impacts to sage grouse from roads may include direct habitat loss, direct mortality, (Forman and Alexander 1998), expansion into previously unused areas, spread of invasive weeds (; Gelbard and Belnap 2003; Connelly et al. 2004), noise in the vicinity of leks (; Braun 1986; Forman and Alexander 1998), and increased recreational use and associated human disturbances (Forman and Alexander 1998; Massey 2001; Wyoming Game and Fish Department 2003).

Braun et al. (2002) suggested that daily vehicular traffic along road networks for oil wells can impact Gunnison and greater sage-grouse breeding activities based on lek population patterns. Modeling done in Connelly et al. (2004) found that the number of active leks, lek persistence and lek activity increased with increasing distance from an

37

**Comment [ES51]:** ADDRESSED AS BEST WE COULD WITH LIMITED TIME.

**Comment [JM52]:** Moved. REARRANGED BUT KEPT

**Deleted:** Additional habitat loss has resulted from reservoir development in some of the population areas. Past

**Deleted:** reservoir development in the Gunnison Basin flooded 3,700 ha (9,200 ac or 1.5 percent) of likely sage-grouse habitat. Three other reservoirs inundated approximately 11 percent of habitat in the San Miguel Basin population area. We are unaware of any plans for additional reservoir construction in the foreseeable future.¶

**Comment [JM53]:** The cite does not support this. They speak generally of roads being a barrier and reference beetles, small mammals and amp… [11]

**Comment [JM54]:** Cites do not support the statement. SEE RES… [12]

**Comment [JM55]:** Cites do not support the statement. RO CHE… [13]

**Deleted:** creation

**Deleted:** of barriers to migration corridors or seasonal habitats

**Deleted:** facilitation of mammalian (Forman and Alexander 1998; Fo… [14]

**Deleted:** and corvid predation (Connelly et al. 2000b; Aldridge… [15]

**Deleted:** and

**Comment [JM56]:** Forman and Alexander 1998 state specifically… [16]

**Comment [JM57]:** Forman 2000 does not address plants at all, but prim… [17]

**Comment [JM58]:** Does not support, correlates wires and corvid pred… [18]

**Comment [JM59]:** Does not support other than uses a model that incl… [19]

**Deleted:** Forman and Alexander 1998

**Deleted:** ; Forman 2000

**Deleted:** Knick et al. 2003

**Comment [JM60]:** They looked at mining noise, and how it might a… [20]

**Deleted:** Amstrup and Phillips 1977

**Comment [JM61]:** Lyon and Anderson made no such suggesti… [21]

**Deleted:** Lyon and Anderson (2003) suggested that roads may be the c… [22]

**Comment [JM62]:** Page 344 of the cite. EDIT AS WRITTEN MAR… [23]

**Deleted:** abandonment

interstate highway. Other than this single predictive model output, we have no

quantitative information on the current impact of roads to Gunnison sage-grouse. It is

unclear what specific factor relative to roads sage-grouse are responding to, and Connelly

et al. (2004) caution that they have not included other potential sources of disturbance

(e.g., powerlines) in their analyses.

Roads may have additional indirect effects that result from birds' behavioral

avoidance of road areas because of noise, visual disturbance, pollutants, and predators

moving along them. The absence of screening vegetation in arid and semiarid regions

further exacerbates any problems. Male sage-grouse depend on acoustical signals to

attract females to leks (Gibson and Bradbury 1985; Gratson 1993). If noise interferes

with mating displays, and thereby female attendance, it is possible that younger males

will not be drawn to the lek and eventually leks will become inactive (). Dust from roads

and exposed roadsides can damage vegetation through interference with photosynthetic

activities; the actual amount of potential damage depends on winds, wind direction, the

type of surrounding vegetation and topography (Forman and Alexander 1998).

Chemicals used for road maintenance, particularly in areas with snowy or icy

precipitation, can affect the composition of roadside vegetation (Forman and Alexander

1998). While all these potential effects have been identified, we were unable to data

documenting these potential effects have actually affected sage-grouse populations

individually or at a species level. In fact, the same studies which correlated invasive

species with road presence also found that local conditions can affect exotic richness,

particularly in low moisture availability, shallow depth and/or low nutrient levels,

38

arguably at least one of those factors exists in the sagebrush steppe habitat favored by sage grouse (Gelbard and Belnap, 2003 pp 429).

The habitat of the Gunnison Sage Grouse is already fragmented by a number of roads. New roads and increased traffic on existing roads may cause some impact to the Dry Creek Basin birds in the San Miguel Basin, primarily due to ongoing gas field development and exploration on both the eastern and western edges of the current range. Increases in truck traffic have been noted on 24 km (15 mi) of road that cross the center of the current range in Dry Creek Basin.  However, only two sage-grouse have been killed on the roads in Dry Creek Basin since 2003 (CDOW, unpubl. lit. 2006).    No paved roads occur in the current range for the Piñon Mesa population, but with projected human population increases of 91 percent by 2030 (Colorado Department of Local Affairs [CDLA] 2004), we anticipate that new or existing roads will be paved in the foreseeable future.

The new roads will result in additional habitat loss and fragmentation, as well as increased disturbance and chance of direct mortality.  However, based on the data available to us, we have no reason to believe that the continuing effects of existing roads in general, and the new roads specifically will have a significant effect on the Gunnison Sage Grouse.

Powerlines

**Comment [JM66]:** Also check out the fact that this study references another that found no relationship between native cover and exotic species richness in sagebrush steppe habitat.  This study really didn't examine whether the roads actually facilitated transport, but really examined whether roadside verges are more or less suitable for exotics based on their level of development.  The conclusion that roads facilitate transport because there are more exotics at roadsides does not necessarily follow from the fact that there are more exotics by roadsides.  There is an issue of causality that is not addressed.  SEE P.421 OF CITE.

**Deleted:** parameters

**Comment [JM67]:** The cited literature does not support the statement. SEE OYLER-MCCANCE ET AL. 2001, P.330

**Comment [JM68]:** It is unclear to me why we are cataloguing the amount of roads in the affected areas.  The roads are there, the habitat fragmented, and the real question is whether the grouse is threatened by the current situation or by new road construction that is planned.  DELETED DATA ON MILES OF ROADS.  RO KEPT OYLER CI[...] [24]

**Deleted:** Road

**Deleted:**  development within Gunnison sage-grouse habitats precluded movement of sage-grouse between the resultant patches, presumably to [...] [25]

**Deleted:**

**Deleted:** Basin is bisected by State Highway 50, a major highway with high traffic volume.  Two other State highways further intersect this [...] [26]

**Deleted:** N

**Deleted:** , expected as oil and gas development continues (see discussion below),

**Comment [JM69]:** Moved ACCEPTED AND ACCEPTED DELETIONS

**Deleted:** Only two sage-grouse have been killed on the roads in Dry Creek Basin since 2003 (CDOW, unpubl. lit. 2006).  In the combined San Mig[...] [27]

**Deleted:**  paved roads occur in the current range for the Piñon Mesa population, but with projected human population increases of 91 perce[...] [28]

**Deleted:** The cumulative impact of roads through sage-grouse habitat has not been measured, so we do not know the magnitude of this potential threat [...] [29]

**Deleted:** ¶

39

The most detrimental effect that powerlines have is to provide a convenient perch for predators.  There are reports that they can also directly affect sage-grouse by posing a collision and electrocution hazard (Braun 1998; Connelly et al. 2000a and fragmenting habitat (Braun 1998).  However, although death through collision and electrocution are widely referenced, only one cite, Borell (1939) actually provides any data to support the claim with a report of the deaths of three adult sage-grouse as a result of colliding with a telegraph line in Utah (Borell 1939).  Both Braun (1998) and Connelly et al. (2000a) report that sage-grouse collisions with powerlines occur, but no specific instances were presented.

In areas where the vegetation is low and the terrain relatively flat, power poles provide an attractive hunting and roosting perch, as well as nesting stratum for many species of raptors (Steenhof et al. 1993; Connelly et al. 2000a; Manville 2002; Vander Haegen et al. 2002).  Power poles increase a raptor's range of vision, allow for greater speed during attacks on prey, and serve as territorial markers (Steenhof et al. 1993; Manville 2002).  Raptors may actively seek out power poles where natural perches are limited.  For example, within 1 year of construction of a 596-km (373-mi) transmission line in southern Idaho and Oregon, raptors and common ravens (Corvus corax) began nesting on the supporting poles (Steenhof et al. 1993).  Within 10 years of construction, 133 pairs of raptors and ravens were nesting along this stretch (Steenhof et al. 1993).  The increased abundance of raptors and corvids within the current Gunnison sage-grouse range can result in increased predation.  Ellis (1985) reported that golden eagle predation on greater sage-grouse on leks increased from 26-73 percent of the total predation after

40

**Deleted:** P

**Deleted:** ), and can have indirect effects by increasing predation (Connelly et al. 2004),

**Comment [JM70]:** powerlines don't facilitate invasive plants, no data provided to support the assertion.. ACCEPTED

**Deleted:** , and facilitating the invasion of exotic annual plants (Knick et al. 2003; Connelly et al. 2004

**Deleted:** )

**Deleted:** In 1939,

**Deleted:** ed

**Deleted:** although

**Comment [TG71]:** You can't talk about greater and then stick in an unsupported statement regarding Gunnison. ADDED CITATION

completion of a transmission line within 200 m (656 ft) of an active sage-grouse lek in northeastern Utah. The lek was eventually abandoned, and Ellis (1985) concluded that the presence of the powerline resulted in changes in sage-grouse dispersal patterns and fragmentation of the habitat. Leks within 0.4 km (0.25 mi) of new powerlines constructed for coalbed methane development in the Powder River Basin of Wyoming had significantly lower growth rates, as measured by recruitment of new males onto the lek, compared to leks further from these lines, which was presumed to be the result of increased raptor predation (Braun et al. 2002). The presence of a powerline may fragment sage-grouse habitats even if raptors are not present. Braun (unpubl. lit. 1998) found that use of otherwise suitable habitat by sage-grouse near powerlines increased as distance from the powerline increased for up to 600 m (1,969 ft) and reported that the presence of powerlines may limit sage-grouse use within 1 km (0.6 mi) in otherwise suitable habitat.

Linear corridors through sagebrush habitats can facilitate the spread of invasive species, such as cheatgrass (Bromus tectorum) (Gelbard and Belnap 2003; Connelly et al. 2004). However, we were unable to find any information regarding the amount of invasive species incursion as a result of powerline construction and it is unlikely that such incursion is significant when compared to the invasive species that occur as a result of past land use practices of the federal land management agencies.

Comment [JM72]: See my note on Gelbard and Belnap above…. It doesn't really support this statement. DELETED CITES

Comment [JM73]: Does not support. DELETED CITE

Deleted: Knick et al. 2003

Deleted: ;

Comment [ES74]: DID NOT ACCEPT. WE HAVE NO CITATION TO SUPPORT IT.

On 121,000 ha (300,000 ac) of BLM land in Gunnison Basin there are 36 rights-of-way for power facilities, power lines, and transmission lines, which have

41

resulted in the direct loss of 350 ha (858 ac) of occupied habitat (BLM, unpubl. lit. 2005c).  A transmission line runs through the Dry Creek Basin group in the San Miguel Basin population, and the Beaver Mesa group has two.  None of the transmission lines in the San Miguel Basin have raptor proofing (BLM, unpubl. lit. 2005d), nor do most distribution lines (Jim Ferguson, BLM, pers. comm. 2005).  One major electric transmission line runs east-west in the northern portion of the current range of the Monticello group and one powerline runs east-west in the northern part of the current range (San Juan County GSWG, unpubl. lit. 2005).  Powerlines are not present in sufficient density to pose a significant threat to Gunnison sage-grouse in the Piñon Mesa population at this time.  One transmission line parallels Highway 92 in the Crawford population and distribution lines run from there to homes on the periphery of the current range (J. Ferguson, BLM, pers. comm. 2005).  Where there is projected human population growth in and near Gunnison sage-grouse populations we expect an increase in powerlines with a concomitant increase in predation from raptors and corvids.  However, the future increase will be small in proportion to the powerlines currently existing in the grouse's range, and accordingly, do not expect any increase in predation related to the increase to be significant.

Fences

Fences are used to delineate property boundaries and to manage livestock (Braun 1998; Connelly et al. 2000a).  The effects of fencing on sage-grouse include direct mortality through collisions, creation of predator (raptor) perch sites, the potential creation of a predator corridor along fences (particularly if a road is maintained next to

42

**Deleted:** With projected human population growth in and near Gunnison sage-grouse populations we expect an increase in powerlines in all populations but future impacts are unknown at this time

**Comment [JM75]:** Is this right? Your paragraph does not draw a conclusion... but certainly begs for one. RO EDITED TO CORRECT INSERTION.

**Comment [TG76]:** Do we need a conclusion that powerlines do not pose a threat?  ADDED CONCLUSION

**Deleted:** ¶

the fence), incursion of exotic species along the fencing corridor, and habitat

fragmentation (Call and Maser 1985; Braun 1998; Connelly et al. 2000a; Beck et al.

2003; Knick et al. 2003; Connelly et al. 2004).


Sage-grouse frequently fly low and fast across sagebrush flats and new fences can

create a collision hazard (Call and Maser 1985).  Thirty-six carcasses of greater

sage-grouse were found near Randolph, Utah, along a 3.2-km (2-mi) fence within

3 months of its construction (Call and Maser 1985).  Twenty-one incidents of mortality

through fence collisions near Pinedale, Wyoming, were reported in 2003 to the BLM

(Connelly et al. 2004).  Fence collisions continue to be identified as a source of mortality

for both species (Braun 1998; Connelly et al. 2000a; Oyler-McCance et al. 2001;

Connelly et al. 2004, San Juan County GSWG, unpubl. lit. 2005), although effects on

populations are not understood.  Braun (1998) suggested that collision with fences,

especially woven wire fences, was a potential factor in sage-grouse decline.  Connelly et

al. (2000a) noted that grouse have been observed hitting or narrowly missing fences and

that grouse remains are frequently found next to fences.  The impact of collisions on

populations of grouse has not been investigated.  Fences provide perch sites for avian

predation and depending on their design may also cause habitat loss and fragmentation.

Where there are maintained trails alongside the fence, there are assertions invasive weeds

may increase(Braun 1998; Connelly et al. 2000a; Oyler-McCance et al. 2001; Gelbard

and Belnap 2003; Knick et al 2003; Connelly et al. 2004).  Where sage-grouse avoid

habitat adjacent to fences, presumably to minimize the risk of predation, effective habitat

fragmentation results even if the actual habitat is not removed (Braun 1998).

43

Comment [JM77]: Fences do not always have roads associated with them, particularly if you are talking about grazing lands.  Not only that, we've already discussed roads.  ACCEPTED

Deleted: (and their associated roads) also cause habitat loss and fragmentation, increases in invasive weeds, and

Comment [JM78]: Assertions only, no data.  ACCEPTED

Deleted: S

Deleted: ance of

Deleted: ly results in

Comment [JM79]: I will just note, that Braun's comments here were opinion and anecdotal.  Not only that, he mentions one specific area where this has happened, as thought it is an anomaly.  BRAUN ET AL 2002 WOULD BE A BETTER REFERENCCE HERE, BUT THE DOCUMENT HAS GONE TO WO.

Comment [TG80]: If they avoid the habitat adjacent to fences, how are they being killed by the fences. If they are staying away from the habitat, they are staying away from the fences. You can't have it both ways, you can't say they are avoiding fences and flying into fences in the same section.
BRAUN ET AL 2002 WOULD BE A BETTER REFERENCCE HERE, BUT THE DOCUMENT HAS GONE TO WO.

There are at least 1,540 km (960 mi) of fence within BLM lands within the

Gunnison Basin (BLM, unpubl. lit. 2005f) and an unquantified amount on other land

ownerships.  While these fences  contribute to habitat fragmentation in this area and

increase the potential for loss of individual grouse through collisions or enhanced

predation; such effects have been ongoing since the first agricultural conversions

occurred in the sage grouse habitat.  We have been unable to identify any reason to

expect a major increase in the number of fences and we have no data other than anecdotal

information to identify any significant existing threat to Gunnison sage grouse from

fences.

| Deleted: , further |
| Deleted: ing |
| Deleted: the habitat |
| Deleted: , as well as |
| Deleted: ing |
| Deleted: .  In 2003, a Monticello sage-grouse was documented as killed by colliding with a fence (San Juan County GSWG, unpubl. lit. 2005). |
| Deleted: were |

Comment [TG81]: Fences and powerlines sections should be consistent with  Greater Sage grouse finding. RO MODIFIED SUBSTANTIALLY

Deleted: determine any estimate of fences and their impacts on Gunnison sage-grouse for the other populations

**Urban Development**

Urban development has affected or eliminated much sage-grouse habitat in the

West (Braun 1998).  Interrelated effects from urban/suburban development include

construction of associated infrastructure (roads, powerlines, and pipelines) which have

been discussed as well as predation threats from the introduction of domestic pets and

increases in predators subsidized by human activities (e.g., landfills).  Urban expansion

into rural areas also results in habitat fragmentation, direct habitat loss and conversion, as

well as alteration of remaining sage-grouse habitats around these areas due to the

presence of humans and pets (Braun 1998; Connelly et al. 2000a).

Comment [JM82]: We need to focus on effect to Gunnison Habitat. ACCEPTED

Deleted: It

Deleted:  is estimated that 3-5 percent of all sage-grouse historical habitat in Colorado has already been converted into urban areas (Braun 1998).

Deleted: and

Deleted: Recent u

Deleted: is

Deleted: ing

Comment [JM83]: This should talk about the Gunnison Counties. ACCEPTED

Deleted: In some Colorado counties, up to 50 percent of sage-grouse habitat is under rural subdivision development (Braun 1998

Deleted: ).

44

U.S. Census Bureau projections show that human population growth varies widely across the current distribution of Gunnison sage-grouse (CDLA 2004). Public ownership in the Crawford and Gunnison Basin areas, and portions of the San Miguel Basin will limit potential impacts from development in those particular areas. However, even these public lands are intersected by private lands. Conservation easements also may help alleviate potential impacts of the expansion effects of urban and suburban development. Existing and contemplated conservation easements in the Gunnison Sage Grouse range are addressed in more detail under the existing State regulatory protections considerations in Factor D.

Aldridge (2005) used spatial modeling to determine various habitat, climatic, and anthropogenic factors that influence greater sage-grouse nest and brood habitat selection and to determine nest and brood success. He determined that broods avoided habitats with a high density of urban development and areas close to cropland. A single human-use feature did not appear to affect nest occurrence but sage-grouse strongly avoided nesting in areas when roads, well sites, urban habitats, and cropland were analyzed in combination. Aldridge (2005) agreed with Fuhlendorf et al. (2002) that this may be due to predator avoidance behavior.

It is possible that residential development that is not managed to account for the needs of the Gunnison Sage Grouse could destroy and fragment habitat for the Gunnison Basin population. Gunnison County currently has a low population density of

45

Deleted: may contribute to reduction of any

Deleted: No development c

Deleted: C

Deleted: Beginning in the 1970s, residential development patterns in Colorado changed to extensive home building in subdivisions and large lots away from existing towns (Riebsame et al. 1996). This "exurban" development resulting from human population growth second home construction, has been a significant cause of loss of sagebrush habitat (GSRSC 2005).¶

Deleted: Future

Deleted: may

5 people/sq mi in 2000 (GSRSC 2005), with projected growth rates ranges from .1 to 1.6 percent per year.  These rates result in a population increase of  about 5700 people by 2030 (41% or 7 people/sq mi) (CDLA 2004).  A 30 percent housing increase is projected from 2000-2020 (GSRSC 2005).  The town of Gunnison is located near the center of this population.  Growth from the town of Crested Butte, on the northern end of this population, is expanding southward.  Population growth estimates are not available for the portion of Saguache County that comprises approximately 25 percent of this population's current range, although county-wide the projected population growth from 3 people/sq mi in 2000 (GSRSC 2005) to 2030 is 45 percent (CDLA 2004).  Currently, an estimated 100-500 people live in the Gunnison Basin portion of Saguache County so the estimated population in 2030 will be between 145 and 725 people.

**Deleted:** but

**Deleted:** 41 percent between 2000 and

**Deleted:** to

**Deleted:** is projected

**Deleted:** and

**Deleted:** a

**Deleted:** (Paul Jones, CDOW, pers. comm. 2004)

Sixty-nine percent of the current range within the Gunnison Basin is under public ownership.  However, 37 percent of leks, 33 percent of nesting and brood-rearing areas, and 31 percent of winter range are privately-owned (GSRSC 2005).  Much of the riparian habitat, including some lek sites, north of the town of Gunnison, is privately owned and is currently under development pressure.  There were no new platted subdivisions from 2002-2004 in the current range in Gunnison County (Gunnison County, unpubl. lit. 2003; Paul Jones, CDOW, pers. comm. 2005).  The apparent current and projected slow rate of development in the Gunnison Basin suggests that urban and exurban development is not a significant threat to that Gunnison sage-grouse population.

46

Dry Creek Basin is the only group within the San Miguel Basin population with significant Federal and State land ownership (70 percent).  This population is made up of 4(?) groups, the Iron Springs Mesa, Gurley Reservoir, Miramonte Reservoir and Dry Creek Basin.  San Miguel County had 9 people/sq mi in 2000 (GSRSC 2005); most residents live in the town of Telluride or several smaller communities, including Norwood.  The population in San Miguel County is expected to double to 18 people/sq mi between 2000 and 2030 (CDLA 2004), accompanied by a 62 percent increase in housing units by 2020 (GSRSC 2005).  Based upon the location of current subdivided areas, expansion into sage-grouse habitat is certain without some action by local government (GSRSC 2005).  Residential development is likely to affect the Iron

Springs Mesa and Gurley Reservoir groups (GSRSC 2005).  Subdivision development increased during 2003 and 2004 and  at Gurley Reservoir, a 260-ha+ (640-ac+) area has been broken up into 16, 16-ha (40-ac) tracts for development.  Approximately 8 percent of the current range for this portion of the San Miguel Basin population will be developed.  Continued development in the area threatens to cause habitat loss, fragmentation, and future connection of the San Miguel Basin population to others.  The Miramonte Reservoir group has a long-term threat of housing development (GSRSC 2005).  However, the Dry Creek Basin group, which is the largest, has little expected threat from development (GSRSC 2005).  We conclude that development is not a significant threat to this population of Gunnison sage-grouse.

The Monticello group of the Monticello-Dove Creek population is in San Juan County, Utah, which has approximately 2 people/sq mi (GSRSC 2005) with a projected

47

| Deleted: be an impact in |
| --- |

| Deleted: . |
| --- |
| Deleted: A |

| Comment [JM84]: Doesn't make sense, there is a missing word. ADDRESSED |
| --- |

| Formatted: Highlight |
| --- |

| Comment [JM85]: Why?  Is the Dry Creek Basin Group that much bigger?  Are the conservation plans that strong?  We just spent a whole paragraph laying out the threats, and then we expect the reader to believe us that it's not threatened?  We really need to explain why we think this.  ADDRESSED |
| --- |

Ex. R: Privilege-Waived Records        Page 193 of 284

increase of roughly 18% to 2600 people (2.4 people/sq mi) by 2030 (Utah Governor's Office of Planning and Budget 2005). Almost all the current range in both States is in private ownership.

The Piñon Mesa population is in Mesa County, which had a population density of 55 people/sq mi in 2000 (GSRSC 2005) with a projected increase to 105 people/sq mi by 2030 (CDLA 2004). Approximately 70 percent of the current range is in private ownership. Expansion of growth from the nearby city of Grand Junction poses a threat of permanent habitat loss and fragmentation. The eastern 33 percent of the current range is privately owned and contains 810 ha (2,000 ac) in tracts less than 65 ha (160 ac), and an additional 1,500 ha (3,600 ac) in tracts between 65 and 130 ha (160 and 320 ac), all of which can be further subdivided (GSRSC 2005). However, 19 percent of the private land containing occupied habitat is currently in conservation easements with additional lands being negotiated for conservation easements with the landowners, thereby limiting the threat of development (See Factor D for further discussion of easements).

There was an estimate of 24 people/sq mi living in and near the Crawford Area population in 2000 (GSRSC 2005). Montrose County contains the southeastern 75 percent of the current range of the Crawford population. The county was identified as one of the fastest growing counties in the country, with human population expected to double from 2000-2030 (CDLA 2004) and housing expected to increase by 68 percent by 2020. Growth will likely fragment and destroy current habitat and potential linkages to the San Miguel and Cerro Summit-Cimarron-Sims Mesa populations (GSRSC 2005),

48

Deleted: to

Deleted: 3.6

Comment [JM86]: Math is not working here. 18% increase confirmed in your staff notes. That results in only a 2.4 density. In addition, how can you have a 54% increase in housing over 20 years, when you are only expecting a 20% increase in housing for 30 years? Clarify or delete. UNCERTAIN WHAT STAFF NOTES WERE REFERENCED. PERHAPS THEY WERE MISREAD; 18% IS THE INCREASE FOR SAN MIGUEL COUNTY THAT IS DISCUSSED IN THE DOC. CORRECTED TO REFLECT THE FIGURES RO HAS.

Deleted: and a 54 percent increase in housing by 2020 (GSRSC 2005).

Comment [JM87]: Math doesn't work, please explain or remove. MATH LOOKS OK TO RO. THERE WOULD BE ~2 PEOPLE PER HOUSE.

Deleted: and 56 percent in housing units by 2020 (GSRSC

Deleted: 2005).

Comment [JM88]: The following sentences are confusing. So 5600 acres is in small tracts that could be subdivided. But then… 19% is in conservation easements… is that 19% of the 70 percent? Or 19% of the 5600 acres? And what proportion of the 33% is at risk? And how big is the 70%... there is no frame of reference for the reader to understand the relative risks we are talking about. CLARIFIED IN FINAL.

Deleted: -

creating further isolation of this population (see Factor E for further discussion).  The northwestern 25 percent of the current range is in Delta County, which is projected to increase in population by 79 percent by 2030 (CDLA 2004) with an increase in housing of 58 percent by 2020 (GSRSC 2005).

Human population growth and housing development is occurring in all of the Gunnison sage-grouse populations and is projected to continue to do so over the next 2 decades.  However, with the exception of the Piñon Mesa population, human population densities are low and do not appear to pose a significant threat.  At Piñon Mesa, the threat of development may be diminished by current conservation easements with additional easements planned.

NOTE:  generally, this is a very confusing section.  All the information is relative and so there is no way to really understand the amount of habitat that is safe from development and the amount that we are writing off.  We talk about increases in densities but we don't tell people what densities pose a small threat or conversely, whether the bulk of the growth will be concentrated in areas that will not affect sage grouse.  Ie… is the growth spread evenly throughout the county (which is the per acre density) or whether all growth will take place in cities, or how it will be allocated.  I think this kind of explanation would go a long way to bolstering our argument that it's not likely to affect the grouse.

Energy Development

49

The development of oil and gas resources requires surveys for economically recoverable reserves, construction of well pads and access roads, subsequent drilling and extraction, and transport of oil and gas, typically through pipelines. Ancillary facilities can include compressor stations, pumping stations and electrical facilities (Connelly et al. 2004). Surveys for recoverable resources occur primarily through seismic activities, using vibroesis trucks or shothole explosives. Well pads vary in size from 0.10 ha (0.25 ac) for coalbed natural gas wells in areas of level topography to greater than 7 ha (17 ac) for deep gas wells (Connelly et al. 2004). Pads for compressor stations require 5-7 ha (12-17 ac) (Connelly et al. 2004). Well densities and spacing are typically designed to maximize recovery of the resource and are administered by State agencies (Connelly et al. 2004).

Direct habitat losses result from construction of well pads, roads, pipelines, powerlines, and the crushing of vegetation during seismic surveys. As disturbed areas are reclaimed, sage-grouse may repopulate the area. However, re-population may take 20-30 years, as habitat conditions are not immediately restored (Braun 1998; 2003a). For most developments, return to pre-disturbance population levels is not expected due to a net loss and fragmentation of habitat (Braun et al. 2002). After 20 years, sage-grouse have not recovered to pre-development numbers in Alberta, even though well pads in these areas have been reclaimed (Braun et al. 2002). In some reclaimed areas, sage-grouse have not returned (Aldridge and Brigham 2003).

Comment [JM89]: This paragraph is an incomplete picture. IT REFLECTS THE AVAILABLE SCIENCE TO THE EXTENT THE RO IS AWARE.

Comment [TG90]: The growing season in Alberta is significantly shorter than the one in SW Colorado….Common sense would dictate that reclamation in these northern areas will be slow…also we don't know the reclamation requirements in Alberta and Canada, and whether they are as rigorous as those in Colorado/U.S. RECLAMATION WAS UNDERWAY ~20 YRS PRIOR TO THE ARTICLE, PLENTY OF TIME REGARDLESS OF WEATHER.

50

Noise can drive away wildlife, cause physiological stress, and interfere with auditory cues and intraspecific communication, as discussed previously. Aldridge and Brigham (2003) reported that, in the absence of stipulations to minimize the effects, mechanical activities at well sites may disrupt sage-grouse breeding and nesting activities. Greater sage-grouse hens that bred on leks within 3 km (2 mi) of oil and gas development in the upper Green River Basin of Wyoming selected nest sites with higher total shrub canopy cover and average live sagebrush height than hens nesting away from disturbance (Lyon 2000). The author hypothesized that exposure to road noise associated with oil and gas drilling may have been one cause for the difference in habitat selection. However, noise could not be separated from the potential effects of increased predation resulting from the presence of a new road. Above-ground noise is typically not regulated to mitigate effects to sage-grouse or other wildlife (Connelly et al. 2004). Gunnison sage-grouse were observed flushing from a lek when a compressor station switched on, disrupting breeding behavior (Jim Garner, CDOW, pers. comm. 2004). However, this was a single incident, and we have no information to conclude that noise from energy development poses a significant threat to the species.

Water quality and quantity may be affected in oil and gas development areas. However, since, sage-grouse do not require free water (Schroeder et al. 1999) we anticipate that impacts to water quality from mining activities would have minimal effects on them.

51

Increased human presence resulting from oil and gas development also can impact sage-grouse either through avoidance of suitable habitat, disruption of breeding activities, or increased hunting and poaching pressure (Aldridge and Brigham 2003; Braun et al. 2002; BLM 2003).  Sage-grouse also may be at increased risk for collision with vehicles simply due to the increased traffic associated with oil and gas activities (BLM 2003).

Only a few studies have examined the effects of oil and gas development on sage-grouse.  While each of these studies reported sage-grouse population declines, specific causes for the negative impacts were not determined.  In Alberta, Canada, the development of well pads and associated roads in the mid-1980s resulted in the abandonment of three greater sage-grouse lek complexes within 200 m (656 ft) of these features (Braun et al. 2002).  Those leks have not been active since that time.  A fourth lek complex has gone from three to one lek with fewer numbers of sage-grouse on it (Braun et al. 2002).  The well pads have since been reclaimed, but greater sage-grouse numbers have not recovered (we do not have information on post-reclamation vegetation).  Subsequent to the development of the Manyberries Oil Field in high quality greater sage-grouse habitat in Alberta, male sage-grouse counts fell to the lowest known level (Braun et al. 2002).  Two additional leks were directly disturbed, and neither of these leks has been active within the past 10 years (Braun et al. 2002).  The development of oil reserves in Jackson County, Colorado, was concurrent with decline of greater sage-grouse numbers in the oil field area (Braun 1998).  Sage-grouse populations still occur in at least one long-term oil field development in Colorado where leks are not within line-of-sight of an active well or powerline (Braun et al. 2002).  Although the

52

number of active leks has declined in this field, sage-grouse have been consistently documented there since 1973. Lyon and Anderson (2003) concluded that impacts of oil and gas development extend over 0.40 km (0.25 mi) from well pads.

Of particular relevance to estimating oil and gas development impacts is the fidelity of sage-grouse hens to nesting and summer brood-rearing areas demonstrated by Lyon and Anderson (2003). Hens that have successfully nested will return to the same areas to nest every year. If these habitats are affected by oil and gas development, there is a strong potential that previously successful hens will return but not initiate nesting (Lyon 2000). Depending on the number of hens affected, local populations could decline.

The reauthorization of the Energy Policy and Conservation Act in 2000 dictated reinventory of Federal oil and gas reserves, which identified extensive reserves in the Greater Green River Basin of Colorado, Utah, and Wyoming, and the San Juan Basin of New Mexico and Colorado (Connelly et al. 2004). Energy development on Federal (BLM and USFS) lands is regulated by the BLM and can contain conservation measures for wildlife species (see Factor D for a more thorough discussion). The BLM (1999) classified the area encompassing all Gunnison sage-grouse habitat for its gas and oil potential. Three of the populations have areas with high (San Miguel Basin, Monticello group) or medium (Crawford) oil and gas potential. San Miguel County, where much oil and gas activity has occurred in the last few years, ranked 8 out of 64 in counties producing natural gas in 2002 (Colorado Oil and Gas Conservation Commission 2004).

53

In the current sage-grouse range in the Gunnison Basin 33 percent of the area ranked as low potential, with the remainder having no potential for oil and gas development (BLM 1999; GSRSC 2005). No federally-leased lands exist within the population area (BLM, unpubl. lit. 2005g). However, one active well and six inactive wells are on non-Federal lands in the current range in the northern part of the Gunnison Basin (BLM, unpubl. lit. 2005g).

The entire San Miguel Basin population area is classified as having high potential for oil and gas development (BLM 1999; GSRSC 2005)). Natural gas exploration in the San Miguel Basin has increased in recent months (CDOW, unpubl. lit. 2005g), with 49 percent of the current range on public and private land with Federal leases for gas development (BLM, unpubl. lit. 2005g). As a general practice, all currently unleased BLM lands within the current sage-grouse range in the San Miguel Basin are being deferred for oil and gas leasing until completion of the Resource Management Plans (RMPs) covering the habitat for this population (anticipated in 2007 and 2008).

The Colorado State Land Board (CSLB) offered four sections of State school section land for oil and gas leasing in the San Miguel Basin population in February 2006. One of these is in occupied habitat of the Miramonte Reservoir group and the other three are in the Dry Creek Basin group. The San Miguel County Board of Commissioners requested that they withdraw those sections or at least place a "no surface occupancy" prescription on the land with adherence to conservation measures in the RCP (San

54

Miguel County, unpubl. lit. 2006).  The CSLB stipulated that well pads would be placed out of Gunnison sage-grouse habitat [to the extent possible] on one parcel in Dry Creek Basin where the surface and the mineral rights are owned by the CSLB (Linda Luther, San Miguel County, pers. comm. 2006).  However, the other three parcels are split estate (private surface, CSLB-owned minerals) and the CSLB was unwilling to, or believed they could not, put stipulations for sage-grouse on those parcels.  San Miguel County will continue to work with the landowners, CSLB, and oil and gas companies to place stipulations on the parcels (Linda Luther, San Miguel County, pers. comm. 2006) but whether stipulations will occur is uncertain.  Nonetheless, this illustrates a strong conservation commitment by the County for the San Miguel Basin population.

One oil and gas operator, who holds several leases in the San Miguel Basin, has decided to temporarily abandon drilling on its leases in the Hamilton Mesa, Miramonte Reservoir, Gurley Reservoir, Beaver Mesa, and Iron Springs Mesa areas because they are not expected to be economically feasible.  However, exploration and production may continue in the future (CDOW, unpubl. lit. 2005g).  Fifty-one oil and gas wells have been developed in the current range in the San Miguel Basin.  All but 1 is in the Dry Creek Basin and 47 are on federally-leased land (BLM, unpubl. lit. 2005g).  Additional wells on existing leases are proposed for this area in the next 10 years.  Five gas pipelines are proposed for this development, one of which is expected to transect winter habitat and another will remove habitat in places (BLM, unpubl. lit. 2005h).  The exact locations of any future drill sites are not known, but because the area is small, they will likely lie within 3 km (2 mi) of one of only three leks in this group (CDOW, unpubl. lit. 2005g).

55

The Monticello group is in an area of high energy potential (GSRSC 2005). Oil and gas leases with State and Federal mineral rights have been acquired or applied for on over 2,000 ha (5,000 ac) (6 percent) in the current range (Tammy Wallace, BLM, pers. comm. 2005a). One new well pad was constructed in 2005 (San Juan County GSWG, unpubl. lit. 2005) and additional drilling is expected to occur in the next few years. However, BLM is currently deferring new leases in the current range.

No oil and gas wells are within the current range in the Piñon Mesa area, although oil and gas leases occupy 17 percent of this habitat (BLM, unpubl. lit. 2005g). The remaining portion of the current range has no potential for oil or gas in this area except for a small portion on the eastern edge of the largest habitat block (BLM 1999; GSRSC 2005). The Crawford population is in an area with high to medium potential for oil and gas development (BLM 1999; GSRSC 2005). However, no Federal leases and only one well (on non-Federal lease property) are in the current range (BLM, unpubl. lit. 2005g). The BLM will defer Federal oil and gas leases in the current range in this population. Future development could occur on State and private land in the Crawford area under Colorado Oil and Gas Commission regulation and on BLM land if their future RMP allows it.

In summary, some Gunnison sage-grouse habitat is in areas with high potential for oil and gas development, particularly in the San Miguel Basin. However, while a few studies on greater sage-grouse reported population declines in response to oil and gas

56

development (Braun et al. 2002; Lyon and Anderson 2003), specific causes for the

declines were not determined.  A recent study of greater sage-grouse in Wyoming found

that as oil and gas development increased, lek activity declined, up to 100 percent

(Holloran 2005).  Negative impacts to active leks extended to a distance of 5 km (3 mi)

from an active drilling rig.  Similarly, juvenile male recruitment to impacted leks also

fell.  Nesting females avoided areas with high well densities, although site fidelity to

previous nesting locations may result in delayed population response to the habitat

changes associated with development.  While some birds were displaced by the

disturbance, Holloran (2005) also found that many sage-grouse discontinued breeding

attempts, and others died at a higher rate than birds from unaffected areas.  He concluded

that stipulations placed on oil and gas development were insufficient to maintain

sage-grouse breeding populations.  Application of these impacts from gas development to

the San Miguel and Crawford populations and Monticello group could threaten their

long-term persistence.  However, the immediate threat to Gunnison sage-grouse is

curtailed by BLM lease deferments and economic infeasibility of extraction.


Colorado has been the largest producer of coalbed methane in the country since

2002, and production has increased (Cappa et al. 2005).  Deposits exist under the current

range of the San Miguel and Crawford populations (Cappa et al. 2005), although no wells

have been drilled to date in those areas (D. Spencer, BLM, pers. comm. 2005).


Renewable energy resources, such as windpower, require many of the same

features for construction and operation as do nonrenewable energy resources.  Therefore,

57

**Comment [TG91]:** This is a very loaded paraphrase of a very specific study in Jonah field in Wyoming. Legal sufficiency analysis -- What are the range of impacts … Also, this study was done on a very extensively developed area…Needless to say, this kind of density will not be duplicated in Gunnison habitat. What was the range of impacts?
THE STUDY WAS IN THE PINEDALE ANTICLINE, WHERE WELL DENSITIES ARE FAIRLY LOW AND SIMILAR TO THOSE IN THE GUSG RANGE.

we anticipate that potential impacts from direct habitat losses, habitat fragmentation through roads and powerlines, noise, and increased human presence (Connelly et al. 2004) will generally be the same as already discussed for nonrenewable energy development.  Windpower may have additional mortalities resulting from sage-grouse flying into turbine rotors or meteorological towers (Erickson et al. 2001).  One greater sage-grouse was found dead within 45 m (148 ft) of a turbine on the Foote Creek Rim wind facility in south-central Wyoming, presumably from flying into a turbine (Young et al. 2003).  During 3 years of monitoring operation, this is the only known sage-grouse mortality at this facility.

Current interest and speculation in wind energy exists in the Monticello area.  A wind test tower (anemometer) has been erected at a site approximately 2.4 km (1.5 mi) from a lek (GSRSC 2005), and landowners in the area have been contacted by power company contractors about leases for wind power development.  Depending on the location and number of wind turbines placed near leks and other important habitat in the Monticello group, Gunnison sage-grouse in this area may be impacted.  We are not aware of any other wind energy development proposed throughout the rest of the Gunnison sage-grouse current range.

> **Comment [TG92]:** Do we need a conclusion on energy development? DONE

Mining

Surface mining for any mineral resource (coal, uranium, copper, bentonite, gypsum, oil shale, phosphate, limestone, gravel, etc.) will result in direct habitat loss for

58

Gunnison sage-grouse if the mining occurs in current sagebrush range.  Direct loss of

sage-grouse habitat also can occur if the overburden and/or topsoil resulting from mining

activities are stored in sagebrush habitats.  The actual effect of this loss depends on the

quality, amount, and type of habitat disturbed, the scale of the disturbance, and if

non-breeding habitat is affected, the availability of adjacent habitats (Proctor et al. 1983;

Remington and Braun 1991).


Regulation of non-coal mining in the United States is at the discretion of the

individual States.  New vegetation types including exotic species may become established

on mined areas (Moore and Mills 1977), altering their suitability for sage-grouse.  If

reclamation plans call for the permanent conversion of the mined area to a different

habitat type (e.g., agriculture) the habitat loss becomes permanent.  Invasive exotic plants

also may establish on the disturbed surfaces.  Removal of the overburden and target

mineral may result in changes in topography, subsequently resulting in changes in

microclimates and microhabitats (Moore and Mills 1977).  Additional habitat losses can

occur if supporting infrastructure, such as roads, railroads, utility corridors, buildings,

etc., become permanent landscape features after mining and reclamation are completed

(Moore and Mills 1977), which is allowed in Colorado (Colorado Statute Title 34,

Article 32) and Utah (R647-4-110).


Other indirect effects from mining can include reduced air quality from fugitive

dust, degradation of surface water quality and quantity, disturbance from noise, human

presence, and mortality from collision with mining equipment (Moore and Mills 1977;

59

Brown and Clayton 2004).  Fugitive dust could affect local vegetative and insect

resources (Moore and Mills 1977).  Most large surface mines are required to control

fugitive dust, so these impacts are probably limited.  Since sage-grouse do not require

free water (Schroeder et al. 1999), we anticipate that impacts to water quality from

mining activities would have minimal population-level effects.  The possible exception is

degradation or loss of riparian areas, which could result in brood habitat loss.  The effects

on sage-grouse of noise from mining are unknown, but sage-grouse also depend on

acoustical signals to attract females to leks (Gibson and Bradbury 1985; Gratson 1993).

If noise does interfere with mating display and thereby female attendance, younger males

will not attend the lek, and eventually leks will become inactive (Amstrup and Phillips

1977; Braun 1986).  Mining also can impact sage-grouse through the increased presence

of human activity, either through avoidance of suitable habitat adjacent to mines or

through collisions with vehicles associated with mining operations (Moore and Mills

1977; Brown and Clayton 2004).  However, we were unable to find any information

regarding increased mortality of Gunnison sage-grouse as a result of this effect.

Within Gunnison sage-grouse current range, coal, uranium, and vanadium are

most commonly mined and have begun to increase in recent years (Cappa et al. 2005).

These minerals were mined historically in the San Miguel area and impacted an unknown

amount of the range.  Uranium deposits are within the current range of the San Miguel

Basin population and Monticello group (Cocker 2001; Cappa et al. 2005) and three mines

near the San Miguel Basin population were reopened in 2004 (Cappa et al. 2005).

60

Six active hardrock, gravel or road fill mines are on BLM land in sage-grouse range in the Gunnison Basin (BLM, unpubl. lit. 2005c). Total disturbance, excluding roads, is 39 ha (96 ac). Two hundred ninety-one inactive or abandoned mines and numerous miles of road have caused unquantified past habitat loss and fragmentation (BLM, unpubl. lit. 2005b), but future impact of hardrock, gravel, or road fill mines are likely limited.

We conclude that present and future mining activities appear to be limited and do not pose a significant threat to Gunnison sage-grouse.

Grazing

Grazing is the dominant use of sagebrush rangelands in the West (Connelly et al. 2004); almost all sagebrush areas are managed for livestock grazing (Knick et al. 2003). Although we lack information on the proportion of occupied Gunnison sage-grouse habitat that is grazed, we expect that it is a vast majority. Excessive grazing by domestic livestock during the late 1800s and early 1900s, along with severe drought, significantly impacted sagebrush ecosystems (Knick et al. 2003). Although current livestock stocking rates are substantially lower than high historic levels (Laycock et al. 1996), long-term effects from this overgrazing, including changes in plant communities and soils, persist today. Although it is likely that livestock grazing and associated land treatments have altered plant composition, increased topsoil loss, and increased spread of exotic plants, the impacts on sage-grouse are not clear. Few studies have directly addressed the effect

61

of livestock grazing on sage-grouse (Beck and Mitchell 2000; Wamboldt et al. 2002; Crawford et al. 2004), and there is little direct experimental evidence linking grazing practices to sage-grouse population levels (Braun 1987, Connelly and Braun 1997). Rowland (2004) conducted a literature review and found no experimental research that demonstrates grazing alone is responsible for the reduction in sage-grouse numbers.

The GSRSC (2005) could not find a direct correlation between causative historic conditions and reduced sage-grouse numbers.  It has been demonstrated that the reduction of grass heights due to livestock grazing of sage-grouse nesting and brood-rearing habitat negatively affects nesting success by reducing cover necessary for predator avoidance (Gregg et al. 1994; Delong et al. 1995; Connelly et al. 2000a).  Nest success in Gunnison sage-grouse is related to greater grass and forb height and shrub density (Young 1994). In addition, livestock consumption of forbs may reduce food availability for sage-grouse. This is particularly important for pre-laying hens, as forbs provide essential calcium, phosphorus, and protein.  A hen's nutritional condition affects nest initiation rate, clutch size, and subsequent reproductive success (Connelly et al. 2000a).  Livestock grazing can reduce the forage availability in breeding and brood-rearing habitat, subsequently negatively affecting sage-grouse populations (Braun 1987; Young 1994; Dobkin 1995; Beck and Mitchell 2000).  Exclosure studies have demonstrated that domestic livestock grazing also reduces water infiltration rates and cover of herbaceous plants and litter, as well as compacting soils and increasing soil erosion (Braun 1998).  This results in a change in the proportion of shrub, grass, and forb components in the affected area, and an increased invasion of exotic plant species that do not provide suitable habitat for

**Comment [TG93]:** Do we mean "historic grazing" if so, just say so!! ADDRESSED

sage-grouse (Miller and Eddleman 2000). Thus, important factors of livestock operations related to impacts on sage-grouse include stocking levels and season and duration of use.

Comment [TG94]: Until this theory is tested, it should not be cited as a finding, but as a hypothesis or deleted altogether. This wasn't even in the first draft of the greater sage grouse finding. CITATION IS CORRECT AND WAS INCLUDED IN THE GRSG FINDING ON P.2259.

Deleted: Hulet (1983, as cited in Connelly et al. 2000a) found that heavy grazing could lead to increases in ground squirrels that depredate sage-grouse nests

Deleted: .

Other consequences of grazing include several related to livestock trampling. Outright nest destruction by livestock trampling does occur and the presence of livestock can cause sage-grouse to abandon their nests (Rasmussen and Griner 1938; Patterson 1952; Call and Maser 1985; Crawford et al. 2004). Call and Maser (1985) indicate that forced movements of cattle and sheep could have significant effects on nesting hens and young broods caught in the path of these drives. Livestock also may trample sagebrush seedlings thereby removing a source of future sage-grouse food and cover (Connelly et al. 2000a), and trampling of soil by livestock can reduce or eliminate biological soil crusts making these areas susceptible to cheatgrass invasion (Mack 1981 as cited in Miller and Eddleman 2000; Young and Allen 1997; Forman and Alexander 1998).

Livestock grazing also may compete directly with sage-grouse for rangeland resources. Aldridge and Brigham (2003) suggest that poor livestock management in mesic sites results in a reduction of forbs and grasses available to greater sage-grouse chicks, thereby affecting chick survival. Pedersen et al. (2003) documented sheep consumption of rangeland forbs in areas where sage-grouse occur. The effects of direct competition between livestock and sage-grouse depend on condition of the habitat and grazing practices.

63

Development of springs and other water sources to support livestock in upland shrub-steppe habitats can artificially concentrate domestic and wild ungulates in important sage-grouse habitats, thereby exacerbating grazing impacts in those areas through vegetation trampling, etc. (Braun 1998). Diverting water sources has the secondary effect of changing the habitat present at the water source before diversion. This could result in the loss of either riparian or wet meadow habitat important to sage-grouse as sources of forbs or insects.

Sagebrush removal to increase herbaceous forage and grasses for domestic and wild ungulates is a common practice in sagebrush ecosystems (Connelly et al. 2004). Herbicide, especially Tebuthiuron applications were commonly used to kill large expanses of sagebrush, but it also killed many forbs used for brood-rearing (Crawford et al. 2004). Thinning, rather than removal, of sagebrush using Tebuthiuron has been the focus of some treatments (Emmerich 1985; Olson and Whitson 2002).

Sage-grouse response to herbicide treatments depends on the extent to which forbs and sagebrush are killed. Chemical control of sagebrush has resulted in declines of sage-grouse breeding populations through the loss of live sagebrush cover (Connelly et al. 2000a). Herbicide treatment also can result in sage-grouse emigration from affected areas (Connelly et al. 2000a), and has been documented to have a negative effect on nesting, brood carrying capacity (Klebenow 1970), and winter shrub cover essential for food and thermal cover (Pyrah 1972 and Higby 1969 as cited in Connelly et al. 2000a). Carr and Glover (1970) found that greater sage-grouse would use block-sprayed areas for

64

strutting but not for other activities.  They found that adults would move the 1.6 km

(1.0 mi) across the sprayed areas but believed that movement across the area may cease

as dead standing sagebrush deteriorated.  They also determined that broods were impeded

from moving to a previously used riparian area due to killing of the sagebrush between

nesting sites and the riparian area.  Winter use also did not occur in the area due to lack of

live sagebrush for forage.


Small treatments interspersed with non-treated sagebrush habitats did not affect

sage-grouse use, presumably due to minimal effects on food or cover (Braun 1998).

Also, application of herbicides in early spring to reduce sagebrush cover may enhance

some brood-rearing habitats by increasing the coverage of herbaceous plant foods

(Autenrieth 1981).


Mechanical treatments are designed to either remove the above-ground portion of

the sagebrush plant (mowing, roller chopping, and rotobeating), or to uproot the plant

from the soil (grubbing, bulldozing, anchor chaining, cabling, railing, raking, and

plowing; Connelly et al. 2004).  These treatments were begun in the 1930s and continued

at relatively low levels to the late 1990s (Braun 1998).  Mechanical treatments, if

carefully designed and executed, can be beneficial to sage-grouse by improving

herbaceous cover, improving forb production, and resprouting sagebrush (Braun 1998).

However, adverse effects also have been documented (Connelly et al. 2000a).

Mechanical treatments in blocks greater than 100 ha (247 ac), or of any size seeded with

65

exotic grasses, degrade sage-grouse habitat by altering the structure and composition of the vegetative community (Braun 1998).

For Gunnison sage-grouse the best available measure of potential grazing impacts is derived from monitoring habitat conditions in grazing allotments and comparing them to habitat objectives, although this comparison has not occurred for most BLM lands in the Gunnison sage-grouse range. Where information is available, it is presented below.

Within the current range in the Gunnison Basin, 23 of 66 BLM allotments have sage-grouse habitat objectives and conservation measures incorporated into the allotment management plans or Records of Decision for permit renewals (BLM, unpubl. lit. 2005i). In 2002, 50 percent of the Wyoming big sagebrush/Indian ricegrass (Achnathrum hymenoides) vegetation, which accounts for a significant portion of the nesting/early brood-rearing habitat, met the desired condition on BLM lands in the area (GSRSC 2005). In 2003, 75 percent of 32,000 ha (80,000 ac) of nesting/early brood-rearing habitat monitored met habitat objectives (BLM, unpubl. lit. 2004). Under 50 percent of the 579 km (360 mi) of riparian areas, which are important for brood-rearing, met desired conditions identified in the Gunnison Basin Conservation Plan (1997) and 85 percent met short-term stubble height objectives (nesting cover) (BLM, unpubl. lit. 2004). In 2004, 23,000 ha (56,000 ac) were monitored within a 3-km (2-mi) radius of a lek, and less than 2 percent met the local (Gunnison Basin Conservation Plan 1997) objectives for grass stubble height (BLM, unpubl. lit. 2005j). However, grass growth may have been

66

suppressed by effects of drought, which appeared to be impacting habitat in most populations in 2004 (See Factor E for further drought discussion).

Although BLM has stated that it does not consider grazing to be problematic in the portions of the San Miguel Basin they manage (BLM, unpubl. lit. 2005d), no sage-grouse habitat objectives or conservation measures are in allotment management plans or grazing permits for their allotments (BLM, unpubl. lit. 2005d and 2005g). On BLM land in the Dry Creek Basin group remaining sagebrush patches have been subjected to overgrazing and continue to succeed to a late-seral sagebrush community lacking in understory. This is not optimal for sage-grouse use (CDOW, unpubl. lit. 2005g). We were unable to acquire information on grazing intensity on public or private land.

Eight BLM grazing allotments totaling 2,700 ha (6,700 ac) occur within the current range in the Monticello group (San Juan County GSWG, unpubl. lit. 2005). Few or no habitat objectives or conservation measures have been incorporated in BLM allotment management plans, nor have changes in grazing intensity been implemented for sage-grouse in the group. No data are available on whether grazing lands on BLM or private land are meeting sage-grouse habitat objectives for the Monticello group. The CRP has provided a considerable amount of brood-rearing habitat in the Monticello group because of its forb component. Grazing of CRP in Utah occurred in 2002 under emergency Farm Bill provisions due to drought. Radio-collared males and non-brood-rearing females exhibited temporary avoidance of grazed fields during and

67

> **Formatted:** Font: 12 pt
>
> **Formatted:** Line spacing: Double
>
> **Comment [TG95]:** We need to insert what the BLM sage grouse strategy is accomplishing. There are specific terms and conditions and stipulations out there on specific allotments that may not show up in AMPs. I seriously doubt that there are no conservation measures in any permit anywhere in the Gunnison's habitat. I'd like Colorado State office of BLM to check the validity of this statement.
> BASED IN DISCUSSION WITH BLM WO, LITTLE OF THE BLM STRATEGY BEYOND ADMIN ACTIONS HAVE BEEN IMPLEMENTED. THE STRATEGY CALLS FOR ASSESSMENTS FIRST, NOT ACTIONS
>
> **Formatted:** Font: 12 pt

after grazing (San Juan County GSWG, unpubl. lit. 2005), although one hen with a brood

continued to use a grazed CRP field.

**Comment [TG96]:** We need to insert what the BLM sage grouse strategy is accomplishing. There are specific terms and conditions and stipulations out there on specific allotments that may not show up in AMPs. I seriously doubt that there are no conservation measures in any permit anywhere in the Gunnison's habitat. I'd like Colorado State office of BLM to check the validity of this statement.
SEE PREVIOUS COMMENT RESPONSE.

**Formatted:** Font: 12 pt

Fifty grazing allotments on BLM land are within the current range in the Piñon

Mesa population (BLM, unpubl. lit. 2005a).  We do not know the extent of grazing on the

private land within the Piñon Mesa sage-grouse range.  Only three BLM allotments

(6 percent) have Gunnison sage-grouse habitat objectives incorporated into the allotment

management plan or grazing permit in this area.

In the Crawford population there are nine BLM grazing allotments, totaling about

8,500 ha (21,000 ac) or 60 percent of the habitat.  Sage-grouse conservation measures

have been incorporated into seven of the allotment plans.  The BLM (unpubl. lit. 2005c)

believes that livestock grazing is not a threat, at least on BLM land, to the Crawford

population due to reductions of Animal Unit Months and recent changes in grazing

management.  The Gunnison Gorge Land Health Assessment showed that

34,000 out of 44,000 ha (84,000 out of 110,000 ac), or 76 percent of the current range,

met the land health standard for threatened and endangered species (including Gunnison

sage-grouse habitat).  The extent of livestock grazing on private land is unknown.

In conclusion, overgrazing and habitat manipulations to improve livestock forage

can impact sage-grouse habitat.  However, it is unclear whether effects from current

68

livestock grazing management, such as reduction of vegetation or spread of weeds

threaten Gunnison sage-grouse at a population or rangewide level.

We lack adequate information on the effect of deer and elk grazing on Gunnison

sage-grouse and their habitat to fully address this potential impact.  Overgrazing by deer

and elk may cause local degradation of habitats by removal of forage and residual hiding

and nesting cover.  Hobbs et al. (1996) documented a decline in available perennial

grasses as elk densities increased.  Such grazing could negatively impact nesting cover

for sage-grouse.  Excessive but localized deer and elk grazing has been documented in

the Gunnison Basin (BLM, unpubl. lit. 2005j; Paul Jones, CDOW, pers. comm. 2005).

The winter range of deer and elk overlaps the year-round range of the Gunnison

sage-grouse.  Deer and elk herds were above the carrying capacity of their winter range

before the 2002 drought and were not significantly reduced during or after it (BLM,

unpubl. lit. 2005j).  However, no evidence exists that competition for resources is

limiting Gunnison sage-grouse in the Gunnison Basin.  Although grazing by deer and elk

occurs in all population areas, information on overgrazing by deer or elk in other

populations has not been reported.

Invasive Weeds

Invasive species have been defined as those that are not native to an ecosystem

and whose introduction causes, or is likely to cause, economic or environmental harm or

harm to human health (Executive Order 13112, 1999).  Invasive species often cause

69

declines in native plant populations by reducing light, water, and nutrients, and they grow

so quickly that they outcompete other species (Wooten et al. 1996). Exotic plants can

reduce and eliminate populations of plants that sage-grouse use for food and cover.

Frequent fires with short intervals within sagebrush habitats favor invasion of cheatgrass,

which is unsuitable as sage-grouse habitat (Schroeder et al. 1999). Cheatgrass then

shortens the fire interval (from approximately 30 years down to 5 years), perpetuating its

own persistence and spread, and exacerbating the effects of fire in remaining sage-grouse

habitats (Whisenant 1990; Billings 1994; Grahame and Sisk 2002; Connelly et al. 2004).

A cheatgrass invasion into sagebrush habitat can lead to an eventual conversion of

sagebrush/perennial grass community to sagebrush/annual grass or annual grass

rangeland (Connelly et al. 2000a; Miller and Eddleman 2000). Rehabilitation of an area

to sagebrush after cheatgrass becomes established is extremely difficult (Connelly et al.

2004). In some cases cheatgrass invasion encourages other exotic species such as

knapweed and thistle (Grahame and Sisk 2002).

Cheatgrass has invaded areas in Gunnison sage-grouse range, supplanting

sagebrush plants upon which the species depend. Connelly et al. (2000a) indicated that

some greater sage-grouse populations have been affected and some will decline due to

projected, continuing spread of cheatgrass domination in the absence of effective

management. There has not been a demonstrated change in fire cycle in any population

of the Gunnison sage-grouse, so they may not be as threatened as greater sage-grouse.

While all of the Colorado Gunnison sage-grouse counties have noxious weed programs,

none identify cheatgrass as a noxious weed for control purposes (Colorado Department of

70

Agriculture 2003).  The BLM, on whose land many acres of cheatgrass occur, is currently restricted to application of 6 ha (15 ac) of an effective herbicide per Field Office per year, limiting their ability to control this noxious weed (BLM, unpubl. lit. 2005j).

Approximately 14,249 ha (35,200 ac) have been invaded by cheatgrass in the Gunnison Basin, equaling 6 percent of the current range (BLM, unpubl. lit. 2005j) with 405 ha (1,000 ac) considered dominated by cheatgrass (Sandy Borthwick, BLM, pers. comm. 2005) despite past treatments to control this weed (Gunnison Watershed Noxious Weed Program, unpubl. lit. 2005).  In addition, cheatgrass has been found at 50 other locations and 21 roads or road segments throughout the Gunnison Basin population's range.  Although disturbed areas contain the most weeds, they can readily spread into undisturbed habitat.  Given its invasive nature, cheatgrass may increase in the Gunnison Basin in the future, but the actual extent or rate of increase is uncertain.  Cheatgrass is present throughout much of the current range in the San Miguel Basin (BLM, unpubl. lit. 2005d).  It is sparsely scattered in the five Gunnison sage-grouse groups east of Dry Creek Basin, which are at higher elevation, and does not appear to pose a serious threat to them (CDOW, unpubl. lit. 2005g).  Because cheatgrass can readily dominate native plant communities at lower elevations (CDOW, unpubl. lit. 2005g), it may be an impact to the Dry Creek Basin group, which comprises 62 percent of the San Miguel Basin population.  Invasive species are present at low levels in the Monticello groups (San Juan County GSGWG, unpubl. lit. 2005).  However, there is no evidence that they are impacting the population.  Cheatgrass dominates 10-15 percent of the sagebrush understory in the current range of the Piñon Mesa population (R. Lambeth, BLM, pers. comm. 2005).  It

71

occurs in the lower elevation areas below Piñon Mesa that were formerly Gunnison sage-grouse range. It invaded two small prescribed burns in or near occupied habitat conducted in 1989 and 1998 (BLM, unpubl. lit. 2005a), and continues to be a concern with any ground disturbing projects. Four invasive weedy forbs also occur in the area, but occupy less than 4 ha (10 ac) (BLM, unpubl. lit. 2005a). Invasive weeds, especially cheatgrass, occur primarily along roads, other disturbed areas, and isolated areas of untreated vegetation in the Crawford population. No current estimates of the extent of weed invasion are available (BLM, unpubl. lit. 2005d).

Although invasive weeds, especially cheatgrass, have impacted some sage-grouse habitat, the impacts do not appear to be threatening individual populations or the species rangewide.

Fire

There have been significant changes in fire frequency, distribution, and intensity since European settlement (Young et al. 1979; Miller and Eddleman 2000). The effects of fire on sagebrush habitats vary according to the species and subspecies of sagebrush and other plant species present (e.g., the understory) and the frequency, size and intensity of fires. Widely variable estimates of mean fire intervals have been described in the literature--35-100 years (Brown 2000), greater than 50 years for big sagebrush communities (McArthur 1994), 12-15 years for mountain big sagebrush (Artemesia tridentata vaseyana) (Miller and Rose 1999), 20-100 years (Peters and Bunting 1994),

72

10-110 years depending on sagebrush species or subspecies and specific geographic area (Kilpatrick 2000), and 13-25 years (Frost 1998 cited in Connelly et al. 2004).

Fire tends to extensively reduce the sagebrush component within the burned areas. Time needed for most sagebrush species and subspecies to reestablish after burning suggests they evolved in an environment where wildfire was infrequent (interval of 30-50 years) and patchy in distribution (Braun 1998). Prior to European settlement, fire patterns in sagebrush communities were patchy, particularly in Wyoming big sagebrush, due to the discontinuous and limited fuels and unburned islands that remained after a fire (Miller and Eddleman 2000). Huff and Smith (2000) noted that these unburned islands appear to be important to the future recolonization of the sagebrush community by providing sources of sagebrush seed. Where sagebrush habitat has become fragmented and limited, there is potential for fire to eliminate the existing seed source, reducing the likelihood of natural regeneration.

A variety of techniques have been attempted at re-establishing sagebrush post-fire, with mixed success (Quinney et al. 1996, Livingston 1998). Restoration of the sagebrush biome following a fire has been complicated not only by the invasion of exotic annual plant species, but the difficulty associated with establishing sagebrush seedlings (Boltz 1994). Wirth and Pyke (2003) reported that forb response post-fire is dependant on the forb community pre-burn.

73

A clear positive response of sage-grouse to fire has not been demonstrated (Braun 1998). Call and Maser (1985) noted that fires could cause adverse conditions where cover is limited. Studies of prescribed fire in mountain big sagebrush at Hart Mountain National Antelope Refuge demonstrate short-term benefits in certain forbs, but the reduction in sagebrush cover potentially rendered habitat less suitable for nesting and brood-rearing for greater sage-grouse (Rowland and Wisdom 2002). Similarly, Nelle et al. (2000) reported that the removal of greater sage-grouse nesting and brood-rearing habitat by fire resulted in no increase in invertebrate abundance in the first year post-fire and hence, no benefit for greater sage-grouse chick foraging. This loss of nesting habitat created a long-term negative impact which would require 20 years of sagebrush regrowth before sufficient canopy cover was available for nesting birds (Nelle et al. 2000). Byrne (2002) reported the general avoidance of available burned habitats by nesting, brood-rearing, and broodless female greater sage-grouse. Connelly et al. (2000c) and Fischer et al. (1996) found that prescribed burning did not improve greater sage-grouse brood-rearing habitat in Wyoming big sagebrush, as forbs did not increase and insect populations declined as a result of the treatment. Hence fire in this sagebrush type may negatively affect brood-rearing habitat rather than improve it (Connelly and Braun 1997). However, Klebenow (1970), Gates (1983, as cited in Connelly et al. 2000c), Sime (1991 as cited in Connelly et al. 2000a), and Pyle and Crawford (1996) all indicated that fire could improve brood-rearing habitat. Slater (2003) reported that greater sage-grouse using burned areas were rarely found more than 60 m (200 ft) from the edge of the burn. In southeastern Idaho, Connelly et al. (2000c) concluded that, even though sage-grouse populations were in decline across the study area, population declines were more severe

74

in the post-fire years.  Fischer <u>et al.</u> (1997) concluded that habitat fragmentation, as a
result of fire, may influence distribution or migratory patterns in sage-grouse.

Three prescribed burns have occurred in the Gunnison Basin since 1984, totaling
700 ha (1,700 ac).  The fires created large sagebrush-free areas that were further degraded
by poor post-burn livestock management (BLM, unpubl. lit 2005b).  Two prescribed
burns conducted in 1986 (105 ha (260 ac)) and 1992 (140 ha (350 ac)) on BLM land in
the San Miguel Basin on the north side of Dry Creek Basin had negative impacts on
sage-grouse.  The burns were conducted for big game forage improvement, but Land
Health Assessments in 2004, noted that sagebrush had died and largely been replaced
with weeds (BLM, unpubl. lit. 2005h).  The 2002 Burn Canyon fire in the Dry Creek
Basin and Hamilton Mesa areas created a short-term habitat loss of 890 ha (2,200 ac).
Fire has apparently not occurred recently in the Monticello group.

One wildfire in the Gunnison Basin burned 445 ha (1,098 ac) in June 2002 (Sandy
Borthwick, BLM, pers. comm. 2006).  There appears to be a good response to the fire
from grass and forbs.  Mountain big sagebrush also appears to have responded well based
on seedling establishment in seeded and non-seeded areas.  Some cheatgrass, suspected to
have come in with the sagebrush seed, was observed on the seeded sites but was sparse
(Sandy Borthwick, BLM, pers. comm. 2006).  At least four wildfires in the last 20 years
burned 39,300 ha (97,200 ac) in the current range in the Piñon Mesa area and created
large expanses almost devoid of sagebrush and invaded by cheatgrass and Russian thistle
(<u>Salsola</u> spp) (BLM, unpubl. lit. 2005a).  Some wildfire suppression has occurred in

75

sage-grouse habitat in the vicinity of residences.  Fire occurs infrequently in the Crawford

area.  The Fruitland wildfire burned 240 ha (600 ac) of pinyon-juniper and old sagebrush

in 1996.  Two efforts to reseed the area with sagebrush and native forbs and grasses

failed and the area is now dominated by cheatgrass (BLM, unpubl. lit. 2005d).  Spread of

cheatgrass into other areas is an increasing threat due to its establishment in the burned

area.

Where fire suppression has occurred, sagebrush communities may advance

successionally to pinyon pine and juniper (Burkhardt and Tisdale 1969; Young and Evans

1981; Miller and Rose 1995; Miller et al. 2000; Wrobleski and Kauffman 2003),

eventually resulting in a near total loss of shrubs and sage-grouse habitat (Miller and

Eddleman 2000).  Gambel oak invasion as a result of fire suppression also has been

identified as a potential threat to Gunnison sage-grouse (CDOW, unpubl. lit. 2002).

Trees provide perches for raptors; consequently, Gunnison sage-grouse avoid areas with

pinyon-juniper (Commons et al. 1999).

Native tree or shrub encroachment on 11,336 ha (28,000 ac) or 5 percent of the

current range has occurred in the Gunnison Basin.  Oakbrush encroachment is a potential

threat in the San Miguel Basin, especially in the five easterly and higher elevation groups.

Approximately 2,955 ha (7,300 ac) or 9 percent of the current range in these areas are

dominated by oakbrush.  Mountain shrubs also have encroached on about 3,280 ha

(8,100 ac) or 9 percent of habitat in the San Miguel Basin population (GSRSC 2005).  No

pinyon-juniper dominated areas are within the current range.

76

The Monticello area has 1,170 ha (2,889 ac) or 5 percent of the current range dominated by oakbrush (GSRSC 2005). Pinyon and juniper trees are reported to be encroaching throughout the current range in the Monticello group, based on a comparison of historical versus current aerial photos, but there has been no quantification or mapping of the encroachment (San Juan County GSWG, unpubl. lit. 2005). A relatively recent invasion of pinyon and juniper trees between the Dove Creek and Monticello groups appears to be contributing to their isolation from each other (GSRSC 2005).

About 1,600 ha (3,935 ac) of trees and shrubs dominate 16 percent of the current range in the Piñon Mesa area (GSRSC 2005). In addition to limiting habitat, tree and shrub encroachment is further isolating Piñon Mesa from the Crawford and San Miguel populations, thereby impacting connectivity and maintenance of genetic diversity (see discussion under Factor E). Approximately 9 percent of the 1,300 ha (3,200 ac) of the current range in the Crawford population is classified as dominated by pinyon-juniper (GSRSC 2005). However, BLM (unpubl. lit. 2005f) estimates that as much as 20 percent of the population area is occupied by pinyon-juniper. The Crawford population also has about 400 ha (953 ac) or 3 percent of oakbrush-dominated land in the current range (GSRSC 2005).

Although fire suppression has likely caused low to moderate levels of native tree and shrub encroachment in the populations we copnsidered, none of the encroachment is sufficient to pose threat to the Gunnison sage-grouse at a population or rangewide level.

77

Fires can cause spread of weeds and burn suitable sage-grouse habitat, but they do not threaten the species currently and we do not anticipate that they will in the future.  Fires can be beneficial by rejuvenating forbs and grasses and reducing encroachment of native trees and shrubs.

Conclusion for Factor A

Habitat fragmentation resulting in elimination or near elimination of exchange of individual Gunnison sage-grouse among populations is occurring in all populations.  Population isolation is most pronounced in Pinon Mesa and Monticello.  There also is some evidence that the Monticello and Dove Creek groups have recently been separated from each other by habitat changes; however, there is no evidence that habitat fragmentation has limited exchange of sage-grouse within other populations, including the San Miguel Basin population which has six groups separated by 1-4 air miles.

Forty three percent of the occupied habitat in the Monticello group was converted to agriculture in the past, but little conversion is expected there in the future.  Other occupied population areas have had lower percentages of converted land with no conversion expected in the future.  There is evidence that Gunnison sage-grouse will not use agricultural fields further than about 50 m (160 ft) from the edge for foraging but no evidence that agricultural conversion has led to rangewide threats to the sage-grouse.  Reservoirs caused fragmentation and/or loss of a small percentage of habitat in the Gunnison Basin population and the Gurley and Miramonte groups in the San Miguel

78

Basin population. There is no evidence that reservoir development has caused

range-wide or population-wide threats to the Gunnison sage-grouse.

Other than two direct mortalities in the San Miguel Basin population, we were

unable to find any data directly relating effects of roads to impacts on Gunnison

sage-grouse populations. Based on the stable population trend, the current network of

roads does not appear to be a threat to the species, and we have no information that

indicates that future road development will pose a threat to the species rangewide.

Despite the presence of powerlines in all populations there also is no evidence that they

are threatening Gunnison sage-grouse populations rangewide or within populations.

Urban or exurban development does not appear to be a threat to the sage-grouse

based on the low human population densities in all but one county with Gunnison

sage-grouse. Projections of human population growth and housing development are not

known to be a rangewide threat.

High potential for oil and gas development only exists in the San Miguel Basin

population and Monticello group; high to medium potential exists in the Crawford

population. Low or no potential exists in the Gunnison Basin and Pinon Mesa

populations. Energy development on Federal lands can contain conservation measures

for wildlife species (see Factor D for a more thorough discussion). We have no evidence

that oil and gas development will threaten the Gunnison sage-grouse rangewide in the

foreseeable future. Other energy development activities, such as wind turbine

79

development, are not expected to cause a threat to the Gunnison sage-grouse rangewide in the foreseeable future. Additionally, coal or hardrock mining appears to pose little threat to occupied habitat.

Although overgrazing can impact habitat, it is unclear whether effects from current livestock grazing management, such as reduction of vegetation below suitable conditions or spread of weeds threaten the Gunnison sage-grouse at a population or rangewide level. Cheatgrass may impact sage-grouse habitat in nearly all Gunnison sage-grouse populations, but there has not been a demonstrated change in fire cycle in any population, nor is it documented that cheatgrass, at its current distribution and density, will threaten the Gunnison sage-grouse in the foreseeable future. Invasive weeds other than cheatgrass occur in some populations but at levels that do not cause a threat to the Gunnison sage-grouse.

Fires can cause spread of weeds and burn suitable sage-grouse habitat, but also may be beneficial by rejuvenating forbs and grasses and reducing encroachment of native trees and shrubs. Fire can be both beneficial and detrimental depending on location, size, and intensity and is not expected to be a rangewide threat in the foreseeable future. Although there has been low to moderate levels of native tree and shrub encroachment in nearly all the populations, most likely as a result of fire suppression, none of the encroachment is great enough to cause a documented threat to the Gunnison sage-grouse at a rangewide level.

80

Although various factors discussed in this section are believed to, or could potentially be, impacting the populations individually these factors have not caused significant declines in individual populations or the species rangewide.  Thus, based on the best scientific and commercial data available, we have concluded that destruction, modification, or curtailment of its habitat or range does not threaten or endanger the Gunnison sage-grouse throughout all or a significant portion of its range in the foreseeable future.

**Deleted:** or cumulatively,

**Comment [TG97]:** We have no support to state there may be cumulative impacts, therefore, it should be deleted. REVISIONS MADE

**B.  Overutilization for Commercial, Recreational, Scientific, or Educational Purposes.**

Hunting

**Formatted:** Strikethrough

~~Studies suggest that recreational hunting of sage-grouse may be compensatory (i.e., harvest replaces mortality that would have happened otherwise due to causes such as predation; or mortality is compensated by increased productivity [Crawford 1982]), have no measurable effect on spring sage-grouse densities (Braun and Beck 1996), or may be additive (i.e., harvest adds more deaths per year to the total otherwise attributable to other causes, and is not compensated by increased productivity [Zunino 1987; Connelly et al. 2000a]).  Johnson and Braun (1999) concluded that harvest mortality may be additive for sage-grouse if adult females and young birds sustain the highest hunting mortality within a population.  No studies have demonstrated that regulated hunting is a primary cause of widespread reduced numbers of greater sage-grouse (Connelly et al. 2004).~~

**Formatted:** Strikethrough
**Formatted:** Strikethrough
**Formatted:** Strikethrough

**Formatted:** Strikethrough
**Formatted:** Strikethrough
**Formatted:** Strikethrough

81

~~Hunting of Gunnison sage-grouse is regulated by the State wildlife agencies (GSRSC 2005).  Hunting in the Gunnison Basin appears to have been compensatory, as it had little if any impact on the population (CDOW, unpubl. lit. 2005g).  However,~~ Sage-grouse hunting was eliminated in the Gunnison Basin in 2000 due to concerns with

Deleted: s

meeting population objectives as suggested in the Gunnison Basin Conservation Plan (1997).  It is not known if hunting contributed to the failure to meet these objectives. Hunting has not occurred in the other Colorado populations of Gunnison sage-grouse since 1995 when the Pinon Mesa area was closed (GSRSC 2005).  Utah has not allowed hunting since 1989.  Both States have committed to disallow hunting until the species is no longer a candidate for listing or no longer federally-listed and will only consider hunting if populations can sustain (GSRSC 2005).  Furthermore, hunting will be restricted to only 5-10 percent of the fall population, and will be structured to limit harvest of females to the extent possible (GSRSC 2005).  Public input will be considered when determining if hunting seasons should be reinstated (GSRSC 2005).  We are not aware of any studies or other data that demonstrate that poaching (illegal harvest) has contributed to Gunnison sage-grouse population declines in either State.

<u>Lek Viewing</u>

The Gunnison sage-grouse is a newly designated species, which prompts bird watchers to view it for their "life lists" and may lead to disturbance in commonly known leks.  Daily human disturbances on sage-grouse leks could cause a reduction in mating,

82

and some reduction in total production (Call and Maser 1985). Boyko et al. (2004, as cited in GSRSC 2005) determined that human disturbance, particularly if additive to disturbance by predators, could reduce the time a lek is active, as well as reduce its size by lowering male attendance. Smaller lek sizes have been hypothesized to be less attractive to females, thereby conceivably reducing the numbers of females mating there. Disturbance during the peak of mating also could result in some females not breeding (GSRSC 2005). Lek viewing might affect nesting habitat selection by females (GSRSC 2005), as leks are typically close to areas in which females nest. If females move to poorer quality habitat farther away from disturbed leks, nest success could decline. If chronic disturbance causes sage-grouse to move to a new lek site away from preferred and presumably higher-quality areas, both survival and nest success could decline. Whether any or all of these have significant population effects would depend on timing and degree of disturbance (GSRSC 2005).

The BLM closed a lek in the Gunnison Basin to viewing in the late 1990s due to declining population counts which were perceived as resulting from recreational viewing activities, although no scientific studies were conducted (BLM, unpubl. lit. 2005j; GSRSC 2005). A comparison of male counts on a designated viewing lek versus male counts on other leks in the general area, show that the viewing lek's counts followed the same trend line as leks in the rest of the area (GSRSC 2005). Lek viewing protocols on designated leks have generally been followed (GSRSC 2005). Two lek-viewing tours are organized and led by UDWR per year in the Monticello group without noticeable effects

83

(Guy Wallace, UDWR, pers. comm. 2006). Data collected by CDOW indicates that controlled lek visitation also has not impacted greater sage-grouse (GSRSC 2005).

Scientific Research

Gunnison sage-grouse have been the subject of scientific research studies, some of which included the capture and handling of the species. Few, direct mortalities have occurred during recent studies and it does not appear that research is having any significant impacts on the sage-grouse (Apa 2004; CDOW, unpubl. lit. 2005g). Most research is conducted in the Gunnison and San Miguel Basin populations; the two largest populations. Based on the available information, we believe scientific research on Gunnison sage-grouse is a relatively minor impact, with only short-term effects to individuals in localized areas.

Conclusion for Factor B

We have no evidence suggesting that hunting has resulted in overutilization of Gunnison sage-grouse. Future hunting restrictions should adequately conserve Gunnison sage-grouse. Based on limited data it appears that lek viewing has not impacted the Gunnison sage-grouse and lek viewing protocols designed to reduce disturbance have generally been followed. Scientific research appears to be limited to short-term impacts of individuals in localized areas and is not a rangewide threat. We know of no overutilization for commercial or educational purposes. Thus, based on the best scientific

84

and commercial data available, we have concluded that overutilization for commercial,

recreational, scientific, or educational purposes does not threaten or endanger the

sage-grouse throughout all or a significant portion of its range in the foreseeable future.

**C.  Disease or Predation.**

Disease

Nothing has been published about the types or pathology of diseases in Gunnison

sage-grouse.  However, multiple bacterial and parasitic diseases have been documented

in greater sage-grouse (Patterson 1952; Schroeder et al. 1999).  Some early studies have

suggested that greater sage-grouse populations are adversely affected by parasitic

infections (Batterson and Morse 1948).  No parasites have been documented to cause

mortality in Gunnison sage-grouse, but the protozoan, Eimeria spp., which causes

coccidiosis, has been reported to cause death (Connelly et al. 2004).  Infections tend to be

localized to specific geographic areas and no cases of greater sage-grouse mortality

resulting from coccidiosis have been documented since the early 1960s (Connelly et al.

2004).

Parasites also have been implicated in greater sage-grouse mate selection, with

potentially subsequent effects on the genetic diversity of this species (Boyce 1990;

Deibert 1995).  Connelly et al. (2004) note that while these relationships may be

important to the long-term ecology of greater sage-grouse, they have not been shown to

85

be significant to the immediate status of populations.  However, Connelly et al. (2004)

have suggested that diseases and parasites may limit isolated sage-grouse populations

such as most of the Gunnison sage-grouse populations.  However, we have no evidence

indicating that bacterial or parasitic diseases are affecting Gunnison sage-grouse

individuals or populations.

Greater sage-grouse also are subject to a variety of bacterial, fungal, and viral

pathogens.  The bacteria Salmonella spp., has caused mortality in the greater sage-grouse;

the bacteria is apparently contracted through exposure to contaminated water supplies

around livestock stock tanks (Connelly et al. 2004).  Other bacteria found in sage-grouse

include Escherichia coli, botulism (Clostridium spp.), avian tuberculosis (Mycobacterium

avium), and avian cholera (Pasteurella multocida).  These bacteria have never been

identified as a cause of mortality in greater sage-grouse and the risk of exposure and

hence, population effects, is low (Connelly et al. 2004).  We have no reason to expect that

mortality and exposure risk are different in Gunnison sage-grouse.

West Nile virus (WNv; Flavivirus) was first diagnosed in greater sage-grouse in

2003, and has been shown to affect their survival rates.  Experimental results, combined

with field data, suggest that a widespread WNv infection could negatively impact greater

sage-grouse (Naugle et al. 2004; Naugle et al. 2005).  Summer habitat requirements of

sage-grouse potentially increase their exposure to WNv.  Sage-grouse hens and broods

congregate in mesic habitats in the mid- to late summer, thereby placing them in the same

potential habitats as the WNv mosquito (Culex spp.), vector when the mosquitoes are

86

likely to be active.  Surface water sources that have been created for agricultural,

livestock, and energy and mining activities may increase the contact between sage-grouse

and the mosquito vector.  To date, WNv has not been documented in Gunnison

sage-grouse despite the presence of WNv-positive mosquitoes in all counties throughout

their range (Colorado Department of Public Health 2004; Centers for Disease Control and

Prevention 2004).

Predation

Predation is the most commonly identified cause of mortality in sage-grouse

(Bergerud 1988; Schroeder et al. 1999; Connelly et al. 2000b).  The composition and

density of predator communities can vary greatly across space and time (Greenwood

1986; Johnson et al. 1989; Sargeant et al. 1993; Sovada et al. 1995).  The effect of

predation on the demographic structure and population fluctuations of Gunnison

sage-grouse is unknown will depend on the composition of the predator community,

grouse population levels, and habitat condition.  In a study of nesting Gunnison

sage-grouse, Young (1994) documented only 1 predation event in 37 nesting attempts.

Predation on greater sage-grouse has been well documented.  Predators of adult greater

sage-grouse include coyotes (Canis latrans), bobcats (Lynx rufus), weasels (Mustela

spp.), golden eagles, red-tailed hawks (Buteo jamaicensis), Swainson's hawks

(B. swainsoni), and ferruginous hawks (B. regalis) (Hartzler 1974; Schroeder et al. 1999;

Schroeder and Baydack 2001).  Avian predators, primarily corvids (Corvus spp., were

major predators of greater sage-grouse nests in Idaho (Autenrieth 1981) and Washington

87

(Vander Haegen 2002), while ground squirrels and badgers (<u>Taxidea taxus</u>) were major nest predators in Wyoming (Patterson 1952). Most mammalian predation is on eggs; only coyotes and red foxes (<u>Vulpes vulpes</u>) are likely to prey on all sage-grouse life stages (GSRSC 2005). Young (1994) found that the most common predators of Gunnison sage-grouse eggs were weasels, ground squirrels and coyotes. Most raptor predation of sage-grouse is on juveniles and older age classes, while corvids mainly affect clutches (GSRSC 2005).

Predation rates vary seasonally. The period of highest mortality for yearling and adult males occurs during the lekking season, as they are very conspicuous while performing their mating display. Adult female greater sage-grouse are most susceptible to predators while on the nest or during brood-rearing when they are with young chicks (Schroeder and Baydack 2001). Autenrieth (1981) concluded that predation of eggs was the most important population constraint in Idaho at that time, and this appears to be the case for Gunnison sage-grouse, based on limited data (Young 1994). Schroeder and Baydack (2001) suggest that high variation in nest success may be due to nest predators. Nest predation may be higher, more variable, and have a greater impact on small, fragmented Gunnison sage-grouse populations (GSRSC 2005).

The population viability analysis of Gunnison sage-grouse (GSRSC 2005) found that mortality of chicks and breeding-age hens contributed substantially to increasing the relative probability of extinction because these two groups contribute most significantly to population productivity. Gregg <u>et al.</u> (2003a, 2003b) found that chick predation

88

mortality in greater sage-grouse ranged from 10 to 51 percent from 2002-2003 on three study sites in Oregon.  The juvenile mortality rate, during the first few weeks after hatching, has been estimated to be 63 percent (Wallestad 1975 in Schroeder and Baydack 2001).  While chicks are very vulnerable to predation during this period, other causes of mortality, such as weather, are included in this estimate.

Female Gunnison sage-grouse with nests that were predated nested in sites with lower shrub density and lower forb and grass cover (Young 1994).  Habitat alteration that reduces cover for young greater sage-grouse chicks can increase the rate of predation on this age class (Schroeder and Baydack 2001).

Increasing residential development increases the likelihood that feral cats (Felis domesticus) and dogs (Canis domesticus) will be introduced into local Gunnison sage-grouse populations.  Development also can contribute to increased populations of predators (e.g., red foxes, American crows (Corvus americanus)) that are frequently associated with altered landscapes (GSRSC 2005).  Agricultural development, landscape fragmentation, and human populations have the potential to increase predation pressure by forcing birds to nest in marginal habitats, by increasing travel time through habitats where they are vulnerable to predation, and by increasing the diversity and density of predators (Ritchie et al. 1994; Schroeder and Baydack 2001; Connelly et al. 2004; Summers et al. 2004).  Where greater sage-grouse habitat has been altered in localized areas, the influx of predators can limit populations (Gregg et al. 1994; Braun 1998; DeLong et al. 1995; Schroeder and Baydack 2001).  Habitat fragmentation and the

89

resultant predation increase may be a limiting factor for the Gunnison sage-grouse
(Oyler-McCance et al. 2001).

Municipal solid waste landfills have been shown to contribute to increases in
common raven populations (Knight et al. 1993; Restani et al. 2001; Webb et al. 2004).
Ravens are known to prey on sage-grouse and have been considered a restraint on
sage-grouse population growth in some locations (Batterson and Morse 1948; Autenrieth
1981; Altstatt 1995). However, no studies could be found that linked landfill presence,
common raven populations, and sage-grouse population levels.

The effect of predation on the fluctuations and viability of sage-grouse
populations has never been investigated (Connelly and Braun 1997; Connelly et al 2000b;
Schroeder and Baydack 2001). Research conducted to determine survival and nest
success in greater sage-grouse concluded that predation typically does not limit
sage-grouse numbers (Connelly and Braun 1997; Connelly et al. 2000a; Connelly et al.
2000b; Wambolt et al. 2002). This conclusion is supported by evidence showing that
predator removal does not have long-lasting effects on sage-grouse population size or
stability over large regions (Cote and Sutherland 1997; Schroeder et al. 1999; Wambolt et
al. 2002). For example, Slater (2003) demonstrated that coyote control failed to produce
an effect on greater sage-grouse nesting success in southwestern Wyoming. In their
review of literature regarding predation, Connelly et al. (2004) noted that only two of
nine studies examining survival and nest success indicated that predation had limited a
sage-grouse population by decreasing nest success. However, both studies indicated that

90

low nest success due to predation was ultimately related to poor nesting habitat. Connelly et al. (2004) further noted that the idea that predation is not a widespread factor depressing sage-grouse populations is supported by studies of nest success rates, by the relatively high survival of adult birds, and by the lack of an effect on nesting success as a result of coyote control.

In a study of 28 radio-collared Gunnison sage-grouse in the Monticello group, 11 birds died, but only 4 of these could be attributed to predation by coyotes or eagles (San Juan County GSWG, unpubl. lit. 2005).  However, demographic studies of Gunnison sage-grouse in the San Miguel Basin population suggests, but does not conclusively prove, that predation may be impacting this population (CDOW, unpubl. lit. 2005g).  No information is available for the other populations considered.

Conclusion for Factor C

No rangewide or population level impacts of bacterial, viral, fungal, or parasitic diseases on Gunnison sage-grouse have been reported, including WNv.  There also is no evidence to suggest that predation is a population or rangewide threat to Gunnison sage-grouse.  Thus, based on the best scientific and commercial data available, we have concluded that disease and predation do not threaten or endanger the sage-grouse throughout all or a significant portion of its range in the foreseeable future.

**D.  The Inadequacy of Existing Regulatory Mechanisms.**

91

<u>Local Laws and Regulations</u>

Approximately 43 percent of occupied Gunnison sage-grouse habitat is privately owned (GSRSC 2005).  Gunnison County and San Miguel County, Colorado, are the only entities that have ordinances within the species' range that provide a level of conservation consideration specifically for the Gunnison sage-grouse or their habitats on private land (Dolores County 2002; Mesa County, unpubl. lit. 2003; Montrose County 2003).  In 2001, Gunnison County, Colorado developed Land Use Resolutions (LUR) to be consistent with the Memorandum of Agreement (MOA) signed for the Gunnison Basin Conservation Plan in 1998 (Gunnison County 2001).  In the MOA, Gunnison County agreed to "…reasonably consider sage-grouse conservation actions in its regulation of land use…" and to implement the Gunnison Basin Conservation Plan to the best of their ability.  In 2003, the LUR was revised slightly to allow two houses on 35 acres rather than one house without County review.  In 2005, San Miguel County amended its Land Use Codes to include consideration and implementation, to the extent possible, of conservation measures for the sage-grouse when considering land use activities and development located in Gunnison sage-grouse habitat (San Miguel County, unpubl. lit. 2005).  In addition to the county protections, Gunnison County has hired a Gunnison Sage-grouse Coordinator and organized a Strategic Committee to facilitate implementation of conservation measures in the Gunnison Basin under both the local Conservation Plan and RCP.  San Miguel County is currently pursuing hiring a Gunnison

92

Sage-grouse Coordinator for the San Miguel Basin population. The efforts of these two counties reflect positively on their willingness to conserve Gunnison sage-grouse.

Colorado State statute (C.R.S. 30-28-101) exempts parcels of land of 14 ha (35 ac) or more per home from regulation, so county zoning laws in Colorado can only restrict developments with housing densities greater than one house per 14 ha (35 ac). We could find no data on the precise threshold of the number of acres per house that will impact Gunnison sage-grouse.

Habitat loss is not regulated or monitored in Colorado counties where Gunnison sage-grouse occurs. Therefore, conversion of agricultural land from one use to another, such as native pasture containing sagebrush converted to another use, such as cropland, would not normally come before a county zoning commission.

We recognize that county or city ordinances in San Juan County, Utah, that address agricultural lands, transportation, and zoning for various types of land uses have the potential to influence sage-grouse. However, we were unable to obtain information regarding the nature or extent of zoning efforts and their direct or indirect effects on populations and habitats.

State Laws and Regulations

93

Ex. R: Privilege-Waived Records          Page 239 of 284

Colorado Revised Statutes, Title 33 Article 1 give CDOW responsibility for the management and conservation of wildlife resources within State borders. Title 33 Article 1-101, Legislative Declaration requires a continuous operation of planning, acquisition, and development of wildlife habitats and facilities for wildlife-related opportunities. The CDOW is required by statute (C.R.S. 106-7-104) to provide counties with information on "significant wildlife habitat," and provide technical assistance in establishing guidelines for designating and administering such areas, if asked. The CDOW also has authority to regulate possession of the Gunnison sage-grouse, set hunting seasons, and issue citations for poaching. The Wildlife Resources Code of Utah (Title 23) provides UDWR the powers, duties, rights, and responsibilities to protect, propagate, manage, conserve, and distribute wildlife throughout the State.
Section 23-13-3 declares that wildlife existing within the State, not held by private ownership and legally acquired, is property of the State. Sections 23-14-18 and 23-14-19 authorize the Utah Wildlife Board to prescribe rules and regulations for the taking and/or possession of protected wildlife, including Gunnison sage-grouse.

Gunnison sage-grouse are managed by CDOW and UDWR on all lands within each State as resident native game birds. In both states this classification allows the direct human taking of the bird during hunting seasons authorized and conducted under State laws and regulations. However, in 2000, CDOW closed the hunting season for Gunnison sage-grouse in the Gunnison Basin, the only area then open to hunting for the species. The hunting season for Gunnison sage-grouse in Utah has been closed since 1989. The Gunnison sage-grouse is listed as a species of special concern in Colorado and

94

a sensitive species in Utah providing heightened priority for management (Gary Skiba, CDOW, pers. comm. 2006; Guy Wallace, UDWR pers. comm. 2006).

Easements that prevent long-term or permanent habitat loss by prohibiting development are held by CDOW, UDWR, Natural Resources Conservation Service (NRCS), NPS, and non-governmental organizations (Table 2). Some of the easements include conservation measures that are specific for Gunnison sage-grouse, while most are directed at other species, such as big game (GSRSC 2005). We do not have information on the location or size of the easements with sage-grouse specific conservation measures and, therefore, we cannot assess their overall value to Gunnison sage-grouse.

Table 2. Acres of conservation easements by population and percentages of occupied habitat protected by easements (GSRSC 2005).

| POPULATION | NUMBER OF ACRES | % OF OCCUPIED HABITAT |
|---|---|---|
| Gunnison Basin | 26,145 | 4 |
| San Miguel Basin | 844 | 1 |
| Monticello | 2,560 | 1 |
| Piñon Mesa | 7,314 | 19 |
| Crawford | 523 | 2 |

The CDOW has been gathering information from landowners who may be interested in signing up under the CCAA referenced earlier in this document. As of January 2006, 72 landowners owning 41,278 ha (102,000 ac) have expressed an interest in enrolling their lands under the CCAA.

Regulation of non-coal mining in the United States is at the discretion of the individual States. Colorado law (State Statute Title 34, Article 32) contains language

95

intended to protect wildlife resources through appropriate reclamation and encourages revegetation using native species.  Utah mining regulations (R647-4-110) allow reclamation to wildlife resource use.

We are not aware of any conservation measures implemented for potential oil and gas development impacts to Gunnison sage-grouse on private lands underlain with privately-owned minerals, which are regulated by the Colorado Oil and Gas Conservation Commission or the Utah Division of Oil, Gas, and Mining.  Colorado and Utah have laws that directly address the priorities for use of State school section lands, which require that management of these properties be based on maximizing financial returns.  We are not aware of any conservation measures established for Gunnison sage-grouse on State school section lands other than a request to withdraw or apply "no surface occupancy" and conservation measures from the RCP to four sections available for oil and gas leasing in the San Miguel Basin population (see Factor A for further discussion).  State school section lands account for only 1 percent of occupied habitat in Colorado and 1 percent in Utah so impacts may be considered negligible.  The UDWR does not own any land within occupied habitat in Utah.  The CDOW owns 2 percent of the occupied habitat in Colorado, with some management for Gunnison sage-grouse on those lands.

Federal Laws and Regulations

Gunnison sage-grouse are not covered or managed under the provisions of the Migratory Bird Treaty Act (16 U.S.C. 703-712).  Federal agencies are responsible for

96

managing 55 percent of the total Gunnison sage-grouse habitat (GSRSC 2005).  The

Federal agencies with the most sagebrush habitat are BLM, an agency of the Department

of the Interior, and USFS, an agency of the U.S. Department of Agriculture.  The NPS in

the Department of the Interior also has responsibility for lands that contain sage-grouse

habitat.


About 42 percent of occupied habitat is on BLM-administered land (GSRSC

2005).  The Federal Land Policy and Management Act of 1976 (FLPMA)

(43 U.S.C. 1701 et seq.) is the primary Federal law governing most land uses on

BLM-administered lands.  Section 102(a)(8) of FLPMA specifically recognizes wildlife

and fish resources as being among the uses for which these lands are to be managed.

Regulations pursuant to FLPMA and the Mineral Leasing Act (30 U.S.C. 181 et seq.) that

address wildlife habitat protection on BLM-administered land include 43 CFR 3162.3-1

and 43 CFR 3162.5-1; 43 CFR 4120 et seq.; 43 CFR 4180 et seq.


The BLM policy regarding candidate species occurring on BLM-managed land is

addressed under BLM Manual 6840-Special Status Species Management (BLM 2001).

Required actions include implementation of management plans for conserving the species

and its habitats; ensuring actions authorized, funded, or carried out by BLM do not

contribute to the need for the species to become listed; ensuring the species are

considered in RMPs; developing and participating in management plans and species and

habitat assessments; and monitoring the species for evaluation of management objectives

(BLM 2001).


97

Resource Management Plans (RMPs) are the basis for all actions and authorizations involving BLM-administered lands and resources. They establish allowable resource uses, resource condition goals and objectives to be attained; program constraints and general management practices needed to attain the goals and objectives; general implementation sequences; and intervals and standards for monitoring and evaluating the plan to determine its effectiveness and the need for amendment or revision (43 CFR 1601.0-5(k)).

The RMPs provide a framework and programmatic guidance for activity plans, which are site-specific plans written to implement decisions made in a RMP. Examples include Allotment Management Plans that address livestock grazing, oil and gas field development, travel management, and wildlife habitat management. Activity plan decisions normally require additional planning and National Environmental Policy Act (NEPA) analysis. With regard to special status species, including candidate species, BLM Manual 6840.22A states "Implementation-level planning should consider all site-specific methods and procedures which are needed to bring the species and their habitats to the condition under which the provisions of the Act are not necessary, current listings under special status species categories are no longer necessary, and future listings under special status species categories would not be necessary." Within the Gunnison Basin population 56 percent of the BLM allotment acreage in occupied habitat has Gunnison sage-grouse habitat objectives incorporated into the allotment management plans (BLM, unpubl. lit. 2005i). Rangewide, only 20 percent of BLM grazing allotments

98

have incorporated Gunnison sage-grouse conservation measures and/or habitat objectives into the allotment management plans or in permit renewals.

On November 16, 2004, BLM Instruction Memorandum (IM) 2005-024 transmitted information to all BLM field and Washington Office officials regarding the development of a National BLM Sage-grouse Habitat Conservation Strategy for BLM-administered lands.  This strategy is described as the framework to address the conservation of sage-grouse and risk to sagebrush habitats on lands and activities administered by BLM.  It commits BLM to work with States and local interests on this issue.  The IM instructed BLM State Directors to develop a process and schedule to update deficient RMPs to adequately address sage-grouse and sagebrush conservation needs.  The BLM has developed a process to update RMPs in Colorado, and has notified the Service of general timeframes for RMP updates but specific deadlines have not been provided.  The BLM continues to update applicable RMPs and activity plans.

The BLM has regulatory authority for oil and gas leasing, as provided at 43 CFR 3100 et seq., and they are authorized to require stipulations as a condition of issuing a lease.  The BLM is planning handbook has program-specific guidance for fluid minerals (which include oil and gas) that specifies that RMP decisions will identify restrictions on areas subject to leasing, including closures, as well as lease stipulations (BLM 2000).  The handbook also specifies that all stipulations must have waiver, exception, or modification criteria documented in the plan, and notes that the least restrictive constraint to meet the resource protection objective should be used (BLM

99

2000).  The BLM has regulatory authority to condition "Application for Permit to Drill"

authorizations, conducted under a lease that does not contain sage-grouse conservation

stipulations (BLM 2004).  Also, some oil and gas leases have a 193.12-km (0.12-mi)

stipulation, which allows movement of the drilling area by that distance (BLM 2004).

The BLM states that many of their field offices work with the operators to move a

proposed drilling site farther or justify such a move through the site-specific NEPA

process (BLM 2004).

For existing oil and gas leases on BLM land in occupied Gunnison sage-grouse

habitat, oil and gas companies can conduct drilling operations if they wish.  The BLM

has stopped issuing new drilling leases in occupied sage-grouse habitat in Colorado at

least until the new RMPs are in place.  All occupied habitat acreages in the Crawford

Area and Gunnison Basin populations are covered by this policy.  However, leases

already exist in 17 percent in the Pinon Mesa population, and 49 percent in the San

Miguel Basin population.  Enforcement of environmental compliance also may be

difficult with limited staff and budgets.  The Government Accountability Office (2005)

concluded that the number of oil and gas operations has increased so much the last

6 years that BLM staff cannot adequately conduct followup environmental inspections to

help protect the environment from natural gas development impacts in Colorado, Utah,

and three other western States.

The oil and gas leasing regulations authorize BLM to modify or waive lease terms

and stipulations if the authorized officer determines that the factors leading to inclusion

100

of the term or stipulation have changed sufficiently to no longer justify protection, or if proposed operations would not cause unacceptable impacts (43 CFR 3101.1-4). "Unacceptable impacts" has not been defined as to whether the impacts to an imperiled species override other resource values, or where this criteria comes into consideration. The Service does not have information on the type or number, or the basis for, exceptions, modifications, or waivers of stipulations pertaining to the Gunnison sage-grouse and/or their habitat that have been granted by BLM, or information on any impacts this would have on the Gunnison sage-grouse.

The Energy Policy and Conservation Act of 2000 included provisions requiring the Secretary of the Department of the Interior to conduct a scientific inventory of all onshore Federal lands to identify oil and gas resources underlying these lands and the nature and extent of any restrictions or impediments to the development of such resources (U.S.C. Title 42, Chapter 77, §6217(a)). On May 18, 2001, the President signed Executive Order 13212-Actions to Expedite Energy-Related Projects (66 FR 28357, May 22, 2001), which states that it is the Administration's policy that the executive departments and agencies shall take appropriate actions, to the extent consistent with applicable law, to expedite projects that will increase the production, transmission, or conservation of energy. The Executive Order specifies that this includes expediting review of permits or taking other actions as necessary to accelerate the completion of projects, while maintaining safety, public health, and environmental protections. The BLM has responded to these declarations with the issuance of several IMs to their staff that may influence sage-grouse conservation during these actions, including providing

101

guidance for planning relative to oil and gas operations and focusing efforts for resource

recovery in seven areas, two of which are within Gunnison sage-grouse habitats

(IM 2003-137, April 3, 2003; IM 2003-233, July 28, 2003; IM CO-2005-038, July 12,

2005).

The BLM regulatory authority for grazing management is provided at

43 CFR 4100 (Regulations on Grazing Administration Exclusive of Alaska). Livestock

grazing permits and leases contain terms and conditions determined by BLM to be

appropriate to achieve management and resource condition objectives on the public lands

and other lands administered by BLM, and to ensure that habitats are, or are making

significant progress toward being, restored or maintained for BLM special status species

(43 CFR 4180.1(d)). The State or regional standards for grazing administration must

address habitat for endangered, threatened, proposed, candidate, or special status species,

and habitat quality for native plant and animal populations and communities

(43 CFR 4180.2(d)(4) and (5). The guidelines must address restoring, maintaining or

enhancing habitats of BLM special status species, including candidate species, to

promote their conservation, as well as maintaining or promoting the physical and

biological conditions to sustain native populations and communities

(43 CFR 4180.2(e)(9) and (10). The BLM is required to take appropriate action not later

than the start of the next grazing year upon determining that existing grazing practices or

levels of grazing use are significant factors in failing to achieve the standards and

conform with the guidelines (43 CFR 4180.2(c)). The BLM agreed to work with their

resource advisory councils to expand the rangeland health standards required under

102

43 CFR 4180 so that there are public land health standards relevant to all ecosystems, not just rangelands, and that they apply to all BLM actions, not just livestock grazing (BLM Manual 180.06.A). Both Colorado and Utah have resource advisory councils. However, we have no information on how these rangeland health categories affect Gunnison sage-grouse habitats.

On December 8, 2003, BLM issued a proposed rule (68 FR 68452) to modify the current grazing management regulation in two ways: (1) it provides that assessment and monitoring standards are needed to support a determination that livestock grazing significantly contributes to not meeting a standard or conforming with a guideline; and (2) it requires BLM to analyze, formulate and propose appropriate action within 24 months of the determination rather than before the start of the next grazing year.

No RMPs have been updated to include Gunnison sage-grouse habitat objectives or conservation measures. We do not have data assessing whether current management practices facilitate habitat conditions necessary for the conservation of the Gunnison sage-grouse as outlined in the structural habitat guidelines in Appendix H of the RCP (GSRSC 2005).

However, in signing the RCP (GSRSC 2005), BLM has agreed to follow recommendations for conservation efforts addressing the effects of grazing, oil and gas development and other threats. To address the time requirement necessary to revise and incorporate Gunnison sage-grouse conservation measures and habitat objectives in

103

RMPs, the Colorado Office of the BLM issued IM CO-2005-038, which provides an interim policy to implement the RCP. The IM directs that the RCP guidance and strategies be applied through site-specific analysis consistent with NEPA for all projects or actions in Gunnison sage-grouse habitat. For surface disturbing activities such as oil and gas development the IM directs BLM staff to work with the operator to minimize habitat loss and fragmentation. Additionally, if the local conservation plans for each population have additional measures that address local conditions the IM directs BLM staff to consider if they are more effective than guidance in the RCP and, if so, to implement them. Full implementation of the RCP, according to the IM, will occur as guidance and strategies are considered and analyzed during RMP revisions and/or amendments.

The USFS has management authority for 10 percent of the occupied Gunnison sage-grouse habitat (GSRSC 2005). Management of Federal activities on National Forest System lands is guided principally by the National Forest Management Act (NFMA) (16 U.S.C. 1600-1614, August 17, 1974, as amended. The NFMA specifies that all National Forests must have a Land and Resource Management Plan (LRMP) (16 U.S.C. 1600) to guide and set standards for all natural resource management activities on each National Forest or National Grassland. The NFMA requires USFS to incorporate standards and guidelines into LRMPs (16 U.S.C. 1600). This has historically been done through a NEPA process, including provisions to manage plant and animal communities for diversity, based on the suitability and capability of the specific land area in order to

104

meet overall multiple-use objectives.  The USFS planning process is similar to that of

BLM.

      The 1982 NFMA implementing regulation for land and resource management

planning (1982 rule, 36 CFR 219), under which all existing forest plans were prepared,

requires USFS to manage habitat to maintain viable populations of existing native

vertebrate species on National Forest System lands (1982 rule, 36 CFR 219.19).  A new

USFS planning regulation was implemented on January 5, 2005 (70 FR 1023).  Plans

developed under the new regulation are to be more strategic and less prescriptive in

nature than those developed under the 1982 planning rule.  For example, previous plans

might have included a buffer for activities near the nest sites of birds sensitive to

disturbance.  Under the new regulation a desired condition description and guidelines will

be provided, rather than a set of prescriptive standards that apply to projects.  Planning,

and decisions for projects and activities, will address site-specific conditions and identify

appropriate conservation measures to take for each project or activity.

      Under the new regulation, the purpose of forest plans is to establish goals and to

set forth guidance to follow in pursuit of those goals.  The rule calls for five components

of plans: desired conditions; objectives; guidelines; suitability of areas; and special areas

(36 CFR 219.7(a)(2)).  The rule states that these components are intended to provide

general guidance and goals or other information to be considered in subsequent project

and activity decisions, and that none of these components are commitments or final

decisions approving projects and activities (36 CFR 219.7(a)(2)).  Approval of a plan,

plan amendment, or plan revision comprised of these five components may be categorically excluded from NEPA documentation (36 219.4(b)).

The new regulation does not include provisions regarding habitat for species viability. Rather, with regard to ecological sustainability, plans are to provide a framework to contribute to sustaining native ecological systems by providing ecological conditions to support diversity of native plants and animal species in the plan area (36 CFR 219.10 (b)). Ecosystem diversity is described as being the primary means by which a plan contributes to sustaining ecological systems (36 CFR 219.10 (b)), and USFS states that this focus is expected to conserve most species. The regulation defines species-of-concern as "Species for which the Responsible Official determines that management actions may be necessary to prevent listing under the Endangered Species Act" (36 CFR 219.16).

For each unit of the National Forest System, the transition period for the new regulation is 3 years (36 CFR 219.14). A document approving a plan developed, revised, or amended using the new regulation must include a description of the effects of the plan on existing permits, contracts, or other instruments implementing approved projects and activities (36 219.8(a)).

The Gunnison sage-grouse is designated as a USFS sensitive species in Region 2 (Colorado) and Region 4 (Utah). The forests within the range of sage-grouse provide important seasonal habitats for the species, particularly the Grand Mesa, Uncompahgre,

106

and Gunnison National Forests.  While the 1982 planning regulation, including its

provision for population viability, was used in the development of the existing Forest

Plans, no information has been provided regarding specific implementation of the above

new regulations and policies for the Gunnison sage-grouse.

We did not receive information from the USFS on whether habitat objectives and

conservation measures have been incorporated into grazing allotments and whether local

conservation plan sage-grouse habitat objectives and conservation measures have been

incorporated into Forest Plans or LRMPs.

The USFS would have to revise their Forest Plans to withdraw oil and gas activity

on their land.  To date USFS has not deferred or withdrawn oil and gas leasing in

occupied habitat, but sage-grouse conservation measures can be included at the

"Application for Permit to Drill" stage.  The BLM, which regulates oil and gas leases on

USFS lands, has the authority to defer leases.  However, the only population with USFS

lands that are in areas of high or even medium potential for oil and gas reserves is the San

Miguel Basin and USFS lands only make up 1.4 percent of that population (GSRSC

2005).

The NPS is responsible for managing 2 percent of occupied Gunnison

sage-grouse habitat (GSRSC 2005).  The NPS Organic Act (39 Stat. 535; 16 U.S.C. 1, 2,

3, and 4) states that NPS will administer areas under their jurisdiction "...by such means

and measures as conform to the fundamental purpose of said parks, monuments, and

107

reservations, which purpose is to conserve the scenery and the natural and historical objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." Lands in the Black Canyon of the Gunnison National Park and the Curecanti Recreation Area include portions of occupied habitat of the Crawford and Gunnison Basin populations. Gunnison sage-grouse conservation measures are not included in the General Management Plan, but are included in current RMPs. They also will be incorporated when the RMPs are revised or amended. The NPS is currently following conservation measures in the local conservation plans and the RCP (Myron Chase, NPS, pers. comm. 2005).

The NRCS of the U.S. Department of Agriculture assists farmers, ranchers, and other private landowners in reducing threats to sage-grouse habitat by providing technical assistance and financial resources to support management and habitat restoration efforts, helping farmers and ranchers maintain and improve habitat as part of larger management efforts, and developing technical information to assist NRCS field staff with sage-grouse considerations when working with private landowners. The NRCS has the Wildlife Habitat Incentive Program and Environmental Quality Incentive Program that can be used to fund projects implementing conservation measures in Gunnison sage-grouse habitat. The Service's Partners for Fish and Wildlife Program also can fund conservation measures for Gunnison sage-grouse.

Conclusion for Factor D

108

Gunnison sage-grouse conservation has been addressed through numerous local, State, and Federal plans, laws, regulations, and policies.  Current county regulations provide some ability to limit impacts to sage-grouse habitat from housing developments where the area is zoned for under 14 ha (35 ac) per house.  Both counties where the largest populations of Gunnison sage-grouse occur have Land Use Resolutions or Codes to promote Gunnison sage-grouse conservation.  The CDOW and UDWR have implemented and continue to pursue conservation easements in Colorado and Utah, respectively, to conserve Gunnison sage-grouse habitat and the species' needs.  State wildlife regulations provide opportunities to address other conservation needs of the species.

Impacts resulting from current leases for oil and gas development on Federal lands may still be regulated at the "Application for Permit to Drill" stage as protective stipulations are applied through guidance in IM CO-2005-038.  Grazing impacts can be adequately regulated with existing laws, regulations, and policies.  Laws, regulations, and policies guiding development and implementation of land management plans for all the Federal agencies, will address conservation of Gunnison sage-grouse habitat.  Given that implementation of the aforementioned laws, regulations, and policies has not resulted in a decline within recent timeframes, as analyzed by Garton (2005) and, based on the best scientific and commercial data available we have concluded that inadequacy of existing regulatory mechanisms does not threaten or endanger the sage-grouse throughout all or a significant portion of its range in the foreseeable future.

109

**E.  Other Natural or Manmade Factors Affecting Its Continued Existence.**

Other factors potentially affecting the Gunnison sage-grouse's continued existence include genetic risks, drought, recreational activities, and pesticides.

Genetics

Small populations face three primary genetic risks: inbreeding depression; loss of genetic variation; and accumulation of new mutations.  Inbreeding can have individual and population consequences by either increasing the phenotypic expression of recessive, deleterious alleles (Charlesworth and Charlesworth 1987) or by reducing the overall fitness of individuals in the population.  Estimates for how large populations must be to prevent inbreeding depression vary dramatically.  For example, Lande (1995b), Lynch et al. (1995), and Charlesworth et al. (1993) suggested that populations will need to have a genetic effective population size of 1,000, 100, and 12 individuals, respectively, to avoid accumulating deleterious mutations.  However, if mutation accumulation is a threat to small populations, it is expected to take hundreds to thousands of generations to occur (GSRSC 2005).  No information is available to evaluate the threat of inbreeding to Gunnison sage-grouse or whether inbreeding depression is of concern.

Small, isolated, populations may suffer from loss of genetic diversity (Trombulak et al. 2004), causing physical problems and eventual extirpation of the population.

110

Adaptation to local changes in the environment is more likely to occur if there is high genetic variation among individuals in a population (GSRSC 2005). In principle, populations with high genetic variation will have a greater chance of coping with climate change, exotic diseases, or other stresses (GSRSC 2005).

As a result of habitat fragmentation, Gunnison sage-grouse have been isolated into several populations with little or no genetic interchange between them and little genetic diversity (Kahn et al. 1999). Oyler-McCance et al. (2005) investigated population structure of Gunnison sage-grouse using mitochondrial DNA sequence data from seven geographic areas (Cerro Summit-Cimarron-Sims Mesa, Crawford, Gunnison Basin, Curecanti area of the Gunnison Basin, Monticello-Dove Creek, Piñon Mesa, and San Miguel Basin). They found that levels of genetic diversity were highest in the Gunnison Basin, which consistently had more alleles and contained most of the alleles present in other populations. All other populations had much lower levels of diversity. These lower diversity levels are linked to small population sizes and a high degree of geographic isolation. Collectively, the smaller populations contain 24 percent of the genetic diversity of the species. Individually, each of the small populations may not be important genetically to the survival of the species, but collectively it is possible that 24 percent of the genetic diversity is important to future rangewide survival of the species. All populations sampled were found to be genetically discrete units (Oyler-McCance et al. 2005), so the loss of any of them would result in a decrease in genetic diversity of the species. In addition, multiple populations across a broad geographic area provide insurance against a single catastrophic event (such as drought),

111

and the aggregate number of individuals across all populations increases the probability of demographic persistence and preservation of overall genetic diversity by providing an important genetic reservoir (GSRSC 2005).

Historically, the Monticello-Dove Creek, San Miguel, Crawford, and Piñon Mesa populations were larger and were connected through more contiguous areas of sagebrush habitat. Oyler-McCance et al. (2001) documented a 20 percent loss and 37 percent fragmentation of sagebrush habitat in southwestern Colorado between the late 1950s and the early 1990s, which led to the current isolation of these populations and is consistent with the documented low amounts of gene flow and isolation by distance (Oyler-McCance et al. 2005). However, Oyler-McCance et al. (2005) noted that a few individuals in their analysis appeared to have the genetic characteristics of a population other than their own, suggesting they were dispersers from a different population. Two probable dispersers were individuals moving from San Miguel into Monticello-Dove Creek and Crawford. The San Miguel population itself appeared to have a mixture of individuals with differing probabilities of belonging to different clusters. This suggests that the San Miguel population may act as a conduit of gene flow among the satellite populations surrounding the larger population in Gunnison. Additionally, Oyler-McCance et al. (2005) found that another potential disperser into Crawford was from the Gunnison Basin. This is not surprising given their close geographic proximity.

While no consensus exists on the population size needed to retain a level of genetic diversity that maximizes evolutionary potential (i.e., the ability to adapt to local

112

changes), suggestions range from 500-5,000 individuals (Franklin 1980; Lande and

Barrowclough 1987; Lande 1995a).  Similarly, population sizes in the upper 100s-1,000s

are reported to be required for a higher probability of persistence over 100 years (Shaffer

1987).  While the persistence of wild populations is usually influenced more by

ecological rather than by genetic effects, once they are reduced in size, genetic factors

become increasingly important (Lande 1995a).

The population viability analysis for Gunnison sage-grouse presented in the RCP

stated that there is less than 1 percent probability that the Gunnison Basin population of

the sage-grouse will go extinct in the next 50 years (GSRSC 2005).  As discussed in the

Background section, Garton's (2005) analysis of population trends also supports a

relatively stable rangewide population, as well as a stable Gunnison Basin population for

the last 10 years and longer.  The RCP (GSRSC 2005) identified the need to increase

gene flow among populations by improving corridors for between-population movement

or translocation of selected genotypes from the Gunnison Basin to smaller populations,

and vice-versa for population augmentation and maintenance of genetic diversity.

Drought/Weather

Drought is a common occurrence throughout the range of the Gunnison

sage-grouse (Braun 1998).  Drought reduces vegetation cover (Milton et al. 1994;

Connelly et al. 2004), potentially resulting in increased soil erosion and subsequent

reduced soil depths, decreased water infiltration, and reduced water storage capacity.

113

Drought also can exacerbate other natural events, such as defoliation of sagebrush by insects.  Approximately 2,544 sq km (982 sq mi) of sagebrush shrublands died in Utah in 2003 as a result of drought and infestations with the Aroga (webworm) moth (Connelly et al. 2004).  Sage-grouse are affected by drought through the potential loss of vegetative habitat components and reduced insect production (Connelly and Braun 1997).  These habitat component losses can result in declining sage-grouse populations due to increased nest predation and early brood mortality associated with decreased nest cover and food availability (Braun 1998; Schroeder et al. 1999).

Greater sage-grouse populations declined during the 1930s period of drought (Patterson 1952; Willis et al. 1993; Braun 1998).  Drought conditions in the late 1980s and early 1990s also coincided with a period when sage-grouse populations were at historically low levels (Connelly and Braun 1997).  Although drought has been a consistent and natural part of the sagebrush-steppe ecosystem, drought impacts on sage-grouse can be exacerbated when combined with other habitat impacts that reduce cover and food (Braun 1998).

Drought began in the Gunnison Basin at least by 2001 and was most severe in 2002 (BLM, unpubl. lit. 2005j).  The drought fully or partially killed approximately 40,470 ha (100,000 ac) (17 percent) of sagebrush in occupied range of the sage-grouse in the Gunnison Basin in 2002 (BLM, unpubl. lit. 2005j).  About 35,000 ha (86,000 ac) had significant dieback and 5,700 ha (14,000 ac) had moderate to light dieback of sagebrush and other shrubs.  An estimated 4,000 ha (10,000 ac) (2 percent) had substantial mortality

114

of grasses and forbs. <u>Phlox</u> spp., a forb that is important sage-grouse forage in the spring and summer, had 50- to 80-percent mortality in areas where sagebrush dieback was over 50 percent (BLM, unpubl. lit. 2005j). In 2003, 48 percent of all sagebrush plants were defoliated and 17 percent were dead (Wenger <u>et al.</u> 2003). By 2004, there was only modest recovery with increased moisture (BLM, unpubl. lit. 2005j). By 2005, sagebrush plants that were partially killed were recuperating (Sandy Borthwick, BLM, pers. comm. 2005).

The drought also impacted sagebrush communities in the San Miguel Basin population, particularly in the Dry Creek Basin area. During the late fall and winter of 2003-2004, CDOW conducted sagebrush transects in Dry Creek Basin to monitor drought-related impacts. Approximately 75 percent of the sagebrush canopy in Dry Creek Basin was lost to sagebrush defoliation due to drought (Wenger <u>et al.</u> 2003). Although most plants survived and exhibited signs of recovery in 2003, large areas, particularly at low elevation, lost over 90 percent of the plants (Wenger <u>et al.</u> 2003). These communities started to recover in the spring of 2004, and plants that survived had heavy seed crops in the fall of 2004. Recuperation of these communities continued in 2005 (Kathy Nickell, BLM, pers. comm. 2005). Detrimental effects on Gunnison sage-grouse, particularly on the birds attending the Desert Lek in Dry Creek Basin were observed after the drought. This lek had the greatest number of males counted (12-18) of the 3 leks in the population from 1996 through 2002, but was reduced to 0 in 2004 and 2005 (CDOW, unpubl. lit. 2005b).

115

In the Monticello group, most nesting areas are in poor condition due to lack of herbaceous cover as a result of drought and grazing (GSRSC 2005). Long-term drought also has reduced the availability of wet meadow habitat for brood-rearing (GSRSC 2005). Rains in 2005 have replenished some wet meadow habitats or riparian areas (Tammy Wallace, BLM, pers. comm. 2005). In the Piñon Mesa population the recent drought may have caused some limited, but unquantified, sagebrush and herbaceous understory die-back at lower elevations. Most plants affected do not appear to have died completely and sagebrush conditions have improved in 2004 and 2005 (CDOW, unpubl. lit. 2005g). Drought has been identified as a primary threat to the Crawford population (Crawford Area Conservation Plan 1998, GSRSC 2005). Drought conditions occurred there between 1999 and 2003 (Jim Ferguson, BLM, pers. comm. 2005). No quantitative habitat data are available, but little grass, forb or sagebrush growth occurred during this period (Jim Ferguson, BLM, pers. comm. 2005). Since 1999, lek counts have declined. The BLM cut back on grazing animal unit months and there were no other identifiable negative impacts to BLM lands in the area during this timeframe, suggesting drought as the primary cause of decline (Jim Ferguson, BLM, pers. comm. 2005).

The Gunnison sage-grouse appears capable of enduring moderate or severe, but relatively short-term, drought as observed from persistence of the populations during drought conditions from 1999-2003 throughout much of the range. Habitat appeared to be negatively impacted by drought across a broad area of the Gunnison sage-grouse's range. However, the reduction of sagebrush density in some areas, allowing for greater

116

herbaceous growth, and stimulating the onset of sagebrush seed crops (Wenger et al. 2003) may actually be beneficial to sagebrush habitats over the long term.

Recreation

Studies have determined that non-consumptive recreational activities can degrade wildlife resources, water, and the land by distributing refuse, disturbing and displacing wildlife, increasing animal mortality, and simplifying plant communities (Boyle and Samson 1985). Sage-grouse response to disturbance may be influenced by the type of activity, recreationist behavior, predictability of activity, frequency and magnitude, timing, and activity location (Knight and Cole 1995).

Recreation from off-highway vehicles, hikers, mountain bikes, campers, snowmobiles and other sources has impacted many parts of the range, especially portions of the Gunnison Basin and Pinon Mesa population (BLM, unpubl. lit. 2005j; CDOW, unpubl. lit. 2005g). These activities can result in abandonment of lekking activities and nest sites, energy expenditure reducing survival, and greater exposure to predators (GSRSC 2005). Recreation is a significant land use on lands managed by BLM (Connelly et al. 2004) and recreational use of national forests has increased 76 percent since 1977 (Rosenberg et al. 2004).

Recreational activities within the Gunnison Basin are widespread, occur during all seasons of the year, and have expanded as more people move to the area or come to

117

recreate (BLM, unpubl. lit. 2005i).  A comprehensive plan to manage motorized and

non-motorized recreation is not available for BLM land in the Gunnison Basin, nor has

there been monitoring or research on the extent of impacts (BLM, unpubl. lit. 2005i).

The BLM has seasonal closures on 17 roads with 6 of these protecting leks, but many

more roads provide access to leks (BLM, unpubl. lit. 2005i).  Road closures are

frequently violated (BLM, unpubl. lit. 2005i).  The Gunnison BLM has only one ranger

with responsibility for the Gunnison Basin, Cerro Summit-Carmon-Sims Mesa, and San

Miguel Basin populations, thereby limiting BLM's effectiveness in enforcing road

closures.


Dispersed camping occurs at a low level on public lands in all of the populations,

particularly during the hunting seasons for other species.  A designated campground is

located on BLM land near occupied habitat on Piñon Mesa (BLM, unpubl. lit. 2005j).

No studies on recreational effects in the Piñon Mesa population have occurred. With its

proximity to Grand Junction and expected growth in Mesa County and the Glade Park

area, recreational impacts are expected to increase in the Pinon Mesa population area.


Domestic dogs accompanying recreationists can disturb, harass, displace, or kill

Gunnison sage-grouse.  Authors of many wildlife disturbance studies concluded that dogs

with people, dogs on leash, or loose dogs provoked the most pronounced disturbance

reactions from their study animals (Sime 1999 and references within).  The primary

consequences of dogs being off leash is harassment, which can lead to physiological

118

stress as well as the separation of adult and young birds, or flushing incubating birds from their nest.

Pesticides

Insects are an important component of sage-grouse chick and juvenile diets (Patterson 1952, Klebenow and Gray 1968, Johnson and Boyce 1990, Fischer et al. 1996a).  Insects, especially ants (Hymenoptera) and beetles (Coleoptera), can comprise a major proportion of the diet of juvenile sage-grouse (Patterson 1952) and are important components of early brood-rearing habitats (Drut et al. 1994a); however, most pesticide applications are not directed at control of such resources.  Pesticides are used primarily to control insects causing damage to cultivated crops on private lands and to control grasshoppers (Orthoptera) and Mormon crickets (Mormonius sp.) on public lands. Infestations of Russian wheat aphids (Diuraphis noxia) have occurred in Gunnison sage-grouse occupied range in Colorado and Utah (GSRSC 2005).  Disulfoton, a systemic organophosphate extremely toxic to wildlife, was routinely applied to over a million acres of winter wheat crops to control the aphids during the late 1980s but effects if any are unknown (GSRSC 2005).  One instance of greater sage-grouse mortality was reported following application of organophosphate and carbamate pesticides to cultivated crops in Idaho (Blus et al. 1989),  More recently, an infestation of army cutworms (Euxoa auxiliaries) occurred in sage-grouse habitat along the Utah-Colorado State line. Thousands of acres of winter wheat and alfalfa fields were sprayed with insecticides such

119

as permethrin by private landowners to control them (GSRSC 2005) but again, effects, if any, are unknown.

Use of insecticides to control mosquitoes is infrequent and probably do not have detrimental effects on sage-grouse. Available insecticides that kill adult mosquitoes include synthetic pyrethroids such as permethrin, which are applied at very low concentrations and have very low vertebrate toxicity (Rose 2004). Organophosphates such as malathion have been used at very low rates to kill adult mosquitoes for decades, and are judged relatively safe for vertebrates (Rose 2004).

Conclusion for Factor E

Although genetic consequences of low Gunnison sage-grouse population numbers could express themselves, there is no evidence that genetic factors have thus far caused a threat to the Gunnison sage-grouse and it is unlikely that genetic factors (even without connectivity corridors or population augmentation) will be a threat for many generations. Effects of the severe drought centered on the year 2002 appear to have been ameliorated starting in 2004, and the sage-grouse survived the drought as they have survived other droughts in the past. Despite potentially greater effects to the smaller populations we have no evidence that drought is a threat to the sage-grouse. Although disturbance and habitat destruction, fragmentation, or degradation may result from recreational activities, no studies have been conducted on recreational impacts to Gunnison sage-grouse to demonstrate that recreation is or may become a threat to the species. Based on the

120

available information, there appears to be infrequent use of insecticides in populations of

the Gunnison sage-grouse.  The most likely impact of pesticides on Gunnison

sage-grouse is the reduction of insect prey items.  However, we could find no information

to indicate that use of pesticides, in accordance with their label instructions, is a threat to

Gunnison sage-grouse.  Thus, based on the best scientific and commercial data available,

we have concluded that other natural or manmade factors do not threaten or endanger the

sage-grouse throughout all or a significant portion of its range in the foreseeable future.


Finding


       We have assessed the best scientific and commercial information available and

have determined that the Gunnison sage-grouse is not warranted for listing under the

Endangered Species Act, as amended.  We also no longer consider the species to be a

candidate for listing.  The PVA (GSRSC 2005) concluded that the Cerro Summit-

Cimarron-Sims Mesa and Poncha Pass populations and the Dove Creek group of the

Monticello-Dove Creek population have a high probability of extirpation in the

foreseeable future. These populations do not comprise a significant portion of the range

of the Gunnison sage-grouse, as they are small and isolated.  However, we continue to

encourage CDOW and other interested parties to take necessary management actions to

prevent their extirpation as the genetic material from these populations will be helpful in

insuring the species does not become threatened or endangered in the future.  For the

remaining populations, numerous impacts pose potential threats to the Gunnison

sage-grouse when considered under the listing factors.  However, there is no evidence

**Comment [TG98]:** Rewrite to include these populations as stable and viable based on recent history. WECANNOT REVISE AS REQUESTED BECAUSE THE PVA CONCLUDES OTHERWISE.

121

that the impacts are causing rangewide threats to the sage-grouse, or are likely to cause them in the foreseeable future.

If impacts to the species rise to the level of being a threat in the future or if the Service finds that the populations are declining significantly faster than they were found to have done in the past (Garton 2005), the Service will reexamine the listing status of the Gunnison sage-grouse.  We will continue to monitor the status of the Gunnison sage-grouse and its habitat and will continue to accept additional information and comments from all governmental agencies, the scientific community, industry, or any other interested party concerning this finding.

References

A complete list of references used in the preparation of this finding is available upon request from the Western Colorado Field Office (see ADDRESSES section).

Author

The primary author of this finding is the staff of the Western Colorado Ecological Services Field Office (see ADDDRESSES).

Authority

122

The authority for this action is the Endangered Species Act of 1973, as amended

(16 U.S.C. 1531 et seq.).

Gunnison sage-grouse are smaller than greater sage-grouse (C. urophasianus), weighing approximately 1/3 less (Hupp and Braun 1991; Young et al. 2000). Their filoplumes (specialized feathers on the neck) are longer and give the appearance of a "ponytail" during the courtship display, unlike the filoplumes on greater sage-grouse. Gunnison sage-grouse retrices (tail feathers) have distinctive barring, unlike the mottled pattern on greater sage-grouse retrices (Young et al. 2000). Gunnison sage-grouse mating displays are slower than greater sage-grouse (Young et al. 2000). Mating calls also are distinct. Gunnison sage-grouse "pop" their apteria nine times instead of twice like greater sage-grouse (Young et al. 2000). Young (1994) found that female Gunnison sage-grouse avoided playbacks of male greater sage-grouse mating calls. She concluded that differences in courtship vocalizations were likely a barrier to mating between Gunnison and greater sage-grouse. The DNA sequence information from mitochrondrial and nuclear genomes indicate there is no gene flow between Gunnison and greater sage-grouse (Oyler-McCance et al. 1999; Young et al. 2000).

Oyler-McCance et al. (2005) conducted a genetic analysis of Gunnison sage-grouse populations using mitochondrial DNA sequence and nuclear microsatellite data. The Cerro Summit-Cimarron-Sims Mesa population was not included in this analysis due to inadequate sample sizes. The Poncha Pass population also was not included as it is composed of individuals transplanted from Gunnison Basin. In general, Gunnison sage-grouse have low levels of genetic diversity when compared to the greater sage-grouse (Oyler-McCance et al. 2005). Within the species, the Gunnison Basin birds had higher levels of genetic diversity than the other populations. Lower genetic diversity is consistent with small population size and geographical isolation (Oyler-McCance et al. 2005).

123

Oyler-McCance et al. (2005) concluded that gene flow among populations of Gunnison sage-grouse is limited.  The loss of genetic diversity in the Piñon Mesa and Monticello-Dove Creek populations suggests that habitat fragmentation has resulted in cessation or near cessation of emigration and immigration from and to other populations because genetic differences between populations of Gunnison sage-grouse increase as the geographical separation of the populations increases (Oyler-McCance et al. 2005).  This is supported by the documented loss and fragmentation of sagebrush vegetation in southwestern Colorado (Oyler-McCance et al. 2001).  It suggests that habitat fragmentation is precluding movements among populations.  Occasional migration among some populations may still occur (Oyler-McCance et al. 2005).  Gunnison sage-grouse are known to migrate several miles between areas within the San Miguel Basin population (Apa 2004), crossing unsuitable habitat such as the San Miguel River valley and roads.  Each of the six groups in the San Miguel Basin population are separated by 1-4 air miles (GSRSC 2005).

124

Dated:_____

Signed:_____

     Director, U.S. Fish and Wildlife Service

~~[Endangered and Threatened Wildlife and Plants; 12-Month Finding to List the Gunnison~~

~~Sage-grouse as Threatened or Endangered]~~

125

| Page 30: [1] Deleted | Julie MacDonald | 3/23/2006 10:28:00 AM |
|---|---|---|

-McCance et al. (2005) conducted a genetic analysis of Gunnison sage-grouse

populations using mitochondrial DNA sequence and nuclear microsatellite data.  The

Cerro Summit-Cimarron-Sims Mesa population was not included in this analysis due to

inadequate sample sizes.  The Poncha Pass population also was not included as it is

composed of individuals transplanted from Gunnison Basin.  In general, Gunnison

sage-grouse have low levels of genetic diversity when compared to the greater

sage-grouse (Oyler-McCance et al. 2005).  Within the species, the Gunnison Basin birds

had higher levels of genetic diversity than the other populations.  Lower genetic diversity

is consistent with small population size and geographical isolation (Oyler-McCance et al.

2005).

| Page 34: [2] Deleted | Julie MacDonald | 3/23/2006 11:03:00 AM |
|---|---|---|

While sage-grouse are dependent on interconnected expanses of sagebrush

(Patterson 1952; Connelly et al. 2004), data are not available regarding minimum

sagebrush patch sizes to support populations of sage-grouse.  Estimating the impact of

habitat fragmentation on sage-grouse is complicated by time lags in response to habitat

changes, particularly since sage-grouse will continue to return to altered breeding areas

(leks, nesting areas, and early brood-rearing areas) due to strong site fidelity despite

nesting or productivity failures (Wiens and Rotenberry 1985).[JM1]

| Page 34: [3] Comment [JM41] | Julie MacDonald | 4/5/2006 3:17:00 PM |
|---|---|---|

Moved, not deleted. IT WAS MOVED TO END OF DOC.  DELETED THE IRRELEVANT
SENTENCES.

| Page 34: [4] Deleted | Julie MacDonald | 3/23/2006 10:49:00 AM |
|---|---|---|

-McCance et al. (2005) concluded that gene flow among populations of Gunnison

sage-grouse is limited.  The loss of genetic diversity in the Piñon Mesa and

Monticello-Dove Creek populations suggests that habitat fragmentation has resulted in cessation or near cessation of emigration and immigration from and to other populations because genetic differences between populations of Gunnison sage-grouse increase as the geographical separation of the populations increases (Oyler-McCance et al. 2005). This is supported by the documented loss and fragmentation of sagebrush vegetation in southwestern Colorado (Oyler-McCance et al. 2001). It suggests that habitat fragmentation is precluding movements among populations. Occasional migration among some populations may still occur (Oyler-McCance et al. 2005). Gunnison sage-grouse are known to migrate several miles between areas within the San Miguel Basin population (Apa 2004), crossing unsuitable habitat such as the San Miguel River valley and roads. Each of the six groups in the San Miguel Basin population are separated by 1-4 air miles (GSRSC 2005).

| Page 34: [5] Comment [ES42] | Ecological Services | 4/5/2006 3:17:00 PM |
|---|---|---|

DID NOT ACCEPT BECAUSE SOURCE NOT PEER REVIEWED OR PUBLISHED AND ASSERTION NOT DOCUMENTED.

| Page 34: [6] Comment [ES43] | Ecological Services | 4/5/2006 3:17:00 PM |
|---|---|---|

NOT ABLE TO ACCEPT. NO CITATIONS AND VALIDITY NOT ESTABLISHED.

| Page 34: [7] Comment [JM44] | Julie MacDonald | 4/5/2006 3:17:00 PM |
|---|---|---|

Moved  DID NOT FIND WHERE MOVED. THUS, KEPT HERE.

| Page 34: [8] Deleted | Julie MacDonald | 3/23/2006 11:34:00 AM |
|---|---|---|

increased predation and reduced nest success due to predators associated with agriculture (Connelly et al. 2004). Past

| Page 34: [9] Deleted | Julie MacDonald | 3/23/2006 11:09:00 AM |
|---|---|---|

development of irrigation projects to support agricultural production has resulted in additional sage-grouse habitat loss (Braun 1998).

| Page 34: [10] Deleted | Julie MacDonald | 3/23/2006 11:41:00 AM |
|---|---|---|

Though some crops such as alfalfa (Medicago sativa) and young bean sprouts (Phaseolus spp.) are eaten or used for cover by sage-grouse (C. Braun, CDOW, pers.

comm. 1998), crop monocultures do not provide adequate year-round food or cover

(GSRSC 2005).  Gunnison sage-grouse will use hay pastures for foraging within about

50 m (165 ft) of the edge of the field but do not forage further into the pasture due to lack

of suitable habitat (Gunnison Basin Conservation Plan 1997).

| Page 37: [11] Comment [JM53] | Julie MacDonald | 4/5/2006 3:17:00 PM |
|---|---|---|

The cite does not support this.  They speak generally of roads being a barrier and reference beetles, small mammals and amphibians.  However, there is no reference to birds either specifically or generally, and none of the other cites document roads being a barrier for grouse, which makes sense because they can fly right over.  THIS PARAGRAPH IS ABOUT IMPACTS OF ROADS IN GENERAL.  ADDED SENTENCE AT END OF PARA TO CLARIFY.

| Page 37: [12] Comment [JM54] | Julie MacDonald | 4/5/2006 3:17:00 PM |
|---|---|---|

Cites do not support the statement.  SEE RESPONSE TO PREVIOUS COMMENT.

| Page 37: [13] Comment [JM55] | Julie MacDonald | 4/5/2006 3:17:00 PM |
|---|---|---|

Cites do not support the statement.  RO CHECKED CITES; THEY DO SUPPORT IT.

| Page 37: [14] Deleted | Julie MacDonald | 3/23/2006 12:08:00 PM |
|---|---|---|

facilitation of mammalian (Forman and Alexander 1998; Forman 2000)

| Page 37: [15] Deleted | Julie MacDonald | 3/23/2006 12:08:00 PM |
|---|---|---|

and corvid predation (Connelly et al. 2000b; Aldridge and Brigham 2003;

Connelly et al. 2004)

| Page 37: [16] Comment [JM56] | Julie MacDonald | 4/5/2006 3:17:00 PM |
|---|---|---|

Forman and Alexander 1998 state specifically that roads are not an important conduit for plans (pp 211)  SEE P.210 FOR SPECIFIC LANGUAGE.

| Page 37: [17] Comment [JM57] | Julie MacDonald | 4/5/2006 3:17:00 PM |
|---|---|---|

Forman 2000 does not address plants at all, but primarily focuses on noise.  SEE P.33 FOR PLANT DISCUSSION

| Page 37: [18] Comment [JM58] | Julie MacDonald | 4/5/2006 3:17:00 PM |
|---|---|---|

Does not support, correlates wires and corvid predation, not roads.  DELETED CITE

| Page 37: [19] Comment [JM59] | Julie MacDonald | 4/5/2006 3:17:00 PM |
|---|---|---|

Does not support other than uses a model that includes roads as a component.  THE MODEL IS STRONG, HAS WITHSTOOD PEER REVIEW AND IS SUBMITTED FOR PUBLICATION.

| Page 37: [20] Comment [JM60] | Julie MacDonald | 4/5/2006 3:17:00 PM |
|---|---|---|

They looked at mining noise, and how it might affect lek use, and got not results. THE STUDY LOOKED AT NOISE FROM ROADS.  THE RESULTS WERE INCONSISTENT BUT SUPORT USE AS CITED.

| Page 37: [21] Comment [JM61] | Julie MacDonald | 4/5/2006 3:17:00 PM |
|---|---|---|

Lyon and Anderson made no such suggestion.  They examined nesting effects of roads and found no significant different between disturbed and undisturbed hens.  Although they do go on to justify their difference as biologically significant, I'm not sure what that means when you are trying to distinguish between a real difference and random noise in the system.  ADDED ALTERNATE CITATION

| Page 37: [22] Deleted | Julie MacDonald | 3/23/2006 12:24:00 PM |
|---|---|---|

Lyon and Anderson (2003) suggested that roads may be the primary impact of oil

and gas development to greater sage-grouse, due to their persistence and continued use

even after drilling and production have ceased[JM2].

| Page 37: [23] Comment [JM62] | Julie MacDonald | 4/5/2006 3:17:00 PM |
|---|---|---|

Page 344 of the cite.   EDIT AS WRITTEN MAKES SENTENCE MISLEADING.   REWORDED
ORIGINAL SENTENCE TO CLARIFY.

| Page 39: [24] Comment [JM68] | Julie MacDonald | 4/5/2006 3:17:00 PM |
|---|---|---|

It is unclear to me why we are cataloguing the amount of roads in the affected areas.  The roads are there,
the habitat fragmented, and the real question is whether the grouse is threatened by the current situation or
by new road construction that is planned. DELETED DATA ON MILES OF ROADS.  RO KEPT OYLER
CITE BECAUSE IT RESPONDS TO THE LAST SENTENCE IN THIS COMMENT.

| Page 39: [25] Deleted | Julie MacDonald | 3/23/2006 7:12:00 PM |
|---|---|---|

development within Gunnison sage-grouse habitats precluded movement of

sage-grouse between the resultant patches, presumably to minimize their exposure to

predation (Oyler-McCance et al. 2001).

| Page 39: [26] Deleted | Julie MacDonald | 3/23/2006 7:17:00 PM |
|---|---|---|

Basin is bisected by State Highway 50, a major highway with high traffic volume.

Two other State highways further intersect this population.  The BLM estimates that

paved, gravel, and dirt roads total 7,400 km (4,600 mi) in the current range in the

Gunnison Basin (BLM, unpubl. lit. 2005b), although the Colorado Department of

Transportation (CDOT) (2005) reports only 2,650 km (1,650 mi) for all of Gunnison

County.  There are 2,050 km (1,300 mi) of roads in San Miguel County (CDOT 2005).

| Page 39: [27] Deleted | Julie MacDonald | 3/23/2006 7:23:00 PM |
|---|---|---|

Only two sage-grouse have been killed on the roads in Dry Creek Basin since

2003 (CDOW, unpubl. lit. 2006).  In the combined San Miguel Basin, Crawford, and

Cerro Summit-Cimarron-Sims Mesa populations there are 1,350 km (840 mi) of paved

and unpaved roads on BLM lands, which accounts for 38 percent of the current range in

those populations.  Mileage for these roads was not available by Gunnison sage-grouse

population.  San Miguel, Delta, and Montrose Counties contain a total of 9,400 km (5,830 mi) of roads (CDOT 2005) some of which pass through the current range (Jim Ferguson, BLM, pers. comm. 2005).  One paved road (Highway 92) occurs on the southeastern edge of the current range in the Crawford population, along with a few dirt and several two-track roads of unknown mileage.

Two paved highways run through the current range in the Monticello group.  Dirt roads and other minor roads occur throughout the Monticello group at approximately every 0.8-1.6 km (0.5-1 mi) (San Juan County GSWG, unpubl. lit. 2005) causing loss of habitat, habitat fragmentation, disturbance from traffic, increased incursion of weeds and the potential for increased predation.  No

| Page 39: [28] Deleted | Julie MacDonald | 3/23/2006 7:18:00 PM |
|---|---|---|

paved roads occur in the current range for the Piñon Mesa population, but with projected human population increases of 91 percent by 2030 (Colorado Department of Local Affairs [CDLA] 2004), we anticipate that new or existing roads will be paved in the foreseeable future.  A moderate number of dirt roads are on public and private land, but we do not know the number of miles they cover.

| Page 39: [29] Deleted | Julie MacDonald | 3/23/2006 7:23:00 PM |
|---|---|---|

The cumulative impact of roads through sage-grouse habitat has not been measured, so we do not know the magnitude of this potential threat to the species.



**Susan Linner/R6/FWS/DOI**
04/06/2006 08:24 AM

To  Brian T Kelly/R6/FWS/DOI@FWS, Pat Mehlhop/R6/FWS/DOI@FWS, Robert Dach/R6/FWS/DOI@FWS, Al Pfister/R6/FWS/DOI@FWS

cc

bcc

Subject  Fw: Not over yet

I know that time is short for this particular finding and WO will do what they have to do today to get it out, but I'm very concerned about this direction in peer review that Ben Jesup is suggesting.  We ask for peer review because the reviewers are **independent** scientists who should be **experts** on the subject.  Now we're being asked to critique their scientific opinions.  In my opinion that defeats the whole purpose of the peer review process and I think its a very slippery slope to go down.  If we start criticizing PhD scientists for their expert opinions we are soon going to find very few scientists who are willing to do peer review and, of greater concern, we lose the independence of the peer review by molding their comments into our own mindset.  I think someone should take this issue to the WO, maybe on the ESA conference call if you still have those, and at least try to get a clearer idea of why we're doing this.

Susan

Susan Linner, Field Supervisor
Colorado Ecological Services Office
134 Union Blvd., Suite 670
PO Box 25486 DFC
Denver, CO  80225
phone: 303-236-4773
fax: 303-236-4005

----- Forwarded by Susan Linner/R6/FWS/DOI on 04/06/2006 08:18 AM -----



**Kurt Johnson/ARL/R9/FWS/DOI**
04/06/2006 08:09 AM

To  Brian T Kelly/R6/FWS/DOI@FWS

cc  Pat Mehlhop/R6/FWS/DOI@FWS, Robert Dach/R6/FWS/DOI@FWS, Susan Linner/R6/FWS/DOI@FWS, Terry Ireland/R6/FWS/DOI@FWS, Bridget Fahey/R6/FWS/DOI@FWS, Douglas Krofta/ARL/R9/FWS/DOI@FWS

Subject  Not over yet

We still have a ways to go on this thing.  Ben Jesup has provided comments which I am trying to address.  I will probably need your help from time to time, today, so I hope that someone will be available to do so.  Here is my first help request:

The following text is on page 30 of the revised finding--

However, given that two peer reviewers supported the Gunnison sage-grouse trend analysis and a similar approach was peer reviewed by the Ecological Society of America in the greater sage-grouse conservation agreement (Connelly et al. 2004), and the fact that the questions raised by the peer reviewers would require additional information that we do not currently have, Garton (2005) constitutes the best currently available information.

Ben's comments are as follows:  He circled the words *peer reviewed* in the first line and wrote "so was

this.  The issue is whether it passed w/flying colors then..."  Further along Ben bracketed the words *the fact that the questions raised by the peer reviewers would require additional information that we do not currently have, Garton (2005) constitutes the best currently available information.*  and wrote "This is kind of weak.  We can't substantively address **any** of the concerns raised?  We have no expert opinion as to whether these concerns have merit? (We're supposed to be the expert agency...)    But do the criticisms undercut the weigfht we can give it in our analysis?

**TASK:  PLEASE ADDRESS BEN'S COMMENTS/CONCERNS**


Brian T Kelly/R6/FWS/DOI



| | |
|---|---|
| **Brian T Kelly/R6/FWS/DOI**<br>04/05/2006 06:17 PM | To  Al Pfister/R6/FWS/DOI@FWS, Terry Ireland/R6/FWS/DOI@FWS, Pat Deibert/R6/FWS/DOI@FWS, Pat Mehlhop/R6/FWS/DOI@FWS, Robert Dach/R6/FWS/DOI@FWS, Kurt Johnson/ARL/R9/FWS/DOI@FWS |
| | cc  Chris Nolin/ARL/R9/FWS/DOI@FWS, Julie Lyke/R6/FWS/DOI@FWS, Susan Linner/R6/FWS/DOI@FWS |
| | Subject  A VERY BIG THANK YOU |


I suppose this is one of the treats I get as Acting ARD, but I just want to pass on to you how grateful I am for the effort you all put in to getting us to, in my judgement, a very good product in the revised Gunnison Sage Grouse Finding given the very difficult timeline/workload we had.   I read it this AM and found it to be well done given the volume of information to consider and the time you had to do it in.   I asked for a few changes and those were diligently put in and the finding moved along to DC.    Very well done everyone!

Brian



**Kurt
Johnson/ARL/R9/FWS/DOI**

04/06/2006 09:12 AM

To   Robert Dach/R6/FWS/DOI@FWS

cc   Brian T Kelly/R6/FWS/DOI@FWS, Bridget
     Fahey/R6/FWS/DOI@FWS, Douglas
     Krofta/ARL/R9/FWS/DOI@FWS, Pat

bcc

Subject   Re: Next #1 📄

Done!

Robert Dach/R6/FWS/DOI



**Robert Dach/R6/FWS/DOI**

04/06/2006 11:08 AM

To   Kurt Johnson/ARL/R9/FWS/DOI@FWS

cc   Brian T Kelly/R6/FWS/DOI@FWS, Bridget
     Fahey/R6/FWS/DOI@FWS, Douglas
     Krofta/ARL/R9/FWS/DOI@FWS, Pat
     Mehlhop/R6/FWS/DOI@FWS, Susan
     Linner/R6/FWS/DOI@FWS, Terry
     Ireland/R6/FWS/DOI@FWS

Subject   Re: Next #1 📄

Delete the paragraph - it gives data by county, but the rest of the section gives data by grouse populations which seems more pertinent anyway.  Plus, we make the same conclusion later in this section so we lose nothing by deleting the paragraph.

Also, note typo in last paragraph of section on pg 35:  (S. McCall, Bureau of Reclamation, pers. comm.. 2005) - has 2 periods after comm.

Bob Dach
Mountain Prairie Region Office
134 Union Blvd., Suite 645
Lakewood, CO  80228
303-236-4264
Fax:  303-236-0027
Kurt Johnson/ARL/R9/FWS/DOI



**Kurt
Johnson/ARL/R9/FWS/DOI**

04/06/2006 08:56 AM

To   Robert Dach/R6/FWS/DOI@FWS

cc   Brian T Kelly/R6/FWS/DOI@FWS, Bridget
     Fahey/R6/FWS/DOI@FWS, Douglas
     Krofta/ARL/R9/FWS/DOI@FWS, Pat
     Mehlhop/R6/FWS/DOI@FWS, Susan
     Linner/R6/FWS/DOI@FWS, Terry
     Ireland/R6/FWS/DOI@FWS

Subject   Next #1

Acreage in cropland declined from 1992 to 1997 in Delta, Gunnison, Mesa, Montrose, and Saguache counties by 3, 22, 6, 17, and 10 percent, respectively (Colorado Department of Agriculture 2004), and it increased by 28 percent in San Miguel County. Acreage in pastureland also decreased from 1992-1997 in Gunnison, Mesa, Montrose, and San Miguel counties, by 20, 6, 21, and 13 percent, respectively, and increased in Delta County by 7 percent and Saguache County by 1 percent. We have no data to indicate what has happened to lands taken out of cropland or pastureland, nor any subsequent beneficial or detrimental impacts to Gunnison sage-grouse.

Ben bracketed the last sentence and wrote: "OK, so why is this paragraph relevant then? (perhaps because the decrease in land under agricultural use suggests there will be little future conversion of sagebrush to ag — and maybe housing will be built in ex-ag. areas instead of sagebrush — but if that's is what you think you must say so.

TASK: ADDRESS BEN'S COMMENT

**Al Pfister/R6/FWS/DOI**

04/06/2006 10:14 AM

To  Robert Dach/R6/FWS/DOI@FWS

cc  Pat Mehlhop/R6/FWS/DOI@FWS, Terry
Ireland/R6/FWS/DOI@FWS, Susan
Linner/R6/FWS/DOI@FWS

bcc

Subject  Re: Fw: Next #4

Sixty-nine percent of the current range within the Gunnison Basin is under public ownership.
However, 37 percent of leks, 33 percent of nesting and brood-rearing areas, and 31 percent of
winter range are privately owned (GSRSC 2005). Much of the riparian habitat, including some
lek sites, north of the town of Gunnison, is privately owned and ***is currently under some
development pressure*** . "Single family lots are being developed throughout this riparian area."
However, there were no new platted subdivisions from 2002-2004 in the current species range in
Gunnison County (Gunnison County, unpubl. lit. 2003; Paul Jones, CDOW, pers. comm. 2005) (
This last statement/sentence leads to confusion and should be deleted it does not accurately
reflect the effects of development on grouse, and without going into all the subtleties it should be
deleted )

The reason the statement is cryptic is that we CANNOT say that it isn't a problem. This particular
drainage is under intense development pressure, so much so that the Gunnison Basin Working Group
Research Sub-committee wrote that "further fragmentation could jeopardize population. It is one of the
three highest priority private lands area for protection in Basin"


Al Pfister
Western Colorado Supervisor
Western Colorado Office - USFWS
Grand Junction, CO

(970) 243-2778 - phone ext. 29
(970) 245-6933 - fax
Robert Dach/R6/FWS/DOI



**Robert Dach/R6/FWS/DOI**

04/06/2006 09:25 AM

To  Al Pfister/R6/FWS/DOI@FWS, Terry
Ireland/R6/FWS/DOI@FWS

cc  Pat Mehlhop/R6/FWS/DOI@FWS

Subject  Fw: Next #4


Can you guys give me a parenthetical to explain the statement, something like : (i.e., hotels,
condominiums complexes, new Home Depot?...) and then say why it isn't a problem (which seems to
follow from the tenor of the sentence).

Bob Dach
Mountain Prairie Region Office
134 Union Blvd., Suite 645
Lakewood, CO  80228
303-236-4264
Fax:  303-236-0027



**Kurt Johnson/ARL/R9/FWS/DOI**
04/06/2006 09:16 AM

To  Robert Dach/R6/FWS/DOI@FWS

cc  Brian T Kelly/R6/FWS/DOI@FWS, Bridget Fahey/R6/FWS/DOI@FWS, Douglas Krofta/ARL/R9/FWS/DOI@FWS, Pat Mehlhop/R6/FWS/DOI@FWS, Susan Linner/R6/FWS/DOI@FWS, Terry Ireland/R6/FWS/DOI@FWS

Subject  Next #4

Top of Page 46.  Ben's comment:  "Still think this cryptic statement should be explained."   The cryptic statement is in bold italics:

Sixty-nine percent of the current range within the Gunnison Basin is under public ownership. However, 37 percent of leks, 33 percent of nesting and brood-rearing areas, and 31 percent of winter range are privately owned (GSRSC 2005).  Much of the riparian habitat, including some lek sites, north of the town of Gunnison, is privately owned and ***is currently under some development pressure*** .  However, there were no new platted subdivisions from 2002-2004 in the current species range in Gunnison County (Gunnison County, unpubl. lit. 2003; Paul Jones, CDOW, pers. comm. 2005)

**Pat Mehlhop/R6/FWS/DOI**

04/10/2006 03:06 PM

To   Al Pfister/R6/FWS/DOI@FWS, Susan Linner/R6/FWS/DOI@FWS, Terry Ireland/R6/FWS/DOI@FWS

cc

bcc

Subject   Fw: GSG

FYI.  This afternoon, apparently Julie MacDonald requested an electronic version so she can do some editing.

Patricia Mehlhop, Candidate Conservation Coordinator
303-236-4215
----- Forwarded by Pat Mehlhop/R6/FWS/DOI on 04/10/2006 03:04 PM -----



**Robert Dach/R6/FWS/DOI**

04/10/2006 12:20 PM

To   Pat Mehlhop/R6/FWS/DOI@FWS

cc

Subject   Fw: GSG

Bob Dach
Mountain Prairie Region Office
134 Union Blvd., Suite 645
Lakewood, CO  80228
303-236-4264
Fax:  303-236-0027
----- Forwarded by Robert Dach/R6/FWS/DOI on 04/10/2006 12:20 PM -----



**Thomas Graf/COSO/CO/BLM/DOI@BLM**

04/10/2006 11:40 AM

To   Kurt Johnson/ARL/R9/FWS/DOI@FWS

cc   Robert Dach/R6/FWS/DOI@FWS

Subject   Fw: GSG



----- Forwarded by Thomas Graf/COSO/CO/BLM/DOI on 04/10/2006 11:38 AM -----



**"James.A.Maysonett@usdoj.gov" <James.A.Maysonett@usdoj.gov>**

04/10/2006 11:36 AM

To   "Thomas_Graf@blm.gov" <Thomas_Graf@blm.gov>

cc

Subject   RE: GSG

Please let me know when you find out what's going on.  I will need to inform

the Court and Plaintiffs immediately.  If you want to avoid contempt
proceedings, I strongly recommend we do so today.  It may make sense to
reconsider the decision on providing a .pdf to Plaintiffs as well -- it may
mollify them somewhat and I don't really see a downside (once it's final, that
is).

-- James

-----Original Message-----
From: Thomas_Graf@blm.gov [mailto:Thomas_Graf@blm.gov]
Sent: Monday, April 10, 2006 1:31 PM
To: Maysonett, James A. (ENRD)
Cc: Chuck_Davis@fws.gov
Subject: Fw: GSG
Importance: High

Sorry...I was told on Friday that it was on its way to FR...obviously I was
misinformed.

I'll let you know something as soon as I know anything. Right now I know
nothing.

Thomas R. Graf
c/o U.S. Department of the Interior
Office of the Regional Solicitor
755 Parfet St. Suite 151, Lakewood CO 80215
ph. (303) 231-5353 Ext. 551; fax: (303) 231-5363
----- Forwarded by Thomas Graf/COSO/CO/BLM/DOI on 04/10/2006 11:22 AM -----

|  |  |  |
|--|--|--|
| Chuck Davis/R6/FWS/DOI@FWS | | To |
| | Thomas Graf/COSO/CO/BLM/DOI@BLM | |
| 04/10/2006 09:55 AM | | cc |
| | | Subject |
| | GSG | |

Last we heard the GSG package was still in AS/FWP this morning.

Chuck Davis
Endangered Species Litigation Coordinator
Fish and Wildlife Service Region 6
(303) 236-4253

# Exhibit S:

Letter from DOI Inspector General
Earl E. Devaney
to Congressman Nick J. Rahall, II
(Mar. 23, 2007)